EXHIBIT A

```
 1              UNITED STATED DISTRICT COURT
 2             WESTERN DISTRICT OF LOUISIANA
 3                    MONROE DIVISION
 4

 5   MAYA DETIEGE, DAYNE SHERMAN   CIVIL ACTION NO:
 6                   PLAINTIFFS           3:23-cv-175
 7   VERSUS                      JUDGE DONALD E. WALTER
 8   KATRINA JACKSON, IN HER     MAGISTRATE JUDGE
     OFFICIAL AND INDIVIDUAL     MCCLUSKY
 9   CAPACITIES
10                   DEFENDANT
11   * * * * * * * * * * * * * * * * * * * * * * * *
12
13
14
15        The deposition of KATRINA JACKSON, taken in
16        connection with the captioned cause, pursuant
17        to the following stipulations before Marcia B.
18        Mitchell, Certified Court Reporter, at the
19        office of Hammonds, Sills, Adkins, Guice, Noah
20        & Perkins LLP, 1500 North 19th Street, Suite
21        301, Monroe, Louisiana 71201, on the 18th day
22        of September 2024, beginning at 9:04 a.m.
23
24
25
```

                                            Page  1

**Page 2**

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFFS, MAYA DETIEGE AND DAYNE SHERMAN:
 3    MS. KATIE SCHWARTZMANN
      DIRECTOR AND PROFESSOR OF THE PRACTICE FIRST
 4    AMENDMENT CLINIC
      TULANE LAW SCHOOL
 5    6329 FRERET STREET
      NEW ORLEANS, LOUISIANA  70118-6248
 6    kschwartzmann@tulane.edu
 7
      MR. RICHARD A. CROW
 8    TULANE LAW SCHOOL
      6329 FRERET STREET
 9    NEW ORLEANS, LOUISIANA  70118-6248
10
    FOR THE DEFENDANT, KATRINA JACKSON:
11
      MR. THOMAS M. HAYES IV
12    HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS,
      LLP
13    1500 N 19TH STREET
      SUITE 301
14    MONROE, LOUISIANA  71201
      thayes4@hamsil.com
15
16  ALSO PRESENT:
17    MS. VIRGINIA M. HAMRICK
      FIRST AMENDMENT CLINIC
18    TULANE LAW SCHOOL
      6329 FRERET STREET
19    NEW ORLEANS, LOUISIANA  70118-6248
      vhamrck@tulane.edu
20
      MR. LANDON PETTIGREW
21    MS. ANNA CLEVELAND
      FIRST AMENDMENT CLINIC
22    TULANE LAW SCHOOL
      6329 FRERET STREET
23    NEW ORLEANS, LOUISIANA  70118-6248
24
25
```

**Page 3**

```
 1          S T I P U L A T I O N
 2      It is hereby stipulated by and among counsel
 3  for plaintiff and counsel for defense that the
 4  deposition of
 5          KATRINA JACKSON
 6  be taken before Marcia B. Mitchell, Certified Court
 7  Reporter, by counsel for the plaintiffs for all
 8  purposes, pursuant to notice and to the provisions
 9  of the appropriate statutes of the Code of Civil
10  Procedure of the State of Louisiana.
11      The parties hereto waive all formalities in
12  connection with the taking of said deposition,
13  excluding the reading and signing thereof, the
14  swearing of the witness and the reduction of the
15  questions and answers to typewriting.
16      Per Article 1443(D) of the Louisiana Code of
17  Civil Procedure, counsel for all parties reserve all
18  objections until trial or other use of the
19  deposition.
20              *  *  *
21
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2  EXAMINATION
 3  BY MR. CROW . . . . . . . . . . . . . . . .    9
 4
 5  OBJECTIONS:
 6  BY MR. HAYES
 7      214, 267, 268, 310, 351, 365, 366, 369, 379
 8
 9  EXHIBITS:
10  EXHIBIT 1  TWITTER FILE . . . . . . . . . .    147
11  EXHIBIT 2  FIRST TWEET . . . . . . . . . .    153
12  EXHIBIT 3  TWITTER PAGE . . . . . . . . . .    181
13  EXHIBIT 4  TWITTER POST . . . . . . . . . .    182
14  EXHIBIT 5  SENATE WEBSITE HOME PAGE . . . .    188
15  EXHIBIT 6  PAGE ON WEBSITE . . . . . . . .    189
16  EXHIBIT 7  PLATFORM WEBSITE . . . . . . . .    193
17  EXHIBIT 8  TWEET - MARCH 20, 2012 . . . . .    207
18  EXHIBIT 9  TWEET - APRIL 22, 2012 . . . .    215
19  EXHIBIT 10  TWEET - MAY 29, 2012 . . . . . .    222
20  EXHIBIT 11  TWEET - SEPTEMBER 14, 2012 . . .    224
21  EXHIBIT 12  TWEET - MAY 18, 2013 . . . . . .    227
22  EXHIBIT 13  TWEET - NOVEMBER 18 2014 . . . .    229
23  EXHIBIT 14  TWEET - APRIL 17, 2019 . . . . .    231
24  EXHIBIT 15  TWEET - APRIL 21, 2021 . . . . .    234
25  EXHIBIT 16  TWEET - JUNE 3, 2020 . . . . . .    235
```

**Page 5**

```
 1          INDEX (CONTINUED)
 2  EXHIBITS (CONTINUED)
 3  EXHIBIT 17  TWEET - JUNE 25, 2020 . . . . .    238
 4  EXHIBIT 18  GRAPHIC . . . . . . . . . . . .    239
 5  EXHIBIT 19  TWEET - APRIL 27, 2021 . . . . .    240
 6  EXHIBIT 20  TWEET - APRIL 28, 2021 . . . . .    243
 7  EXHIBIT 21  TWEET - DECEMBER 10, 2021 . . .    246
 8  EXHIBIT 22  TWEET - MARCH 4, 2022 . . . . .    249
 9  EXHIBIT 23  TWEET - MARCH 11, 2022 . . . . .    252
10  EXHIBIT 24  TWEET - MARCH 14, 2022 . . . . .    253
11  EXHIBIT 25  TWEET - MARCH 18, 2023 . . . . .    255
12  EXHIBIT 26  TWITTER REPLY - NOVEMBER 18, 2014    276
13  EXHIBIT 27  TWITTER EXCHANGE - MARCH 10, 2014    285
14  EXHIBIT 28
15  SCREENSHOT FROM TWITTER - APRIL 29, 2021  . .    294
16  EXHIBIT 29  TWEET - JUNE 26, 2022 . . . . .    299
17  EXHIBIT 30  TWEET - JUNE 5, 2022 . . . . . .    304
18  EXHIBIT 31  TWITTER EXCHANGE OCTOBER 23, 2012    313
19  EXHIBIT 32  TWITTER EXCHANGE APRIL 5, 2013    316
20  EXHIBIT 33  TWEET . . . . . . . . . . . . .    323
21  EXHIBIT 34  RETWEET - FEBRUARY 9, 2023 . . .    358
22  EXHIBIT 35  NEWSPAPER ARTICLE . . . . . . .    359
23  EXHIBIT 36  ARTICLE - FEBRUARY 9, 2023 . . .    363
24  EXHIBIT 37
25  ARTICLE - DAILY ADVERTISER - FEBRUARY 15, 2023    367
```

2 (Pages 2 - 5)

INDEX (CONTINUED)

EXHIBITS (CONTINUED)

EXHIBIT 38  ARTICLE . . . . . . . . . . . .   375

EXHIBIT 39  TWEET - JUNE 24, 2022 . . . . .   380

EXHIBIT 40  TWEET - GRAPHIC JUNE 24, 2022    381

EXHIBIT 41  TWEET - JUNE 26, 2022 . . . . .   383

EXHIBIT 42  TWEET WITH REPLIES . . . . . . .   390

EXHIBIT 43  TWEET - JUNE 24, 2022 . . . . .   391

---

1  COURT REPORTER:
2      Okay.
3  MR. HAYES:
4      Thomas Hayes the IV.  I represent the
5  Senator Jackson.
6  WITNESS:
7      And Senator Katrina Jackson.
8  COURT REPORTER:
9      Okay.
10  WITNESS:
11      I guess I'm representing the –- I don't
12  know who I'm representing.
13  MR. HAYES:
14      You're not representing.
15  WITNESS:
16      This is personal.
17  MR. HAYES:
18      You're not wrong.  You're the client.
19  WITNESS:
20      Me the client.
21  COURT REPORTER:
22      Okay.
23  MR. HAYES:
24      Get your questions asked.
25  COURT REPORTER:

---

1  COURT REPORTER:
2      Good morning, today's date is September
3  the 18th, 2024.  The time is approximately
4  9:04 a.m.  We are here for the deposition
5  of Katrina Jackson.  If the attorneys
6  present in the room would please state your
7  name and who you represent and then I will
8  swear the witness.
9  MS. SCHWARTZMANN:
10      My name is Katie Schwartzmann, I
11  represent the plaintiffs in this matter.
12  MR. CROW:
13      My name is Richard Alexander Crow and I
14  also represent the plaintiffs in this
15  matter.
16  MR. PETTIGREW
17      Hi, my name is Landon Pettigrew and I
18  also represent the plaintiffs in this
19  matter.
20  MS. HAMRICK:
21      Virginia Hamrick.  I represent the
22  plaintiffs.
23  MS. CLEVELAND:
24      Anna Cleveland.  I represent the
25  plaintiffs.

---

1      Ms. Jackson, would you raise your right
2  hand, please?
3  WITNESS:
4      Yes, yes.
5  COURT REPORTER:
6      Do you solemnly swear or affirm that
7  the testimony you give here today will be
8  the truth, the whole truth, and nothing but
9  the truth so help you God?
10  WITNESS:
11      I do.
12  COURT REPORTER:
13      Okay.  Thank you.  Go ahead.
14      KATRINA JACKSON,
15  after having been duly sworn, was examined and did
16  testify as follows:
17  MR. CROW:
18      All right.  First, if we just wanted to
19  talk about objections.  Are we going to be
20  preserving all objections for trial except
21  as those to form?
22  MR. HAYES:
23      Agreed.  Uh-huh.
24  MR. CROW:
25      All right.  Then, I guess we can get

1    started.
2  EXAMINATION BY MR. CROW:
3  Q   Good morning, Senator.  I need to start with
4    the most basic question.  Can you please state
5    your name for the record?
6  A   Sure.  Katrina Jackson.  You said my name,
7    that's it, right?  Uh-huh.
8  Q   Yes, ma'am.  All right.  Senator, because
9    you're a lawyer you already know this, but I
10    have to ask some basic information to lay the
11    groundwork for this deposition.
12  A   Yes.
13  Q   So first, this court reporter is trying to take
14    down everything you and I say.  That means that
15    I need your answers to be audible.  If you
16    shake your head or say, "hmm," they may not get
17    what you're saying.
18  A   Uh-huh.
19  Q   Is that fine?
20  A   I understand.
21  Q   You are under oath to tell the whole truth in
22    response to my questions.  That means you have
23    to tell the whole truth just as you would as if
24    you were in a courtroom before a judge and
25    jury.  Do you understand that?

Page 10

1  A   So help me God, I understand.
2  Q   Are you under the influence of alcohol?
3  A   No.
4  Q   Are you under the influence of any drugs?
5  A   Advil Cold & Sinus.  That's not influential.
6  Q   Okay.
7  A   That's what I took this morning, so you told me
8    to tell the whole truth.
9  Q   All right.  Thank you.  Is there anything that
10    would prevent you from giving your full
11    attention to my questions today?
12  A   No.
13  Q   And is there any reason you can not give full
14    and accurate answers to my questions today?
15  A   No.
16  Q   Also, if we need to take a break at anytime,
17    just please let us know and we'll take a break.
18    And if we do take a break, I will ask who you
19    spoke to and what you reviewed during that
20    break.  Is that okay?
21  A   Oh, most definitely.
22  Q   Have you ever given a deposition before?
23  A   No.  Not that I can recall.  I've been in law
24    for so long but I have –- I have sit in a lot
25    of them in as internal.

Page 11

1  Q   Okay.
2  A   So very familiar with depositions.
3  Q   Okay.  Have you been the subject of a
4    deposition?
5  A   Not that I can recall.  But I'm 47 years old,
6    so –- and I'm serious, I don't think I have but
7    --
8  Q   Okay.  Did you review any documents in
9    preparation for this deposition today?
10  A   Just my discovery answers.
11  Q   Did you –- do you have those documents with
12    you?
13  A   I do.
14  Q   All right, excellent.  So, first, I want to
15    start –- I want to start with your background.
16    So what is your current job?
17  A   My current job, I'm an attorney.  That's what
18    pays the bills, right?  And I own my own law
19    firm.  And I'm also a senator for District 34.
20  Q   And how long have you been practicing law?
21  A   Since 2005.
22  Q   What type of law do you practice?
23  A   I do criminal defense.  I also do some personal
24    injury.  A little bit of medical malpractice.
25    And then, just the general stuff.  We're in a

Page 12

1    small community, so like successions, wills,
2    power of attorneys.  But my main practice has
3    become –- not by choice, I love it, but
4    criminal defense.  I think about sixty percent
5    (60%) of my practice is criminal defense.
6  Q   Okay.  And are you a member of the bar in
7    Louisiana?
8  A   I am.
9  Q   Are you barred in any other state?
10  A   No.
11  Q   Have you ever held elected office?
12  A   Yes.
13  Q   What offices have you been elected to?
14  A   I've been a Louisiana State Representative and
15    now I'm currently a Louisiana Senator.
16  Q   And just to clarify.  You were a representative
17    first and then a senator?
18  A   Yes.  If I remember, I was elected to be a
19    representative -- I know we were sworn in 2012.
20  Q   What made you decide to run for public office?
21  A   I was staffing the legislature.  We were in the
22    middle of what was the Jindal era.  I don't
23    know how to say other than that, Governor
24    Jindal, you know.  And I just remember knowing
25    that we were going to hit a deficit.  Because

Page 13

**Page 14**

1  it was the first time I determined as I was in
2  prayer one night in my house and I felt that by
3  the holy spirit to run. I got up and went back
4  to bed because I didn't want to do it. And
5  after that, through spiritual counseling,
6  whatever –- not ever mention it to anyone,
7  three times pastors were calling me. It was --
8  it was a weird thing. And one –- right after
9  it happened I was in the car –- and I'm very
10  transparent about this. This is public. I was
11  in the car with one of my friends who's a
12  minister and all of sudden she said, "I'm going
13  to have to let you go back to Monroe. God's
14  calling you to run for office and he –- you're
15  ignoring him." Then, I –- one night at 2:00 in
16  the morning –- I get up sometimes like that.
17  Not now, I'm too old. And –- you know, in your
18  younger years you get up in the middle of the
19  night. And I got up and prayed and I called
20  one of my prayer partners and I said, look,
21  this is going to be devastating on the state, I
22  can't even hardly sleep. When these votes are
23  taken, we're going to -- you know, I just –-
24  every economists, it's very clear that we're
25  going into a deficit because the new

**Page 15**

1  legislature –- I don't know whether they
2  understood it or not, but they had been sold on
3  that there was going to be like a windfall of
4  money if we give businesses a lot of tax
5  credits and everything. And economists was
6  saying there's no way our economy can catch up
7  and our state revenue can catch up that fast.
8  So, just in prayer about my job. I was
9  Executive Director of the Black Caucus at the
10  time. Legislative Black Caucus. And I called
11  my prayer partner that night and she said, "God
12  has already told you to run and you're ignoring
13  him." So that was the second confirmation.
14  And then the third confirmation was, I was on
15  the phone with one of my pastor friends I had
16  just met, a peer, and he said, "I just really
17  believe this seed is graded for you." So, I
18  came in on the obedience of God, but it wasn't
19  like an instant obedience. Let me be very
20  clear.
21 Q  Thank you. And so, you said you were first
22  sworn into the House in 2012, correct?
23 A  If I remember now. The best record is whatever
24  the state says, but I believe it was 2012.
25 Q  When you were a State Representative in the

**Page 16**

1  House, did you serve on any committees?
2 A  And you're going to take me back. The first
3  year I was on Health and Welfare. I remember
4  that because my entire eight (8) years in the
5  House I was on Health and Welfare, so that's a
6  easy committee. My entire time in the House,
7  halfway through that first year I was put on
8  Senate –- not Senate. I'm sorry. House
9  Appropriations and Joint Budget as an interim
10  member, which means I served when session was
11  not going on. What else did I serve on that
12  first year? I don't remember serving on
13  criminal jus- -- I'm –- look, the House records
14  is going to be best. I can tell you what I
15  remember, but that's not exhaustive --
16 Q  Okay.
17 A  –- because it's been years. So it was Finance.
18  It was –- I mean, not Finance. In the House it
19  was Joint Budget, interim. Appropriations,
20  interim. Health and Welfare, all eight years.
21  At some point, I became Chair of Judiciary in
22  my second term, so I remember that quite well.
23  When you're chair you somewhat get a lighter
24  schedule. I'm going through the list in my
25  head of all the committees. But I definitely

**Page 17**

1  remember those and the House record would
2  reflect anything else. I remember, I think, I
3  served on some subcommittees as well.
4 Q  Okay. Can you explain –- can you explain to me
5  the role of a committee in the House?
6 A  A committee vets bills. So basically if it's a
7  –- if it's a bill in the House –- you said in
8  the House, right?
9 Q  Yes, ma'am.
10 A  That originates in the House, we vet the bills
11  if they don't get favorable passage then they
12  don't go to the floor. Now, there are
13  mechanisms that can take them to the floor like
14  a discharge of a committee and put it in a
15  committee of the whole. Or you can refer it to
16  another committee and with a majority vote of
17  the House, that committee –- that bill can have
18  another committee hearing somewhere else or it
19  can come into the committee of the whole. But
20  the committee of the whole is generally
21  reserved for –- let me know if you need me to
22  slow down. I forgot to tell you I talk fast.
23  A committee of the whole is generally reserved
24  for appropriation bills. If the bill doesn't
25  come out of committee, it is very few times.

1     Because, you know, in old days, right?  You
2     respected the will of the committee.  We've
3     seen more maneuvers with term limits and, you
4     know, legislators passing in and out.  It is a
5     very rare occurrence that it does –– makes it
6     to the floor, but sometimes it does.
7     Especially in last-minute negotiations where,
8     you know, different parties are negotiating
9     different things, different reps are
10    negotiating different things and we may have to
11    bring a bill out as a negotiation that died,
12    you know, at the beginning of session.  So
13    basically that's the role of committees.
14 Q   Okay.
15 A   Oh, and also, I apologize.  We take testimony
16    from the public.  We –– whether it's live
17    testimony, whether it's testimony by emails or
18    letters, all of that testimony from the public
19    is submitted in the committees.
20 Q   Okay.  And does a legislator ––– or actually let
21    me back –– let me rephrase that.  In the House,
22    do you get to choose the committees which
23    you're on?
24 A   You can request your preference committees, but
25    ultimately they're selected by the House

Page 18

1     speaker.
2 Q   Okay.  Did you request any of the committees
3    that you mentioned?
4 A   I'm sure I did because at the time that was
5    Speaker Kleckley.  With me having no real
6    background in the House there was no, you know,
7    I didn't have a lot of political foes at the
8    time so it wouldn't have been any reason for
9    the speaker to not put me -- I think it was
10    Speaker Kleckley, to not put me on some
11    committees.  I was in a minority party at the
12    time like I've always been in the House and the
13    Senate.  So, I probably requested something and
14    maybe got one.  I just can't remember.
15    Generally, we send in that request by phone.
16 Q   Uh-huh.
17 A   Sometimes it's by email.  That far back, I
18    wouldn't have the request.
19 Q   Okay.  So you wouldn't be able to recall that?
20 A   I just recall that we all had to submit, at the
21    time, our top committees and then our secondary
22    committees.  And if I remember in meeting with
23    Speaker Kleckley.  I remember meetings more
24    than I remember communications by email, right?
25 Q   Uh-huh.

Page 19

1 A   He was trying to put every member on one
2    committee of their choice.
3 Q   Okay.
4 A   So I would have thought that maybe I requested
5    one of them also.  I remember requesting
6    appropriations because my former boss told me
7    to always request appropriations.
8 Q   Okay.
9 A   And I didn't get that committee originally.
10    That was through negotiations like six (6)
11    months later.
12 Q   Okay.  Is there any other reason why you
13    requested the Appropriations Committee?
14 A   Because I'm from Northeast Louisiana.  Number
15    one, everyone wants to be on appropriations or
16    capital outlay.  Well, what is it?  Is it
17    Capital Outlay Committee?  I guess.  I can't
18    remember in the House, I'm in the Senate.  But
19    everyone wants to be on that committee, right?
20    One of the money committees or either
21    transportation.  It really bears on you being
22    the first to see the budget and what happens
23    with the budget.  Also, your ability to fight
24    for your district and bring money home when you
25    serve rural parishes.  At the time I was

Page 20

1     serving Ouachita which we're sitting in now,
2    and Morehouse, it would have been it.  And just
3    being –– working for state representative, you
4    know, since I was 20; 19 to 20.  I can't
5    remember when I started.  You knew that was an
6    important committee.
7 Q   How many people serve on a committee in the
8    House?
9 A   It varies.  And usually it's in-house rules,
10    but because of the number of –– if I remember
11    they had just renovated that committee because
12    we do joint budget.  The speakers may add by
13    rule or delete so –– I don't know in the House
14    now.  In the House –– and the sizes of
15    committees vary.
16 Q   Okay.  And you mentioned that you were in your
17    second term, the chair of the Judiciary
18    Committee?
19 A   Yes.
20 Q   Are there any other that are leadership roles
21    within committee besides the chair?
22 A   In the House, I don't even remember if I –– I
23    don't think I had a vice chair the first year.
24    I might have the first term.  I just don't
25    remember.  I was also the chairman of the black

Page 21

6 (Pages 18 - 21)

1  caucus while I served in the House I –-
2  probably early on in the first two (2) years.
3  And like I said, the legislative history would
4  be best because it's been awhile.  Recollection
5  of it would be the legislative history.  I
6  served at -- I believe, in the House and in the
7  Senate I've served in the leadership of the
8  women's caucus.  And I've never served in
9  leadership, if I'm not mistaken –- and I could
10  be wrong, the best recollection is always going
11  to be the history of the committees and the
12  history of the caucuses.  I think –- I don't
13  believe I've served as a democratic in
14  democratic or rural caucus leadership.
15 Q  Okay.  Let me actually rephrase that question.
16 A  Uh-huh.
17 Q  I'm not asking, at this point, what leadership
18  roles you've had.
19 A  Uh-huh.
20 Q  But just in the Judiciary you are the chair,
21  was there a vice chair or any --
22 A  Yes.
23 Q  –- other position?
24 A  Jay Morris from Monroe was my vice chair.  I
25  remember that because you just remember when
Page 22

1  somebody from home serves in leadership with
2  you.  It's very rare.
3 Q  Okay.  And were there any other positions of
4  leadership within the committees?
5 A  No.
6 Q  Okay.
7 A  Not that I know of, no.  Huh-uh.
8 Q  Okay.  So, with being the chairman of a
9  committee, what are the –- like what are the
10  duties of the chairman or a chair person?
11 A  The duties are kind of written out.  I won't
12  remember them all because the House rules are
13  different from the Senate rules and I hadn't
14  been in the House in about five (5) years.  But
15  basically to manage the meetings, to schedule
16  the agenda of what's going to be heard in
17  committees as well as to manage testimony with,
18  you know, consent of your committee members.
19  Meaning that if you know you're going to the
20  floor before 2:00 p –- at 2:00 p.m., I'm just
21  giving you an example.
22 Q  Uh-huh.
23 A  And there are number of people willing –-
24  wanting to testify on a number of bills, then
25  you want to give everyone a chance.  So you may
Page 23

1  confer with the committee and say we may need
2  to, you know, vote the two-minute, the three-
3  minute rule, the five-minute rule on testimony.
4  So that's what I mean by managing the
5  committee.
6 Q  Okay.  And what does the –- what does the vice
7  chair do?
8 A  The vice chair assists in that, yes.
9 Q  Okay.  Do they have any other different duties?
10 A  Not that I know of.  And they sit in the chair
11  if the chairman is not present.  Uh-huh.
12 Q  Okay.  So just to make sure that I — just to
13  clarify.  So the chairman kind of manages the
14  meetings --
15 A  Uh-huh.
16 Q  -- and they schedule the agenda and they also
17  manage the testimony that's going to be heard?
18 A  Right.  And I don't want you to think that
19  chairman have plenary power.  The rules are
20  very clear in the House that if someone request
21  the bills be scheduled in writing, you request
22  it.  Also, the Speaker of the House is the
23  ultimate person who manages the entirety of the
24  House.  So for most chairman if the speaker
25  asks a bill to be added, even if it's not on
Page 24

1  your agenda, you add it.  So it's not like a
2  chairman of a committee has plenary power on
3  what's heard in the committee.  That would be
4  false, right?  We have to honor the member's
5  requests.  You know, kind of the discretion is
6  -- is if a bill, a subject matter bill was
7  coming and you've decided to handle all
8  economic development bills today, even though
9  that wouldn't be judiciary, but using that as
10  an example, then the chairman will tell you,
11  right now this agenda is reserved for economic
12  development bills, we can put you on the next
13  agenda.  So maybe sometimes because there's so
14  -- constituents from all over the state -- well
15  obvious, but mainly constituents.  Let's say
16  constituents for acts that deal with
17  disability.  Bills that deal with disability.
18  To be courtesy to them, the chairmans of
19  committees generally will say, this is the day
20  we're going to take all bills related to
21  persons with disabilities.  I remember that
22  very intensely because in the House we had just
23  experienced budget cuts and we were in a
24  deficit and parents were bringing children who
25  they had to feed through tubes and committee.
Page 25

7 (Pages 22 - 25)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

1    And that's why I remember that because we had
2    become very, very narrow in appropriations on
3    making sure that we didn't schedule bills all
4    over the place; when you can.  Sometimes a bill
5    is just not right for hearing because it hasn't
6    had its readings and you have to bring them
7    back.  In Judiciary, it's mostly the district
8    attorneys, the sheriffs, and the constituents,
9    like, those who advocate for those incarcerated
10    and things of that nature.  And you're saying,
11    I want to get them here all on the same day to
12    be courteous so people are not driving back and
13    forth across the state every time they schedule
14    a bill.  That's in utopia, right?  That doesn't
15    always happen, but that's if a committee goes
16    in utopia.  If you know anything about the
17    legislature, if you're topal, you exist one
18    day.  That's your day of reward.
19    Q    Okay.  So it sounds like the chair role has
20    some power.  Can you explain how the scheduling
21    and taking -- and taking testimony duties
22    impact the legislation?
23    A    It's basically -- let me say this.  As chairman
24    for me, I always let it go through the process.
25    I may have a strong opinion as a chairman,
                                                    Page 26

1    general rule at the time.  In my first term I
2    don't recall having a vice chairmanship, but I
3    could have.  Maybe stray, I just don't recall.
4    Q    Okay.  And so you mentioned that the committee
5    drafts and vets legislation, then moves on to
6    the whole House?
7    A    Right.
8    Q    And then the whole House would consider and
9    vote?
10    A    Yes.
11    Q    So -- and you mentioned that if a bill was
12    killed in committee, there are some mechanisms
13    to bring it to a House vote and kind of
14    circumvent the committee, but they aren't --
15    A    Uh-huh.
16    Q    -- often used.  Is that --
17    A    No.
18    Q    -- what you said?
19    A    They're not often -- and people will attempt to
20    use them, but the bodies, as a whole, generally
21    will, you know, it has to be a serious matter
22    for the body to take it up.  It's not a
23    standard practice for you to get a majority
24    vote.  Does a member kind of have to advocate
25    for the district and that bill was important to
                                                    Page 28

1    someone else may have a strong opinion.  Some
2    new members may follow the lead of the
3    chairman.  I believe before term limits when I
4    staff that a chairman had a lot more, you know,
5    influence over their committee.  Post-term
6    limits, we're seeing an era where chairmen
7    don't have as much influence over their
8    committee.  I've only served -- I've -- I was a
9    staffer but I've served post-term limits.  Do
10    chairmans still have some influence over some
11    members of their committee, yes, but, you know,
12    it's not like it was, you know, pre-term
13    limits.  And so the chairman's, you know,
14    discretion is respected, but it's not, you
15    know, given as much weight as it was pre-term
16    limit.
17    Q    And so, you mentioned that you held -- you were
18    the chair -- the chair person of the judiciary
19    in the House.  Did you hold any other
20    leadership positions on your other committees
21    that you recall?
22    A    Not that I can recall.  Usually, when you're
23    the chair -- and that was in my second term,
24    you're not going to have, like, a vice chair of
25    another committee.  That's just -- that was the
                                                    Page 27

1    their district and it didn't come out, you'll
2    see a member go to the floor and attempt it,
3    but it's not usually granted at all.
4    Q    Okay.
5    A    Uh-huh.
6    Q    So you would say that the standard practice
7    would be that the committee vote is what's
8    going to determine what the rest of the
9    legislature gets to vote on?
10    A    Yes.  Uh-huh.
11    Q    If a legislator is on a particular committee,
12    does that mean that that legislator has an
13    expertise on the subject matter of that
14    committee maybe compared to other legislators?
15    A    Sometimes and sometimes, no.  You know, just
16    that's how it goes.  I didn't serve on
17    education at all in the House and I'm a former
18    teacher and now I serve on education in the
19    Senate.  It doesn't -- sometimes, like, you'll
20    -- you know, a legislator may request a
21    committee that they have expertise on.  A
22    former sheriff is probably going to request
23    criminal justice.  It depends on your politics
24    whether you get it or not.
25    Q    Okay.  Now, even if they don't come in with
                                                    Page 29

8 (Pages 26 - 29)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

Page 30

```
 1    that expertise --
 2  A  Uh-huh.
 3  Q   -- to the committee, are the committee members
 4    considered within the legislator to have --
 5    legislature to have substance of knowledge on
 6    the subject matter?
 7  A   The committee members to the extent of
 8    testimony, what we respect is this, we get to
 9    know each other.  So we know your background,
10    right?  And we know sometimes -- you may not
11    get to know everyone, but some committee
12    members you know their background because
13    you've heard them testify about it.  So you may
14    go to them sometimes and say, what do you think
15    of this, because of their background that
16    you've heard them either testify to or you've
17    gained personal knowledge of.  What we consider
18    with committee members if -- is they're the
19    people that hear the public's testimony.  And
20    so they have a better understanding of how it's
21    going to impact the general public because
22    they've heard the public's testimony.  I think
23    that's the greatest difference given to members
24    that sit on a committee, what did the public
25    say?  And then, because of email communications
```

Page 31

```
 1    and things like that, you kind of now know --
 2    unless it's an email -- it's a -- it's a bill
 3    that you receive no email from your
 4    constituents or the general public on, you'll
 5    know what the public says because you're going
 6    to get the emails.
 7  Q   Okay.  And so, would you say because of that
 8    the committee members are influential members
 9    on their subject of their committee?
10  A   No.  A lot of bills make it out of committee
11    and not make it off the floor.  Honestly, no.
12    Like, I don't know how to say it other than
13    that.  A lot of bills make it out of committee
14    and they don't make it off the floor.  That's
15    why bills die daily on the floor.  People are
16    generally going to vote their district.
17  Q   Okay.  So -- and remind me.  How long did you
18    serve in the House of Representatives?
19  A   Eight years.
20  Q   Eight years.  And then while you were still a
21    representative after that eight years, you then
22    decided to run for State Senate?
23  A   My senator was term limited.  I had one term I
24    could run in the House and I just decided to
25    run.  The seat came open.
```

Page 32

```
 1  Q   Okay.  Can you describe to me what the
 2    difference is in the roles of the House and the
 3    Senate and the State Legislature?
 4  A   We consider -- it's a funny saying.  We
 5    consider the House the people's House because
 6    you only have -- if I remember, and like I
 7    said, redistricting the rules of how many
 8    senators each -- well, how many constituents
 9    each member have is best reserved for looking
10    at their districts.  You have a much smaller
11    district.  Much, much -- about forty-plus
12    people to serve.  Forty thousand-plus in the
13    House.  The senators may have anywhere from
14    ninety something thousand to a hundred and
15    twenty or above, but the record is going to be
16    best reflected on running each person's
17    district.  That's the major difference in the
18    territory you cover and the amount of
19    constituents you answer to.  You know, that's
20    the difference.
21  Q   Uh-huh.  Aside from those that arise from the
22    larger constituency --
23  A   Uh-huh.
24  Q   -- are there different responsibilities between
25    the House and the Senate?
```

Page 33

```
 1  A   No.  You're still going to vet bills in your
 2    committee.  Now, you have a lot more
 3    responsibility in your Senate district because
 4    you are just answering to a lot more people
 5    regarding legislation.  And you have more
 6    responsibility on budget issues because whereas
 7    you have a smaller district, you now have to
 8    fulfill the budgetary requests of more
 9    municipalities.  Unless you're in a larger area
10    like New Orleans or Baton Rouge, when you get
11    up to these areas, you know, we have several
12    municipalities and several parishes in our
13    district.
14  Q   And why did you decide to run for Senate again?
15  A   My senator was term limited.  The seat came
16    open.
17  Q   Okay.  And was there any -- was there any other
18    reason?
19  A   My senator was term limit and the seat came
20    open.
21  Q   Okay.  And do you remember when you were first
22    elected to State Senate?
23  A   Now, let me see.  I can remember the House
24    because it was my start of my career.  The --
25    whatever the legislative record is, but I know
```

1    I'm in –- I think I'm in my sixth year.  Uh-
2    huh.
3  Q    Okay.  So that would have been around two –-
4    2018 in that case?
5  A    If election happened in 2018, yes.  Uh-huh.
6    Well, the election for 2018 would have been
7    2017.  So –- I hate to reference COVID, but
8    what I do remember is I was first sworn in to
9    District 34 in January and COVID hit that March
10    or April.  Well, we was shut down.  That's the
11    best way I remember when I came to the Senate.
12  Q    Okay.  And so, now, we talked about kind of the
13    responsibilities generally.  Do you –- what
14    responsibilities do you see as yours as Senator
15    of District 34?
16  A    To serve the people of District 34.  Uh-huh.
17    And also –- that's -- basically that's what it
18    encompass.  You serve the people of your
19    district first.  You serve others next.  And
20    you do the best job you can for the people of
21    the district.
22  Q    When you say serve others next, that's people
23    –- that's to state outside of your district?
24    Is that what you're referring to?
25  A    It –- let me say –- let me put it in these

Page 34

1  Q    Is there anything else?
2  A    I'm sure it is but not that, you know.  Look,
3    there's no form to what you do as a senator.
4    Everyone's district is different.  Your needs
5    of your district are different, so you just
6    kind of make it work for your constituency.
7  Q    As a senator, do you think it's important to be
8    active in communicating with your constituents?
9  A    Everyone chooses different forms of
10    communication with their district.  I am very
11    active in emails in my office.  Sometimes we
12    may slip up, you know, on something if we get
13    busy during session, but we try to respond to
14    all emails.  Generally, my office staff works
15    –- I just changed the schedule yesterday
16    because I have a staffer that's driving in
17    about forty (40) minutes and we generally are
18    open from 8:00 to 5:00.  We're now open from
19    8:30 to five o'clock with a lunch from 12:00 to
20    1:00.  We are –- during the fall I let them
21    leave at 4:30 because it gets dark, right,
22    during the fall and winter and you want to give
23    people a chance get home whether they're in
24    district or not.  I've always been sensitive
25    and I do it with my law office to the need of

Page 36

1    terms.  Sometimes you may get an email that's
2    outside of your district of persons that need
3    help.  I generally refer them back to their
4    senator out of respect for that senator.  If –-
5    I think my –- I have a rule that if you hadn't
6    heard from your senator in twenty-four (24) to
7    forty-eight (48) hours, if you contact us back
8    I will contact your senator to try to get you
9    help.  At that point if they don't help you and
10    it's something I can help you on, I will help
11    you.  Now, there are exceptions.  Kids, you
12    know, having issues, being mistreated, you
13    generally send that straight to the member.
14    And for me -- everyone has different rules into
15    the department.  If you think someone is
16    imminent danger or threat, you report it
17    immediately, you know, even if it's outside of
18    your district.
19  Q    Are there any other responsibilities as your
20    role as a senator?
21  A    I mean, we have a lot of roles.  We do speaking
22    engagements.  We do things for schools.  We
23    sponsor certain things.  Although that's not
24    your ultimate responsibility, it becomes a part
25    of the job.  Things like that, yeah.

Page 35

1    people who pick up their children, to go to the
2    grocery store and not feel like they getting
3    home at dark every day.  So that's the only
4    time we schedule shifts.  But to answer your
5    question, I think the importance comes from
6    within the office.  Most things are directed to
7    your office and so we try to make sure that we
8    are there and communicating.  That's one thing
9    that has always been a pet peeve of mine, when
10    a senator doesn't have anyone in their office
11    or a rep doesn't have anyone in their office
12    because you kind of feel like the constituents
13    are not served.
14  Q    As a state senator, are you required to take an
15    oath of office?
16  A    Yes.  Uh-huh.
17  Q    What does that oath entail?
18  A    The best record of that oath I know is to serve
19    your constituents but to uphold the
20    constitution and laws of this state.  I think
21    the laws of the United States, but if you want
22    a copy of that oath the Senate has it.
23  Q    And so we talked about what the role of the
24    committee was in the House.  In the Senate,
25    what is the role of the committee --

Page 37

1  A   The same role.
2  Q   –– in that body?
3       Okay.  So, are there any differences from
4  the role in the House?
5  A   Same role.
6  Q   Are there any other –– you mentioned in the
7  House that there is the chair and the vice
8  chair of each committee.  Are there any other
9  leadership positions in the Senate besides
10  those two?
11  A   Those are generally the leadership committees
12  of the –– leadership positions of the
13  committees.
14  Q   Okay.  And in the Senate, what committees have
15  you served on?
16  A   I'll start with this term because that's
17  easier.  Well, I serve on education.  I've
18  served on education both terms.  Last term I
19  was vice chair, but now I serve as a member
20  without a leadership role.  I serve as vice
21  chair of Health and Welfare this term.  Did not
22  serve on Health and Welfare last term.  I serve
23  on Finance and Joint Budget this term.  I also
24  serve as the chair of the Select Committee on
25  Women and Children this term.  And I may be on

Page 38

1  on.  Something may get graded during the year.
2  You know, like last term the state –– a select
3  committee on state police was formed because
4  of, you know, the Ronald Green matter and some
5  other matters that were going on.  So, that's
6  –– and then the year before I served –– the
7  term before that, I served on insurance.  I did
8  not have a committee role –– a leadership role.
9  I was interim on Finance and the Budget
10  Committee, the Joint Budget Committee.  I
11  served –– I told you about education.  I
12  vice chair.  And there was one other committee
13  but it's –– it flees me.  Let's just say I
14  didn't get the committees I wanted the first
15  time.
16  Q   Okay.  So, just to make –– just to clarify to
17  make sure that I've got this down correctly.
18  So as far as standing committees --
19  A   Uh-huh.
20  Q   –– that you've been a part of in the Senate.
21  We've got the Education Committee.  The Health
22  and Welfare Committee.  The Finance and Joint
23  Budget Committee --
24  A   Uh-huh.
25  Q   –– and the Insurance Committee?

Page 40

1  some subcommittees.  Because that's a –– that's
2  a non-standing committee, that's a Select
3  Committee.  I also –– we just got through
4  discussing it.  I am still showing as a member
5  on the Select Committee on state police and
6  from time to time I may be put on a task force.
7  You are appointed to outside, like –– how they
8  put it?  Organizations or –– not boards but,
9  you know, networks.  Like I serve, I think, on
10  the Louisiana Emergency Network, I serve as the
11  Senate Committee this term.  The Senate member
12  nonvoting member for Louisiana High School
13  Athletic Association.  God we have –– we have a
14  myriad of responsibilities that don't deal with
15  committees.  And that's both in the House and
16  the Senate.  There is more spread in the House,
17  so you may serve on certain committees.  I
18  serve as a member of the –– and Lord I may get
19  this wrong, but it's the –– the committee that
20  deals with –– not a committee.  It's the ––
21  it's in the Department of Education or Board of
22  Regions to deal with HPCU's.  Yeah.  But I may
23  miss something because, you know, our committee
24  switch.  Our selection outside of our standing
25  committees may switch depending on what's going

Page 39

1  A   And there's one more, but I just can't go back
2  two or three years to think about it.  I think
3  there's one more but the best recollection is
4  going to be the Senate record.
5  Q   Okay.  And this Senate record would tell us
6  what committees ––
7  A   Right.
8  Q   –– you've been on?
9  A   Uh-huh.
10  Q   Where could we find that?
11  A   You can ask the Secretary of the Senate.  Also,
12  you can go on our website if it's still posted.
13  Like my current committees is at the www.legis,
14  L-E-G-S –– L-E-G-I-S, .la.gov.  If it's not
15  still posted from last term, you could ask the
16  secretary of the Senate.  And I can ––
17  basically if I can send that to you, I'm sure I
18  can get it.  I have a record in my office.
19  Q   Okay.  So, let's start with the Education
20  Committee.  You said that you were the vice
21  chair in your first term but --
22  A   Uh-huh.
23  Q   –– now you're a member?
24  A   Right.
25  Q   And you said you've been on the Education

Page 41

1    Committee the entire time you've been in the
2    Senate?
3  A  No. Yes. Yes. The entire time. Uh-huh.
4  Q  Okay. And what does the Education Committee in
5    the Senate do?
6  A  It vets education bills. Education related
7    bills. Whatever is scheduled for that
8    committee.
9  Q  Okay. Is there anything else that they work
10   on?
11 A  Sometimes there's passports, but it's -- it's
12   pretty much all education related.
13 Q  Okay. So, they really only consider Education
14   --
15 A  Matters, uh-huh.
16 Q  -- Committee? Okay.
17     All right. And now with the Health and
18   Welfare Committee. Can you tell me -- did you
19   say you've been on that one both terms, as
20   well?
21 A  No. I just was put back on Health and Welfare
22   this term.
23 Q  Okay. So this most recent term?
24 A  Uh-huh.
25 Q  And what does that committee do?

Page 42

1  Q  And what does that committee consider?
2  A  It vets everything with the budget. Everything
3    that may impact the budget. And also if a --
4    if any bill from any committee has a physical
5    note, which means has more of an impact of A
6    hundred Thousand Dollars ($100,000.00) or more
7    to the state. We don't vet it for subject
8    matter, but it comes to us to consider it for
9    budgetary matters if it passes its subject
10   matter committee.
11 Q  So if a bill from another committee has over a
12   One Hundred Thousand Dollar impact --
13 A  Right.
14 Q  -- to the budget, you guys get to see it? Can
15   you --
16 A  We get to see it not for substantive, but to
17   make sure we can pay for it as a state.
18 Q  Okay. And can you describe how that process
19   looks?
20 A  When a bill leaves committee, a subject matter
21   committee and it comes to the floor, let's say
22   it -- it's voted out. If it's not voted out,
23   we don't get it at all. If it's voted out,
24   it's dual-referred. We call it the dual-
25   referral. The secretary dual refers it to our

Page 44

1  A  It vets all healthcare matters and that is a
2    myriad of things, healthcare, mental health,
3    everything. Hospitals, the medical board, all
4    licensure board, legislation regarding
5    healthcare. Nursing board, all of that. A
6    number of things. We also, like any other
7    committee, if there's a rule promulgation by
8    the department, that comes to us, too. We may
9    not take it up. We're not mandated to take it
10   up. But, you know, if someone objects or we
11   want a review hearing on it, yeah.
12 Q  And is there any other legislation that
13   committee considers?
14 A  Healthcare legislation.
15 Q  You also said you're a member of the Finance
16   and Joint Budget --
17 A  Right.
18 Q  -- Committee? When were you on that committee?
19 A  I was an interim member the first term, which
20   means I served only in the interim when we were
21   not in session. Right now I am a full-time
22   member of that committee.
23 Q  So you were an interim member then, now you're
24   a full-time member?
25 A  Yes.

Page 43

1    committee.
2  Q  And then you decide -- you look at it --
3  A  We --
4  Q  -- to see if the state can pay for it?
5  A  Right. And the chairman constantly reminds you
6    that it's just not -- it's not going to be
7    vetted as subject matter or substantive because
8    that committee has already done its job.
9  Q  Okay. And the last committee that you said as
10   you remember of a standing committee was the
11   Insurance Committee--
12 A  Last term.
13 Q  -- correct?
14 A  Uh-huh.
15 Q  Okay. You're no longer a member --
16 A  No.
17 Q  -- of that committee?
18 A  I'm trying to remember. Education right now.
19   I thought I had a fourth committee. Education.
20   Healthcare. Finance and Joint Budget. Uh-huh.
21 Q  Okay. And so with the Insurance Committee, you
22   were in that in the first term. What does that
23   committee consider?
24 A  All insurance related bills.
25 Q  Okay. Can you elaborate on that?

Page 45

12 (Pages 42 - 45)

1  A   Like, definitely anything that comes from the
2      Department of Insurance. Deductibles. Any
3      insurance that's healthcare insurance, as well
4      as car insurance, home insurance, property
5      insurance. Anything dealing with insurance.
6  Q   And do they consider any other types of
7      legislation besides insurance?
8  A   Insurance, yeah. And it keeps us busy in the
9      state of Louisiana.
10 Q   Okay. Now you mentioned that there are
11     leadership positions within the Senate
12     Committee. How does one obtain a leadership
13     position?
14 A   It's the same as the House. You put your top
15     committees. You -- sometimes you may ask for a
16     leadership position, sometimes you may not,
17     but it's the same thing. Ultimately, it's up
18     to the president of the Senate to place you on
19     committees.
20 Q   So the president -- let me -- actually let me
21     rephrase that. So, when you request a
22     committee, you also, in that same process
23     request whether you want a leadership position?
24 A   Yes.
25 Q   And you mentioned -- just to make -- just to

1      clarify. You hold a leadership position -- you
2      used to hold the leadership position in the
3      Education Committee?
4  A   Right.
5  Q   You currently hold one in the Health and
6      Welfare Committee?
7  A   Right.
8  Q   Do you hold any other leadership positions with
9      any committee?
10 A   The chair. I think I told you I'm chair of the
11     Select Committee on Women and Children; so
12     right now. And some of the Select Committees
13     haven't been reappointed.
14 Q   Okay. So, as the -- as the vice chair of
15     Health and Welfare, what are your
16     responsibilities in that role?
17 A   Actually, with that committee I hadn't dealt
18     with much of scheduling bills or anything.
19     This chairman is a little bit more independent.
20     We get along well, but he's just a little bit
21     more independent. Most chairman, you know,
22     it's their discretion on whether they call
23     their vice chairman on scheduling bills and
24     stuff. If the chairman is not in the chair, I
25     generally take the chair. But because that is

1      my heavy day, which meaning with being on
2      education and Health and Welfare I am in the
3      same committee room all day. I kind of start
4      at 9:00 -- I start earlier but I go to
5      committee between 9:00 and 9:30. I'm usually
6      in the hanker room until it's time to go to the
7      floor. So I won't take the chair as much
8      because I'm usually leaving out of education
9      and going to Health and Welfare or vice versa.
10     And by then, I'm probably in the back listening
11     -- because we have a room in the back where
12     members can listen. I generally don't have a
13     lunch break, so -- yeah.
14 Q   Okay. So, with your role -- is there anything
15     else you do in that role besides take the chair
16     if the chairman's unavailable?
17 A   And I often don't do that anymore because I
18     have two committees that day.
19 Q   Okay. And now you also mentioned that you were
20     a former vice chair of the Education Committee.
21     What were your responsibilities in that role?
22 A   Senator Fields and I conferred more on the
23     agenda. So, we confer more on the agenda.
24     He's independent, but he's a -- he's a -- like
25     all of them, they're gentlemen, but with him

1      being in Congress he's a -- he's a gentleman of
2      the Senate. He's going to at least tell you
3      his vice chair what's schedule and you'll know
4      before you get to the meeting.
5  Q   And he was the chairman?
6  A   Yes.
7  Q   So in the Education Committee compared to the
8      Health and Welfare Committee, you had a little
9      bit more of a role as the vice chair?
10 A   Right.
11 Q   Okay.
12 A   And look, it's not an issue with the chairman.
13     The truth is, is that when you serve full time
14     on finance and joint budget and then you have
15     two committees that day, the chairman, McMath
16     is well capable. If he needs my help, he calls
17     me. He's just well capable and the senator was
18     well capable, but I had a little bit more time
19     my first term because I was an interim member,
20     which means I didn't touch finance or joint
21     budget in my first term until we were out of
22     session. With this, you're constantly looking
23     at budget bills and looking at bills that may
24     impact the budget. And when you see something
25     referred to committee, you're trying to figure

1   out what it -- what it is and how it's going to
2   fit in the budget.  So you're -- committee is
3   not the only time you're reviewing bills, you
4   just -- you would have to go in code.  So with
5   that many committees -- and I want to say I go
6   somewhere else during the day, too.  I just
7   can't remember because we're out of session.
8   With that many committees, you are reviewing
9   bills until you come into committee.  Also,
10  because I have such a large district I'm -- I
11  constantly have constituents in the Capitol,
12  which I do like to meet with them in there --
13  if they are in the Capitol.  So, your
14  schedule's a little bit tighter.
15 Q   Okay.  You also mentioned that you're just a
16  member of a handful of other committees.
17 A   Uh-huh.
18 Q   I want to start with the Education Committee
19  now that you're a member there.
20 A   Right.
21 Q   What is your scope of authority as a member on
22  that committee?
23 A   As any other committee member.  You get
24  testimony and you vote on the bill.
25 Q   Okay.  Is there anything else that members are

Page 50

1   required to do?
2 A   Not that you're required to do, but if you're
3   going to be good at what you do for your
4   constituents, you're going to meet with the
5   different interest groups that they requested.
6   You're going to take calls on those bills.
7   You're going to take emails on those bills.
8   You're going to step out the meeting because
9   education is a -- you know, like any other
10  committee, is important.  You have children
11  coming in who want to talk to you, you're going
12  to give deference to them.  You're going to get
13  up and go see what that child wants because it
14  impacts them whether it's a college student or
15  a K through 12 student.
16 Q   Okay.  You mentioned you give deference when
17  people come in --
18 A   Right.
19 Q   -- to talk to you.  Can you explain why that's
20  important?
21 A   Because these are your constituents.  If
22  someone comes -- this drive from Monroe is
23  three-and-a-half hours, right?  You know, at
24  best for most people.  And people have taken
25  off work.  If they're retired, they've -- you

Page 51

1   know, if it's a senior, you just basic give
2   deference when people come to the -- to the
3   State Capitol to see you.
4 Q   Okay.  And you mentioned you were also a member
5   of the Finance and Joint Budget Committee.  Are
6   the mem -- the duties of the member in that
7   committee --
8 A   The same.
9 Q   -- the same?
10      Is there any difference in them?
11 A   A lot more duties -- it's the same duties, it
12  takes a lot more time.
13 Q   Okay.  And with the Insurance Committee.  Would
14  that also be --
15 A   Yes.
16 Q   -- similar duties?
17 A   The same thing.  Uh-huh.
18 Q   Okay.  Are there any committees, within the
19  Senate, whether you are on them or not, that --
20 A   Uh-huh.
21 Q   -- you believe are particularly important?
22 A   All of them are.
23 Q   Is there one that you think maybe has outsized
24  importance?
25 A   I don't -- I wouldn't say outsized importance.

Page 52

1   You always know that your bills are going to
2   hit finance if they're over Hundred Thousand
3   Dollars.  If we can't pay for it, it may be a
4   good idea that's something we can't afford.  So
5   we always look to that committee if your bill
6   is over a Hundred Thousand, you know you're
7   going to dual-referral.
8 Q   Uh-huh.  You said, "look to that committee."
9   What did you mean by that?
10 A   To see whether that you can afford it, right?
11  The legislation.  And sometimes honestly you
12  know it's needed, so you push it and hope the
13  funding comes and we will put bills and finance
14  on the stack.  On the stack means, we know we
15  need to try to get the bill out, right?
16  However -- or give it a fair hearing.  But you
17  can't give bills a fair hearing before you know
18  what's really going on with the budget when
19  they have a fiscal note of A Hundred Thousand
20  or more.  So what the chairman does is put them
21  on a stack and we hear them after we know
22  what's going to be in the budget.  It's kind of
23  unfair to a member to hear their bill and
24  reject it because our sole role on nonfinancial
25  bills in the -- in the -- in finance is to see

Page 53

14 (Pages 50 - 53)

1  whether we can afford that bill.  We can't --
2  we're just -- we're not there to vote on the
3  substantive matter of the bill.  So, generally,
4  finance, you put them on the stack until you
5  know the overall outlook of the budget.
6  Q   Okay.  So, as a member on the Finance
7  Committee, sometimes other committees will
8  consult with you prior to them voting on their
9  bill?
10 A   No.
11 Q   Okay.
12 A   Generally not.  Because they -- the general
13  rule is, you do your job as a committee.  If it
14  has to come to Finance, we put it on the stack
15  if it comes out of your committee until we know
16  the overall look of the budget.  It would be
17  premature for a substantive committee on their
18  bill, on their subject matter to defer to us or
19  talk to us about it because we don't know what
20  the budget looks like.  But everybody, you
21  know, is talking to members about their bills,
22  right?  Hey, I got a bill coming to your
23  committee.  And generally you tell them, I love
24  your bill but, you know, if you're on Finance
25  it's going to go down to whether we have the

Page 54

1  money.  So, committees couldn't flow if they
2  waited on Finance Committee.  That's why bills
3  go on the stack when they come out of committee
4  -- off the floor -- out of committee.
5  Q   Are there any committees that for you
6  personally are particularly, like, near and
7  dear to your heart?
8  A   Finance Committee because I have to bring money
9  home.  I mean, that's -- I have seven (7)
10  parishes.  I have probably over fifteen (15)
11  municipalities are townships in those parishes.
12  I represent one of the most indigent parts of
13  the state, The Delta.  So of course, you know,
14  when you're going to a gym with no air and you
15  know you can't give them money for air
16  generally because the infrastructure of schools
17  are paid by the locals, you try to give them
18  everything, you know, you can so they can free
19  up money.  I have parishes that have -- two (2)
20  parishes that have no recreation centers.  We
21  just funded those.  And so, yeah, that
22  committee is near and dear to my heart because
23  it's bringing home to people what they don't
24  have, right?  But every committee I serve on is
25  near and dear to my heart.  You're going to get

Page 55

1  in the committee regardless if you didn't ask
2  for it or not.  And a subject matter will come
3  up that almost breaks your heart, so your heart
4  is tugged on with every committee, right?  You
5  may think, this is going to be more important
6  to my district, but then you get in committee
7  and it's all important.
8  Q   Would you say that you have areas of
9  legislative work that you have a particular
10  expertise in?
11 A   No.  No.  I was good at judiciary in the House
12  because I am an attorney, right?  And I'm
13  always in the mix of the judiciary.  Budget, my
14  history in the budget comes from when, you
15  know, you're a student now, right?  When I was
16  19 and 20 -- I think, 20, when I wanted to be
17  nothing but an attorney, would plop down the
18  budget and say find my projects and I would be
19  stuck in the conference room for a week and I
20  couldn't get free to do law work until I found
21  his projects.  So that is my experience in that
22  committee.
23  In Health and Welfare, I ended up being on
24  it for eight (8) years in the House so you
25  become more, you know, acquainted with their

Page 56

1  subject matter.  Education, I'm a former
2  teacher, you know, an educator.  But when
3  you've staffed for the House and the Senate, I
4  generally had to produce for the Legislative
5  Black Caucus as executive director, with the
6  help of our law students through the Clinic at
7  Southern that were our students when session
8  started.  We had to -- you know, they had to
9  rebuild and brief them and we had to put out
10  brief for every committee.  And I did that for
11  five (5) years.
12 Q   Okay.  And I want to shift a little bit to your
13  -- to your role as --
14 A   Uh-huh.
15 Q   -- a lawmaker.  You talk a lot publicly about
16  your faith, correct?
17 A   Yes.
18 Q   How do your religious beliefs inform or affect
19  your role as a lawmaker?
20 A   Greatly.  I told my constituents that when I
21  ran in 2012.  It's not a secret.  Your
22  constituents get to vote for who they want to
23  represent them based on their values.  Some
24  districts may feel like those who are pro-
25  second amendment, without any limits, and they

Page 57

15 (Pages 54 - 57)

1    vote on you because of that.  I don't see your
2    beliefs as anything different than your belief
3    on other subject matters.  I believe you are
4    up-front to your constituents on who you are
5    and if they share your same views, they vote
6    you in.
7  Q    What is your political party?
8  A    I'm a democrat.
9  Q    Would you say that you worked --- you tried to
10    work across the political aisle?
11  A    Yeah.  Of course.  I mean, you --- I've never
12    understood how party drives everything you do
13    or the majority of what you do.  I have a 60 ---
14    then, 60/40 District.  I don't even know --- I
15    think it's 60 something percent now.  I
16    couldn't ignore people because they weren't a
17    part of my party.  Then, you know, you --- yeah,
18    you represent the majority of your district but
19    then you don't represent others.  So, party
20    kind of has its place, but not a major place
21    for me.
22  Q    Why do you think it's important to work across
23    the political aisle?
24  A    I think that everyone has something to add to
25    the conversation.  All members are elected to
                                              Page 58

1    represent their constituents and so you work
2    with them and you're not the smartest in the
3    room.  If you're the smartest person in the
4    room, you --- I was always told you were in the
5    wrong room.  You may know something about a
6    subject matter and someone else knows something
7    more about it.  So working across party lines
8    gives you all views.
9  Q    In addition to your role on committee, do you
10    hold any other leadership roles within the
11    Senate?
12  A    Not that I'm aware of.  They hadn't told me.
13  Q    Okay.  Okay.  And I want to talk just a --- just
14    briefly about some of the Select Committees you
15    said you were on.  You said that you were the
16    chair of the Select Committee on Women and
17    Children?
18  A    Yes.
19  Q    Can you talk about your work on that committee?
20  A    I --- I've been on the committee on Women and
21    Children my last term.  And we have not had a
22    meeting because we were in a six-month long
23    session.  I've been very sensitive to members
24    to allow them to get back home and get to their
25    work.  Most members, if they're not retired,
                                              Page 59

1    have jobs like I do.  So, I am just about to
2    get started with meetings.  Because we
3    generally --- a Select Committee, unless the
4    rules are suspended, does not hold a meeting
5    during session.  So there was nothing --- and
6    it's always something pressing on women and
7    children, right?  And so we'll probably
8    schedule the first meeting for October.  I will
9    generally go over an overview of the
10    departments that have an impact, women and
11    children, at that first meeting is my plan.  I
12    will also ask members is there anything else
13    that needs to be scheduled.  If it goes with
14    that general overview, I'll schedule it if it's
15    something pressing.  That's the thing about the
16    Select Committee on Women and Children from
17    being a member that I've noticed.  If we find
18    that a jurisdiction is ignoring the cries of
19    women or children, like, I'll give you an
20    example.  We never knew her name but the 15-
21    year-old who had reported to three
22    jurisdictions that she was being molested by
23    her step-father.  Regardless of our schedules
24    at that point if that happens, you will get a
25    committee hearing notice and the women of that
                                              Page 60

1    committee.  Because we have women and sometimes
2    one man and I don't know who serving --- I think
3    it's all women right now.  We will go --- we
4    will spring into action.  At one time there
5    were, you know, a high number of fentanyl
6    deaths of children.  We had had two in a row or
7    something and we springed into action.  Because
8    we want to know what's going on that a child
9    arrives at the hospital with drugs in his
10    system and he's --- he or she is placed back in
11    the home.  My --- maybe on --- not on one
12    incident but when it becomes so egregious that
13    we feel like the cries of women and children in
14    this state are being ignored, those committee
15    meetings become unscheduled.  And sometimes you
16    may have very heavy committee meetings and
17    sometimes you want.  This first meeting is
18    going to be more of an overview unless we find
19    some pressing matters that need to be
20    addressed.
21  Q    So that committee you said though, it may be
22    more frequently than other Select Committees
23    has a very pressing ---
24  A    Sometimes.
25  Q    --- matter that you have to jump into?
                                              Page 61

**Page 62**

1  A   Yes. Uh-huh. And women's health, you know,
2      we've created the committee –– I mean, under
3      the department we've created under the
4      Department of Health the committee for women ––
5      I mean not the committee, the department, you
6      know, section for women's health.
7  Q   Okay. And you also mentioned that you're a
8      member on the –– on a Select Committee for
9      state police oversight?
10 A   Right. But I –– I'm still waiting to see if
11     that committee has been reappointed because
12     it's the same committee members on the list
13     from last year.
14 Q   Let me actually back up a little bit.
15 A   Uh-huh.
16 Q   What is the difference –– or excuse me, what is
17     a Select Committee?
18 A   A Select Committee is a –– is a certain subject
19     matter, like, Health and Welfare deals with
20     women. Of course, women issues come up in
21     education, right? Their access to an
22     education, the sexual harassment thing goes ––
23     of women, goes to a certain committee about
24     education, right? And what happened with all
25     of the stuff at the colleges and universities,

**Page 63**

1      Title IX and all of that. But knowing that
2      some women and children issues that are in
3      every committee need to be looked at
4      holistically so testimony can be taken in a
5      interim, that's what that committee is for.
6      We, the Select Committee, can not bring forth
7      legislation. You can bring it as a member, but
8      legislation does not run through our committee.
9      We don't meet during session. So we can not ––
10     we can not vote on legislation or rules or
11     anything like that.
12 Q   So you mentioned that they can't –– they can't
13     bring forth legislation out of the Select
14     Committee. Are there any other difference?
15 A   We can do recommendations and one member may
16     bring it or all of us may author it if we feel
17     strong about it like the Title IX issue.
18 Q   Uh-huh.
19 A   Yeah.
20 Q   So it's your duty as a member of this –– of
21     these committees to take testimony and perform
22     some kind of fact-finding on the particular
23     issues ––
24 A   We don't ––
25 Q   –– at hand?

**Page 64**

1  A   –– we don't perform so-say a fact-finding of a
2      Select Committee. We may –– if there is a task
3      force created, we may bring forth a report.
4  Q   Okay. And how are Select Committees formed?
5  A   Select Committees are formed by the president.
6  Q   Does the president also appoint the members?
7  A   Yes.
8  Q   You also mentioned that you serve in either a
9      leadership –– you mentioned that you serve on a
10     committee, I believe, about the Louisiana High
11     School Athletic Association?
12 A   I serve as the Senate member of the Louisiana
13     High School Athletic Association having no
14     vote.
15 Q   Okay. Can you explain that to me?
16 A   Different state –– and they are not a state
17     entity. But different state boards and state
18     entities and some non-state entities have a
19     member of the Senate and a member of the House
20     appointed by the president of the Senate and as
21     the Speaker of the House.
22 Q   And you said you don't have a voting role ––
23 A   No.
24 Q   –– in that?
25     What are your duties as that member?

**Page 65**

1  A   I can attend members –– meetings as it's –– as
2      any other member. I can ask questions.
3  Q   Okay. Is there anything else that you do in
4      that role?
5  A   Generally, no.
6  Q   You also mentioned that you serve on some task
7      forces.
8  A   Uh-huh.
9  Q   What task forces do you serve on?
10 A   I would have to get you a list of those. Those
11     sometimes are plentiful. They haven't really
12     start meeting yet from this session. Task
13     forces are generally created by legislation for
14     a certain period of time. Task forces are not
15     something that you're going to see go on
16     forever unless it's just an issue that can not
17     be resolved and we're still taking testimony.
18     So, task force may form, like, I can tell you
19     one that is not really not a task force but it
20     is. Right now I'm heading up –– because I've
21     always –– a task force to look at giving people
22     a hand up and not a handout; that's what I
23     consider it as. I created it and it didn't go
24     as far under the Jindal adminstra –– I mean,
25     under the Jindal or Edwards administration and

17 (Pages 62 - 65)
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1  I've asked Landry.  I've -- you know, it was
2  still in law because I put in statute because
3  it's just that important.  I -- my belief is
4  that, you know, people think that others are
5  just on benefits because they want to be.  When
6  I first were hiring in my law firm, one young
7  lady had one or two kids and I remember back in
8  2011, 2012, right?  And -- so this is how these
9  task force form just being straightforward.
10  And she was so happy to get her first job in a
11  office and then she had to reject it because
12  she was going to be cut off of all benefits and
13  couldn't take care of her children.  That
14  sparked me to start doing research that first
15  year and I said, you know, this is an issue.
16  And then when I start talking to other members
17  of other business owners they had experienced
18  it.  So it's a long-haul on that one.
19      We will start meeting soon and looking at
20  how we can ask for federal waivers.  I've met
21  with former Congressman Abraham who was then
22  the Secretary of Department of Health.  He's
23  now the Surgeon General.  So I think he -- he
24  doesn't know who will be assigned to that but
25  he thinks he will.  The Senate staff is in the
Page 66

1 Q   Oh, so it can be either?
2 A   I believe so.  But it's most likely by -- what
3      I've seen is by legislation.  Because the
4      president -- no.  Let me back up.  The
5      president can create a Select Committee.  Task
6      force are generally by a legislation or by a
7      department.
8 Q   Okay.  And you mentioned this hand-up
9      committee.  Are there any other -- or excuse
10     me, task --
11 A   It's not called --
12 Q   -- force.
13 A   -- that but, you know, that's how I look at.
14 Q   That's --
15 A   Uh-huh.
16 Q   -- okay.  So besides that task force, are there
17     any others you can think of that you're a
18     member of?
19 A   Not at this moment, but I can get a list to
20     you.
21 Q   Okay.  And did you say that you were the leader
22     of that committee -- of that task force?
23 A   I authored the legislation so I'll chair it,
24     yes.  And everything that you author, you don't
25     chair.  That one specifically is chaired by the
Page 68

1  process of, you know, seeing who will be
2  assigned.  And that one is near and dear to my
3  heart to figure out whether we need federal
4  waivers.  And what I'm hoping it looks like but
5  you know it changes with input of others.  We
6  listed a number of departments to determine how
7  we can get federal waivers.  What can we do to
8  matriculate people off of benefits.  Because
9  there's a desire to be independent, but the way
10  the system is set up, to me, this is my
11  opinion, it is set up to be perpetual in nature
12  and people never come off even if you don't
13  think it is.  Because if you take a mother with
14  two kids off of benefits -- off of benefits
15  when she gets a job making Twelve Dollars
16  ($12.00) an hour, she can't support her and her
17  kids.  So how can we kind of make a tiered
18  approach to those benefits until people get to
19  a liveable wage.
20 Q   Okay.  And so you mentioned the task forces are
21      created by legislation?
22 A   Mostly, yes.
23 Q   Okay.
24 A   Or the -- or the -- or the president can create
25      one.
Page 67

1      senator for District 34.
2 Q   Okay.
3 A   Uh-huh.
4 Q   And talking -- one more question about task
5      forces.  What would you say that the task force
6      is responsible for?
7 A   Some of them don't meet and they just become
8      ineffective because, you know, created by
9      legislation.  Sometimes they bring out
10     legislative ideas.  They may investigate
11     matters within a department.  And some may
12     prepare a report.  It just depends.  It's a
13     myriad of things that can happen.
14 Q   Investigate in what way?
15 A   Like if there have been inefficiencies in a
16     department, you may bring out recommendations
17     for legislation or policies that the department
18     can -- if it's in that area, can adopt.  Or --
19     and it's all suggestive.  Because this is the
20     thing, a bill can't become law -- a bill can't
21     be heard in that committee and a bill can't
22     become law unless it goes to one of the
23     standing committees during session.
24 Q   But sometimes the task force will bring a bill
25     to a committee?
Page 69

18 (Pages 66 - 69)

**Page 70**

1  A   Not the -- you have the entirety of the task
2      force if you get a majority vote, but a member
3      has to offer that bill.  The task force can't
4      bring a bill.  The task force can only suggest
5      that this change in law is needed.  If a member
6      doesn't pick it up, that's dead on the vine.
7  Q   Okay.  What is your role on the Louisiana
8      Emergency Network?
9  A   I think that's the right one.  And I'll
10     probably start attending meetings in August or
11     in October.  I'm -- I think I'm a non-voting
12     member of that board.  I was appointed by the
13     chairman.  I think that board requested me as a
14     member.  Because I've -- and then I want to
15     make sure that's the right board because it's
16     too synonymous and we just switched, you know,
17     where we're appointed because it's a new term
18     you know?  But it will be just to help them
19     establish whatever they need to establish, to
20     understand better what's needed.  Especially,
21     you know, for those in the 9-1-1 network and
22     all of that.
23 Q   And as a -- so as a non-voting member of that
24     --
25 A   I think I'm non-voting.  I have to check that

**Page 71**

1      one.
2  Q   Okay.  So what would your role be if you're not
3      a voting member?
4  A   I would go to meetings.  I would hear from the
5      experts.  Hear their needs and -- because I
6      believe it's important to make sure emergency
7      services are available.  And I think that's the
8      name of it.  Because we have a plethora of
9      boards that Senate members are appointed to.
10     Like, Louisiana Schools in Math and Science, I
11     was a member of that four years ago.  So, that
12     board was a non-voting membership, I believe.
13     It might have been voting.  I have to check.
14     But you just basically are a member of the
15     Senate who sits on that committee or that board
16     and bring things back to the Senate.
17 Q   And are you a member of the Black Legislative
18     Caucus?
19 A   Of course.
20 Q   And were you on that as a Representative and a
21     Senator?
22 A   Yes.  I think I paid my dues every year I've
23     been in the House and the Senate.
24 Q   Do you have leadership roles within that
25     caucus?

**Page 72**

1  A   I right now serve as advisor to the chairman.
2      Senate advisor to the chairman.
3  Q   What are your roles in that?  What are your
4      duties, excuse me, in that role?
5  A   To effectuate policies and advocacy for those
6      who are under served.  Not just African
7      Americans, but any underserved community.
8  Q   Okay.  And that's underserved communities
9      across the city?
10 A   Yes.  Uh-huh.  It's made up of members from all
11     parts of the state.
12 Q   Okay.  Would you say that caucus and -- excuse
13     me.  Let me rephrase that.  Would you say that
14     the caucus operates as -- or actually, let me
15     back up even further.
16 A   Uh-huh.
17 Q   The Black Legislative Caucus, what does that
18     caucus do?  What's the goal of that body?
19 A   What I just stated.  To serve the underserved
20     people of the state and to bring more awareness
21     to the needs of those who are underserved to
22     bring more awareness to voter suppression
23     issues.  And it changes.  You know, when we had
24     issues with police brutality in this state,
25     that's something we shifted to.  It's fluent,

**Page 73**

1      you know, but the main purpose is to help those
2      who are underserved.
3  Q   Would you say that the caucus operates in the
4      legislature as an influential voting block?
5  A   Under the old legislature.  Look, I'm not
6      making any bones about it.  The legislature is
7      two-thirds republican now.  We don't have a
8      black caucus member at the time who was
9      republican.  I think former Senator Guillory
10     was our last one.  Influential in that we hold
11     some votes, you know, but we are not a majority
12     on any committee.  We're not a majority on the
13     floor.  We are in the minority.  Do people look
14     to us on issues related to African Americans,
15     yes, you know, sometimes.  Our most important
16     legislation has never been passed, you know.
17     And all of it is important, but when we look at
18     minimum wage, you're seeing a number of voting
19     suppression -- what we believe to be voter
20     suppression laws.  We have not been able to
21     block them.  We are influential in our in own
22     right.  Our members -- our Senate counterparts
23     respect us, but you'll see that at the floor
24     constantly.
25 Q   Does the caucus often vote together on issues?

**Page 74**

1  A   Sometimes.
2  Q   Can you give an example?
3  A   If you –– an example.  If we're funding urban
4      areas, you'll see us vote together, right?
5      Because most minority areas, those are the
6      urban areas, right?  We vote our individual
7      districts on probably more heightened issues.
8      HPCU Funding is something you're going to see
9      us vote in a block on.  Funding for people who
10     are underserved, you're going to see us vote in
11     a block on.  But the caucus understands that
12     your vote is your district vote.
13 Q   You mentioned that the black legislative caucus
14     is a smaller group within the legislature, but
15     you --
16 A   Uh-huh.
17 Q   -- did you say that other legislators will
18     sometimes on issues of your expertise look to
19     that caucus?
20 A   Not expertise.  I'm black, I mean, right?  I
21     mean, that's obvious.  And so they may ask me
22     how does this impact the black community,
23     right?
24     MR. HAYES:
25        You're black?

**Page 75**

1      WITNESS:
2        I'm black.  And I attend in the HPCUs,
3      so if they want to know what the HPCU
4      experience looks like I'm –– I do a lot
5      with Southern still, Grambling.  But I also
6      do a lot with ULM because I'm graduate of
7      ULM.  But if they've never stepped on
8      Southern and Grambling's campus, they're
9      going to say what's going on with AG
10     Center.  Because I'm also on the
11     Agriculture.  I knew I would think about it
12     soon.  And so, you know, it just depends.
13 BY MR. CROW:
14 Q   I want to just jump back now that you've
15     remembered that last --
16 A   Right.
17 Q   -- committee.  Do you –– how long have you been
18     on the Agriculture Committee?
19 A   Probably almost my entire time in the House and
20     Senate.  Definitely my entire time in the
21     Senate.  AG is very important in my district.
22     Most, you know, a lot of African Americans
23     don't have a lot of agriculture in their
24     district, I do.  Morehouse Parish has the
25     highest amount of farmland probably in the

**Page 76**

1      entirety of the state and agriculture is a
2      major part of my district.  And I will say this
3      and I'm going answer every question.
4      Legislatively I'm not a pinpoint type of
5      legislature –– legislator.  My loyalty is to
6      God and my district and when I can work with
7      others to get things done, I will.  I try to
8      remain sensitive to everyone's issues, but my
9      district is a very diverse district.  More
10     diverse than most minority districts in the
11     state.  The needs in my districts are more --
12     you know, and some others are more diverse than
13     most members in the state.
14 Q   And the Agriculture Committee, do you hold or
15     have you held a --
16 A   No.
17 Q   -- leadership position?
18     And is there any –– can you talk about what
19     kind of --
20 A   Not that I can remember.
21     MR. HAYES:
22        Let him finish the question.
23     MR. CROW:
24        Oh.
25     WITNESS:

**Page 77**

1        No, I just had to add that.
2     MR. HAYES:
3        I know.
4     WITNESS:
5        -- because I'm trying to go through my
6      head.
7     MR. CROW:
8        It's all right.
9     WITNESS:
10        Uh-huh.
11 BY MR. CROW:
12 Q   And the Agriculture Committee, does it –– what
13     kind of bills does it consider?
14 A   Agriculture bills.  Bills related to AG
15     schools.  Bills related to the agriculture
16     industry.
17 Q   Okay.  It also overlaps with schools though,
18     with agriculture schools you said?
19 A   Right.
20 Q   Can you explain that?
21 A   Well, like, if the agriculture schools are
22     starting a new program that has to state-
23     approved, that will come forth.  They generally
24     give us a presentation each year.  If the
25     agriculture schools are working with the

20 (Pages 74 - 77)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

1    Department of Agriculture on an issue, our
2    bill, it comes up.  It all overlaps.  AG is the
3    number one industry in the state.
4  Q  Okay.  And you mentioned agriculture schools.
5    Can you clarify?  Are you speaking of a higher
6    education institution --
7  A  Right.
8  Q  -- or -- okay.
9  A  Uh-huh.  Right now my efforts for this year are
10   going to turn the focus in AG to try and -- to
11   put more agriculture elective in -- electives
12   in schools in my district and in Northeast
13   Louisiana and in all over the -- well, just in
14   Northeast Louisiana, right?  Because from what
15   I have seen, I've seen somewhat of a
16   disinterest of young people in AG.
17 Q  Do you think it's important that young people
18   take an interest in AG?
19 A  Oh, of course.  It's the number one industry in
20   the state.  It's a big economic driver even
21   though people ignore it sometimes.
22 Q  Okay.  Shifting back to where we left off.  Is
23   there a particular piece of legislation from
24   the Senate that you're particularly proud of?
25 A  A lot of them.  For me?  Yeah.

Page 78

1  Q  Yes.
2  A  I'm serious about the legislation I file like
3    -- when people say what's your hallmark
4    legislation, I don't think I have a hallmark
5    piece of legislation.  My best day in my office
6    if -- and I tell people this a lot.  Is if a
7    senior from my district calls in a hundred and
8    something degree weather and their lights are
9    turned off and I call Entergy and go over the
10   rules with them about turning off lights and
11   that person gets lights and air conditioner
12   then.  My best day is, you know, sometimes when
13   we have community service events.  It's not,
14   you know -- I can't think of something, it all
15   plays a part.
16 Q  Okay.  But regarding your legislation, is there
17   a particular piece that you're --
18 A  That's what I'm saying.
19 Q  -- most proud of?
20 A  It all plays a part.
21 Q  Can you give us an example of legislation that
22   you've sponsored in the Senate that has had a
23   statewide effect?
24 A  A lot of it.  A lot of it.  I mean, if I talk
25   about the task force right now that I talked

Page 79

1    about in previous questions, that's district.
2    It impacts my district and another member's
3    districts that's added.  And I'm hoping that
4    has a statewide impact because it's only a
5    pilot program now.  Then, some other
6    legislation has a statewide impact in education
7    and healthcare.  The budget, I pass it every
8    year, right?  I don't sponsor it, but it has a
9    statewide impact.
10 Q  Because of your work in the State Legislature,
11   you mentioned that sometimes you're asked to
12   speak at events?
13 A  Yes.
14 Q  On what subjects have you been asked to speak
15   on?
16 A  I'm trying to get them all in my mind.
17   Education.  Healthcare.  Judiciary Chair of
18   Criminal Justice System.  Finances of the
19   state.  A myriad of subjects.
20 Q  I want to zero on -- in on something a little
21   bit more specific.  You're seeing in Louisiana,
22   as a leader, I would say statewide on issues
23   related to education and family health.  Would
24   you agree with that?
25 A  I'm not sure how all of Louisiana sees me but,

Page 80

1    I guess.  If you would have asked me four years
2    ago, I was seen as a leader of criminal
3    justice.
4  Q  Going back to the subjects that you're -- or
5    your speaking --
6  A  Uh-huh.
7  Q  -- engagements that you have.  Are those often
8    in your district?
9  A  Right now, yes.
10 Q  Okay.
11 A  Let me tell you, in the last probably four or
12   five years, unless it's a Zoom, I've rarely
13   taken speaking engagements outside of my
14   district just because COVID hit.  We're in and
15   out of session a lot.  There's been a lot of
16   shifts.  But I do take speaking engages outside
17   of my district.  I've taken some outside of the
18   state.
19 Q  What other states have you given speaking
20   events at?
21 A  I think in New York.  And you'll ask me and I
22   wont remember because during COVID, a lot of
23   places I may have accepted cancelled; and non-
24   COVID.  Sometimes my law practice allows me,
25   you know, is that I cancelled in Washington.

Page 81

21 (Pages 78 - 81)

1    And I can't remember the others. It may be a
2    couple of others, but I doubt it. Because I
3    started cancelling a lot when I picked up my
4    Senate district  I started not accepting as
5    many speaking engagements outside of the state
6    because of the work here. It was Virginia, I
7    think. And that was when I was in the House.
8    I believe it was Virginia once when I was in
9    the House.
10  Q   And when you spoke on this –- and let's start
11       with in Virginia.
12  A    Uh-huh.
13  Q   Do you remember what you spoke about in that
14       engagement?
15  A    In Virginia, if it was Virginia, it would have
16       been pro-life.
17  Q   Okay.
18  A    My stance on being pro-life.
19  Q   And you said --
20  A    I think that's what we did in -- yeah, because
21       I've got work to do, yeah --
22  Q   Okay.
23  A    -- in court.
24  Q   And in New York --
25  A    Am I -- am I a pro-life advocate? Yes, I am.

Page 82

1    you say you're a –- one of the national leaders
2    on Rights of the Unborn?
3  A    Not Rights of the Unborn. Rights from the Womb
4    to the Tomb. I also speak a lot on the death
5    penalty.
6  Q   Okay.
7  A    I am a life advocate. Meaning, I believe in
8    life from the womb to the tomb, which is
9    probably different from –- is different from
10   what most consider the pro-life movement to be.
11   I'm a member of Democrats for Life. Democrats
12   for Life deal with a myriad of issues. We also
13   deal with access to healthcare. We also deal
14   with whether or not what funding is offered in
15   the areas of women and children. So, it's kind
16   of a different type of advocacy and I've said
17   that a lot.
18  Q   Okay. So would you say you're a national
19   leader on life advocacy then?
20  A    Not national leader. I've not been to
21   Congress. I don't think I've been to Congress
22   to speak on it. I've been to Congress once but
23   I think it was maybe on edu -- I can't remember
24   on what issue. I think it was something else.
25   Not a national leader. I guess I wouldn't

Page 84

1  Q   Okay. We'll get to that.
2  A    Okay.
3  Q   But in New York, do you remember what you spoke
4    about in New York?
5  A    I think I went once for the black caucus as a
6    leader of black caucus and I went one time for
7    pro-life.
8  Q   And in Washington?
9  A    I've –- I think I've spoken on a panel at the
10   Congressional Black Caucus, if I recall, and
11   I've spoken on pro-life issues at the National
12   Right to Life.
13  Q   And had you also given a speaking event in
14   California?
15  A    Oh, yeah. I did.
16  Q   Okay.
17  A    I think that was my last time traveling out of
18   state.
19  Q   Okay.
20  A    Because I made a vacation out of it afterwards.
21  Q   Okay. And what –- do you remember what you
22   spoke about at that event?
23  A    Pro-life.
24  Q   Given that you've been asked to speak on pro-
25   life issues now throughout the country, would

Page 83

1    consider myself that, but maybe some do. And
2    I'm being very transparent, you know. I hadn't
3    done many speeches on that lately.
4  Q   Okay. But you have spoken in --
5  A    Oh, yes.
6  Q   –- a number of states?
7  A    Uh-huh. Yes.
8  Q   On that issue?
9  A    Right. Only about three including Louisiana.
10   I think three or four.
11  Q   At these events, do you remember who you spoke
12   to or spoke –- gave the speaking event to? Let
13   me rephrase.
14  A    The National Right to Life organization has a
15   major life march, and I spoke there twice. New
16   York has an organization, and I spoke there.
17   Democrats for Life have –- has invited me to
18   speak. I forgot where I went to Democrats for
19   Life because I deal with them a lot just over
20   the phone and stuff. I speak –- I spoke there.
21   And I think that's kind of where it is. And in
22   New Orleans I have spoken. Yeah.
23  Q   Where did you speak in New Orleans?
24  A    At the Right to Life banquet --
25  Q   And --

Page 85

22 (Pages 82 - 85)

1  A   -- at a hotel.
2  Q   Okay. And so that was to the Right to Life?
3  A   Right. Louisiana Right to Life.
4  Q   Okay. Why do you choose to speak at events
5      outside your district?
6  A   I try to advocate more for what legislation
7      that I believe in. It's not about whether it's
8      in or out of my district, it's basically what I
9      believe in.
10 Q   As a legislator, is part of your job having
11     interaction with the public?
12 A   Yes, most definitely.
13 Q   Can you talk about that?
14 A   Kind of what I said before. In my district I'm
15     everywhere, right, as much as possible. About
16     three or four years ago -- that's another
17     reason I tapered as much as I speak because I
18     began to raise my, now, 15-year-old nephew when
19     he was 12 and he's been with me three-and-a-
20     half years. I got married to a pastor and
21     preach -- a pastor and a principal, assistant
22     principal now in January and so that kind of
23     slowed me down. We lost my stepfather about
24     two-and-a-half years ago, so giving more
25     attention to my mother who's a widow. Things

Page 86

1      like that. My niece started college. And I'm
2      very family-oriented, so with my niece starting
3      college, she's right across street, I give more
4      attention to her. And so, a lot of what I do,
5      I commit to my constituents. When I'm able to
6      vail -- avail myself to others, I do. When
7      family matters come up, I know I'm still
8      obligated to my constituents in District 34 so
9      I'll tailor more stuff where I can get home.
10     So now with the life I live, I tailor more
11     stuff so that I can get home. That's just the
12     bottom line. People will tell you, usually my
13     car is packed because of my business was
14     suffering. Just being straightforward. We
15     were in out of session like crazy. So if they
16     say we're getting out Wednesday, I would come
17     home at 11:00 and 12:00 at night and go sleep,
18     you know, and get up and go to work. The
19     different needs in my lifestyle dictate whether
20     I avail myself to people outside of the
21     district, the best way to put it.
22 Q   Okay. So, do you listen to stakeholders who
23     have an interest in State Legislative matters?
24 A   Yes.
25 Q   How do you do that?

Page 87

1  A   Generally, through email. Like I've said,
2      through office calls. I'm a stickler on trying
3      to answer emails. Sometimes they may be form
4      emails but I believe that, you know, when you
5      email -- now I'm very particular on this. If
6      you get disrespectful, you know, I think it's
7      okay to be agreeable without being
8      disagreeable. I try not to go into the
9      personal part of, you know, personal debate
10     towards the person itself. I always stick to
11     the subject matter because that's important.
12     That's to me how you get things resolved.
13 Q   Okay. You mentioned that you're very active in
14     your responding to emails.
15 A   Uh-huh.
16 Q   Do you listen to stakeholders on social media?
17 A   Sometimes. See this is the -- this is the
18     funny part about social media. I'm more active
19     on Facebook than anything. My niece says
20     because I'm older and older people do more
21     Facebook, but I try to as much as possible.
22     You will see me on social media tell people if
23     the debate goes long, please contact my office
24     because I'm going from committee to committee.
25     The ability to remember to respond to someone

Page 88

1      on social media is less than the ability to get
2      back to the office and talk to my staff about
3      what emails have come in. And so you see me on
4      social media refer people to the office a lot.
5      Right now on my Facebook page where there's
6      more activity than anywhere, there is a post
7      and it's pinned that says, "Please contact our
8      office for legislative matters." And that's
9      just because I believe I'm very much more
10     responsive on my legislative email and my phone
11     because that's what staff is involved in. And
12     they'll keep a running list of constituent
13     requests so when I'm back in the office or if
14     I'm driving and I say, what do we have, what
15     have I not responded to, what's going on,
16     that's where you're going to get the best
17     response.
18 Q   Okay. All right. Now I want to talk about
19     your bills that you sponsor. How do you decide
20     to sponsor a piece of legislation?
21 A   When they are active, which they are getting
22     back active now post-COVID. I have several
23     district committees, which is kind of un-
24     similar to most senators, right? I have a
25     Youth Advisory Committee that's made of people

Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1    -- made up, I think -- we've accepted once a | 1   Q   And all those children are from District 34? |
| 2    couple of seventh graders, but eighth to | 2   A   Yes. Or they go to school in District 34. |
| 3    twelfth grade. But it's limited to on when you | 3   Q   Oh, okay. So, you seek input from these |
| 4    can join because if you're getting ready to | 4    special committees that you've set up? |
| 5    graduate, then honestly, you know, you're | 5   A   Right. And I'm going back to that. Because |
| 6    leaving. Some of my youth legislation, | 6    COVID kind of stopped it and now -- I didn't |
| 7    education legislation, I'm probably going to be | 7    want to put more on people. They were doing |
| 8    pounded on that first meeting that's about to | 8    Zoom everything, you know, it was -- so, yeah, |
| 9    happen over the cell phone policy bill. And -- | 9    that's where generally -- and I started that |
| 10   seriously. Like, and then I have the | 10   when I was in District 16 as a House member. |
| 11   Agriculture Committee that I'm about to start | 11   Q   Do you seek input from any others on |
| 12   back meeting with. We just reappointed. | 12    legislation? |
| 13   People applied throughout the district. I have | 13   A   If someone emails me about something or an |
| 14   a Healthcare Committee. I have a Economic | 14    issue, I'm going to respond. We'll look into |
| 15   Development Committee. My Senior Committee is | 15    it. Sometimes it's sent to staff, you know, |
| 16   a voice of a lot. Those are my senior citizens | 16    tell me about this, is it a real issue. So, |
| 17   and some non-senior citizens who deal with | 17    yeah, that -- yeah. |
| 18   those issues. And there's one other committee, | 18   Q   So you get -- you get some input from the |
| 19   but basically that's where a lot of my | 19    public? |
| 20   legislation comes from. | 20   A   Right. |
| 21   Q   So the members of these committee -- the | 21   Q   Do you seek input from other legislators? |
| 22    members of these committees are all from people | 22   A   Not often. If I have an issue that I think |
| 23    that are within District 34? | 23    impact -- that I think impacts more than my |
| 24   A   Or working within in District 34; that's a | 24    district I'll talk to a legislator and say, |
| 25    requirement. You attend school, you work, or | 25    "Have you had this issue"? Sometimes I will, |
| Page 90 | Page 92 |
| 1    live in District 34. And those committees -- | 1    you know? |
| 2    because like I said, during COVID they kind of | 2   Q   Okay. You mentioned when we were talking about |
| 3    slumped. I think we scheduled a meeting and | 3    -- |
| 4    people couldn't get there so I'm realizing, I | 4   A   And then there are special interest groups. |
| 5    didn't want to, we're going to have to do them | 5    I'm sorry to interrupt you. There are special |
| 6    by Zoom to get them back active. I have seven- | 6    interest groups. Sometimes you receive |
| 7    parish district so I encompass parts of | 7    legislative emails from lobbies or a special |
| 8    Ouachita, parts of Morehouse, parts of | 8    interest group and you'll look into that, as |
| 9    Richland. All of Madison Parish. All of East | 9    well. |
| 10   Carroll Parish. Part -- all of Tensas and a | 10   Q   You actually beat me to it. That's what I was |
| 11   small part of Concordia. If you drove here | 11    -- |
| 12   from the Baton Rouge kind of way -- basically | 12   A   Right. |
| 13   it takes me about -- to get to the furthest | 13   Q   -- about to ask -- |
| 14   part of my district from where we're sitting | 14   A   Uh-huh. |
| 15   now, it takes me about an hour and thirty or | 15   Q   -- about. So these special interest groups, |
| 16   forty minutes. | 16    can you explain how that relationship works |
| 17   Q   And on the education advisory group within -- | 17    between legislators in those groups? |
| 18   A   Uh-huh. | 18   A   They may catch you in the Capitol. They may |
| 19   Q   -- your district, specifically, you said that's | 19    email you. If you're -- if you're talking to |
| 20   made up of kids from within district? | 20    me about legislation, and you're not a |
| 21   A   Huh-uh. The youth advisory council. | 21    constituent, I'm saying, "email the office." |
| 22   Q   Oh, the youth advisory council. | 22    And most of the time I'm telling them to email |
| 23   A   Uh-huh. | 23    the office or call the office because you can't |
| 24   Q   That's made up between -- | 24    keep track of everything, right? So you try to |
| 25   A   Right. | 25    involve your staff in mostly everything. |
| Page 91 | Page 93 |

**Page 94**

1    Because I've found in my years of experience
2    that you'll forget to file something that
3    you've committed to.  So my office keeps, you
4    know, sometimes -- when I have a great deal
5    like I do now, they'll keep a running list of
6    bills I want to file, which we haven't started
7    on this year.  And then I'll go look at them
8    and narrow them down because in odd years you
9    only get five (5) general bills before pre-
10   filing -- well, five general bills, I think,
11   period.  So sometimes in odd years -- well, in
12   odd years you're limited on what you can file.
13   So there's a more of narrow vetting process.
14   If I feel compassionate about something, you
15   said, do you talk to another member, I'm like,
16   do you have a bill, can you file this, you
17   know, this is a pressing issue if I run out of
18   bills.  But, yeah, it's the same kind of
19   process.  I do reject legislation, right?  Yes.
20 Q  Okay.  I want to back up to one of the last
21   things you said in that statement.  You said
22   that sometimes if you are at your limit --
23 A  Uh-huh.
24 Q  -- on bills you can file, you will sometimes
25   reach out to other legislators --

**Page 95**

1 A  Uh-huh.
2 Q  -- to see if they have room?
3 A  Right.
4 Q  Can you talk about how that works?
5 A  Usually, you call them.  If you can't get them,
6   you email them.  But most of it is calling.
7   Legislators reach out to me and say, "Katrina,
8   if you're not opposed to this bill, can you
9   carry it"?  We do the same.  That's in odd
10   number of years when you have limited bills.
11 Q  Okay.  Now, talking about the bills themselves.
12   Where do you get the language for your bills?
13 A  The staff probably doesn't like me on this, I'm
14   a former drafter.  So sometimes I go too in
15   detail with language.  I'm being honest.  And
16   sometimes I just call a staff and say this is
17   the issue I'm trying to fix, draft me
18   something.  So it's -- it's just -- it varies
19   --
20 Q  Okay.
21 A  -- you know?  And sometimes a constituent would
22   send you legit language and you will have the
23   staff to tweak it if you agree with it.  I'll
24   cross it out sometimes or the staff -- it goes
25   to staff as is.  Sometimes interest groups will

**Page 96**

1   send you language.  Now, who are more prone to
2   change language on is interest groups.  Only
3   because it's not coming from a direct
4   constituent.  So I may agree with part of it, I
5   may reject it, or I may say I'm going to file
6   it, but you're probably not going to like how
7   it looks.  You can find another author.  Or if
8   I -- and then I still have the right to file
9   it, right, in the way I want.  And sometimes
10   when it is -- when it's introduced I let them
11   go through it and we fight and I say find you
12   another author.
13 Q  Okay.  So just to clarify.  So sometimes
14   organizations will assist you in the drafting
15   and you'll make edits?
16 A  Not in the drafting.  Staff drafts.  They may
17   send you suggestive drafting -- departments may
18   send you suggestive drafting.  At the end of
19   the day, what the member files is based on them
20   because your name is on it.  So you may go back
21   and forth with your staff several times on
22   legislation.
23 Q  Okay.
24 A  And sometimes you're late and we're working
25   before we get there and I'll tell a staff file

**Page 97**

1   it, I'll correct it when I get there.  I've
2   filed bills with anticipated amendments because
3   I didn't have time or the staffers working --
4   you know, there's a -- thirty-nine (39) members
5   in the Senate.  And people are filing bills so
6   at the last minute sometimes a member will say,
7   "Draft this, but remember I want this
8   amendment."  Because you don't have time for it
9   now, we're meeting a deadline.
10 Q  How do you seek input on legislation you
11   sponsor?
12 A  We have a great email database I believe of
13   constituents and so we send it out that way.
14   We send it out via social media.  Because some
15   people are -- some people in District 34 are
16   just social media people, right?  And just
17   talking out in the community when I go to the
18   Council on Aging.  When I go to the schools and
19   all of that; myriad of ways.
20 Q  Okay.
21     WITNESS:
22       Tommy, if you're cutting this air down
23     --
24     MR. HAYES:
25       That's what I'm --

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                        www.veritext.com

1    WITNESS:
2        You about to lose me.
3    MR. HAYES:
4        -- are you cold or you're hot?
5    WITNESS:
6        I'm nice now.  But go on get --
7    MR. HAYES:
8        You're nice?
9    WITNESS:
10       Well, go on get your air right.
11   MR. HAYES:
12       Well, no, no.  I can put -- I can --
13   and --
14   WITNESS:
15       I'm nice.
16   MR. HAYES:
17       -- go off.  We can put this off the
18   record.
19       (OFF THE RECORD)
20   COURT REPORTER:
21       We're back on the record.
22   EXAMINATION CONTINUED BY MR. CROW:
23   Q   All right.  So, Senator Jackson, now I want to
24       talk to you about your voting on legislation.
25   A   Okay.

Page 98

1    Q   Do you seek input on how to vote on pending
2        legislation?
3    A   From my constituents sometimes, yes.
4    Q   Who else do you ask for input?
5    A   Members that share my views on a certain
6        subject matter.  Sometimes, you know, you'll
7        say, you know, "What's going on with this bill?
8        How did it come out at committee"?  You know,
9        did -- was it, I don't have time to look at the
10       committee because I'm in committee a lot, so
11       I'm saying, you know, who testified on this
12       bill, was there a large number of constituents.
13       I'll ask, should I go back and watch the
14       committee if I didn't see the committee.
15   Q   Okay.  And when you say members, you mean
16       members of the legislature?
17   A   Yes.  And constituents.
18   Q   Okay.
19   A   I go back through my email like when I sit down
20       if it's a -- you know that some bills are going
21       to have more of an impact than others, right?
22       So you'll go search for that bill number to see
23       or that subject matter to see.  Or I'll call my
24       staff real quick and say, "Hey, I got this bill
25       coming up, it's on this, have you heard from

Page 99

1    some of our constituents on it"?
2    Q   Okay.  Do you ever work -- do you ever solicit
3        the thoughts of outside organizations?
4    A   I can say like -- I think it was -- who has the
5        pharmacy school?  Tulane in New Orleans or
6        Loyola?
7        MS. SCHWARTZMANN:
8            Xavier.
9    A   Xavier.  So Xavier students came down I thought
10       they were ULM students and remember I gave you
11       that instance, and I went out and they told me
12       about a pharmaceutical issue why they weren't
13       going to stay in the state of Louisiana.  I
14       filed the bill.  The Pharmacist Association
15       came interested in it.  And so at that point --
16       because I know they speak for the small
17       pharmacies around the state, Louisiana Small
18       Pharmacy Association.  So like this session I
19       would -- if somebody said I need you to add
20       this and I knew a lot about the bill, but not
21       enough to know how that was going to impact a
22       bill, I would go to the appointed lobbyist for
23       the Pharmacy Association and say, "How is this
24       amendment going to impact what we're trying to
25       do"?

Page 100

1    BY MR. CROW:
2    Q   So you do discuss --
3    A   And staff.  Staff.  Let me say that because
4        staff is your first stop shop.
5    Q   Got you.  So you do occasionally consult with
6        lobbyist and outside --
7    A   Right.
8    Q   -- organizations?
9    A   Uh-huh.
10   Q   Are there any that come to mind outside of the
11       pharmacist?
12   A   Pharmacy Association.  The sheriffs.  The
13       district attorneys.  The advocacy group vote.
14       The advocacy group.  I can not remember their
15       name, but Mr. Chico has a advocacy group on
16       those who are formerly incarcerated.  The
17       yellow shirts, that's what they've become known
18       as.  The advocates with disabilities.  The
19       Right to Life.  Teachers Associations.  Do you
20       want me to keep going because it's a lot of
21       them?  Okay.
22   Q   And so why do you choose to work with these --
23   A   Because --
24   Q   -- organizations?
25   A   -- they represent constituents.

Page 101

26 (Pages 98 - 101)

1    Q    Okay.  And are these organizations, they're
2         statewide?
3    A    Some are statewide, some are more local in
4         nature.
5    Q    Okay.
6    A    My Monroe Chamber of Commerce, local in nature.
7         Or, you know, Chamber of Commerce, most
8         parishes have them.  Teachers Association has a
9         statewide organization.  I'm more concerned
10        because of the way education has kind of
11        shifted in the state that I talk to my locals
12        on how it's going to impact them.  I'm going to
13        talk to my most local sheriffs before I talk to
14        the Sheriff's Association because we're in a
15        rural area in most parts.  So you want to know
16        how is this going to impact rural sheriffs.
17        What you will find is that you talk to the
18        statewide organizations but I talk more at
19        home.  How is this going to impact us?  Because
20        the districts are so different.  Louisiana is
21        so vast in how its populated.
22   Q    So you --- just to make sure that I'm
23        understanding this correctly.  You like to --
24        if there is a local -- a local group --
25   A    Uh-huh.

Page 102

1    Q    -- you like to talk to them first before than
2         talking to the state --
3    A    If I'm approached by a state group, you know,
4         I'm going to call my local group.
5    Q    Would you say -- is it common for legislators
6         to talk to one another before voting a vote on
7         a bill?
8    A    Sometimes, yes.
9    Q    Do you ever consult with other legislators
10        prior to voting on a bill?
11   A    Yes.  Legislators may ask me for amendments.  I
12        may ask them for an amendment on a bill.  If
13        I'm kind of on the fence and feel like an
14        amendment would clear that up, I'll ask for,
15        you know, an amendment on the bill.  If I'm not
16        well-versed in the area and a legislator is
17        carrying a bill, I want to consider all
18        legislation.  Especially if it's a piece of
19        local legislation that relates to that member's
20        district and I don't understand it.  I'm going
21        to go to this member and talk about how it
22        impacts their district, what it does to the
23        rest of the state, and talk to them, as well.
24   Q    Are there any other reasons you may ask another
25        legislator for their opinion on a bill?

Page 103

1    A    Because I need their vote.  Yeah.  Trying to
2         get it out of committee.  Trying to get it off
3         the floor.
4    Q    Are there any others?
5    A    No.
6    Q    Do you try to keep the public informed about
7         current legislation?
8    A    Yes.
9    Q    Why do you do that?
10   A    I think a public has -- the public has a right
11        to know, especially my district, what I'm doing
12        in Baton Rouge.  So, like I said, our email
13        database is vast.  And if it's a teacher's bill
14        I may email my teacher's database.  I may text
15        the superintendents in my district and say,
16        hey, this is what's going on, tell me how this
17        is going to impact us; so, various ways.
18   Q    Are there any other ways that you try and keep
19        the public informed?
20   A    Sometimes I may post something about a bill.
21        I'm more active on Facebook, so sometimes I may
22        post something about a bill.
23   Q    Have you ever post about a bill on Twitter?
24   A    Oh, yes.  Uh-huh.  Sometimes I forget I have
25        Twitter.

Page 104

1    Q    Do you seek input from members of the public
2         prior to voting on legislation?
3    A    Sometimes.  If I haven't had enough public
4         input and I think it's going to have a major
5         impact in my district, I'm going to seek input.
6    Q    How are --
7    A    I remember when I was in the House and then the
8         first time a nurse practitioner bill came up.
9         And I had never taken a position on the
10        physician/nurse practitioner whether they did
11        collaborative agreement.  I remember that one
12        because me and one of my best friends kind of
13        were at odds on it after I saw the input.
14        That's why some things stick out because of
15        what -- how will the impact affects you when
16        you leave the legislative process.
17   Q    And so when you seek this input, how do you ask
18        for this input?
19   A    Via email.  Via phone calls.  Sometimes by
20        posting on social media.  Sometimes I'll walk
21        out the room and ask for someone to step out
22        because I'm trying to figure out how the next
23        bill -- especially if they're under the three-
24        minute rule and they've been --- or five-minute
25        rule and they've been limited to testimony and

Page 105

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

1   I want to get more of an input on what they
2   said. It's just various ways. There's -- you
3   -- I'm telling you, I can't even pinpoint
4   myself. I am so pressed before I vote on a
5   bill that's going to impact this district. I'm
6   pressed to find out everything I can. Staff.
7   Most of the time I'll have a staffer come down.
8   Q   So -- in talking about how people will give or
9   how you'll ask for this input, do people call
10   your office to discuss legislation?
11  A   They do.
12  Q   Can you tell us how your office handles these
13      calls?
14  A   If they're doing what they're supposed to do,
15      which most of the time they will -- I've had a
16      shift in staff. My -- the person who trained
17      me retired. She came over as a legislative
18      assistant from training me. That was a better
19      flow because we had worked together since I was
20      19 or 20. They'll send me an email. If there
21      are vast calls, they may say, you've had a
22      hundred calls on this bill to vote no, you've
23      had a hundred calls on this bill to vote yes.
24      My next question sometimes -- and you could --
25      you know, is how -- who was it from my
                                        Page 106

1   district, let's narrow it down to the district,
2   you know? Sometimes they'll say this person
3   called irate. I'm like this in my legislative
4   office and my legal office, I want irate calls.
5   I want to see what's going on. Now, if you've
6   disrespected my staff, I'm probably going to
7   call you if I can. If you pick up -- if I pick
8   up the phone and you start just berating
9   personally, I'll say, look, when you calm down
10  call me back. Most of the time in session
11  you're not going to get through all your calls,
12  so I'll send a form response to my staffer. If
13  it's in my district, I'm going to try to call
14  you unless it's a hundred, two hundred calls
15  from my district. I tell my staff to take
16  emails so that we can email all of them
17  something back.
18  Q   How are you able to determine whether someone's
19      calling for -- from your district?
20  A   They generally ask for their address.
21  Q   Okay.
22  A   Uh-huh.
23  Q   Is that on every call?
24  A   Most of them. That's a part of procedure.
25      Especially because like constituent requests.
                                        Page 107

1   On legislation if they're getting four hundred
2   calls a day they may have to, you know -- which
3   they don't. Like, fifty calls a day and
4   they're still working through bills, they're
5   not going to answer and say, "Are you in
6   District 34"? Right.
7   Q   Okay. And I want to make sure that I heard
8       this right. Can you explain -- you talked
9       about what happens when people disrespect your
10      staffers on the phone?
11  A   Uh-huh.
12  Q   And that you will then call them back?
13  A   I will try if I'm not busy. Some days I'm
14      stuck in committee and I'll just tell my staff,
15      "Listen, just be kind and get through the
16      call." I've only had a few times where staff
17      was, like, I can't get through this call. I
18      just, you know, I couldn't get through the
19      call. I asked them to call back when you were
20      here. That's only a few times. Most of the
21      time my staff has learned how to de-escalate a
22      call.
23  Q   Uh-huh.
24  A   And get the message that the person wants to
25      get to me. We've gone through de-escalation
                                        Page 108

1   tactics of constituents, right? How do you get
2   to the meat of what they want to say without
3   disrespecting a constituent. That's very
4   important. One call was a threat on my life.
5   I tell them to get off the phone immediately
6   and call the police. End that call, call the
7   police if there ever -- if there's ever a
8   threat on life.
9   Q   Okay. So generally your practice is the public
10      will give whatever information they would like
11      to give --
12  A   Uh-huh.
13  Q   -- to you over the phone --
14  A   Right.
15  Q   -- to a staffer and the staffer will then give
16      that information to you?
17  A   Right. And if I'm able to answer by not
18      calling the person back, I'll give the staff --
19      I give the staff a message. If it's something
20      where I'm, like, oh, I got to call this person
21      back, I don't understand. Sometimes I'll tell
22      the staffer, I don't think you -- you'll see an
23      email, you didn't get enough information, I
24      need more information, remember the who, what,
25      when, and where, I can't answer this question.
                                        Page 109

1    If I have time.  With session -- this is the
2    part about session, you're not able to step out
3    and talk all the time because you're listening
4    to testimony.  So you'll say, you know, they'll
5    call you or text you and you'll be like, get
6    some more information, I don't know which bill
7    they're talking about, you know?  Constituents
8    generally will not know the bill number, so --
9    and sometimes they will.  So we're -- the staff
10   is back and forth with constituents or I'll say
11   call this staffer for this committee and see
12   what bill that they could possibly be talking
13   about.
14  Q    How does your staff keep notes on who calls?
15  A    Generally, they'll email me.  If it's a lot,
16   lot of constituents -- sometimes when a bill --
17   like the teacher's pay raise.  Sometimes I'm
18   like, just take their name and their email
19   address and when we get an answer to it we'll
20   keep them updated.  If it's a criminal justice
21   -- when we did criminal justice reform.  Take
22   their name and email and as bills go through
23   the process we'll try to inform them.
24  Q    So on every call it's your procedure to ask for
25   an email address?

Page 110

1  A    Not on every.  If it's like we're getting two
2   or three hundred calls and if the staff has
3   time.  See, all this lever on this -- because
4   when we're in session, remember that we still
5   have constituent requests coming in that are
6   pressing.  I didn't get my stack -- tax refund.
7   My license is about to be revoked for this, can
8   you call the department.  So they're weighing
9   things.  So you have to know, you know, the
10  weight of -- you know, and I tell them, listen,
11  if you don't get to it all, you have to tell
12  me.  But it's weighed.  It's a different
13  procedure based on what we're dealing with that
14  day when session starts.  You're trying to
15  serve all hundred and twenty something, thirty
16  something thousand constituents while still
17  getting through voting on bills.
18 Q    Okay.  And just to clarify.  So typically it's
19  your staff that's going to be taking these
20  calls and facilitating these requests --
21 A    Right.
22 Q    -- to you?
23 A    Uh-huh.
24 Q    But if someone's particularly disrespectful to
25  your staff to a level of which they can't do

Page 111

1    that --
2  A    Uh-huh.
3  Q    -- you will then call that person back?
4  A    If I have time.
5  Q    If you have time.
6  A    Sometimes you don't get to check your emails
7   until the end of the day, you know, and it's
8   just what it is, right?  And sometimes you
9   check them during the day or your staff texts
10  you with an emergency call.  Generally, on bill
11  calls, those are not considered emergency
12  calls.  Emergency calls during session are
13  reserved for constituents who have emergency
14  issues.
15 Q    Okay.  So we talked about your office receiving
16  calls.  Does your office, you said, receives a
17  lot of emails about proposed legislation from
18  the public?
19 A    Sometimes.  Sometimes we'll have a week where
20  we don't receive anything, and sometimes it
21  floods and then you get all of these.  We also
22  get automatic emails.  So the procedure when
23  you get more than ten emails or more than a
24  hundred emails, more than fifty, whatever it
25  is, you create a folder for that legislation or

Page 112

1    that subject matter and we do a rule in our
2   office that everything goes to that.  So that's
3   really how we started doing it.  I forgot about
4   that.  Where when I have an answer to it, they
5   can go into that folder and do a rule to send
6   my reply I type out.  Send it to them or give
7   it to them over the phone and everyone will get
8   that reply.  That's how we really -- with the
9   amount of legislation that's being passed,
10  that's how we've really come to replying.  Is
11  that, you know, they'll run a rule from March
12  9th -- because subject matters are each year.
13  Some of them are recurring.  If the session
14  started March 13th, they may run a rule and say
15  move all bill, you know, move all emails on
16  this subject matter or this bill to this
17  folder.  And so if I can get back to it if
18  something major happens with the legislation
19  when they leave at night, they can set up to
20  run emails to those folders to give people form
21  responses.
22 Q    And so that's -- that system is used when you
23  get a lot of emails --
24 A    Right.
25 Q    -- on a particular subject?

Page 113

1  A   Yes.  No way I can return a hundred calls in a
2      day and still do legislative work.
3  Q   What email addresses do you use to get input
4      from the public about proposed legislation?
5  A   jacksonk@legis, L-E-G-I-S, .la.gov.  That's my
6      official district office email.
7  Q   Okay.  Do you get any to any other emails?
8  A   I'm not supposed to.  Sometimes people will get
9      confused and if they have my law office email
10     they'll send it.  The staff immediately sends a
11     reply to send it back to the correct --- please
12     contact this email.
13 Q   Do you personally see each email?
14 A   I would like to say I do but, no.  There's no
15     way you can.  If I get one call on a bill I'm
16     likely to see that email.  And one email on a
17     bill I'm likely to see that email.  But what we
18     do is this, once we send a form answer, if
19     it's a thanks, they may not send it.  But if
20     someone has further questions, out of the
21     hundred you sent it to, two may have further
22     questions.  You try to get to them but if it's
23     day where I'm in Health and Welfare and
24     Education.
25 Q   So, you said you're probably not able to

Page 114

1      personally see every email?
2  A   Uh-huh.
3  Q   Do you strive to?
4  A   I try to, yeah.  But it's just not humanly
5      possible.
6  Q   Do you respond to emails?
7  A   If I have a little time at night I may login to
8      my staff email and respond to make it easier on
9      them.  I know what they're going through during
10     the day.  I used to work in the district office
11     part time and I used to be a legislative ---
12     Executive Director of Legislative Black Caucus.
13     So sometimes I'll, you know, will go in and
14     assist my staff.
15 Q   But your staff is who will often respond to
16     these emails?
17 A   Right.  But I have responded over the phone
18     with them.  So my staff does not send a form
19     answer I hadn't given them or a response I
20     haven't given them.  What you will see from my
21     staff is they'll say, thank you, we've received
22     your email, we're forwarding it to Senator
23     Jackson.
24 Q   You've mentioned a couple of times about your
25     legislative staff.

Page 115

1  A   Uh-huh.
2  Q   How many staffers do you have --- or how many
3      people are on your legislative staff?
4  A   One (1).
5  Q   Just one?
6  A   Now you understand why we're a system.  One.
7  Q   Okay.
8  A   Now, I have --- no, I have two (2).  I have a
9      part timer.  But the thing is, is with the
10     legislature you only get one staffer.  You only
11     get one income.  Your full-time legislative
12     assistant is said to be the person that
13     receives sixty percent (60%) of the income.
14     And I think legislative staffers, even with my
15     sixteen (16) years in service, make about
16     Thirty-Nine Thousand (39,000).  That sums it up
17     for you.  Right.
18 Q   Okay.  And so this one --- you said you have one
19     full-time staffer and --
20 A   Uh-huh.
21 Q   --- one part time?
22 A   Probably work about five (5) --- maybe about ten
23     (10) hours a month.
24 Q   Oh.
25 A   That's how part time it is.

Page 116

1  Q   Okay.
2  A   And I have staff in Baton Rouge.  But staff in
3      Baton Rouge is considered your Capitol staff
4      and they can not deal with -- you know, they
5      can not deal --- they can take your messages,
6      they can do all that.  They can't deal with,
7      you know, sending, you know, messages back all
8      the time.  And I get a Senate aide during
9      session.  That Senate aide generally does not
10     have an email because they're not given a state
11     email.  That's generally a student worker.
12 Q   Okay.  First, I want to talk about your one
13     full-time --
14 A   Uh-huh.
15 Q   --- staffer.  Who is that person?
16 A   Theresa Tran.
17 Q   And what is her job description?
18 A   You --- best found on whatever the Human
19     Resource documents are.  They work at the will
20     of the legislature.  I know that we set their
21     hours and it's anything in the legislative
22     office, as well as, community events for me.
23     And I try to attend most of my community
24     events.  My staff generally doesn't work after-
25     hours unless I have to when I'm in session.

Page 117

| | |
|---|---|
| 1   And they have to while I'm in session.<br>2 Q   And you've mentioned that Theresa, your<br>3     legislative staffer, she's -- is it a woman?<br>4     I'm sorry.<br>5 A   Yes, she is.<br>6 Q   Yes.  She is going to be the one who when you<br>7     send a form response, she's the one who's<br>8     sending those back out --<br>9 A   Right.<br>10 Q   -- to constituents?<br>11 A   Uh-huh.  And even a non-form response.<br>12 Q   Okay.  But she's the one who's going to be<br>13     answering the phone and answering the --<br>14 A   Right.<br>15 Q   -- emails --<br>16 A   Uh-huh.<br>17 Q   -- on your behalf, which --<br>18 A   And sometimes when I answer the phone when I'm<br>19     here, people are shocked.  They're like, this<br>20     is you, you know, go ahead with -- you know?<br>21     You know?<br>22 Q   Okay.  And you also said that you have one<br>23     part-time staffer; who is that?<br>24 A   Right now that's Sharon Duncan.  She doesn't<br>25     touch emails.  She doesn't answer the phone.<br><br>Page 118 | 1 Q   Okay.<br>2 A   They're not going to answer our personal<br>3     emails.<br>4 Q   Okay.  So we've talked about you receive calls<br>5     and emails from the public.  How else do you<br>6     hear from the public about proposed<br>7     legislation?<br>8 A   If they're in the Capitol they may talk to me.<br>9 Q   Just run into you in the Capitol?<br>10 A   Right.  Or they're in committee and -- or<br>11     you're on the floor and they send a note saying<br>12     can I talk to you.<br>13 Q   Are there any other ways that you can think of<br>14     that the public reaches --<br>15 A   Every once in --<br>16 Q   -- out to you?<br>17 A   -- a while social media.  Mostly on Facebook.<br>18     Most of my stuff is centered around Facebook.<br>19 Q   So you do use social media to engage with the<br>20     public on some proposed legislation?<br>21 A   Uh-huh.  Not now.  Its become too weighted.<br>22     What I generally do is I may post something.<br>23     If they comment, I may comment.  Most of the<br>24     time if someone inboxes me I send them that<br>25     graphic that says please contact our<br><br>Page 120 |
| 1   She just helps with, you know, things.<br>2 Q   What kind of things?<br>3 A   Sometimes a community event every once in a<br>4     while, but I don't generally pull them for a<br>5     community event.  She will proof some of my<br>6     letters.  She's good at proofing.<br>7 Q   Is there anything else you can think of that<br>8     she does?<br>9 A   No.<br>10 Q   And then you also mentioned you have Capitol<br>11     staff.  How many Capitol staff members do you<br>12     have?<br>13 A   Capitol staff is a little different.  If you're<br>14     not a chairman, there's one administrative<br>15     person assigned to -- I forgot how many<br>16     members.  Right?  So you have that person, but<br>17     you share them with other senators.  You get a<br>18     Senate aide that comes to the Capitol with you<br>19     only during session.  They're not set to any<br>20     hours.  I think it's fifty something dollars a<br>21     day.  It's mostly a student worker or a law<br>22     student, something like that.  That's it.  And<br>23     the Senate staff works for all senators, so the<br>24     drafting staff, the attorneys, they work for<br>25     everyone.<br><br>Page 119 | 1     legislative office.<br>2 Q   Okay.  So how do you -- how do you interact<br>3     with people -- or how do you engage with the<br>4     public on proposed legislation on social media?<br>5 A   I may put my legislation and I also put little<br>6     designs of, this just passed or this is coming<br>7     up in committee.  Some of the times it's not<br>8     even my legislation, it's just an important<br>9     issue.  Budget hearings, I may say please<br>10     watch, we're about to receive testimony on<br>11     this.  Not more of an engagement, a more of<br>12     notifying.<br>13 Q   And what social media platforms do you use to<br>14     engage with the public?<br>15 A   Mostly like Instagram, Facebook, and sometimes<br>16     Twitter.  I know this is going to sound bad and<br>17     I know Twitter's changed name is X.  I usually<br>18     sometimes for days forget I have Twitter.  I<br>19     have an official Senate Facebook page, that's<br>20     why I'm more apt to be on Facebook.  I have a<br>21     official -- I have my personal page and then I<br>22     have an official state senator Facebook page.<br>23 Q   Okay.  Have you ever asked users on social<br>24     media for their thoughts on legislation?<br>25 A   When I had time in the House I always did, but<br><br>Page 121 |

1  now in the Senate, not as much.  I will -- I
2  will post something to make them aware of it
3  more now than anything.
4  Q   Okay.  So just to make sure that I'm -- just to
5  clarify.  So, you don't do it as much as you
6  used to?
7  A   Not at all.  Since I've been in the Senate I
8  don't do as much as I used to.  Most of the
9  time it's for notification.  When I was in the
10  House I had a little bit more freedom to say,
11  what do you think about this.  I only had two
12  parishes.  Now -- and I probably do it
13  sometimes, but most of the time it's
14  notifications.
15  Q   And you also mentioned that at least part of
16  the reason for that is it's a function of time?
17  A   Uh-huh.  It's a function of time and -- there's
18  so many fake accounts on social media that you
19  never really know who you're talking to.  You
20  -- viruses that pop up on social media, things
21  you open, so, yeah.
22  Q   When you have solicited social media users for
23  their thoughts on legislations, do you remember
24  any specific instances of what you asked?
25  A   It would have most likely been in the House.
Page 122

1  A   Not because they -- it voiced displeasure.
2  You're going to have displeasure over your
3  bills.  Because I found out information through
4  their advocacy that let me know this was not a
5  bill that should have been filed or it's not
6  good for the State of Louisiana.  I have to get
7  to a point where I realize it's not good for
8  the District 34 or the state or it's going to
9  have a, you know, some impact that I did not
10  intend for it to.  Now, sometimes I still roll
11  with it because it's needed, but those are
12  generally the issues where I'll withdraw a bill
13  from the files.  Or sometimes I withdraw a bill
14  from the files because it's going through the
15  process and you realize its already been taken
16  care of.  Or the department meets with you and
17  say this is going to be taken care of, then
18  I'll withdraw it.
19  Q   But you have withdrawn a bill after public
20  comment given you more context?
21  A   More context, yes.  Uh-huh.
22  Q   Do you remember when that was?
23  A   I don't.
24  Q   You're not able to recall a specific bill?
25  A   No.
Page 124

1  That's why I remember some incidents because it
2  got more hits than others.
3  Q   Is there anything you can recall?
4  A   The nurse practitioner bill that I stated.
5  Especially when we were going through the
6  select committee on state police oversight.
7  That would have been one.  When we're going
8  through the budget, would have been another
9  one.  That I want them to watch the budget
10  hearings in my district and understand what's
11  going on.
12  Q   Do you try and incorporate the public input you
13  receive into your positions in the legislature?
14  A   My district more than anything.
15  Q   But you try to incorporate the public's input
16  into your positions?
17  A   My district, yes.
18  Q   How do you do that?  Can you give us some
19  examples?
20  A   What we've talked about.  Email.  And my
21  advisory council.  Things like that.  Before
22  session we try to do little session tours, meet
23  with people, things like that, in the district.
24  Q   Have you ever withdrawn a bill because the
25  public voiced displeasure over it?
Page 123

1  Q   Have you ever amended a bill because of
2  feedback from the public?
3  A   Yes.
4  Q   Do you remember a specific instance?
5  A   No.  That can happen at any given time.
6  Amendments fly all the time.  Sometimes it's
7  just me deeply reading a subject matter,
8  reading a new case that came out, something
9  like that.  So it's a myriad of issues why I
10  would do amendments to get a bill out of
11  committee because of committee member's input.
12  Yeah.
13  Q   But you -- have you sometimes -- let me
14  rephrase that.  Have you ever amended a bill
15  because of, like, public feedback?
16  A   Yes.  If it's like -- I remember and I don't
17  know what bill it was.  I remember -- I amend
18  other members' bills.  Like if the advocates
19  for disability come in here and say, this is
20  the impact it's going to have, did you realize
21  you were doing this education bill but it's
22  going to do A, B, C, D, yeah.
23  Q   Have you ever solicited bills or legislation
24  ideas from Twitter specifically?
25  A   I don't recall.  I really don't.
Page 125

32 (Pages 122 - 125)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

1  Q    You don't recall whether you've done this?
2  A    No. I don't. I know I've posted notifications
3       about bills and stuff like that. I just -- I
4       can't tell you which means I would have used to
5       solicit bill ideas. Now, what I do know is
6       that I probably posted legislative session is
7       starting with my contact information on all
8       social media accounts. Yeah.
9  Q    Do you know if other lawmakers use Twitter?
10 A    I'm not as familiar with Twitter. This case is
11      making me have to become familiar with it.
12      I've just never been as familiar with Twitter.
13 Q    But do you know if other legislators use their
14      Twitter?
15 A    Sometimes I know they -- I don't know how they
16      use it, but sometimes I know when a bill comes
17      up I'm tagged in Twitter posts with other
18      lawmakers who have Twitter so, yes. I think
19      the House and the Senate has Twitter accounts.
20      Because they have Facebook accounts and they
21      have Instagram accounts. That's who officially
22      speaks for the House or the Senate. We don't
23      control the House or the Senate social media
24      accounts nor can we post on them.
25 Q    You mentioned that sometimes you get tagged.
Page 126

1  A    Uh-huh.
2  Q    Are you tagged by other legislators or other
3       legislators tagged with you?
4  A    Most of the time in my social media accounts,
5       other legislators are tagged with me. And
6       sometimes another legislator will tag me if
7       we're working on a bill together.
8  Q    All right. And now I want to talk about the
9       devices that you have. Do you remember --
10 A    Uh-huh.
11 Q    -- responding to interrogatories in this case?
12 A    I do. Uh-huh.
13 Q    In response to Interrogatory No. 17, you said
14      you have two government issued devices, which
15      are a district office desktop and a laptop; is
16      that correct?
17 A    Right. That's in my district office. I think
18      I have a laptop. Sometimes if I -- if I have
19      my Senate aide I may have a laptop, a old
20      laptop that's used. As far as me personally,
21      the only thing I generally carry around is my
22      chamber laptop.
23 Q    Okay. And so that laptop you said, that third
24      laptop or third device?
25 A    I don't think I have one right now.
Page 127

1  Q    Okay. But that would be for the aide when you
2       do have it --
3  A    Yes.
4  Q    -- is that what you said?
5  A    Uh-huh.
6  Q    Okay.
7  A    Uh-huh. And the aide only works during
8       session. I did have a legislative assistant in
9       the rural area at one time that was more
10      active. She had a computer but she did not
11      have -- she had that laptop and that's why I
12      think it's turned in. And she had a -- she
13      wasn't given a state email so she couldn't
14      access our state emails.
15 Q    But the laptop was provided by the state?
16 A    Right.
17 Q    That interrogatory response also said that you
18      had personal devices including an iPhone 12, a
19      Mac Pro and an iPad Pro; is that right?
20 A    Uh-huh. I don't have a Mac Pro anymore. I
21      couldn't figure out -- I never got acclimated
22      to it. I cleaned it up and gave it to a friend
23      because it was brand-new and sitting in the
24      office wasting money.
25 Q    Okay. And then, you also said you have a law
Page 128

1       office laptop and several desktop computers; is
2       that correct?
3  A    Used for the law office only.
4  Q    Is all of this the same with the exception of
5       you no longer have the Mac Pro?
6  A    I think I have another iPhone because mine
7       acted up, so I had to change --
8  Q    You've gotten a new phone?
9  A    Claimed insurance and they sent me another one.
10 Q    Okay. Other than that, the answers are the
11      same --
12 A    Yes.
13 Q    -- in the sense -- okay.
14 A    Uh-huh.
15 Q    So, this phone, it's not a government issued
16      phone --
17 A    No.
18 Q    -- correct?
19      So if you have no government issued phone,
20      do you use your personal cell phone for work?
21 A    No. This is mostly for law office work, yes.
22 Q    Okay.
23 A    Uh-huh.
24 Q    Do you use it --
25 A    I generally text people and say this is my
Page 129

**Page 130**

```
1     personal cell phone.  If I pick up the phone
2     and someone has gotten hold of it, I say, hey,
3     I'm not being rude, this is my personal cell
4     phone, can you call the office.
5  Q  And that's regarding your Senate work?
6  A  Yes.  My clients generally call the office, as
7     well, in my legi –– in my law office but, yeah.
8  Q  Do you communicate with your constituents on
9     your personal cell phone?
10 A  No.  Not often at all.  You have to have ––
11    like, it may be a church member and they may
12    have my phone because we do stuff at church.
13    Maybe a friend and they may call just like any
14    friend calls and says, what do you think of
15    this, and I may talk to them.  But all of my
16    calls on my cell phone are based to –– are more
17    personal in nature.
18 Q  But occasionally you discuss legislative
19    matters with other stakeholders on your
20    personal cell phone?
21 A  Very seldom.  What happens is, I call my office
22    and say connect me to this person.  So the
23    phone –– the calls go through my office.
24 Q  Do you communicate with other lawmakers on your
25    personal cell phone about legislative matters?
```

**Page 131**

```
1  A  They'll call.  Most of the time it's about
2     meetings and stuff.  Or, hey, when you get to
3     the Capitol I want to talk you about this.
4     Katrina, where are you?  I'm looking for you,
5     stuff like that.
6  Q  Did you say you text with other lawmakers about
7     legislation?
8  A  No, not really.  Those are phone calls mostly.
9     Yeah.  I don't because texts can get
10    misconstrued, right?  The only time you get a
11    text is they say, "Hey, we've started
12    committee.  Where are you"?  Like a staffer
13    will say, "Are you coming to committee?  We
14    don't have a quorum."
15 Q  Going back to your government issued devices.
16 A  Uh-huh.
17 Q  I want to start with your Senate office –– your
18    district office desktop computer.  Have you
19    used that computer to access your social media
20    accounts?
21 A  I have.  Because sometimes I sit in there, yes.
22 Q  Have you used it to access your Senate Facebook
23    page?
24 A  Yes.
25 Q  Have you used it to access your Twitter?
```

**Page 132**

```
1  A  It would have been years ago.  Sometimes –– I
2     don't even know my password to Twitter half of
3     the time, I mean, so, you know?
4  Q  So is that a, yes?
5  A  Yes, I have.  Uh-huh.
6  Q  You have –– you have logged into Twitter on
7     your ––
8  A  Right.  Yes.  On my district office and my
9     chamber laptop.
10 Q  Oh, so you've logged in on your office laptop
11    also?
12 A  But most of the time now I carry a law office
13    laptop and so I'll login on there.
14 Q  Okay.  But ––
15 A  Uh-huh.
16 Q  –– you have used your government issued ––
17 A  Probably in years past, yeah.
18 Q  Do you use your personal cell phone to access
19    your social media accounts?
20 A  Yes.  Uh-huh.
21 Q  Including Twitter?
22 A  Yes.
23 Q  I want to ask you more broadly about your
24    social media ––
25 A  My Twitter is my, like, personal page.  The
```

**Page 133**

```
1     only Senate page I have is the Facebook.
2  Q  Okay.  I want to ask you about your social
3     media use more broadly.  I know you've
4     mentioned a couple, but can you list out the
5     social media accounts that you have?
6  A  It would be the same ones I responded to.
7     Twitter, which is a personal account.  My
8     Facebook personal account.  My Senate personal
9     account.  And –– my Senate Facebook page.  My
10    personal Facebook page and my personal, I
11    think, Instagram page.
12 Q  Okay.  So, just to make sure I've taken this
13    down correctly.  You have a Twitter page.
14    You've got a personal Facebook.  You've got a
15    Senate Facebook ––
16 A  Uh-huh.
17 Q  –– and then you have a Instagram account?
18 A  Uh-huh.  The only account that is the –– is
19    like designated for the Senate is that Senate
20    Facebook account.
21 Q  Okay.  So, turning to your Facebook.  That
22    Senate account is –– the Senate account is a
23    public page?
24 A  Yes.
25 Q  And it's for your Senate, correct?  For your
```

1    Senate --
2  A   Uh-huh.
3  Q   -- position?
4  A   I think all my pages are public pages.  I don't
5      -- I don't think I have anything set as
6      private.
7  Q   Okay.  And this public page -- or excuse me.
8      Let me rephrase that.  This Senate page --
9  A   Uh-huh.
10 Q   -- you only talk about your Senate work,
11     generally, on it?
12 A   Sometimes I may talk about personal stuff, but
13     it's not often.
14 Q   Do you use that particular page for your law
15     firm?
16 A   I have a law office Facebook page.
17 Q   Okay.  Is that a third account?
18 A   Yes.  I --
19 Q   Okay.
20 A   -- forgot about that.  I have a law office
21     Facebook page.
22 Q   So you don't use your Senate Facebook page for
23     any of your law office matters?
24 A   I try not to.  It might be a mistake and post
25     every once in a while when I'm moving fast but,
Page 134

1    no.  My law office page is reserved for my law
2    office.
3  Q   And then you also have a personal page?
4  A   And everything goes on there.
5  Q   And is that page private?
6  A   No.
7  Q   It's open to the public?
8  A   Yes.
9  Q   Why do you have the three different Facebook
10     pages?
11 A   Because I never want to mix my office business
12     with Senate business.  Facebook is my most
13     active account, so that is the social media
14     account I would say I designate to use to
15     communicate with constituents so I need a
16     Senate Facebook page.  That's where I run ads
17     from on law office matter -- I mean on Senate
18     matters.  That's probably the one page that I
19     solicit opinions from the public on.
20 Q   Why did you choose to have a personal Facebook
21     account?
22 A   Facebook's the most -- it's the thing I'm most
23     familiar with.  And I'm very active,
24     personally, on Facebook.  And so, when my
25     personal Facebook page became inundated with
Page 135

1    Senate stuff, we created a Senate page.  Also,
2    I remember, you can not -- I probably would
3    have used my personal page.  You can't run ads
4    on a personal page on Facebook.  So since
5    Facebook was going to be my main stream of
6    communicating with constituents, I needed to
7    recreate that Senate page to run ads.
8  Q   You also mentioned you have an Instagram
9      account?
10 A   Yes.
11 Q   And just one?
12 A   Yes.
13 Q   Is your Instagram account private?
14 A   No.  Well, I think it is.  Yes.  I don't know.
15     I don't even know how Instagram works that
16     much.  It may be public or private.  I don't
17     know.
18 Q   Is there anything that could get you to recall
19     whether it's private or public?
20 A   I don't know what's -- I'm telling you, I'm
21     more versed on Facebook.  I think that -- the
22     only thing I know about Instagram that may
23     distinguish it is, when you get a message
24     request, but Instagram may be set up that way.
25     When you get a message request from someone
Page 136

1    that's not following you, you always see, you
2    know, a message.  It always shows up as a
3    message request.  So I don't know what that
4    signifies.  I'm not well-versed.  I can post on
5    Instagram.  I'm not real well-versed at it.
6    And Facebook automatically posts to Instagram.
7  Q   Okay.
8  A   My personal Facebook page automatically posts
9    to Instagram.
10 Q   So, why have you chosen to make your Instagram
11     private?
12 A   I don't know if it's private.  I just know that
13     if you're not following me on Instagram and you
14     send a inbox message, it says message request.
15     That may be the way Instagram is set up.  I
16     can't tell you whether it's public or private.
17     What I do know is when I -- I don't know a lot
18     about Instagram.  So what I do know is when I
19     set it up, it set up for people to follow you.
20     It may or may not be private.  I don't know.
21 Q   You also mentioned you have an account on X,
22     formerly known as Twitter, correct?
23 A   Right.  Uh-huh.
24 Q   And you've mentioned this already.  But the
25     company is now called X, but --
Page 137

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                www.veritext.com

1  A   Uh-huh.
2  Q   -- we will call it Twitter throughout this
3     deposition.
4  A   Sure. Uh-huh.
5  Q   So when I say Twitter, can we agree that I'm
6     referring to the company now known as X?
7  A   Most definitely.
8  Q   Your Twitter account is publicly available; is
9     that correct?
10  A   I believe it is. I don't set anything to
11     private. If something is set to private it's
12     because that's how it was, you know, when I
13     signed on it was -- it's -- the only thing that
14     would be set to private is if a page mandates
15     that you set it to public for it to be public.
16  Q   Okay.
17  A   So like let's say you sign up with Facebook. I
18     think you have to set your Facebook page
19     private. I'm more, you know, familiar with
20     Facebook, so I never went in and set it to
21     private. When you sign up with Twitter, I'm
22     not sure what it mandates. Instagram, I'm not
23     as familiar with, that's the newest one. I
24     think one of the -- Twitter or Instagram, I
25     don't know. I think it's Instagram, is the

Page 138

1     newest created one. I don't know what
2     questions it would have asked when it was set
3     up.
4  Q   Okay. Going back to your Twitter. So your
5     Twitter is publicly available, which means that
6     anyone on Twitter can see your tweets, correct?
7  A   I think so. However it was set up when it was
8     -- when I signed into it. I'm not as familiar,
9     but I think it's public.
10  Q   And so would that mean that because your
11     account is public and -- even a user that's not
12     following you could see your tweets?
13  A   I think so, yeah.
14  Q   And any person on Twitter can respond to your
15     tweets?
16  A   I believe so. Uh-huh.
17  Q   Even if they're not following you?
18  A   I believe -- I believe so, yes. I'm not as
19     familiar with Twitter.
20  Q   Has your Twitter account -- has your Twitter
21     account ever -- let me rephrase that. Has your
22     Twitter account always been publicly available?
23  A   I'm not sure.
24  Q   Has your Twitter account ever been private?
25  A   I'm being honest, I'm not sure. I'm really not

Page 139

1     as familiar with Twitter. If I have hit
2     something by mistake, it may have converted the
3     page. I'm just not as familiar.
4  Q   So you don't recall whether it's ever been
5     private?
6  A   No. I wouldn't remember all of that. Because
7     I don't even know how long I've had Twitter.
8     Whatever answer I gave in my discovery answers
9     would be correct.
10  Q   Okay. When did you create a Twitter account?
11  A   Whatever my discovery answers said. I would
12     have had to look at it to see. I didn't have
13     any social media. I used to work for the
14     Legislative Black Caucus. My fear was that in
15     working for them because you are the Executive
16     Director, at some point I would post something
17     that was contrary to their views. So I didn't
18     even have social media to a certain point. I
19     probably either had it nearing the end of my
20     time or right after my -- you know, when I took
21     sabbatical. I was always very careful when I
22     was working for the legislature. I saw staff
23     called in about what they posted, so I wasn't
24     as active on social media. Even if I had it, I
25     wouldn't have been as active because of the

Page 140

1     staffing issues. So, I can look through my --
2     I think you asked that in my -- oh, here it is.
3     February 13, 2023 -- no. That wouldn't have
4     been it. When did I -- let's see if it tells
5     how long I've had Twitter. That's the
6     supplemental. Let me go to the first one. I'm
7     looking for it based on what I answered. If
8     it's not in here -- I'm trying to see if it's
9     in here. No. I don't see it from a cursory
10     review of when I had it. But I remember I was
11     very careful either to not have social media or
12     to be very limited what I posted on social
13     media while I was working for the House and
14     then when I working for the Black Caucus. I
15     became more -- when I took my sabbatical from
16     the Black Caucus, I either formed social media
17     accounts or became active on them. It was
18     because the role I was sitting in.
19  Q   Do you ever remember -- do you remember ever
20     setting your Twitter account to private?
21  A   I remember that I was getting so many
22     notifications and we were in, like, a hearing
23     that was important and I hit something. That's
24     because you're trying to turn off notifications
25     at that point because they're coming --

Page 141

36 (Pages 138 - 141)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

1  sometimes when you update your phone -- this is
2  what I remember most about Twitter, Facebook.
3  Sometimes when you get a new phone, update your
4  phone, it was always when you would start
5  receiving notifications. I really call my
6  niece and like, what do I do. If she's at
7  school, I'm like, let me hit something just to
8  get these notifications off my phone while I'm
9  sitting in committee. Because I'm also dealing
10 with texts from my law office; from staff in my
11 law office. So I'm trying to get those
12 notifications that pop up on my phone off of my
13 phone during those hearings. And most of the
14 time if I update it, if I do a IS -- IOS update
15 sometimes, unintentionally, it turns stuff back
16 on. So I could have done anything if I'm
17 trying to get those notifications from popping
18 up.
19 Q  How many times do you remember taking that kind
20    of action?
21 A  I can't tell you. If we're in a tense hearing,
22    I'm waiting on a call from my law office and
23    all of a sudden stuff starts posting -- popping
24    up and you're like, how did this notification
25    come -- I hate notifications from social media

Page 142

1  directly to the device, right? I'll start
2  cutting off whatever I can and keep listening.
3  And when you say cutting off, you mean you turn
4  off your notifications from social media?
5  A  That's what I intend to do, but with the ones
6    I'm not as familiar with, yeah. Sometimes I
7    call the staff and say, you know, do what you
8    can do with this. Or if my niece is in the
9    Capitol with me, I say, do whatever you can do
10   with this, I need to get my calls from the law
11   -- I need to get my texts from the law office.
12 Q  Do you have any idea how many times you've done
13    that?
14 A  Huh-uh.
15 Q  You can't recall how many times?
16 A  No. I've been in the legislature fifteen (15)
17    or sixteen (16) years and sometimes I'm in
18    trial. And if I'm in trial and stuff starts
19    popping up and I'm waiting to make sure my
20    staff gets me a document I need, I hit whatever
21    I can hit and keep moving. Just being straight
22    with you. I -- you know, sometimes I may hit a
23    wrong button, sometimes I may get it right,
24    sometimes I go into my phone settings. Now
25    more frequently since I've understood, they

Page 143

1  walked me through it -- my niece has walked me
2  through it several times. I know to go to my
3  phone settings and start shutting stuff down.
4 Q  So that's how you --
5 A  Now.
6 Q  Okay.
7 A  Uh-huh.
8 Q  And so that would be turning off the
9    notifications from there?
10 A  Right. And I've learned that. She said, just
11    go to your phone settings. My niece tells me
12    just go to your phone settings and turn off
13    your notifications. And my nephew. Remember
14    I got him two-and-a-half years ago. He's way
15    more familiar and he's also have to -- way more
16    available because I support him financially, so
17    -- you know what I mean? Got to be way more
18    available. And he's in the house with me so
19    sometimes I'll say, what is this, and so he's
20    taught me over the last two-and-a-half years.
21    My niece used to try to tell me, she's like, oh
22    my God, old folks. But he -- he'll say -- walk
23    me through it, this is how you turn off your
24    notifications. If I forgot before I really
25    learned over the last two years, he'll say,

Page 144

1  turn off your notifications. So now I go -- I
2  try to go through settings in the phone.
3 Q  Okay. So when you've taken this kind action,
4    it's you've turned off the notifications?
5 A  Uh-huh. Or attempted to. Now I know I turn
6    them off.
7 Q  Okay. But you don't recall ever setting your
8    account to private?
9 A  I don't know if -- if I did, it was probably
10    because I didn't know how to turn off
11    notifications. So, I do what I have to do to
12    get through the day of not being distracted and
13    still being able to look at the phone when it
14    dings so that I can answer law office messages.
15 Q  Do you remember why you created the Twitter
16    account?
17 A  Probably because I was finally free from having
18    to be cautious about what I post about social
19    issues because I was working for the Black
20    Caucus.
21 Q  And actually, let me back up just a little bit.
22    You mentioned that you had taken a sabbatical
23    --
24 A  Uh-huh.
25 Q  -- from working for the Black Caucus. Why did

Page 145

**Page 146**

1     you take a sabbatical?
2 A   To run for office.
3 Q   Okay.
4 A   Right.
5 Q   So you took a –– you took a sabbatical and then
6     after taking that sabbatical --
7 A   The next day I –– the next day or so I
8     announced my candidacy.
9 Q   Okay.
10 A   And I never went back.
11 Q   And so why did you create a Twitter account?
12 A   I was free. I was free from being scared to be
13     called in on stuff that we posted.
14 Q   Are you familiar with what a Twitter handle is?
15 A   I just know it's a @ symbol, I think. Yeah.
16 Q   And then after –– what is after the @ symbol,
17     that is your Twitter handle, correct?
18 A   Yes. Uh-huh.
19 Q   Do you choose your own Twitter handle?
20 A   Yes.
21 Q   Do you know what your Twitter handle is?
22 A   Probably not now. I don't. I have not changed
23     anything, so whatever it was as an inception of
24     the case. As an attorney I know when something
25     is being litigated, don't change it.

**Page 147**

1 Q   Did you request your data from Twitter as part
2     of discovery in this ––
3 (Inaudible conversation between Ms. Schwartzmann and
4           and Mr. Crow)
5 A   Whatever I answered in the discovery is going
6     to be your best answer on all that stuff.
7 Q   Okay. In –– did you request your data from
8     Twitter as part of discovery in this case?
9 A   Yeah. My attorney contacted me and told me I
10     needed to request my data.
11 Q   Did you review this data?
12 A   Probably about three minutes and I sent it
13     over. It all looked like jargon to me.
14 Q   Okay. I'm now going to show you a file your
15     counsel gave us from production of Twitter --
16 A   Uh-huh.
17 Q   –– which I'm marking as "Exhibit 1." This is
18     titled 51963872-screen-Name-Change?
19 A   Uh-huh.
20 Q   I want to direct your attention --
21       MR. CROW:
22         I'm sorry, Tommy.
23       WITNESS:
24         Uh-huh.
25 BY MR. CROW:

**Page 148**

1 Q   I want to direct your attention to the screen
2     name change on December 28, 2019, which says,
3     the screen name changed from "RepKJackson" to
4     "SenatorKRJ." Is that --
5 A   From --
6 Q   –– correct?
7 A   Uh-huh. (Affirmative response).
8 Q   Was RepKJackson your first Twitter handle?
9 A   I'm not sure. I really am not.
10 Q   Based on this information received from
11     Twitter, do you have any reason to believe that
12     your first Twitter handle was not @RepKJackson?
13 A   I wouldn't know because I don't know when I
14     started this page. This shows 2019. And so
15     maybe that's when the Twitter available, you
16     know, Twitter documents or whatever we
17     requested, that's as far as they could go back
18     maybe. I don't know when I started this Senate
19     page so I couldn't say that. What I know is
20     that I changed my profile names because when
21     people were looking for me they couldn't find
22     me, friends and everything. So I played with
23     the Twitter handle a number –– a number of
24     times to make sure people could find me. The
25     –– because I did know a lot about Twitter and,

**Page 149**

1     you know, I kept changing it so people could
2     me, you know?
3 Q   So, why did you change your name from
4     RepKJackson to SenatorKRJ?
5 A   Because for some reason regardless of what page
6     you have people –– I don't –– look, Twitter is
7     hard for me to find people and Twitter is hard
8     for people to find me. So I play with what I
9     think they're going to search.
10 Q   Okay. In this name change, you changed your
11     name from representative or RepKJackson to
12     SenatorKRJ. And that was on December 28th,
13     2019, correct?
14 A   Yeah. And probably because what I wanted
15     wasn't available.
16 Q   In changing from rep to senator, was –– would
17     that have been around the time you were elected
18     to become --
19 A   Most likely --
20 Q   –– a senator?
21 A   –– because of regardless of what page, your own
22     personal, otherwise people are going to put in
23     senator.
24 Q   Okay. And so you changed that because --
25 A   Right.

1  Q   -- you were a senator and no longer a
2      representative?
3  A   Because that's how people search you.
4      Regardless if it's your personal page or not,
5      people are going to search you that way.
6  Q   You then changed your screen name again on
7      March 4th, 2020, from SenatorKRJ to
8      KatrinaJack_Sen; is that correct?
9  A   That's correct.
10 Q   Did you make this change?
11 A   I did. Because I realized people were
12     searching me more by Katrina.
13 Q   Okay. Are there any other reasons you made
14     this change?
15 A   Because I realized people were searching me
16     more by Katrina. Oh, and I know one change was
17     made because we -- and that's why we always say
18     Katrina R. Jackson. Because at some point --
19     I'm a former teacher and someone sent me
20     something were a former teacher. So one of
21     these changes denoted that and that might be
22     when I changed to Senator. Where a teacher
23     named Katrina Jackson in another state molested
24     a child or something and it came up one day and
25     people were like, hey, and I was, oh, let me --
                                              Page 150

1      let me get distinguishable on my social media
2      accounts. That's why you always see us say
3      Katrina R. Jackson. If you search in Google
4      now, you -- you know, I don't know. I haven't
5      searched in awhile. So we play with Twitter
6      and all kind of names and added the -- and
7      always keep the R. Because with me having a --
8      when I say I'm a former educator and people are
9      "Katrina Jackson," so I've experienced that a
10     couple of times and I was like, oh, no.
11 Q   Would this Twitter handle that you've changed
12     to on March 4th, 2020, Katrina --
13 A   Uh-huh. (Affirmative response).
14 Q   -- Jack_Sen --
15 A   Uh-huh. (Affirmative response).
16 Q   -- was Jack_Sen a play on the -- on your last
17     name and the fact that you're a senator?
18 A   Uh-huh. (Affirmative response). I just tried
19     to put in everything people may search me by.
20 Q   You then changed it again on February 21st,
21     2021, correct?
22 A   To KatrinaRJackson.
23 Q   And that was --
24 A   Because it might have became available.
25 Q   -- and that was because -- or excuse me. And
                                              Page 151

1      you changed it from KatrinaJack_Sen?
2  A   Yeah. Uh-huh. (Affirmative response).
3  Q   And do you remember why you made this change?
4  A   Because that's what I kind of want to be known
5      as. On my personal page as KatrinaRJackson.
6      Again, I'm always including that R because I
7      don't want anybody to think I'm the Katrina
8      Jackson. So, it might have been because it was
9      available, right? Because personally, now it's
10     going to be Andrews when that -- I've already
11     hyphened it in the Senate to Jackson-Andrews.
12     Dash Andrews. And I need to do it -- and
13     that's why I didn't give you that name because
14     I haven't done it legally yet. So, that's
15     basically I want to be known. It's -- I don't
16     know how to say it other than that. Now people
17     can search Katrina R. Jackson and find Katrina
18     R. Jackson and they can search my entire first
19     name. So that's how it is. And I think I
20     wrote on your exhibit. I'm sorry. Here,
21     Tommy, this is going to become an exhibit most
22     definitely.
23 Q   And so have you changed your Twitter handle
24     from KatrinaRJackson to anything else?
25 A   Not that I know of.
                                              Page 152

1  Q   So is this your current handle?
2  A   I believe it is. I'm not sure. I would have
3      to check with -- I would have to check Twitter.
4      Again, I'm always playing to make -- playing
5      with everything to make sure people can find
6      me.
7  Q   So you said that you're aware in discovery in
8      this case that we sought your twistory [sic] --
9      your history from Twitter, correct?
10 A   Uh-huh. (Affirmative response). Yes.
11 Q   And Twitter produced some of this data --
12 A   Uh-huh. (Affirmative response).
13 Q   -- to you, which was produced to us by your
14     counsel; is that right?
15 A   Right.
16 Q   And now I'd like to talk about some of your
17     activity on Twitter.
18 A   Sure, go ahead.
19 Q   What was your first tweet?
20 A   I don't know. Whatever I put in discovery if
21     it was on there.
22 Q   I'm showing you now what I'm going to mark as
23     deposition "Exhibit #2."
24 A   Uh-huh.
25 Q   It's a tweet dated March 12th, 2000– or excuse
                                              Page 153

39 (Pages 150 - 153)

| | |
|---|---|
| 1    me, March 9th -- | 1    Q   And you posted in this tweet that "Our office |
| 2    A   Uh-huh. (Affirmative response). | 2        will update you daily."  Is that right? |
| 3    Q   -- 2012.  Are you familiar with this tweet? | 3    A   Right.  And I do remember now, I apologize, why |
| 4    A   It's probably the -- it's probably what I put | 4        I changed to KatrinaRJackson, it was the |
| 5        on every social media account I had. | 5        search.  I don't get on Twitter as much and I |
| 6    Q   Is this a fair and accurate representation of | 6        wanted to make sure this was identified as my |
| 7        your tweet? | 7        personal account.  Uh-huh. (Affirmative |
| 8    A   Right.  It would have been something I put on | 8        response).  That's why I would have taken all |
| 9        every social media account.  I try to notify | 9        the tags off.  Because I knew I wasn't going to |
| 10       constituents in every way possible that I'm | 10       be on Twitter as much so it was, like, this is |
| 11       gone.  Also, it notifies my friends, it | 11       my personal account.  Right. |
| 12       notifies my clients, you know, that I'm gone. | 12   Q   And you said -- when you said, our office will |
| 13   Q   Can you read this tweet for me? | 13       update you daily -- |
| 14   A   Sure.  "On Monday at noon we will begin | 14   A   Uh-huh. (Affirmative response). |
| 15       Legislative Session.  Our office will update | 15   Q   -- were those daily updates provided on |
| 16       you daily." | 16       Twitter? |
| 17   Q   Was this your first tweet? | 17   A   No.  Because I don't get on Twitter enough. |
| 18   A   I'm not sure.  Like, I don't even know when I | 18       That's probably why I would have changed it and |
| 19       started Twitter. | 19       made sure people understood it was my personal |
| 20   Q   Do you have any reason to believe that this is | 20       ~~account.  Redirecting~~ people to the office I |
| 21       not your first tweet? | 21       think is a bit ambitious to think you're going |
| 22   A   I would have to see the entirety of Twitter | 22       to update daily.  Our office -- like what we |
| 23       data and go back and research it.  Like, I | 23       started doing is sending out stuff saying |
| 24       couldn't tell you. | 24       basically -- years ago, for legislative updates |
| 25   Q   You have received your data from Twitter; is | 25       for this and that when we're in meetings, |
| Page 154 | Page 156 |
| 1        that correct? | 1        please email jacksonk@legis.la.gov. |
| 2    A   Yeah.  And I perused it for about three to four | 2    Q   If -- |
| 3        minutes and sent it to Tommy.  It looked like | 3    A   You're bright-eyed and bushy-tailed and think |
| 4        jargon.  And I probably put this on my personal | 4        you're going to do everything when you first |
| 5        Facebook page as well as my Senate Facebook | 5        get in in 2012, right?  And after that, you |
| 6        page. | 6        realize that things need to go through your |
| 7    Q   If told you this was your first tweet, do you | 7        office and that your personal life needs to be, |
| 8        have any reason to disagree with me? | 8        you know, personal. |
| 9    A   No.  Uh-uh. (Negative response).  Unless other | 9    Q   In this tweet when you said that you would |
| 10       information showed it. | 10       provide updates -- |
| 11   Q   Do you have evidence of the contrary? | 11   A   Uh-huh. (Affirmative response). |
| 12   A   I'm not sitting with my Twitter page.  I'm not | 12   Q   -- those would have been updates on the |
| 13       sitting with all the data produced from | 13       legislative session? |
| 14       Twitter.  So, you know, I didn't know this was | 14   A   Right.  Which I never followed through with on |
| 15       -- I needed to bring evidence to this | 15       social media.  That's why we began to redirect |
| 16       deposition. | 16       everyone to the office.  Denoting the name |
| 17   Q   But you do have that data to authenticate it? | 17       change from Exhibit 1 -- I changed it a couple |
| 18   A   Tommy has it now.  And I think Twitter went | 18       of times for searches, but in 2021 I definitely |
| 19       back as far as they could go.  So I don't -- | 19       changed to KatrinaRJackson because people were |
| 20       look, I don't know what -- I guess I would have | 20       getting confused with all the Senate handles |
| 21       to ask Twitter, is this my first tweet or is | 21       and everything.  And when I realized |
| 22       this as far back as you can go. | 22       KatrinaRJackson would distinguish me from the |
| 23   Q   And in this tweet you're announcing the | 23       teacher who had a relationship with a underage |
| 24       legislative session, correct? | 24       child, I was like this will work. |
| 25   A   Right. | 25   Q   Who in your office provides these updates? |
| Page 155 | Page 157 |

1  A    They are provided -- if it's on social media,
2      they're provided by me.  Now, there are no --
3      there are no real updates, daily updates on
4      social media.  Facebook has more updates than
5      anything.  But the daily updates when things
6      happen -- you know, because even providing
7      daily updates was ambitious in 2012, right?
8      But the updates that do happen are provided
9      through me via staff.  Staff is not going to
10     update them on legislative session because
11     they're not there.  Sometimes the House staff
12     will give me things.  Like I'll say, give me
13     this to post or give me this to send to my
14     constituents.  So it's a, you know, a higher
15     effort.  What's posted on my social media is by
16     me.
17  Q   But your staff does help you prepare these
18     updates?
19  A   The legislative staffers will help me prepare a
20     graphic.  And sometimes I prepare my own
21     graphics, right?  And they help all us prepare
22     graphics.  And sometimes I'll prepare them
23     because I've learned how to prepare my own
24     graphics and sometimes the staff at home will
25     prepare graphics.

1  Q   All right.  And so back up.  When you say your
2      legislative staffers --
3  A   Uh-huh.  (Affirmative response).
4  Q   -- those are the ones that are at the Capitol?
5  A   Right.  We have a -- I forgot what it's called
6      because we reestablished it a year or two ago,
7      but it's the Office of Communicative Public --
8      whatever it is, it's a new title, but they help
9      members prepare graphics.  I've become savvy to
10     where -- I guess I call it savvy.  It is for
11     me, right?  Where I can prepare my own
12     graphics.  And so I'll prepare my own graphics
13     most of the time.  I've even helped other
14     members prepare theirs.
15  Q   But the legislative staffers occasionally help
16     you with --
17  A   Right.
18  Q   -- these graphics?
19  A   Occasionally.  Uh-huh.  (Affirmative response).
20  Q   So, with this tweet, you started using Twitter
21     at the beginning of a legislative session,
22     correct?
23  A   Uh-huh.  (Affirmative response).  Yes.  I'm
24     sorry.
25  Q   Did you continue to tweet during the

1      legislative session?
2  A   Not often.  That's what became the issue with
3      Twitter.  And that's why with any of my social
4      media, that's why we direct people to the
5      office for the most updates for what's really
6      happening.  Facebook I use more than anything.
7      And Instagram just is a -- is a newer, you
8      know, it's a secondary beneficial --
9      beneficiary of my use of Facebook because when
10     you post on Facebook, it posts on Instagram.
11  Q   You said that was the issue.  Can you just -- I
12     missed what that was.  Can you -- what was the
13     issue?
14  A   That you were not going to be able to update
15     people daily on social media.  So your main
16     source was what the government issued to you,
17     was your phone line at the Senate office and
18     your email address.
19  Q   Do you continue to tweet during the legislative
20     session?
21  A   Every so often.
22  Q   So is that a yes?
23  A   Yes.  Every so often.  Uh-huh.  (Affirmative
24     response).  I continue to tweet every so often
25     throughout the year, yeah.  My activity on

1      Twitter is minimal to compare to my activity on
2      other social media accounts.
3  Q   Do you find Twitter useful to you as a public
4      official?
5  A   No.  Absolutely not.  And I don't -- I don't
6      mean that in a bad way.  No.  It's hard to
7      read.  The conversations are not as defined, so
8      you never know where stuff is coming from.
9      Facebook, you post and everything goes under
10     that post.  Twitter threads are just not been
11     useful as much to me.  I can catch something
12     every once in a while on there but not as much.
13     It's just not as useful at all.
14  Q   How do you use Twitter?
15  A   When I feel like posting.
16  Q   Do you use Twitter to receive information?
17  A   Not really.  You're not going to see a lot in
18     my inbox because I didn't even know how to use
19     my Twitter inbox for a while.  I don't message
20     people on Twitter much at all.  I'm just not as
21     familiar with Twitter.  If I try to follow a
22     conversation on Twitter, I get lost in it.
23     Whether it's a personal conversation,
24     otherwise, I just kind of get lost.
25  Q   Do you use Twitter to share information?

1   A    Occasionally. I share both, personal and other
2        information.  It's my personal page.  I
3        sometimes use my personal page to share
4        legislative information every once in a while.
5        Twitter is just not my high-traffic area.
6   Q    So why do you tweet?
7   A    I don't tweet as much.  Sometimes somebody will
8        say, go Twitter and look at this, stuff like
9        that.
10  Q    But why do you post tweets?
11  A    If I remember I have Twitter I might go on
12       there just to keep the account active.
13  Q    Do you tweet to communicate with the public?
14  A    Not as much.  Sometimes I'll copy what I'm
15       putting on Facebook and put it on there so that
16       my account remains active.
17  Q    Okay.  You said not as much, but that is, yes,
18       you do occasionally?
19  A    Like if someone is -- like a friend has told me
20       they hate Facebook, they don't use Facebook,
21       I'll put a family picture up.  Something like
22       that.  When I got married I used all realms of
23       my social media to announce my marriage.  I was
24       happy.  I was gleeful.  Uh-huh.  (Affirmative
25       response).

Page 162

1        hundred percent sure.  And I wouldn't be able
2        to tell you if I did the last time I did it.
3   Q    Is there anything that would allow you to
4        recall that?
5   A    Twitter jargon is Twitter jargon.  This case.
6        I know I would have tweeted that some bill
7        passed because that became the cross of this
8        case.
9   Q    Do you tweet about your committee hearings?
10  A    I'm not sure.  I would have to look at my old
11       Twitter feed to see.
12  Q    You're not sure if you've tweeted about your
13       committee hearings?
14  A    I'm -- I may have.  Yeah.  But --
15  Q    Have you tweeted to provide the public with
16       information about proposed and pending
17       legislation?
18  A    I may have.
19  Q    Is there any specifics that you can recall?
20  A    This case.  But I don't know if I tweeted about
21       the proposed.  I know I tweeted -- I think I
22       tweeted about his passage.
23  Q    You mentioned previously that occasionally you
24       solicit feedback from the public regarding how
25       to vote --

Page 164

1   Q    Do you tweet to provide information to the
2        public regarding the happenings of the
3        legislature?
4   A    I probably used to before I -- you know, before
5        I changed to KatrinaRJackson.  Sometimes I have
6        since then -- well, my main source of providing
7        to the public is in my office and that Senate
8        Facebook page.
9   Q    But you do occasionally tweet --
10  A    Yeah, occasionally.
11  Q    -- to provide information?
12  A    Uh-huh.  (Affirmative response).
13  Q    And what kind of -- what types of information
14       do you try to provide?
15  A    I couldn't tell you.  Like, seriously I just --
16       I couldn't tell you.
17  Q    Do you tweet in advance of legislative
18       hearings?
19  A    I don't remember if I've done it often.  I
20       don't.  I may have.  Sometimes I copy
21       everything and just put it on each social media
22       website.
23  Q    Okay.  So have you tweeted in advance of
24       legislative hearings and votes?
25  A    I might have.  Yeah.  I might have.  I'm not a

Page 163

1   A    Uh-huh.  (Affirmative response).
2   Q    -- for the side to sponsor legislation --
3   A    Uh-huh.  (Affirmative response).
4   Q    -- is that correct?
5   A    Yes.
6   Q    Do you get some of this from social media?
7   A    From Facebook.
8   Q    Have you ever gotten any from Twitter?
9   A    I don't recall.  I don't think I have.  I know
10       that we were all being tagged on every social
11       media account people could find when the
12       (indiscernible 2:37:19) stuff happened.  So
13       there are instances where we all being tagged
14       on everything.  And that's my recollection of
15       Twitter, like, being tagged when there's a hot-
16       button issue.  And I try to redirect people to
17       the office.  If I have time to say -- you know,
18       being courtesy to a constituent.  If I have
19       time to say something about it, I will
20       regardless of where they communicate with me.
21       And even on my personal Facebook page, right?
22       I will respond.  If it gets to the point where
23       I can't respond and I can't answer, I'll say,
24       please call the office so we can communicate,
25       right?  I can tell you that a student has

Page 165

1    tagged us for two weeks on Twitter.  Two or
2    three weeks about the cell phone policy.  And
3    he –- I kind of figured out he was never going
4    to call the office.  I didn't want to leave
5    that student hanging, so it was last night or
6    day –- night before last I finally went on
7    Twitter and realized he had tagged me like for
8    the last two weeks.  Me, Beth, and others.  And
9    I tried to answer his questions a couple of
10   times.  Because Twitter is not a form I
11   generally use, when he kept having questions, I
12   said, can you please contact the office.  You
13   know, so out of courtesy even on my personal
14   page, if someone is asking over and over about
15   something I generally will not ignore a
16   constituent.  But when it keeps going, I'll
17   finally say, can you please contact the office.
18   Sometimes I won't respond, I'll just direct
19   them directly to the office.
20 Q    And with the specific example that you just
21      mentioned --
22 A    Uh-huh.  (Affirmative response).
23 Q    –- regarding the cell phone policy, you
24      responded to this person on Twitter because you
25      thought they would not call?

Page 166

1 A    They had been –- he –- I think one of the
2      members asked me, have you seen the amount of
3      times we've been tagged by this student.  And I
4      said, oh, my God, let me go to Twitter.  I
5      don't want to ignore a student.  So that was
6      yesterday or the day before yesterday.  So
7      sometimes a member that's tagged or something
8      will say, hey, you haven't engaged in this
9      conversation and I'll –- then I'll go to
10     Twitter.  And so after going back and forth
11     twice, I said, look, my –- the best way to
12     communicate with me is through the office, can
13     you call the office.
14 Q    Okay.  Have you tweeted about legislation being
15      considered by committees?
16 A    I'm not sure.  I might have.
17 Q    Have you tweeted about how you're going to vote
18      on legislation in advance of the vote?
19 A    I'm not sure.  I may or may have.  I'm not
20      sure.
21 Q    Have you tweeted about legislation that you've
22      sponsored?
23 A    I may or may have.  I'm not sure.  I think I
24      have, but I –- I just remember -- this case
25      gives me the best Twitter memory.

Page 167

1 Q    And you've tweeted to get feedback from the
2      public on proposed legislation, correct?
3 A    Guys, can we take a break?  I have a personal
4      matter that I've been trying to handle for two
5      weeks and my staff is texting me that they have
6      that person on a call.
7          MR. HAYES:
8             Let's go off the record.
9          --OFF THE RECORD--
10  EXAMINATION BY MR. CROW, continuing:
11 Q    Senator, before the break, you mentioned that
12      you –- there are sometimes legislative staffers
13      that work on your graphics, correct?
14 A    Uh-huh.  (Affirmative response).  Yes.  I
15      apologize.
16 Q    What was – do you have the names of these
17      legislative staffers?
18 A    Jeremy is one.  He works for whatever our
19      communications is.  It's a combined
20      communications -- communication office.  But
21      actually any staffer in that office can work on
22      your graphics.  So whoever is free and does
23      them, does them.  Mainly what graphics they
24      work on sometimes is when I'm going to announce
25      a bill.  But mainly I sometimes try to do a

Page 168

1      Zoom with my district because I –- you know,
2      all fo them can't get down there.  That's
3      another form I forgot about.  Sometimes it's
4      weekly, sometimes it's not as frequent
5      depending on how much work and balance we're
6      doing.  This year I did, I think, one.  Where
7      they can communicate with me on bills and other
8      matters.
9 Q    And Jeremy, do you know Jeremy's last name?
10 A    I don't know.  But it's any staffer.  I can say
11      it's him, but actually he might have created
12      the first one.  It's any staffer in that
13      legislative communications office.  I do the
14      graphics as well as sometimes as Theresa in my
15      district office does graphics.
16 Q    Theresa sometimes works on --
17 A    Right.
18 Q    –- these graphics --
19 A    Uh-huh.  (Affirmative response).
20 Q    –- also?
21          MADAM COURT REPORTER:
22             What was her last name?
23          WITNESS:
24             Tran.  T-R-A-N.  But none of them post
25      on my social media account.  They come back

Page 169

43 (Pages 166 - 169)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

1    to me via email or text and I post it on my
2       social media accounts.
3  MR. CROW:
4  Q  But they sometimes create the graphics?
5  A  Creates the graphics, yes. Uh-huh.
6  Q  Okay. I also wanted to circle back to your
7     Instagram account. You said you couldn't
8     recall whether it was public or private --
9  A  Right.
10 Q  -- is that correct?
11 A  Uh-huh.
12 Q  I'm showing you on my phone. Is this your
13    Instagram account?
14 A  Yes, it is.
15 Q  Is -- can you tell if it's public or private?
16 A  It's private. Uh-huh.
17 Q  Does that picture of your account that I just
18    showed you -- or it wasn't a picture, it was --
19    that was your --
20 A  Uh-huh.
21 Q  -- account on Instagram? Does that refresh
22    your recollection of whether your Instagram is
23    public or private?
24 A  Yes. And it says it's private so it's probably
25    -- it's most likely private. I've never seen
Page 170

1  Q  Do you take phone calls from the public during
2     these meetings?
3  A  No. The only time I'll step out of committee
4     is if my legislative -- my legal staff calls
5     me. Like, we just -- you know, I just did in
6     this deposition because we're waiting on a call
7     or a judge's office gets on the phone. My
8     family calls me, then I step out of committee
9     if it's something pressing. I'll sometimes
10    text them and say, hey, is this something
11    pressing. If someone who's working on, you
12    know, legislation bills calls me like a
13    constituent, which really never happens, right?
14    I'll step out of committee. There are various
15    reasons to step out of committee. Very rarely
16    is it to make a call or take a call from the
17    public, no.
18 Q  Okay. And so you said it's --
19 A  I will initiate a call if I have a question. I
20    will initiate a call to a -- to someone back
21    home to get information on a bill. And I will
22    sometimes go on a record and said I've just
23    spoke to so-and-so. Most of the time I refer
24    to emails that I'm reading on a bill while I'm
25    in committee if it's a constituent.
Page 172

1    it from anyone else's account so, thank you.
2  Q  No problem. And I had one other question
3     regarding your --
4  A  I need to go make that public. I didn't know
5     it was private.
6  Q  Okay. And so circling back to where we left
7     off. Do you check Twitter during committee
8     meetings or in between meetings?
9  A  No, not often. No. I may have but I -- it's
10    not like a standard form of communication for
11    me, for a legislator, so -- sometimes I don't
12    check Twitter for months. It's just that when
13    I get those I -- up -- IOS updates and it
14    triggers it to start sending me notifications.
15    Or sometimes I've touched something and I start
16    getting notifications. You know, the updates
17    kind of knock out some of your settings, that's
18    when more frequent -- or if somebody says, have
19    you seen all these tags on Twitter, and then
20    I'll go check it.
21 Q  But you said you don't do it frequently but you
22    have checked Twitter during committee meetings?
23 A  I do everything during committee meetings. I
24    practice law during committee meetings, so I
25    can't say no to that.
Page 171

1  Q  When you use Twitter, do you tweet about your
2     law practice or law firm?
3  A  I'm not sure. I don't -- I don't use Twitter
4     as much. I have a law practice -- and
5     sometimes I will. I think I have in the past,
6     I think. I would have to research it.
7  Q  Do you advertise for legal clients or solicit
8     clients on Twitter?
9  A  That's what I'm saying, I would have to go back
10    and look. I'm not sure. I don't --
11 Q  You don't recall?
12 A  -- Twitter -- no. And I don't use Twitter as
13    much, so -- yeah.
14 Q  When you tweet, you said that you sometimes
15    cross post to Facebook and Instagram?
16 A  Yeah. What I'll do sometimes is whatever I've
17    posted, if I remember I have tweet that --
18    Twitter that day, if you compare my Facebook
19    page to my Twitter and my Instagram because
20    Facebook instantly posts to Instagram, you'll
21    see a lot more posts. If I remember I have
22    Twitter that day I'll click on it and paste and
23    keep going. I may not ever open it again for
24    weeks sometimes, you know?
25 Q  Okay. And you mentioned that Instagram you
Page 173

44 (Pages 170 - 173)

1  have the option for it to post the same post
2  you've posted on Facebook to Instagram --
3  A   It is--
4  Q   -- at the same time?
5  A   -- connected.  I don't think I have to hit it,
6  it's just connected.
7  Q   Okay.  But your Twitter is not connected to
8  that?
9  A   No.
10  Q   And so would you just copy and paste if you --
11  A   Yeah.
12  Q   -- posted it?
13  A   And that's why you don't see a lot of Twitter
14  posts because I mainly use Facebook, but
15  Instagram automatically post to Facebook.  So
16  Instagram is, you know, it's more high-frequent
17  only because Facebook instantaneously, on my
18  personal page, posts to Instagram.
19  Q   Okay.  But that -- the Facebook page that is
20  linked to your Instagram --
21  A   Uh-huh.
22  Q   -- is your personal page?
23  A   Right.  I believe so.  I don't -- I don't fully
24  know how it works.  I know when I post
25  something personally I generally see it on

Page 174

1  Q   Do you have any specific recollection?
2  A   No.  Just the same as I don't have real
3  specific recollection besides this case on what
4  I put on Twitter about my personal or
5  legislative.  The only thing specific I
6  remember is my wedding and sometimes when my
7  nephew receives an award probably.
8  Q   And I want to talk about your interactions on
9  Twitter.  How do you use Twitter to interact
10  with other users?
11  A   Yeah.  It's pretty hard so sometimes you don't
12  see me do it often.  Like I said, if I get a
13  notification like somebody says, you see all
14  the stuff we're being tagged in, our Twitter is
15  going crazy a member is saying, I'll go to it.
16  Like that.  I don't use that inbox for Twitter.
17  If I have a friend that doesn't have Facebook
18  or, you know, I may go to Twitter.  I remember
19  the only thing I had for the ULM coach for a
20  period, the old ULM coach, and she was doing a
21  great job, was we had interacted on Twitter.
22  So that's pretty much the only thing I had, so
23  I would, you know, post about that mostly or
24  tweeted her a couple of times on Twitter back
25  and forth because that's how she contacted me.

Page 176

1  Instagram or somebody may send me a shot.  You
2  know, me and my friends joke when we say
3  because I joke -- me and my husband joke a lot
4  so they'll say, you all are so funny or
5  something like that, right?
6  Q   Do you have any specific recollection of having
7  posted -- cross posted from your Senate page to
8  your Twitter page?
9  A   Not that I know of.  When I cross post it
10  probably goes on my personal page first and
11  then it goes on every page.  So I wouldn't have
12  any specific recollection.
13  Q   Do you recall ever having tweeted about your
14  practice or law firm?
15  A   I'm -- you've kind of asked that.  I've told
16  you if I've tweeted about my practice or my law
17  firm, advertised for my practice or law firm or
18  did anything like that on Twitter, I would have
19  to go back through Twitter.  I don't often use
20  Twitter so the content of what's on Twitter, I
21  wouldn't know about.
22  Q   But you don't have --
23  A   Without --
24  Q   -- any recollection of doing that?
25  A   I'm not sure.

Page 175

1  That's why I started playing with the Twitter
2  name, but eventually when KatrinaRJackson
3  became available or whatever, I was like, good,
4  finally who I am, bam.  That's what I identify
5  as so that's pretty much it.
6  Q   So is it your testimony that your current
7  Twitter handle @KatrinaRJackson was not
8  available when you made your Twitter?
9  A   I'm not sure.  Because see, what I remember and
10  testified before the break, was that I played
11  with how they can search me.  Like, who -- how
12  do people frequently search me and I kept
13  playing with that.  And I don't remember.  I
14  just remember -- maybe I said let me try
15  KatrinaRJackson and it was available.
16  Q   Do you reply to other user's tweets on Twitter?
17  A   I -- sometimes I do.  If I get on Twitter and
18  it's something interesting, I will.  If I'm
19  congratulating someone, I will.  Just like
20  before the break I talked about, you know,
21  somebody said, have you seen this kid -- I
22  think it was Beth, that keeps tagging us, and I
23  said, it's a child, oh, let me go to Twitter.
24  And then last night or the night before last
25  after the first two exchanges -- because you

Page 177

Page 178

1  can't -- for me, the thread -- tread of -- the
2  thread of Twitter is hard to follow.  I
3  redirected him to the office.  Because number
4  one, I know I'm not going to check Twitter
5  much.  And number two, it's important that a
6  child -- I think I might have responded, you
7  know, thank you for your advocacy as a young
8  man even though we don't agree.  He posted, you
9  all are making decisions.  I remember this
10  because this -- it must have been last night.
11  "You all are making decisions and you're not --
12  and you've never been a teacher."  Because we
13  told him -- I think I was the one that told him
14  the teacher complaint.  Because I can only
15  remember my post because I don't know how to do
16  Twitter much; my responses.  And after that, I
17  told him I was a high school educator before
18  law school and then a junior high educator.
19  And that, you know, cell phones can be a
20  disturbance in the class, but he wanted to go
21  further.  Like I do with most people, I
22  redirect them to the law office for further
23  conversation -- I mean to the legislative
24  office for further conversation and
25  legislation.

Page 179

1  Q   And this young man that you were responding to
2      --
3  A   Uh-huh.
4  Q   -- last night, where does he live?
5  A   I'm not sure.  I don't -- I didn't even click
6      on his profile.  They just told me a kid was
7      texting us.  And I remember afterwards, I said,
8      I don't know if that's a kid.  Because when I
9      invited him to call the office, he was like,
10     never mind, you're just not going to answer
11     like you've not answered on this.  I don't go
12     into a big detail.  I'm not on Twitter for two
13     to three weeks at a time.  So if someone cues
14     me in that a child or something is -- you know,
15     I'm not going to ignore them.  The hardest
16     thing for -- to get young people to do is get
17     involved in the legislative process.  Trying to
18     explain to them this is not, you know, page I
19     wrote.  You know, I basically try to respond if
20     it's quick.  Then, I come off and ask them to
21     go to my -- to contact me at the office.
22  Q   And so as we've just discussed, you interact
23     with other Twitter users on matters relating to
24     the legislature and politics?
25  A   Very infrequently.

Page 180

1  Q   But it does happen?
2  A   Just like today -- I mean yesterday or the day
3      before when somebody cued me into it or like I
4      said before the break when my phone has somehow
5      started sending me notifications or when I get
6      bored, which is not usual because the schedule
7      is what it is, so I'll finally go to Twitter on
8      my habit or if I'm on the phone, I'll say, oh,
9      I ain't been to Twitter in a while, I click on
10     it.
11  Q   So is that a yes?
12  A   That's a yes with details.
13  Q   Do you have any other plans to run for other
14     office?
15  A   Whatever God deals with me on.  I'm newly
16     married.  I'm raising a 15-year-old child whom
17     I love.  And my plans will be directed as they
18     always have been by God.
19  Q   But you don't have any current plans?
20  A   No.  I didn't have plans to run for what I'm
21     in.
22  Q   Do you have any plans, currently, to leave the
23     Louisiana Senate?
24  A   My plans are always directed by God.  The day
25     he tells me he's done, we'll walk out together

Page 181

1      like we walked in.
2  Q   Do you plan to use Twitter after you leave
3      office?
4  A   I'm going to use all my social media.  I joke a
5      lot on social media.  Im not going to -- it's
6      kind of an outlet for me.  Also, a lot of my
7      friends are busy just like I am so we follow
8      each other's lives on social media.  If
9      something important happens it let's you know
10     to send a card.  If somebody posts they're sick
11     and that's a friend that I hadn't talked to in
12     awhile, it lets me know to reach out to them.
13     So, yeah, to that extent I don't plan to shut
14     down anything.  Plans change, but right now I
15     don't plan to shut down anything.
16  Q   I now want to go ahead and I want to move and
17     talk about your Twitter homepage.  So, I'm
18     going to show you what I'm marking as
19     plaintiff's deposition --
20  A   Uh-huh.
21  Q   -- "Exhibit #3."
22  A   Uh-huh.
23  Q   Is this your Twitter page?
24  A   Yes.
25  Q   Is this a fair and accurate representation of

1    your Twitter page?
2  A   Yes, it is. Uh-huh. My marriage photo is the
3    profile picture.
4  Q   At the top of the page I see you in a photo
5    with a group of people.
6  A   Oh, yeah, that's always my favorite profile
7    photo. It usually stays on all my social
8    media. It is a qualifying photo, but that is
9    -- usually be the picture that has most of my
10   friends and family on it, so that remains
11   current.
12 Q   You said it was a qualifying photo.
13 A   Right.
14 Q   What do you mean by that?
15 A   Qualifying for public office. That's usually
16   when my friends -- most of my friends and
17   family come together most.
18 Q   I now want to show you what I'm marking as
19   plaintiff's deposition "Exhibit #4."
20 A   Oh, and I see my last tweet, which is about
21   God.
22 Q   I want to show you this. Is this the post from
23   which your Twitter cover photo comes from?
24 A   Yes, it is.
25 Q   Are you familiar with this tweet?

Page 182

1  A   I am. We have a prayer breakfast before each
2    post -- I mean before each qualifying. And
3    listen, I've never said that I didn't post
4    about my political office on Twitter. You just
5    showed me Exhibit 3 which had posts about God,
6    it had nothing to do with politics. If you
7    show me some more posts, you're going to see
8    posts about my family. My Twitter profile
9    picture is my husband and I because I recently
10   was married. I think we can kind of -- I'll
11   let you ask your questions.
12 Q   And so you said your cover photo is from this
13   event?
14 A   No. My cover photo -- I will give you back
15   Exhibit 3. My cover photo is my husband and I
16   marriage official photo.
17 Q   Is that your --
18 A   Oh, my --
19 Q   -- cover --
20 A   -- profile. Yeah. My cover photo is from that
21   event. If you see the kids in the front are
22   kids from my church and my best friend's kids.
23   And then I have my father beside me, my
24   sisters, all of my friends, my nephew. It is
25   the photo every four years that has most of my

Page 183

1    friends and family in it so that generally --
2    besides my wedding, becomes my cover photo for
3    all of my pages. Even my personal Facebook
4    page, but I don't know what it is now because
5    that changes more frequently. I think it's me
6    and my husband at the church.
7  Q   So you mentioned that this photo is from the
8    day you qualified to run for Senate District
9    34. Did you run in this race unopposed,
10   correct?
11 A   Not in -- let me see which photo it is right
12   now. I'm sorry. From Exhibit 3, that's the
13   most recent. I was not unopposed. In the one
14   from Exhibit 4, I think I was unopposed. I was
15   unopposed in Exhibit 4 when the cover photo was
16   that last prayer breakfast. I was opposed in
17   #3 Exhibit. I was opposed.
18 Q   The cover --
19 A   See --
20 Q   -- photo from Exhibit 3 comes from the post in
21   Exhibit 4, correct?
22 A   No. I'm sorry. I should have looked at them.
23   You see I have on a red dress where they -- and
24   you see different people in that post. My
25   sister has on a red and white dress and this

Page 184

1    one she has on a blue dress. I always wear
2    red. One is -- the #3 is a high-collar, so
3    that's not the same post. Number 3 is about
4    six years ago when I first ran for Senate.
5    Exhibit 4. Let me see which exhibit it is.
6    Exhibit 4 is when I first ran for Senate
7    unopposed five or six years ago. And then
8    Exhibit 3 is the newest time I ran for Senate
9    and I was opposed. So it -- they're different.
10   So this post and this is not the same.
11 Q   Okay. If we look back -- can I direct you back
12   to Exhibit 3?
13 A   Sure.
14 Q   You talked about your profile picture.
15 A   Uh-huh.
16 Q   And that you said it was that of you and your
17   husband?
18 A   Right.
19 Q   Did you choose your own profile picture?
20 A   I did. Uh-huh.
21 Q   Why did you choose that profile picture?
22 A   Because it's the newest current event in my
23   life.
24 Q   Also in Exhibit 3, can you see your Twitter
25   bio?

Page 185

47 (Pages 182 - 185)

1 A   "I'm interested in a better Louisiana."  And
2   I've always been interested in a better
3   Louisiana.  When I worked for the House of
4   Representatives, I was.  When I worked as the
5   Legislative Black Caucus Executive Director, I
6   was.  That's kind of a saying I've always had,
7   I'm interested in a better Louisiana.
8 Q   That statement, I'm interested in a better
9   Louisiana, what does that statement mean to
10   you?
11 A   A lot of people even when I was in –- after law
12   school, a lot of attorneys left the state of
13   Louisiana.  When I worked for the legislature,
14   a lot of people were leaving.  In my youth I
15   felt like it was more –- it's kind of like one
16   of those better together statements.  It was
17   more about retaining people here in the State
18   of Louisiana.  I've had a lot of law office
19   staffers to kind of come in and out of
20   Louisiana.  Move.  So it's just that, you're
21   interested in a better Louisiana.  Also, it
22   means -- in my faith, it means that I'm
23   interested in Louisiana that upholds the
24   principals of God.  I'm very transparent on
25   that.  In my personal life I'm interested in a

Page 186

1   better Louisiana for my nieces and nephews who
2   are questionable about staying in Louisiana.
3   When I look at the poverty when I drive
4   throughout Louisiana, I'm interested in a
5   better Louisiana for the people of Louisiana.
6   It is a mutlifaceted heart type of thing.  The
7   heart of the matter.  I've had times where
8   before I was elected I thought about moving,
9   but didn't.  And so I remained committed, you
10   know, to where I grew up at.  Probably during
11   the Ronald Green matter, it meant I was --
12   interested in a better Louisiana because people
13   were being killed.  And I don't know when I put
14   this up, I would have to go back and look.  It
15   might have been triggered from an event.  It
16   may have been triggered for emotions, but that
17   is my statement when bad things happen.
18 Q   In your Twitter bio, still in that --
19 A   Uh-huh.
20 Q   –- Exhibit 3.  Sorry.
21 A   Uh-huh.
22 Q   Do you have any links in your Twitter bio?
23 A   I have a link to katrinarjackson.com.  That is
24   my Senate page that –- Lord, I don't even do
25   any work on hardly.  I need to do better.  But

Page 187

1   that is my Senate page.
2 Q   The katrinarjackson.com --
3 A   Uh-huh.
4 Q   –- is your website?
5 A   Yes.
6 Q   What information can someone find on this
7   website?
8 A   Unfortunately, nothing current.  I need to do
9   better.  But it was probably linked when it was
10   created.  I don't have a law office website I
11   would have linked that to.  I don't have a
12   personal website I would have linked that to.
13   I tend to link everything I can so people can,
14   you know, find me in whatever capacity I'm in.
15 Q   Okay.  I'm now going to show you what I'm
16   marking as plaintiff's deposition "Exhibit #5."
17 A   I'm going to keep them in order for you.  Yes.
18 Q   Is this the homepage of your website?
19 A   Yes.  That's my Senate website.  That's the one
20   I referenced was linked.
21 Q   Is this a fair and accurate representation of
22   your website, katrinarjackson.com?
23 A   Yes, it is.
24 Q   So, when we arrive and look at this landing
25   page, there are several links.  In the upper-

Page 188

1   lefthand corner is a button that says,
2   "Donate"; is that correct?
3 A   That is correct.
4 Q   I'm now going to hand you what I'm marking as
5   deposition "Exhibit #6."  Is this –- is this a
6   fair and accurate representation of the page
7   one is directed to after clicking the donate
8   button on --
9 A   Yes.
10 Q   –- katrinajackson –- katrinarjackson.com?
11 A   Yes, it is.
12 Q   And on this page there is a statement that
13   says, "State Rep. Katrina Jackson is expanding
14   the territory of her Servant's reach to serve
15   more people and parishes.  It is through this
16   ministry that she has experienced great joy.
17   She has the passion to help people across
18   Northeast Louisiana and this Great State.
19   Louisiana's most valuable resource is its
20   people and therefore she's asking that we unite
21   and donate to continue to push our region and
22   state forward."
23 A   Yes.
24 Q   Is that right?
25 A   Uh-huh.

Page 189

48 (Pages 186 - 189)

1  Q   It reads as though you created this donate page
2      when you were a State Representative but had
3      then decided to run for Senate; is that
4      correct?
5  A   Right. And they probably caught the Senate
6      part and didn't catch the State Rep. part. Or
7      either they –- I don't think I –- this page was
8      put up. I don't think this page –- I can't
9      remember, was put up when I was a State Rep.
10     So they may have copied and pasted it from
11     somewhere else but it might have been put up
12     when I was a State Rep. I just don't –- I
13     don't recall having this page when I was a
14     State Representative.
15 Q   And also on this –- on this page you explain
16     that you're choosing to run for Senate to
17     expand your reach and to help more people
18     across Northeast Louisiana and the State --
19 A   Right.
20 Q   –- correct?
21     Can you talk more about that?
22 A   Northeast Louisiana is where my constituency
23     is. I do know sometimes my bills have
24     statewide impact and so this Great State.
25     Also, I've always said in the legislature that

Page 190

1      what happens for Northeast Louisiana impacts
2      the state as a whole. I've always felt, and
3      I've been very clear on that, that Northeast
4      Louisiana receives less representation because
5      our districts are so spread. Whereas you may
6      have two –- two or three senators or more in
7      Baton Rouge or four or five senators in –- or
8      more in New Orleans. Northeast Louisiana has,
9      I think, a total of four senators spanning
10     across multiple parishes. So what I always try
11     to bring home to people of this state is that,
12     whatever happens in one region of the state
13     greatly impacts the other. And when people
14     determine whether or not they're going to move
15     into the state if Northeast is not, you know,
16     where it should be business-wise, then it may
17     impact other areas of the state. I always try
18     to draw that analogy to ask people to help
19     Northeast Louisiana when we're in the
20     legislature.
21 Q   I'd now like to bring you back to the main
22     landing page of your website. That was marked
23     as Exhibit 5.
24 A   Uh-huh.
25 Q   On this main page we can view a drop-down list

Page 191

1      of the six parishes --
2  A   Okay.
3  Q   –- that are in the Senate.
4  A   Uh-huh.
5  Q   Your Senate district, correct?
6  A   Seven. It should be seven unless there's an
7      error.
8  Q   Oh, seven?
9  A   Uh-huh.
10 Q   Okay. But you can see where that is on the
11     website?
12 A   Somewhere on the website it should tell you
13     what parishes I represent, yes.
14 Q   And we can click a hyperlink to a gallery,
15     which shows various photos of you at work in
16     the legislature; is that correct?
17 A   You should be able to see that, yes. I have a
18     lot of pictures on that website.
19 Q   On this website there is also a contact button
20     which allows someone to submit a form to
21     contact you, correct?
22 A   Right. Uh-huh.
23 Q   And you also have links to your platform; is
24     that correct?
25 A   I would have to see it. I think I do, yes.

Page 192

1  Q   And do you have that exhibit?
2  A   No.
3  Q   Exhibit 5?
4  A   You gave me –- okay. Go back to Exhibit 5. I
5      apologize, yes. Uh-huh.
6  Q   And so there is a link to your platform?
7  A   Right.
8  Q   I'm now handing you what I'm going to mark as
9      deposition "Exhibit #7."
10 A   Uh-huh.
11 Q   It's a couple of pages.
12 A   Uh-huh.
13 Q   Is this a fair and accurate representation of
14     the platform as it's seen on your website?
15 A   Yes. Uh-huh.
16 Q   The issues that you list here, these are the
17     priorities of your office; is that correct?
18 A   Yes, it is. Uh-huh. Myriad of issues.
19 Q   Did you write this platform?
20 A   With the help of probably a consultant, yes.
21 Q   So finally, to return back to that –- oh. You
22     said with a consultant. Do you know who that
23     consultant –- who was the consultant?
24 A   I'm not sure. This was created, you know,
25     probably six or seven years ago.

Page 193

| | |
|---|---|
| 1 Q  So you don't -- you don't recall? | 1 A  I don't have a newsletter anymore. |
| 2 A  I don't.  It may have been Mr. Hartman, but I'm | 2 Q  Or -- excuse me.  Your -- the contents you come |
| 3    not sure if he was -- because I don't use him | 3    out -- you put out to your email database? |
| 4    anymore, but it could have been him. | 4 A  It's -- if it's going -- yeah.  From that |
| 5 Q  Okay.  I now want to direct you back to Exhibit | 5    jacksonk@legis.la.gov that is our legislative |
| 6    5 -- | 6    email so it would come from that. |
| 7 A  Uh-huh. | 7 Q  And you write these emails? |
| 8 Q  -- which is the main landing page. | 8 A  Most of them, yes.  Sometimes staff may send |
| 9 A  Okay. | 9    you a memo about, you know, you may request a |
| 10 Q  On this page on Exhibit 5, we see that members | 10    memo about something or a current issue even |
| 11    of the public can sign up for a newsletter from | 11    sometimes that is not a legislative matter, |
| 12    your office; is that -- | 12    more or less, but you're trying to communicate |
| 13 A  Right. | 13    with your constituents.  Maybe a grant that's |
| 14 Q  -- correct? | 14    coming available to the federal government. |
| 15 A  That's correct. | 15    Maybe an event that's taking place.  Like I've |
| 16 Q  How often do you put newsletters out? | 16    sponsored this -- this year I'm sponsoring a |
| 17 A  ~~We start putting them out~~ -- this website was | 17    big event in Morehouse Parish with a number of |
| 18    last changed three years ago because of having | 18    others for a Fall Fest that's going to go out |
| 19    one staffer it became too much.  They couldn't | 19    by email.  If a school has a certain award, |
| 20    keep up with the newsletters so we do more by | 20    that may go out, you know?  Schools -- the |
| 21    email which I explained at the beginning of the | 21    district score is high and I may congratulate |
| 22    deposition. | 22    the school district.  You know, it's just -- |
| 23 Q  Okay.  And I wanted to talk more.  You | 23    it's a myriad of things. |
| 24    mentioned you have an extensive email database? | 24 Q  And how does one join this email list? |
| 25 A  I -- yes.  That's constituents who sign up when | 25 A  It's so many various ways.  They -- some people |
| Page 194 | Page 196 |

| | |
|---|---|
| 1    we go to district meetings in each parish like | 1    don't join, we'll just put them in.  Because |
| 2    to talk about things.  Or it may be people that | 2    they've emailed us about a issue and we want to |
| 3    have emailed me about issues and they may -- | 3    keep them up-to-date.  Constituents when they |
| 4    like the pharmacists are in a pharmacy | 4    email, when my staff has time -- because they |
| 5    database. | 5    always don't have time, they may add |
| 6 Q  Do you post your newsletter to that email list? | 6    constituents to it.  So, somebody may come in |
| 7 A  I don't have a newsletter anymore.  That's what | 7    and say, I want to be updated on this or call |
| 8    I -- it wasn't -- my staff wasn't able to keep | 8    in and they'll put them on that subject matter |
| 9    up with it. | 9    database.  It's not a way -- usually -- this |
| 10 Q  What do you -- what do you put out to your | 10    website, it's not even pushed that's why it's |
| 11    email database? | 11    not up-to-date so most of the time it's from |
| 12 A  A number of things.  Like this week I think | 12    contact. |
| 13    what's going out, because the deadline hasn't | 13 Q  And in your communications through this email |
| 14    passed, is that senior citizens, if they | 14    list, how often do you send those? |
| 15    haven't, ~~Meet the Go Freeze~~, what happens with | 15 A  I can't tell you.  It's -- sometimes it's a |
| 16    their homestead exemption.  And we have a law | 16    lot, sometimes it doesn't.  Like I know I need |
| 17    that you can freeze it at a certain age.  I | 17    to get that out to the seniors so it's going to |
| 18    think it's 65.  So that's going to go out to | 18    -- something's going to go out to my senior |
| 19    let them know, before that increase hits, | 19    database.  And sometimes I don't want to overly |
| 20    freeze it.  Because once the increase hits you | 20    inundate them, so if I feel like we're sending |
| 21    can't go back and freeze it, so you'll now | 21    a lot.  If I get busy in my law practice I |
| 22    freeze it at the amount of the increase.  Stuff | 22    can't send it.  It just -- it depends. |
| 23    like that. | 23 Q  But it's not regular? |
| 24 Q  So the information on the newsletter is of a | 24 A  Sometimes it becomes regular if I'm having a |
| 25    legislative nature? | 25    slow period and then other times it's not |
| Page 195 | Page 197 |

1  regular.
2  Q  Okay. Are there different databases based on
3     the content of the email? Like you mentioned
4     --
5  A  Sometimes it is, yes. And that might be from
6     across the state. If somebody from Baton Rouge
7     asks to keep them updated, I'm going to add
8     them to the list and if they want to receive
9     it, they can. I do -- I used to do weekly Zoom
10    meetings. So it's not for a targeted area, but
11    it's mostly to inform my constituents. If
12    somebody talks to their mother in somewhere
13    else and says -- even I have people that lived
14    in Louisiana and they'll say, "Hey, I used to
15    live there. I want to keep updated because of
16    my parent." Then, I'm going to add them so
17    they can communicate to their parent that
18    doesn't get on email that much what's going on
19    in the district.
20 Q  Let me rephrase that question. In your email
21    -- you've mentioned that some event that's
22    coming up that you're about to email about is
23    --
24 A  Uh-huh.
25 Q  -- about the senior homestead exemption,
Page 198

1  correct?
2  A  Right. Uh-huh.
3  Q  If someone -- I'm 24. If someone around my age
4     were in your newsletter, would they get --
5  A  I don't have a newsletter anymore.
6  Q  Or excuse me. If they were on your email list.
7  A  Uh-huh.
8  Q  Would someone of that age also get that letter
9     that's targeted to seniors?
10 A  It probably will. Because with seniors, I'm
11    more specific to try to email as many people as
12    I can knowing some of them do not regularly
13    check their email. Some of them are to the
14    point where they may have Alzheimer's and other
15    issues, so I try to get -- senior emails,
16    unless it's a senior giveaway or something like
17    that, I'm going to try to get out to as many
18    people as possible because I know some younger
19    people handle their parents' affairs when they
20    become seniors. So we -- we're cognizant that
21    others handle the affairs of seniors.
22 Q  But on other topics, not everyone in your email
23    list will get a particular email?
24 A  On most topics they will.
25 Q  Are there some that they won't?
Page 199

1  A  If my staff is running quickly and it's a bill
2     that people have been asked to be updated on,
3     it's going to go to the -- it's not a database.
4     We delete them every year. Like a bill, it'll
5     have a bill number on the folder and the email
6     and they'll do a reply all to this folder to
7     give an update. Then that -- only that
8     particular folder gets the update at the end of
9     session. Because bill numbers are the same
10    each year, we delete them.
11 Q  Uh-huh.
12 A  So that we can, you know, start the next
13    session. If it's a current issue like -- what
14    was an issue? Health -- car insurance rates.
15    That stays there, right? I don't know if it's
16    there now because I think we're finally not
17    dealing -- we're dealing with the issue but
18    it's not -- and you're updating people as stuff
19    happens. So it just depends on the issue. It
20    depends on -- it depends on everything. Now,
21    if it's a general constituent in the district
22    -- and the problem is, is sometimes my
23    constituent database gets a little merky
24    because people will say, "Oh, yeah, I'm in your
25    district," and you don't know. The staff may
Page 200

1     have not taken, you know, good information and
2     they're in that database so they're getting
3     those emails. I think at one time they mixed
4     the lobbyist database up with my constituent
5     database and the lobbyist was getting emails.
6     At one time every member in Northeast
7     delegation that was a representative, somebody
8     said, "I get all of your updates," and I said,
9     "Did you all put my colleagues in there"? So
10    it kind of, you know, depends on how proficient
11    your staff is. But this -- let me -- if I can.
12    This does not -- Exhibit 5 I think it was or
13    where it says click the contact, that's
14    whatever exhibit that's in, this is not where
15    we get the majority of our database from.
16 Q  Where do you get it from?
17 A  As I've testified to before, it comes from when
18    people are asking questions. When people walk
19    in or call and say I want to be updated. And
20    we -- we'll go to Facebook and ask our
21    constituents to sign up so that we can keep
22    them updated.
23 Q  Can you still request to be added via that
24    contact form on your website?
25 A  The website hadn't changed. I'm sure you can,
Page 201

| | |
|---|---|
| 1     but I don't think -- I -- from my knowledge, no | 1   Q   Have you ever let your legislative staff access |
| 2     one has. If they have, my staff would have, | 2     your Twitter account? |
| 3     you know, added them. But I'm, you know, it's | 3   A   Not that I can recall because I don't use it |
| 4     not a frequent used website. | 4     much. What I generally do is access it myself. |
| 5   Q   Why did you link this website to your Twitter? | 5     What they have access to is my Senate Facebook |
| 6   A   Because I link generally my websites to my | 6     page and they don't have constant access. |
| 7     pages. I don't have a law office website and I | 7     That's just when I get busy and I'll say, "I |
| 8     don't have a personal website. That's the only | 8     need you to go to my Senate Facebook page." |
| 9     website I have right now. | 9     But other than that, I try to, you know, as -- |
| 10   Q   Is this page linked to your personal Facebook | 10     I keep my activity as far as communication on |
| 11     page? | 11     legislation to a minimal on -- as far as going |
| 12   A   No. I don't -- I don't think I know how to | 12     back and forth, I always kind of say, contact |
| 13     link Twitter to my Facebook page. I don't | 13     the office. So my staff doesn't need access to |
| 14     think it is. I don't think I know how to link | 14     it. |
| 15     Twitter. | 15   Q   Going back to your legislative staff. You |
| 16   Q   Let me rephrase that. Is your website, | 16     mentioned that you have one full-time staffer |
| 17     katrinarjackson.com linked to your Facebook | 17     -- |
| 18     page? | 18   A   Right. |
| 19   A   It has been on there before, yes. | 19   Q   -- Theresa Tran. |
| 20   Q   Is it linked currently? | 20     How long has Theresa worked there? Or for |
| 21   A   I don't know if you can link websites to | 21     -- |
| 22     Facebook. And I would have to look. I think | 22   A   Theresa's been back about four months. Before |
| 23     you can. I would have to look. I wouldn't | 23     that, I think about -- I may be wrong, but |
| 24     know. | 24     about three or four months. |
| 25   Q   Is it linked to your Instagram? | 25   Q   And what is Theresa's title? |
| Page 202 | Page 204 |

| | |
|---|---|
| 1   A   I would have to look. I don't know. | 1   A   She's my legislative assistant. And it could |
| 2   Q   In response to Interrogatory No. 3, you stated | 2     be longer. I'm just -- the year passed, but I |
| 3     that you have sole access to your Twitter | 3     know -- I want to say she came back in -- I |
| 4     account; is that correct? | 4     can't remember. She's on a quarter system at |
| 5   A   That's correct. | 5     Tech, so I can't think about the semester like |
| 6   Q   Do you still have sole access? | 6     -- but it was after her last quarter at Tech. |
| 7   A   Yes. Well, besides my attorney. I had to | 7   Q   Who was -- did you have a legislative staffer |
| 8     print off a lot of stuff for him. | 8     before her? |
| 9   Q   Do you write all of your tweets? | 9   A   Yes. And let me think. And that's sad to have |
| 10   A   Yes. | 10     to think. I was -- my office was very |
| 11   Q   No one else writes any tweets for you? | 11     transient for a while after I loss my full-time |
| 12   A   No. | 12     legislative assistant. Who was there before |
| 13   Q   And we've talked about you create some of the | 13     her? |
| 14     graphics you tweet? | 14   Q   Who was your full-time legislative assistant? |
| 15   A   Uh-huh. | 15   A   That's what I'm trying to think. I think the |
| 16   Q   But some of them are created by legislative | 16     office was empty for a while. And I'm trying |
| 17     staff -- | 17     to remember who -- I would have to get the |
| 18   A   Right. | 18     records from the House. I had students coming |
| 19   Q   -- or Theresa? | 19     in. Like, somebody would be full time and go |
| 20   A   Yes. She's a legislative staffer as well. | 20     back to school, I think that's what it was. So |
| 21   Q   Yes. She creates some but then the general | 21     I -- to get you an accurate of the order and |
| 22     staff in the -- | 22     I'll supplement it and I'll get it from the |
| 23   A   Right. Creates some as well. | 23     Senate. |
| 24   Q   -- communications office? | 24   Q   Did the legislative staffers who worked before |
| 25   A   Yes. | 25     Theresa, did they have the same |
| Page 203 | Page 205 |

| | |
|---|---|
| 1    responsibilities? | 1    would have posted this tweet. I do all my |
| 2  A  Yes. Uh-huh. | 2    Twitter access. It would have been me. |
| 3  Q  There's no –- there wasn't any difference? | 3  Q  So is this a fair and accurate representation |
| 4  A  To the extent that Theresa's part-time | 4    of your tweet? |
| 5    legislative and part-time –- full-time | 5  A  It's a copy. If you say it's on there, then if |
| 6    legislative to a certain extent and part-time | 6    you're saying you pulled it from Twitter it |
| 7    law office, hers may be different. But, no, as | 7    will be, but I can't go back to 2012 and |
| 8    far as the legislative duties they would not | 8    remember what I posted. |
| 9    have been different. During COVID that was the | 9  Q  So is this a fair and accurate representation |
| 10    only time they would have been different | 10    of your tweet? |
| 11    because the needs of the constituents was | 11  A  I cannot go back to 2012 and remember what I |
| 12    different, but it's still the same focus on | 12    posted on Twitter. So, I would have no |
| 13    constituency. | 13    personal knowledge if this is something that's |
| 14  Q  You mentioned that your legislative staff | 14    typed out or from my Twitter. Assuming it's |
| 15    sometimes accesses your Facebook page? | 15    from my Twitter, yes. I've given you the |
| 16  A  Uh-huh. Yes. My Senate Facebook page. | 16    general statement that sometimes I post on all |
| 17  Q  When do they do that? | 17    of my social media platforms about my personal |
| 18  A  Only when I call them and give –- call in and | 18    life, my legislative life, and –- so... |
| 19    give them the password. It probably has | 19  Q  Is there anything that could refresh your |
| 20    happened twice in this year at the most. | 20    recollection as to whether this is a fair and |
| 21  Q  And why do you do that? | 21    accurate representation of your tweet? |
| 22  A  If I'm busy and something needs to go out, a | 22  A  Probably not. This is 2012. |
| 23    deadline or something, and I'm in a meeting I | 23  Q  You requested your data from Twitter, correct? |
| 24    will call in or if I'm not near my computer or, | 24  A  I did. |
| 25    you know, just busy –- I'm running and I'm | 25  Q  And that Twitter data included tweets that you |
| Page 206 | Page 208 |

| | |
|---|---|
| 1    driving and I don't want to drive and get on | 1    had sent? |
| 2    there, I'll say, "Please post this –-" I don't | 2  A  I don't know what it included. If you have it |
| 3    if it happened at all this year. | 3    I can look at it. From what I recall I looked |
| 4  Q  Do you recall any –- do you have –- do you | 4    at it for two or three minutes. I couldn't |
| 5    recall any examples of times that you've done | 5    make heads or tails of it so I sent it to Tommy |
| 6    this? | 6    to send to you. |
| 7  A  No. Because I don't think it happened this | 7    MS. SCHWARTZMANN: |
| 8    year. I don't remember it happening this year. | 8    I think we may need to take a break for |
| 9  Q  Have you ever authorized any of your | 9    a minute or two. We'll step outside. |
| 10    legislative staff to send a tweet from your | 10    WITNESS: |
| 11    account? | 11    Okay. |
| 12  A  Not that I can recall, no. | 12    MR. HAYES: |
| 13  Q  Has any of your legislative staff ever logged | 13    Okay. |
| 14    into your Twitter account? | 14    MS. SCHWARTZMANN: |
| 15  A  Not that I can recall. | 15    What time is it? |
| 16  Q  I now want to shift and I want to talk about | 16    COURT REPORTER: |
| 17    some more specific tweets. First, I'm going to | 17    The time is 1:14. Off the record. |
| 18    show you a tweet that I'm marking as –- or the | 18    (OFF THE RECORD) |
| 19    plaintiff's deposition "Exhibit #8," which is a | 19    COURT REPORTER: |
| 20    tweet dated March 20, 2012. Are you familiar | 20    Okay, the time is 1:30 p.m., we are |
| 21    with this tweet? | 21    back on the record. |
| 22  A  This jogs my memory, but it's 2012 –- 2012, so | 22  EXAMINATION CONTINUED BY MR. CROW: |
| 23    I wouldn't remember it. | 23  Q  Is this a fair and accurate representation of |
| 24  Q  Did you make this tweet? | 24    your tweet? |
| 25  A  It would have been me. I make my tweets. I | 25  A  I answered that. I won't remember what I |
| Page 207 | Page 209 |

1    tweeted in 2012.
2  Q    If you do not know if this is a fair and
3    accurate representation, do you have any reason
4    to dispute that this is your tweet?
5  A    I'm an attorney and I don't ever give a final
6    answer on something that I don't know.  It's --
7    I'm trained to not authenticate something I'm
8    not familiar with or don't have personal
9    recollection of.
10 Q    Do you have any evidence that this is not your
11    tweet?
12 A    I didn't bring evidence to this deposition.
13    Didn't know I needed it.
14 Q    Do you have any evidence that this is not your
15    tweet?
16 A    I didn't bring evidence to -- I don't know what
17    I would have in my possession.  I would have to
18    go back and research this.
19 Q    So is that a, no?
20 A    Not with me today.
21 Q    Does evidence exist, at all, that this is not
22    your tweet?
23 A    I'm not sure it's my -– I don't remember this
24    tweet.  It's my first time seeing it.  I don't
25    know.  What I've suggested to my attorney is
                                        Page 210

1  Q    And Twitter produced this data to you; is that
2    correct?
3  A    That is true.
4  Q    And you then produced that data from Twitter to
5    us?
6  A    That is true.
7  Q    Can you review that data from Twitter?  Let me
8    rephrase that.  You can review that data from
9    Twitter, correct?
10 A    I reviewed it for two or three minutes.  I kind
11    of couldn't make sense of a lot of it and I
12    sent it to my attorney.
13 Q    If that data shows that this tweet was from
14    your account, do you have any reason to dispute
15    that data?
16 A    I'm not sure.  Look, this is my first time ever
17    requesting data from Twitter.  So I would have
18    to look through it, probably figure out what it
19    is and -- but my best recollection of reminding
20    me of what I tweeted on Twitter is going to be
21    to go through those pages.
22 Q    But do you have any reason to dispute that if
23    your Twitter data showed that this tweet was
24    from your account that that is not true?
25 A    I would have to look at it first fully and
                                        Page 212

1    that if you would like me to authenticate
2    tweets, it would take a while to do that
3    because I would have to go into Twitter and
4    look at tweets and get back down to this.  What
5    I've suggested is, if you want to propound some
6    discovery, then I can look at each individual
7    tweet that you want me to authenticate.
8  Q    Where would you look for evidence that would
9    prove that this is not your tweet?
10 A    I would sign into Twitter and see if it's
11    posted on Twitter.
12 Q    Is there anywhere else?
13 A    I would look -– that's it.  I would look into
14    Twitter and see if it's on my Twitter page.  I
15    could verify that it was on my Twitter page.
16 Q    Does this tweet appear on your Twitter feed,
17    correct?
18 A    I'm not sure.  I would have to go all the way
19    back down to 2012 and look and see.
20 Q    If the tweet appears on your Twitter feed, that
21    means you made the tweet, correct?
22 A    Yes.  That is accurate.
23 Q    You did a request for your data from Twitter,
24    correct?
25 A    I did.
                                        Page 211

1    thoroughly, which I have not done.  I would
2    have to get familiar with Twitter data and what
3    was sent to us.
4  Q    Senator, do you have any reason to dispute that
5    the Twitter data that you requested and
6    received from Twitter is inaccurate?
7  A    I haven't fully looked through it.  It's what
8    Twitter sent.
9  Q    That doesn't answer my question.  This is a yes
10    or no question.  Do you have any reason to
11    believe that the Twitter data that you
12    requested and received from Twitter is
13    inaccurate?
14 A    I know you would like it to be a yes or no
15    question, but I have not thoroughly reviewed
16    the Twitter data.  I looked at it for two or
17    three minutes and I sent it my attorney.  So
18    before I can answer that as a yes or no
19    question, I would have to fully look through
20    the data and see if there was anything I had
21    reason to dispute.
22 Q    As you sit here today, in this deposition, do
23    you have reason to believe that the Twitter
24    data that you received from Twitter and
25    produced to us is inaccurate?
                                        Page 213

| | |
|---|---|
| 1 A  Not without reviewing it. | 1 A  I would have to -- we've kind of come down to |
| 2 Q  As you sit here today? | 2   that, but we're kind of going through this. |
| 3 A  I have not fully reviewed it.  So as I sit here | 3   And if we're going to go through this with |
| 4   today, you're asking me if a document I haven't | 4   every tweet, we're going probably go through |
| 5   fully reviewed, do I have a reason to dispute | 5   ten folders before the time is up. |
| 6   it.  I've said, I don't have a reason not | 6     MR. HAYES: |
| 7   without reviewing all of the data. | 7     And we had an opportunity to discuss |
| 8 Q  So you don't have a reason as you sit here | 8   this off the record, too.  The problem is |
| 9   today? | 9   that this is not something that we had |
| 10     MR. HAYES: | 10   prior notice of preparation to discuss the |
| 11     Objection.  Asked and answered. | 11   individual tweets and which ones were going |
| 12 BY MR. CROW: | 12   to be identified.  And there's no efficient |
| 13 Q  In this tweet in Exhibit #9, what did you | 13   way by which to go through the Twitter -- |
| 14   tweet? | 14   the Twitter page to identify this as being |
| 15 A  If this is one of my tweets, I tweeted that | 15   posted based -- for her to do that based on |
| 16   "The Education Reform bills to be heard on the | 16   her memory. |
| 17   House Floor ask your Legislators to vote NO | 17   MS. SCHWARTZMANN: |
| 18   Con-" -- | 18   Are we on the record or off the record? |
| 19     COURT REPORTER: | 19 COURT REPORTER: |
| 20     It's 8. | 20   Yes.  We're on the record. |
| 21     WITNESS: | 21 WITNESS: |
| 22     Eight.  I'm sorry, #8. | 22   Oh. |
| 23     MR. CROW: | 23 MS. SCHWARTZMANN: |
| 24     Oh.  My apologies. | 24   Because I -- |
| 25 A  "Legislators to vote No Contact information | 25 WITNESS: |
| Page 214 | Page 216 |

| | |
|---|---|
| 1   found -- NO Contact information found at | 1   I said off the record. |
| 2   legis.state.la.us." | 2 MS. SCHWARTZMANN: |
| 3 MR. CROW: | 3   Yeah. |
| 4 Q  You told Twitter users in this tweet to contact | 4 WITNESS: |
| 5   their legislators, correct? | 5   Oh. |
| 6 A  Correct. | 6 MS. SCHWARTZMANN: |
| 7 Q  Do you think it's important to let Twitter | 7   Also. |
| 8   users know what bills are being heard by the | 8 MR. HAYES: |
| 9   legislature? | 9   And I'm not offering that as a talking |
| 10 A  I think it's important to know constituents.  I | 10   objection, I'm just -- I'm just trying to |
| 11   don't divide constituents by Twitter users, by | 11   relay what the reality of the situation is. |
| 12   Facebook users, by Instagram.  Some of my | 12 MS. SCHWARTZMANN: |
| 13   constituents don't have any social media.  I | 13   Well, I think we have no choice because |
| 14   just generally think it's important to let my | 14   we're here, other than to ask the Senator |
| 15   constituents know what's being heard, I do that | 15   what she remembers. |
| 16   in various ways. | 16 WITNESS: |
| 17 Q  I'm now showing you what I'm going to mark as | 17   Okay.  We can go through each tweet and |
| 18   plaintiff's deposition "Exhibit #9," which is | 18   ask me what I remember.  But I've said and |
| 19   dated April 22, 2012.  It's two pages.  Are you | 19   since we're still on the record, let me |
| 20   familiar with this tweet? | 20   answer this very clearly.  Have I tweeted |
| 21 A  I'm not, it's 2012.  Any tweet you give me from | 21   about legislature on Twitter?  Yes.  Have I |
| 22   2012 my familiarity with it is not going to be | 22   on my public -- on my private Twitter page? |
| 23   there.  That was, what, how many years ago? | 23   Yes.  Have I tweeted about my family on my |
| 24   Twelve years ago. | 24   private Twitter page?  Yes.  Have I tweeted |
| 25 Q  Was this tweet made by your account? | 25   about other matters besides the legislature |
| Page 215 | Page 217 |

| | |
|---|---|
| 1 on my private Twitter page?  Yes, I have. | 1 day.  Right? |
| 2 I've admitted to that.  But for me to | 2 MR. HAYES: |
| 3 authenticate multiple tweets from 2012 and | 3 Understood.  I understand. |
| 4 twelve (12) and thirteen (13) years ago, | 4 MS. SCHWARTZMANN: |
| 5 I'm not being rude, I'm getting a little | 5 I would like to get as close to done as |
| 6 frustrated because I'm not going to be able | 6 we can, hopefully done.  So that we can do |
| 7 to do that and you want me to definitely | 7 other stuff by written instrument. |
| 8 identify something that if it was posted, | 8 MR. HAYES: |
| 9 it was posted in 2012. | 9 Sure. Sure understood. |
| 10 MS. SCHWARTZMANN: | 10 MS. SCHWARTZMANN: |
| 11 And I don't want to argue back with | 11 Okay. |
| 12 your client, Tommy, so I'll address this to | 12 BY MR. CROW: |
| 13 you, which is just to say, we have -- as we | 13 Q So do you have any recollection of this tweet? |
| 14 go through them, there may be some that she | 14 A No.  No personal recollection of this tweet.  I |
| 15 will remember and some that she won't, | 15 can't say that it was on my page or it wasn't. |
| 16 right?  Because it's not as the memory was | 16 All I can generally say is that I posted tweets |
| 17 wiped in 2012 or '13. | 17 sometimes about legislation on Twitter. |
| 18 MR. HAYES: | 18 Q In this exhibit, it shows your name at the top, |
| 19 Understood. | 19 correct? |
| 20 MS. SCHWARTZMANN: | 20 A It does, yes. |
| 21 So we got we weren't able to remember | 21 Q Is that your Twitter handle underneath, |
| 22 the first one.  We'll see if there's a | 22 @katrinarjackson? |
| 23 memory on this one, but there may be some | 23 A It is. |
| 24 obviously that are going to stick out and | 24 Q In this tweet, it says "Contact members of |
| 25 you're going to remember.  So -- | 25 House Ways and Means Committee and ask them to |
| Page 218 | Page 220 |

| | |
|---|---|
| 1 MR. HAYES: | 1 vote in favor of HB 1106 -Support Public |
| 2 And I -- | 2 Education," correct? |
| 3 MS. SCHWARTZMANN: | 3 A That's correct. |
| 4 -- I don't want to just wholesale say | 4 Q And there is a graphic of who is on that |
| 5 let's give up because -- | 5 committee, correct -- attached to this tweet? |
| 6 MR. HAYES: | 6 A That's what it seemingly is, yes. |
| 7 No, no.  And I -- and I'm not | 7 Q Why -- |
| 8 suggesting you give up, but to go through | 8 A No -- Wow, that would be a -- that would be a |
| 9 the entire -- the entire line of | 9 long list of members.  Maybe we had committees |
| 10 questioning for each individual one, it | 10 that big.  I don't know.  But it looks like it. |
| 11 might be expedited by saying, you know, | 11 Q Why did you tell Twitter users to contact |
| 12 here's -- one I mark as "Exhibit 10" and | 12 members of the House Ways and Means Committee |
| 13 you recognize this and you confirm that it | 13 and ask them to vote in favor of the bill? |
| 14 was -- that it's identified as being on her | 14 A I don't remember what 1106 is, but if this is |
| 15 page, you could find out if she has memory. | 15 my tweet, it probably went to a broad base of |
| 16 But if she doesn't have memory, to continue | 16 emails, every social media account I had, both |
| 17 to press her on that is just a waste of | 17 personal and public -- both personal and my |
| 18 time here today.  So the -- I think -- I | 18 senate -- if I had my senate at the time on my |
| 19 think that the -- in the interest of the | 19 rep account on my Facebook, if I had it.  But I |
| 20 ticking clock and the -- and everything | 20 wouldn't remember what this is.  It says to |
| 21 else, that that might be the most expedient | 21 support public education.  If this is a tweet I |
| 22 way to approach this. | 22 made, it must have been a bill dealing with |
| 23 MS. SCHWARTZMANN: | 23 public education. |
| 24 I understand.  What I'm trying to avoid | 24 Q Why would you tell Twitter users to vote in |
| 25 is having to recess and come back another | 25 favor of a bill? |
| Page 219 | Page 221 |

1  A   I would have told everyone to vote in favor of
2      a bill if I was in support of it.
3  Q   Is there any other reason you would tweet that?
4  A   No.
5  Q   I'm now showing you what I'm going to mark as
6      "Deposition Exhibit #10" which is dated May 29,
7      2012.  Are you familiar with this tweet?
8  A   Oh, 1106 -- yes.  I'm not familiar with the
9      tweet as far as whether I tweeted it or not.
10     It looks like 1106 would have been a bill that
11     I authored now that there is further
12     information on this bill.  That was a tax
13     rebate for donations to public schools, which
14     I'm very familiar with because I think I re-
15     authored this bill a few years ago but it's not
16     funded.  I finally got it passed but it's not
17     funded.  It was passed and it's -- it would
18     have been passed the first time -- now I have
19     personal knowledge of that bill -- as far as
20     not the tweet, but Governor Jindal vetoed it.
21 Q   Is this a fair and accurate representation of
22     your tweet?
23 A   I'm not sure.  I can't ver -- I'm not going to
24     be able to verify tweets from 2012.  If you
25     give me a bill and something about it, I will
                                              Page 222

1      correct, in order to do so?
2  A   It's a link.  I don't think that link is fully
3      out.  I would probably think that was a link to
4      the senate members.
5  Q   I'm now going to show you what I'm marking as
6      "Deposition Exhibit #11."  And this is dated
7      September 14, 2012.  Are you familiar with this
8      tweet?
9  A   No.  But I'm familiar with the subject matter.
10     I'm familiar with my press release because I
11     helped fully write this press release.  I mean
12     I'm not familiar with tweet -- with remember
13     tweeting it, but I remember this press release.
14 Q   You do remember the press release?
15 A   Yes.
16 Q   Is this a fair and accurate representation of
17     your tweet and press release?
18 A   Yes.
19 Q   In this, you tweeted @Senlandrieu "Attorney
20     General issued opinion stating that the
21     governor must have legislative approval to
22     privatize OGB," correct?
23 A   Yes.
24 Q   And you --
25 A   If this is my tweet, yes.  ~~Team Casey P. would~~
                                              Page 224

1      remember the -- the instance of the bill.
2      These tweets have none of my personal tweets,
3      none of my other tweets that were earmark
4      moments, you know, in my life that I probably
5      would remember because the pictures are
6      something would make me remember.
7  Q   But there are some from that time period that
8      you might remember, correct?
9  A   Yeah.  We going to keep going through them.  If
10     I get to some, I -- the content of what's on
11     the pages, whether I remember if it was a tweet
12     from my page, I may not remember.  If there's
13     some content on the page, I will remember the
14     context of the bill, especially if it was one
15     of my bills.
16 Q   At the top of this page, does it have your name
17     on it?
18 A   Yes.
19 Q   Does it have your Twitter handle?
20 A   Yes.
21 Q   In this you told Twitter users to contact their
22     senators to vote yes on the bill, correct?
23 A   If it was my tweet, that's what I would have
24     said.
25 Q   And attached to this tweet, there is a link,
                                              Page 223

1      be Karen Carter Peterson.  Senator Landrieu
2      would be -- it looks like I'm replying to a
3      tweet, so I'm not sure if this is from my page.
4  Q   And you included a press release with this
5      tweet, correct?
6  A   Yes, if this is a tweet.  I do remember the
7      press release.  I helped draft this one.
8  Q   You included your district office phone number,
9      correct?
10 A   On my press release?
11 Q   Yes, ma'am.
12 A   Yes, I did.  Uh-huh.  All of my press release
13     have my district office phone number because
14     that's my primary contact for legislative
15     matters.  They also have my fax and they have
16     my email.
17 Q   It has your district email also,--
18 A   Right.
19 Q   -- correct?
20 A   Uh-huh.
21 Q   Anyone on Twitter could see this press release,
22     correct?
23 A   I think if I posted this on Twitter, it was
24     definitely posted on Facebook so anyone -- and
25     it was sent out to email database usually.  And
                                              Page 225

| | |
|---|---|
| 1   most likely streamlined to a folder that had | 1   asked to start tweeting with -- and I don't |
| 2   OGB because it was a big issue and it would | 2   know what year that was -- we were asked to |
| 3   have been emailed to constituents from that. | 3   start tweeting and tagging Louisiana Dems |
| 4   Q   My question was could anyone on Twitter see | 4   because that was the official Twitter account |
| 5   this press release? | 5   for Louisiana Dems. The House at some point |
| 6   A   I think my Twitter account has always been | 6   has a Twitter page that's official |
| 7   public. If it's on my Twitter account, it | 7   communication from the House. The Senate has |
| 8   would have maybe -- if it was private, then it | 8   an official Twitter page as an official Twitter |
| 9   would have been just followers. | 9   for the Senate if I'm not mistaken. Louisiana |
| 10   Q   And these people would have been able to call | 10   Dems have a Twitter page or some page that I |
| 11   your district office, correct? | 11   tagged most of the official for the Democrats. |
| 12   A   Right. Where I direct all of legislative | 12   Republicans have the same thing. Every caucus |
| 13   questions to. | 13   real member has that official Twitter page that |
| 14   Q   Or email you? | 14   speaks for the group. And the State and the |
| 15   A   Yes. | 15   Senate have those official Twitter pages that |
| 16   Q   Did Mr. Sherman respond to this tweet? | 16   speak for the State Senate and the State House. |
| 17   A   Dayne Sherman? I don't know if -- oh, he said | 17   Q   So in this instance, you tweeted this at the |
| 18   thank you Rep. Jackson -- if this is it -- and | 18   official Louisiana Democrats page? |
| 19   he responds with a thank you. | 19   A   Right. And it would have been under my old |
| 20   Q   And did you respond to Mr. Sherman? | 20   profile. |
| 21   A   Yeah. "No thanks needed. The people first." | 21   Q   And you said you added them because it had been |
| 22   The people who have OGB insurance who were | 22   discussed within the legislature that that was |
| 23   fighting this. And there was a host of people | 23   going to become a practice? |
| 24   who were fighting the privatization of OGB at | 24   A   Within the Democratic -- it wasn't a practice. |
| 25   the time. | 25   Within a Democratic caucus, we found out, at |
| Page 226 | Page 228 |
| 1   Q   I'm now showing you what I'm marking as | 1   some point, we had a Democratic caucus Twitter |
| 2   "Deposition Exhibit #12" which is a tweet dated | 2   page. So they said hey, can you -- you know, |
| 3   May 18, 2013. Did you tweet this? | 3   tag us on some things so our page gets out |
| 4   A   I don't have recollection of this tweet. I | 4   there. Same thing I do if a school ask me to |
| 5   might have tweeted it. | 5   tag -- have people on a fund-raiser. My alumni |
| 6   Q   Is this your account that appears on the top? | 6   school, which I'm supposed to be at today, ask |
| 7   A   Yes. | 7   me to tag things with my class, I'll tag it. |
| 8   Q   Is that your Twitter handle? | 8   Q   And this was tweeted during legislative |
| 9   A   Yes. | 9   session, correct? |
| 10   Q   Is that your profile picture? Let me rephrase | 10   A   May 28, 2013, assuming that we're generally in |
| 11   that. Is that a profile picture you've used in | 11   session then, it would have been tweeted during |
| 12   the past? | 12   legislative session if it's a tweet from my |
| 13   A   Right, I've used this picture for quite some | 13   page. |
| 14   time. | 14   Q   And in this tweet, you encourage Twitter users |
| 15   Q   Can you read what you tweeted in this instance? | 15   to contact their legislators? |
| 16   A   What -- I guess you're asking me to read if | 16   A   Yes. |
| 17   this is my tweet -- "Get on the phone and | 17   Q   I'm showing you what I'm marking as |
| 18   email, tell legislators to vote for any | 18   "Plaintiff's Deposition Exhibit #13." This is |
| 19   amendment and bill requiring legislative | 19   a Twitter reply dated November 18, 2014. Did |
| 20   approval to privatize hospitals." Another big | 20   you make this reply? |
| 21   issue. I remember the issue. | 21   A   Let me try to read and see if I remember. If |
| 22   Q   Who did -- did you at anyone in this tweet? | 22   it's from my page, I often say that in the open |
| 23   A   Louisiana Dems because at the time -- I don't | 23   forum, so yes. I don't often -- that's like |
| 24   know what time this was, but I know at some | 24   probably the first two or three times I've said |
| 25   point in democratic caucus meetings we were | 25   it. And this would have been before I changed |
| Page 227 | Page 229 |

1    my Twitter name to Katrina R. Jackson.
2  Q   Is this a fair and accurate representation of
3    your tweet?
4  A   I'm not sure.
5  Q   Is that your account that is making this tweet?
6  A   I can't authenticate it without going back
7    through my account.
8  Q   Let me rephrase that.  Is your name on that
9    reply to the tweet?
10  A   Yes.
11  Q   Is that your Twitter handle?
12  A   Yes.
13  Q   Is that a profile picture in which you've used
14    in the past?
15  A   Yes.
16  Q   In this tweet –- or in this –- excuse me.  In
17    this reply, you said "Our ability to discuss
18    issues and candidates in an open forum helps
19    create better solutions for Louisiana."  Is
20    that correct?
21  A   That's correct, if it's my tweet, yes.
22  Q   Why did you tweet this?
23  A   Because the person said it was very gracious of
24    me –- there –- at some point in the
25    legislature, there was a tenure, like a feeling

Page 230

1    about a constituent that people would not
2    respond.  And I'm not sure –- and I would have
3    to look at the entire tweet –- this may have
4    been a tweet where the person didn't agree with
5    me and I responded.  Just like on emails I
6    respond.  So without seeing the entirety of the
7    conversation, I couldn't get into the context
8    of why the tweet was made if it was the tweet
9    from me.
10  Q   What did you mean by open forum?
11  A   Open forum, meaning –- it could be anything.
12    We have town hall meetings.  We have Zoom
13    meetings.  It could have meant anything.  It
14    might have just been a choice of word.
15  Q   I'm now going to show you what I'm marking as
16    "Plaintiff's Deposition Exhibit #14", which is
17    a tweet dated April 17, 2019.  Are you familiar
18    with this tweet?
19  A   I'm not familiar with this tweet, but I am
20    familiar with the MFP.  I generally advocate
21    for it each year if it has all of the
22    components that support education.
23  Q   Is this a fair and accurate representation of
24    your tweet?
25  A   I would not remember if this is a tweet I made

Page 231

1    without going back to my Twitter.  But this is
2    a subject matter that I often advocate for as a
3    former educator and legislator in support of my
4    schools.
5  Q   So you said that you recall the legislation
6    referencing this tweet?
7  A   Not this specific bill.  The issue –- the MFP
8    comes up every year.  I have advocated for and
9    against the MFP depending on the content of it
10    each year.  I am assuming if this is my tweet
11    and I –- and I'm asking people –- I'm mad
12    because they rejected the MFP, then it was an
13    MFP I was supporting.  That's the conclusion I
14    can draw if this is my tweet.
15  Q   Is your name at the top of this tweet?
16  A   Yes.
17  Q   Is that your Twitter handle attached to this
18    tweet?
19  A   That is my Twitter handle.  It wouldn't have
20    been –- I don't know when –- well you gave me
21    data in something that would have showed what
22    my Twitter –- may I?  Because I think you keep
23    –- well, you keep asking about a Twitter handle
24    and it looks like in –- from Exhibit 1, my
25    Twitter handle changed to Katrina R. Jackson.

Page 232

1    So it would be my current Twitter handle, yes.
2    My Twitter handle in 2021 –- April of 2019
3    would have been –- looks like SenatorKRJ.
4  Q   Are you familiar with the mechanics of Twitter
5    handles?
6  A   I'm familiar enough to change them.
7  Q   And when you change them, it changes your
8    Twitter handle across all the tweets that you
9    made, correct?
10  A   And not my profile.  Yes, it does.  But it
11    keeps the data from Twitter.  I'm just not as
12    familiar with making this tweet to say I
13    definitely made it.  I am familiar with the
14    issue, but you keep asking me about my name and
15    my Twitter handle, so I want to be clear.  And
16    that's why I pulled Exhibit 1 that this tweet
17    and the other tweets you've asked me about
18    would have been made at the time that it was
19    either RepKJackson or SenatorKRJ.
20  Q   In this tweet, you tweeted "A vote against the
21    children in education yesterday.  Time to call
22    your legislators.  On yesterday, purely because
23    of politics, a majority of the House Education
24    Committee rejected the MFP which funds K-12
25    education," and you included a link to an

Page 233

1    article, correct?
2  A   If it was my tweet, yes.
3  Q   Why did you tell Twitter users to call their
4    legislators?
5  A   If this is my tweet -- that's why I've
6    explained -- I'm very passionate about the MFP
7    issue.  I was passionate when I was a teacher.
8    And so I would have tweeted because it was a
9    good MFP.  I wouldn't have been upset of them
10   rejecting something that wasn't a good MFP.  In
11   this same time frame, I would have tweeted
12   things about my family and everything else.
13 Q   Because your account is publicly available, any
14   Twitter user would be able to see this tweet,
15   correct?
16 A   I don't -- I would have to go back over the --
17   was it data they sent or something -- to see if
18   my page was public the entire time.  I can't
19   testify as to whether my page was public in
20   2019.
21 Q   I'm now showing you what I'm marking as
22   "Plaintiff's Deposition Exhibit #15" which is
23   dated April 21, 2021.  Are you familiar with
24   this tweet?
25 A   I am familiar with this tweet.  This is the

1    issue I talked to you about at first.  I'm more
2    familiar with these tweets because it was a
3    time when the colleges and universities had --
4    basically we had been in committees on this
5    with the women for children -- the select
6    committee on women and children, so I'm very
7    familiar with this tweet because I followed
8    this issue more at the time.  And it was a
9    sexual harassment bill that a number of us had
10   co-authored or authored.
11      MR. HAYES:
12        So you handed me two copies, I believe
13      they're the same thing.
14      MR. CROW:
15        Oh, sorry.  I didn't know if I had
16      given you one or not.
17 BY MR. CROW:
18 Q   So --
19 A   I have April 21st.
20      MR. HAYES:
21        Oh, I've got June 3rd on mine.  Which
22      one is it?
23 BY MR. CROW:
24 Q   Let's ask about June 3rd first.  So I will mark
25   this as "Exhibit 16."

1  A   Okay.  I'll give you back this one, or you want
2    to keep this one?
3  Q   We will get to that one in a second.
4  A   Okay.
5  Q   But it's already marked so we'll leave it
6    there.  On June 6th, you tweeted -- or excuse
7    me -- this is a tweet dated June 3rd, 2020.
8    Are you familiar with this tweet?
9  A   I am not familiar with the tweet itself, but
10   higher education funding is something, you
11   know, I would have asked people to watch.  It
12   looks like this was a time period sometimes
13   where I was asking people to watch legislative
14   committees.
15 Q   And what did you tweet in this instance?
16 A   I said I'm not familiar with tweeting this.  I
17   just kind of can tell you the contents around
18   higher education if you're interested in
19   watching the higher education funding and
20   request, you can be -- you can watch here.  If
21   this is my tweet, it was not about a piece of
22   legislation more than we have preliminary
23   hearings on higher education budgets.
24 Q   I'm sorry -- you included a link for Twitter
25   users to watch this, correct?

1  A   Right.
2  Q   I'm now showing you --
3  A   If it's my tweet, I'm going to keep prefacing
4    that when I'm not familiar with a tweet.  This
5    one I'm familiar with, 15.
6  Q   Okay.  And so now I want to direct you back to
7    that Exhibit 15 which is dated April 21, 2021,
8    correct?
9  A   Yes.
10 Q   All right.  You said you're familiar with this
11   tweet?
12 A   I am, yes.
13 Q   Is this a fair and accurate representation of
14   your tweet?
15 A   As far as I can remember.  I can't remember my
16   exact words, but yes I'm familiar with tweeting
17   about sexual harassment issues.
18 Q   What did you tweet in this instance?
19 A   A bill against sexual harassment up in next --
20   next in the committee.
21 Q   You included a link for Twitter users to watch
22   the committee meeting, correct?
23 A   Yes.  And it might have been from Facebook, I
24   don't know.  But this would have been a cross
25   thing and I probably would have emailed on it,

**Page 238**

1 too. Or maybe not, but I definitely would have
2 posted on several posts.
3 Q  When you say –- you reference in this tweet –-
4 you say it's up next in committee. Did you
5 make this tweet while the committee meeting was
6 going on?
7 A  I might have been watching in my office. If
8 I'm in a committee, it would have been made in
9 committee. If I wasn't on the committee it was
10 going to, it would have been made while sitting
11 in my office or sitting at my apartment.
12 Q  I'm now going to show you what I'm marking as
13 "Deposition Exhibit #17" which is dated June
14 25, 2020. All right. Is this your tweet?
15 A  I'm not for sure. I know that is my committee
16 meetings to watch today –- that's my graphic.
17 I'm not sure if I tweeted this. Car insurance
18 went on for a long time. We can kind of assume
19 this is mine because I remember this graphic.
20 But I don't remember making the tweet.
21 Q  Can you describe this tweet?
22 A  This tweet just tells people the bills to watch
23 and it has multiple things concerning it.
24 Q  And it includes committees that you're on,
25 correct?

**Page 239**

1 A  I don't know at the time if these committees I
2 was on, but I've been on –- I can kind of say I
3 was on Senate Insurance and Education, so it's
4 most likely committees I was on.
5 Q  And with this tweet, you included a graphic,
6 correct?
7 A  Right.
8 Q  I'm now going to show you what I'm marking as
9 "Plaintiff's Deposition Exhibit #18" which is
10 that graphic.
11 A  Okay.
12 Q  You said you are familiar with this graphic,
13 correct?
14 A  I am, yes.
15 Q  Who made this graphic?
16 A  I couldn't tell you. It could be me, it could
17 be the staff up in the Capitol, and it could be
18 my staff back in Baton Rouge. I wouldn't
19 remember who made it. When I'm in session, I
20 try to do as much first hand stuff as possible
21 because I know what's going on. So it's likely
22 me, but I can't definitely say it's me because
23 if I don't have time I'll shift it to one of
24 the staff.
25 Q  This graphic has instructions on how to watch

**Page 240**

1 the committee meetings, correct?
2 A  Right. Yes, it does.
3 Q  And it also gives information on how people can
4 contact your legislative office?
5 A  Right.
6 Q  In this graphic, did you provide your
7 legislative email?
8 A  Yes, I did. And my legislative number. I'm
9 always referring back to the legislative
10 office.
11 Q  Why did you include information on how to
12 contact your office?
13 A  Because most of my stuff goes through my
14 office. If I'm going to be able to respond
15 properly, communicate with constituents and
16 remember to do it, as I stated earlier I
17 include my staff in it so I can remember to
18 communicate with people.
19 Q  I'm now going to show you what I'm marking as
20 "Deposition Exhibit #19" which is dated April
21 27, 2021. Are you familiar with this tweet?
22 A  No. I just don't remember it. I'm familiar
23 with the issue.
24 Q  Is this a tweet –- is your name at the top of
25 this tweet?

**Page 241**

1 A  Yes.
2 Q  Is that your Twitter handle at the top of this
3 tweet?
4 A  What was my Twitter handle at the time? It's
5 my current Twitter handle, yes.
6 Q  So this is your current Twitter handle as if
7 you were to look up this tweet?
8 A  Right. If I could look it up in this room, yes
9 it would be my current Twitter handle.
10 Q  And you said you're not familiar with this
11 tweet?
12 A  I just don't recall making it. I'm familiar
13 with the subject matter.
14 Q  In this instance, what did you tweet?
15 A  If it's my tweet, I tweeted "These hearings are
16 happening now and you can watch by clicking
17 here." Legalization of marijuana at the top of
18 it. So it would have been, if it's my tweet,
19 about legalization of marijuana.
20 Q  Is this a fair and accurate representation of
21 your tweet?
22 A  I am not sure. I can't authenticate this
23 tweet. I don't remember it.
24 Q  In this tweet, you included a link for Twitter
25 users to watch, correct?

1   A   Yes.  Anytime -- if I put on Facebook, if I
2       email and I'm asking you to watch something,
3       I'm going to include a link.
4   Q   So users on Twitter could watch this hearing,
5       correct?
6   A   Users on Facebook, users on Twitter, if I
7       emailed it, people I've emailed.
8   Q   You mentioned that you were familiar with the
9       issue.  Is this issue something that you would
10      have posted to social media about?
11  A   Maybe or maybe not.  It depends on how heavy it
12      got at the time.  The legalization of marijuana
13      is not something I essentially voted on so I'm
14      not sure how pressing I would have been on it.
15  Q   Why would you have tweeted about an issue such
16      as that?
17  A   I'm not sure.  I don't remember the tweet.  You
18      know, generally -- let me say this over a
19      general statement.  If I want people to watch
20      something, I'm going to put it on Facebook.  I
21      may put it on Twitter because Twitter is not
22      used all the time.  If you go through my
23      Facebook posts, we'll be here fifty (50) days,
24      right, and I may email.
25  Q   You mentioned that you included -- there is a

Page 242

1       after the Ronald Green matter and I would have
2       post -- cross-posted this and maybe if I had
3       time emailed it out.
4   Q   What did you tweet in this instance?
5   A   "On today I was appointed to serve on the
6       select committee for State Police oversight.
7       My commitment is to hear from constituents and
8       do all I can to help implement policies to put
9       an end to police brutality in the ranks of our
10      State Police," i.e. why I would have remembered
11      this tweet because of what it was about.
12  Q   So is this a fair and accurate representation
13      of your tweet?
14  A   It is, yes.
15  Q   In your announcement on Twitter, you included a
16      press release, right?
17  A   Uh-huh.  Yes.
18  Q   And this press release was from your
19      legislative office?
20  A   Yes.  What I drafted myself, uh-huh.
21  Q   And it included your office number and email,
22      correct?
23  A   To revert people to the office to communicate
24      with me, yes.  And I would have posted this on
25      Facebook, both my private and my Senate

Page 244

1       link included in this tweet.
2   A   Uh-huh.
3   Q   And you included this so Twitter users could
4       watch the hearing, correct?
5   A   I would include it for all constituents to
6       watch the hearing.
7   Q   But if this was attached to a Twitter post, it
8       would allow any Twitter user to watch the
9       hearing if they have that link?
10  A   Or someone that was looking at someone's
11      Twitter page.
12  Q   And you tweeted this as the hearing was going
13      on?
14  A   If I tweeted this, it says the hearings are
15      happening now, yes.  I don't know if it was a
16      committee I was sitting on or something I was
17      just watching in the apartment.
18  Q   I'm now going to show you what I'm marking as
19      "Deposition Exhibit #20" which is dated April
20      28, 2021.  Are you familiar with this tweet?
21  A   I'm not familiar with -- yeah, I am familiar
22      with this tweet.  I don't know -- but I would
23      have to have -- what date, October 20 -- yeah,
24      I remember this tweet.  This -- I remember
25      because this was a hot bun issue.  It was right

Page 243

1       Facebook page, my Instagram page, Twitter and I
2       probably would have emailed it out.
3   Q   Is it your testimony that every time you have
4       tweeted, you have also posted the same content
5       on your Facebook page?
6   A   Most of the time.  I can't say yes, but most of
7       the time I probably would have, yes.  And
8       sometimes with Facebook, just FYI, because it
9       gets so much traffic, I would have moved it to
10      trash or deleted it so I could go to the next
11      thing because I have so much traffic on
12      Facebook.  So in order to get to the next, you
13      know, issue on my Senate Facebook page,
14      sometimes I will delete something so I can stop
15      getting those dings on coming so when I post I
16      can -- when I go in to direct people to the
17      office or something like that -- or I would
18      have just said in the comments, please contact
19      my office if people start wanting to discuss
20      something on Facebook, right.  And so sometimes
21      I'll move it to trash so we can go onto the
22      next thing because those notifications, you
23      know.
24  Q   So just to back up and talk about that for a
25      second.

Page 245

1  A   Uh-huh.
2  Q   You occasionally delete Facebook posts?
3  A   I do, yes.
4  Q   Have you ever deleted any Twitter posts?
5  A   Not that I remember.  I don't use Twitter that
6      much.
7  Q   I'm now showing you what I'm marking as
8      "Exhibit #21", which is dated December –-
9      December 12 –- excuse me –- December 10, 2021.
10     Oh, dear.  Are you familiar with this tweet?
11 A   I'm not familiar with the tweet.  I'm familiar
12     with the graphic.
13 Q   You are familiar with the graphic?
14 A   Yes.  But I kind of can with confidence say
15     that this was tweeted because I'm so familiar
16     with the subject matter.
17 Q   So on this tweet you said "On Monday the Senate
18     Select Committee for State Police Oversight
19     will meet.  Public comments are allowed."?
20 A   Right.  That's directing people to come to the
21     committee to make comments.
22 Q   And so would you say this is a fair and
23     accurate representation of your tweet?
24 A   I believe this one is, yes.
25 Q   And you included a graphic on this tweet.  This

Page 246

1      graphic included your district email?
2  A   Right, because I always -- the central place to
3      communicate with me is my district office so I
4      would have included, on any graphic, my email
5      and my phone number which I've explained before
6      is the best way to communicate with me and get
7      a good response.
8  Q   In this tweet, you told Twitter users -- or
9      actually in this tweet and in the graphic you
10     told Twitter users that public testimony was
11     welcome?
12 A   Right.  That's public testimony at the hearing.
13     Uh-huh.
14 Q   And this is the statewide committee hearing for
15     a committee on which you're a member?
16 A   Well every committee hearing is statewide.
17 Q   But it was for a committee that you were a
18     member?
19 A   A member of, yes.  And public testimony refers
20     to the fact that this committee is taking
21     public testimony in the hearing.
22 Q   And with the state, there's a select committee
23     for State Police Oversight, what is that
24     committee?  Can you explain that?
25 A   That's -- well, you want me to go back from

Page 247

1      what I said earlier?  We talked about this
2      earlier in the deposition of how it was formed,
3      when it was formed and what it's set up to do.
4      You want me to go through it again because
5      we've kind of answered this one?
6  Q   We have what it was set up to do.  Oh, yes we
7      would like you to explain what it was set up to
8      do.
9  A   Okay.  Sure.  After the Ronald Green incident,
10     I think there was one other incident that was
11     local in nature and I can't remember if it was
12     from Baton Rouge -- or was it set up -- I'm
13     pretty sure it was the Ronald Green incident,
14     but coming back to think of it, I think there
15     was an issue in Baton Rouge, too, with -- Lord,
16     I can't --
17     MS. SCHWARTZMANN:
18     Officer Sterling?
19 A   Sterling.  Now the State Police was not
20     involved in Sterling, if I remember.  So this
21     committee was set up because after the Ronald
22     Green incident or right before, there was a
23     question on whether or not Governor Edwards
24     knew and the police superintendent knew what
25     happened at -- what happened to Ronald Green

Page 248

1      and whether it was hidden.  So this committee
2      was set up not to investigate Ronald Green.
3      Let me be clear, like I said, because we
4      couldn't investigate matters that were already
5      under investigation.  It was set up to look at
6      policies and recommend policies to the State
7      Police and allow the public to learn more about
8      their policies.
9  BY MR. CROW:
10 Q   What are your responsibilities as a member of
11     that select committee?
12 A   Same as any other select committee -- to hear,
13     to ask questions, to get to the bottom of
14     issues, you know, that occur.
15 Q   And how many people serve on this committee?
16 A   I'm not really sure.  Senate committees are
17     smaller.  I'm just not sure how many.
18 Q   I'm now showing you what I'm marking as
19     "Plaintiff's Deposition Exhibit #22" which is
20     dated December 12th, 2021.  Actually -- sorry,
21     we've already -- we just had that one.  I'm
22     actually going to show you what's just
23     "Deposition Exhibit #22" which is dated March
24     11, 2022.  Are you familiar with this tweet?  But
25 A   Not really.  I don't remember posting it.  But

Page 249

1   I do remember -- I don't really remember the
2   graphic because this would have been a series
3   of graphics. Like I would have put this out
4   almost every day I was in session during that
5   time. So I remember the series of graphics,
6   you know.
7   Q   So is this a fair and accurate representation
8   of your tweet?
9   A   Of the graphic, yes. I just don't remember
10   whether I tweeted this. There was a series of
11   graphics, that's why I remember it. I don't
12   remember this particular graphic because it's
13   more of a mundane thing when you're creating a
14   series of graphics. It's just telling people
15   where you are every day.
16   Q   You don't remember this particular graphic?
17   A   No.
18   Q   Did you make this graphic?
19   A   I would have made a series of graphics and it
20   would have been the same picture, same
21   everything. That's why I can't remember this
22   specific graphic. But I remember the series of
23   graphics telling people what committees I was
24   going to.
25   Q   Did you specifically make this graphic?

Page 250

1   A   I cannot remember. I mean, I literally cannot
2   remember. Sometimes what happens is the
3   original graphic on a series of graphics would
4   be made by the legislative staffer. I remember
5   I start asking if I made a graphic, it would be
6   me. This cursive writing may have been me
7   because the legislators don't usually do the
8   cursive writing. So I probably would have made
9   a standard graphic and changed it every day.
10   And maybe it was the legislator staffer, I
11   don't know. Usually it's me if you see that
12   little cutesy -- but I can't say who it was.
13   Q   In this tweet, you tweeted "Tomorrow's day in
14   the capitol, Three Committees before the state
15   of session. You can watch them by going to"
16   and then you link to legis.la.gov, correct?
17   A   I don't remember this tweet, but yeah, probably
18   just been standard. I would really have to see
19   if Facebook was attached to Twitter during that
20   time -- if there was a way to. I just don't
21   know.
22   Q   And in this graphic that was included with this
23   tweet, this graphic has your image on it,
24   correct?
25   A   Yes, it does. That's when I was smaller.

Page 251

1   Q   And it also includes information on how to
2   contact your legislative office?
3   A   Yeah, I'm always reverting people back to the
4   legislative office for communication on
5   legislation.
6   Q   I'm now going to show you what I'm marking as
7   "Deposition Exhibit #23" which is dated March
8   11, 2022. Are you familiar with this tweet?
9   A   Not so much, but -- because it's -- I thought
10   we had this tweet already. Not so much, but I
11   remember keeping the public informed in various
12   ways about the State Police Oversight. I'm not
13   familiar with posting this tweet, but I did
14   keep the public informed in as many ways as
15   possible, even on my personal pages about this
16   issue.
17   Q   This is your account that appears at the top of
18   this tweet?
19   A   My personal Twitter account, yes.
20   Q   And your Twitter handle?
21   A   Yes.
22   Q   You said that you recalled keeping the public
23   informed on this State Police Oversight
24   Committee?
25   A   I remember sending out emails at times. I

Page 252

1   remember Facebook. I remember talking to
2   constituents; all of that, yes.
3   Q   So is this something you would have posted
4   about?
5   A   On the oversight hearing -- I'm not sure if
6   this is a post, but yeah. Yes -- I'm sorry.
7   Q   In this tweet, you told Twitter users how to
8   watch the committee meeting; is that correct?
9   A   If this is my tweet, yes.
10   Q   And this was as the committee meeting was
11   getting ready to start?
12   A   What time is this? I don't see a time on it.
13   Q   It just -- the tweet states "The State Police
14   Oversight Committee is meeting now," correct?
15   A   Yeah. So if this was my tweet, it would have
16   been -- yes. And I would have been sitting in
17   the Capitol at that moment. Unless -- let me
18   say this -- let me preface -- unless I was away
19   and couldn't attend the meeting.
20   Q   And you did include a link with this?
21   A   Yes.
22   Q   I'm now showing you what I'm marking as
23   "Deposition Exhibit #24" which is dated March
24   14, 2022. Do you recognize this tweet?
25   A   Let me read it. I remember the graphic, not so

Page 253

| | |
|---|---|

1    much making the tweet. But I remember the
2    graphic.
3  Q  Did you tweet this graphic on Facebook?
4  A  I am not sure because that's the face -- that's
5    the governor's Facebook page. Like at the top
6    -- the tag is the governor's Facebook page. So
7    I'm not for sure.
8  Q  What did you tweet in this tweet?
9  A  If it's my tweet -- remember, I don't remember
10    -- "It's my prayers that we do not seek to make
11    democrat or republican decisions, but that we
12    seek to make Godly decisions. The governor
13    will deliver his address of the State -- of the
14    address at 1:00 p.m." I probably was at my
15    apartment.
16  Q  And you tagged the Louisiana governor's
17    Facebook page as well as gov.la.gov, correct?
18  A  Yes. Uh-huh. So I probably -- assuming I
19    might have tweeted this one on -- you know what
20    -- or it may have just been an email we
21    received from the governor, or a text or
22    something. Probably email really because
23    that's how the governor communicates with us --
24    that we receive with all of his stuff. Or it
25    could have been from Facebook -- I would have

Page 254

1    tweet?
2  A  I wouldn't be familiar with tweeting this. I
3    would say it was something that I would have
4    put out to the public or to on every forum I
5    had, whether public or private.
6  Q  This tweet is dated May 18th, 2023, correct?
7  A  Yes.
8  Q  Which was last year?
9  A  Yes.
10  Q  And you don't -- you do not recall whether you
11    made this tweet?
12  A  No, because it's such a general subject. It's
13    just a general subject. Every year I talk
14    about education and teacher pay raises.
15  Q  So it's something that you would post about?
16  A  I just stated that, yes.
17  Q  In this tweet, you tweeted "We are now
18    discussing the funding of education and teacher
19    pay raises and senate education. You may watch
20    at the link below," correct?
21  A  I don't remember the tweet, but it's likely
22    that -- it's like you're saying, I can't verify
23    I tweeted it. I don't remember the tweet.
24    It's such a general broad subject. It's one
25    that I've been tackle -- you know, been

Page 256

1    lifted it from Facebook on the governor's page
2    but would have added my own saying at the top
3    of it, right. Because usually I don't tweet
4    the governor's Facebook -- I mean or -- and I
5    don't even put it on Facebook. So this would
6    have been something I copied probably from his
7    page and added my top two sentences to it.
8  Q  Did you copy this graphic from his -- from the
9    governor's page?
10  A  No. No.
11  Q  In this graphic -- this graphic has an image of
12    you on it, correct?
13  A  Right.
14  Q  And this graphic also says "We would love to
15    hear from you and keep you informed," correct?
16  A  Right. And it gives my -- where I always
17    direct people to for comments and to talk to me
18    about legislation -- it gives my district
19    office information. Contact us -- everything
20    that you've seen says contact us and it tells
21    people how to contact us to discuss
22    legislation.
23  Q  I'm now showing you what I'm marking as
24    "Deposition Exhibit #25" which is dated May
25    18th of 2023. Are you familiar with this

Page 255

1    involved in for the last you know, fourteen
2    (14), fifteen (15) years.
3  Q  Is that what this tweet says?
4  A  Yes.
5  Q  And this tweet, it is from your Twitter handle,
6    correct?
7  A  It appears from a copy, yes.
8  Q  Why did you tweet this?
9  A  I don't --
10  Q  Let me rephrase. Why would you tweet something
11    like this?
12  A  We've been over -- we've been over these
13    education and teacher pay raises tweets. It's
14    something I'm passionate about.
15  Q  You told Twitter users to watch about -- excuse
16    me -- you told Twitter users about the
17    committee meeting, correct?
18  A  If this is my tweet, it's probably all over
19    everywhere and in an email.
20  Q  I now want to shift gears a little bit.
21    MS. SCHWARTZMANN:
22       We're going to take five minutes, if we
23    can.
24    COURT REPORTER:
25       Five minute break?

Page 257

65 (Pages 254 - 257)
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

1    MS. SCHWARTZMANN:
2        Yes, please.
3    COURT REPORTER:
4        Okay. We're off the record. The time
5    is 2:20 p.m.
6        (OFF THE RECORD)
7  EXAMINATION CONTINUED BY MR. CROW:
8  Q   Senator Jackson, I now want to talk to you
9    about muting on Twitter.
10   COURT REPORTER:
11       We're back on the record. It's 2:34
12   p.m.
13   WITNESS:
14       I still do that, start talking.
15 BY MR. CROW:
16 Q   Senator Jackson, I now want to talk to you
17    about muting on Twitter. Do you know what
18    muting is?
19 A   I do now.
20 Q   What is muting?
21 A   Muting is where you don't see like a lot of
22    responses from people.
23 Q   You being you don't see their responses on your
24    profile?
25 A   Yes. Well -- yes, I think that's the case.

Page 258

1    But you don't see a lot of their responses.
2  Q   When a user is muted, can the muted user see
3    your profile?
4  A   Yes.
5  Q   Have you muted any words on Twitter?
6  A   I don't know. I might have. I don't know.
7  Q   You do not recall whether you've muted words on
8    Twitter?
9  A   No. Huh-uh.
10 Q   Have you muted any hashtags on Twitter?
11 A   Hashtags like -- hashtags -- I don't know.
12 Q   You don't recall?
13 A   No, I don't recall.
14 Q   Have you ever muted another Twitter user?
15 A   I have. I'm not sure if I have anyone muted
16    now, but yes, I have.
17 Q   Which users have you muted?
18 A   I don't recall.
19 Q   You don't recall even one user that you've
20    muted?
21 A   No. Usually if I use mute it's because someone
22    is continuously responding and responding and
23    responding like I said before and I'm getting
24    notification after notification or I may have
25    muted a Twitter user who has used derogatory

Page 259

1    language or something like that.
2  Q   But you don't remember which user?
3  A   No. I don't use Twitter like that, so no.
4  Q   Why might you mute a Twitter user?
5  A   I just went over it.
6  Q   So you say you don't remember muting any
7    specific users. Do you remember specific facts
8    around why you've muted a user or group of
9    users?
10 A   Sometimes what I do remember that I muted
11    people because their accounts were fake. Like
12    basically it's not a real person's account. I
13    know that's one reason. As far as subject
14    matters, no. But that is one reason and I
15    would have muted people if their responses were
16    derogatory or I would have muted people if they
17    just like were -- how should I put it -- just
18    constant, constant, constant so I can stop
19    getting these notifications.
20 Q   Is there anything that would refresh your
21    memory as to whether -- as to which users
22    you've muted?
23 A   Maybe or may not. If I see some names I
24    probably can talk about whether I muted them or
25    not.

Page 260

1  Q   Have you ever let someone else mute another
2    Twitter user on your account?
3  A   No.
4  Q   Have you ever let someone mute a phrase or
5    hashtag on your account?
6  A   No. I have my sole access to Twitter.
7  Q   Are you familiar with Twitter's reporting
8    function?
9  A   I -- I was not up until -- so Twitter changed
10    how it looked a couple of times. So like when
11    I was familiar with something, it would go away
12    if it took too long to find it. So off and on
13    I'm familiar based on what they changed.
14    Sometimes I can't find it and I'll just hit the
15    mute button and keep moving.
16 Q   The reporting function, you can use that to
17    report to Twitter inappropriate tweets,
18    correct?
19 A   I'm not sure. I know you can use -- I think
20    so. And I'm not sure because Facebook lets you
21    report fake pages, but honestly it's just kind
22    of a waste. You don't -- you get the response
23    that we have reviewed it, on Facebook I know
24    when it doesn't. So I'm not kind of -- I don't
25    generally report. It's a waste of time.

Page 261

1  Q   Have you ever reported a tweet to Twitter as
2      inappropriate?
3  A   I'm not -- I don't remember.  When I figured
4      out reporting was a waste of time on any social
5      media website, I just don't waste the time.
6      The only time I generally report now is on
7      Facebook when someone duplicates someone's
8      account because that's always happening.
9  Q   So you don't recall a single instance in which
10     you've reported a tweet to Twitter?
11 A   I don't know.  I can't tell you when I kind of
12     stopped reporting stuff.  I don't know.
13 Q   So you can -- you cannot recall?
14 A   No.
15 Q   I now want to talk to you about your blocking
16     of Twitter users.  You know -- are you familiar
17     with blocking on Twitter?
18 A   Yes, I am.
19 Q   What is blocking on Twitter?
20 A   Blocking is where you can't see their content
21     and they can't see yours.
22 Q   So when a user is blocked, can they see your
23     profile?
24 A   Not that I'm aware of, no.
25 Q   So they would not be able to see your tweets

Page 262

1      about committee meetings?
2  A   No, but they can go to Facebook and the
3      legislative page every day or the day before,
4      sometimes a week before a post legislative
5      committee meetings.  My page is not the
6      official page for legislative committee
7      meetings.  Everyone -- that's why I've always
8      directed them to the legislative website
9      because that's the official and it gives notice
10     first of when public hearings are being had.
11     All hearings of the legislature are public.
12     They have to be posted within twenty-four (24)
13     to forty-eight (48) hours.  Generally if we're
14     not in session, they're posted before then.
15     And especially like select committees -- unless
16     we decide to have one late -- and it still has
17     to be within that reporting period.  And we
18     always tell people -- we always -- I apologize,
19     one second.  That's why we always direct
20     everyone back to the legislative office and to
21     the legislative page because your most accurate
22     notices are coming from there.  If there's
23     cancellations, it's coming from there.  It's a
24     public page that everyone has access to.
25 Q   You keep looking at your phone.  Can you please

Page 263

1      share what you're looking at on your phone?
2  A   I'm texting my staff -- my legal staff to tell
3      them I'm still in deposition.  There is a
4      standard rule in my office that if a judge
5      calls another attorney on a case, this -- I
6      foolishly set this deposition to end at 12:45.
7      My family has text and we've taken five breaks.
8      If my mom texts, I tell everyone I'm going to
9      try to respond.
10 Q   If you need to go on your phone, will you
11     please let us know so we can take a break?
12 A   Sure, no problem.
13 Q   Going back to your -- you talked about, you
14     know, that they would be able to see -- they
15     being blocked users -- would be able to see
16     your notices about committee meetings to -- on
17     your website, correct?
18 A   I don't -- I don't post the notices.  The
19     official state website that posts the notice is
20     www.legis.la.gov.  That's posted by legislative
21     staffers, whoever does our legislative website.
22     Also, committees are generally posted sometimes
23     on the house and senate Facebook, Twitter page
24     and all of that.  I don't post the official
25     notices.  They're also posted within the

Page 264

1      capitol.
2  Q   But you do -- let me rephrase.  You have posted
3      about the time and when a committee meeting was
4      about to begin and you have -- actually, excuse
5      me, you can answer that first question.
6  A   Yes, I have.
7  Q   And you have also included links to watch these
8      committee meetings?
9  A   Right.
10 Q   And so if a user is blocked, they would not see
11     these tweets, correct?
12 A   No, not on my personal Twitter page.
13 Q   Would Twitter users who are blocked also not be
14     able to see tweets where you ask for their
15     thoughts about legislation?
16 A   Not that I know of.  And I don't know if I
17     frequently do that or anything.  Usually
18     anything I tweet about what's your thoughts --
19     or if I have tweeted about what's your
20     thoughts, it's always going to include my
21     legislative email and my office number so that
22     you can come back there.
23 Q   I now want to talk about specifics.  Have you
24     ever blocked a Twitter user?
25 A   Yes.

Page 265

| | |
|---|---|
| 1 Q   Who have you blocked? | 1    you have blocked on Twitter? |
| 2 A   I don't recall.  I know from this case I've | 2       MR. HAYES: |
| 3    blocked -- it's some account that says | 3          Objection, asked and answered.  You may |
| 4    @somebody something.  So I didn't even know if | 4       answer. |
| 5    that was a real Twitter account honestly and if | 5 A   I cannot recall. |
| 6    I remember that account, it was a hockey player | 6 BY MR. CROW: |
| 7    from some other state or the fan page of a | 7 Q   You mentioned that most of the time that you've |
| 8    hockey player from some other state.  I recall | 8    blocked a Twitter user, it is because it is a |
| 9    when I looked through that page because it gave | 9    fake account; is that correct? |
| 10    -- it said that not all black women are smart, | 10 A   Right.  Uh-huh.  If I can recall, those are the |
| 11    some are dumb b-i-t-c-h-e-s.  When I looked | 11    ones I remember.  Quite like in this case where |
| 12    through that page, I recalled the profile was a | 12    it didn't have a person's name, it didn't have |
| 13    hockey page.  Something else was Ed something. | 13    any person's personal identification |
| 14    It might not have been somebody, but there was | 14    information, it didn't have any pictures of a |
| 15    no identifying mark of it being a real person. | 15    person.  It didn't have any connectivity with |
| 16    There was no identifying mark of it being | 16    Louisiana.  Now, have I blocked some real |
| 17    anyone from Louisiana or anything.  There were | 17    people?  I've testified to that before, you |
| 18    no personal pictures when I took a cursory | 18    know, that if I did it was because -- usually |
| 19    review of the page of an actual person. | 19    now I know how to mute them.  I think I've |
| 20 Q   How many users have you blocked over the course | 20    blocked a couple of people or -- I can't give |
| 21    of your time on Twitter? | 21    you a number -- for derogatory comments, right. |
| 22 A   I wouldn't remember. | 22 Q   Is it your testimony that you blocked Maya |
| 23 Q   Can you estimate? | 23    Detiege, our client, @midaeros because she had |
| 24 A   No. | 24    no personal info on her page? |
| 25 Q   You can't even give a ballpark figure? | 25 A   A couple of reasons -- number one, I don't |
| Page 266 | Page 268 |
| 1 A   No. | 1    think it was -- I don't even remember her |
| 2 Q   Can you think of a single person you've blocked | 2    Twitter handle so I would have to -- and I'm |
| 3    on Twitter? | 3    hoping we're going to request at the data of |
| 4 A   I just gave the example of this case. | 4    what her Twitter handle was because if I |
| 5 Q   Can you think of anybody with the exception of | 5    remember, this was a hockey fan page or |
| 6    the parties to this litigation that you've | 6    something of somebody.  It wasn't from |
| 7    blocked on Twitter? | 7    Louisiana.  I don't even know if it said @maya. |
| 8 A   No.  Because when I block on Twitter, most of | 8    It might have.  I just don't remember what it |
| 9    the time it's been because it's a fake page | 9    said.  It was based on her derogatory comments, |
| 10    like this one. | 10    whether I should be subjected to those |
| 11 Q   In terms of how many users you've blocked, are | 11    derogatory comments on my personal Twitter |
| 12    we talking about five (5) users? | 12    page, number one.  Number two, when I looked at |
| 13 A   I couldn't recall. | 13    her page further, it looked like a fake created |
| 14 Q   Are we talking about twenty-five (25) users? | 14    page.  So for those reasons, that page was |
| 15 A   I couldn't recall.  I couldn't recall. | 15    blocked. |
| 16 Q   Are we talking about a hundred (100) users? | 16 Q   You personally block every person that has been |
| 17       MR. HAYES: | 17    blocked -- excuse me, let me rephrase that. |
| 18          Objection, asked and answered multiple | 18    You personally block every person that has been |
| 19       times now. | 19    blocked by your Twitter account; is that |
| 20 BY MR. CROW: | 20    correct? |
| 21 Q   You can answer. | 21 A   If someone was blocked, I blocked them. |
| 22 A   I couldn't recall. | 22 Q   So you are familiar with how many times you've |
| 23 Q   So it's your testimony today that you cannot | 23    blocked a user on Twitter? |
| 24    recall a single person outside of the members | 24 A   No, I answered that.  I said if someone was |
| 25    to this -- the parties to this litigation that | 25    blocked, I blocked them.  But I wouldn't be |
| Page 267 | Page 269 |

1    familiar with how many times I blocked someone.
2  Q   Is there anyone who would know this
3     information?
4  A   I'm the only one with access to my Twitter
5     page.
6  Q   How frequently would you say you block a user
7     -- you've blocked users on Twitter?
8  A   I wouldn't recall because sometimes I use
9     Twitter and sometimes I don't.  So I just
10    wouldn't recall.
11  Q   Are there certain topics or conversations that
12    you remember resulting in blocking?
13  A   It's never about a topic of a conversation.
14    It's just when they go -- when they make
15    derogatory comments -- which I don't block
16    everybody with a derogatory comment, but it's
17    like when they go on and on.  I remember this
18    one -- like I told you what procedure I went
19    through with this one.  The derogatory comments
20    -- then I looked at it and it didn't identify
21    as a real page at all.  And I think once we
22    request Twitter history, it will show that.  If
23    I recall, nothing was on the page to identify
24    it as a person or to connect it to Louisiana in
25    any way.

Page 270

1  Q   Would you say that some of your legislative
2     work is more controversial than others?
3  A   Depending on to different groups.  If you are
4     dealing with the death penalty, then that
5     legislation is very controversial to victims or
6     family members of people who have passed away.
7     If you're dealing with the reform of the
8     criminal justice laws, that is more
9     controversial depending on what side you stand
10    on, to victims of crime or either those who
11    have been wrongfully incarcerated.  If I'm
12    dealing with the right to life, that's going to
13    be very controversial on one side and very
14    helpful on the other side.  It just depends on
15    who's active at that time.  And that's another
16    thing -- controversy is based on the time and
17    day.  Post Roe versus Wade, the reversal of
18    abortion became very contro -- abortion
19    legislation became very controversial.
20  Q   So you are a part of -- depending on the timing
21    -- very controversial legislation?
22  A   Right.  And that's in a myriad of areas.
23    What's controversial like today is not
24    controversial tomorrow.  Disability rights when
25    they were being cut was extremely

Page 271

1     controversial.  Car insurance rates became
2     controversial between trial lawyers and the
3     general public and political personalities.
4  Q   Okay.  You talked -- one of the issues you
5     talked about that was particularly
6     controversial, at least at the time, was when
7     Roe v. Wade was overturned.  Do you recall
8     blocking any Twitter users as a result of
9     tweets regarding that matter?
10  A   When Roe v. Wade was overturned?
11  Q   Yes.
12  A   Because it was just -- it was recently
13    overturned, what, a year ago?
14  Q   That's correct.
15  A   No, not a year ago.  Maybe.  I don't remember.
16    But I think the -- if we going to get to the
17    crux of the litigation we're here for today, if
18    I remember was a tweet regarding the passage of
19    -- but that was prior to Roe v. Wade being
20    overturned.  That was the passage of a bill --
21    a pro life bill.
22  Q   You also mentioned that some of your work with
23    the death -- regarding the death penalty has
24    been very controversial?
25  A   Yes.

Page 272

1  Q   Do you recall blocking any Twitter users as a
2     result of these discords?
3  A   I'm not sure if I posted on Twitter about death
4     penalty.  Most of the time, victims come to
5     committee.  More of what happens on social
6     media with the death penalty is more of kind of
7     party issues and things like that.  It's more
8     of members.  It's not the general public if I
9     recall.
10  Q   You also mentioned that one of the more
11    controversial pieces that you work on involves
12    car insurance.  Can you talk about that a
13    little bit?
14  A   The car insurance rates in Louisiana are
15    skyrocketing.  We went into a session where the
16    insurance commissioner promised that if we
17    passed trial lawyer reform is what they call
18    it, or judicial reform, that car insurance
19    would go down.  It didn't.  And that was two or
20    three years ago or more and we're just dealing
21    that cycle.  People are tired.
22  Q   Do you remember blocking anybody over these
23    issues?
24  A   I either block or muted, I can't remember.  I
25    remember it being controversial on all

Page 273

1    platforms and even in our emails and I think --
2    and don't hold me to this -- that might have
3    been -- that wasn't the subject that an email
4    was reported on, but I wouldn't remember.
5 Q   The other topic that you mentioned that was
6    very controversial was your work in criminal
7    justice reform?
8 A   Right.
9 Q   Do you recall blocking anyone as a result of
10    these concessions?
11 A   My major work in criminal justice reform,
12    besides what happened in the legislature, was
13    the first bill I passed, so I wouldn't recall
14    because I was in the House then.
15 Q   Are there any other controversial topics that
16    you have waded into on social media?
17 A   I can't remember them all. Look, teacher pay
18    raises sometimes is controversial. At the
19    right moment, the right time, everything can
20    become controversial.
21 Q   Do you recall blocking anybody over teacher pay
22    raises?
23 A   I wouldn't recall. I cannot tell you what I've
24    blocked individuals over. I just -- you know,
25    unless it's something that stands out, I

Page 274

1    couldn't tell you. Most of the time -- and
2    that's why I gave you the general scope of
3    anybody I blocked, that is what it would have
4    been and I wouldn't know if it's a lot of
5    people, some people. I just wouldn't know
6    that. I know the weight of blocking sometimes
7    was based on fake accounts.
8 Q   And I want to shift over to your Twitter. When
9    you post on Twitter, do other Twitter users
10    reply to your tweets?
11 A   Sometimes. And sometimes I see them and
12    sometimes I don't because sometimes I post on
13    Twitter and keep moving.
14 Q   Do you read all of your replies?
15 A   That's what I just stated. Sometimes I post on
16    Twitter and keep moving, so.
17 Q   Why is that?
18 A   Because generally I get my updates from
19    constituents. I give updates through my
20    legislative office. That's why you see all the
21    posts say you know, contact my legislative
22    office because I know how flighty I am with
23    checking Twitter.
24 Q   I want to talk about some of your tweets that
25    you've tweeted about blocking. I'm going to

Page 275

1    show you what I'm marking as "Deposition
2    Exhibit #26" --
3 A   Sure.
4 Q   -- which is dated -- or excuse me, it's a
5    Twitter reply dated November 18, 2014. Did you
6    tweet this?
7 A   I'm not sure. I'm trying to see where my tweet
8    would have been on this page.
9 Q   I believe it's the third message and the fifth
10    message. Or actually could you just read this
11    entire exchange?
12 A   Okay. I'm not going to be able to verify this
13    exchange, but I can read what is purported to
14    be a Twitter exchange. Phil Kerpen, if I'm
15    pronouncing it right, says "Another dirty
16    @SenLandrieu ad voiced by @RepKJackson:
17    'Republicans are even considering impeaching
18    President Obama.' Then he tweets again -- I
19    don't respond I guess and he says
20    "@friedrichsgroup Well, @SenLandrieu supports
21    taxpayer-funded third trimester abortions.
22    @RepKJackson supports her. So no tolerance."
23    And then I say "@kerpen at -- looks like that
24    friedrichsgroup I'm blocked from --
25    @SenLandrieu Cassidy supports cutting

Page 276

1    healthcare of parents who choose Life," so this
2    must have been the race with Cassidy and
3    Landrieu I guess -- "life to support him. So
4    no tolerance." I don't know if I tweeted that
5    or if I re -- or mistakenly re-tweeted it. I
6    can't figure that out. And then Phil Kerpen
7    says "What an embarrassing stupid thing to say.
8    I feel sorry for you." And again, he tweets
9    back for the @friedrichsgroup is blocked from
10    my -- or they blocked me from their account I
11    guess. And then I respond back "Your inability
12    to advocate for your beliefs in a respectful
13    manner just earned you a block." So if it was
14    me, I blocked him. It's what I've testified to
15    today that when people get disrespectful and go
16    from the issues and start with personal name
17    calling on my personal Twitter page, they may
18    have been blocked.
19 Q   So this is a fair and accurate representation
20    of this exchange?
21 A   I said at the beginning of this that I didn't
22    know if this was a real exchange because I
23    can't authenticate this tweet. It's from 2014.
24    It's ten years later.
25 Q   I want to direct your attention to the final

Page 277

1    reply in this thread from you on this exhibit.
2  A   If it is mine.
3  Q   In this tweet -- let me rephrase that. This
4    particular tweet at the bottom, that is your
5    account?
6  A   That is -- it purports to be my account, yes.
7    I can't -- I can't verify this.
8  Q   And that's your Twitter handle?
9  A   And it purports to be my Twitter handle. It's
10    a copy of something so without looking at
11    Twitter, I couldn't verify this.
12  Q   In this tweet, it says "Your beliefs," speaking
13    to Phil Kerpen, "your inability to advocate for
14    your beliefs in a respectful manner just earned
15    you a block." What did you mean by earned you
16    a block?
17  A   If it was me, that he was going to be blocked,
18    which I testified to today. Like if they start
19    calling you stupid and all of that, saying what
20    you're saying is stupid. I debate issues, not
21    people. And I've said that publicly before.
22  Q   And you stated that if this was you that
23    tweeted this --
24  A   Right.
25  Q   -- if it was, you did block this user?

Page 278

1  A   I'm not sure. I could have blocked him. I
2    could have just said that and kept moving. I
3    don't know. I would have put down my phone.
4    You're doing fifty (50) things at once. I
5    could have put down my phone and kept moving.
6  Q   You mentioned reasons why you might have
7    blocked him were because he was being
8    derogatory towards you --
9  A   Right.
10  Q   -- and disrespectful toward you, correct?
11  A   Right.
12  Q   Are there any other reasons why you might have
13    blocked him?
14  A   Because of that and I've kind of testified to
15    that. And also, this person -- and I don't
16    have the rest of this thread. It could have
17    been a thread that went on forever. It could
18    have -- I don't know.
19  Q   I want to talk --
20  A   Also, I might have looked at his profile and he
21    wasn't anybody from Louisiana. If he was, I
22    don't know. Like with just this paper, I
23    couldn't tell you.
24  Q   You said that you might have blocked him
25    because he was addressing you or speaking with

Page 279

1    you in a derogatory manner.
2  A   Right.
3  Q   Can you define that term for me?
4  A   Derogatory to me is anything that goes outside
5    of the issues that we're discussing and starts
6    name calling or starts being disrespectful. If
7    you've looked at all of my communication with
8    anyone at any time, whether it's by letter,
9    email or anything, it's going to address them
10    in a respectful manner. It's going to address
11    the issue that we're discussing and not them as
12    a person.
13  Q   So if someone is speaking outside of the issue,
14    which you're debating over --
15  A   No, no, no. They can ask me about another
16    issue. They have to stick to issues, not
17    insults of people or myself or other members.
18    Well, really myself. And I don't know if I
19    blocked this person. I could have said that
20    and put my phone down and kept walking.
21    Sometimes -- you know, I might not -- I just
22    don't even know if I knew how to block in 2014.
23    Again, Twitter changes, interfaces. Once I
24    learned how to mute, I use mute instead.
25  Q   You also said you might have blocked him

Page 280

1    because he was being disrespectful.
2  A   Uh-huh.
3  Q   Can you define disrespectful in this context?
4  A   It's a wide range. In this context, you know,
5    saying I'm stupid or anything like that, yes.
6  Q   So you're talking about like name calling?
7  A   Right. Or not even name calling, just getting
8    off of the issue and starting to get insulting.
9    You can kind of see when the conversation is
10    going that way. Now I tend to just mute or
11    tend to put down my phone because Twitter is
12    you know, my personal page, right. So I can't
13    really explain it to you with just looking at
14    this. I would have to look at the whole
15    conversation and everything.
16  Q   How else -- and you can answer this without
17    referring to the exhibit -- how else would you
18    define disrespectful in terms of you
19    potentially deciding to block someone on any
20    social media?
21  A   What happened in this case would definitely be
22    defined as disrespectful.
23  Q   Can you be more specific?
24  A   She said that not all black women were smart,
25    some of us are stupid, dumb b-i-t-c-h-e-s.

Page 281

1  Q  How else would you define disrespectful?
2  A  There's a myriad of ways, depending on the
3     subject matter.
4  Q  Can you please give some examples?
5  A  I think I've given examples.
6  Q  I'd like to know if you have any more examples.
7  A  I don't.  It's just on a case by case basis.
8  Q  If you can't give another example, can you
9     explain to me what are the characteristics of
10    disrespectful speech?
11 A  It's on a case by case basis.  There is no form
12    answer for that and I'm not going to -- and
13    what you're asking -- and I keep saying it's on
14    a case by case basis because that's how I judge
15    things -- on a case by case basis.
16 Q  What do you use to decide whether something is
17    disrespectful?
18 A  My intelligence.
19 Q  Can you walk me through that process?
20 A  And my faith.  And I'm not going to be
21    subjected to stuff that go against my sincerely
22    held religious beliefs.  So when it gets to
23    that point...
24 Q  Aside from your religious beliefs, what other
25    standards do you use when evaluating whether

Page 282

1  speech is disrespectful?
2  A  My intelligence.
3  Q  Can you explain how you use your intelligence
4     to do that?  Can you just walk me through what
5     that looks like?
6  A  It's on a case by case basis.  I process
7     whether it's disrespectful or not and make that
8     decision.
9  Q  How do you process whether something is
10    disrespectful?
11 A  Mentally.  Mentally.  I don't know what else to
12    say.  I don't have a bright line in my notebook
13    that tells me check point A, B, C, D.  I don't
14    have that.  I don't have something in my mind
15    that says check point A, B, C, D.
16 Q  Are there any particular comments, words or
17    phrases that are disrespectful to you?
18 A  If someone uses profanity, but it's not toward
19    me, I generally ask them to go back and you
20    know, re-categorize what they've said.  And I
21    know that for a fact that I've done that
22    before.
23 Q  How would you define profanity?
24 A  Use of profane words.  F-u-c-k you, mother
25    f-u-c-k, b-i-t-c-h.  I think there's a standard

Page 283

1     of what profanity is.  B-i-t-c-h, like this
2     user did.
3  Q  Okay.  Other than --
4  A  Racial slurs would be offensive.  And in this
5     instance, I don't care if you're black, white,
6     Puerto Rican, to say not all black women are
7     smart, some of you are stupid b-i-t-c-h-e-s,
8     that means you've used a racial slur to me and
9     you have also, at that point, been
10    disrespectful by calling some black woman
11    b-i-t-c-h-e-s.  I think that's very clear.
12 Q  Outside of profanity, are there any other words
13    or phrases that you find --
14 A  Racial slurs.
15 Q  Okay.  Other than profanity and racial slurs,
16    are there any other categories --
17 A  We kind of went over it -- name calling and
18    things like that.  When you come off the issue.
19    I don't fight people.  I fight for issues.
20 Q  Have you blocked anyone else for not -- for
21    speaking to you in a derogatory or
22    disrespectful manner?
23 A  I wouldn't remember.  I just wouldn't recall.
24 Q  You don't recall whether you've blocked anyone
25    else for being disrespectful or derogatory?

Page 284

1  A  I don't.  May have, you know.  I don't know.
2     If you had something to refresh my memory, if
3     it refreshed my memory, I would let you know.
4  Q  I'm now showing you what I'm marking as
5     "Plaintiff's Deposition Exhibit #27" which is
6     dated March 10, 2014.
7  A  You've taken me back to 2014.  I pray I can
8     remember.
9  Q  Yes.  Okay, so in this deposition Exhibit #27,
10    this is an exchange between you and another
11    Twitter user named Lamar White, Jr.; is that
12    correct?
13 A  Yeah, I remember Lamar White, Jr. because he --
14    he sometimes doesn't have anything to do but go
15    on social media.
16 Q  So you're familiar with this exchange?
17 A  I'm not familiar with the exchange, but I
18    remember him.  He has a number of exchanges on
19    a number of things.  I think -- is Lamar White,
20    Jr. the one that writes a column maybe?  So I
21    could be wrong.  I just remember the name from
22    somewhere.
23 Q  But you've interacted with him before?
24 A  I just remember the name.
25 Q  Is this a fair and accurate representation of

Page 285

1    this interaction?
2  A   I'm not sure. I don't remember 2014
3    interaction.
4  Q   Throughout this exchange -- this is a back and
5    forth between a Twitter user, @LamarWhiteJr,
6    and then @KatrinaRJackson?
7  A   I'm not sure. I couldn't authenticate it.
8    It's copies. I would have to go to my Twitter
9    page. So we can kind of do this -- I cannot
10   authenticate tweets unless I tell you I
11   remember them.
12 Q   Right. But as you see it, is this your Twitter
13   handle?
14 A   Yes.
15 Q   And is this a photo you've used as your profile
16   picture?
17 A   Yes.
18 Q   In this exchange, Lamar White, Jr. asks -- he
19   asks why outside groups continue to take credit
20   for writing your legislation.
21 A   Can I have a moment to review this? This is
22   multiple pages. It seems like a Twitter
23   account that just wouldn't stop.
24 Q   No problem.
25 A   Is this in order? Maybe it is. It seems to be

Page 286

1    a little bit out of order. Maybe it is, it's
2    just not reading right to me.
3  Q   So in this exchange --
4         MR. HAYES:
5              Are you done reading?
6  A   No.
7  BY MR. CROW:
8  Q   Oh, sorry.
9  A   Okay, I've read it.
10 Q   So in this exchange, Lamar White, Jr. asks why
11   outside groups continue to take credit for
12   writing your legislation; --
13 A   Uh-huh.
14 Q   -- is that correct?
15 A   Yes.
16 Q   And in this response, he includes a link to a
17   website, Nationalrighttolifenews.org; is that
18   right?
19 A   If this is authentic Twitter, yes.
20 Q   Can you read your reply to this tweet?
21 A   "I can't speak for others actions but I work
22   with a number of people on each bill."
23 Q   So this exchange is about HB 388, which is
24   legislation that you drafted, correct?
25 A   That's what it seems to be about, yes. If this

Page 287

1    is an exchange with me.
2  Q   Can you tell us about this situation where Mr.
3    White was saying that
4    Nationalrighttolifenews.org was taking credit
5    for writing your bill?
6  A   I don't know if they were taking credit. And
7    this is in 2014. I couldn't tell you what was
8    in that link or whether I looked at it. What I
9    do know is a couple of pages over, someone
10   responds to let him know they weren't taking
11   credit for it. He goes on the app, say
12   something about Jindal and I explained to him
13   that I've never seen -- I hadn't talked to
14   Jindal about this bill. Then he goes on to the
15   family forum and I go on to tell him I don't
16   know why the family forum would take -- you
17   know, the claim. I think from what I can see,
18   I'm assuming that people were supporting the
19   bill and this was like a fishing expedition to
20   see who I had talked to about the bill.
21 Q   So with this bill -- you said you recall House
22   Bill 388?
23 A   Yes.
24 Q   How is this particular legislation arrived at?
25 A   I'm not going to remember that. Like it's

Page 288

1    2014.
2  Q   But you do remember the bill?
3  A   I remember the bill, yes.
4  Q   In your reply, you mentioned that you worked
5    with quote "a number of people on each bill" --
6  A   Right.
7  Q   -- end quote. Can you explain that a little
8    bit more?
9  A   I explained it kind of in the first deposition
10   about how bills are formed. Sometimes they
11   come from constituents, sometimes they come
12   from interest groups. I may change it. I may
13   tweak it regardless of who it comes from.
14   Sometimes it comes from my life experiences.
15   Sometimes it may come from something I'm
16   watching or a piece of law that I'm reading and
17   I'm saying I didn't know this was unclear law
18   and I would go back and edit it. Sometimes I
19   may be at a conference or speaking to someone
20   while shopping in the grocery store. It's just
21   a lot of ways. That's why I say I work with a
22   myriad of people.
23 Q   So you work with many groups and people --
24 A   Right.
25 Q   -- on each bill?

Page 289

1  A    That's correct.
2  Q    Can you give me some examples of some
3       organizations that you've worked with on bills?
4  A    I went through that list before we went off the
5       record one time.  I did a list of
6       organizations.  Remember I talked about the
7       teachers association, I talked about this.
8       I've answered that question.
9  Q    Back to this exchange with Mr. White and the
10      exhibit, Mr. White then asks "Do you believe
11      that your bill, HB 388, includes the morning
12      after pill," correct?
13 A    I don't remember this conversation.  I remember
14      that becoming an issue, at some point, with
15      this bill.  Well no, that was a bill from --
16      and it wasn't my bill, it was someone else's
17      bill.  But I don't -- so I don't even remember
18      the conversation about this bill as far as the
19      morning after pill.  I am looking for that in
20      the bill -- well, I mean in this document.
21 Q    Well, so let me back up.  You're saying that
22      this HB 388 was not your bill?
23 A    No, it was my bill.  I'm saying I don't
24      remember the discussion about the morning after
25      pill as it was applied to this bill.

Page 290

1  Q    Can you read your reply to that message?
2  A    If it is my reply -- okay -- because that's
3       what I'm saying -- I cannot authenticate this
4       and you're saying my reply.  You probably want
5       to say the reply because I hadn't authenticated
6       this.  "I know what's in my bill.  I'm looking
7       at any unintended consequences if any" -- I did
8       not -- I think I -- he was -- looks like he
9       kind of asked a couple of questions.  It
10      repeats itself.  Let me see.  Under any
11      unintended consequences, did not talk to Jindal
12      before this bill was filed.
13 Q    So in this, you said that you're reviewing the
14      provision and you'll get back to him, correct?
15 A    No.  I said I know --
16 Q    That's not what this tweet says?
17 A    Where am I?
18 Q    "I am reviewing that provision and will get
19      back to you."
20 A    No, I'm on this provision -- that's what I just
21      read.  "I know what's in my bill.  I'm looking
22      at any unintended consequence if any.  Did not
23      talk to Jindal before this bill was filed."
24      That's what I just read.
25 Q    Okay.  Well can I direct you back to the second

Page 291

1       response from your account on the first page?
2  A    If it's a response from my account.  Thank you.
3  Q    So here, you engage with Lamar White, Jr. about
4       specific provisions of a bill that you
5       authored, correct?
6  A    Yes.
7  Q    Do you know where Lamar White, Jr. lives?
8  A    At the time I think he was a resident of
9       Louisiana.  I just -- I don't know if this is
10      the same person I'm thinking about.  So let me
11      clear.  There is a columnist from Louisiana and
12      I may be thinking of the wrong person.
13 Q    Does he live in District 34?
14 A    I'm not sure.
15 Q    I now want to direct your attention in this
16      exhibit to Page 6 where Lamar White, Jr. has
17      tweeted at -- at you and he says "Are you
18      suggesting that the LFF is lying about 'working
19      with Rep. Katrina Jackson'?"  Correct?
20 A    Where is that?
21 Q    It's at the top of the sixth page.
22 A    Okay, so yeah, this Twitter handle at that time
23      would have been probably @Rep -- that's why I
24      need that one till we get through.  May I?
25      COURT REPORTER:

Page 292

1       Yes.
2  A    This is 2014.  The Twitter handle in 2014 would
3       have been RepKJackson.
4  Q    So he did make that -- he did make that tweet,
5       correct?
6  A    Right.  I guess, yes.
7  Q    And then you respond to this tweet?
8  A    So yes, this has to be the columnist or either
9       he made a comment.  No, that's him.  Let me
10      see.  Yeah, can only say I have not talked to
11      them that's a fact.  I clearly know that you,
12      in article, was untruthful about what the bill
13      does.  So this probably is a columnist from
14      Louisiana.
15 Q    And at what time did you make this reply?
16 A    If I made this reply, it was at 10:42 p.m.  But
17      you know, I testified that sometimes I get on
18      Twitter -- I get on social media when I'm done
19      for the day.
20 Q    Did you block the user @LamarWhiteJr after this
21      exchange?
22 A    I don't recall.
23 Q    You don't have any recollection of that?
24 A    No.  I don't know if this was an exchange.  I
25      don't know if this was all of the exchange.  I

Page 293

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

1    don't know anything. I don't know if this user
2    went back to their page and posted something
3    else that was, you know -- I don't know. I
4    would have to look at my Twitter.
5  Q   I'm now going to show you what I'm marking as
6    "Deposition Exhibit #28" which is a screenshot
7    from Twitter. So this exhibit is a screenshot
8    from Twitter, correct?
9  A   I'm not sure. I couldn't authenticate it. I
10    don't remember this. It's not from my page so
11    I definitely couldn't authenticate this.
12  Q   We're not asking you to. Is that a screenshot
13    of Twitter?
14  A   I'm not sure. It could be a graphic. You
15    know, I don't know.
16  Q   If we can authenticate that this is a
17    screenshot from Twitter, do you believe it's a
18    screenshot from Twitter?
19  A   I'm not sure.
20  Q   If we can authenticate that this is a
21    screenshot from Twitter, it shows two tweets
22    from a user Andrew Perry or @houchin_andrew,
23    correct?
24  A   I suppose. This is -- yeah.
25  Q   Is that a, yes?

Page 294

1  A   No. I just -- look, you want me to -- I don't
2    know what this is, right. This doesn't even --
3  Q   If we're able to authenticate this --
4  A   -- no, this doesn't even look like Twitter.
5  Q   If we can authenticate this as an authentic
6    screenshot from Twitter --
7  A   Then it's Andrew Perry.
8  Q   Yes. And there's two tweets from his account,
9    correct?
10  A   I don't know if there's more outside of this.
11  Q   On this screenshot.
12  A   Right, on this screenshot. Yes.
13  Q   I want to direct your tweet -- or excuse me --
14    I want to direct your attention to the bottom
15    tweet on this screenshot dated April 29, 2021.
16    In this tweet, Andrew Perry is tweeting at you;
17    is that correct?
18  A   I'm not sure. But if this is authenticated,
19    yes.
20  Q   What did he say in this tweet?
21  A   "@KatrinaRJackson is voting for legislation
22    targeting trans kids but doesn't want to be
23    called transphobic. People sure hate when
24    words are used accurately."
25  Q   And in this response, he has re-tweeted a tweet

Page 295

1    from Julie O'Donoghue, correct?
2  A   Yes, this was the women -- looks like if this
3    is her tweet, the was a women in sports field.
4  Q   And so in this tweet, he tweeted about
5    legislation that was being considered by the
6    legislature, correct?
7  A   If this is the authentic tweet, yes. Uh-huh.
8  Q   And then he tweeted again on April 30th,
9    correct?
10  A   If this is his tweet, yes.
11  Q   What did he tweet on April 30, 2021?
12  A   It purportedly shows that I blocked him.
13  Q   Can you read me his tweet?
14  A   "@KatrinaJackson, you're still a transphobic --
15    well, transphobe. And a coward now, too." And
16    this might not have been all of the
17    conversation between August 29 and August the
18    30th.
19  Q   But it shows --
20  A   If this was a conversation, it seems like it
21    skips.
22  Q   But it does show that he's been blocked by you?
23  A   It purportedly shows that, yes.
24  Q   Did you block Andrew Perry?
25  A   I can't recall. I just said I don't recall

Page 296

1    this tweet.
2  Q   Do you have any reason to believe that you
3    didn't block Andrew Perry?
4  A   I have no reason to believe I did or didn't.
5  Q   Is this the kind of rhetoric that might cause
6    you to block someone on Twitter?
7  A   This could be a number of things taken in
8    context. This may be just part and parcel. I
9    don't know if it was Andrew Perry -- if this is
10    a correct tweet -- that was in committee
11    calling, you know -- I just don't remember. I
12    don't know the whole content and whether it was
13    around. So it may not have been in a tweet
14    alone. I just don't know what it was around.
15  Q   In the April 30th tweet, Andrew Perry calls you
16    a transphobe, correct?
17  A   Yes. And he calls me transphobic in the April
18    29th, '21 tweet.
19  Q   Would you consider that disrespectful?
20  A   It would just be in the context of everything
21    that was happening. Had I -- I don't know.
22    There may be other tweets. He may have been in
23    committee. I don't know. I do -- I don't
24    remember -- I remember the topic of the bill.
25    I remember people in committee became very

Page 297

1  disrespectful.  I remember us not being able to
2  walk out of committee.  I remember that some
3  things rose to the level of threats outside of
4  the committee room.  So I would have to just --
5  I wouldn't remember who was who in that whole
6  thing.  That's what I remember about this bill.
7  Q    Would you --
8  A    I remember the Sergeant at Arms having to walk
9  us out of committee.
10  Q    Would you consider yourself to be transphobic?
11  A    No.  This was a women in sports bill is what
12  they're referencing and it says that men can't
13  play women's sports.
14  Q    Not looking at the exhibit, would you consider
15  yourself transphobic?
16  A    No.
17  Q    Would someone claiming that you are transphobic
18  -- would that be derogatory to you?
19  A    Somewhat in nature.  And I think that she
20  quoted me in committee.  I probably said I
21  don't know that I don't call people racist
22  because they don't see my side of everything.
23  Generally when people are angry or wanting to
24  be insulting and go off the issues, they'll do
25  excited utterance of name calling.
                                                Page 298

1  Q    He also, on April 30th, called you a coward,
2  correct?
3  A    That's correct.  If this is authenticated, yes.
4  That would have been insulting, as well.  That
5  would have been going outside of the issue and
6  talking about and going into personal issues.
7  Q    So this would have been derogatory?
8  A    Yes.
9  Q    And would it have been disrespectful?
10  A    Yes, of course.  If somebody called you a
11  coward, would it be disrespectful?
12  Q    So you might have blocked him for being
13  disrespectful and derogatory?
14  A    I don't know.  And with this context, I can't
15  speak to this particular person.  I would have
16  to look at everything that was surrounding,
17  whether there were other tweets, whether there
18  was something going on.  I wouldn't know.
19  Q    I now want to shift gears and I want to talk to
20  you -- okay.  Actually now I want to show you
21  what I'm marking as "Deposition Exhibit #29" --
22  A    Uh-huh.
23  Q    -- which is dated July 26, 2022.  Can you
24  please read this tweet?
25  A    If it is a tweet -- "I mean I'm absolutely
                                                Page 299

1  writing an article for an international
2  publication about what you've done to us here
3  in Louisiana with this heinous abortion bill,
4  but go AWF with this block."  And this -- I
5  couldn't, again, tell you about this because
6  they're actually -- they're -- if this was a
7  real tweet, there is something else that
8  happened prior to this that I don't have in my
9  hand.
10  Q    What is the date of this tweet?
11  A    It is June 26, 2022.
12  Q    And this tweet was tweeted by a user that is
13  @Geaux -- G-e-a-u-xGabrielle?
14  A    I can't authenticate it, but that's what it
15  seems to be.
16  Q    And this tweet, if it is a tweet -- if we can
17  authenticate it as a tweet -- this includes a
18  screenshot that is attached to the tweet,
19  correct?
20  A    Right, yes.
21  Q    And what does that screenshot show?
22  A    It shows that I blocked this user.  But with
23  this one thing in hand, I couldn't give you any
24  context behind if it's a real tweet or not.  If
25  it's a real tweet, I still couldn't give you
                                                Page 300

1  context because there seems to would have been
2  some prior communication prior to this tweet.
3  Q    Do you remember blocking this user?
4  A    No.
5  Q    So this was two years ago and you don't recall
6  blocking this user?
7  A    No.
8  Q    You have no recollection of this?
9  A    No.  And I would have -- like I said, it would
10  have gone through a procedure of a lot of
11  things.  But I mean I might could recall -- do
12  you have the tweets before this?
13  Q    I actually want to ask it differently.  So
14  looking back at this exhibit, this user
15  @GeauxGabrielle refers to an abortion bill has
16  heinous.
17  A    Right.
18  Q    And again, seeing that this is on June 26,
19  2022, that was a bill that you had sponsored,
20  correct?
21  A    I'm not sure.  Because sometimes I support
22  legislation, sometimes it's a bill that I've
23  done.  I'm not sure without more context.
24  Q    At the time, June 26, 2022, you had sponsored a
25  bill that would preserve right to life in
                                                Page 301

Page 302

1     Louisiana, correct?
2 A  I'm not sure what year that bill was.  It might
3     have been 2022.  I did, at some point, author a
4     bill that preserved the right to life.
5 Q  So looking at the language of this tweet,
6     calling -- if this was about -- if this is a
7     tweet --
8 A  Uh-huh.
9 Q  -- and if this tweet was about your bill that
10     you had sponsored --
11 A  Right. Uh-huh.
12 Q  -- would someone calling that bill heinous be
13     offensive to you?
14 A  No.  This is actually -- if this is a real
15     tweet -- this was after the block.  So this
16     would have been after whatever happened leading
17     up to a block if she was blocked.  This
18     wouldn't be -- number one, I would never have
19     seen this at that point.
20 Q  Could you please answer my question.
21 A  I just did.  No, it wouldn't -- heinous
22     wouldn't be offensive.  I wouldn't have even
23     seen this tweet.  You're asking me to make a
24     judgment call on something I -- that wouldn't
25     have been in play.

Page 303

1 Q  If someone called a bill that you had sponsored
2     as heinous, would that be offensive to you?
3 A  It would -- it depend -- number one, I think
4     it's more than heinous because if I -- if I'm
5     looking at AWF go --
6 Q  Go Off I believe is how that would --
7 A  No, it's not off.  It's an abbreviation.
8 Q  Yeah, can you explain what the abbreviation is?
9     I'm sorry, I'm not familiar.
10 A  It's -- I can't remember what it is, but AWF in
11     an abbreviation.  I just can't remember what it
12     is.  It's not off.  It's not a word, it is an
13     abbreviation.
14 Q  So would you have blocked someone for using
15     that abbreviation?
16 A  It seems that she was blocked before this
17     abbreviation, so I don't know.
18 Q  But you block someone if someone used
19     that at you today?
20 A  Probably not, but what I'm saying is -- I guess
21     I don't understand the content of your
22     questions because this was -- I wouldn't have
23     even seen this.  You're asking me to make a
24     judgment call on something I haven't seen
25     without the -- without surrounding, you know,

Page 304

1     pre -- you know, pre-tweets that would have
2     occurred before this.  Do you have those?
3 Q  I'm now going to show you what I'm marking as
4     "Deposition Exhibit #30" which is dated June
5     25, 2022.
6 A  Yes.
7 Q  This is from the day previous -- the day prior
8     to the other -- the previous exhibit.  This is
9     from June 25, 2022; is that correct?
10 A  I'm not -- I can't authenticate it, but that's
11     what it seems to be.
12 Q  Assuming that we can authenticate this as a
13     tweet --
14 A  Then it will be a tweet from June 25, 2022.
15 Q  Can you please read this tweet?
16 A  "Never forget that this is the face of the
17     despicable democrat @KatrinaRJackson who
18     authored Senate Bill 342 which has taken your
19     reproductive rights from you.  Her bill signed
20     by @LouisianaGov will flood the jails, sentence
21     women to die and has no exceptions for rape or
22     incest."
23 Q  And this tweet, if we can authenticate that it
24     is a tweet, was made by that same
25     GeauxGabrielle as the previous exhibit,

Page 305

1     correct?
2 A  Right.  Correct.
3 Q  And does this bill include -- or excuse me --
4     does this tweet include a screenshot?
5 A  It does, yes.
6 Q  And what is that screenshot of?
7 A  Of me.
8 Q  She also tagged you in this tweet, correct?
9 A  Yes.
10 Q  Did you block her after this?
11 A  I'm not sure because she tags me in the tweet,
12     too, that says I'm blocked and it's still on
13     blue.  Usually when you've blocked somebody,
14     you no longer show up in blue on their profile
15     because it's not an active Twitter on your
16     page.  But now that I'm going back to Exhibit
17     29, I'm still showing as an active Twitter user
18     on her page.  So I'm not sure how I'm blocked
19     and someone is still tagging me because when
20     you're blocked -- if she's blocked, she can't
21     tag me anymore.  And on 29 when she claims to
22     be blocked, she's tagging me.  So that's kind
23     of weird.  I don't know how a blocked account
24     would still be able to tag my Twitter page.
25 Q  In this tweet from June 2025 -- or excuse me --

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

**Page 306**

1    June 25, 2022, was there any language in this
2    tweet that you would find disrespectful to you?
3  A  I would find a personal attack on the
4    despicable democrat, but I don't know if that
5    would be the content. I would have to go see
6    whether there was any other tweets. Sometimes
7    people tweet multiple. So I couldn't make a
8    judgment call on something I don't remember
9    with just a screenshot. I would have to access
10   my Facebook page and that person -- well,
11   Twitter page. And people delete tweets and so
12   I wouldn't be able to give you the full content
13   of this. Especially when they're getting ready
14   for litigation.
15  Q  If someone were to make this comment -- the
16   despicable -- calling you a despicable democrat
17   -- could that cause you to block them?
18  A  Not normally, no. So usually it would be
19   something else that would be the first attack.
20   I probably would say hey, stick to the issue.
21   But again, you know, I would never know I'm
22   sure. People clean up their page when you know
23   -- but it just doesn't seem like she's blocked
24   and maybe she was, I don't know. Because she's
25   still able to tag my page.

**Page 307**

1  Q  You mentioned in this -- in responding to this
2    exhibit that people do things when they're
3    getting ready for litigation.
4  A  Uh-huh.
5  Q  Who was getting ready for litigation?
6  A  Well I mean the plaintiff because you know, I'm
7    sure she's, at some point, identified her page
8    before it was a hockey fan page.
9  Q  Is this our client?
10  A  No, not that I know of. No. I don't -- I
11   still am not real sure who your client is.
12   I've never seen her or him.
13  Q  So if --
14  A  I think it's a her because of your references
15   made in the petition.
16  Q  So if this Gabrielle Perry is not our client,
17   how would our client getting ready for
18   litigation clean up this user's page?
19  A  I'm just saying I made a general statement. So
20   I would have to see this person -- the entirety
21   of their page to be able to give you the
22   content of if it was accurate -- give you the
23   content of it.
24  Q  And making that statement, are you insinuating
25   that this screenshot was edited or doctored in

**Page 308**

1    preparation for litigation?
2  A  I just said the screenshot seems weird because
3    I'm tagged in a post of somebody's that says
4    they're blocked. And from my understanding, I
5    can't tag someone when they block me. I've
6    been blocked before. What it generally shows
7    is this shows up, but I can't tag them after
8    that. Unless Twitter has changed. And I don't
9    use Twitter much, but when somebody's blocked
10   from your page, you generally can no longer tag
11   them. The blue highlight generally means that
12   the person is tagged. I'll give you an
13   example. If you go back to -- well, Lamar
14   White never shows himself blocked I guess. Let
15   me make sure because it's one that shows
16   himself blocked. But generally my
17   understanding is I have not been able to tag
18   anyone that blocked me. And maybe I'm wrong.
19   And like I said, I don't know much about
20   Twitter, but I'm tagged.
21  Q  So I understand that line of reasoning that
22   you're making. What we're trying to see is if
23   not even specifically to this tweet for this
24   user, but would the kind of rhetoric used in
25   this tweet -- could that cause you to block

**Page 309**

1    someone for being derogatory or disrespectful?
2  A  Probably not. It would have been something
3    else surrounding that other tweets that may
4    have been deleted. Probably not.
5  Q  Okay. So now I want to talk about your
6    interactions on Twitter with our clients. So
7    first I want to talk about the blocking of Mr.
8    Dayne Sherman.
9  A  I don't recall -- I think I said I don't recall
10   if I blocked Dayne Sherman.
11  Q  His -- Dayne Sherman, whose Twitter handle is
12   @TweettheSouth -- did you block Mr. Sherman?
13  A  I'm sorry, I just said I don't remember
14   blocking him.
15  Q  You don't recall blocking Mr. Sherman?
16  A  No. I'm not saying I didn't. I'm not saying
17   that I did. I just don't recall it.
18  Q  Mr. Sherman is alleging, in this suit, that you
19   have blocked him on Twitter. Do you have any
20   reason to disagree with his assertion that you
21   blocked him?
22  A  I don't know if I blocked him.
23  Q  Did you read the lawsuit in this matter?
24  A  I did read the lawsuit in this matter. I just
25   don't know if I blocked him.

1  Q    Do you have any facts that dispute that you
2       blocked him?
3  A    I haven't done research on it. The best I
4       guess recollection is going to be to look and
5       see if he's blocked on Twitter.
6  Q    It's your testimony that you, in preparing for
7       this deposition, did not familiarize yourself
8       with one of the parties?
9           MR. HAYES:
10              Objection. That's --
11 A    No, it's my testimony --
12          MR. HAYES:
13              Let me finish my objection.
14          WITNESS:
15              -- mischaracterizing prior testimony.
16 A    It's my testimony that I don't remember if I
17      blocked Mr. Sherman. I would have to have, you
18      know, hopefully something that would refresh my
19      memory.
20 BY MR. CROW:
21 Q    You were sued in Federal Court, correct?
22 A    I believe this lawsuit is in Federal Court,
23      yes.
24 Q    Did you investigate the claims in the
25      complaint?

Page 310

1  A    I gave my attorney everything that he asked
2       for.
3  Q    Did you personally investigate?
4  A    I remember trying to figure out who the Twitter
5       user was, but that was like I Googled the
6       Twitter user on Facebook when I received the --
7       I mean on Google. When I couldn't find
8       anything about that Twitter user, I went to the
9       hockey players. I Googled the hockey player.
10      I couldn't figure out who it was. I remember
11      doing things like that, yes. Like any normal
12      person would.
13 Q    You are aware that Dayne Sherman is a plaintiff
14      in this case?
15 A    I believe he was added later.
16 Q    When he was added, did you take any steps to
17      investigate whether he had a claim against you?
18 A    I'm sure I did, I just don't remember them.
19      But I'm sure I did. I'm an attorney.
20 Q    So you investigated whether Mr. Sherman had --
21 A    I wouldn't say -- I wouldn't say investigated.
22      I probably did a cursory review of who he was
23      and things like that. Like I just said, I deal
24      with the other person. I didn't hire a private
25      investigator. I didn't spend hours on it. In

Page 311

1       my mind I purported it to be a frivolous
2       lawsuit.
3  Q    Before concluding that this was a frivolous
4       lawsuit, did you look to see if you had blocked
5       Mr. Sherman?
6  A    I don't recall. I really don't.
7  Q    On what basis did you conclude that this was a
8       frivolous lawsuit?
9  A    Because I thought never would a Supreme Court
10      uphold someone making racial slurs to you and
11      calling you b-i-t-c-h-e-s. Also, I believe
12      this to be my personal Twitter page.
13 Q    You have read the complaint in this case,
14      correct?
15 A    I have.
16 Q    And Mr. Sherman does not -- has not ever -- Mr.
17      Sherman has not made any racial slurs at you,
18      correct?
19 A    No. You were asking me about the lawsuit as
20      originally filed. With Mr. Sherman, to the
21      best of my memory, I Googled to see who he was.
22      And I don't remember what else I did, but it
23      was not like a formal investigation or
24      anything. Nothing else comes to mind.
25 Q    But it's your testimony that you cannot recall

Page 312

1       whether Dayne Sherman has ever been blocked on
2       your account?
3  A    I can't. If I had something to refresh my
4       memory, you're -- look, you asked me about --
5       we've been in hours of deposition. If you've
6       got something to refresh my memory, let's talk
7       about it.
8  Q    To your recollection, did Mr. Sherman ever use
9       a racial slur at -- directed at you?
10 A    I don't right now even remember Sherman -- Mr.
11      Sherman. I know he's a party to this
12      litigation. That's why I'm asking if you have
13      something to refresh my memory on who Mr.
14      Sherman is and then I'll be able to kind of
15      answer if I remember. But I don't remember
16      interactions with Mr. Sherman.
17 Q    Okay. Let's talk about some of these
18      interactions with Mr. Sherman. First I want to
19      show you what I'm marking as "Deposition
20      Exhibit 31" which is an exchange dated October
21      23, 2012. Are you familiar with this Twitter
22      exchange?
23 A    I'm not.
24 Q    If we can authenticate that this is a Twitter
25      exchange between -- involving you -- for the

Page 313

1  record, this tweet is from Louisiana Fed
2  Teachers Twitter account and they tweeted "BESE
3  to hold hearing on new rules for voucher
4  schools." They then included a link and then
5  tagged multiple people, including you,
6  @RepKJackson as well as @TweettheSouth which is
7  a handle of our client, correct?
8  A  I'm supposing it is. If it's authenticated,
9  yes. And I don't remember this exchange. It's
10  from 2012.
11  Q  Do you know what BESE is?
12  A  BESE is the Board of Elementary and Secondary
13  Education.
14  Q  And you were tagged in this tweet, correct?
15  A  Yes. I do a lot with education.
16  Q  Did you respond to this tweet?
17  A  If this is my response in 2012, which I can't
18  remember, I said I will be there.
19  Q  And in this exchange, did Mr. Sherman respond
20  to you?
21  A  I can't remember this tweet, but the tweet does
22  signify that he responded to me that he said
23  "Thank you," and "Keep fighting."
24  Q  Did you reply to that tweet?
25  A  If it is –– I cannot remember this tweet. If I

Page 314

1  Q  But you did tag him?
2  A  Right. Well when you reply, it automatically
3  tags someone.
4  Q  Why did you say thank you to him?
5  A  This may be like something else, like I don't
6  know –– with just this I couldn't tell you.
7  Like I would have probably thought he was
8  actually the one that posted the original post
9  about the vouchers for schools. Not being as
10  familiar with Twitter, especially back then, I
11  would have thought that I was responding to his
12  original. If I thank somebody for posting
13  something that they didn't post, I would have
14  thought that they were actually the ones that
15  posted letting people know about the hearing.
16  Q  I'm now going to show you what I'm marking as
17  "Plaintiff's Deposition Exhibit #32" which is a
18  Twitter exchange between you and Mr. Sherman,
19  which is dated April 5, 2013. Did you tweet
20  this?
21  A  I don't think I tweeted. I think I responded.
22  Q  Did you make these responses?
23  A  I can't remember. I have so many
24  communications on bills and so many different
25  areas, especially by email and things. And I'm

Page 316

1  replied, it says "Thank you for keeping the
2  citizens informed." It's in 2012, so you're
3  asking me to remember a tweet from 2012. I've
4  communicated in my legislative career in the
5  last fifteen (15) years with hundreds of
6  thousands of people.
7  Q  We understand that you may not have immediate
8  recall of this interaction. But does this ––
9  if we can authenticate this as an interaction
10  that happened on Twitter, does this refresh
11  your recollection?
12  A  No. I don't recall this tweet. I don't ––
13  because I didn't –– looks like I didn't tweet
14  the original tweet. I don't recall this
15  exchange that I was included in. I'm not
16  saying it wasn't me, I'm just saying I don't
17  recall the tweet. It's from twelve (12) years
18  ago.
19  Q  In this exchange, you thank Dayne Sherman,
20  correct?
21  A  Yes. If this is authenticated, I thank Dayne
22  Sherman on this issue, yes.
23  Q  And you specifically tagged him when saying
24  thank you?
25  A  I replied. Looks like I replied.

Page 315

1  not sure if this is how this tweet would have
2  started. It's eleven (11) years ago, so I
3  remember the issue because this was when we
4  were in a major deficit and I had just come
5  into the legislature. Because when I see that
6  checkout LLBC package, that was when everyone
7  was trying to solve the deficit and so taxes
8  were the biggest thing, on how to reform the
9  tax code, including certain bills. And it
10  looks like Mr. Sherman made a suggestion about
11  a 4.5% tobacco tax and I think I asked him to
12  check this out –– if this is an authenticated
13  tweet –– and like to review them before
14  repealing high sales tax. And then he
15  responded. I don't remember this exchange. I
16  think –– is he a reporter? I don't know.
17  Q  I actually want to back up just a second. You
18  said you remember the legislation which this
19  tweet ––
20  A  Not legislation, the issue.
21  Q  Or the issue?
22  A  Right.
23  Q  Okay. Did you post about this issue?
24  A  I'm not sure.
25  Q  Did you post about this issue to Facebook?

Page 317

1  A  I'm not sure. I'm assuming I would have
2      because it was a big issue.
3  Q  So you're assuming you would have posted about
4      this?
5  A  Right, because it's a big issue. Because I see
6      where I — I send him to — if this is an
7      authenticated tweet — I send him to the LLBC
8      official website.
9  Q  I'd like to direct you to this second reply in
10     the chain. So that's your first reply if this
11     can be authenticated.
12 A  Uh-huh. Well I don't know because I don't know
13     if this is the full — the full — looks like
14     it started somewhere else because he starts
15     with "I'll give @RepKatrinaJackson that for
16     sure." So it seems like there's more in this
17     thread that is being responded to. So I don't
18     think this was the original post. It looks
19     like a reply to a post.
20 Q  Let me clarify. Let me direct you to the
21     second reply in this exhibit, which is your
22     reply.
23 A  Yes.
24 Q  Where in this exhibit, you tagged a number of
25     people, including our client, @TweettheSouth,

1      and you said —
2  A  Well, I didn't —
3  Q  — check out LLBC tax package and then you
4      listed their website. And then you said
5      discuss.
6  A  I didn't tag people. When you reply, it
7      replies to everyone. So if you look at the
8      comment before that, it has all of them tagged
9      and so when I hit reply, it replied to
10     everyone. And so I didn't tag them, it was a
11     reply.
12 Q  Well you may not have tagged them specifically,
13     nonetheless he was tagged in this tweet?
14 A  Right. And I replied to him and he was tagged
15     in the tweet with others he had tagged. I
16     replied to someone and I send them to the
17     official LLBCinfo.com.
18 Q  You also said at the end of that reply "to
19     discuss." What did you mean by that?
20 A  I didn't say to discuss. It might have been a
21     — it might have been a mistype because it says
22     check out LLBCT — LLBC — that's Louisiana
23     Legislative Black Caucus Tax Package at
24     LLBCinfo.com discuss. So it probably was just
25     a mistype.

1  Q  Is your testimony today that that was a
2      mistype?
3  A  No. I'm saying I can't authenticate because I
4      don't remember it. But it's definitely not a
5      complete — you know, it's not a complete
6      thought, so that's why I'm assuming it was a
7      mistype.
8  Q  Mr. Sherman replied to this reply, correct?
9  A  Looks like it. He said — if this is
10     authenticated — I'd like repeal — he doesn't
11     — okay. Let me look at this. "I'd like
12     repeal all state sales taxes, max local at
13     4.5%, add tobacco, alcohol. Dee Richard's bill
14     to review all tax credits @RepKJackson." And
15     if this is me, I said "I would like to review
16     them before repealing (have a bill), high sales
17     tax may kill businesses and municipalities tax
18     base." So he's talking about others
19     legislation.
20 Q  And can you read to me what date that this
21     exchange — if it can be authenticated —
22     happened?
23 A  April 5, 2013, some eleven years ago.
24 Q  And so this exchange happened right before the
25     legislative session convened that year on

1      Monday, April 8th, correct?
2  A  I don't remember. Like I've been in this over
3      twenty (20) sessions probably or a little bit,
4      somewhere. I know I've been through at least
5      fifteen (15), right, because I've been in the
6      legislature fifteen years. Sometimes we've had
7      two and three sessions, like this year. I
8      wouldn't remember when something started.
9  Q  Why did you participate in this exchange,
10     should it be able to be authenticated, with Mr.
11     Sherman?
12 A  I would have had time.
13 Q  Is there any other reason you would do it?
14 A  I would have had time and the tax issue was an
15     important issue. I was new to the legislature
16     at the time. I think that's why I ended up
17     changing it also to KatrinaRJackson because I
18     realized I wasn't going to be on Twitter like
19     that. At this time I was young and bright eyed
20     and bushy tailed and thought I could respond to
21     everything. That's why people have been
22     directed to my office.
23 Q  So you said you participated in this exchange
24     because the bill being discussed was important?
25 A  Because I had time.

1 Q   And because you had time?
2 A   Mainly because I had time, yeah.
3 Q   Why did you ask for Mr. Sherman's opinion?
4 A   I didn't ask for Mr. Sherman's opinion. I
5     don't think I did. He's tagged me in a
6     discussion and it looks like there's more of a
7     discussion and I just told him check out LLBC
8     package at because that's what the black caucus
9     was asking everyone to go do. I didn't ask for
10    his opinion. He gave his opinion. I sent him
11    and directed him to our proposals and then he
12    gave an opinion that was outside of our
13    proposal. Dee Richard is not a member of the
14    black caucus, so this would have been totally
15    out of what I directed him to go look at for
16    the LLBC package.
17 Q   Yes, but he only gave his opinion or his
18    suggestion to that bill after you tweeted,
19    whether it was a typo or not, discuss.
20 A   And I don't know whether it was a typo -- I
21    sent him to the legislative -- and this all
22    happened in the same day, so I doubt Mr.
23    Sherman went to that page. And if I had time,
24    I would probably -- if this is the case --
25    purport to say that he didn't go to that page.

Page 322

1     It looks like Mr. Sherman enjoyed giving his
2     opinions and that's great. But -- yeah.
3 Q   I'm now going to show you what I'm marking as
4     "Deposition Exhibit #33". It is a lengthier
5     one, so please take a moment --
6 A   Thank you.
7 Q   -- and review that.
8         MR. CROW:
9             I have one for you also.
10 A   It's like this repeats itself. Is it the same
11    one? Maybe it's a different one, I don't know.
12    Okay, I've looked through it.
13 BY MR. CROW:
14 Q   Are you familiar with this Twitter exchange
15    that I've just given you?
16 A   I remember the bill, but the actual exchange,
17    no. It's from 2013. I remember the bill
18    because I've read through it and I remember
19    sponsoring the prayer in school bills allowing
20    students to ask for a prayer club in schools.
21 Q   Do you have any recollection -- you said you
22    were familiar with the legislation being
23    discussed?
24 A   As I read through it, I remember. I can't
25    authenticate this exchange because I don't

Page 323

1     remember this from eleven years ago, but I'm
2     familiar with the bill being discussed.
3 Q   Okay. You do remember the bill though?
4 A   Right. Uh-huh.
5 Q   Okay. Did you block anyone surrounding the
6     discussion of this bill?
7 A   I don't remember this exchange. I wouldn't
8     remember that.
9 Q   Outside of this exchange, do you remember --
10 A   I don't recall. I wouldn't -- I wouldn't have
11    blocked anyone from discussing a bill as far as
12    not being disrespectful, not just going on and
13    on for me to get to the next issue that I had.
14    These are people on this exchange disagreeing
15    with me and I'm discussing that disagreement
16    respectfully. At some point I tell them that I
17    respect a -- you know, I look forward to a
18    respectable debate. I don't know if I ever
19    went back to that because I probably didn't
20    have time. As I've said before, I realized
21    very quickly, you know, the proper forum for
22    debating bills was not on Twitter.
23 Q   Mr. Sherman is alleging in this lawsuit that he
24    was blocked on Twitter after this exchange.
25 A   I'm sure it would be a lot more than this if he

Page 324

1     was -- like I can't say that he was blocked,
2     but it wouldn't have been based on this
3     exchange. If you look at it, at times I tell
4     him thank you for the -- let me go back up. I
5     mean throughout this exchange I tell him thank
6     you. So I mean I don't know -- I don't know
7     and it could have been something else that went
8     on after this exchange or it could have been
9     something else. This may not be the entirety
10    of the exchange if this was on Twitter. So I
11    don't know.
12 Q   Did you block anyone in this Twitter exchange?
13 A   Same answer. I don't even remember having this
14    actual Twitter exchange. I remember the
15    subject matter. That was -- if you look at it,
16    at some point, if this is mine, I corrected the
17    unfounded accusations and we kept going. If I
18    look at what's here, he's still showing up. In
19    my last response, he's still highlighted.
20 Q   Is Mr. Sherman still blocked on your Twitter
21    account?
22 A   I don't know if he was ever blocked and I would
23    have to check Twitter to see.
24 Q   Is he blocked currently?
25 A   I would have to check Twitter to see. I don't

Page 325

1  know if he was ever blocked and I would have to
2  check Twitter to see.
3  Q   So you could check Twitter to see if he was
4  blocked?
5  A   Yes.
6  Q   And you did not do that prior to this
7  deposition?
8  A   No.  The only thing I reviewed before walking
9  into this deposition in the last week, last
10 month was my discovery answers.
11     MR. HAYES:
12         Listen to the -- listen to the question
13     that was asked.  I think you misunderstood
14     that.
15     WITNESS:
16         Okay.
17     MR. HAYES:
18         If you wouldn't mind asking the first
19     art of that question again?
20     MS. SCHWARTZMANN:
21         Can the court reporter read the
22     question back?
23     MR. CROW:
24         Yes.
25     COURT REPORTER:

Page 326

1  A   I do and I have it here.  I can reference it.
2  Q   Do you remember a request that we made for
3  every person you had blocked on Twitter?
4  A   Which -- which discovery was it?  Was it the
5  supplemental or the initial discovery?  It's
6  Number 5.  It asks -- Identify all users
7  blocked from your Twitter account prior to --
8  and I couldn't go back and look at prior to, so
9  we requested it from Twitter.  That's what the
10 response shows.  That's it, right?
11 Interrogatory Number 5?
12     MR. HAYES:
13         Let's look at the --
14     WITNESS:
15         Let's look at the -- Let's look at the
16     supplemental.  It says; Identify all users
17     blocked on your Twitter account prior to
18     February 13, 2023.  That was the question
19     on your second supplemental answers and I
20     explained about the midaeros and I think
21     you -- yeah -- midaeros and I went through
22     that.  And I also explained about at block
23     somebody that was -- that was blocked that
24     I remembered.  But everything says prior to
25     February 13, 2023, so it required me to go

Page 328

1         I can't read -- was fiddling with these
2     and --
3     MS. SCHWARTZMANN:
4         Okay.
5  BY MR. CROW:
6  Q   Are you capable of checking Twitter -- you said
7     you'd have to check Twitter to see if he was
8     blocked.  Could you do that right now?
9     MR. HAYES:
10        Are you asking about if he's currently
11     blocked or if he was ever blocked?
12     MR. CROW:
13        If he's currently blocked.
14 A   I believe I could, yes.
15 BY MR. CROW:
16 Q   Did you -- and you've always been able to do
17     that, correct -- to see if he's currently
18     blocked?
19 A   Yes.
20 Q   When Mr. Sherman was added to this complaint,
21     did you check Twitter to see if he was
22     currently blocked?
23 A   I don't recall.
24 Q   Do you remember answering discovery in this
25     case?

Page 327

1         back to who may have been blocked at any
2     time before February 13, 2023, and that's
3     what we requested from Twitter.
4  BY MR. CROW:
5  Q   In answering this interrogatory, what did you
6     do in order to answer this request?
7  A   I think, if I remember, we got together and we
8     worked to see if anything was blocked, me and
9     my attorney.  Whether we had any way of going
10    through the history of who had been blocked on
11    my page.  I quickly figured out we couldn't do
12    that and I said we would have to request it
13    from Twitter.
14 Q   Can you tell me all the steps that you took in
15    order to answer this question?
16 A   That was a year ago.  I just know -- I don't
17    know -- I went to Twitter, played with it to
18    see if I can get a history.
19 Q   So you then requested the information from
20    Twitter?
21 A   I think you guys subpoenaed it or we made a
22    request and couldn't get it or something.
23    There was some emails -- I think you made the
24    request.  I'm sorry, my attorney made the
25    request.  And then couldn't get it and we had

Page 329

1     to end up -- I end up signing some documents so
2     that Twitter information could come.  That
3     Twitter information came.  I remember my
4     attorney asking me had anything came.  I went
5     look at the email, kjacksonlegal@gmail.com, to
6     see if anything came and I found it.  He kind
7     of told me what -- my attorney kind of told me
8     what to search for and I found it and I sent it
9     to him after looking through it for two or
10     three minutes.
11 Q   Okay.  And so then you sent it to him and then
12     he sent it to us, correct?
13 A   I believe so.  I wasn't here with him.
14       MR. CROW:
15         Counsel, is that correct?
16       MR. HAYES:
17         I can't answer.
18       MR. CROW:
19         Sorry.
20 A   I don't -- I don't want to answer questions on
21     the custody of it once it left me.  I wasn't in
22     the office with him to determine what happened.
23 BY MR. CROW:
24 Q   But you did send it to him?
25 A   Yes.

1 Q   And we have requested it?
2 A   Yes.  It's my understanding, yes.  Not directly
3     from me, but through my attorney.  That's why I
4     sent it to him.
5 Q   And that -- the response today that you are
6     saying you cannot authenticate this document,
7     correct?
8 A   I cannot -- no, you've asked me about documents
9     regarding different pictures of Twitter and I
10     can't authenticate those.  I can just tell you
11     that I received a printout from my email from
12     Twitter and I sent it to my attorney.  I
13     reviewed it -- what I stated was I reviewed it
14     for two or three minutes.  I would have to look
15     at the document because I didn't even look all
16     the way through it.  I just sent it to my
17     attorney.  So I believe what I stated, was that
18     I would have to review that full document in
19     detail.
20 Q   You had an opportunity to review this whole
21     document in detail, correct?
22 A   I said I would have to because I reviewed it
23     for two or three minutes and sent it to my
24     attorney.  It looked like jargon.  That's what
25     I said.  I may have not used the word jargon,

1     but it did make sense, so I just sent it to
2     him.
3 Q   But you have had an opportunity -- you had the
4     chance?
5 A   I have not done so.
6 Q   But you had the chance to?
7 A   Looked like jargon.  I sent it on to him.
8 Q   I'd like you to please answer my question.
9 A   Was it in my possession?  Yes.  Did I review it
10     in detail?  No.  I looked at it for two or
11     three minutes and I've answered this question
12     several times before and I sent it on because
13     it looked like jargon to me.
14 Q   But the question that I'm asking is you had it
15     in your possession, correct?
16 A   Yes, I just stated that.
17 Q   And because it was in your possession, you had
18     the opportunity to look at it because it was in
19     your possession?
20 A   Yes.
21 Q   Did you look at it?
22 A   I just said no, I looked -- well, I just said
23     that I looked at it for two or three minutes.
24     It looked like jargon to me and I sent it on to
25     my attorney.  I've kind of said that like all

1     throughout this deposition.
2       MR. HAYES:
3         Is there a specific aspect of the
4     Twitter documents that you're asking about
5     here?  The -- we're talking about this in
6     general so I don't know the -- I'm not
7     trying to hide the ball from you here on
8     anything.  So I don't know exactly what the
9     problem is.
10     WITNESS:
11       And I've also said a number of times if
12     there's something specific you want to ask
13     me about it, I could review it in its
14     totality like I've done with other
15     exhibits.
16     MS. SCHWARTZMANN:
17       The Senator is saying that she can't
18     verify that one of our named plaintiffs was
19     blocked when we propounded discovery
20     directly on point to everybody that was
21     blocked.  And so we have to explore that.
22     You have to understand.  So we're getting
23     in the scope of what she knows, but I think
24     we're ready to move on.
25 A   And I want to correct that.  You guys asked me

1     who was blocked prior to February 13, 2023.
2     And that was like who was blocked prior to,
3     which -- and these were sent May 21, 2024. So
4     we responded accurately that Twitter doesn't --
5     there's no way I could discover history of who
6     had been blocked prior to, you know, a year --
7     more than a year prior.  Because it doesn't say
8     who is blocked now.  It says identify all users
9     blocked from your Twitter account prior to.
10    And that was more than a year before that.  And
11    what I said was Twitter doesn't give me a
12    history of whose been blocked.  And I said that
13    we would have to request it from Twitter, which
14    we did at your request or at my attorney's
15    request or your request.
16  BY MR. CROW:
17  Q    Just to make sure that I'm understanding this
18    correctly, when you requested that information
19    from Twitter, Twitter said that they were
20    unable to tell you if you had blocked someone
21    prior to that date --
22  A    Twitter didn't send me a sentence back.  I
23    think my attorney, at that point, sent me a
24    form of how to request it from Twitter.  I
25    requested it from Twitter.  When the

Page 334

1     information came in, I did a cursory review of
2     it for two or three minutes.  It looked like
3     jargon.  I sent it on to him.  I was litigating
4     a case.  I remember that.  I had a case that I
5     was working and my commitment was to my client.
6     I think I had like hearings coming up on that
7     case.  So I sent it to him as to not delay him
8     because you remember, I wasn't able -- he
9     wasn't able to get in touch with me much
10    because I was preparing a case of my own.
11  Q    So you just stated that Twitter was not able to
12    send you --
13  A    No.  I said not that Twitter was not able to
14    send me.  When I went to Twitter, I was not
15    able to find stuff -- I said that I misspoke.
16    When I went to Twitter, I wasn't able to find a
17    prior history.  So I believe my attorney
18    researched -- because I'm not as familiar with
19    Twitter and I think if I'm not mistaken, my
20    attorney, on a call, said you know, this is how
21    you can request information from Twitter.  So I
22    went about that.  When Twitter sent the
23    information, I was in the middle of working a
24    case so I had a commitment to a client.  The
25    attorney had to ask me to go check that email

Page 335

1     and see if I received it.  He gave me a keyword
2     search.  I put it in.  I think I fussed at him.
3     I said I don't have time for this right now,
4     I'm working a case.  I looked at it for two or
5     three minutes.  It looked like jargon.  I sent
6     it on to him and got back to my case.  And I
7     don't know when custody -- I'm sure you might
8     have received that document -- I can only
9     assume.
10  Q    You said you could not see any prior history,
11    correct?
12  A    Right.  Uh-huh.
13  Q    What could you see?
14  A    When I went to blocked, I could see -- that was
15    May 2024 when you asked for that.  I was able
16    to see the current block and I also had
17    answered that.  I answered that within the
18    discovery.  That's why I referred back to
19    Interrogatory Number 5.  "I knew she was
20    blocked because that was the litigation of the
21    suit and I could see someblocked somebody,"
22    which is a fake page.  So I gave you what I
23    could see.
24  Q    But it's your testimony that you do not have
25    recollection that Mr. Sherman was ever blocked

Page 336

1     on your account?
2  A    No, I don't.  Because when I got this
3     discovery, I went and answered discovery with
4     what I could see.  I requested the rest from
5     Twitter.
6  Q    We're talking -- I'm asking about your memory.
7  A    Yeah, I don't.  I don't.  I probably wouldn't
8     have remembered your client had this lawsuit
9     not came up, you know.  You're asking me to --
10    you know, I don't know the year Mr. Sherman --
11    I don't even remember the year Mr. Sherman is
12    alleged being blocked.  I guess I can review
13    the amended petition and see the year when he's
14    alleging being blocked.
15  Q    At some point, after this legis -- excuse me,
16    let me rephrase that question.  At some point,
17    after this lawsuit was filed, did you on
18    Twitter go and unblock multiple people at once?
19  A    Yes.
20  Q    You did?
21  A    Yes.
22  Q    Who did you unblock?
23  A    I don't remember.
24  Q    When did you unblock them?
25  A    It was -- I think it was before -- it was

Page 337

1    actually before the litigation. I think I had
2    received an email concerning our letter
3    concerning this client. I talked to Yolanda --
4    I say what do I -- not Yolanda. Who was it? I
5    talked to somebody -- an attorney, one of my
6    friends because the State hadn't appointed me
7    an attorney because it wasn't in litigation.
8    So I talked to one of my friends and they said
9    look, you know -- they said go check and see if
10    you have a reason to block someone if they're
11    blocked. And I didn't do that. I just
12    unblocked everybody and kept this plaintiff
13    because the letter clearly said why she was
14    blocked or something and I kept going.
15 Q   So you said, just now, that you kept @midaeros
16    --
17 A   Right.
18 Q   -- which is Maya Detiege. You kept her
19    blocked?
20 A   Right.
21 Q   Why is that?
22 A   And somebodyblock because it was clearly a fake
23    page.
24 Q   Okay.
25 A   Because I remember that exchange. It had

Page 338

1    happened recently and I remembered why I had
2    blocked her. Well the -- and at the time, it
3    wasn't a her. At the time, for me, and -- it
4    was a -- a fake -- because I remember when I
5    did it, I mistakenly unblocked her and I got a
6    call saying hey, you unblocked her. I said I
7    didn't mean to do that because I distinctly
8    remember this exchange because a letter came
9    immediately afterwards. I was also able to go
10    to something and see -- no -- I don't know what
11    it was, but I remember why she was blocked, I
12    thought it was justifiable and I kept moving.
13    I still think it's justifiable.
14 Q   So the other people you unblocked, you decided
15    that they were unjustifiably blocked?
16 A   No, I couldn't see anything. I just said I
17    can't remember, here it is. This one I can
18    remember because it's so recent. And I do
19    remember this -- because I don't know who it
20    was, but before I blocked her -- or either
21    after I blocked this page -- I said this is --
22    this doesn't even seem like a Louisiana page.
23    And I started Googling it and everything. So I
24    distinctly remember this one because I was
25    trying to figure out was this one of my

Page 339

1    District 34 constituents. There was nothing
2    identifiable but hockey. I went down the page
3    -- because this was a weird looking page. It
4    had no personal pictures of anyone. That's why
5    I distinctively remember this one. It had no
6    references. If I remember in my review, it had
7    no references of anything personal about
8    anyone, so it just looked like a fake page.
9    And so it was recent with the letter I received
10    and I remembered it.
11 Q   So your testimony is you suddenly blocked
12    everyone -- you had suddenly unblocked --
13 A   Not suddenly. I willingly did it after talking
14    to a friend. I just said I don't remember this
15    and so let me unblock everyone.
16 Q   Let me rephrase that question. I understand
17    how that can be confusing. When you unblocked
18    many people at once --
19 A   It wasn't many people. I don't recall it being
20    many people. I think it was few people. I
21    can't remember. I think it was few people and
22    I couldn't remember why they were blocked and I
23    unblocked them. I could -- the
24    somebodyblocked, I didn't unblock it because it
25    was clearly a fake page. That page, I could

Page 340

1    remember everything about it. It was egregious
2    in what she had said. Now I know it's a she.
3    Didn't know at the time of the blocking. I
4    didn't unblock it because it was recent and I
5    can remember it. It wasn't a plethora of
6    people.
7 Q   But you unblocked the blocked users on your
8    account except for Maya Detiege @midaeros and
9    @somebodyblocked which you believe is a bot,
10    correct?
11 A   So you keep saying Maya Detiege @midaeros -- I
12    think what I left blocked was @midaeros.
13    Didn't have a person's name or anything.
14 Q   Yes.
15 A   So I don't -- I guess I don't know what you're
16    asking. If you can give me the Twitter
17    handle --
18 Q   I'm sorry, I'm clarifying.
19 A   @midaeros --
20 Q   Is Maya Detiege. That is our client.
21 A   So the page was a hockey player fan page.
22 Q   Yes.
23 A   Had no identifying marks of who it was. Had no
24    identifying marks besides that it was a hockey
25    player. You could assume it was a hockey

Page 341

86 (Pages 338 - 341)

1    player outside of the state, but then I guess
2    it said someone's number one fan so you can
3    assume that it was out of the state or a fake
4    page. You know, that was my assumption. So
5    there was not much to go on with that page. It
6    was only -- if I remember -- and I don't want
7    to misstate because I don't recall -- it wasn't
8    a plethora of people. It was a few people
9    blocked. I couldn't remember anything and I
10    unblocked them and kept moving.
11 Q   I need you to answer the question that I'm
12    asking.
13 A   Uh-huh.
14 Q   When you unblocked a number of people -- you
15    said multiple at once --
16 A   Multiple could be two, three, yeah.
17 Q   Yes. When you blocked a number of people, you
18    did not unblock Maya Detiege and @somebody else
19    who you believe is a bot, correct?
20 A   I did not block @midaeros. Today you're
21    telling me and through the lawsuit you've told
22    me that is Maya Detiege, a person who is a
23    resident of the State of Louisiana which I had
24    no knowledge of at the time of the block. And
25    so I unblocked @midaeros and it was a hockey

Page 342

1 A   I don't know. And I didn't know I unblocked
2    her until -- I kind of said I wasn't familiar
3    with Twitter. I do stuff and keep moving. I
4    think I've said that several times. And so it
5    was -- I don't know which attorney with this
6    First Amendment Clinic called me and I said oh
7    no, I didn't intend to do that. I'm sorry.
8    No, this litigation can go forth and I
9    reblocked her.
10      WITNESS:
11       And that was before you. I didn't
12      consult you because you weren't around.
13 BY MR. CROW:
14 Q   So you mentioned that you inadvertently
15    unblocked Ms. --
16 A   Right.
17 Q   -- @midaeros, Ms. Detiege.
18      Was there anyone else that you
19    inadvertently unblocked and then had to re-
20    block?
21 A   Not that I can recall.
22 Q   In evaluating whether or not -- actually let me
23    back up even further. Did you evaluate the
24    rest of the accounts that you had blocked?
25 A   I just looked at their name and said don't

Page 344

1    player or a hockey player fan from another
2    state. That's what I did not unblock. And
3    @somebodyblock because it's clearly a fake
4    page.
5 Q   So you've never unblocked Maya Detiege?
6 A   I think I made a error -- I think you called me
7    -- I don't know which attorney called me. This
8    was before the State gave me an attorney. Some
9    attorney for now who I know to be Maya Detiege
10    called me and I said oh no, I made a mistake,
11    I'm going to go back and block this page. It's
12    not -- I do not intend to unblock this page.
13    And that's why we're here -- this lawsuit --
14    because unless the courts order me to unblock
15    this page I do not intend to unblock it.
16 Q   Okay. Well previously you said that you
17    decided to unblock a number of accounts --
18 A   Two, three, four, something. Yeah.
19 Q   And that was shortly after Ms. Detiege
20    @midaeros interaction with you and the reason
21    that you didn't want to unblock her was because
22    you remembered that interaction, correct?
23 A   Right. Uh-huh.
24 Q   So if you remembered that interaction, how were
25    you -- how did you accidentally unblock her?

Page 343

1    remember, unblock. Might not have been -- you
2    know, don't remember, unblock. Don't remember,
3    unblock maybe four or five times. With her, I
4    remembered. Any time, you know, it's that
5    close and somebody sends a letter and it was
6    egregious. It was something that I felt like
7    -- and then it wasn't her. It wasn't a her.
8    It was a hockey fan page from another state. I
9    did notice that when I had to go back and
10    search for her to block her back that all of a
11    sudden there was a profile picture and
12    everything. I guess in preparation for
13    litigation.
14 Q   Well, you said previously that you decided to
15    unblock a number of people prior to this
16    lawsuit getting filed?
17 A   I don't know if it was prior to it or
18    afterwards. I just don't remember when it was.
19    I just remember that -- it might have been the
20    lawsuit had been filed. I don't remember
21    because I got a call from -- and I think -- let
22    me separate the two. I think that was prior to
23    this lawsuit being filed. And then I got a
24    call -- I can't remember -- after the lawsuit
25    was filed or either prior to -- I don't

Page 345

87 (Pages 342 - 345)

1 remember when the call was -- about Mrs. -- the
2 account @midaeros saying I had unblocked it. I
3 said that was a mistake. I think it was after
4 the lawsuit was filed that I got the call that
5 that one had been unblocked. That's the call I
6 think that happened -- I don't remember, but I
7 think it happened after the lawsuit.
8 Q    So it's your testimony today that you unblocked
9    everyone with the exception of Maya Detiege
10    @midaeros and @somebodyblocked? Strike that
11    question, please. So it's your testimony that
12    you unblocked everyone before this lawsuit?
13 A    I don't know. I think it was before the
14    lawsuit. I think at the time of the lawsuit if
15    I can remember, it was @detiege -- well,
16    @midaeros and at -- and I hope I'm pronouncing
17    that correctly -- @somebodyblocked.
18 Q    What made you unblock the other users you had
19    blocked?
20 A    I think I had a conversation with an attorney
21    or a letter came from an attorney. I think it
22    was prior to the lawsuit and I just you know,
23    said I talked to a friend and then I said let
24    me see why -- who I have blocked or something.
25    And I -- the few people I had blocked didn't
Page 346

1 @midaeros. And it could have been that an
2 email account that I thought was fake -- if I'm
3 remembering -- and I can go and research and
4 send it to you if I find it -- sent me
5 something.
6 Q    But it was from the First Amendment --
7 A    I think, but I'm not going to say that.
8 Q    How did you receive this communication?
9 A    I don't remember. It could have been an email.
10    That's what I'm saying -- my memory is foggy on
11    this so I rather refresh my memory before and
12    produce that to you.
13    MR. HAYES:
14        To the best of your recollection --
15    WITNESS:
16        Right.
17    MR. HAYES:
18        -- as you sit here right now, what do
19    you think it was?
20    WITNESS:
21        It could have been an email. Because
22    as I'm going back, right, we've received so
23    much communication since the Clinic has
24    gotten involved. I would have to produce
25    it. I'll try to go find it. It was either
Page 348

1 ring a bell. I unblocked them.
2 @somebodyblocked was evidently a fake account.
3 And @midaeros, I had just received a letter on.
4 Q    You mentioned that you spoke with a friend.
5    Who was that friend?
6 A    I can't recall. It was most likely Bob or
7    Glenn, because they're friends in my office who
8    are attorneys.
9 Q    Bob or Glenn who?
10 A    Bob Noel is in my office. I probably would
11    have discussed the letter with him because
12    we're always in the office together. Or either
13    Attorney Glenn Fleming who is another attorney.
14    We're not in the same firm, we just are in the
15    same office.
16 Q    And you referenced a letter. That was a letter
17    that an attorney had sent you?
18 A    I think the Clinic sent it to me -- an attorney
19    from your Clinic.
20 Q    From our Clinic?
21 A    I believe so.
22 Q    How did you receive --
23 A    Or it was a -- it was a letter or email and I
24    don't know if it was from an attorney. I just
25    remember receiving some communication about
Page 347

1 an email or a letter. And it might have
2 been an email. And I'm not going to say it
3 was from an attorney or who it was from. I
4 just literally don't remember.
5 BY MR. CROW:
6 Q    Can you take a break to see if you can find
7    that email?
8 A    I would have to go to the computer at the
9    office.
10 Q    You cannot check your legislative email on your
11    phone?
12 A    I can sign into it probably, but because it's
13    been so long ago, most of the time that's been
14    archived. So it would probably be best for me
15    to go -- and I don't know who it was from. It
16    was either an email or a letter and I'm going
17    to have to go search the office for it. And I
18    don't even think I sent that to an attorney
19    because it didn't -- it never came up in
20    discussion because I believe it was prior to
21    the lawsuit.
22 Q    In our Request for Production Number 10 --
23 A    Uh-huh. Is that the supplemental or -- no, you
24    didn't do a supplemental. Let me get to it.
25 Q    In this Request for Production Number 10, we
Page 349

88 (Pages 346 - 349)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

1   said to produce any and all documents or
2   communications related to your blocking of
3   Twitter users other than the plaintiffs.
4 A   This was regarding the plaintiff.  This letter
5   or email was regarding the plaintiff.
6 Q   I was under the impression that it was your
7   testimony that you had this conversation about
8   this letter of people you blocked?
9 A   No.  I had a letter about this person is what I
10   stated.  I hope I stated correctly.  Letter,
11   email or something.  And so then after I didn't
12   unblock them, a lawsuit was filed.  And I think
13   -- I want to say -- and I just can't remember
14   -- prior to the lawsuit being filed, I think I
15   talked to an attorney.  I don't know if it was
16   from your Clinic or not -- on behalf of this
17   plaintiff.  So it could have been a phone call,
18   but I don't believe it was a phone call.  I had
19   some communication with an attorney who I
20   believe was from your Clinic before this
21   lawsuit was filed.  If I'm not mistaken, I did,
22   yes.
23 Q   So looking back to an earlier question -- what
24   was the reason that you gave for unblocking
25   everyone -- everyone else we'll just say?
                                          Page 350

1 A   The few people I unblocked, I've said it a
2   couple of times.  Do I have to repeat it?  It
3   was asked and answered but I guess I'm not the
4   attorney in this.
5      MR. HAYES:
6         Well, if you'd like I can object as
7      asked and answered, but --
8 A   I'll go ahead.
9      MR. HAYES:
10         -- that doesn't prevent you from having
11      to answer.
12      WITNESS:
13         I just like to reserve objections.  You
14      know I'm an attorney.
15      MR. HAYES:
16         I understand.
17 BY MR. CROW:
18 Q   Yes, I'd like you to answer that please.
19 A   Right.  So after that communication --
20 Q   What communication?
21 A   It was either -- and I'm going to have to go
22   back -- and I don't have notes if it was a
23   phone call.  I just remember getting some
24   communication on this plaintiff.  And so that
25   I'm not clear on memory -- it was either a
                                          Page 351

1   phone call, an email, letter or something.  I
2   talked to either Bob or Glenn, whoever was in
3   my firm that day, and -- with me -- and they
4   said well, just go look and see who you have
5   blocked.  And I did and the only person I can
6   remember, when I looked, was this plaintiff
7   because I had just gotten that information of
8   the plaintiff.  But @somebodyblocked just was a
9   -- was not a real Twitter account.  I didn't
10   take this seriously at first honestly.  I
11   didn't think anyone would sue you for access to
12   calling you a dumb, black b-i-t-c-h.
13 Q   Regarding the other users that you unblocked,
14   it's your testimony that you did no
15   investigation into why other users had been
16   blocked, you just looked at their Twitter
17   handle --
18 A   Didn't remember them and unblocked them.
19 Q   Moving forward, what is your standard for
20   blocking someone on Twitter?
21 A   I've answered that already and it's on a case
22   by case basis.  It's based on disrespect, going
23   outside of the issue, inciting -- I've had
24   someone to incite violence before.  That wasn't
25   on Twitter though.  And so it's on a case by
                                          Page 352

1   case basis.
2 Q   All right.
3      MR. CROW:
4         If we can, I'd like to take just a
5      small break.
6      COURT REPORTER:
7         We're off the record and the time is
8      4:24 p.m.
9         (OFF THE RECORD)
10      COURT REPORTER:
11         We're back on the record at 4:36 p.m.
12 EXAMINATION CONTINUED BY MR. CROW:
13 Q   All right, Senator, I just had two clean up
14   questions --
15 A   Sure.
16 Q   -- before we're going to go ahead and move on.
17   So you mentioned -- you've mentioned previously
18   in this deposition that you may block someone
19   for profanity, being disrespectful, being
20   derogatory and name calling, correct?
21 A   Usually it's after warning unless it's highly
22   inflammatory, like this one.
23 Q   And would you say this is your -- kind of your
24   standard for blocking people?
25 A   No.  It's literally on a case by case basis as
                                          Page 353

1   I -- you know, at first I didn't use Twitter
2   much. So sometimes there's profanity all over
3   the Twitter page. I get on, hit it and keep
4   moving after I hadn't used it. So it's just
5   not a standard. I think it's on a case by case
6   basis.
7   Q   But in evaluating each case, do you evaluate it
8       for those four?
9   A   If it's a fake page -- remember I talked to you
10      about that. If it's a fake page, then I just
11      block it. If -- you know, I don't know how
12      many people I've blocked on Twitter so I can't
13      give that. I don't think it was a whole lot of
14      blocking experience to set a pattern of what I
15      do.
16  Q   Okay. And also just to clean up one last thing
17      regarding Mr. Sherman before we move on.
18  A   Right.
19  Q   You don't know -- you don't recall -- you have
20      no recollection as to whether you ever blocked
21      Mr. Sherman?
22  A   No. Maybe something could refresh my memory,
23      but I don't have any recollection. From what
24      I've seen from you with Mr. Sherman today is
25      2013 and 2014. I just -- unless -- I don't

Page 354

1       Sherman?
2   A   No. You know how long it would take to go
3       through social media history? I'm not -- just
4       no.
5   Q   All right. Now I want to move on to Maya
6       Detiege -- and just for brevity, that is the
7       Twitter user @midaeros. I'll be calling her
8       Ms. Detiege -- is that okay?
9   A   That is okay.
10  Q   So you have said that you did block Ms.
11      Detiege, correct?
12  A   That page is showing blocked, yes.
13  Q   Why did you block Ms. Detiege?
14  A   It's in your petition, I believe. She called
15      me -- she said not all black women are smart,
16      some of you are -- let me -- instead of trying
17      to -- let me cite it for reference. From what
18      I remember and what you put in the petition, I
19      do remember her calling me a black b-i-t-c-h,
20      saying all black women aren't smart. Some of
21      you -- she's referring to -- we had an exchange
22      -- hold on.
23          MR. HAYES:
24              It was before that one I think. It was
25          before that one page.

Page 356

1   know.
2   Q   Do you remember, specifically, unblocking Mr.
3       Sherman?
4   A   No, I don't remember if he was blocked.
5   Q   You don't recall whether he was one of the
6       accounts that was unblocked?
7   A   No. Huh-uh.
8   Q   When Mr. Sherman was added as a plaintiff, you
9       never checked to see if Mr. Sherman was blocked
10      on your page, correct?
11  A   Not that I can recall, no.
12  Q   Do you remember any exchange with Mr. Sherman
13      on Twitter?
14  A   I've seen some exchange today but I don't
15      firsthand knowledge remember it.
16  Q   You don't remember any other exchanges except
17      those that we showed you today?
18  A   I don't even remember those, I just remember
19      the subject matters. It was -- it was from
20      2013 and 2014. We're in 2024. I communicate
21      with people on email and everything. I just
22      don't remember. That's not an insult to Mr.
23      Sherman. I just don't remember.
24  Q   So in this, you never went through your Twitter
25      history to see if you had interacted with Mr.

Page 355

1   A   I think I attempted to ignore her and she kept
2       going too. Now that I know it's a she.
3   BY MR. CROW:
4   Q   If you'd like --
5   A   I say this with all disrespect -- burn in hell.
6       So she told me to burn in hell. You don't care
7       about women, you don't care about pregnant
8       people, you don't care about children, you
9       don't care about education. I do not respect
10      all black women. Some of you b-i-t-c-h-e-s are
11      very dumb. That is -- you know.
12  Q   Okay. And so can you explain what was -- you
13      recall this interaction?
14  A   Right.
15  Q   Correct?
16  A   I do.
17  Q   Can you explain what happened? Can you give me
18      -- let me rephrase that. Can you give me your
19      version of events and explain what happened?
20  A   If I remember -- and this could be wrong -- I
21      posted something about a bill. It had to do
22      with a supporting life bill and Ms. Detiege, at
23      that time who I -- it was a gentleman
24      something, something for a hockey player -- the
25      gentleman something -- the Australian gentleman

Page 357

90 (Pages 354 - 357)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

1    or the something gentleman -- it identified the
2    state or something and that was the only thing
3    on Twitter and we began to interact.  I'm not
4    sure if I interacted with her, maybe I did.
5    And then what I just read to you was sent to
6    me.
7  Q    When this suit -- when this lawsuit was filed
8    in February 2023, did you make any public
9    statements about the lawsuit?
10 A    I did, but I don't remember the statement I
11    made.  It was a press release.  I thought I
12    produced it.  If I didn't, I'll try to go find
13    it, but I think I produced it.
14 Q    Did you make any statements about this lawsuit
15    on social media?
16 A    I think I did, but I can't remember.
17 Q    Did you tweet about this lawsuit?
18 A    I don't remember.
19 Q    I'm now going to hand you what I'm marking as
20    "Plaintiff's Deposition Exhibit #34"?
21        COURT REPORTER:
22            Yes.
23 BY MR. CROW:
24 Q    And this is dated February 9th of 2023.
25 A    Uh-huh.

Page 358

1  A    Senator Jackson sued for blocking Twitter user.
2  Q    And this article, it's from the Ouachita
3    Citizen about this lawsuit, correct?
4  A    Yes.
5  Q    What's the date of this article?
6  A    February 15, 2023.
7  Q    I'd like to direct you to a portion of this
8    article that quotes your Facebook post.  This
9    is on Page 2.  The paragraph believes -- it's
10    in the middle.  It starts with "if in fact."
11    You see where I am?
12 A    Uh-huh.
13 Q    Can you please read that paragraph?
14 A    "If in fact anyone has been restricted from my
15    personal Twitter page or any page, it would be
16    because of lewd comments that were
17    inappropriate for teenagers and others who
18    follow me."
19 Q    What did you mean by lewd?
20 A    Lewd means -- lewd is a variety of things.
21    Lewd can be -- for me, lewd means comments that
22    are inappropriate.
23 Q    What do you mean by inappropriate?
24 A    Inappropriate is case by case basis.  Anything
25    that I believe is inappropriate.  Profanity --

Page 360

1  Q    Are you familiar with this retweet?
2  A    Yes, I am.  Uh-huh.  Now that I've -- my memory
3    has been jogged.  I said I don't have to be
4    subjected as an African American woman to hate
5    speech.  This literally turns on what black
6    women have been subjected to.
7  Q    And you retweeted this tweet by Julie
8    O'Donoghue, correct?
9  A    Yes.  I think I gave her -- I think she called
10    me and I gave her this statement and I think
11    that's what happened.  I don't remember.
12 Q    Is this a fair and accurate representation of
13    your retweet?
14 A    Yes.  Now you're getting into stuff I remember.
15 Q    And what was the reason given for your blocking
16    in this retweet?
17 A    Hate speech.
18 Q    I'm now going to --
19 A    Because it's derogatory.
20 Q    I'm now going to show you what I'm marking as
21    "Plaintiff's Deposition Exhibit #35".  This is
22    -- I'll give you a second to look over this.
23    This is --
24 A    Okay, I'm familiar.  We can move forward.
25 Q    Can you read me the headline of this article?

Page 359

1    we talked about this.  Attacks on character
2    that go well beyond anything appropriate.
3  Q    So if it's on a case by case basis, is that
4    arbitrary?
5  A    It's subjective.  It's subjective.  It's just
6    like you, you're a human being, it's
7    subjective.
8  Q    So what does that mean to you?
9  A    I kind of explained that.  I don't have a
10    further definition for it.  It's on a case by
11    case basis.
12 Q    What -- you mentioned that it --
13 A    I can definitely tell you that this rose to
14    that level.
15 Q    You mentioned that -- you also mentioned things
16    that are inappropriate for teenagers -- what
17    did you mean by that?
18 A    Because on my personal pages there are more
19    teenagers from my district.  And when I speak
20    with my teenagers from my district, my nieces
21    and nephews are on my page, which is always
22    concerning what they see.  And those are my
23    personal pages, so I'm always very careful on
24    those pages.
25 Q    Did you make -- oh, sorry.  You've talked about

Page 361

1    that it needs to be on a case by case basis.
2    What is your standard for evaluating what is
3    inappropriate for teens?
4  A   You've already asked me that.  But I guess you
5    put for teens -- it's going to be the same
6    standard, yes.  To expose them to something
7    that we've asked them not to do, to expose them
8    to something we've told them is wrong.  To make
9    them believe that advocacy involves
10    disrespecting of others.  Same thing your
11    mother would have told you.
12  Q   How do you decide whether something is
13    inappropriate?
14  A   It's on a case by case basis.
15  Q   Are there any factors that you look at?
16  A   I've given them to you.  Profanity, excessive
17    profanity, attacks that go well beyond the
18    reasonable demands, right.  And it's
19    subjective.  There's no -- it's no
20    jurisprudence behind it.  It's subjective.
21  Q   Did you make any other statements about this
22    lawsuit to the press?
23  A   Probably -- I don't remember, but probably not
24    because I think after that an attorney was
25    hired and he told me not to, right?  I think

Page 362

1  A   I'm not sure.  It's not a direct quote.
2  Q   But have you -- did you say this to her?
3  A   I said it today that I use a case by case
4    basis.  If it's offensive or something like
5    that, I may or may block.  Sometimes I look at
6    it and keep going.  But this is not a direct
7    quote from me.
8  Q   Do you remember making that statement to the
9    reporter?
10  A   I don't.  I do remember making this one -- "I'm
11    not going to run from this.  Jackson said if
12    any federal court in our nation considers that
13    protected speech, then African Americans are no
14    longer protected from hate speech."  I think
15    she was very pointed in putting in quotation
16    marks what I actually said.  What she derived
17    from my comments may have been something
18    different.  But if you look at this article, I
19    think she was -- and I'm looking, going back --
20    "I don't think I have to be subjected as an
21    African American woman to hate speech.  She
22    said I think the Supreme Court has been very
23    clear on hate speech."  Those are direct
24    comments.
25  Q   And you remember those direct comments?

Page 364

1    you told me not to.
2  Q   I'm now showing you --
3  A   I'm not a great client because I'm an attorney,
4    but I at least try to be a client for Tommy.
5  Q   I'm now showing you what I'm marking as
6    "Deposition Exhibit #36".
7  A   Uh-huh.
8  Q   I'll give you some time to look over this.
9  A   Okay.
10  Q   Can you read me the headline of this article?
11  A   Louisiana Senator Sued Over Blocking Critic on
12    Twitter.
13  Q   And what's the date of this article?
14  A   It is February the 9th, 2023.
15  Q   Can I please direct you to Page 3 to the
16    paragraph that begins -- it's towards the
17    middle -- that begins with "Jackson said," do
18    you see where I am?
19  A   Yes.
20  Q   Can you read that paragraph for me?
21  A   "Jackson said it is not unusual for her to
22    block Twitter accounts that use offensive
23    language or engage in what she considers
24    harassment."
25  Q   Did you say this?

Page 363

1  A   Yes.  I've said them before and I've said them
2    since.
3  Q   But you don't remember the previous statement?
4  A   The previous statement is not a direct quote
5    from me.  It may be her interpretation of my
6    interview with her.
7  Q   Did you tell this reporter that it's not
8    unusual for you to block Twitter accounts --
9  A   I don't remember.  I'm sorry.  I don't remember
10    using the statement of not unusual, no.  I said
11    I have before.
12  Q   So are you saying -- is your testimony today
13    that the reporter got this quote -- got this
14    statement incorrect?
15  A   I don't know.  I can just tell you what I
16    remember saying.  I don't remember saying it
17    was not unusual.  I'm not -- look, I can't
18    fully remember the interview.  I was upset of
19    course when this happened and so --
20  Q   Okay.  You don't remember giving this
21    statement.  Do you agree with that statement?
22      MR. HAYES:
23        Object to the characterization as a
24        statement.  It's not a quote.
25  A   I don't agree with it.  I agree with what I

Page 365

92 (Pages 362 - 365)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company    www.veritext.com

1    said today.  I used it on a case by case basis
2    and I did before.  And I think I said I have
3    before.  And so -- and that's what I've said
4    today.  That I have blocked users before -- not
5    knowing how many.  I've blocked users before.
6    I think that -- that's what I remember.
7  BY MR. CROW:
8  Q    Can you please explain, in this context, what
9    language is offensive?
10       WITNESS:
11         I've answered that several times,
12    Tommy.
13       MR. HAYES:
14         Objection, asked and answered.  Let's
15         move on to something else.  We've gone
16         through that one multiple, multiple times.
17  BY MR. CROW:
18  Q    How would you define harassment?
19  A    Like when I had a death threat, that's
20    harassment.  When they begin to flood you with
21    profanity and ugly comments and attack you over
22    and over again -- that's something.  When
23    people use what I consider to be hate speech,
24    whether the Supreme Court believes that or not
25    -- that's harassment given the history of
                                                    Page 366

1    gave.
2  Q    Can you read the headline of this article and
3    it extends to the second page?
4  A    Before Lawsuit, Louisiana Senator Had A History
5    of Blocking Critics on Twitter.
6  Q    It's dated February 15, 2023, correct?
7  A    Yes.
8  Q    On Page 4 of this article, you're quoted as
9    saying you couldn't respond to individual
10    accusations about Twitter blocks without
11    reviewing records from the social media
12    platform, correct?
13  A    Correct.
14  Q    You did say that?
15  A    Yes.
16  Q    And you requested your records from Twitter?
17  A    Yes.  We've gone over that.  I received my
18    records from Twitter.  I looked -- Tommy -- I
19    was in the middle of a case.  Tommy said hey,
20    did you get some records from Twitter, can you
21    search.  I searched "X" or whatever it is.  I
22    found the records.  I reviewed them for two or
23    three minutes and sent them to him.
24  Q    So you only reviewed those records for a couple
25    of minutes?
                                                    Page 368

1    African Americans in this country.
2  Q    Can you think of other times you've blocked
3    users for offensive or harassing language?
4  A    No.  You asked me that.
5  Q    I'm now showing you what I'm marking as
6    "Plaintiff's Deposition Exhibit #37"?
7       COURT REPORTER:
8         Yes.
9  BY MR. CROW:
10  Q    Please take a second to look at that.  I'm
11    sorry, I accidentally gave you the wrong one.
12    This is the marked Exhibit.
13  A    Okay.
14  Q    I'm sorry.
15  A    No problem.  You've been here a long time like
16    we have.  This is the same reporter.
17  Q    Yes.  This article was from The Daily
18    Advertiser, correct?
19  A    Well it's from The Daily Advertiser, but it's
20    like an article that Julie O'Donoghue wrote --
21    O'Donoghue wrote and it's published in multiple
22    papers.  If you look at 36, it's entitled --
23    it's by Julie O'Donoghue.  It's from the same
24    interview, so yeah it is, but it's the same
25    interview.  It derives from one interview I
                                                    Page 367

1  A    Right.
2  Q    You're also quoted in this article, on that
3    same page, mentioning that users can delete
4    offensive tweets; is that correct?
5  A    Yes, they can.  I believe you can.  I know I
6    can delete my tweets.  Yeah, I think users can.
7    I don't know if -- I'm not sure if you can
8    delete a tweet by someone.
9  Q    But that users could delete their own offensive
10    tweets?
11  A    Yes, they can.  Yes.
12  Q    And you did say this in the article?
13  A    I'm not sure.  I probably did.
14  Q    How do you decide when a tweet is offensive?
15       MR. HAYES:
16         Objection, asked and answered.  Let's
17         move on to something else.
18  BY MR. CROW:
19  Q    When is a tweet offensive enough to block the
20    user tweeting.
21  A    We've talked about that.
22       MR. HAYES:
23         Objection, asked and answered.  Move on
24         to something else, please.
25  BY MR. CROW:
                                                    Page 369

93 (Pages 366 - 369)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1  Q  For that question, do you have the same answer
2     that you stated earlier?
3  A  Yes, same answer.  If I -- you know, because
4     it's been asked like multiple times.  I think
5     I've answered it multiple times.  You can
6     combine all those answers.  Case by case basis.
7  Q  What would make you unblock a user?
8  A  Sometimes -- well, when I look through, I
9     unblock people.  That was that one time I
10    talked about.
11 Q  You're also quoted in this article saying the
12    people who are blocked should send you an email
13    to discuss whether they should be unblocked; is
14    that correct?
15 A  I don't remember saying that.  I might have.  I
16    don't think I did.  I don't know.  If I have a
17    discussion with someone and they say look, you
18    know, I apologize.  I still -- you know,
19    whatever, I may unblock them.  That has never
20    occurred.  I have not talked to anyone.
21 Q  But you did make that statement?
22 A  I don't know.  I don't recall.
23 Q  If you look at Page 4, are you quoted making
24    that statement?
25 A  I am quoted, but I don't recall making that

Page 370

1     that is the subject -- one of these accounts
2     that is the subject matter of this lawsuit.
3  Q  I'm still trying to understand how you would
4     decide whether to unblock someone.
5  A  Besides the instance I told you where I just
6     did a blanket unblock, I don't know.  I've
7     never gone through it.
8  Q  I'd like to bring your attention back to this
9     article, to Page 3, specific --
10 A  Is that Exhibit 34?  37?
11 Q  Thirty-seven, yes.  Yeah, specifically to Page
12    3 with the paragraph beginning with "Drew
13    McKevitt."  Do you see where I am?
14 A  Uh-huh.
15 Q  In this, he says that you blocked him for
16    criticizing your sponsorship of abortion
17    restrictions and calling you a coward; is that
18    correct?
19 A  He says that, but I don't remember.  I don't
20    recall this.
21 Q  Did you block Mr. McKevitt?
22 A  I don't recall this.  I don't even know who
23    Drew McKevitt is.
24 Q  Just to make sure I'm recalling this correctly
25    -- you established earlier that you felt the

Page 372

1     statement.  I could have.  I don't know.  I
2     don't remember.  There's no personal memory of
3     that statement.
4  Q  Regardless of whether you made that statement
5     or it was misquoted, you said that there has
6     not been anyone whose emailed you in order to
7     try to be unblocked on Twitter?
8  A  Not that I recall.  But the best thing is for
9     me to go back and search.  I'm not going to
10    make a statement.  I get hundreds of emails a
11    week.  And something could have come through
12    that I never responded to and don't know it's
13    there because that comes to my staff's email.
14 Q  If someone were to email you and ask you to be
15    unblocked, how would you evaluate whether they
16    should be unblocked?
17 A  I've never -- I don't think I've ever had to do
18    it.  I probably would talk to the person and
19    see what happened.  I probably wouldn't go back
20    years like you've sent me, 2013 or 2014
21    documents.  It's my personal page and so, at
22    that point, I would evaluate it based on my
23    personal thoughts.  Right now nobody is blocked
24    I believe but @blocksomebodys account or
25    @somebodyblocked account and at this account

Page 371

1     word coward -- calling someone a coward was
2     offensive.  Oh, let me strike that actually.
3     Is the word coward offensive?
4  A  Depends on what context it's used, how many
5     times they tweet, whether the user -- it's a
6     lot of things.  I think you're looking for some
7     type of standard and I've said it's on a case
8     by case basis.  And I don't remember Drew
9     McKevitt.  I don't -- I can't say that he or
10    she -- well I guess it's a he, it's Drew, but
11    Drew can be a female -- was ever blocked.
12 Q  You said that with this, it would depend on the
13    context, right?
14 A  Everything depends on the context.  It goes on
15    a case by case basis.  I am an attorney by
16    right.  I've earned it.  And so I'm going to
17    look at everything like I would look at
18    anything else.
19 Q  But because it depends on the context, the word
20    coward could be offensive, right?
21 A  It depends on what words are with it.  If you
22    call me a coward, I usually laugh and keep
23    going.  But like if you're just constantly and
24    I can't get to the next person -- I've said
25    that before -- I may in the past have blocked

Page 373

1  someone that just constantly just, you know --
2  and this is from what someone said.  I don't
3  know this to be true.
4  Q   I'd now like to bring your attention to the
5  following three paragraphs after the paragraph.
6  So that's the two on Page 3 and the first
7  paragraph on Page 4.
8  A   Okay.
9  Q   I'll give you a moment to read them.
10  A   I've read it.
11  Q   These paragraphs -- these three paragraphs
12  discuss the blocking of Donald Hodge, correct?
13  A   They do, but I don't know who Donald Hodge is
14  and I have no recollection of blocking him.
15  Q   You do not recall if you blocked Donald Hodge?
16  A   No.  I don't know who Donald Hodge is.
17  Q   He said in this article that you were complicit
18  in that lie, correct?
19  A   I remember the subject matter.  I don't know if
20  he said that.  I don't remember this exchange.
21  I don't remember who Donald Hodge is.  It was
22  another member's bill looks like that he
23  referred to in the article -- Senator Francis
24  Thompson.
25  Q   But isn't —

Page 374

1  A   This would have been when I was in the House.
2  I definitely wouldn't remember this because
3  Senator Thompson was in the Senate in my seat
4  when I was in the House.  So this would have
5  been a while back.
6  Q   But in this article, he says that you were
7  complicit in that lie, correct?
8  A   That's what he said he said, yes.
9  Q   In this, he criticized your support of a name
10  change of a school, correct?
11  A   Right.
12  Q   I'm now going to show you what I'm marking as
13  "Deposition Exhibit #38".  Can you read the
14  headline of this article?
15  A   State Senator Jackson Responds to Lawsuit
16  Claiming She Violated a Woman's First Amendment
17  Right by Blocking Her on Twitter.
18  Q   I'd like to direct you to the last paragraph on
19  the first page.
20  A   "What I do know is hate speech, Jackson told
21  KNOE that's the crux of this lawsuit.  Someone
22  is fighting to be able to tell someone to burn
23  in hell and categorize some black women as dumb
24  b-i-t-c-h-e-s."
25  Q   And this is a quote from you, correct?

Page 375

1  A   I'm believing it is.  I mean, I don't know if
2  it's a direct quote.  I know I've said that
3  before.  I've said that it's what this lawsuit
4  hinges on.
5  Q   You remember making this statement?
6  A   I don't.  I know I did -- and it may not have
7  been the statement.  I'd have to go back and
8  look at my press release.  This -- this could
9  have been from that one press release.
10  Q   That paragraph says "Jackson told KNOE."  Did
11  you make a statement to KNOE?
12  A   I don't remember.
13  Q   In this, you talk about what I do know is hate
14  speech, correct?
15  A   That is what they quoted.  I don't know if that
16  was a direct quote.  I have talked about it --
17  me feeling like it was hate speech, yes.
18  Q   Okay.  But you did feel like Ms. Detiege's
19  tweets toward you --
20  A   Right.
21  Q   -- were hate speech?
22  A   Right.
23  Q   Can you please explain to me -- let me rephrase
24  this.  As you've stated, there is no legal
25  definition of hate speech, correct?

Page 376

1  A   Right.
2  Q   And so the reason I need to ask this is so I
3  can understand your definition of hate speech.
4  So how would you define that term?
5  A   When you single out a person because they
6  belong to a certain racial class and you do so
7  in a manner that brings -- and I can't fully
8  explain it -- but basically when you single out
9  someone because they belong to a certain class
10  and offer offensive comments to them.  Now I'm
11  thinking about hate speech and having to
12  research it for something else, it may have to
13  be followed by some type of action.  Like you
14  said, there's no legal definition of it.  So I
15  would be reluctant to give the full definition.
16  I can just say that I felt like this was hate
17  speech.
18  Q   In there you mentioned it having to be followed
19  by an action?
20  A   I said I usually thought it had to be followed
21  by an action, but it doesn't.  The Supreme
22  Court hasn't given a definite on that.  And it
23  doesn't have to be followed by an action.
24  Q   Okay.
25     WITNESS:

Page 377

1    I'm just going to check my phone to
2    make sure I'm not getting calls about my
3    nephew. Okay, my brother said he's picking
4    him up. It's good.
5  Q  Is it your understanding that hate speech is
6    unprotected speech?
7  A  In some arenas, it is. I think on my personal
8    page it is.
9  Q  You believe that hate speech on your own
10    page --
11  A  My personal page, yes.
12  Q  -- is constitutionally unprotected speech?
13  A  Well, let me say this. When it comes to
14    whether someone has access to your personal
15    page, yes.
16  Q  That's not the question that I'm asking.
17  A  You asked me was hate speech protected. It is
18    protected in certain instances I believe. I
19    don't know. I haven't researched this recently
20    with the Supreme Court.
21    MR. HAYES:
22        You're asking her if it's
23    constitutionally protected? Was that the
24    question?
25    MR. CROW:

Page 378

1    Yes.
2    MR. HAYES:
3        Let me object to that as it calls for
4    legal conclusion.
5  BY MR. CROW:
6  Q  Can you please explain why you blocked Ms.
7    Detiege?
8  A  We've gone through this several times.
9  Q  Not as to this client.
10  A  Yeah, we did. We talked about this tweet and I
11    said that -- I said what she stated. I've read
12    what she stated. And I said because of those
13    reasons, I blocked her.
14  Q  Okay. So you reviewed her tweets --
15  A  Also --
16  Q  -- correct? Directed at you?
17  A  I reviewed that one. I read that one, yes.
18  Q  In that tweet, was there hate speech in that
19    tweet?
20  A  I believe it was. She singled out a race of
21    people, black women, and decided to call some
22    of us dumb b-i-t-c-h-e-s.
23  Q  So in that tweet --
24  A  I can't give you the definition. The court
25    would have to decide that.

Page 379

1  Q  But in regards to how you feel, what did you
2    feel about that tweet was hate speech?
3  A  In the initial reaction to that tweet, I felt
4    like it was because she said all black women
5    are not smart. Some of you are dumb b-i-t-c-h-
6    e-s. If she would have said all women, maybe
7    it would have been okay, but she specifically
8    said black women. It wouldn't have been okay
9    on my page, but she specifically said black
10    women. She specifically went into my race as a
11    context for her speech.
12  Q  Okay. I now want to ask you more in depth
13    about your Twitter exchange with Ms. Detiege.
14    I'm going to show you what I'm marking as
15    "Plaintiff's Deposition Exhibit #39"?
16    COURT REPORTER:
17        Correct.
18  BY MR. CROW:
19  Q  It's dated June 24, 2022. Are you familiar
20    with this tweet?
21  A  I am. That's the one I'm most familiar with.
22    "I say this with all disrespect, burn in hell."
23    I mean she prefaces that she says this with all
24    disrespect. "You don't care about women. You
25    don't care about pregnant people. You don't

Page 380

1    care about children. You don't care about
2    education. I do not support all black women.
3    Some of you b-i-t-c-h-e-s are very dumb." I
4    mean she prefaces I say this with all
5    disrespect. So when you ask me is this
6    disrespectful, the tweet was prefaced with I
7    mean this to be disrespectful.
8  Q  And disrespect is one of the reasons why you
9    blocked her?
10  A  Well it goes -- yeah, one of the reasons. This
11    was a flaming -- burn in hell, that's another
12    reason. The profanity is another reason. The
13    categorization of some black women as dumb b-i-
14    t-c-h-e-s -- yeah, this one was filled with
15    foolishness.
16  Q  Okay. I now want to introduce -- or I now want
17    to show you what I'm marking as "Deposition
18    Exhibit #40". This is dated June 24, 2022. Do
19    you recall this tweet?
20  A  I don't recall the tweet -- yes, I do. I
21    recall this tweet. It was a graphic I made
22    after Roe versus Wade was overturned and it was
23    about advocating and turning our advocacy --
24    because I'm a whole life advocate -- to women
25    -- well, which I had always been doing, but I

Page 381

1    had been encouraging others to do, to support
2    for women and children from the womb to the
3    tomb, which I had said for years.
4  Q   So is this a fair and accurate representation
5    of your tweet and graphic?
6  A   Yes.
7  Q   In this graphic, you included Senator Katrina
8    R. Jackson on the graphic, correct?
9  A   Right.
10  Q   Why did you do that?
11  A   It was a legislative position and also my
12    personal beliefs.
13  Q   And why did you tweet this graphic?
14  A   I think I tweeted it or I might have emailed
15    it. I don't think -- I don't know if I emailed
16    this one. I probably put it on Facebook. It
17    was something I felt.
18  Q   When you make graphics or when people help make
19    graphics for you --
20  A   I made this one.
21  Q   Okay. When it's got Senator Katrina R. Jackson
22    on it, those are like legislative positions
23    you're taking?
24  A   Those are legislative positions. They may
25    intertwine with my personal positions.

Page 382

1  Q   Okay. But if it has that kind of tag line on
2    it --
3  A   Right.
4  Q   -- that's showing it as a legislative position,
5    correct?
6  A   Right. Yes. This one showed what I was
7    preparing and continuing to fight for.
8  Q   And this graphic -- one last question about
9    this graphic. This graphic shows that twenty-
10    three (23) people replied to this tweet,
11    correct?
12  A   That's what it seems at the time when it was
13    printed, yes.
14  Q   I'm now going to show you what I'm marking as
15    "Plaintiff's Deposition #41" which is dated
16    June 26, 2022. Did you -- do you recall this
17    tweet?
18  A   I don't. I vaguely recall the graphic, but I
19    don't recall this tweet, no.
20  Q   Did you make this graphic?
21  A   I -- it looks like something I would have made,
22    but I can't for certain because I don't -- I
23    just vaguely recall the graphic.
24  Q   If it was not made by you personally, would you
25    say it was made by someone on behalf of you if

Page 383

1    it was not made by you?
2  A   Yeah, but I think I'm -- I vaguely recall this
3    one so it may have been something I made.
4  Q   Yes. I actually want to direct you to the
5    graphic to the second paragraph. It says "SB
6    342 that I authored." That's tweeting -- or
7    that's -- excuse me -- that's speaking in the
8    first person?
9  A   Right. So it's probably me.
10  Q   And is this a fair and accurate representation
11    of your tweet and graphic?
12  A   I don't remember the tweet. Looks like the
13    graphic -- I vaguely remember the graphic but
14    it's probably, most likely, something I would
15    have posted.
16  Q   So the graphic, it's a fair and accurate
17    depiction of the graphic?
18  A   I vaguely remember the graphic, but it's
19    probably -- looks like me because it's in the
20    first person as you acknowledged.
21  Q   On this graphic, you included Senator Katrina
22    R. Jackson?
23  A   Right. I authored it as a Senator so I'm
24    generally going to include that.
25  Q   You authored this graphic as a Senator?

Page 384

1  A   I authored the bill as a Senator.
2  Q   Why did you tweet this graphic?
3  A   Probably to give people -- I don't know. I
4    really don't. Like -- but it looks like
5    something I would have tweeted. It gives a --
6    it's the main reason -- it gives the current
7    expert pass what the trigger law was and what
8    it is going to be.
9  Q   And did people respond to this graphic?
10  A   I don't recall. Looks like on the page six
11    people retweeted it. There looks to be
12    thirteen (13) comments and eighteen (18) likes
13    -- hearts.
14  Q   And this tweet was about legislation, correct?
15  A   Well, it was about an act because it had become
16    law.
17  Q   Oh, okay. It was about an act and that act,
18    you had sponsored the legislation?
19  A   Right.
20  Q   And this Act that was SB 34 --
21  A   It might have been an act. I would have to go
22    back and look. It's June 26, so the Governor
23    probably had signed it by then.
24  Q   Okay. But SB 342 that you sponsored, that
25    applied across the state, correct?

Page 385

1  A  Yes, it did.
2  Q  I'm now going to direct you back to Exhibit 39
3     --
4  A  Okay.
5  Q  -- and we've already had you read this tweet --
6  A  Right.
7  Q  -- so I won't have you read it again. Did
8     these tweets -- this pair of tweets influence
9     your decision to block Ms. Detiege?
10  A  Yes.
11  Q  Why is that?
12  A  We talked about that. I felt like it was hate
13     speech. I felt like it was disrespectful. As
14     she said, this is meant to be disrespectful.
15     It was no longer advocating for any issue. It
16     was basically calling out black women as dumb
17     b-i-t-c-h-e-s. And telling me to burn in hell.
18     Which in my faith, burning in hell means that I
19     have not followed my faith.
20  Q  Okay. And I want to direct you to the second
21     of the two tweets, the bottom tweet.
22  A  Uh-huh.
23  Q  Can you read what that says?
24  A  "I do not feel valued or supported by
25     @KatrinaRJackson and I am actively rooting for

1     her to be voted out in 2023. Can't come fast
2     enough. Rooting for your downfall." Glad she
3     didn't get what she wanted.
4  Q  Did that tweet influence your decision to block
5     Ms. Detiege?
6  A  Not really. People have a right to -- I'm
7     probably had just come back to the tweet or
8     something. Sometimes I put my -- you know, my
9     phone down. People have the right to not
10     support you. I work with people who run
11     against me. One of my major supporters in my
12     district is -- ran against me in my first race.
13     It was holistically due to this first tweet.
14     The above tweet.
15  Q  It was about the above tweet?
16  A  Right.
17  Q  If Ms. Detiege -- let me actually back up. Ms.
18     Detiege is not a resident of your district,
19     correct?
20  A  From what I understand from the pleadings, no.
21  Q  If Ms. Detiege were a resident from District
22     34, would you still have blocked her for this
23     tweet?
24  A  I probably would have looked her up in the
25     database, but this gave no distinction. This

1     didn't even show a resident of Louisiana. This
2     was "the german gentleman aka grubauer's #1
3     fan." I see what's currently on her page is I
4     guess a picture of her, but it wasn't -- it was
5     the hockey player. If it was somebody in my
6     district or someone who I could identify, I
7     probably would have then communicated with them
8     like I have before on please, you know, don't
9     use profanity. If it's somebody in my district
10     and they give their right name, sometimes I've
11     called people and say hey, let's discuss this,
12     right, before. This gave no identification of
13     anything. And usually I do that by email so
14     I'm not that extensive on Twitter, right. When
15     someone emails me and the emails are going back
16     and forth, I'll just say let's discuss this.
17  Q  If you block them on Twitter --
18  A  Uh-huh. Yes.
19  Q  -- how would you then discuss with them?
20  A  Well, if you look all over Twitter and you've
21     given a number of exhibits where everything
22     says contact me at -- my public email, my
23     public phone number is out there everywhere.
24  Q  Have you ever -- I want to jump back because
25     you said you use your senate Facebook page --

1  A  I do.
2  Q  -- frequently. Have you blocked any users on
3     that page?
4  A  Not that I'm aware of, no. Now let's say --
5     you know how sometimes -- and I don't think I
6     have -- but like you know you get these things
7     -- I've gotten before, and I don't think I've
8     blocked them, but if it's email I have turned
9     it in because you know, we have so many
10     viruses. They say if an email looks bad, just
11     turn it in because the legislative emails --
12     we've been getting so many viruses. You know
13     how you get that thing that says over and over
14     again -- if you use Facebook at all, they go to
15     every post you have -- you need to check out
16     this site, you need to -- you know it's a fake
17     page. Something like that. It wouldn't be
18     based on any of this. It would just be based
19     on like a virus that's probably going to hit
20     your page. And I don't -- I would have to look
21     at it and review it to see, but with Facebook,
22     I'm more concerned about viruses and things
23     like that with everything that's been happening
24     with Meta. And with that page, when people use
25     inflammatory language like this, I generally

| | |
|---|---|
| 1  have the ability to just delete it and move on | 1  which is dated June 24, 2022. And I apologize, |
| 2  because it's my senate page so the teenagers | 2  this one is in black and white. |
| 3  and everyone on my page won't see it. | 3  A  No problem. |
| 4  Q  I'm now going to show you what I'm marking as | 4  Q  Can you describe this tweet? Actually, strike |
| 5  "Plaintiff's Deposition Exhibit #42" which is a | 5  that. Are you familiar with this tweet and |
| 6  tweet with some replies. | 6  reply? |
| 7  A  Okay. | 7  A  I am not. It's June 24 of 2022, if it is |
| 8  Q  Are you familiar with this Twitter exchange? | 8  authenticated. It's |
| 9  A  No. | 9  thegermangentlemanakagrubauer's#1fan and it is |
| 10  Q  If we are able to authenticate that this is an | 10  -- looks like from the page of one of the |
| 11  authentic Twitter exchange between you and this | 11  plaintiffs and it talks about the Three Million |
| 12  other user, can you describe this exchange you | 12  Dollars. |
| 13  had with them? | 13  Q  Is this -- provided it can be authenticated -- |
| 14  A  I'm reading it. This looks like -- let me see | 14  is this a fair and accurate representation? |
| 15  -- it's 2022. I'm talking about the budget and | 15  A  I don't know. This is someone else's tweet. |
| 16  telling them what's in there for women -- if | 16  I'm at the bottom. And it's weird -- did you |
| 17  this authentic. I can't authenticate because I | 17  advocate for more. And I don't know what |
| 18  don't remember it. Talked about sex | 18  that's a reply to because it could be from |
| 19  trafficking, pregnancy, support for pregnancy | 19  another tweet. I'm not sure. |
| 20  centers. He or she asked about what about paid | 20  Q  In this top tweet by Ms. Detiege, can you read |
| 21  sick leave, paid maternity leave, affordable | 21  that for us? |
| 22  child care and a living wage. So let me | 22  A  It says "Laugh out loud. Yeah, that $3 million |
| 23  understand then -- I talk about the | 23  dollar (0.0008% of the budget) is really game |
| 24  criminalization of women and the non- | 24  changing. Thanks for the pennies. And it has |
| 25  criminalization of women. | 25  X.com. |
| Page 390 | Page 392 |
| 1  Q  So in this exchange, provided that we can | 1  Q  Yeah -- which is -- that was a link to your |
| 2  authenticate this exchange, you tweeted about | 2  Twitter page, correct? |
| 3  budget items you supported, correct? | 3  A  I'm not sure. It looks like it but I'm not |
| 4  A  I didn't tweet. There must be some other part | 4  sure. |
| 5  of -- there must be some other part of this | 5  Q  And then -- |
| 6  exchange because where it starts out, it seems | 6  A  And it doesn't seem like -- I don't think it's |
| 7  that this person is responding to something on | 7  a link because it's not bolded. |
| 8  my page. Maybe I'm wrong. | 8  Q  And then in response to this -- well, actually |
| 9  Q  Let me rephrase and clarify. Did you make this | 9  let me back up. This tweet by Ms. Detiege, |
| 10  reply about budget items you support? | 10  does it appear that she is belittling the |
| 11  A  I remember discussing this but I don't remember | 11  amount that the three -- like the three million |
| 12  this tweet chain. So if it's authenticated, | 12  that you -- that was able to be secured to |
| 13  yes. | 13  pregnancy centers? Would you characterize it |
| 14  Q  Okay. And it had to do with budget items you | 14  as that? |
| 15  supported? | 15  A  If it's her tweet, yes. And then I make sure I |
| 16  A  Right. | 16  go back and look at 39 to put it back in |
| 17  Q  And you also mentioned that -- in your first | 17  Exhibit 39. It was part of -- it looks like it |
| 18  reply on this page that you were able to secure | 18  might have been part of that exchange. So it |
| 19  Three million dollars for -- to support | 19  looks like it may have been part of that |
| 20  pregnancy centers? | 20  exchange. |
| 21  A  Let me see. Did I say I said? I did, but the | 21  Q  And so in response to this where she is being |
| 22  no one states that fact -- the budget this | 22  critical of the amount, is that why you then |
| 23  year. Talk about the budget this year -- that | 23  replied asking if she advocated for more money |
| 24  would have been a group effort. | 24  than that? |
| 25  Q  I'm now showing you "Deposition Exhibit #43" | 25  A  No, because -- I don't know because there was |
| Page 391 | Page 393 |

1  also another exchange about the three million
2  dollars, so I don't know.  You know, you've
3  sent me something that may be purported to be.
4  I might have been replying to them if this was
5  -- if both of these tweets were accurate.  I
6  don't know.  I don't have -- usually -- usually
7  like you see here -- post your reply, replying
8  to?  Usually when I'm replying to someone or
9  replying to a seat, it says @midaeros and this
10  one doesn't say that.
11  Q  Okay.  Just to clean up before we move on to
12  our last topic, you said that you are not very
13  familiar with Twitter, correct?
14  A  I've gotten familiar when I had to request this
15  information, but still not as familiar, no.
16  Q  As a user are you familiar with Twitter?
17  A  Not as much.  I'm a little bit more familiar.
18  It's not -- I usually get on and post.  Once a
19  thread goes long, I can't like -- sometimes
20  I'll see something from two weeks ago on a
21  thread that I answered and never answered the
22  first thread.  Because once it starts going
23  long, it condenses the thread.  The thread -- I
24  think it's called a thread.  I'm sorry.  So
25  what I mean by that is like sometimes when you

Page 394

1  click on it, it goes to someone else's response
2  -- things like that.  It's not as concise as a
3  -- as a thread that's on Facebook.
4  Q  I'd like to direct you back to a previous
5  exhibit.  I'll need to figure out which one it
6  is.  It was the exhibit of your Twitter home
7  page.
8      MR. PETTIGREW:
9          Exhibit 3.
10  BY MR. CROW:
11  Q  Yes, Exhibit 3.
12  A  Okay.  I'm keeping it in order, I promise you.
13  There it is.
14  Q  And you mentioned, if we're able to
15  authenticate it, this appears -- this is your
16  Twitter page, correct?
17  A  It looks to be, yes.
18  Q  At the top where it says -- you see where it
19  says Katrina Jackson in bold?
20  A  Katrina R -- Katrina Jackson, yes.
21  Q  Yes.  And that's at the top above your cover
22  photo?
23  A  Right.
24  Q  What does it say underneath that?
25  A  @KatrinaRJackson.  That's my Twitter handle.

Page 395

1  Q  Let me direct you to what's right underneath
2  that right here.
3  A  Oh, Two Thousand Three Hundred Forty-Five
4  (2,345) posts -- that would be since the
5  inception of my Twitter page I think was in
6  2011 or 2012.  I've posted 2,345 times within
7  twelve (12) to thirteen (13) years.  If
8  Facebook could count what I've posted, it would
9  quadruple that.
10  Q  And how many followers do you have on Twitter
11  at the time of this screenshot?
12  A  At the time of this screenshot, if this is
13  accurate I have Six Thousand One Hundred
14  Thirty-Three (6,133).  I don't have to approve
15  followers on Twitter.  I have to approve
16  Facebook requests on Facebook and I'm just
17  telling you what I'm more familiar with.  I
18  don't have to approve Twitter requests on
19  Twitter.  It's public.
20  Q  Yes, because your account is public, correct?
21  A  Right.  Uh-huh.  Just as my other accounts.  I
22  think the only thing I've probably discovered
23  that's private is my Instagram account.  I'm
24  going to have to go look at that and see.
25  Q  Okay.  I now want to shift gears and I want to

Page 396

1  go back and revisit your role on the education
2  committee.
3  A  Sure.
4  Q  You mentioned at the -- I know it was a while
5  ago in this deposition, but I believe you
6  mentioned that you were previously the vice-
7  chair of the education committee --
8  A  Right.
9  Q  -- but now you're a member?
10  A  In last term.  We started a new term and I'm a
11  member.
12  Q  When did that new term begin?
13  A  Let's see, what are we in?  2024?
14      MR. HAYES:
15          Last year?
16  A  Was it last year?  Yeah.  I think it was
17  January of -- wait, this is 2024.  So I think
18  it was last year of 2023.  Or was it 2022?  I
19  don't remember.  I think it was 2023.
20  BY MR. CROW:
21  Q  Okay.
22  A  January -- we would get sworn in, in January,
23  so it was last year.  I wore pink St. Jones I
24  remember that.
25  Q  Okay.  Does the education committee do any work

Page 397

100 (Pages 394 - 397)
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

| | |
|---|---|
| 1 that affects the funding of higher education | 1 and they said, no. |
| 2 institutions within the state? | 2 Q Who did you speak with? Well actually, let me |
| 3 A We don't impact the funding absent a bill | 3 back up. |
| 4 passing that has some substantive provisions. | 4 A Yeah. |
| 5 And if it impacts the funding, it goes to | 5 Q Strike that. How many phone calls did you make |
| 6 finance next because it's generally over a | 6 with officials with Tulane? |
| 7 hundred thousand. The only committee that | 7 A One and I got a phone call back and I can't |
| 8 appropriates is finance. | 8 remember who it was from. |
| 9 Q But sometimes legislation that the education | 9 Q Was it from President Fitz? |
| 10 committee is putting forth includes and affects | 10 A I don't remember if I spoke to President Fitz. |
| 11 the funding of higher education institutions? | 11 I don't. |
| 12 A Yes. | 12 Q Can you tell me about what that phone call |
| 13 Q It would then go to the finance committee? | 13 entailed? I know you started to mention it. I |
| 14 A If it's over a hundred thousand dollars, it's | 14 believe I cut you off. |
| 15 still referred. | 15 A Right. Because we do by way of our |
| 16 Q Does your committee do any work that bears on | 16 scholarships if I'm not mistaken give some type |
| 17 Tulane University's legislative priorities? | 17 of state funding –- I think –- by way of |
| 18 A I don't know if we've had –- I'm sure we would, | 18 scholarships. Or they offer scholarships. And |
| 19 I just can't think of anything. But not | 19 I wanted to make sure state funding was not |
| 20 funding. It would be more substantive. It may | 20 being used to sue on this issue that I felt |
| 21 be creating a program or something like that. | 21 like was not appropriate. But we don't fund |
| 22 Q Can you describe that? | 22 Tulane. They –- you know. |
| 23 A Sometimes –- most of the time boards create | 23 Q So you were calling to inquire as to whether |
| 24 programs. But if a school –- and I don't | 24 state money –- |
| 25 remember with Tulane –- have a desire for us to | 25 A Right. |
| Page 398 | Page 400 |
| 1 fund a program, usually it's a system. Tulane | 1 Q –- was funding the Clinic work? |
| 2 is a private college, but usually it's a | 2 A Right. Whether it was ethical for state |
| 3 system. I don't know if we would do anything | 3 funding if it was funding the Clinic work. |
| 4 with the funding of Tulane because it's a | 4 COURT REPORTER: |
| 5 private college, you know, and the state | 5 Six hours and fifty-nine minutes. |
| 6 generally does not fund them. | 6 BY MR. CROW: |
| 7 Q In your role in the committee either as | 7 Q In calling the school, what action did you hope |
| 8 previously being vice-chair or being a member, | 8 the school would take? |
| 9 do you work with members –- with staff at | 9 A None. I just wanted to see if this Clinic was |
| 10 Tulane? | 10 ethically funded because it was odd that a |
| 11 A Not very often. Not that I can –- sometimes I | 11 school's Clinic was suing anyone. |
| 12 guess. They come down for Tulane Day at the | 12 Q Did you file –- |
| 13 Capitol. Direct communication, I may –- I'm | 13 A I wasn't familiar with it. |
| 14 sure I've had some direct communication with | 14 Q Did you file a complaint with the Attorney |
| 15 Tulane before. But the state doesn't fund | 15 General about any lawyers on this lawsuit, |
| 16 Tulane. It's a private university. | 16 including Professor Schwartzmann? |
| 17 Q After this lawsuit was filed, you contacted | 17 A No. Not that I can recall and I think I would |
| 18 officials at Tulane University, correct? | 18 recall that. |
| 19 A Right. Because I believe –- I thought that | 19 Q What –- what action did you hope the people in |
| 20 their funding was for this Clinic and I said | 20 the Legislative Affairs office would take? |
| 21 are –- I want to get it straight –- are you –- | 21 A I called the Legislative Affairs office because |
| 22 because we do provide scholarships, so that –- | 22 I think that's the only contact I had. None. |
| 23 the state does, by way of scholarships, give | 23 I don't think anyone in Legislative Affairs |
| 24 state funding –- and I ask was state funding | 24 office –- |
| 25 being used to fund a clinic that sues people | 25 Q Was your goal to have Tulane require the |
| Page 399 | Page 401 |

101 (Pages 398 - 401)
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

1    withdrawal of this suit?
2  A    No.  I was -- again, I just spoke of that.  I
3    wanted to make sure it was ethical if state
4    funding was being used to fund a clinic because
5    I think initially someone told me the Clinic
6    was funded by state funding.
7  Q    At the time, did you advise Tulane that you
8    were considering a protest of the university by
9    the Black Legislative Caucus as a result of
10    this lawsuit?
11  A    Yes.
12  Q    How could that --
13  A    No, I didn't.  I told them that I would inform
14    the Black Caucus that Tulane was upholding what
15    I believed and others of the Black Caucus had
16    stated was hate speech.  And that we had a
17    concern about that.
18  Q    How could a protest by the Black Legislative
19    Caucus impact Tulane University?
20  A    Same way it can impact the State Police.  You
21    have to come answer for it if it's unethical
22    because we thought it was state funding.  Once
23    we realized it wasn't state funding after
24    talking to some members, we left it alone.
25  Q    Has this lawsuit negatively impacted Tulane's
Page 402

1  A    That's what I just testified to.  When I made
2    the call, they told me and after that it was
3    like oh, okay.
4  Q    Are you aware that because of principles of
5    academic freedom that Tulane University should
6    not control or interfere with the work of its
7    law clinics?
8  A    That's what I just stated.  When I found out it
9    wasn't state funded or anything, I was like oh,
10    okay let's roll.
11  Q    So that's a, yes?
12  A    Yes.
13  Q    All right.  That's all that we have.  Thank
14    you.
15        MR. HAYES:
16            Read and sign?  Yes?
17        WITNESS:
18            Yes.
19        MR. HAYES:
20            We'll read and sign.
21        COURT REPORTER:
22            Do you want me to send it to you, Mr.
23        Hayes?
24        MR. HAYES:
25            Please, yes.
Page 404

1    standing in the state legislature?
2  A    No.  After I found out it wasn't state funding,
3    we don't even mention Tulane.  We just discuss
4    that we're fighting in our personal pages not
5    to be called b-i-t-c-h-e-s.  More than --
6    really, the Black Caucus doesn't really discuss
7    it.  It's more of a women's caucus.  When I see
8    the women in the Legislature and of the Senate.
9    And Tulane never comes up.
10  Q    Did you tell anyone at Tulane that you were
11    considering filing a complaint with -- about
12    anyone from the Clinic or lawyers --
13  A    No.
14  Q    -- with the Attorney General?
15  A    No.  I don't think a complaint -- and let me
16    say this.  I don't have knowledge of a
17    complaint being filed with the Attorney
18    General's office.  That wouldn't even be the
19    perfect place.
20  Q    Did you tell anyone at Tulane that you were
21    filing a complaint with any agency or entity?
22  A    No.
23  Q    Are you aware that the law clinic operates
24    completely independently from the main
25    university of Tulane?
Page 403

1        COURT REPORTER:
2            And do you want a copy of the
3        transcript?
4        MR. HAYES:
5            Yes, I need a complete copy with
6        exhibits, please.
7  THE WITNESS WAS EXCUSED.
8  DEPOSITION CONCLUDED AT 5:37 P.M.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
Page 405

102 (Pages 402 - 405)
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

REPORTER'S PAGE

I, Marcia B. Mitchell, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or the Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the spontaneous nature of the interaction and discourse of the proceeding, double-dashes (--) have been used to indicate pauses, changes of thought and/or talkovers; that such is the universally accepted method for a court reporter's transcription of a proceeding; that double-dashes (--) do not indicate that words or phrases have been left out of the transcript;

And that the spelling of any words and/or names which could not be verified through reference resources have been denoted with the parenthetical phrase "(spelled phonetically)."

_____

CERTIFIED COURT REPORTER

Page 408

---

THE WITNESS WAS EXCUSED.
DEPOSITION CONCLUDED AT 5:37 P.M.

Page 407

---

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this certificate.

I, MARCIA B. MITCHELL, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that KATRINA JACKSON, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 18th day of September 2024, at Monroe, Louisiana, as hereinbefore set forth; that this testimony was reported by me in the penwriting reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is true and correct to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and rules of the board; that I have no actual knowledge or any

Page 409

1 prohibited employment or contractual relationship,
2 direct or indirect, between a court reporting firm
3 and any party litigant in this matter, nor is there
4 any such relationship between myself and a party
5 litigant in this matter; that I am not related to
6 counsel or to any of the parties hereto, I am in no
7 manner associated with counsel for any of the
8 interested parties to this litigation, and I am in
9 no way concerned with the outcome thereof.
10     This 11th day of October 2024, Jena, Louisiana.
11
12
13
14
15
16
17 _____
18 MARCIA B. MITCHELL, CCR
19 LOUISIANA CERTIFICATE #91236
20
21
22
23
24
25
                                    Page 410

1 Detiege, Maya & Sherman, Dayne v. Jackson, Katrina
2 Senator Katrina R Jackson (#6901812)
3      E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Senator Katrina R Jackson              Date
25
                                    Page 412

1 Thomas Hayes
2 thayes4@hamsil.com
3      October 11, 2024
4 RE:   Detiege, Maya & Sherman, Dayne v. Jackson, Katrina
5    9/18/2024, Senator Katrina R Jackson (#6901812)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 errata-tx@veritext.com.
16  Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22     Yours,
23     Veritext Legal Solutions
24
25
                                    Page 411

1 Detiege, Maya & Sherman, Dayne v. Jackson, Katrina
2 Senator Katrina R Jackson (#6901812)
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Senator Katrina R Jackson, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Senator Katrina R Jackson              Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18     _____
19 NOTARY PUBLIC
20
21
22
23
24
25
                                    Page 413

**[& - 2019]**

**&**

**&**   1:20 2:12
11:5 411:4
412:1 413:1

**0**

**0.0008**   392:23

**1**

**1**   4:10 116:4
147:17 157:17
232:24 233:16
388:2
**10**   4:19 5:7,13
116:23 219:12
222:6 246:9
285:6 349:22
349:25
**100**   267:16
**100,000.00**   44:6
**10:42**   293:16
**11**   4:20 5:9
224:6 249:24
252:8 317:2
411:3
**1106**   221:1,14
222:8,10
**11:00**   87:17
**11th**   410:10
**12**   4:21 51:15
86:19 128:18
218:4 227:2
233:24 246:9
315:17 396:7
**12.00**   67:16

**12:00**   36:19
87:17
**12:45**   264:6
**12th**   153:25
249:20
**13**   4:22 141:3
218:4,17
229:18 328:18
328:25 329:2
334:1 385:12
396:7
**13th**   113:14
**14**   4:20,23 5:10
224:7 231:16
253:24 257:2
**1434**   408:5
409:24
**1443**   3:16
**147**   4:10
**15**   4:24 5:25
55:10 60:20
86:18 143:16
180:16 234:22
237:5,7 257:2
315:5 321:5
360:6 368:6
**1500**   1:20 2:13
**153**   4:11
**16**   4:25 92:10
116:15 143:17
235:25
**17**   4:23 5:3
127:13 231:17
238:13

**175**   1:6
**18**   4:21,22 5:4
5:11,12 227:3
229:19 239:9
276:5 385:12
**181**   4:12
**182**   4:13
**188**   4:14
**189**   4:15
**18th**   1:21 7:3
255:25 256:6
409:10
**19**   5:5 21:4
56:16 106:20
240:20
**193**   4:16
**19th**   1:20 2:13
**1:00**   36:20
254:14
**1:14**   209:17
**1:30**   209:20
**1fan**   392:9

**2**

**2**   4:11 22:2
55:19 116:8
153:23 360:9
**2,345**   396:4,6
**20**   4:17 5:6
21:4,4 56:16
56:16 106:20
207:20 243:19
243:23 321:3
413:15
**2000**   153:25

**2005**   12:21
**2011**   66:8
396:6
**2012**   4:17,18,19
4:20 5:18
13:19 15:22,24
57:21 66:8
154:3 157:5
158:7 207:20
207:22,22
208:7,11,22
210:1 211:19
215:19,21,22
218:3,9,17
222:7,24 224:7
313:21 314:10
314:17 315:2,3
396:6
**2013**   4:21 5:19
227:3 229:10
316:19 320:23
323:17 354:25
355:20 371:20
**2014**   4:22 5:12
5:13 229:19
276:5 277:23
280:22 285:6,7
286:2 288:7
289:1 293:2,2
354:25 355:20
371:20
**2017**   34:7
**2018**   34:4,5,6
**2019**   4:23
148:2,14

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[2019 - 34]**

| | | | **3** |
|---|---|---|---|
| 149:13 231:17 | 397:17 409:10 | **25**  5:3,11 | **3**  4:12,25 |
| 233:2 234:20 | 410:10 411:3 | 238:14 255:24 | 181:21 183:5 |
| **2020**  4:25 5:3 | **2025**  305:25 | 267:14 304:5,9 | 183:15 184:12 |
| 150:7 151:12 | **207**  4:17 | 304:14 306:1 | 184:17,20 |
| 236:7 238:14 | **21**  4:24 5:7 | **252**  5:9 | 185:2,3,8,12,24 |
| **2021**  4:24 5:5,6 | 234:23 237:7 | **253**  5:10 | 187:20 203:2 |
| 5:7,15 151:21 | 246:8 334:3 | **255**  5:11 | 363:15 372:9 |
| 157:18 233:2 | **214**  4:7 | **26**  5:12,16 6:6 | 372:12 374:6 |
| 234:23 237:7 | **215**  4:18 | 276:2 299:23 | 392:22 395:9 |
| 240:21 243:20 | **21st**  151:20 | 300:11 301:18 | 395:11 |
| 246:9 249:20 | 235:19 | 301:24 383:16 | **30**  5:17 296:11 |
| 295:15 296:11 | **22**  4:18 5:8 | 385:22 | 304:4 411:16 |
| **2022**  5:8,9,10 | 215:19 249:19 | **267**  4:7 | **301**  1:21 2:13 |
| 5:16,17 6:4,5,6 | 249:23 | **268**  4:7 | **304**  5:17 |
| 6:8 249:24 | **222**  4:19 | **27**  5:5,13 | **30th**  296:8,18 |
| 252:8 253:24 | **224**  4:20 | 240:21 285:5,9 | 297:15 299:1 |
| 299:23 300:11 | **227**  4:21 | **276**  5:12 | **31**  5:18 313:20 |
| 301:19,24 | **229**  4:22 | **28**  5:6,14 148:2 | **310**  4:7 |
| 302:3 304:5,9 | **23**  5:9,18 252:7 | 229:10 243:20 | **313**  5:18 |
| 304:14 306:1 | 313:21 383:10 | 294:6 408:4 | **316**  5:19 |
| 380:19 381:18 | **231**  4:23 | **285**  5:13 | **32**  5:19 316:17 |
| 383:16 390:15 | **234**  4:24 | **28th**  149:12 | **323**  5:20 |
| 392:1,7 397:18 | **235**  4:25 | **29**  4:19 5:15,16 | **33**  5:20 323:4 |
| **2023**  5:11,21,23 | **238**  5:3 | 222:6 295:15 | **34**  5:21 12:19 |
| 5:25 141:3 | **239**  5:4 | 296:17 299:21 | 34:9,15,16 |
| 255:25 256:6 | **24**  5:10 6:4,5,8 | 305:17,21 | 69:1 87:8 |
| 328:18,25 | 35:6 199:3 | **294**  5:15 | 90:23,24 91:1 |
| 329:2 334:1 | 253:23 263:12 | **299**  5:16 | 92:1,2 97:15 |
| 358:8,24 360:6 | 380:19 381:18 | **29th**  297:18 | 108:6 124:8 |
| 363:14 368:6 | 392:1,7 | **2:00**  14:15 | 184:9 292:13 |
| 387:1 397:18 | **240**  5:5 | 23:20,20 | 340:1 358:20 |
| 397:19 | **243**  5:6 | **2:20**  258:5 | 372:10 385:20 |
| **2024**  1:22 7:3 | **246**  5:7 | **2:37:19**  165:12 | 387:22 |
| 334:3 336:15 | **249**  5:8 | | |
| 355:20 397:13 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                         www.veritext.com

**[342 - able]**

**342**  304:18
384:6 385:24
**35**  5:22 359:21
**351**  4:7
**358**  5:21
**359**  5:22
**36**  5:23 363:6
367:22
**363**  5:23
**365**  4:7
**366**  4:7
**367**  5:25
**369**  4:7
**37**  5:24 367:6
372:10
**375**  6:3
**379**  4:7
**37:2554**  409:9
**38**  6:3 375:13
**380**  6:4
**381**  6:5
**383**  6:6
**388**  287:23
288:22 290:11
290:22
**39**  6:4 97:4
380:15 386:2
393:16,17
**39,000**  116:16
**390**  6:7
**391**  6:8
**3:23**  1:6
**3rd**  235:21,24
236:7

**4**
**4**  4:13 5:8
182:19 184:14
184:15,21
185:5,6 368:8
370:23 374:7
**4.5**  317:11
320:13
**40**  6:5 36:17
381:18
**41**  6:6 383:15
**42**  6:7 390:5
**43**  6:8 391:25
**47**  12:5
**48**  35:7 263:13
**4:24**  353:8
**4:30**  36:21
**4:36**  353:11
**4th**  150:7
151:12

**5**
**5**  4:14 5:17,19
23:14 57:11
94:9 116:22
188:16 191:23
193:3,4 194:6
194:10 201:12
267:12 316:19
320:23 328:6
328:11 336:19
**50**  242:23
279:4
**51963872**
147:18

**5:00**  36:18
**5:37**  405:8
407:9

**6**
**6**  4:15 20:10
189:5 292:16
**6,133**  396:14
**60**  13:5 58:13
58:15 116:13
**60/40**  58:14
**6329**  2:5,8,18
2:22
**65**  195:18
**6901812**  411:5
412:2 413:2
**6th**  236:6

**7**
**7**  4:16 55:9
193:9
**70118-6248**  2:5
2:9,19,23
**71201**  1:21
2:14

**8**
**8**  4:17 16:4
56:24 207:19
214:20,22
**8:00**  36:18
**8:30**  36:19
**8th**  321:1

**9**
**9**  4:3,18 5:21
5:23 214:13
215:18

**9-1-1**  70:21
**9/18/2024**
411:5
**91236**  410:19
**9:00**  48:4,5
**9:04**  1:22 7:4
**9:30**  48:5
**9th**  113:12
154:1 358:24
363:14

**a**
**a.m.**  1:22 7:4
**abbreviation**
303:7,8,11,13
303:15,17
**ability**  20:23
88:25 89:1
230:17 390:1
409:15
**able**  19:19
73:20 87:5
107:18 109:17
110:2 114:25
124:24 145:13
160:14 164:1
192:17 195:8
218:6,21
222:24 226:10
234:14 240:14
262:25 264:14
264:15 265:14
276:12 295:3
298:1 305:24
306:12,25
307:21 308:17

Page 3
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[able - active]**

313:14 321:10
327:16 335:8,9
335:11,13,15
335:16 336:15
339:9 375:22
390:10 391:18
393:12 395:14
**abortion**
271:18,18
300:3 301:15
372:16
**abortions**
276:21
**above** 32:15
387:14,15
395:21 411:6
413:7
**abraham** 66:21
**absent** 398:3
**absolutely**
161:5 299:25
**academic** 404:5
**accepted** 81:23
90:1 408:12
**accepting** 82:4
**access** 62:21
84:13 128:14
131:19,22,25
132:18 203:3,6
204:1,4,5,6,13
208:2 261:6
263:24 270:4
306:9 352:11
378:14

**accesses** 206:15
**accidentally**
343:25 367:11
**acclimated**
128:21
**accompanied**
409:3
**account** 133:7
133:8,9,17,18
133:20,22,22
134:17 135:13
135:14,21
136:9,13
137:21 138:8
139:11,20,21
139:22,24
140:10 141:20
145:8,16
146:11 154:5,9
156:7,11,20
162:12,16
165:11 169:25
170:7,13,17,21
171:1 203:4
204:2 207:11
207:14 212:14
212:24 215:25
221:16,19
226:6,7 227:6
228:4 230:5,7
234:13 252:17
252:19 260:12
261:2,5 262:8
266:3,5,6
268:9 269:19

277:10 278:5,6
286:23 292:1,2
295:8 305:23
313:2 314:2
325:21 328:7
328:17 334:9
337:1 341:8
346:2 347:2
348:2 352:9
371:24,25,25
396:20,23
**accounts**
122:18 126:8
126:19,20,21
126:24 127:4
131:20 132:19
133:5 141:17
151:2 161:2
170:2 260:11
275:7 343:17
344:24 355:6
363:22 365:8
372:1 396:21
**accuracy** 411:9
**accurate** 11:14
154:6 181:25
188:21 189:6
193:13 205:21
208:3,9,21
209:23 210:3
211:22 222:21
224:16 230:2
231:23 237:13
241:20 244:12
246:23 250:7

263:21 277:19
285:25 307:22
359:12 382:4
384:10,16
392:14 394:5
396:13
**accurately**
295:24 334:4
**accusations**
325:17 368:10
**acknowledged**
384:20
**acknowledge...**
413:3
**acknowledg...**
411:12
**acquainted**
56:25
**act** 385:15,17
385:17,20,21
**acted** 129:7
409:22
**action** 1:5 61:4
61:7 142:20
145:3 377:13
377:19,21,23
401:7,19
**actions** 287:21
**active** 36:8,11
88:13,18 89:21
89:22 91:6
104:21 128:10
135:13,23
140:24,25
141:17 162:12

**[active - ago]**

162:16 271:15
305:15,17
**actively**  386:25
**activity**  89:6
153:17 160:25
161:1 204:10
**acts**  25:16
**actual**  266:19
323:16 325:14
409:25
**actually**  18:20
22:15 46:20
47:17 62:14
72:14 93:10
145:21 168:21
169:11 247:9
249:20,22
265:4 276:10
299:20 300:6
301:13 302:14
316:8,14
317:17 338:1
344:22 364:16
373:2 384:4
387:17 392:4
393:8 400:2
**ad**  276:16
**add**  21:12 25:1
58:24 77:1
100:19 197:5
198:7,16
320:13
**added**  24:25
80:3 151:6
201:23 202:3

228:21 255:2,7
311:15,16
327:20 355:8
**addition**  59:9
**additions**  413:6
**address**  107:20
110:19,25
160:18 218:12
254:13,14
280:9,10
**addressed**
61:20
**addresses**
114:3
**addressing**
279:25
**adkins**  1:19
2:12
**administration**
65:25
**administrative**
119:14
**adminstra**
65:24
**admitted**  218:2
**adopt**  69:18
**ads**  135:16
136:3,7
**advance**  163:17
163:23 167:18
**advertise**  173:7
**advertised**
175:17
**advertiser**  5:25
367:18,19

**advil**  11:5
**advise**  402:7
**advisor**  72:1,2
**advisory**  89:25
91:17,21,22
123:21
**advocacy**  72:5
84:16,19
101:13,14,15
124:4 178:7
362:9 381:23
**advocate**  26:9
28:24 82:25
84:7 86:6
231:20 232:2
277:12 278:13
381:24 392:17
**advocated**
232:8 393:23
**advocates**
101:18 125:18
**advocating**
381:23 386:15
**affairs**  199:19
199:21 401:20
401:21,23
**affect**  57:18
**affects**  105:15
398:1,10
**affirm**  9:6
**affirmative**
148:7 151:13
151:15,18
152:2 153:10
153:12 154:2

156:7,14
157:11 159:3
159:19,23
160:23 162:24
163:12 165:1,3
166:22 168:14
169:19
**afford**  53:4,10
54:1
**affordable**
390:21
**african**  72:6
73:14 75:22
359:4 364:13
364:21 367:1
**ag**  75:9,21
77:14 78:2,10
78:16,18
**age**  195:17
199:3,8
**agency**  403:21
**agenda**  23:16
24:16 25:1,11
25:13 48:23,23
**aging**  97:18
**ago**  71:11 81:2
86:16,24 132:1
144:14 156:24
159:6 185:4,7
193:25 194:18
215:23,24
218:4 222:15
272:13,15
273:20 301:5
315:18 317:2

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[ago - anybody]**

320:23 324:1
329:16 349:13
394:20 397:5
**agree**  80:24
95:23 96:4
138:5 178:8
231:4 365:21
365:25,25
**agreeable**  88:7
**agreed**  9:23
**agreement**
105:11
**agriculture**
75:11,18,23
76:1,14 77:12
77:14,15,18,21
77:25 78:1,4
78:11 90:11
**ahead**  9:13
118:20 153:18
181:16 351:8
353:16
**aide**  117:8,9
119:18 127:19
128:1,7
**ain't**  180:9
**air**  55:14,15
79:11 97:22
98:10
**aisle**  58:10,23
**aka**  388:2
**alcohol**  11:2
320:13
**alexander**  7:13

**alleged**  337:12
**alleging**  309:18
324:23 337:14
**allotted**  411:19
**allow**  59:24
164:3 243:8
249:7
**allowed**  246:19
**allowing**
323:19
**allows**  81:24
192:20
**alumni**  229:5
**alzheimer's**
199:14
**ambitious**
156:21 158:7
**amend**  125:17
**amended**  125:1
125:14 337:13
**amendment**  2:4
2:17,21 57:25
97:8 100:24
103:12,14,15
227:19 344:6
348:6 375:16
**amendments**
97:2 103:11
125:6,10
**american**  359:4
364:21
**americans**  72:7
73:14 75:22
364:13 367:1

**amount**  32:18
75:25 113:9
167:2 195:22
393:11,22
**analogy**  191:18
**andrew**  294:22
294:22 295:7
295:16 296:24
297:3,9,15
**andrews**
152:10,11,12
**angry**  298:23
**anna**  2:21 7:24
**announce**
162:23 168:24
**announced**
146:8
**announcement**
244:15
**announcing**
155:23
**answer**  32:19
37:4 76:3 88:3
108:5 109:17
109:25 110:19
113:4 114:18
115:19 118:18
118:25 120:2
140:8 145:14
147:6 165:23
166:9 179:10
210:6 213:9,18
217:20 265:5
267:21 268:4
281:16 282:12

302:20 313:15
325:13 329:6
329:15 330:17
330:20 332:8
342:11 351:11
351:18 370:1,3
402:21
**answered**
141:7 147:5
179:11 209:25
214:11 248:5
267:18 268:3
269:24 290:8
332:11 336:17
336:17 337:3
351:3,7 352:21
366:11,14
369:16,23
370:5 394:21
394:21
**answering**  33:4
118:13,13
327:24 329:5
**answers**  3:15
10:15 11:14
12:10 129:10
140:8,11
326:10 328:19
370:6
**anticipated**
97:2
**anybody**  152:7
267:5 273:22
274:21 275:3
279:21

Page 6
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[anymore - asking]

anymore 48:17
128:20 194:4
195:7 196:1
199:5 305:21
anytime 11:16
242:1
apartment
238:11 243:17
254:15
apologies
214:24
apologize 18:15
156:3 168:15
193:5 263:18
370:18 392:1
app 288:11
appear 211:16
393:10
appearances
2:1
appears 211:20
227:6 252:17
257:7 395:15
appended
413:7
applicable
411:8
applied 90:13
290:25 385:25
appoint 64:6
appointed 39:7
64:20 70:12,17
71:9 100:22
244:5 338:6

approach
67:18 219:22
approached
103:3
appropriate
3:9 361:2
400:21
appropriates
398:8
appropriation
17:24
appropriations
16:9,19 20:6,7
20:13,15 26:2
approval
224:21 227:20
approve 396:14
396:15,18
approved
77:23
approximately
7:3
april 4:18,23
4:24 5:5,6,15
5:19 34:10
215:19 231:17
233:2 234:23
235:19 237:7
240:20 243:19
295:15 296:8
296:11 297:15
297:17 299:1
316:19 320:23
321:1

apt 121:20
arbitrary 361:4
archived
349:14
area 33:9 69:18
102:15 103:16
128:9 162:5
198:10
areas 33:11
56:8 74:4,5,6
84:15 191:17
271:22 316:25
arenas 378:7
aren't 356:20
argue 218:11
arms 298:8
arrangement
409:19
arrangements
409:21
arrive 188:24
arrived 288:24
arrives 61:9
art 326:19
article 3:16
5:22,23,25 6:3
234:1 293:12
300:1 359:25
360:2,5,8
363:10,13
364:18 367:17
367:20 368:2,8
369:2,12
370:11 372:9
374:17,23

375:6,14 408:5
409:24
aside 32:21
282:24
asked 8:24 66:1
80:11,14 81:1
83:24 108:19
121:23 122:24
139:2 141:2
167:2 175:15
200:2 214:11
228:1,2 233:17
236:11 267:18
268:3 291:9
311:1 313:4
317:11 326:13
331:8 333:25
336:15 351:3,7
362:4,7 366:14
367:4 369:16
369:23 370:4
378:17 390:20
asking 22:17
166:14 189:20
201:18 214:4
227:16 232:11
232:23 233:14
236:13 242:2
251:5 282:13
294:12 302:23
303:23 312:19
313:12 315:3
322:9 326:18
327:10 330:4
332:14 333:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[asking - automatic]**

337:6,9 341:16
342:12 378:16
378:22 393:23
**asks**   24:25
198:7 286:18
286:19 287:10
290:10 328:6
**aspect**   333:3
**assertion**
309:20
**assigned**   66:24
67:2 119:15
**assist**   96:14
115:14
**assistant**   86:21
106:18 116:12
128:8 205:1,12
205:14
**assists**   24:8
**associated**
410:7
**association**
39:13 64:11,13
100:14,18,23
101:12 102:8
102:14 290:7
**associations**
101:19
**assume**   238:18
336:9 341:25
342:3
**assuming**
208:14 229:10
232:10 254:18
288:18 304:12

318:1,3 320:6
**assumption**
342:4
**athletic**   39:13
64:11,13
**attached**   221:5
223:25 232:17
243:7 251:19
300:18 411:11
**attack**   306:3,19
366:21
**attacks**   361:1
362:17
**attempt**   28:19
29:2
**attempted**
145:5 357:1
**attend**   65:1
75:2 90:25
117:23 253:19
**attending**
70:10
**attention**   11:11
86:25 87:4
147:20 148:1
277:25 292:15
295:14 372:8
374:4
**attorney**   12:17
56:12,17
146:24 147:9
203:7 210:5,25
212:12 213:17
224:19 264:5
311:1,19 329:9

329:24 330:4,7
331:3,12,17,24
332:25 334:23
335:17,20,25
338:5,7 343:7
343:8,9 344:5
346:20,21
347:13,13,17
347:18,24
349:3,18
350:15,19
351:4,14
362:24 363:3
373:15 401:14
403:14,17
411:13
**attorneys**   7:5
13:2 26:8
101:13 119:24
186:12 347:8
**attorney's**
334:14
**audible**   10:15
**august**   70:10
296:17,17
**australian**
357:25
**authentic**
287:19 295:5
296:7 390:11
390:17
**authenticate**
155:17 210:7
211:1,7 218:3
230:6 241:22

277:23 286:7
286:10 291:3
294:9,11,16,20
295:3,5 300:14
300:17 304:10
304:12,23
313:24 315:9
320:3 323:25
331:6,10
390:10,17
391:2 395:15
**authenticated**
291:5 295:18
299:3 314:8
315:21 317:12
318:7,11
320:10,21
321:10 391:12
392:8,13
**author**   63:16
68:24 96:7,12
302:3
**authored**   68:23
222:11,15
235:10,10
292:5 304:18
384:6,23,25
385:1
**authority**   50:21
409:9
**authorized**
207:9
**automatic**
112:22

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[automatically - basic]**

| | | | |
|---|---|---|---|
| **automatically** 137:6,8 174:15 316:2 | 380:5 381:3,13 386:17 403:5 408:2,5 409:5 410:18 | 185:11 187:14 191:21 193:4 193:21 194:5 195:21 204:12 | 375:5 376:7 385:22 386:2 387:7,17 388:15,24 |
| **avail** 87:6,20 | **back** 14:3,13 | 204:15,22 | 393:9,16,16 |
| **available** 71:7 138:8 139:5,22 144:16,18 148:15 149:15 151:24 152:9 177:3,8,15 196:14 234:13 411:6 | 16:2 18:21 19:17 26:7,12 35:3,7 41:1 42:21 48:10,11 59:24 61:10 62:14 66:7 68:4 71:16 | 205:3,20 208:7 208:11 209:21 210:18 211:4 211:19 218:11 219:25 230:6 232:1 234:16 236:1 237:6 239:18 240:9 | 395:4 397:1 400:3,7 **background** 12:15 19:6 30:9,12,15 **bad** 121:16 161:6 187:17 389:10 |
| **avoid** 219:24 | 72:15 75:14 | 245:24 247:25 | **balance** 169:5 |
| **award** 176:7 196:19 | 78:22 81:4 89:2,13,22 | 248:14 252:3 258:11 263:20 | **ball** 333:7 **ballpark** |
| **aware** 59:12 122:2 153:7 262:24 311:13 389:4 403:23 404:4 | 90:12 91:6 92:5 94:20 96:20 98:21 99:13,19 107:10,17 | 264:13 265:22 277:9,11 283:19 285:7 286:4 289:18 290:9,21 | 266:25 **bam** 177:4 **banquet** 85:24 **bar** 13:6 **barred** 13:9 |
| **awareness** 72:20,22 | 108:12,19 109:18,21 | 291:14,19,25 294:2 301:14 | **base** 221:15 320:18 |
| **awf** 300:4 303:5,10 | 110:10 112:3 113:17 114:11 | 305:16 308:13 316:10 317:17 | **based** 57:23 96:19 111:13 |
| **awhile** 22:4 151:5 181:12 | 117:7 118:8 131:15 139:4 142:15 145:21 | 324:19 325:4 326:22 328:8 329:1 334:22 | 130:16 141:7 148:10 198:2 216:15,15 |
| **b** | 146:10 148:17 154:23 155:19 | 336:6,18 343:11 344:23 | 261:13 269:9 271:16 275:7 |
| **b** 1:17 3:6 125:22 266:11 281:25 283:13 283:15,25 284:1,7,11 312:11 352:12 356:19 357:10 375:24 379:22 | 155:22 159:1 167:10 169:25 170:6 171:6 172:20 173:9 175:19 176:24 183:14 185:11 | 345:9,10 348:22 350:23 351:22 353:11 364:19 371:9 371:19 372:8 | 325:2 352:22 371:22 389:18 389:18 **basic** 10:4,10 52:1 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[basically - bill]**

**basically** 17:6
18:13 23:15
26:23 34:17
41:17 71:14
86:8 90:19
91:12 152:15
156:24 179:19
235:4 260:12
377:8 386:16
**basis** 282:7,11
282:14,15
283:6 312:7
352:22 353:1
353:25 354:6
360:24 361:3
361:11 362:1
362:14 364:4
366:1 370:6
373:8,15
**baton** 33:10
91:12 104:12
117:2,3 191:7
198:6 239:18
248:12,15
**bears** 20:21
398:16
**beat** 93:10
**becoming**
290:14
**bed** 14:4
**began** 86:18
157:15 358:3
**beginning** 1:22
18:12 159:21
194:21 277:21

372:12
**begins** 363:16
363:17
**behalf** 118:17
350:16 383:25
**belief** 58:2 66:3
**beliefs** 57:18
58:2 277:12
278:12,14
282:22,24
382:12
**believe** 15:17
15:24 22:6,13
27:3 52:21
58:3 64:10
68:2 71:6,12
73:19 82:8
84:7 86:7,9
88:4 89:9
97:12 138:10
139:16,18,18
148:11 153:2
154:20 174:23
213:11,23
235:12 246:24
276:9 290:10
294:17 297:2,4
303:6 310:22
311:15 312:11
327:14 330:13
331:17 335:17
341:9 342:19
347:21 349:20
350:18,20
356:14 360:25

362:9 369:5
371:24 378:9
378:18 379:20
397:5 399:19
400:14
**believed** 402:15
**believes** 360:9
366:24
**believing** 376:1
**belittling**
393:10
**bell** 347:1
**belong** 377:6,9
**beneficial**
160:8
**beneficiary**
160:9
**benefits** 66:5
66:12 67:8,14
67:14,18
**berating** 107:8
**bese** 314:2,11
314:12
**best** 15:23
16:14 22:4,10
32:9,16 34:11
34:20 37:18
41:3 51:24
79:5,12 87:21
89:16 105:12
117:18 147:6
167:11,25
183:22 212:19
247:6 310:3
312:21 348:14

349:14 371:8
409:15
**beth** 166:8
177:22
**better** 30:20
70:20 106:18
186:1,2,7,8,16
186:21 187:1,5
187:12,25
188:9 230:19
**beyond** 361:2
362:17
**big** 78:20
179:12 196:17
221:10 226:2
227:20 318:2,5
**biggest** 317:8
**bill** 17:7,17,24
18:11 24:25
25:6,6 26:4,14
28:11,25 31:2
44:4,11,20
50:24 53:5,15
53:23 54:1,3,9
54:18,22,24
69:20,20,21,24
70:3,4 78:2
90:9 94:16
95:8 99:7,12
99:22,24
100:14,20,22
103:7,10,12,15
103:17,25
104:13,20,22
104:23 105:8

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

[bill - blocked]

| | | | |
|---|---|---|---|
| 105:23 106:5 | 301:25 302:2,4 | 316:24 317:9 | **blanket** 372:6 |
| 106:22,23 | 302:9,12 303:1 | 323:19 324:22 | **block** 73:4,21 |
| 110:6,8,12,16 | 304:18,19 | **bio** 185:25 | 74:9,11 267:8 |
| 112:10 113:15 | 305:3 320:13 | 187:18,22 | 269:16,18 |
| 113:16 114:15 | 320:16 321:24 | **bit** 12:24 47:19 | 270:6,15 |
| 114:17 123:4 | 322:18 323:16 | 47:20 49:9,18 | 273:24 277:13 |
| 123:24 124:5 | 323:17 324:2,3 | 50:14 57:12 | 278:15,16,25 |
| 124:12,13,19 | 324:6,11 | 62:14 80:21 | 280:22 281:19 |
| 124:24 125:1 | 357:21,22 | 122:10 145:21 | 293:20 296:24 |
| 125:10,14,17 | 374:22 385:1 | 156:21 257:20 | 297:3,6 300:4 |
| 125:21 126:5 | 398:3 | 273:13 287:1 | 302:15,17 |
| 126:16 127:7 | **bills** 12:18 17:6 | 289:8 321:3 | 303:18 305:10 |
| 164:6 168:25 | 17:10,24 23:24 | 394:17 | 306:17 308:5 |
| 172:21,24 | 24:21 25:8,12 | **black** 15:9,10 | 308:25 309:12 |
| 200:1,4,5,9 | 25:17,20 26:3 | 21:25 57:5 | 324:5 325:12 |
| 221:13,22,25 | 31:10,13,15 | 71:17 72:17 | 328:22 336:16 |
| 222:2,10,12,15 | 33:1 42:6,7 | 73:8 74:13,20 | 338:10 342:20 |
| 222:19,25 | 45:24 47:18,23 | 74:22,25 75:2 | 342:24 343:11 |
| 223:1,14,22 | 49:23,23 50:3 | 83:5,6,10 | 344:20 345:10 |
| 227:19 232:7 | 50:9 51:6,7 | 115:12 140:14 | 353:18 354:11 |
| 235:9 237:19 | 53:1,13,17,25 | 141:14,16 | 356:10,13 |
| 272:20,21 | 54:21 55:2 | 145:19,25 | 363:22 364:5 |
| 274:13 287:22 | 77:13,14,14,15 | 186:5 266:10 | 365:8 369:19 |
| 288:5,14,19,20 | 89:19 94:6,9 | 281:24 284:5,6 | 372:21 386:9 |
| 288:21,22 | 94:10,18,24 | 284:10 319:23 | 387:4 388:17 |
| 289:2,3,5,25 | 95:10,11,12 | 322:8,14 | **blocked** 262:22 |
| 290:11,15,15 | 97:2,5 99:20 | 352:12 356:15 | 264:15 265:10 |
| 290:16,17,18 | 108:4 110:22 | 356:19,20 | 265:13,24 |
| 290:20,22,23 | 111:17 124:3 | 357:10 359:5 | 266:1,3,20 |
| 290:25 291:6 | 125:18,23 | 375:23 379:21 | 267:2,7,11 |
| 291:12,21,23 | 126:3 169:7 | 380:4,8,9 | 268:1,8,16,20 |
| 292:4 293:12 | 172:12 190:23 | 381:2,13 | 268:22 269:15 |
| 297:24 298:6 | 214:16 215:8 | 386:16 392:2 | 269:17,19,21 |
| 298:11 300:3 | 223:15 238:22 | 402:9,14,15,18 | 269:21,23,25 |
| 301:15,19,22 | 289:10 290:3 | 403:6 | 269:25 270:1,7 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[blocked - budget]**

274:24 275:3
276:24 277:9
277:10,14,18
278:17 279:1,7
279:13,24
280:19,25
284:20,24
296:12,22
299:12 300:22
302:17 303:14
303:16 305:12
305:13,18,20
305:20,22,23
306:23 308:4,6
308:9,14,16,18
309:10,19,21
309:22,25
310:2,5,17
312:4 313:1
324:11,24
325:1,20,22,24
326:1,4 327:8
327:11,11,13
327:18,22
328:3,7,17,23
329:1,8,10
333:19,21
334:1,2,6,8,9
334:12,20
336:14,20,25
337:12,14
338:11,14,19
339:2,11,15,20
339:21 340:11
340:22 341:7

341:12 342:9
342:17 344:24
346:19,24,25
350:8 352:5,16
354:12,20
355:4,9 356:12
366:4,5 367:2
370:12 371:23
372:15 373:11
373:25 374:15
379:6,13 381:9
387:22 389:2,8
**blocking**
262:15,17,19
262:20 270:12
272:8 273:1,22
274:9,21 275:6
275:25 301:3,6
309:7,14,15
341:3 350:2
352:20 353:24
354:14 359:15
360:1 363:11
368:5 374:12
374:14 375:17
**blocks**   368:10
**blocksomebo...**
371:24
**blue**   185:1
305:13,14
308:11
**board**   39:21
43:3,4,5 70:12
70:13,15 71:12
71:15 314:12

409:18,25
**boards**   39:8
64:17 71:9
398:23
**bob**   347:6,9,10
352:2
**bodies**   28:20
**body**   28:22
38:2 72:18
**bold**   395:19
**bolded**   393:7
**bones**   73:6
**bored**   180:6
**boss**   20:6
**bot**   341:9
342:19
**bottom**   87:12
249:13 278:4
295:14 386:21
392:16
**brand**   128:23
**break**   11:16,17
11:18,20 48:13
168:3,11
177:10,20
180:4 209:8
257:25 264:11
349:6 353:5
**breakfast**
183:1 184:16
**breaks**   56:3
264:7
**brevity**   356:6
**brief**   57:9,10

**briefly**   59:14
**bright**   157:3
283:12 321:19
**bring**   18:11
20:24 26:6
28:13 55:8
63:6,7,13,16
64:3 69:9,16
69:24 70:4
71:16 72:20,22
155:15 191:11
191:21 210:12
210:16 372:8
374:4
**bringing**   25:24
55:23
**brings**   377:7
**broad**   221:15
256:24
**broadly**   132:23
133:3
**brother**   378:3
**brutality**   72:24
244:9
**budget**   16:9,19
20:22,23 21:12
25:23 33:6
38:23 40:9,10
40:23 43:16
44:2,3,14
45:20 49:14,21
49:23,24 50:2
52:5 53:18,22
54:5,16,20
56:13,14,18

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[budget - can't]**

| | | | |
|---|---|---|---|
| 80:7 121:9 | 379:22 380:5 | 351:23 352:1 | 112:16 114:1 |
| 123:8,9 390:15 | 381:3,14 | 373:22 379:21 | 120:4 130:14 |
| 391:3,10,14,22 | 386:17 403:5 | 400:7,12 404:2 | 130:16,23 |
| 391:23 392:23 | **california** | **called** 14:19 | 131:8 143:10 |
| **budgetary** 33:8 | 83:14 | 15:10 68:11 | 172:1,4,8,12 |
| 44:9 | **call** 44:24 | 107:3 137:25 | 264:5 297:15 |
| **budgets** 236:23 | 47:22 79:9 | 140:23 146:13 | 297:17 378:2 |
| **bun** 243:25 | 93:23 95:5,16 | 159:5 295:23 | 379:3 400:5 |
| **burn** 357:5,6 | 99:23 103:4 | 299:1,10 303:1 | **calm** 107:9 |
| 375:22 380:22 | 106:9 107:7,10 | 343:6,7,10 | **campus** 75:8 |
| 381:11 386:17 | 107:13,23 | 344:6 356:14 | **cancellations** |
| **burning** 386:18 | 108:12,16,17 | 359:9 388:11 | 263:23 |
| **bushy** 157:3 | 108:19,19,22 | 394:24 401:21 | **cancelled** 81:23 |
| 321:20 | 109:4,6,6,6,20 | 403:5 | 81:25 |
| **business** 66:17 | 110:5,11,24 | **calling** 14:7,14 | **cancelling** 82:3 |
| 87:13 135:11 | 111:8 112:3,10 | 95:6 107:19 | **candidacy** |
| 135:12 191:16 | 114:15 130:4,6 | 109:18 277:17 | 146:8 |
| **businesses** 15:4 | 130:13,21 | 278:19 280:6 | **candidates** |
| 320:17 | 131:1 138:2 | 281:6,7 284:10 | 230:18 |
| **busy** 36:13 | 142:5,22 143:7 | 284:17 297:11 | **can't** 220:15 |
| 46:8 108:13 | 159:10 165:24 | 298:25 302:6 | 222:23 230:6 |
| 181:7 197:21 | 166:4,25 | 302:12 306:16 | 234:18 237:15 |
| 204:7 206:22 | 167:13 168:6 | 312:11 352:12 | 239:22 241:22 |
| 206:25 | 172:6,16,16,19 | 353:20 356:7 | 245:6 248:11 |
| **button** 143:23 | 172:20 179:9 | 356:19 372:17 | 248:16 250:21 |
| 165:16 189:1,8 | 197:7 201:19 | 373:1 386:16 | 251:12 256:22 |
| 192:19 261:15 | 206:18,18,24 | 400:23 401:7 | 261:14 262:20 |
| **c** | 226:10 233:21 | **calls** 49:16 51:6 | 262:21 266:25 |
| | 234:3 273:17 | 79:7 88:2 | 268:20 273:24 |
| **c** 125:22 266:11 | 298:21 302:24 | 105:19 106:13 | 274:17 277:6 |
| 281:25 283:13 | 303:24 306:8 | 106:21,22,23 | 277:23 278:7,7 |
| 283:15,24,25 | 335:20 339:6 | 107:4,11,14 | 281:12 282:8 |
| 283:25 284:1,7 | 345:21,24 | 108:2,3 110:14 | 287:21 296:25 |
| 284:11 312:11 | 346:1,4,5 | 111:2,20 | 298:12 299:14 |
| 352:12 356:19 | 350:17,18 | 112:11,12,12 | 300:14 303:10 |
| 357:10 375:24 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[can't - certain]**

303:11 304:10
305:20 308:5,7
313:3 314:17
314:21 316:23
320:3 323:24
325:1 327:1
330:17 331:10
333:17 339:17
340:21 345:24
347:6 350:13
354:12 358:16
365:17 373:9
373:24 377:7
379:24 383:22
387:1 390:17
394:19 398:19
400:7
**capable**  49:16
49:17,18 327:6
**capacities**  1:9
**capacity**
188:14
**capital**  20:16
20:17 50:11
**capitol**  50:13
52:3 93:18
117:3 119:10
119:11,13,18
120:8,9 131:3
143:9 159:4
239:17 251:14
253:17 265:1
399:13
**captioned**  1:16

**car**  14:9,11
46:4 87:13
200:14 238:17
272:1 273:12
273:14,18
**card**  181:10
**care**  66:13
124:16,17
284:5 357:6,7
357:8,9 380:24
380:25 381:1,1
390:22
**career**  33:24
315:4
**careful**  140:21
141:11 361:23
**carroll**  91:10
**carry**  95:9
127:21 132:12
**carrying**
103:17
**carter**  225:1
**case**  34:4 125:8
126:10 127:11
146:24 147:8
153:8 164:5,8
164:20 167:24
176:3 258:25
264:5 266:2
267:4 268:11
281:21 282:7,7
282:11,11,14
282:14,15,15
283:6,6 311:14
312:13 322:24

327:25 335:4,4
335:7,10,24
336:4,6 352:21
352:22,25
353:1,25,25
354:5,5,7
360:24,24
361:3,3,10,11
362:1,1,14,14
364:3,3 366:1
366:1 368:19
370:6,6 373:7
373:8,15,15
**casey**  224:25
**cassidy**  276:25
277:2
**catch**  15:6,7
93:18 161:11
190:6
**categories**
284:16
**categorization**
381:13
**categorize**
283:20 375:23
**caucus**  15:9,10
22:1,8,14 57:5
71:18,25 72:12
72:14,17,18
73:3,8,25
74:11,13,19
83:5,6,10
115:12 140:14
141:14,16
145:20,25

186:5 227:25
228:12,25
229:1 319:23
322:8,14 402:9
402:14,15,19
403:6,7
**caucuses**  22:12
**caught**  190:5
**cause**  1:16
297:5 306:17
308:25
**cautious**
145:18
**ccr**  410:18
**cell**  90:9 129:20
130:1,3,9,16,20
130:25 132:18
166:2,23
178:19
**center**  75:10
**centered**
120:18
**centers**  55:20
390:20 391:20
393:13
**central**  247:2
**certain**  35:23
39:17 62:18,23
65:14 99:5
140:18 195:17
196:19 206:6
270:11 317:9
377:6,9 378:18
383:22

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[certificate - circumvent]**

| | | | |
|---|---|---|---|
| **certificate** | **chairman's** | **changes** 67:5 | **chico** 101:15 |
| 409:1,4 410:19 | 27:13 48:16 | 72:23 150:21 | **child** 51:13 |
| **certification** | **chairmans** | 184:5 233:7 | 61:8 150:24 |
| 409:2 | 25:18 27:10 | 280:23 408:11 | 157:24 177:23 |
| **certified** 1:18 | **chairmanship** | 411:10 413:6 | 178:6 179:14 |
| 3:6 408:2,23 | 28:2 | **changing** 149:1 | 180:16 390:22 |
| 409:5 | **chamber** 102:6 | 149:16 321:17 | **children** 25:24 |
| **certify** 409:8 | 102:7 127:22 | 392:24 | 37:1 38:25 |
| **chain** 318:10 | 132:9 | **character** | 47:11 51:10 |
| 391:12 | **chance** 23:25 | 361:1 | 59:17,21 60:7 |
| **chair** 16:21,23 | 36:23 332:4,6 | **characteristics** | 60:11,16,19 |
| 21:17,21,23 | **change** 70:5 | 282:9 | 61:6,13 63:2 |
| 22:20,21,24 | 96:2 129:7 | **characterizati...** | 66:13 84:15 |
| 23:10 24:7,8 | 146:25 147:18 | 365:23 | 92:1 233:21 |
| 24:10 26:19 | 148:2 149:3,10 | **characterize** | 235:5,6 357:8 |
| 27:18,18,23,24 | 150:10,14,16 | 393:13 | 381:1 382:2 |
| 38:7,8,19,21,24 | 152:3 157:17 | **check** 70:25 | **choice** 13:3 |
| 40:12 41:21 | 181:14 233:6,7 | 71:13 112:6,9 | 20:2 217:13 |
| 47:10,10,14,24 | 289:12 375:10 | 153:3,3 171:7 | 231:14 |
| 47:25 48:7,15 | 412:4,7,10,13 | 171:12,20 | **choose** 18:22 |
| 48:20 49:3,9 | 412:16,19 | 178:4 199:13 | 86:4 101:22 |
| 59:16 68:23,25 | **changed** 36:15 | 283:13,15 | 135:20 146:19 |
| 80:17 397:7 | 121:17 146:22 | 317:12 319:3 | 185:19,21 |
| 399:8 | 148:3,20 | 319:22 322:7 | 277:1 |
| **chaired** 68:25 | 149:10,24 | 325:23,25 | **chooses** 36:9 |
| **chairman** | 150:6,22 | 326:2,3 327:7 | **choosing** |
| 21:25 23:8,10 | 151:11,20 | 327:21 335:25 | 190:16 |
| 24:11,13,19,24 | 152:1,23 156:4 | 338:9 349:10 | **chosen** 137:10 |
| 25:2,10 26:23 | 156:18 157:17 | 378:1 389:15 | **church** 130:11 |
| 26:25 27:3,4,6 | 157:19 163:5 | **checked** 171:22 | 130:12 183:22 |
| 45:5 47:19,21 | 194:18 201:25 | 355:9 | 184:6 |
| 47:23,24 49:5 | 229:25 232:25 | **checking** | **circle** 170:6 |
| 49:12,15 53:20 | 251:9 261:9,13 | 275:23 327:6 | **circling** 171:6 |
| 70:13 72:1,2 | 308:8 | **checkout** 317:6 | **circumvent** |
| 119:14 | | | 28:14 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[cite - comment]

**cite**  356:17
**citizen**  360:3
**citizens**  90:16
  90:17 195:14
  315:2
**city**  72:9
**civil**  1:5 3:9,17
  408:4,6 409:24
**claim**  288:17
  311:17
**claimed**  129:9
**claiming**
  298:17 375:16
**claims**  305:21
  310:24
**clarify**  13:16
  24:13 40:16
  47:1 78:5
  96:13 111:18
  122:5 318:20
  391:9
**clarifying**
  341:18
**class**  178:20
  229:7 377:6,9
**clean**  306:22
  307:18 353:13
  354:16 394:11
**cleaned**  128:22
**clear**  14:24
  15:20 24:20
  103:14 191:3
  233:15 249:3
  284:11 292:11
  351:25 364:23

**clearly**  217:20
  293:11 338:13
  338:22 340:25
  343:3
**cleveland**  2:21
  7:23,24
**click**  173:22
  179:5 180:9
  192:14 201:13
  395:1
**clicking**  189:7
  241:16
**client**  8:18,20
  218:12 268:23
  307:9,11,16,17
  314:7 318:25
  335:5,24 337:8
  338:3 341:20
  363:3,4 379:9
**clients**  130:6
  154:12 173:7,8
  309:6
**clinic**  2:4,17,21
  57:6 344:6
  347:18,19,20
  348:23 350:16
  350:20 399:20
  399:25 401:1,3
  401:9,11 402:4
  402:5 403:12
  403:23
**clinics**  404:7
**clock**  219:20
**close**  220:5
  345:5

**club**  323:20
**coach**  176:19
  176:20
**code**  3:9,16
  50:4 317:9
  408:6 409:24
**cognizant**
  199:20
**cold**  11:5 98:4
**collaborative**
  105:11
**collar**  185:2
**colleagues**
  201:9
**college**  51:14
  87:1,3 399:2,5
**colleges**  62:25
  235:3
**column**  285:20
**columnist**
  292:11 293:8
  293:13
**combine**  370:6
**combined**
  168:19
**come**  17:19,25
  29:1,25 50:9
  51:17 52:2
  54:14 55:3
  56:2 62:20
  67:12 77:23
  87:7,16 89:3
  99:8 101:10
  106:7 113:10
  125:19 142:25

  169:25 179:20
  182:17 186:19
  196:2,6 197:6
  216:1 219:25
  246:20 265:22
  273:4 284:18
  289:11,11,15
  317:4 330:2
  371:11 387:1,7
  399:12 402:21
**comes**  37:5
  43:8 44:8,21
  46:1 51:22
  53:13 54:15
  56:14 78:2
  90:20 119:18
  126:16 182:23
  184:20 201:17
  232:8 289:13
  289:14 312:24
  371:13 378:13
  403:9
**coming**  25:7
  51:11 54:22
  96:3 99:25
  111:5 121:6
  131:13 141:25
  161:8 196:14
  198:22 205:18
  245:15 248:14
  263:22,23
  335:6
**comment**
  120:23,23
  124:20 270:16

**[comment - communicate]**

| | | | |
|---|---|---|---|
| 293:9 306:15 | 31:10,13 33:2 | 77:12 88:24,24 | **committees** |
| 319:8 | 37:24,25 38:8 | 89:25 90:11,14 | 16:1,25 18:13 |
| **comments** | 38:24 39:2,3,5 | 90:15,15,18,21 | 18:19,22,24 |
| 245:18 246:19 | 39:11,19,20,23 | 99:8,10,10,14 | 19:2,11,21,22 |
| 246:21 255:17 | 40:3,8,10,10,12 | 99:14 104:2 | 20:20 21:15 |
| 268:21 269:9 | 40:21,22,23,25 | 108:14 110:11 | 22:11 23:4,17 |
| 269:11 270:15 | 41:20 42:1,4,8 | 120:10 121:7 | 25:19 27:20 |
| 270:19 283:16 | 42:16,18,25 | 123:6 125:11 | 38:11,13,14 |
| 360:16,21 | 43:7,13,18,18 | 125:11 131:12 | 39:15,17,25 |
| 364:17,24,25 | 43:22 44:1,4 | 131:13 142:9 | 40:14,18 41:6 |
| 366:21 377:10 | 44:10,11,20,21 | 164:9,13 171:7 | 41:13 46:15,19 |
| 385:12 | 45:1,8,9,10,11 | 171:22,23,24 | 47:12 48:18 |
| **commerce** | 45:17,19,21,23 | 172:3,8,14,15 | 49:15 50:5,8 |
| 102:6,7 | 46:12,22 47:3 | 172:25 220:25 | 50:16 52:18 |
| **commissioner** | 47:6,9,11,17 | 221:5,12 | 54:7 55:1,5 |
| 273:16 | 48:3,5,20 49:7 | 233:24 235:6 | 59:14 61:22 |
| **commit**  87:5 | 49:8,25 50:2,9 | 237:20,22 | 63:21 64:4,5 |
| **commitment** | 50:18,22,23 | 238:4,5,8,9,9 | 69:23 89:23 |
| 244:7 335:5,24 | 51:10 52:5,7 | 238:15 240:1 | 90:22 91:1 |
| **committed**  94:3 | 52:13 53:5,8 | 243:16 244:6 | 92:4 167:15 |
| 187:9 | 54:7,13,15,17 | 246:18,21 | 221:9 235:4 |
| **committee**  16:6 | 54:23 55:2,3,4 | 247:14,15,16 | 236:14 238:24 |
| 17:5,6,14,15,16 | 55:8,22,24 | 247:17,20,22 | 239:1,4 249:16 |
| 17:17,18,19,20 | 56:1,4,6,22 | 247:24 248:21 | 250:23 251:14 |
| 17:23,25 18:2 | 57:10 59:9,16 | 249:1,11,12,15 | 263:15 264:22 |
| 20:2,9,13,17,19 | 59:19,20 60:3 | 252:24 253:8 | **common**  103:5 |
| 21:6,7,11,18,21 | 60:16,25 61:1 | 253:10,14 | **communicate** |
| 23:9,18 24:1,5 | 61:14,16,21 | 257:17 263:1,5 | 130:8,24 |
| 25:2,3,25 | 62:2,4,5,8,11 | 263:6 264:16 | 135:15 162:13 |
| 26:15 27:5,8 | 62:12,17,18,23 | 265:3,8 273:5 | 165:20,24 |
| 27:11,25 28:4 | 63:3,5,6,8,14 | 297:10,23,25 | 167:12 169:7 |
| 28:12,14 29:7 | 64:2,10 68:5,9 | 298:2,4,9,20 | 196:12 198:17 |
| 29:11,14,21 | 68:22 69:21,25 | 397:2,7,25 | 240:15,18 |
| 30:3,3,7,11,18 | 71:15 73:12 | 398:7,10,13,16 | 244:23 247:3,6 |
| 30:24 31:8,9 | 75:17,18 76:14 | 399:7 | 355:20 |

[communicated - considered]

communicated
315:4 388:7
communicates
254:23
communicating
36:8 37:8
136:6
communication
36:10 168:20
171:10 204:10
228:7 252:4
280:7 301:2
347:25 348:8
348:23 350:19
351:19,20,24
399:13,14
communicati...
19:24 30:25
168:19,20
169:13 197:13
203:24 316:24
350:2
communicative
159:7
communities
72:8
community
13:1 72:7
74:22 79:13
97:17 117:22
117:23 119:3,5
company
137:25 138:6
compare  161:1
173:18

compared
29:14 49:7
compassionate
94:14
complaint
178:14 310:25
312:13 327:20
401:14 403:11
403:15,17,21
complete  320:5
320:5 405:5
409:19 413:8
completed
411:16
completely
403:24
compliance
409:17,22
complicit
374:17 375:7
components
231:22
computer
128:10 131:18
131:19 206:24
349:8
computers
129:1
con  214:18
concern  402:17
concerned
102:9 389:22
410:9
concerning
238:23 338:2,3

361:22
concessions
274:10
concise  395:2
conclude  312:7
concluded
405:8 407:9
concluding
312:3
conclusion
232:13 379:4
concordia
91:11
condenses
394:23
conditioner
79:11
confer  24:1
48:23
conference
56:19 289:19
conferred
48:22
confidence
246:14
confirm  219:13
confirmation
15:13,14
confused  114:9
157:20
confusing
340:17
congratulate
196:21

congratulating
177:19
congress  49:1
84:21,21,22
congressional
83:10
congressman
66:21
connect  130:22
270:24
connected
174:5,6,7
connection
1:16 3:12
connectivity
268:15
consent  23:18
consequence
291:22
consequences
291:7,11
consider  28:8
30:17 32:4,5
42:13 44:1,8
45:23 46:6
65:23 77:13
84:10 85:1
103:17 297:19
298:10,14
366:23
considered
30:4 112:11
117:3 167:15
296:5

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[considering - converted]**

considering
  276:17 402:8
  403:11
considers  43:13
  363:23 364:12
constant  204:6
  260:18,18,18
constantly  45:5
  49:22 50:11
  73:24 373:23
  374:1
constituency
  32:22 36:6
  190:22 206:13
constituent
  89:12 93:21
  95:21 96:4
  107:25 109:3
  111:5 165:18
  166:16 172:13
  172:25 200:21
  200:23 201:4
  231:1
constituents
  25:14,15,16
  26:8 31:4 32:8
  32:19 36:8
  37:12,19 50:11
  51:4,21 57:20
  57:22 58:4
  59:1 87:5,8
  97:13 99:3,12
  99:17 100:1
  101:25 109:1
  110:7,10,16

111:16 112:13
118:10 130:8
135:15 136:6
154:10 158:14
194:25 196:13
197:3,6 198:11
201:21 206:11
215:10,11,13
215:15 226:3
240:15 243:5
244:7 253:2
275:19 289:11
340:1
constitution
  37:20
constitutional...
  378:12,23
consult  54:8
  101:5 103:9
  344:12
consultant
  193:20,22,23
  193:23
contact  35:7,8
  88:23 89:7
  114:12 120:25
  126:7 166:12
  166:17 179:21
  192:19,21
  197:12 201:13
  201:24 204:12
  214:25 215:1,4
  220:24 221:11
  223:21 225:14
  229:15 240:4

240:12 245:18
252:2 255:19
255:20,21
275:21 388:22
401:22
contacted
  147:9 176:25
  399:17
content  175:20
  198:3 223:10
  223:13 232:9
  245:4 262:20
  297:12 303:21
  306:5,12
  307:22,23
contents  196:2
  236:17
context  124:20
  124:21 223:14
  231:7 281:3,4
  297:8,20
  299:14 300:24
  301:1,23 366:8
  373:4,13,14,19
  380:11
continue
  159:25 160:19
  160:24 189:21
  219:16 286:19
  287:11
continued  5:1,2
  6:1,2 98:22
  209:22 258:7
  353:12

continuing
  168:10 383:7
continuously
  259:22
contractual
  409:23 410:1
contrary
  140:17 155:11
contro  271:18
control  126:23
  404:6
controversial
  271:2,5,9,13,19
  271:21,23,24
  272:1,2,6,24
  273:11,25
  274:6,15,18,20
controversy
  271:16
convened
  320:25
conversation
  58:25 147:3
  161:22,23
  167:9 178:23
  178:24 231:7
  270:13 281:9
  281:15 290:13
  290:18 296:17
  296:20 346:20
  350:7
conversations
  161:7 270:11
converted
  140:2

Page 19

**[copied - course]**

| | | | |
|---|---|---|---|
| **copied** 190:10 | 224:22 225:5,9 | 330:15 331:7 | 279:23 286:7 |
| 255:6 | 225:19,22 | 331:21 332:15 | 288:7 294:9,11 |
| **copies** 235:12 | 226:11 229:9 | 333:25 336:11 | 300:5,23,25 |
| 286:8 411:14 | 230:20,21 | 341:10 342:19 | 306:7 311:7,10 |
| **copy** 37:22 | 233:9 234:1,15 | 343:22 353:20 | 316:6 328:8 |
| 162:14 163:20 | 236:25 237:8 | 355:10 356:11 | 329:11,22,25 |
| 174:10 208:5 | 237:22 238:25 | 357:15 359:8 | 339:16 340:22 |
| 255:8 257:7 | 239:6,13 240:1 | 360:3 367:18 | 342:9 368:9 |
| 278:10 405:2,5 | 241:25 242:5 | 368:6,12,13 | **council** 91:21 |
| **corner** 189:1 | 243:4 244:22 | 369:4 370:14 | 91:22 97:18 |
| **correct** 15:22 | 251:16,24 | 372:18 374:12 | 123:21 |
| 45:13 57:16 | 253:8,14 | 374:18 375:7 | **counsel** 3:2,3,7 |
| 97:1 114:11 | 254:17 255:12 | 375:10,25 | 3:17 147:15 |
| 127:16 129:2 | 255:15 256:6 | 376:14,25 | 153:14 330:15 |
| 129:18 133:25 | 256:20 257:6 | 379:16 380:17 | 410:6,7 411:14 |
| 137:22 138:9 | 257:17 261:18 | 382:8 383:5,11 | **counseling** 14:5 |
| 139:6 140:9 | 264:17 265:11 | 385:14,25 | **count** 396:8 |
| 146:17 148:6 | 268:9 269:20 | 387:19 391:3 | **counterparts** |
| 149:13 150:8,9 | 272:14 279:10 | 393:2 394:13 | 73:22 |
| 151:21 153:9 | 285:12 287:14 | 395:16 396:20 | **country** 83:25 |
| 155:1,24 | 287:24 290:1 | 399:18 409:15 | 367:1 |
| 159:22 165:4 | 290:12 291:14 | 413:8 | **couple** 82:2 |
| 168:2,13 | 292:5,19 293:5 | **corrected** | 90:2 115:24 |
| 170:10 184:10 | 294:8,23 295:9 | 325:16 | 133:4 151:10 |
| 184:21 189:2,3 | 295:17 296:1,6 | **corrections** | 157:17 166:9 |
| 190:4,20 192:5 | 296:9 297:10 | 413:6 | 176:24 193:11 |
| 192:16,21,24 | 297:16 299:2,3 | **correctly** 40:17 | 261:10 268:20 |
| 193:17 194:14 | 300:19 301:20 | 102:23 133:13 | 268:25 288:9 |
| 194:15 199:1 | 302:1 304:9 | 334:18 346:17 | 291:9 351:2 |
| 203:4,5 208:23 | 305:1,2,8 | 350:10 372:24 | 368:24 |
| 211:17,21,24 | 310:21 312:14 | **couldn't** 231:7 | **course** 55:13 |
| 212:2,9 215:5 | 312:18 314:7 | 239:16 249:4 | 58:11 62:20 |
| 215:6 220:19 | 314:14 315:20 | 253:19 267:13 | 71:19 78:19 |
| 221:2,3,5 | 320:8 321:1 | 267:15,15,22 | 266:20 299:10 |
| 223:8,22 224:1 | 327:17 330:12 | 275:1 278:11 | 365:19 |

Page 20
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

[court - custody]

**court** 1:1,18
3:6 7:1 8:1,8
8:21,25 9:5,12
10:13 82:23
98:20 169:21
209:16,19
214:19 216:19
257:24 258:3
258:10 292:25
310:21,22
312:9 326:21
326:25 353:6
353:10 358:21
364:12,22
366:24 367:7
377:22 378:20
379:24 380:16
401:4 404:21
405:1 408:2,12
408:23 409:5
410:2
**courteous**
26:12
**courtesy** 25:18
165:18 166:13
**courtroom**
10:24
**courts** 343:14
**cover** 32:18
182:23 183:12
183:14,15,19
183:20 184:2
184:15,18
395:21

**covid** 34:7,9
81:14,22,24
89:22 91:2
92:6 206:9
**coward** 296:15
299:1,11
372:17 373:1,1
373:3,20,22
**crazy** 87:15
176:15
**create** 67:24
68:5 112:25
140:10 146:11
170:4 203:13
230:19 398:23
**created** 62:2,3
64:3 65:13,23
67:21 69:8
136:1 139:1
145:15 169:11
188:10 190:1
193:24 203:16
269:13
**creates** 170:5
203:21,23
**creating** 250:13
398:21
**credit** 286:19
287:11 288:4,6
288:11
**credits** 15:5
320:14
**cries** 60:18
61:13

**crime** 271:10
**criminal** 12:23
13:4,5 16:13
29:23 80:18
81:2 110:20,21
271:8 274:6,11
**criminalization**
390:24,25
**critic** 363:11
**critical** 393:22
**criticized** 375:9
**criticizing**
372:16
**critics** 368:5
**cross** 95:24
164:7 173:15
175:7,9 237:24
244:2
**crow** 2:7 4:3
7:12,13 9:17
9:24 10:2
75:13 76:23
77:7,11 98:22
101:1 147:4,21
147:25 168:10
170:3 209:22
214:12,23
215:3 220:12
235:14,17,23
249:9 258:7,15
267:20 268:6
287:7 310:20
323:8,13
326:23 327:5
327:12,15

329:4 330:14
330:18,23
334:16 344:13
349:5 351:17
353:3,12 357:3
358:23 366:7
366:17 367:9
369:18,25
378:25 379:5
380:18 395:10
397:20 401:6
**crux** 272:17
375:21
**cued** 180:3
**cues** 179:13
**current** 12:16
12:17 41:13
104:7 153:1
177:6 180:19
182:11 185:22
188:8 196:10
200:13 233:1
241:5,6,9
336:16 385:6
**currently** 13:15
47:5 180:22
202:20 325:24
327:10,13,17
327:22 388:3
**cursive** 251:6,8
**cursory** 141:9
266:18 311:22
335:1
**custody** 330:21
336:7

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                www.veritext.com

**[cut - decide]**

cut   66:12
   271:25 400:14
cutesy   251:12
cuts   25:23
cutting   97:22
   143:2,3 276:25
cv   1:6
cycle   273:21

**d**

d   3:16 125:22
   283:13,15
daily   5:25
   31:15 154:16
   156:2,13,15,22
   158:3,5,7
   160:15 367:17
   367:19
danger   35:16
dark   36:21
   37:3
dash   152:12
dashes   408:10
   408:14
data   147:1,7,10
   147:11 153:11
   154:23,25
   155:13,17
   208:23,25
   211:23 212:1,4
   212:7,8,13,15
   212:17,23
   213:2,5,11,16
   213:20,24
   214:7 232:21
   233:11 234:17

269:3
database   97:12
   104:13,14
   194:24 195:5
   195:11 196:3
   197:9,19 200:3
   200:23 201:2,4
   201:5,15
   225:25 387:25
databases
   198:2
date   7:2 197:3
   197:11 243:23
   300:10 320:20
   334:21 360:5
   363:13 412:24
   413:12
dated   153:25
   207:20 215:19
   222:6 224:6
   227:2 229:19
   231:17 234:23
   236:7 237:7
   238:13 240:20
   243:19 246:8
   249:20,23
   252:7 253:23
   255:24 256:6
   276:4,5 285:6
   295:15 299:23
   304:4 313:20
   316:19 358:24
   368:6 380:19
   381:18 383:15
   392:1

day   1:21 25:19
   26:11,18,18
   37:3 48:1,3,18
   49:15 50:6
   79:5,12 96:19
   108:2,3 111:14
   112:7,9 114:2
   114:23 115:10
   119:21 145:12
   146:7,7 150:24
   166:6 167:6
   173:18,22
   180:2,24 184:8
   220:1 250:4,15
   251:9,13 263:3
   263:3 271:17
   293:19 304:7,7
   322:22 352:3
   399:12 409:10
   410:10 413:15
dayne   1:5 2:2
   226:17 309:8
   309:10,11
   311:13 313:1
   315:19,21
   411:4 412:1
   413:1
days   18:1
   108:13 121:18
   242:23 411:16
de   108:21,25
dead   70:6
deadline   97:9
   195:13 206:23

deal   25:16,17
   39:14,22 84:12
   84:13,13 85:19
   90:17 117:4,5
   117:6 311:23
dealing   46:5
   111:13 142:9
   200:17,17
   221:22 271:4,7
   271:12 273:20
deals   39:20
   62:19 180:15
dealt   47:17
dear   55:7,22,25
   67:2 246:10
death   84:4
   271:4 272:23
   272:23 273:3,6
   366:19
deaths   61:6
debate   88:9,23
   278:20 324:18
debating
   280:14 324:22
december   5:7
   148:2 149:12
   246:8,9,9
   249:20
decide   13:20
   33:14 45:2
   89:19 263:16
   282:16 362:12
   369:14 372:4
   379:25

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[decided - deposition]**

| | | | |
|---|---|---|---|
| **decided** 25:7 | **definite** 377:22 | 227:25 228:24 | **depiction** |
| 31:22,24 190:3 | **definitely** 11:21 | 228:25 229:1 | 384:17 |
| 339:14 343:17 | 16:25 46:1 | **democrats** | **deponent** |
| 345:14 379:21 | 75:20 86:12 | 84:11,11 85:17 | 411:13 413:3 |
| **deciding** | 138:7 152:22 | 85:18 228:11 | **deposing** |
| 281:19 | 157:18 218:7 | 228:18 | 411:13 |
| **decision** 283:8 | 225:24 233:13 | **dems** 227:23 | **deposition** 1:15 |
| 386:9 387:4 | 238:1 239:22 | 228:3,5,10 | 3:4,12,19 7:4 |
| **decisions** 178:9 | 281:21 294:11 | **denoted** 150:21 | 10:11 11:22 |
| 178:11 254:11 | 320:4 361:13 | 408:18 | 12:4,9 138:3 |
| 254:12 | 375:2 | **denoting** | 153:23 155:16 |
| **declare** 413:4 | **definition** | 157:16 | 172:6 181:19 |
| **deductibles** | 361:10 376:25 | **department** | 182:19 188:16 |
| 46:2 | 377:3,14,15 | 35:15 39:21 | 189:5 193:9 |
| **dee** 320:13 | 379:24 | 43:8 46:2 62:3 | 194:22 207:19 |
| 322:13 | **degree** 79:8 | 62:4,5 66:22 | 210:12 213:22 |
| **deemed** 413:6 | **delay** 335:7 | 68:7 69:11,16 | 215:18 222:6 |
| **deeply** 125:7 | **delegation** | 69:17 78:1 | 224:6 227:2 |
| **defendant** 1:10 | 201:7 | 111:8 124:16 | 229:18 231:16 |
| 2:10 | **delete** 21:13 | **departments** | 234:22 238:13 |
| **defense** 3:3 | 200:4,10 | 60:10 67:6 | 239:9 240:20 |
| 12:23 13:4,5 | 245:14 246:2 | 96:17 | 243:19 248:2 |
| **defer** 54:18 | 306:11 369:3,6 | **depend** 303:3 | 249:19,23 |
| **deference** | 369:8,9 390:1 | 373:12 | 252:7 253:23 |
| 51:12,16 52:2 | **deleted** 245:10 | **depending** | 255:24 264:3,6 |
| **deficit** 13:25 | 246:4 309:4 | 39:25 169:5 | 276:1 285:5,9 |
| 14:25 25:24 | **deliver** 254:13 | 232:9 271:3,9 | 289:9 294:6 |
| 317:4,7 | **delta** 55:13 | 271:20 282:2 | 299:21 304:4 |
| **define** 280:3 | **demands** | **depends** 29:23 | 310:7 313:5,19 |
| 281:3,18 282:1 | 362:18 | 69:12 75:12 | 316:17 323:4 |
| 283:23 366:18 | **democrat** 58:8 | 197:22 200:19 | 326:7,9 333:1 |
| 377:4 | 254:11 304:17 | 200:20,20 | 353:18 358:20 |
| **defined** 161:7 | 306:4,16 | 201:10 242:11 | 359:21 363:6 |
| 281:22 408:4 | **democratic** | 271:14 373:4 | 367:6 375:13 |
| 409:23 | 22:13,14 | 373:14,19,21 | 380:15 381:17 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[deposition - direct]**

383:15 390:5
391:25 397:5
405:8 407:9
409:21
**depositions**
12:2
**depth**  380:12
**derived**  364:16
**derives**  367:25
**derogatory**
259:25 260:16
268:21 269:9
269:11 270:15
270:16,19
279:8 280:1,4
284:21,25
298:18 299:7
299:13 309:1
353:20 359:19
**describe**  32:1
44:18 238:21
390:12 392:4
398:22
**description**
117:17
**designate**
135:14
**designated**
133:19
**designs**  121:6
**desire**  67:9
398:25
**desktop**  127:15
129:1 131:18

**despicable**
304:17 306:4
306:16,16
**detail**  95:15
179:12 331:19
331:21 332:10
**details**  180:12
**determine**  29:8
67:6 107:18
191:14 330:22
**determined**
14:1
**detiege**  1:5 2:2
268:23 338:18
341:8,11,20
342:18,22
343:5,9,19
344:17 346:9
346:15 356:6,8
356:11,13
357:22 379:7
380:13 386:9
387:5,17,18,21
392:20 393:9
411:4 412:1
413:1
**detiege's**
376:18
**devastating**
14:21
**development**
25:8,12 90:15
**device**  127:24
143:1

**devices**  127:9
127:14 128:18
131:15
**dictate**  87:19
**didn't**  231:4
235:15 266:4
268:12,12,14
268:15 270:20
273:19 277:21
289:17 297:3,4
309:16 311:24
311:25 315:13
315:13 316:13
319:2,6,10,20
322:4,9,25
324:19 331:15
334:22 338:11
339:7 340:24
341:3,4,13
343:21 344:1,7
344:11 346:25
349:19,24
350:11 352:9
352:11,18
354:1 358:12
387:3 388:1
391:4 402:13
**die**  31:15
304:21
**died**  18:11
**difference**
30:23 32:2,17
32:20 52:10
62:16 63:14
206:3

**differences**
38:3
**different**  18:8,9
18:9,10 23:13
24:9 32:24
35:14 36:4,5,9
51:5 58:2
64:16,17 84:9
84:9,16 87:19
102:20 111:12
119:13 135:9
184:24 185:9
198:2 206:7,9
206:10,12
271:3 316:24
323:11 331:9
364:18
**differently**
301:13
**dings**  145:14
245:15
**direct**  96:3
147:20 148:1
160:4 166:18
185:11 194:5
226:12 237:6
245:16 255:17
263:19 277:25
291:25 292:15
295:13,14
318:9,20 360:7
363:15 364:1,6
364:23,25
365:4 375:18
376:2,16 384:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                     www.veritext.com

[direct - district]

386:2,20 395:4
396:1 399:13
399:14 410:2
**directed**   37:6
180:17,24
189:7 263:8
313:9 321:22
322:11,15
379:16
**directing**
246:20
**direction**
409:14
**directly**   143:1
166:19 331:2
333:20
**director**   2:3
15:9 57:5
115:12 140:16
186:5
**dirty**   276:15
**disabilities**
25:21 101:18
**disability**   25:17
25:17 125:19
271:24
**disagree**   155:8
309:20
**disagreeable**
88:8
**disagreeing**
324:14
**disagreement**
324:15

**discharge**
17:14
**discords**   273:2
**discourse**   408:9
**discover**   334:5
**discovered**
396:22
**discovery**
12:10 140:8,11
147:2,5,8
153:7,20 211:6
326:10 327:24
328:4,5 333:19
336:18 337:3,3
**discretion**   25:5
27:14 47:22
**discuss**   101:2
106:10 130:18
216:7,10
230:17 245:19
255:21 319:5
319:19,20,24
322:19 370:13
374:12 388:11
388:16,19
403:6
**discussed**
179:22 228:22
321:24 323:23
324:2 347:11
**discussing**   39:4
256:18 280:5
280:11 324:11
324:15 391:11

**discussion**
290:24 322:6,7
324:6 349:20
370:17
**disinterest**
78:16
**displeasure**
123:25 124:1,2
**dispute**   210:4
212:14,22
213:4,21 214:5
310:1
**disrespect**
108:9 352:22
357:5 380:22
380:24 381:5,8
**disrespected**
107:6
**disrespectful**
88:6 111:24
277:15 279:10
280:6 281:1,3
281:18,22
282:1,10,17
283:1,7,10,17
284:10,22,25
297:19 298:1
299:9,11,13
306:2 309:1
324:12 353:19
381:6,7 386:13
386:14
**disrespecting**
109:3 362:10

**distinction**
387:25
**distinctively**
340:5
**distinctly**   339:7
339:24
**distinguish**
136:23 157:22
**distinguishable**
151:1
**distracted**
145:12
**district**   1:1,2
12:19 20:24
26:7 28:25
29:1 31:16
32:11,17 33:3
33:7,13 34:9
34:15,16,19,21
34:23 35:2,18
36:4,5,10,24
50:10 56:6
58:14,18 69:1
74:12 75:21,24
76:2,6,9,9
78:12 79:7
80:1,2 81:8,14
81:17 82:4
86:5,8,14 87:8
87:21 89:23
90:13,23,24
91:1,7,14,19,20
92:1,2,10,24
97:15 101:13
103:20,22

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[district - don't]**

104:11,15
105:5 106:5
107:1,1,13,15
107:19 108:6
114:6 115:10
123:10,14,17
123:23 124:8
127:15,17
131:18 132:8
169:1,15 184:8
192:5 195:1
196:21,22
198:19 200:21
200:25 225:8
225:13,17
226:11 247:1,3
255:18 292:13
340:1 361:19
361:20 387:12
387:18,21
388:6,9
**districts**  32:10
57:24 74:7
76:10,11 80:3
102:20 191:5
**disturbance**
178:20
**diverse**  76:9,10
76:12
**divide**  215:11
**division**  1:3
**doctored**
307:25
**document**
143:20 214:4

290:20 331:6
331:15,18,21
336:8
**documents**
12:8,11 117:19
148:16 330:1
331:8 333:4
350:1 371:21
**doesn't**  261:24
285:14 295:2,4
295:22 306:23
320:10 334:4,7
334:11 339:22
351:10 377:21
377:23 393:6
394:10 399:15
403:6
**doing**  66:14
92:7 104:11
106:14 113:3
125:21 156:23
169:6 175:24
176:20 279:4
311:11 381:25
**dollar**  44:12
392:23
**dollars**  44:6
53:3 67:15
119:20 391:19
392:12 394:2
398:14
**donald**  1:7
374:12,13,15
374:16,21

**donate**  189:2,7
189:21 190:1
**donations**
222:13
**don't**  221:10
221:14 224:2
226:17 227:4
227:23 228:1
229:23 232:20
234:16 237:24
238:20 239:1
239:23 240:22
241:12,23
242:17 243:15
243:22 246:5
249:25 250:1,9
250:11,16
251:7,11,17,20
253:12 254:9
255:3,5 256:10
256:21,23
257:9 258:21
258:23 259:1,6
259:6,11,12,13
259:18,19
260:2,3,6
261:22,24
262:3,5,9,11,12
264:18,18,24
265:16 266:2
268:25 269:1,7
269:8 270:9,15
272:15 274:2
275:12 276:19
277:4 279:3,15

279:18,22
280:18,22
282:7 283:11
283:12,13,14
284:5,19,24
285:1,1 286:2
288:6,15
290:13,17,17
290:23 292:9
293:22,23,24
293:25 294:1,1
294:3,10,15
295:1,10
296:25 297:9
297:11,12,14
297:21,23,23
298:21,22
299:14 300:8
301:5 303:17
303:21 305:23
306:4,8,24
307:10 308:8
308:19 309:9,9
309:13,15,17
309:22,25
310:16 311:18
312:6,6,22
313:10,15
314:9 315:12
315:12,14,16
316:5,21
317:15,16
318:12,12,17
320:4 321:2
322:5,20

**[don't - economists]**

323:11,25
324:7,10,18
325:6,6,11,13
325:22,25
327:23 329:16
330:20,20
333:6,8 336:3
336:7 337:2,7
337:7,10,11,23
339:10,19
340:14,19
341:15,15
342:6,7 343:7
344:1,5,25
345:2,2,17,18
345:20,25
346:6,13
347:24 348:9
349:4,15,18
350:15,18
351:22 354:11
354:13,19,19
354:23,25
355:4,5,14,16
355:18,22,23
357:6,7,8,9
358:10,18
359:3,11 361:9
362:23 364:10
364:20 365:3,9
365:9,15,16,20
365:25 369:7
370:15,16,16
370:22,22,25
371:1,2,12,17

372:6,19,19,22
372:22 373:8,9
374:2,13,16,19
374:20,21
376:1,6,12,15
378:19 380:24
380:25,25
381:1,20
382:15,15
383:18,19,22
384:12 385:3,4
385:10 388:8
389:5,7,20
390:18 391:11
392:15,17
393:6,25 394:2
394:6,6 396:14
396:18 397:19
398:3,18,24
399:3 400:10
400:11,21
401:23 403:3
403:15,16
**double** 408:9
408:14
**doubt** 82:2
322:22
**downfall** 387:2
**draft** 95:17
97:7 225:7
**drafted** 244:20
287:24
**drafter** 95:14
**drafting** 96:14
96:16,17,18

119:24
**drafts** 28:5
96:16
**draw** 191:18
232:14
**dress** 184:23,25
185:1
**drew** 372:12,23
373:8,10,11
**drive** 51:22
187:3 207:1
**driver** 78:20
**drives** 58:12
**driving** 26:12
36:16 89:14
207:1
**drop** 191:25
**drove** 91:11
**drugs** 11:4 61:9
**dual** 44:24,24
44:25 53:7
**due** 387:13
408:8
**dues** 71:22
**duly** 9:15 409:8
**dumb** 266:11
281:25 352:12
357:11 375:23
379:22 380:5
381:3,13
386:16
**duncan** 118:24
**duplicates**
262:7

**duties** 23:10,11
24:9 26:21
52:6,11,11,16
64:25 72:4
206:8
**duty** 63:20

**e**

**e** 1:7 41:14,14
114:5 266:11
281:25 284:7
284:11 300:13
312:11 357:10
375:24 379:22
380:6 381:3,14
386:17 403:5
412:3,3,3
**earlier** 48:4
240:16 248:1,2
350:23 370:2
372:25
**early** 22:2
**earmark** 223:3
**earned** 277:13
278:14,15
373:16
**easier** 38:17
115:8
**east** 91:9
**easy** 16:6
**economic** 25:8
25:11 78:20
90:14
**economists**
14:24 15:5

Page 27
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[economy - emails]**

economy   15:6
ed   266:13
edit   289:18
edited   307:25
edits   96:15
edu   84:23
education
    29:17,18 38:17
    38:18 39:21
    40:11,21 41:19
    41:25 42:4,6,6
    42:12,13 45:18
    45:19 47:3
    48:2,8,20 49:7
    50:18 51:9
    57:1 62:21,22
    62:24 78:6
    80:6,17,23
    90:7 91:17
    102:10 114:24
    125:21 214:16
    221:2,21,23
    231:22 233:21
    233:23,25
    236:10,18,19
    236:23 239:3
    256:14,18,19
    257:13 314:13
    314:15 357:9
    381:2 397:1,7
    397:25 398:1,9
    398:11
educator   57:2
    151:8 178:17
    178:18 232:3

edwards   65:25
    248:23
effect   79:23
effectuate   72:5
efficient   216:12
effort   158:15
    391:24
efforts   78:9
egregious
    61:12 341:1
    345:6
eight   16:4,20
    31:19,20,21
    35:7 56:24
    214:22 263:13
eighteen
    385:12
eighth   90:2
either   20:20
    30:16 64:8
    68:1 140:19
    141:11,16
    190:7 233:19
    271:10 273:24
    293:8 339:20
    345:25 347:12
    348:25 349:16
    351:21,25
    352:2 399:7
elaborate   45:25
elected   13:11
    13:13,18 33:22
    58:25 149:17
    187:8

election   34:5,6
elective   78:11
electives   78:11
elementary
    314:12
eleven   317:2
    320:23 324:1
else's   171:1
else's   290:16
    392:15 395:1
email   19:17,24
    30:25 31:2,3
    35:1 88:1,5
    89:10 93:19,21
    93:22 95:6
    97:12 99:19
    104:12,14
    105:19 106:20
    107:16 109:23
    110:15,18,22
    110:25 114:3,6
    114:9,12,13,16
    114:16,17
    115:1,8,22
    117:10,11
    123:20 128:13
    157:1 160:18
    170:1 194:21
    194:24 195:6
    195:11 196:3,6
    196:19,24
    197:4,13 198:3
    198:18,20,22
    199:6,11,13,22
    199:23 200:5

225:16,17,25
226:14 227:18
240:7 242:2,24
244:21 247:1,4
254:20,22
257:19 265:21
274:3 280:9
316:25 330:5
331:11 335:25
338:2 347:23
348:2,9,21
349:1,2,7,10,16
350:5,11 352:1
355:21 370:12
371:13,14
388:13,22
389:8,10
emailed   195:3
    197:2 226:3
    237:25 242:7,7
    244:3 245:2
    371:6 382:14
    382:15
emails   18:17
    31:6 36:11,14
    51:7 88:3,4,14
    89:3 92:13
    93:7 107:16
    112:6,17,22,23
    112:24 113:15
    113:20,23
    114:7 115:6,16
    118:15,25
    120:3,5 128:14
    172:24 196:7

**[emails - excessive]**

199:15 201:3,5
221:16 231:5
252:25 274:1
329:23 371:10
388:15,15
389:11
**embarrassing**
277:7
**emergency**
39:10 70:8
71:6 112:10,11
112:12,13
**emotions**
187:16
**employment**
410:1
**empty**  205:16
**encompass**
34:18 91:7
**encourage**
229:14
**encouraging**
382:1
**ended**  56:23
321:16
**engage**  120:19
121:3,14 292:3
363:23
**engaged**  167:8
**engagement**
82:14 121:11
**engagements**
35:22 81:7,13
82:5

**engages**  81:16
**enjoyed**  323:1
**entail**  37:17
**entailed**  400:13
**entergy**  79:9
**entire**  16:4,6
42:1,3 75:19
75:20 152:18
219:9,9 231:3
234:18 276:11
**entirety**  24:23
70:1 76:1
154:22 231:6
307:20 325:9
**entities**  64:18
64:18
**entitled**  367:22
**entity**  64:17
403:21 409:20
**era**  13:22 27:6
**errata**  411:11
411:13,15,16
**error**  192:7
343:6
**escalate**  108:21
**escalation**
108:25
**especially**  18:7
70:20 103:18
104:11 105:23
107:25 123:5
223:14 263:15
306:13 316:10
316:25

**essentially**
242:13
**establish**  70:19
70:19
**established**
372:25
**estimate**
266:23
**ethical**  401:2
402:3
**ethically**
401:10
**evaluate**
344:23 354:7
371:15,22
**evaluating**
282:25 344:22
354:7 362:2
**event**  83:13,22
85:12 119:3,5
183:13,21
185:22 187:15
196:15,17
198:21
**events**  79:13
80:12 81:20
85:11 86:4
117:22,24
357:19
**eventually**
177:2
**everybody**
54:20 270:16
333:20 338:12

**everyone's**  36:4
76:8
**evidence**
155:11,15
210:10,12,14
210:16,21
211:8
**evidently**  347:2
**exact**  237:16
**exactly**  333:8
**examination**
4:2 10:2 98:22
168:10 209:22
258:7 353:12
**examined**  9:15
**example**  23:21
25:10 60:20
74:2,3 79:21
166:20 267:4
282:8 308:13
**examples**
123:19 207:5
282:4,5,6
290:2
**excellent**  12:14
**except**  9:20
341:8 355:16
**exception**
129:4 267:5
346:9
**exceptions**
35:11 304:21
**excessive**
362:16

**[exchange - explain]**

| | | | |
|---|---|---|---|
| **exchange** 5:13 | 199:6 230:16 | 188:16 189:5 | **exhibits** 4:9 5:2 |
| 5:18,19 276:11 | 236:6 246:9 | 191:23 193:1,3 | 6:2 333:15 |
| 276:13,14 | 257:15 265:4 | 193:4,9 194:5 | 388:21 405:6 |
| 277:20,22 | 269:17 276:4 | 194:10 201:12 | **exist** 26:17 |
| 285:10,16,17 | 295:13 305:3 | 201:14 207:19 | 210:21 |
| 286:4,18 287:3 | 305:25 337:15 | 214:13 215:18 | **expand** 190:17 |
| 287:10,23 | 384:7 | 219:12 220:18 | **expanding** |
| 288:1 290:9 | **excused** 405:7 | 222:6 224:6 | 189:13 |
| 293:21,24,25 | 407:8 | 227:2 229:18 | **expedient** |
| 313:20,22,25 | **executive** 15:9 | 231:16 232:24 | 219:21 |
| 314:9,19 | 57:5 115:12 | 233:16 234:22 | **expedited** |
| 315:15,19 | 140:15 186:5 | 235:25 237:7 | 219:11 |
| 316:18 317:15 | **exemption** | 238:13 239:9 | **expedition** |
| 320:21,24 | 195:16 198:25 | 240:20 243:19 | 288:19 |
| 321:9,23 | **exhaustive** | 246:8 249:19 | **experience** |
| 323:14,16,25 | 16:15 | 249:23 252:7 | 56:21 75:4 |
| 324:7,9,14,24 | **exhibit** 4:10,11 | 253:23 255:24 | 94:1 354:14 |
| 325:3,5,8,10,12 | 4:12,13,14,15 | 276:2 278:1 | **experienced** |
| 325:14 338:25 | 4:16,17,18,19 | 281:17 285:5,9 | 25:23 66:17 |
| 339:8 355:12 | 4:20,21,22,23 | 290:10 292:16 | 151:9 189:16 |
| 355:14 356:21 | 4:24,25 5:3,4,5 | 294:6,7 298:14 | **experiences** |
| 374:20 380:13 | 5:6,7,8,9,10,11 | 299:21 301:14 | 289:14 |
| 390:8,11,12 | 5:12,13,14,16 | 304:4,8,25 | **expert** 385:7 |
| 391:1,2,6 | 5:17,18,19,20 | 305:16 307:2 | **expertise** 29:13 |
| 393:18,20 | 5:21,22,23,24 | 313:20 316:17 | 29:21 30:1 |
| 394:1 | 6:3,4,5,6,7,8 | 318:21,24 | 56:10 74:18,20 |
| **exchanges** | 147:17 152:20 | 323:4 358:20 | **experts** 71:5 |
| 177:25 285:18 | 152:21 153:23 | 359:21 363:6 | **explain** 17:4,4 |
| 355:16 | 157:17 181:21 | 367:6,12 | 26:20 51:19 |
| **excited** 298:25 | 182:19 183:5 | 372:10 375:13 | 64:15 77:20 |
| **excluding** 3:13 | 183:15 184:12 | 380:15 381:18 | 93:16 108:8 |
| **excuse** 62:16 | 184:14,15,17 | 386:2 390:5 | 179:18 190:15 |
| 68:9 72:4,12 | 184:20,21 | 391:25 393:17 | 247:24 248:7 |
| 134:7 151:25 | 185:5,5,6,8,12 | 395:5,6,9,11 | 281:13 282:9 |
| 153:25 196:2 | 185:24 187:20 | | 283:3 289:7 |

Page 30
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[explain - familiar]**

303:8 357:12
357:17,19
366:8 376:23
377:8 379:6
**explained**
194:21 234:6
247:5 288:12
289:9 328:20
328:22 361:9
**explore**   333:21
**expose**   362:6,7
**extends**   368:3
**extensive**
194:24 388:14
**extent**   30:7
181:13 206:4,6
**extremely**
271:25
**eyed**   157:3
321:19

**f**

**f**   283:24,25
**face**   254:4
304:16
**facebook**   88:19
88:21 89:5
104:21 120:17
120:18 121:15
121:19,20,22
126:20 131:22
133:1,8,9,10,14
133:15,20,21
134:16,21,22
135:9,12,16,20
135:24,25

136:4,5,21
137:6,8 138:17
138:18,20
142:2 155:5,5
158:4 160:6,9
160:10 161:9
162:15,20,20
163:8 165:7,21
173:15,18,20
174:2,14,15,17
174:19 176:17
184:3 201:20
202:10,13,17
202:22 204:5,8
206:15,16
215:12 221:19
225:24 237:23
242:1,6,20,23
244:25 245:1,5
245:8,12,13,20
246:2 251:19
253:1 254:3,5
254:6,17,25
255:1,4,5
261:20,23
262:7 263:2
264:23 306:10
311:6 317:25
360:8 382:16
388:25 389:14
389:21 395:3
396:8,16,16
**facebook's**
135:22

**facilitating**
111:20
**fact**   63:22 64:1
151:17 247:20
283:21 293:11
360:10,14
391:22
**factors**   362:15
**facts**   260:7
310:1
**fails**   411:18
**fair**   53:16,17
154:6 181:25
188:21 189:6
193:13 208:3,9
208:20 209:23
210:2 222:21
224:16 230:2
231:23 237:13
241:20 244:12
246:22 250:7
277:19 285:25
359:12 382:4
384:10,16
392:14
**faith**   57:16
186:22 282:20
386:18,19
**fake**   122:18
260:11 261:21
267:9 268:9
269:13 275:7
336:22 338:22
339:4 340:8,25
342:3 343:3

347:2 348:2
354:9,10
389:16
**fall**   36:20,22
196:18
**false**   25:4
**familiar**   12:2
126:10,11,12
135:23 138:19
138:23 139:8
139:19 140:1,3
143:6 144:15
146:14 154:3
161:21 182:25
207:20 210:8
213:2 215:20
222:7,8,14
224:7,9,10,12
231:17,19,20
233:4,6,12,13
234:23,25
235:2,7 236:8
236:9,16 237:4
237:5,10,16
239:12 240:21
240:22 241:10
241:12 242:8
243:20,21,21
246:10,11,11
246:13,15
249:24 252:8
252:13 255:25
256:2 261:7,11
261:13 262:16
269:22 270:1

**[familiar - finance]**

285:16,17
303:9 313:21
316:10 323:14
323:22 324:2
335:18 344:2
359:1,24
380:19,21
390:8 392:5
394:13,14,15
394:16,17
396:17 401:13
**familiarity**
215:22
**familiarize**
310:7
**family** 80:23
87:2,7 162:21
172:8 182:10
182:17 183:8
184:1 217:23
234:12 264:7
271:6 288:15
288:16
**fan** 266:7 269:5
307:8 341:21
342:2 343:1
345:8 388:3
**far** 19:17 40:18
65:24 127:20
148:17 155:19
155:22 204:10
204:11 206:8
222:9,19
237:15 260:13
290:18 324:11

**farmland** 75:25
**fast** 15:7 17:22
134:25 387:1
**father** 60:23
183:23
**favor** 221:1,13
221:25 222:1
**favorable**
17:11
**favorite** 182:6
**fax** 225:15
**fear** 140:14
**february** 5:21
5:23,25 141:3
151:20 328:18
328:25 329:2
334:1 358:8,24
360:6 363:14
368:6
**fed** 314:1
**federal** 66:20
67:3,7 196:14
310:21,22
364:12 408:4
**feed** 25:25
164:11 211:16
211:20
**feedback** 125:2
125:15 164:24
168:1
**feel** 37:2,12
57:24 61:13
63:16 94:14
103:13 161:15
197:20 277:8

376:18 380:1,2
386:24
**feeling** 230:25
376:17
**felt** 14:2 186:15
191:2 345:6
372:25 377:16
380:3 382:17
386:12,13
400:20
**female** 373:11
**fence** 103:13
**fentanyl** 61:5
**fest** 196:18
**fiddling** 327:1
**field** 296:3
**fields** 48:22
**fifteen** 55:10
143:16 257:2
315:5 321:5,6
**fifth** 276:9
**fifty** 108:3
112:24 119:20
242:23 279:4
401:5
**fight** 20:23
96:11 284:19
284:19 383:7
**fighting** 226:23
226:24 314:23
375:22 403:4
**figure** 49:25
67:3 105:22
128:21 212:18
266:25 277:6

311:4,10
339:25 395:5
**figured** 166:3
262:3 329:11
**file** 4:10 79:2
94:2,6,12,16,24
96:5,8,25
147:14 401:12
401:14
**filed** 97:2
100:14 124:5
291:12,23
312:20 337:17
345:16,20,23
345:25 346:4
350:12,14,21
358:7 399:17
403:17
**files** 96:19
124:13,14
**filing** 94:10
97:5 403:11,21
**filled** 381:14
**final** 210:5
277:25
**finally** 145:17
166:6,17 177:4
180:7 193:21
200:16 222:16
**finance** 16:17
16:18 38:23
40:9,22 43:15
45:20 49:14,20
52:5 53:2,13
53:25 54:4,6

**[finance - force]**

54:14,24 55:2
55:8 398:6,8
398:13
**finances**   80:18
**financial**
409:20
**financially**
144:16
**find**   41:10
56:18 60:17
61:18 96:7,11
102:17 106:6
148:21,24
149:7,8 152:17
153:5 161:3
165:11 188:6
188:14 219:15
261:12,14
284:13 306:2,3
311:7 335:15
335:16 348:4
348:25 349:6
358:12
**finding**   63:22
64:1
**fine**   10:19
**finish**   76:22
310:13
**firm**   12:19 66:6
134:15 173:2
175:14,17,17
347:14 352:3
410:2
**first**   2:3,17,21
4:11 9:18

10:13 12:14
13:17 14:1
15:21 16:2,7
16:12 20:22
21:23,24 22:2
28:1 33:21
34:8,19 40:14
41:21 43:19
45:22 49:19,21
60:8,11 61:17
66:6,10,14
90:8 101:4
103:1 105:8
117:12 141:6
148:8,12
152:18 153:19
154:17,21
155:7,21 157:4
169:12 175:10
177:25 185:4,6
207:17 210:24
212:16,25
218:22 222:18
226:21 229:24
235:1,24
239:20 263:10
265:5 274:13
289:9 292:1
306:19 309:7
313:18 318:10
326:18 344:6
348:6 352:10
354:1 374:6
375:16,19
384:8,20

387:12,13
391:17 394:22
**firsthand**
355:15
**fiscal**   53:19
**fishing**   288:19
**fit**   50:2
**fitz**   400:9,10
**five**   23:14 24:3
36:19 57:11
81:12 94:9,10
105:24 116:22
185:7 191:7
257:22,25
264:7 267:12
267:14 345:3
396:3
**fix**   95:17
**flaming**   381:11
**flees**   40:13
**fleming**   347:13
**flighty**   275:22
**flood**   304:20
366:20
**floods**   112:21
**floor**   17:12,13
18:6 23:20
29:2 31:11,14
31:15 44:21
48:7 55:4
73:13,23 104:3
120:11 214:17
**flow**   55:1
106:19

**fluent**   72:25
**fly**   125:6
**fo**   169:2
**focus**   78:10
206:12
**foes**   19:7
**foggy**   348:10
**folder**   112:25
113:5,17 200:5
200:6,8 226:1
**folders**   113:20
216:5
**folks**   144:22
**follow**   27:2
137:19 161:21
178:2 181:7
360:18
**followed**
157:14 235:7
377:13,18,20
377:23 386:19
**followers**   226:9
396:10,15
**following**   1:17
137:1,13
139:12,17
374:5
**follows**   9:16
**foolishly**   264:6
**foolishness**
381:15
**force**   39:6 64:3
65:18,19,21
66:9 68:6,12
68:16,22 69:5

**[force - function]**

69:24 70:2,3,4
79:25
**forces** 65:7,9
65:13,14 67:20
69:5
**foregoing**
413:5
**forever** 65:16
279:17
**forget** 94:2
104:24 121:18
304:16
**forgot** 17:22
85:18 113:3
119:15 134:20
144:24 159:5
169:3
**form** 9:21 36:3
65:18 66:9
88:3 107:12
113:20 114:18
115:18 118:7
118:11 166:10
169:3 171:10
192:20 201:24
282:11 334:24
**formal** 312:23
**formalities**
3:11
**format** 409:17
**formed** 40:3
64:4,5 141:16
248:2,3 289:10
**former** 20:6
29:17,22 48:20

57:1 66:21
73:9 95:14
150:19,20
151:8 232:3
**formerly**
101:16 137:22
**forms** 36:9
**forth** 26:13
63:6,13 64:3
77:23 96:21
110:10 167:10
176:25 204:12
286:5 344:8
388:16 398:10
409:11
**forty** 32:11,12
35:7 36:17
91:16 263:13
396:3
**forum** 229:23
230:18 231:10
231:11 256:4
288:15,16
324:21
**forward** 189:22
324:17 352:19
359:24
**forwarding**
115:22
**found** 56:20
94:1 117:18
124:3 215:1,1
228:25 330:6,8
368:22 403:2
404:8

**four** 35:6 71:11
81:1,11 85:10
86:16 108:1
155:2 183:25
191:7,9 204:22
204:24 263:12
343:18 345:3
354:8
**fourteen** 257:1
**fourth** 45:19
**frame** 234:11
**francis** 374:23
**free** 55:18
56:20 145:17
146:12,12
168:22
**freedom** 122:10
404:5
**freeze** 195:15
195:17,20,21
195:22
**frequent** 169:4
171:18 174:16
202:4
**frequently**
61:22 143:25
171:21 177:12
184:5 265:17
270:6 389:2
**freret** 2:5,8,18
2:22
**friedrichsgroup**
276:20,24
277:9

**friend** 128:22
130:13,14
162:19 176:17
181:11 340:14
346:23 347:4,5
**friend's** 183:22
**friends** 14:11
15:15 105:12
148:22 154:11
175:2 181:7
182:10,16,16
183:24 184:1
338:6,8 347:7
**frivolous** 312:1
312:3,8
**front** 58:4
183:21
**frustrated**
218:6
**fulfill** 33:8
**full** 11:10,13
43:21,24 49:13
116:11,19
117:13 204:16
205:11,14,19
206:5 306:12
318:13,13
331:18 377:15
**fully** 174:23
212:25 213:7
213:19 214:3,5
224:2,11
365:18 377:7
**function**
122:16,17

Page 34

**[function - give]**

261:8,16

**fund**  229:5

399:1,6,15,25

400:21 402:4

**funded**  55:21

222:16,17

276:21 401:10

402:6 404:9

**funding**  53:13

74:3,8,9 84:14

236:10,19

256:18 398:1,3

398:5,11,20

399:4,20,24,24

400:17,19

401:1,3,3

402:4,6,22,23

403:2

**funds**  233:24

**funny**  32:4

88:18 175:4

**further**  72:15

114:20,21

178:21,22,24

222:11 269:13

344:23 361:10

**furthest**  91:13

**fussed**  336:2

**fyi**  245:8

**g**

**g**  41:14,14

114:5 300:13

**gabrielle**

307:16

**gained**  30:17

**gallery**  192:14

**game**  392:23

**gears**  257:20

299:19 396:25

**geaux**  300:13

**geauxgabrielle**

301:15 304:25

**general**  12:25

28:1 30:21

31:4 54:12

60:14 66:23

94:9,10 200:21

203:21 208:16

224:20 242:19

256:12,13,24

272:3 273:8

275:2 307:19

333:6 401:15

403:14

**generally**  17:20

17:23 19:15

25:19 28:20

31:16 34:13

35:3,13 36:14

36:17 38:11

47:25 48:12

54:3,12,23

55:16 57:4

60:3,9 65:5,13

68:6 77:23

88:1 92:9

107:20 109:9

110:8,15

112:10 117:9

117:11,24

119:4 120:22

124:12 127:21

129:25 130:6

134:11 166:11

166:15 174:25

184:1 202:6

204:4 215:14

220:16 229:10

231:20 242:18

261:25 262:6

263:13 264:22

275:18 283:19

298:23 308:6

308:10,11,16

384:24 389:25

398:6 399:6

**general's**

403:18

**gentleman**  49:1

357:23,25,25

358:1 388:2

**gentlemen**

48:25

**german**  388:2

**getting**  37:2

87:16 89:21

90:4 108:1

111:1,17

141:21 157:20

171:16 201:2,5

218:5 245:15

253:11 259:23

260:19 281:7

306:13 307:3,5

307:17 333:22

345:16 351:23

359:14 378:2

389:12

**give**  9:7 11:13

15:4 23:25

36:22 51:12,16

52:1 53:16,17

55:15,17 60:19

74:2 77:24

79:21 87:3

106:8 109:10

109:11,15,18

109:19 113:6

113:20 123:18

152:13 158:12

158:12,13

183:14 200:7

206:18,19

210:5 215:21

219:5,8 222:25

236:1 266:25

268:20 275:19

282:4,8 290:2

300:23,25

306:12 307:21

307:22 308:12

318:15 334:11

341:16 354:13

357:17,18

359:22 363:8

374:9 377:15

379:24 385:3

388:10 399:23

400:16

**[giveaway - going]**

| | | | |
|---|---|---|---|
| **giveaway** | 77:5 79:9 | 217:17 218:14 | 167:4 180:15 |
| 199:16 | 87:17,18 88:8 | 219:8 234:16 | 180:18,24 |
| **given**   11:22 | 92:2 94:7 | 242:22 245:10 | 182:21 183:5 |
| 27:15 30:23 | 95:14 96:11,20 | 245:16,21 | 186:24 |
| 81:19 83:13,24 | 97:17,18 98:6 | 247:25 248:4 | **god's**   14:13 |
| 115:19,20 | 98:10,17 99:13 | 261:11 263:2 | **godly**   254:12 |
| 117:10 124:20 | 99:19,22 | 264:10 270:14 | **goes**   26:15 |
| 125:5 128:13 | 100:22 103:21 | 270:17 273:19 | 29:16 60:13 |
| 208:15 235:16 | 110:22 113:5 | 277:15 282:21 | 62:22,23 69:22 |
| 282:5 323:15 | 115:13 118:20 | 283:19 285:14 | 88:23 95:24 |
| 359:15 362:16 | 130:23 141:6 | 286:8 288:15 | 113:2 135:4 |
| 366:25 377:22 | 143:24 144:2 | 289:18 298:24 | 161:9 175:10 |
| 388:21 413:9 | 144:11,12 | 300:4 303:5,6 | 175:11 240:13 |
| **gives**   59:8 | 145:1,2 148:17 | 306:5 308:13 | 280:4 288:11 |
| 167:25 240:3 | 153:18 154:23 | 322:9,15,25 | 288:14 373:14 |
| 255:16,18 | 155:19,22 | 325:4 328:8,25 | 381:10 394:19 |
| 263:9 385:5,6 | 157:6 162:8,11 | 335:25 337:18 | 395:1 398:5 |
| **giving**   11:10 | 167:4,9 168:8 | 338:9 339:9 | **going**   9:19 |
| 23:21 65:21 | 171:4,20 | 342:5 343:11 | 13:25 14:12,21 |
| 86:24 323:1 | 172:22 173:9 | 344:8 345:9 | 14:23,25 15:3 |
| 365:20 | 175:19 176:15 | 348:3,25 349:8 | 16:2,11,14,24 |
| **glad**   387:2 | 176:18 177:23 | 349:15,17 | 22:10 23:16,19 |
| **gleeful**   162:24 | 178:20 179:11 | 351:8,21 352:4 | 24:17 25:20 |
| **glenn**   347:7,9 | 179:21 180:7 | 353:16 356:2 | 27:24 29:8,22 |
| 347:13 352:2 | 181:16 187:14 | 358:12 361:2 | 30:21 31:5,16 |
| **gmail.com** | 193:4 195:1,15 | 362:17 371:9 | 32:15 33:1 |
| 330:5 | 195:18,21 | 371:19 376:7 | 39:25 40:5 |
| **go**   9:13 14:13 | 196:18,20 | 385:21 389:14 | 41:4 45:6 48:9 |
| 17:12 26:24 | 197:18 200:3 | 393:16 396:24 | 49:2 50:1 51:3 |
| 29:2 30:14 | 201:20 204:8 | 397:1 398:13 | 51:4,6,7,8,11 |
| 37:1 41:1,12 | 205:19 206:22 | **goal**   72:18 | 51:12 53:1,7 |
| 48:4,6 50:4,5 | 208:7,11 | 401:25 | 53:18,22 54:25 |
| 51:13 54:25 | 210:18 211:3 | **god**   9:9 11:1 | 55:14,25 56:5 |
| 55:3 60:9 61:3 | 211:18 212:21 | 15:11,18 39:13 | 61:8,18 65:15 |
| 65:15,23 71:4 | 216:3,4,13 | 76:6 144:22 | 66:12 74:8,10 |

Page 36
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company            www.veritext.com

**[going - graphic]**

| | | | |
|---|---|---|---|
| 75:9,9 76:3 | 193:8 195:13 | 324:12 325:17 | **government** |
| 78:10 81:4 | 195:18 196:4 | 329:9 338:14 | 127:14 129:15 |
| 88:24 89:15,16 | 196:18 197:17 | 343:11 348:7 | 129:19 131:15 |
| 90:7 91:5 92:5 | 197:18 198:7 | 348:22 349:2 | 132:16 160:16 |
| 92:14 96:5,6 | 198:16,18 | 349:16 351:21 | 196:14 |
| 99:7,20 100:13 | 199:17 200:3 | 352:22 353:16 | **governor** 13:23 |
| 100:21,24 | 204:11,15 | 357:2 358:19 | 222:20 224:21 |
| 101:20 102:12 | 207:17 212:20 | 359:18,20 | 248:23 254:12 |
| 102:12,16,19 | 215:17,22 | 362:5 364:6,11 | 254:21,23 |
| 103:4,20 | 216:2,3,4,11 | 364:19 371:9 | 385:22 |
| 104:16,17 | 218:6,24,25 | 373:16,23 | **governor's** |
| 105:4,5 106:5 | 222:5,23 223:9 | 375:12 378:1 | 254:5,6,16 |
| 107:5,6,11,13 | 223:9 224:5 | 380:14 383:14 | 255:1,4,9 |
| 108:5 111:19 | 228:23 230:6 | 384:24 385:8 | **gracious** |
| 115:9 118:6,12 | 231:15 232:1 | 386:2 388:15 | 230:23 |
| 120:2 121:16 | 237:3 238:6,10 | 389:19 390:4 | **grade** 90:3 |
| 123:5,7,11 | 238:12 239:8 | 394:22 396:24 | **graded** 15:17 |
| 124:2,8,14,17 | 239:21 240:14 | **good** 7:2 10:3 | 40:1 |
| 125:20,22 | 240:19 242:3 | 51:3 53:4 | **graders** 90:2 |
| 131:15 136:5 | 242:20 243:12 | 56:11 119:6 | **graduate** 75:6 |
| 139:4 147:5,14 | 243:18 249:22 | 124:6,7 177:3 | 90:5 |
| 149:9,22 150:5 | 250:24 251:15 | 201:1 234:9,10 | **grambling** 75:5 |
| 152:10,21 | 252:6 257:22 | 247:7 378:4 | **grambling's** |
| 153:22 156:9 | 264:8,13 | **google** 151:3 | 75:8 |
| 156:21 157:4 | 265:20 269:3 | 311:7 | **grant** 196:13 |
| 158:9 160:14 | 271:12 272:16 | **googled** 311:5 | **granted** 29:3 |
| 161:17 166:3 | 275:25 276:12 | 311:9 312:21 | **graphic** 5:4 6:5 |
| 166:16 167:10 | 278:17 280:9 | **googling** | 120:25 158:20 |
| 167:17 168:24 | 280:10 281:10 | 339:23 | 221:4 238:16 |
| 173:23 176:15 | 282:12,20 | **gotten** 129:8 | 238:19 239:5 |
| 178:4 179:10 | 288:25 294:5 | 130:2 165:8 | 239:10,12,15 |
| 179:15 181:4,5 | 299:5,6,18 | 348:24 352:7 | 239:25 240:6 |
| 181:18 183:7 | 304:3 305:16 | 389:7 394:14 | 246:12,13,25 |
| 188:15,17 | 310:4 316:16 | **gov.la.gov** | 247:1,4,9 |
| 189:4 191:14 | 321:18 323:3 | 254:17 | 250:2,9,12,16 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[graphic - happen]**

250:18,22,25
251:3,5,9,22,23
253:25 254:2,3
255:8,11,11,14
294:14 381:21
382:5,7,8,13
383:8,9,9,18,20
383:23 384:5
384:11,13,13
384:16,17,18
384:21,25
385:2,9
**graphics**
158:21,22,24
158:25 159:9
159:12,12,18
168:13,22,23
169:14,15,18
170:4,5 203:14
250:3,5,11,14
250:19,23
251:3 382:18
382:19
**great** 94:4
97:12 176:21
189:16,18
190:24 323:2
363:3
**greatest** 30:23
**greatly** 57:20
191:13
**green** 40:4
187:11 244:1
248:9,13,22,25
249:2

**grew** 187:10
**grocery** 37:2
289:20
**groundwork**
10:11
**group** 74:14
91:17 93:8
101:13,14,15
102:24 103:3,4
182:5 228:14
260:8 391:24
**groups** 51:5
93:4,6,15,17
95:25 96:2
271:3 286:19
287:11 289:12
289:23
**grubauer's**
388:2
**guess** 8:11 9:25
20:17 81:1
84:25 155:20
159:10 227:16
276:19 277:3
277:11 293:6
303:20 308:14
310:4 337:12
341:15 342:1
345:12 351:3
362:4 373:10
388:4 399:12
**guice** 1:19 2:12
**guidelines**
409:17

**guillory** 73:9
**guys** 44:14
168:3 329:21
333:25
**gym** 55:14

**h**

**h** 266:11
281:25 283:25
284:1,7,11
312:11 352:12
356:19 357:10
375:24 379:22
380:5 381:3,14
386:17 403:5
412:3
**habit** 180:8
**hadn't** 288:13
291:5 338:6
354:4
**half** 51:23
86:20,24 132:2
144:14,20
**halfway** 16:7
**hall** 231:12
**hallmark** 79:3
79:4
**hammonds**
1:19 2:12
**hamrick** 2:17
7:20,21
**hamsil.com**
2:14 411:2
**hand** 9:2 63:25
65:22 68:8
189:4 239:20

300:9,23
358:19
**handed** 235:12
**handful** 50:16
**handing** 193:8
**handle** 25:7
146:14,17,19
146:21 148:8
148:12,23
151:11 152:23
153:1 168:4
177:7 199:19
199:21 220:21
223:19 227:8
230:11 232:17
232:19,23,25
233:1,2,8,15
241:2,4,5,6,9
252:20 257:5
269:2,4 278:8
278:9 286:13
292:22 293:2
309:11 314:7
341:17 352:17
395:25
**handles** 106:12
157:20 233:5
**handout** 65:22
**hanging** 166:5
**hanker** 48:6
**happen** 26:15
69:13 90:9
125:5 158:6,8
180:1 187:17

**[happened - heart]**

**happened** 14:9
34:5 62:24
165:12 206:20
207:3,7 248:25
248:25 274:12
281:21 300:8
302:16 315:10
320:22,24
322:22 330:22
339:1 346:6,7
357:17,19
359:11 365:19
371:19
**happening**
160:6 207:8
241:16 243:15
262:8 297:21
389:23
**happenings**
163:2
**happens** 20:22
60:24 108:9
113:18 130:21
172:13 181:9
191:1,12
195:15 200:19
251:2 273:5
**happy** 66:10
162:24
**harassing**
367:3
**harassment**
62:22 235:9
237:17,19
363:24 366:18

366:20,25
**hard** 149:7,7
161:6 176:11
178:2
**hardest** 179:15
**hartman** 194:2
**hashtag** 261:5
**hashtags**
259:10,11,11
**hasn't** 377:22
**hate** 34:7
142:25 162:20
295:23 359:4
359:17 364:14
364:21,23
366:23 375:20
376:13,17,21
376:25 377:3
377:11,16
378:5,9,17
379:18 380:2
386:12 402:16
**haul** 66:18
**haven't** 303:24
310:3 378:19
**hayes** 2:11 4:6
8:3,4,13,17,23
9:22 74:24
76:21 77:2
97:24 98:3,7
98:11,16 168:7
209:12 214:10
216:6 217:8
218:18 219:1,6
220:2,8 235:11

235:20 267:17
268:2 287:4
310:9,12
326:11,17
327:9 328:12
330:16 333:2
348:13,17
351:5,9,15
356:23 365:22
366:13 369:15
369:22 378:21
379:2 397:14
404:15,19,23
404:24 405:4
411:1
**hb** 221:1
287:23 290:11
290:22
**he'll** 144:22,25
**head** 10:16
16:25 77:6
**heading** 65:20
**headline**
359:25 363:10
368:2 375:14
**heads** 209:5
**health** 16:3,5
16:20 38:21,22
40:21 42:17,21
43:2 47:5,15
48:2,9 49:8
56:23 62:1,4,6
62:19 66:22
80:23 114:23
200:14

**healthcare** 43:1
43:2,5,14
45:20 46:3
80:7,17 84:13
90:14 277:1
**hear** 30:19
53:21,23 71:4
71:5 120:6
244:7 249:12
255:15
**heard** 23:16
24:17 25:3
30:13,16,22
35:6 69:21
99:25 108:7
214:16 215:8
215:15
**hearing** 17:18
26:5 43:11
53:16,17 60:25
141:22 142:21
242:4 243:4,6
243:9,12
247:12,14,16
247:21 253:5
314:3 316:15
**hearings** 121:9
123:10 142:13
163:18,24
164:9,13
236:23 241:15
243:14 263:10
263:11 335:6
**heart** 55:7,22
55:25 56:3,3

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[heart - hoping]**

67:3 187:6,7
**hearts** 385:13
**heavy** 48:1
61:16 242:11
**heightened**
74:7
**heinous** 300:3
301:16 302:12
302:21 303:2,4
**held** 13:11
27:17 76:15
282:22
**hell** 357:5,6
375:23 380:22
381:11 386:17
386:18
**help** 9:9 11:1
35:3,9,9,10,10
49:16 57:6
70:18 73:1
158:17,19,21
159:8,15
189:17 190:17
191:18 193:20
244:8 382:18
**helped** 159:13
224:11 225:7
**helpful** 271:14
**helps** 119:1
230:18
**hereinbefore**
409:11
**hereto** 3:11
410:6 413:7

**hey** 54:22
99:24 104:16
130:2 131:2,11
150:25 167:8
172:10 198:14
229:2 306:20
339:6 368:19
388:11
**he's** 296:22
310:5 313:11
320:18 322:5
325:18,19
327:10,13,17
337:13 378:3
**hi** 7:17
**hidden** 249:1
**hide** 333:7
**high** 39:12 61:5
64:10,13 162:5
174:16 178:17
178:18 185:2
196:21 317:14
320:16
**higher** 78:5
158:14 236:10
236:18,19,23
398:1,11
**highest** 75:25
**highlight**
308:11
**highlighted**
325:19
**highly** 353:21
**hinges** 376:4

**hire** 311:24
**hired** 362:25
**hiring** 66:6
**history** 22:3,5
22:11,12 56:14
153:9 270:22
329:10,18
334:5,12
335:17 336:10
355:25 356:3
366:25 368:4
**hit** 13:25 34:9
53:2 81:14
140:1 141:23
142:7 143:20
143:21,22
174:5 261:14
319:9 354:3
389:19
**hits** 123:2
195:19,20
**hmm** 10:16
**hockey** 266:6,8
266:13 269:5
307:8 311:9,9
340:2 341:21
341:24,25
342:25 343:1
345:8 357:24
388:5
**hodge** 374:12
374:13,15,16
374:21
**hold** 27:19 47:1
47:2,5,8 59:10

60:4 73:10
76:14 130:2
274:2 314:3
356:22
**holistically**
63:4 387:13
**holy** 14:3
**home** 4:14
20:24 23:1
36:23 37:3
46:4 55:9,23
59:24 61:11
87:9,11,17
102:19 158:24
172:21 191:11
395:6
**homepage**
181:17 188:18
**homestead**
195:16 198:25
**honest** 95:15
139:25
**honestly** 31:11
53:11 90:5
261:21 266:5
352:10
**honor** 25:4
**hope** 53:12
346:16 350:10
401:7,19
**hopefully** 220:6
310:18
**hoping** 67:4
80:3 269:3

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                         www.veritext.com

**[hospital - hundred]**

| | | | |
|---|---|---|---|
| **hospital**   61:9 | 75:19 82:7,9 | 91:18,21,23 | 174:21 179:3 |
| **hospitals**   43:3 | 92:10 105:7 | 93:14 94:23 | 181:20,22 |
| 227:20 | 121:25 122:10 | 95:1 101:9 | 182:2 185:15 |
| **host**   226:23 | 122:25 126:19 | 102:25 104:24 | 185:20 187:19 |
| **hot**   98:4 165:15 | 126:22,23 | 107:22 108:11 | 187:21 188:3 |
| 243:25 | 141:13 144:18 | 108:23 109:12 | 189:25 191:24 |
| **hotel**   86:1 | 158:11 186:3 | 111:23 112:2 | 192:4,9,22 |
| **houchin**   294:22 | 205:18 214:17 | 115:2 116:1,20 | 193:5,10,12,15 |
| **hour**   67:16 | 220:25 221:12 | 117:14 118:11 | 193:18 194:7 |
| 91:15 | 228:5,7,16 | 118:16 120:21 | 198:24 199:2,7 |
| **hours**   35:7 | 233:23 264:23 | 122:17 124:21 | 200:11 203:15 |
| 51:23 116:23 | 274:14 288:21 | 127:1,10,12 | 206:2,16 |
| 117:21,25 | 375:1,4 | 128:5,7,20 | 225:12,20 |
| 119:20 263:13 | **hpcu**   74:8 75:3 | 129:14,23 | 243:2 244:17 |
| 311:25 313:5 | **hpcu's**   39:22 | 131:16 132:5 | 244:20 246:1 |
| 401:5 | **hpcus**   75:2 | 132:15,20 | 247:13 254:18 |
| **house**   14:2 | **huh**   9:23 10:7 | 133:16,18 | 259:9 268:10 |
| 15:22 16:1,5,6 | 10:18 19:16,25 | 134:2,9 137:23 | 281:2 287:13 |
| 16:8,13,18 | 22:16,19 23:7 | 138:1,4 139:16 | 296:7 299:22 |
| 17:1,5,7,8,10 | 23:22 24:11,15 | 143:14 144:7 | 302:8,11 307:4 |
| 17:17 18:21,25 | 28:15 29:5,10 | 145:5,24 | 318:12 324:4 |
| 19:6,12 20:18 | 30:2 32:21,23 | 146:18 147:16 | 336:12 342:13 |
| 21:8,9,13,14,22 | 34:2,5,16 | 147:19,24 | 343:23 349:23 |
| 22:1,6 23:12 | 37:16 40:19,24 | 148:7 151:13 | 355:7 358:25 |
| 23:14 24:20,22 | 41:9,22 42:3 | 151:15,18 | 359:2 360:12 |
| 24:24 25:22 | 42:15,24 45:14 | 152:2 153:10 | 363:7 372:14 |
| 27:19 28:6,8 | 45:20 50:17 | 153:12,24 | 386:22 388:18 |
| 28:13 29:17 | 52:17,20 53:8 | 154:2 156:7,14 | 396:21 |
| 31:18,24 32:2 | 57:14 62:1,15 | 157:11 159:3 | **human**   117:18 |
| 32:5,5,13,25 | 63:18 65:8 | 159:19,23 | 361:6 |
| 33:23 37:24 | 68:15 69:3 | 160:23 162:24 | **humanly**   115:4 |
| 38:4,7 39:15 | 72:10,16 74:16 | 163:12 165:1,3 | **hundred**   32:14 |
| 39:16 46:14 | 77:10 78:9 | 166:22 168:14 | 44:6,12 53:2,6 |
| 56:11,24 57:3 | 81:6 82:12 | 169:19 170:5 | 53:19 79:7 |
| 64:19,21 71:23 | 85:7 88:15 | 170:11,16,20 | 106:22,23 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                     www.veritext.com

**[hundred - includes]**

107:14,14
108:1 111:2,15
112:24 114:1
114:21 164:1
267:16 396:3
396:13 398:7
398:14
**hundreds**
315:5 371:10
**husband**  175:3
183:9,15 184:6
185:17
**hyperlink**
192:14
**hyphened**
152:11

**i**

**i.e.**  244:10
**idea**  53:4
143:12
**ideas**  69:10
125:24 126:5
**identifiable**
340:2
**identification**
268:13 388:12
**identified**
156:6 216:12
219:14 307:7
358:1
**identify**  177:4
216:14 218:8
270:20,23
328:6,16 334:8
388:6

**identifying**
266:15,16
341:23,24
**ignore**  58:16
78:21 166:15
167:5 179:15
357:1
**ignored**  61:14
**ignoring**  14:15
15:12 60:18
**image**  251:23
255:11
**immediate**
315:7
**immediately**
35:17 109:5
114:10 339:9
**imminent**
35:16
**impact**  26:22
30:21 44:3,5
44:12 49:24
60:10 74:22
80:4,6,9 92:23
99:21 100:21
100:24 102:12
102:16,19
104:17 105:5
105:15 106:5
124:9 125:20
190:24 191:17
398:3 402:19
402:20
**impacted**
402:25

**impacts**  51:14
80:2 92:23
103:22 191:1
191:13 398:5
**impeaching**
276:17
**implement**
244:8
**importance**
37:5 52:24,25
**important**  21:6
28:25 36:7
51:10,20 52:21
56:5,7 58:22
66:3 71:6
73:15,17 75:21
78:17 88:11
109:4 121:8
141:23 178:5
181:9 215:7,10
215:14 321:15
321:24
**impression**
350:6
**inability**
277:11 278:13
**inaccurate**
213:6,13,25
**inadvertently**
344:14,19
**inappropriate**
261:17 262:2
360:17,22,23
360:24,25
361:16 362:3

362:13
**inaudible**  147:3
**inbox**  137:14
161:18,19
176:16
**inboxes**  120:24
**incarcerated**
26:9 101:16
271:11
**inception**
146:23 396:5
**incest**  304:22
**incident**  61:12
248:9,10,13,22
**incidents**  123:1
**incite**  352:24
**inciting**  352:23
**include**  240:11
240:17 242:3
243:5 253:20
265:20 305:3,4
384:24
**included**
208:25 209:2
225:4,8 233:25
236:24 237:21
239:5 241:24
242:25 243:1,3
244:15,21
246:25 247:1,4
251:22 265:7
314:4 315:15
382:7 384:21
**includes**  238:24
252:1 287:16

**[includes - insurance]**

290:11 300:17 398:10
**including**  85:9 128:18 132:21 152:6 314:5 317:9 318:25 401:16
**income**  116:11 116:13
**incorporate** 123:12,15
**incorrect** 365:14
**increase**  195:19 195:20,22
**independent** 47:19,21 48:24 67:9
**independently** 403:24
**index**  4:1 5:1 6:1
**indicate**  408:10 408:14
**indigent**  55:12
**indirect**  410:2
**indiscernible** 165:12
**individual**  1:8 74:6 211:6 216:11 219:10 368:9
**individuals** 274:24

**industry**  77:16 78:3,19
**ineffective**  69:8
**inefficiencies** 69:15
**inflammatory** 353:22 389:25
**influence**  11:2 11:4 27:5,7,10 386:8 387:4
**influential**  11:5 31:8 73:4,10 73:21
**info**  268:24
**inform**  57:18 110:23 198:11 402:13
**information** 10:10 109:10 109:16,23,24 110:6 124:3 126:7 148:10 155:10 161:16 161:25 162:2,4 163:1,11,13 164:16 172:21 188:6 195:24 201:1 214:25 215:1 222:12 240:3,11 252:1 255:19 268:14 270:3 329:19 330:2,3 334:18 335:1,21,23 352:7 394:15

**informed**  104:6 104:19 252:11 252:14,23 255:15 315:2 409:19
**infrastructure** 55:16
**infrequently** 179:25
**initial**  328:5 380:3
**initially**  402:5
**initiate**  172:19 172:20
**injury**  12:24
**input**  67:5 92:3 92:11,18,21 97:10 99:1,4 105:1,4,5,13,17 105:18 106:1,9 114:3 123:12 123:15 125:11
**inquire**  400:23
**insinuating** 307:24
**instagram** 121:15 126:21 133:11,17 136:8,13,15,22 136:24 137:5,6 137:9,10,13,15 137:18 138:22 138:24,25 160:7,10 170:7 170:13,21,22

173:15,19,20 173:25 174:2 174:15,16,18 174:20 175:1 202:25 215:12 245:1 396:23
**instance**  100:11 125:4 223:1 227:15 228:17 236:15 237:18 241:14 244:4 262:9 284:5 372:5
**instances** 122:24 165:13 378:18
**instant**  15:19
**instantaneous...** 174:17
**instantly** 173:20
**institution**  78:6
**institutions** 398:2,11
**instructions** 239:25
**instrument** 220:7
**insult**  355:22
**insulting**  281:8 298:24 299:4
**insults**  280:17
**insurance**  40:7 40:25 45:11,21 45:24 46:2,3,3

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

**[insurance - issues]**

46:4,4,5,5,7,8
52:13 129:9
200:14 226:22
238:17 239:3
272:1 273:12
273:14,16,18
**intelligence**
282:18 283:2,3
**intend**  124:10
143:5 343:12
343:15 344:7
**intensely**  25:22
**interact**  121:2
176:9 179:22
358:3
**interacted**
176:21 285:23
355:25 358:4
**interaction**
86:11 286:1,3
315:8,9 343:20
343:22,24
357:13 408:9
**interactions**
176:8 309:6
313:16,18
**interest**  51:5
78:18 87:23
93:4,6,8,15
95:25 96:2
219:19 289:12
**interested**
100:15 186:1,2
186:7,8,21,23
186:25 187:4

187:12 236:18
410:8
**interesting**
177:18
**interfaces**
280:23
**interfere**  404:6
**interim**  16:9,19
16:20 40:9
43:19,20,23
49:19 63:5
**internal**  11:25
**international**
300:1
**interpretation**
365:5
**interrogatories**
127:11
**interrogatory**
127:13 128:17
203:2 328:11
329:5 336:19
**interrupt**  93:5
**intertwine**
382:25
**interview**  365:6
365:18 367:24
367:25,25
**introduce**
381:16
**introduced**
96:10
**inundate**
197:20

**inundated**
135:25
**investigate**
69:10,14 249:2
249:4 310:24
311:3,17
**investigated**
311:20,21
**investigation**
249:5 312:23
352:15
**investigator**
311:25
**invited**  85:17
179:9
**involve**  93:25
**involved**  89:11
179:17 248:20
257:1 348:24
**involves**  273:11
362:9
**involving**
313:25
**ios**  142:14
171:13
**ipad**  128:19
**iphone**  128:18
129:6
**irate**  107:3,4
**isn't**  374:25
**issue**  49:12
63:17 65:16
66:15 78:1
84:24 85:8
92:14,16,22,25

94:17 95:17
100:12 121:9
160:2,11,13
165:16 196:10
197:2 200:13
200:14,17,19
226:2 227:21
227:21 232:7
233:14 234:7
235:1,8 240:23
242:9,9,15
243:25 245:13
248:15 252:16
280:11,13,16
281:8 284:18
290:14 299:5
306:20 315:22
317:3,20,21,23
317:25 318:2,5
321:14,15
324:13 352:23
386:15 400:20
**issued**  127:14
129:15,19
131:15 132:16
160:16 224:20
**issues**  33:6
35:12 62:20
63:2,23 72:23
72:24 73:14,25
74:7,18 76:8
80:22 83:11,25
84:12 90:18
112:14 124:12
125:9 141:1

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[issues - i'm]**

145:19 193:16
193:18 195:3
199:15 230:18
237:17 249:14
272:4 273:7,23
277:16 278:20
280:5,16
284:19 298:24
299:6
**it'll** 200:4
**items** 391:3,10
391:14
**it's** 222:15,16
222:17 224:2
226:7 229:12
229:22 230:21
236:5 237:3
238:4 239:3,21
239:22 241:4
241:15,18
248:3 250:12
250:14 251:11
252:9 254:9,10
256:12,12,15
256:21,22,24
256:24 257:13
257:18 259:21
260:12 261:21
261:25 263:23
263:23 265:20
266:3 267:9,9
267:23 270:13
270:14,16
273:7,8 274:25
275:4 276:4,9

277:14,23,24
278:9 280:8,9
281:4 282:7,11
282:13 283:6,7
283:18 286:8
287:1 288:25
289:20 292:2
292:21 294:10
294:17 295:7
300:24,25
301:22 303:4,7
303:7,10,12,12
305:12,15
307:14 308:15
310:6,11,16
312:25 314:8,9
315:2,17 317:2
318:5 320:4,5
323:10,11,17
328:5 331:2
336:24 339:13
339:18 341:2
343:3,11 345:4
346:8,11
349:12 352:14
352:21,22,25
353:21,21,25
354:4,5,9,10
356:14 357:2
359:19 360:2,9
361:3,5,5,5,6
361:10 362:5
362:14,18,19
362:20 363:16
364:1,4 365:7

365:24 367:19
367:19,21,22
367:23,23,24
368:6 370:4
371:12,21
373:4,5,7,10,10
376:2,3 378:4
378:22 380:19
382:21 384:9
384:14,16,18
384:19 385:6
385:22 388:9
389:8,16 390:2
390:15 391:12
392:7,8,16
393:6,7,15
394:18,24
395:2 396:19
398:6,14,14
399:1,2,4,16
402:21 403:7
**iv** 2:11 8:4
**ix** 63:1,17
**i'd** 282:6 318:9
320:10,11
332:8 351:18
353:4 360:7
372:8 374:4
375:18 376:7
395:4
**i'll** 229:7 236:1
239:23 245:21
261:14 308:12
313:14 318:15
348:25 351:8

356:7 358:12
359:22 363:8
374:9 388:16
394:20 395:5
**i'm** 222:5,5,8
222:14,23,23
224:5,5,9,10,12
225:2,3 227:1
227:1 228:9
229:6,17,17
230:4 231:2,15
231:15,19
232:11,11
233:6,11 234:6
234:21,21
235:1,6 236:16
236:24 237:2,3
237:4,5,16
238:8,12,12,15
238:17 239:8,8
239:19 240:8
240:14,19,19
240:22 241:12
242:2,3,13,17
242:20 243:18
243:18,21
246:7,7,11,11
246:15 248:12
249:16,17,18
249:18,21
252:6,6,12
253:5,6,22,22
254:7 255:23
255:23 257:14
259:15,23

**[i'm - jargon]**

| | | | |
|---|---|---|---|
| 261:13,19,20 | 320:3,6 323:3 | 391:8,25 | 394:14 396:6,8 |
| 261:24 262:3 | 323:3 324:1,15 | 392:16,19 | 396:22 399:14 |
| 262:24 264:2,3 | 324:25 329:24 | 393:3,3 394:8 | **j** |
| 264:8 269:2 | 332:14 333:6 | 394:17,24 | **jack**  151:14,16 |
| 270:4 271:11 | 334:17 335:18 | 395:12 396:16 | **jackson**  1:8,15 |
| 273:3 275:25 | 335:19 336:4,7 | 396:17,23 | 2:10 3:5 7:5 |
| 276:1,7,7,12,14 | 337:6 341:18 | 397:10 398:18 | 8:5,7 9:1,14 |
| 276:24 279:1 | 341:18 342:11 | 399:13 400:16 | 10:6 98:23 |
| 281:5 282:12 | 343:11 344:7 | **i've**  227:13 | 115:23 150:18 |
| 282:20 285:4,4 | 346:16 348:2,7 | 229:24 234:5 | 150:23 151:3,9 |
| 285:17 286:2,7 | 348:10,22 | 235:21 239:2 | 152:8,11,17,18 |
| 288:18,25 | 349:2,16 | 242:7 247:5 | 189:13 226:18 |
| 289:15,16,17 | 350:21 351:3 | 256:25 263:7 | 230:1 232:25 |
| 290:23 291:3,6 | 351:14,21,25 | 266:2 268:17 | 258:8,16 360:1 |
| 291:20,21 | 356:3 358:3,19 | 268:19 274:23 | 363:17,21 |
| 292:10,14 | 358:19 359:18 | 277:14 278:21 | 364:11 375:15 |
| 293:18 294:5,5 | 359:20,20,24 | 279:14 282:5 | 375:20 376:10 |
| 294:9,14,19 | 361:23 363:2,3 | 283:21 287:9 | 382:8,21 |
| 295:18 299:21 | 363:3,5,5 | 288:13 290:8 | 384:22 395:19 |
| 299:25 301:21 | 364:1,10,19 | 301:22 307:12 | 395:20 409:8 |
| 301:23 302:2 | 365:9,17 367:5 | 308:5 321:5 | 411:4,5 412:1 |
| 303:4,9,9,20 | 367:5,10,14 | 323:12,15,18 | 412:2,24 413:1 |
| 304:3,3,10 | 369:7,13 371:9 | 324:20 332:11 | 413:2,4,12 |
| 305:11,12,16 | 372:3,24 | 333:11,14 | **jacksonk**  114:5 |
| 305:17,18,18 | 373:16 375:12 | 344:4 351:1 | 157:1 196:5 |
| 306:21 307:6 | 375:12 376:1 | 352:23 354:12 | **jackson'** |
| 307:19 308:3 | 377:10 378:1,2 | 354:24 355:14 | 292:19 |
| 308:18,20 | 378:16 380:14 | 359:2 362:16 | **jails**  304:20 |
| 309:13,16,16 | 380:14,21 | 365:1,1 366:3 | **january**  34:9 |
| 311:18,19,19 | 381:17,24 | 366:5,11 370:5 | 86:22 397:17 |
| 313:12,19,23 | 383:14,14 | 371:17,17 | 397:22,22 |
| 314:8 315:15 | 384:2,23 386:2 | 372:6 373:7,16 | **jargon**  147:13 |
| 315:16 316:16 | 387:6 388:14 | 373:24 374:10 | 155:4 164:5,5 |
| 316:16,25 | 389:4,22 390:4 | 376:2,3 379:11 | 331:24,25 |
| 317:24 318:1,1 | 390:4,14,15 | 388:10 389:7,7 | 332:7,13,24 |

Page 46
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[jargon - keep]**

335:3 336:5
**jay** 22:24
**jena** 410:10
**jeremy** 168:18
  169:9
**jeremy's** 169:9
**jindal** 13:22,24
  65:24,25
  222:20 288:12
  288:14 291:11
  291:23
**job** 12:16,17
  15:8 34:20
  35:25 45:8
  54:13 66:10
  67:15 86:10
  117:17 176:21
**jobs** 60:1
**jogged** 359:3
**jogs** 207:22
**join** 90:4
  196:24 197:1
**joint** 16:9,19
  21:12 38:23
  40:10,22 43:16
  45:20 49:14,20
  52:5
**joke** 175:2,3,3
  181:4
**jones** 397:23
**joy** 189:16
**jr** 285:11,13,20
  286:18 287:10
  292:3,7,16

**judge** 1:7,8
  10:24 264:4
  282:14
**judge's** 172:7
**judgment**
  302:24 303:24
  306:8
**judicial** 273:18
**judiciary** 16:21
  21:17 22:20
  25:9 26:7
  27:18 56:11,13
  80:17
**julie** 296:1
  359:7 367:20
  367:23
**july** 299:23
**jump** 61:25
  75:14 388:24
**june** 4:25 5:3
  5:16,17 6:4,5,6
  6:8 235:21,24
  236:6,7 238:13
  300:11 301:18
  301:24 304:4,9
  304:14 305:25
  306:1 380:19
  381:18 383:16
  385:22 392:1,7
**junior** 178:18
**jurisdiction**
  60:18
**jurisdictions**
  60:22

**jurisprudence**
  362:20
**jury** 10:25
**jus** 16:13
**justice** 29:23
  80:18 81:3
  110:20,21
  271:8 274:7,11
**justifiable**
  339:12,13

**k**

**k** 51:15 233:24
  283:24,25
**karen** 225:1
**katie** 2:3 7:10
**katrina** 1:8,15
  2:10 3:5 7:5
  8:7 9:14 10:6
  95:7 131:4
  150:12,16,18
  150:23 151:3,9
  151:12 152:7
  152:17,17
  189:13 230:1
  232:25 292:19
  382:7,21
  384:21 395:19
  395:20,20
  409:8 411:4,5
  412:1,2,24
  413:1,2,4,12
**katrinajack**
  150:8 152:1
**katrinajackson**
  189:10 296:14

**katrinarjackson**
  151:22 152:5
  152:24 156:4
  157:19,22
  163:5 177:2,7
  177:15 220:22
  286:6 295:21
  304:17 321:17
  386:25 395:25
**katrinarjacks...**
  188:2,22
  189:10 202:17
**katrinarjacks...**
  187:23
**keep** 89:12
  93:24 94:5
  101:20 104:6
  104:18 110:14
  110:20 143:2
  143:21 151:7
  162:12 173:23
  188:17 194:20
  195:8 197:3
  198:7,15
  201:21 204:10
  223:9 232:22
  232:23 233:14
  236:2 237:3
  252:14 255:15
  261:15 263:25
  275:13,16
  282:13 314:23
  341:11 344:3
  354:3 364:6
  373:22

Page 47
Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[keeping - know]**

| | | | |
|---|---|---|---|
| **keeping** 252:11 | 86:14,22 89:23 | 280:22 336:19 | 73:1,11,15,16 |
| 252:22 315:1 | 91:2,12 92:6 | **knock** 171:17 | 75:3,12,22 |
| 395:12 | 94:18 102:10 | **knoe** 375:21 | 76:12 77:3 |
| **keeps** 46:8 94:3 | 103:13 105:12 | 376:10,11 | 79:12,14 81:25 |
| 166:16 177:22 | 108:15 119:2 | **know** 8:12 10:9 | 85:2 87:7,18 |
| 233:11 | 142:19 145:3 | 11:17 13:19,23 | 88:4,6,9 90:5 |
| **kept** 149:1 | 151:6 152:4 | 13:24 14:17,23 | 92:8,15 93:1 |
| 166:11 177:12 | 161:24 163:13 | 15:1 17:21 | 94:4,17 95:21 |
| 279:2,5 280:20 | 166:3 171:17 | 18:1,4,8,12 | 97:4 99:6,7,8 |
| 325:17 338:12 | 175:15 181:6 | 19:6 21:4,13 | 99:11,20 |
| 338:14,15,18 | 183:10 186:6 | 23:7,18,19 | 100:16,21 |
| 339:12 342:10 | 186:15,19 | 24:2,10 25:5 | 102:7,15 103:3 |
| 357:1 | 201:10 204:12 | 26:16 27:4,11 | 103:15 104:11 |
| **kerpen** 276:14 | 212:10 216:1,2 | 27:12,13,15 | 106:25 107:2 |
| 276:23 277:6 | 236:17 238:18 | 28:21 29:15,20 | 108:2,18 110:4 |
| 278:13 | 239:2 246:14 | 30:9,9,10,11,12 | 110:6,7,8 |
| **keyword** 336:1 | 248:5 261:21 | 31:1,5,12 | 111:9,9,10 |
| **kid** 177:21 | 261:24 262:11 | 32:19 33:11,25 | 112:7 113:11 |
| 179:6,8 | 273:6 279:14 | 35:12,17 36:2 | 113:15 115:9 |
| **kids** 35:11 66:7 | 281:9 284:17 | 36:12 37:18 | 115:13 117:4,7 |
| 67:14,17 91:20 | 286:9 289:9 | 39:9,23 40:2,4 | 117:7,20 |
| 183:21,22,22 | 291:9 297:5 | 43:10 47:21 | 118:20,20,21 |
| 295:22 | 305:22 308:24 | 49:3 51:9,23 | 119:1 121:16 |
| **kill** 320:17 | 313:14 330:6,7 | 52:1 53:1,6,12 | 121:17 122:19 |
| **killed** 28:12 | 332:25 344:2 | 53:14,17,21 | 124:4,9 125:17 |
| 187:13 | 353:23 361:9 | 54:5,15,19,21 | 126:2,5,9,13,15 |
| **kind** 23:11 | 383:1 | 54:24 55:13,15 | 126:15,16 |
| 24:13 25:5 | **kjacksonlegal** | 55:18 56:15,25 | 132:2,3 133:3 |
| 28:13,24 31:1 | 330:5 | 57:2,8 58:14 | 136:14,15,17 |
| 34:12 36:6 | **kleckley** 19:5 | 58:17 59:5 | 136:20,22 |
| 37:12 48:3 | 19:10,23 | 61:2,5,8 62:1,6 | 137:2,3,12,12 |
| 53:22 58:20 | **knew** 21:5 | 66:1,4,15,24 | 137:17,17,18 |
| 63:22 67:17 | 60:20 75:11 | 67:1,5 68:13 | 137:20 138:12 |
| 76:19 77:13 | 100:20 156:9 | 69:8 70:16,18 | 138:19,25 |
| 84:15 85:21 | 248:24,24 | 70:21 72:23 | 139:1 140:7,20 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[know - known]**

| | | | |
|---|---|---|---|
| 143:7,22 144:2 | 202:24 203:1 | 285:1,1,3 | 344:1,1,5 |
| 144:17 145:5,9 | 204:9 205:3 | 288:6,9,10,16 | 345:2,4,17 |
| 145:10 146:15 | 206:25 209:2 | 288:17 289:17 | 346:13,22 |
| 146:21,24 | 210:2,6,13,16 | 291:6,15,21 | 347:24 349:15 |
| 148:13,13,16 | 210:25 213:14 | 292:7,9 293:11 | 350:15 351:14 |
| 148:18,19,25 | 215:8,10,15 | 293:17,24,25 | 354:1,11,11,19 |
| 149:1,2 150:16 | 219:11 221:10 | 294:1,1,3,3,15 | 355:1 356:2 |
| 151:4,4 152:16 | 223:4 226:17 | 294:15 295:2 | 357:2,11 |
| 152:25 153:20 | 227:24,24 | 295:10 297:9 | 365:15 369:5,7 |
| 154:12,18 | 228:2 229:2 | 297:11,12,14 | 370:3,16,18,18 |
| 155:14,14,20 | 232:20 235:15 | 297:21,23 | 370:22 371:1 |
| 157:8 158:6,14 | 236:11 237:24 | 298:21 299:14 | 371:12 372:6 |
| 160:8 161:8,18 | 238:15 239:1 | 299:18 303:17 | 372:22 374:1,3 |
| 163:4 164:6,20 | 239:21 242:18 | 303:25 304:1 | 374:13,16,19 |
| 164:21 165:9 | 243:15,22 | 305:23 306:4 | 375:20 376:1,2 |
| 165:17 166:13 | 245:13,23 | 306:21,21,22 | 376:6,13,15 |
| 169:1,9,10 | 249:14 250:6 | 306:24 307:6 | 378:19 382:15 |
| 171:4,16 172:5 | 251:11,21 | 307:10 308:19 | 385:3 387:8 |
| 172:12 173:24 | 254:19 256:25 | 309:22,25 | 388:8 389:5,6 |
| 174:16,24,24 | 257:1 258:17 | 310:18 313:11 | 389:9,12,16 |
| 175:2,9,21 | 259:6,6,11 | 314:11 316:6 | 392:15,17 |
| 176:18,23 | 260:13 261:19 | 316:15 317:16 | 393:25 394:2,2 |
| 177:20 178:4,7 | 261:23 262:11 | 318:12,12 | 394:6 397:4 |
| 178:15,19 | 262:12,16 | 320:5 321:4 | 398:18 399:3,5 |
| 179:8,14,18,19 | 264:11,14 | 322:20 323:11 | 400:13,22 |
| 181:9,12 184:4 | 265:16,16 | 324:17,18,21 | **knowing**   13:24 |
| 187:10,13 | 266:2,4 268:18 | 325:6,6,11,22 | 63:1 199:12 |
| 188:14 190:23 | 268:19 269:7 | 326:1 329:16 | 366:5 |
| 191:15 193:22 | 270:2 274:24 | 329:17 333:6,8 | **knowledge** |
| 193:24 195:19 | 275:4,5,6,21,22 | 334:6 335:20 | 30:5,17 202:1 |
| 196:9,20,22 | 277:4,22 279:3 | 336:7 337:9,10 | 208:13 222:19 |
| 197:16 199:18 | 279:18,22 | 337:10 338:9 | 342:24 355:15 |
| 200:12,15,25 | 280:18,21,22 | 339:10,19 | 403:16 409:25 |
| 201:1,10 202:3 | 281:4,12 282:6 | 341:2,3,15 | **known**   101:17 |
| 202:3,12,14,21 | 283:11,20,21 | 342:4 343:7,9 | 137:22 138:6 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company            www.veritext.com

**[known - legal]**

152:4,15
**knows** 59:6
333:23
**kschwartzma...**
2:6

**l**

**l** 3:1 41:14,14
114:5
**la.gov.** 41:14
114:5
**lady** 66:7
**lamar** 285:11
285:13,19
286:18 287:10
292:3,7,16
308:13
**lamarwhitejr**
286:5 293:20
**landing** 188:24
191:22 194:8
**landon** 2:20
7:17
**landrieu** 225:1
277:3
**landry** 66:1
**language** 95:12
95:15,22 96:1
96:2 260:1
302:5 306:1
363:23 366:9
367:3 389:25
**laptop** 127:15
127:18,19,20
127:22,23,24
128:11,15

129:1 132:9,10
132:13
**large** 50:10
99:12
**larger** 32:22
33:9
**late** 96:24
263:16
**lately** 85:3
**laugh** 373:22
392:22
**law** 2:4,8,18,22
11:23 12:18,20
12:22 36:25
56:20 57:6
66:2,6 69:20
69:22 70:5
81:24 114:9
119:21 128:25
129:3,21 130:7
132:12 134:14
134:16,20,23
135:1,1,17
142:10,11,22
143:10,11
145:14 171:24
173:2,2,4
175:14,16,17
178:18,22
186:11,18
188:10 195:16
197:21 202:7
206:7 289:16
289:17 385:7
385:16 403:23

404:7
**lawmaker**
57:15,19
**lawmakers**
126:9,18
130:24 131:6
**laws** 37:20,21
73:20 271:8
**lawsuit** 309:23
309:24 310:22
312:2,4,8,19
324:23 337:8
337:17 342:21
343:13 345:16
345:20,23,24
346:4,7,12,14
346:14,22
349:21 350:12
350:14,21
358:7,9,14,17
360:3 362:22
368:4 372:2
375:15,21
376:3 399:17
401:15 402:10
402:25
**lawyer** 10:9
273:17
**lawyers** 272:2
401:15 403:12
**lay** 10:10
**lead** 27:2
**leader** 68:21
80:22 81:2
83:6 84:19,20

84:25
**leaders** 84:1
**leadership**
21:20 22:7,9
22:14,17 23:1
23:4 27:20
38:9,11,12,20
40:8 46:11,12
46:16,23 47:1
47:2,8 59:10
64:9 71:24
76:17
**leading** 302:16
**learn** 249:7
**learned** 108:21
144:10,25
158:23 280:24
**leave** 36:21
105:16 113:19
166:4 180:22
181:2 236:5
390:21,21
**leaves** 44:20
**leaving** 48:8
90:6 186:14
**left** 78:22 171:6
186:12 330:21
341:12 402:24
408:15
**lefthand** 189:1
**legal** 107:4
172:4 173:7
264:2 376:24
377:14 379:4
411:23

**[legalization - legislature]**

| | | | |
|---|---|---|---|
| **legalization** | 121:5,8,24 | 154:15 155:24 | 402:9,18 |
| 241:17,19 | 125:23 131:7 | 156:24 157:13 | **legislatively** |
| 242:12 | 164:17 165:2 | 158:10,19 | 76:4 |
| **legally**  152:14 | 167:14,18,21 | 159:2,15,21 | **legislator**  18:20 |
| **legi**  130:7 | 168:2 172:12 | 160:1,19 162:4 | 29:11,12,20 |
| **legis**  114:5 | 178:25 204:11 | 163:17,24 | 30:4 76:5 |
| 337:15 | 220:17 232:5 | 168:12,17 | 86:10 92:24 |
| **legis.la.gov** | 236:22 252:5 | 169:13 172:4 | 103:16,25 |
| 196:5 251:16 | 255:18,22 | 176:5 178:23 | 127:6 171:11 |
| **legis.la.gov.** | 265:15 271:5 | 179:17 186:5 | 232:3 251:10 |
| 157:1 | 271:19,21 | 195:25 196:5 | **legislators**  18:4 |
| **legis.state.la....** | 286:20 287:12 | 196:11 203:16 | 29:14 74:17 |
| 215:2 | 287:24 288:24 | 203:20 204:1 | 92:21 93:17 |
| **legislation** | 295:21 296:5 | 204:15 205:1,7 | 94:25 95:7 |
| 26:22 28:5 | 301:22 317:18 | 205:12,14,24 | 103:5,9,11 |
| 33:5 43:4,12 | 317:20 320:19 | 206:5,6,8,14 | 126:13 127:2,3 |
| 43:14 46:7 | 323:22 385:14 | 207:10,13 | 127:5 214:17 |
| 53:11 63:7,8 | 385:18 398:9 | 208:18 224:21 | 214:25 215:5 |
| 63:10,13 65:13 | **legislations** | 225:14 226:12 | 227:18 229:15 |
| 67:21 68:3,6 | 122:23 | 227:19 229:8 | 233:22 234:4 |
| 68:23 69:9,17 | **legislative** | 229:12 236:13 | 251:7 |
| 73:16 78:23 | 15:10 22:3,5 | 240:4,7,8,9 | **legislature** |
| 79:2,4,5,16,21 | 33:25 56:9 | 244:19 251:4 | 13:21 15:1 |
| 80:6 86:6 | 57:4 69:10 | 252:2,4 263:3 | 26:17 29:9 |
| 89:20 90:6,7 | 71:17 72:17 | 263:4,6,8,20,21 | 30:5 32:3 73:4 |
| 90:20 92:12 | 74:13 87:23 | 264:20,21 | 73:5,6 74:14 |
| 93:20 94:19 | 89:8,10 93:7 | 265:21 271:1 | 76:5 80:10 |
| 96:22 97:10 | 105:16 106:17 | 275:20,21 | 99:16 116:10 |
| 98:24 99:2 | 107:3 114:2 | 315:4 319:23 | 117:20 123:13 |
| 103:18,19 | 115:11,12,25 | 320:25 322:21 | 140:22 143:16 |
| 104:7 105:2 | 116:3,11,14 | 349:10 382:11 | 163:3 179:24 |
| 106:10 108:1 | 117:21 118:3 | 382:22,24 | 186:13 190:25 |
| 112:17,25 | 121:1 126:6 | 383:4 389:11 | 191:20 192:16 |
| 113:9,18 114:4 | 128:8 130:18 | 398:17 401:20 | 215:9 217:21 |
| 120:7,20 121:4 | 130:25 140:14 | 401:21,23 | 217:25 228:22 |

**[legislature - little]**

230:25 263:11
274:12 296:6
317:5 321:6,15
403:1,8
**legit** 95:22
**lengthier** 323:4
**letter** 199:8
280:8 338:2,13
339:8 340:9
345:5 346:21
347:3,11,16,16
347:23 349:1
349:16 350:4,8
350:9,10 352:1
**letters** 18:18
119:6
**letting** 316:15
**let's** 235:24
313:6,17
328:15,15
366:14 369:16
388:11,16
389:4 397:13
404:10
**level** 111:25
298:3 361:14
**lever** 111:3
**lewd** 360:16,19
360:20,20,21
360:21
**lff** 292:18
**license** 111:7
**licensure** 43:4
**lie** 374:18
375:7

**life** 82:16,18,25
83:7,11,12,23
83:25 84:7,8
84:10,11,12,19
85:14,15,17,19
85:24 86:2,3
87:10 101:19
109:4,8 157:7
185:23 186:25
208:18,18
223:4 271:12
272:21 277:1,3
289:14 301:25
302:4 357:22
381:24
**lifestyle** 87:19
**lifted** 255:1
**lighter** 16:23
**lights** 79:8,10
79:11
**likely** 68:2
114:16,17
122:25 149:19
170:25 226:1
239:4,21
256:21 347:6
384:14
**likes** 385:12
**limit** 27:16
33:19 94:22
**limited** 31:23
33:15 90:3
94:12 95:10
105:25 141:12

**limits** 18:3 27:3
27:6,9,13
57:25
**line** 87:12
160:17 219:9
283:12 308:21
383:1 412:4,7
412:10,13,16
412:19
**lines** 59:7
**link** 187:23
188:13 193:6
202:5,6,13,14
202:21 223:25
224:2,2,3
233:25 236:24
237:21 241:24
242:3 243:1,9
251:16 253:20
256:20 287:16
288:8 314:4
393:1,7
**linked** 174:20
188:9,11,12,20
202:10,17,20
202:25
**links** 187:22
188:25 192:23
265:7
**list** 16:24 62:12
65:10 68:19
89:12 94:5
133:4 191:25
193:16 195:6
196:24 197:14

198:8 199:6,23
221:9 290:4,5
**listed** 67:6
319:4
**listen** 48:12
87:22 88:16
108:15 111:10
183:3 326:12
326:12
**listening** 48:10
110:3 143:2
**literally** 251:1
349:4 353:25
359:5
**litigant** 410:3,5
**litigated** 146:25
**litigating** 335:3
**litigation** 267:6
267:25 272:17
306:14 307:3,5
307:18 308:1
313:12 336:20
338:1,7 344:8
345:13 410:8
**little** 12:24
47:19,20 49:8
49:18 50:14
57:12 62:14
80:20 115:7
119:13 121:5
122:10 123:22
145:21 200:23
218:5 251:12
257:20 273:13
287:1 289:7

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                         www.veritext.com

**[little - lord]**

321:3 394:17
**live**   18:16
  87:10 91:1
  179:4 198:15
  292:13
**liveable**   67:19
**lived**   198:13
**lives**   181:8
  292:7
**living**   390:22
**llbc**   317:6
  318:7 319:3,22
  322:7,16
**llbcinfo.com**
  319:24
**llbcinfo.com.**
  319:17
**llbct**   319:22
**llp**   1:20 2:12
**lobbies**   93:7
**lobbyist**   100:22
  101:6 201:4,5
**local**   102:3,6,13
  102:24,24
  103:4,19
  248:11 320:12
**locals**   55:17
  102:11
**logged**   132:6
  132:10 207:13
**login**   115:7
  132:13
**long**   11:24
  12:20 31:17
  59:22 66:18

75:17 88:23
140:7 141:5
204:20 221:9
238:18 261:12
349:13 356:2
367:15 394:19
394:23
**longer**   45:15
129:5 150:1
205:2 305:14
308:10 364:14
386:15
**look**   14:20
16:13 36:2
45:2 49:12
53:5,8 54:16
65:21 68:13
73:5,13,17
74:18 92:14
93:8 94:7 99:9
107:9 140:12
141:1 145:13
149:6 155:20
162:8 164:10
167:11 173:10
185:11 187:3
187:14 188:24
202:22,23
203:1 209:3
211:4,6,8,13,13
211:19 212:16
212:18,25
213:19 231:3
241:7,8 249:5
274:17 281:14

294:4 295:1,4
299:16 310:4
312:4 313:4
319:7 320:11
322:15 324:17
325:3,15,18
328:8,13,15,15
330:5 331:14
331:15 332:18
332:21 338:9
352:4 359:22
362:15 363:8
364:5,18
365:17 367:10
367:22 370:8
370:17,23
373:17,17
376:8 385:22
388:20 389:20
393:16 396:24
**looked**   63:3
147:13 155:3
184:22 209:3
213:7,16
261:10 266:9
266:11 269:12
269:13 270:20
279:20 280:7
288:8 323:12
331:24 332:7
332:10,13,22
332:23,24
335:2 336:4,5
340:8 344:25
352:6,16

368:18 387:24
**looking**   32:9
49:22,23 66:19
131:4 141:7
148:21 243:10
263:25 264:1
278:10 281:13
290:19 291:6
291:21 298:14
301:14 302:5
303:5 330:9
340:3 350:23
364:19 373:6
**looks**   44:19
54:20 67:4
75:4 96:7
221:10 222:10
225:2 232:24
233:3 236:12
276:23 283:5
291:8 296:2
315:13,25
317:10 318:13
318:18 320:9
322:6 323:1
374:22 383:21
384:12,19
385:4,10,11
389:10 390:14
392:10 393:3
393:17,19
395:17
**lord**   39:18
187:24 248:15

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company          www.veritext.com

[lose - make]

lose   98:2
loss   205:11
lost   86:23
   161:22,24
lot   11:24 15:4
   19:7 27:4
   31:10,13 33:2
   33:4 35:21
   52:11,12 57:15
   75:4,6,22,23
   78:25 79:6,24
   79:24 81:15,15
   81:22 82:3
   84:4,17 85:19
   87:4 89:4
   90:16,19 99:10
   100:20 101:20
   110:15,16
   112:17 113:23
   137:17 148:25
   161:17 173:21
   174:13 175:3
   181:5,6 186:11
   186:12,14,18
   192:18 197:16
   197:21 203:8
   212:11 258:21
   259:1 275:4
   289:21 301:10
   314:15 324:25
   354:13 373:6
loud   392:22
louisiana   1:2
   1:21 2:5,9,14
   2:19,23 3:10

3:16 13:7,14
13:15 20:14
39:10,12 46:9
64:10,12 70:7
71:10 78:13,14
80:21,25 85:9
86:3 100:13,17
102:20 124:6
180:23 186:1,3
186:7,9,13,18
186:20,21,23
187:1,2,4,5,5
187:12 189:18
190:18,22
191:1,4,8,19
198:14 227:23
228:3,5,9,18
230:19 254:16
266:17 268:16
269:7 270:24
273:14 279:21
292:9,11
293:14 300:3
302:1 314:1
319:22 339:22
342:23 363:11
368:4 388:1
408:3,6 409:6
409:11,23
410:10,19
louisiana's
   189:19
louisianagov
   304:20

love   13:3 54:23
   180:17 255:14
loyalty   76:5
loyola   100:6
lunch   36:19
   48:13
lying   292:18

**m**

m   2:11,17
ma'am   10:8
   17:9
mac   128:19,20
   129:5
mad   232:11
madam   169:21
made   13:20
   72:10 83:20
   89:25 90:1
   91:20,24
   150:13,17
   152:3 156:19
   177:8 211:21
   215:25 221:22
   231:8,25 233:9
   233:13,18
   238:8,10
   239:15,19
   250:19 251:4,5
   251:8 256:11
   293:9,16
   304:24 307:15
   307:19 312:17
   317:10 328:2
   329:21,23,24
   343:6,10

346:18 358:11
371:4 381:21
382:20 383:21
383:24,25
384:1,3 404:1
413:5
madison   91:9
magistrate   1:8
main   13:2 73:1
   136:5 160:15
   163:6 191:21
   191:25 194:8
   385:6 403:24
major   32:17
   58:20 76:2
   85:15 105:4
   113:18 274:11
   317:4 387:11
majority   17:16
   28:23 58:13,18
   70:2 73:11,12
   201:15 233:23
make   24:12
   31:10,11,13,14
   36:6 37:7
   40:16,17 44:17
   46:25 67:17
   70:15 71:6
   96:15 102:22
   108:7 115:8
   116:15 122:2,4
   133:12 137:10
   143:19 148:24
   150:10 153:4,5
   156:6 171:4

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                  www.veritext.com

**[make - max]**

172:16 207:24
207:25 209:5
212:11 223:6
229:20 238:5
246:21 250:18
250:25 254:10
254:12 270:14
283:7 293:4,4
293:15 302:23
303:23 306:7
306:15 308:15
316:22 332:1
334:17 358:8
358:14 361:25
362:8,21 370:7
370:21 371:10
372:24 376:11
378:2 382:18
382:18 383:20
391:9 393:15
400:5,19 402:3
**makes**   18:5
**making**   26:3
67:15 73:6
126:11 178:9
178:11 230:5
233:12 238:20
241:12 254:1
307:24 308:22
312:10 364:8
364:10 370:23
370:25 376:5
409:21
**malpractice**
12:24

**man**   61:2 178:8
179:1
**manage**   23:15
23:17 24:17
**manages**   24:13
24:23
**managing**   24:4
**mandated**   43:9
**mandates**
138:14,22
**maneuvers**
18:3
**manner**   277:13
278:14 280:1
280:10 284:22
377:7 410:7
**march**   4:17 5:8
5:9,10,11,13
34:9 85:15
113:11,14
150:7 151:12
153:25 154:1
207:20 249:23
252:7 253:23
285:6
**marcia**   1:17 3:6
408:2 409:5
410:18
**marijuana**
241:17,19
242:12
**mark**   153:22
193:8 215:17
219:12 222:5
235:24 266:15

266:16
**marked**   191:22
236:5 367:12
**marking**
147:17 181:18
182:18 188:16
189:4 207:18
224:5 227:1
229:17 231:15
234:21 238:12
239:8 240:19
243:18 246:7
249:18 252:6
253:22 255:23
276:1 285:4
294:5 299:21
304:3 313:19
316:16 323:3
358:19 359:20
363:5 367:5
375:12 380:14
381:17 383:14
390:4
**marks**   341:23
341:24 364:16
**marriage**
162:23 182:2
183:16
**married**   86:20
162:22 180:16
183:10
**maternity**
390:21
**math**   71:10

**matriculate**
67:8
**matter**   7:11,15
7:19 25:6
28:21 29:13
30:6 40:4 44:8
44:10,20 45:7
54:3,18 56:2
57:1 59:6
61:25 62:19
88:11 99:6,23
113:1,16 125:7
135:17 168:4
187:7,11
196:11 197:8
224:9 232:2
241:13 244:1
246:16 272:9
282:3 309:23
309:24 325:15
372:2 374:19
410:3,5
**matters**   40:5
42:15 43:1
44:9 58:3
61:19 69:11
87:7,23 89:8
113:12 130:19
130:25 134:23
135:18 169:8
179:23 217:25
225:15 249:4
260:14 355:19
**max**   320:12

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[maya - member]**

| | | | |
|---|---|---|---|
| **maya**  1:5 2:2 | 380:23 381:4,7 | 142:25 143:4 | 65:1 70:10 |
| 268:22 269:7 | 394:25 | 151:1 154:5,9 | 71:4 131:2 |
| 338:18 341:8 | **meaning**  23:19 | 157:15 158:1,4 | 156:25 171:8,8 |
| 341:11,20 | 48:1 84:7 | 158:15 160:4 | 171:22,23,24 |
| 342:18,22 | 231:11 | 160:15 161:2 | 172:2 195:1 |
| 343:5,9 346:9 | **means**  10:14,22 | 162:23 163:21 | 198:10 227:25 |
| 356:5 411:4 | 16:10 43:20 | 165:6,11 | 231:12,13 |
| 412:1 413:1 | 44:5 49:20 | 169:25 170:2 | 238:16 240:1 |
| **ma'am**  225:11 | 53:14 126:4 | 181:4,5,8 | 263:1,5,7 |
| **mcclusky**  1:8 | 139:5 186:22 | 182:8 208:17 | 264:16 265:8 |
| **mckevitt** | 186:22 211:21 | 215:13 221:16 | **meets**  124:16 |
| 372:13,21,23 | 220:25 221:12 | 242:10 262:5 | **mem**  52:6 |
| 373:9 | 284:8 308:11 | 273:6 274:16 | **member**  13:6 |
| **mcmath**  49:15 | 360:20,21 | 281:20 285:15 | 16:10 20:1 |
| **mean**  16:18 | 386:18 | 293:18 356:3 | 28:24 29:2 |
| 24:4 29:12 | **meant**  187:11 | 358:15 368:11 | 32:9 35:13 |
| 35:21 53:9 | 231:13 386:14 | **medical**  12:24 | 38:19 39:4,11 |
| 55:9 58:11 | **meat**  109:2 | 43:3 | 39:12,18 41:23 |
| 62:2,5 65:24 | **mechanics** | **meet**  50:12 | 43:15,19,22,23 |
| 74:20,21 79:24 | 233:4 | 51:4 63:9 69:7 | 43:24 45:15 |
| 99:15 132:3 | **mechanisms** | 123:22 195:15 | 49:19 50:16,19 |
| 135:17 139:10 | 17:13 28:12 | 246:19 | 50:21,23 52:4 |
| 143:3 144:17 | **media**  88:16,18 | **meeting**  19:22 | 52:6 53:23 |
| 161:6 178:23 | 88:22 89:1,4 | 49:4 51:8 | 54:6 60:17 |
| 180:2 182:14 | 97:14,16 | 59:22 60:4,8 | 62:8 63:7,15 |
| 183:2 186:9 | 105:20 120:17 | 60:11 61:17 | 63:20 64:12,19 |
| 224:11 231:10 | 120:19 121:4 | 65:12 66:19 | 64:19,25 65:2 |
| 251:1 255:4 | 121:13,24 | 90:8,12 91:3 | 68:18 70:2,5 |
| 278:15 290:20 | 122:18,20,22 | 97:9 206:23 | 70:12,14,23 |
| 299:25 301:11 | 126:8,23 127:4 | 237:22 238:5 | 71:3,11,14,17 |
| 307:6 311:7 | 131:19 132:19 | 253:8,10,14,19 | 73:8 84:11 |
| 319:19 325:5,6 | 132:24 133:3,5 | 257:17 265:3 | 92:10 94:15 |
| 339:7 360:19 | 135:13 140:13 | **meetings**  19:23 | 96:19 97:6 |
| 360:23 361:8 | 140:18,24 | 23:15 24:14 | 103:21 130:11 |
| 361:17 376:1 | 141:11,13,16 | 60:2 61:15,16 | 167:7 176:15 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[member - minutes]**

201:6 228:13
247:15,18,19
249:10 322:13
397:9,11 399:8
**member's** 25:4
80:2 103:19
125:11
**members** 23:18
27:2,11 30:3,7
30:12,18,23
31:8,8 48:12
50:25 54:21
58:25 59:23,25
60:12 62:12
64:6 65:1
66:16 71:9
72:10 73:22
76:13 90:21,22
97:4 99:5,15
99:16 105:1
119:11,16
125:18 159:9
159:14 167:2
194:10 220:24
221:9,12 224:4
267:24 271:6
273:8 280:17
399:9 402:24
**membership**
71:12
**member's**
374:22
**memo** 196:9,10
**memory** 167:25
207:22 216:16

218:16,23
219:15,16
260:21 285:2,3
310:19 312:21
313:4,6,13
337:6 348:10
348:11 351:25
354:22 359:2
371:2
**men** 298:12
**mental** 43:2
**mentally**
283:11,11
**mention** 14:6
400:13 403:3,3
**mentioned** 19:3
21:16 27:17
28:4,11 38:6
46:10,25 48:19
50:15 51:16
52:4 62:7
63:12 64:8,9
65:6 67:20
68:8 74:13
78:4 80:11
88:13 93:2
115:24 118:2
119:10 122:15
126:25 133:4
136:8 137:21
137:24 145:22
164:23 166:21
168:11 173:25
184:7 194:24
198:3,21

204:16 206:14
242:8,25 268:7
272:22 273:10
274:5 279:6
289:4 307:1
344:14 347:4
353:17,17
361:12,15,15
377:18 391:17
395:14 397:4,6
**mentioning**
369:3
**merky** 200:23
**message** 108:24
109:19 136:23
136:25 137:2,3
137:14,14
161:19 276:9
276:10 291:1
**messages** 117:5
117:7 145:14
**met** 15:16
66:20
**meta** 389:24
**method** 408:12
409:13
**mfp** 231:20
232:7,9,12,13
233:24 234:6,9
234:10
**midaeros**
268:23 328:20
328:21 338:15
341:8,11,12,19
342:20,25

343:20 344:17
346:2,10,16
347:3 348:1
356:7 394:9
**middle** 13:22
14:18 335:23
360:10 363:17
368:19
**million** 391:19
392:11,22
393:11 394:1
**mind** 80:16
101:10 179:10
283:14 312:1
312:24 326:18
**mine** 37:9
129:6 235:21
238:19 278:2
325:16
**minimal** 161:1
204:11
**minimum**
73:18
**minister** 14:12
**ministry**
189:16
**minority** 19:11
73:13 74:5
76:10
**minute** 18:7
24:2,3,3 97:6
105:24,24
209:9 257:25
**minutes** 36:17
91:16 147:12

**[minutes - name]**

155:3 209:4
212:10 213:17
257:22 330:10
331:14,23
332:11,23
335:2 336:5
368:23,25
401:5
**mischaracteri...**
310:15
**misconstrued**
131:10
**misquoted**
371:5
**missed**   160:12
**misspoke**
335:15
**misstate**   342:7
**mistake**   134:24
140:2 343:10
346:3
**mistaken**   22:9
228:9 335:19
350:21 400:16
**mistakenly**
277:5 339:5
**mistreated**
35:12
**mistype**   319:21
319:25 320:2,7
**misunderstood**
326:13
**mitchell**   1:18
3:6 408:2
409:5 410:18

**mix**   56:13
135:11
**mixed**   201:3
**molested**   60:22
150:23
**mom**   264:8
**moment**   68:19
253:17 274:19
286:21 323:5
374:9
**moments**   223:4
**monday**   154:14
246:17 321:1
**money**   15:4
20:20,24 55:1
55:8,15,19
128:24 393:23
400:24
**monroe**   1:3,21
2:14 14:13
22:24 51:22
102:6 409:11
**month**   59:22
116:23 326:10
**months**   20:11
171:12 204:22
204:24
**morehouse**
21:2 75:24
91:8 196:17
**morning**   7:2
10:3 11:7
14:16 290:11
290:19,24

**morris**   22:24
**mother**   67:13
86:25 198:12
283:24 362:11
**move**   113:15,15
181:16 186:20
191:14 245:21
333:24 353:16
354:17 356:5
359:24 366:15
369:17,23
390:1 394:11
**moved**   245:9
**movement**
84:10
**moves**   28:5
**moving**   134:25
143:21 187:8
261:15 275:13
275:16 279:2,5
339:12 342:10
344:3 352:19
354:4
**multiple**
191:10 218:3
238:23 267:18
286:22 306:7
314:5 337:18
342:15,16
366:16,16
367:21 370:4,5
**mundane**
250:13
**municipalities**
33:9,12 55:11

320:17
**mute**   259:21
260:4 261:1,4
261:15 268:19
280:24,24
281:10
**muted**   259:2,2
259:5,7,10,14
259:15,17,20
259:25 260:8
260:10,15,16
260:22,24
273:24
**muting**   258:9
258:17,18,20
258:21 260:6
**mutlifaceted**
187:6
**myriad**   39:14
43:2 69:13
80:19 84:12
97:19 125:9
193:18 196:23
271:22 282:2
289:22

| **n** |
| --- |

**n**   2:13 3:1
169:24
**name**   7:7,10,13
7:17 10:5,6
60:20 71:8
96:20 101:15
110:18,22
121:17 147:18
148:2,3 149:3

**[name - night]**

| | | | |
|---|---|---|---|
| 149:10,11 | **nearing** 140:19 | **negotiating** | **new** 2:5,9,19,23 |
| 150:6 151:17 | **necessary** | 18:8,10 | 14:25 27:2 |
| 152:13,19 | 413:6 | **negotiation** | 33:10 70:17 |
| 157:16 169:9 | **need** 10:3,15 | 18:11 | 77:22 81:21 |
| 169:22 177:2 | 11:16 17:21 | **negotiations** | 82:24 83:3,4 |
| 220:18 223:16 | 24:1 35:2 | 18:7 20:10 | 85:15,22,23 |
| 230:1,8 232:15 | 36:25 53:15 | **nephew** 86:18 | 100:5 125:8 |
| 233:14 240:24 | 61:19 63:3 | 144:13 176:7 | 128:23 129:8 |
| 268:12 277:16 | 67:3 70:19 | 183:24 378:3 | 142:3 159:8 |
| 280:6 281:6,7 | 100:19 104:1 | **nephews** 187:1 | 191:8 314:3 |
| 284:17 285:21 | 109:24 135:15 | 361:21 | 321:15 397:10 |
| 285:24 298:25 | 143:10,11,20 | **network** 39:10 | 397:12 |
| 341:13 344:25 | 152:12 157:6 | 70:8,21 | **newer** 160:7 |
| 353:20 375:9 | 171:4 187:25 | **networks** 39:9 | **newest** 138:23 |
| 388:10 | 188:8 197:16 | **never** 22:8 | 139:1 185:8,22 |
| **named** 150:23 | 204:8,13 209:8 | 58:11 60:20 | **newly** 180:15 |
| 285:11 333:18 | 264:10 292:24 | 67:12 73:16 | **newsletter** |
| **names** 148:20 | 342:11 377:2 | 75:7 105:9 | 194:11 195:6,7 |
| 151:6 168:16 | 389:15,16 | 122:19 126:12 | 195:24 196:1 |
| 260:23 408:16 | 395:5 405:5 | 128:21 135:11 | 199:4,5 |
| **narrow** 26:2 | **needed** 53:12 | 138:20 146:10 | **newsletters** |
| 94:8,13 107:1 | 70:5,20 124:11 | 157:14 161:8 | 194:16,20 |
| **nation** 364:12 | 136:6 147:10 | 166:3 170:25 | **newspaper** |
| **national** 83:11 | 155:15 210:13 | 172:13 178:12 | 5:22 |
| 84:1,18,20,25 | 226:21 | 179:10 183:3 | **nice** 98:6,8,15 |
| 85:14 | **needs** 36:4 | 270:13 288:13 | **niece** 87:1,2 |
| **nationalrightt...** | 49:16 60:13 | 302:18 304:16 | 88:19 142:6 |
| 287:17 288:4 | 71:5 72:21 | 306:21 307:12 | 143:8 144:1,11 |
| **nature** 26:10 | 76:11 87:19 | 308:14 312:9 | 144:21 |
| 67:11 102:4,6 | 157:7 206:11 | 343:5 349:19 | **nieces** 187:1 |
| 130:17 195:25 | 206:22 362:1 | 355:9,24 | 361:20 |
| 248:11 298:19 | **negative** 155:9 | 370:19 371:12 | **night** 14:2,15 |
| 408:8 | **negatively** | 371:17 372:7 | 14:19 15:11 |
| **near** 55:6,22,25 | 402:25 | 394:21 403:9 | 87:17 113:19 |
| 67:2 206:24 | | | 115:7 166:5,6 |

Page 59
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company          www.veritext.com

**[night - odds]**

177:24,24
178:10 179:4
**nine** 97:4
116:16 401:5
**ninety** 32:14
**noah** 1:19 2:12
**noel** 347:10
**non** 39:2 64:18
70:11,23,25
71:12 81:23
90:17 118:11
390:24
**nonfinancial**
53:24
**nonvoting**
39:12
**noon** 154:14
**normal** 311:11
**normally**
306:18
**north** 1:20
**northeast**
20:14 78:12,14
189:18 190:18
190:22 191:1,3
191:8,15,19
201:6
**notary** 413:13
413:19
**note** 44:5 53:19
120:11 411:10
**notebook**
283:12
**noted** 413:7

**notes** 110:14
351:22
**notice** 3:8
60:25 216:10
263:9 264:19
345:9
**noticed** 60:17
**notices** 263:22
264:16,18,25
**notification**
122:9 142:24
176:13 259:24
259:24
**notifications**
122:14 126:2
141:22,24
142:5,8,12,17
142:25 143:4
144:9,13,24
145:1,4,11
171:14,16
180:5 245:22
260:19
**notifies** 154:11
154:12
**notify** 154:9
**notifying**
121:12
**november** 4:22
5:12 229:19
276:5
**number** 20:14
21:10 23:23,24
43:6 61:5 67:6
73:18 78:3,19

85:6 95:10
99:12,22 110:8
148:23,23
178:3,5 185:3
195:12 196:17
200:5 225:8,13
235:9 240:8
244:21 247:5
265:21 268:21
268:25 269:12
269:12 285:18
285:19 287:22
289:5 297:7
302:18 303:3
318:24 328:6
328:11 333:11
336:19 342:2
342:14,17
343:17 345:15
349:22,25
388:21,23
**numbers** 200:9
**nurse** 105:8,10
123:4
**nursing** 43:5

**o**

**o** 3:1
**o'clock** 36:19
**oath** 10:21
37:15,17,18,22
**obama.'** 276:18
**obedience**
15:18,19
**object** 351:6
365:23 379:3

**objection**
214:11 217:10
267:18 268:3
310:10,13
366:14 369:16
369:23
**objections** 3:18
4:5 9:19,20
351:13
**objects** 43:10
**obligated** 87:8
**obtain** 46:12
**obvious** 25:15
74:21
**obviously**
218:24
**occasionally**
101:5 130:18
159:15,19
162:1,18 163:9
163:10 164:23
246:2
**occur** 249:14
**occurred** 304:2
370:20
**occurrence**
18:5
**october** 5:18
60:8 70:11
243:23 313:20
410:10 411:3
**odd** 94:8,11,12
95:9 401:10
**odds** 105:13

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[offensive - okay]**

| | | | |
|---|---|---|---|
| **offensive** 284:4 | 146:2 154:15 | **officer** 248:18 | 248:6 287:8 |
| 302:13,22 | 156:1,12,20,22 | 408:3 409:6 | 343:10 344:6 |
| 303:2 363:22 | 157:7,16,25 | **offices** 13:13 | 361:25 373:2 |
| 364:4 366:9 | 159:7 160:5,17 | **official** 1:8 | 385:17 396:3 |
| 367:3 369:4,9 | 163:7 165:17 | 114:6 121:19 | 404:3,9 |
| 369:14,19 | 165:24 166:4 | 121:21,22 | **okay** 8:2,9,22 |
| 373:2,3,20 | 166:12,17,19 | 161:4 183:16 | 9:13 11:6,20 |
| 377:10 | 167:12,13 | 228:4,6,8,8,11 | 12:1,3,8 13:6 |
| **offer** 70:3 | 168:20,21 | 228:13,15,18 | 16:16 17:4 |
| 377:10 400:18 | 169:13,15 | 263:6,9 264:19 | 18:14,20 19:2 |
| **offered** 84:14 | 172:7 178:3,22 | 264:24 318:8 | 19:19 20:3,8 |
| **offering** 217:9 | 178:24 179:9 | 319:17 | 20:12 21:16 |
| **office** 1:19 | 179:21 180:14 | **officially** | 22:15 23:3,6,8 |
| 13:11,20 14:14 | 181:3 182:15 | 126:21 | 24:6,9,12 |
| 36:11,14,25 | 183:4 186:18 | **officials** 399:18 | 26:19 28:4 |
| 37:6,7,10,11,15 | 188:10 193:17 | 400:6 | 29:4,25 31:7 |
| 41:18 66:11 | 194:12 202:7 | **ogb** 224:22 | 31:17 32:1 |
| 79:5 88:2,23 | 203:24 204:13 | 226:2,22,24 | 33:17,21 34:3 |
| 89:2,4,8,13 | 205:10,16 | **oh** 11:21 18:15 | 34:12 38:3,14 |
| 93:21,23,23 | 206:7 225:8,13 | 68:1 76:24 | 40:16 41:5,19 |
| 94:3 106:10,12 | 226:11 238:7 | 78:19 83:15 | 42:4,9,13,16,23 |
| 107:4,4 112:15 | 238:11 240:4 | 85:5 91:22 | 44:18 45:9,15 |
| 112:16 113:2 | 240:10,12,14 | 92:3 104:24 | 45:21,25 46:10 |
| 114:6,9 115:10 | 244:19,21,23 | 109:20 116:24 | 47:14 48:14,19 |
| 117:22 121:1 | 245:17,19 | 132:10 141:2 | 49:11 50:15,25 |
| 127:15,17 | 247:3 252:2,4 | 144:21 150:16 | 51:16 52:4,13 |
| 128:24 129:1,3 | 255:19 263:20 | 150:25 151:10 | 52:18 54:6,11 |
| 129:21 130:4,6 | 264:4 265:21 | 167:4 177:23 | 57:12 59:13,13 |
| 130:7,21,23 | 275:20,22 | 180:8 182:6,20 | 62:7 64:4,15 |
| 131:17,18 | 321:22 330:22 | 183:18 192:8 | 65:3 67:20,23 |
| 132:8,10,12 | 347:7,10,12,15 | 193:21 200:24 | 68:8,16,21 |
| 134:16,20,23 | 349:9,17 | 214:24 216:22 | 69:2 70:7 71:2 |
| 135:1,2,11,17 | 401:20,21,24 | 217:5 222:8 | 72:8,12 77:17 |
| 142:10,11,22 | 403:18 | 226:17 235:15 | 78:4,8,22 |
| 143:11 145:14 | | 235:21 246:10 | 79:16 81:10 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[okay - ouachita]**

82:17,22 83:1
83:2,16,19,21
84:6,18 85:4
86:2,4 87:22
88:7,13 89:18
92:3 93:2
94:20 95:11,20
96:13,23 97:20
98:25 99:15,18
100:2 101:21
102:1,5 107:21
108:7 109:9
111:18 112:15
114:7 116:7,18
117:1,12
118:12,22
120:1,4 121:2
121:23 122:4
127:23 128:1,6
128:25 129:10
129:13,22
132:14 133:2
133:12,21
134:7,17,19
137:7 138:16
139:4 140:10
144:6 145:3,7
146:3,9 147:7
147:14 149:10
149:24 150:13
162:17 163:23
167:14 170:6
171:6 172:18
173:25 174:7
174:19 185:11

188:15 192:2
192:10 193:4
194:5,9,23
198:2 209:11
209:13,20
217:17 220:11
236:1,4 237:6
239:11 248:9
258:4 272:4
276:12 284:3
284:15 285:9
287:9 291:2,25
292:22 299:20
309:5 313:17
317:23 320:11
323:12 324:3,5
326:16 327:4
330:11 338:24
343:16 354:16
356:8,9 357:12
359:24 363:9
365:20 367:13
374:8 376:18
377:24 378:3
379:14 380:7,8
380:12 381:16
382:21 383:1
385:17,24
386:4,20 390:7
391:14 394:11
395:12 396:25
397:21,25
404:3,10
**old**   12:5 14:17
18:1 60:21

73:5 86:18
127:19 144:22
164:10 176:20
180:16 228:19
**older**   88:20,20
**once**   82:8 83:5
84:22 90:1
114:18 119:3
120:15 134:25
161:12 162:4
195:20 270:21
279:4 280:23
330:21 337:18
340:18 342:15
394:18,22
402:22
**ones**   133:6
143:5 159:4
216:11 268:11
316:14
**open**   31:25
33:16,20 36:18
36:18 122:21
135:7 173:23
229:22 230:18
231:10,11
**operates**   72:14
73:3 403:23
**opinion**   26:25
27:1 67:11
103:25 224:20
322:3,4,10,10
322:12,17
**opinions**
135:19 323:2

**opportunity**
216:7 331:20
332:3,18
**opposed**   95:8
184:16,17
185:9
**option**   174:1
**order**   188:17
205:21 224:1
245:12 286:25
287:1 329:6,15
343:14 371:6
395:12
**organization**
85:14,16 102:9
**organizations**
39:8 96:14
100:3 101:8,24
102:1,18 290:3
290:6
**oriented**   87:2
**original**   251:3
315:14 316:8
316:12 318:18
409:3,4
**originally**   20:9
312:20
**originates**
17:10
**orleans**   2:5,9
2:19,23 33:10
85:22,23 100:5
191:8
**ouachita**   21:1
91:8 360:2

**[page - people]**

390:2,3 391:8
391:18 392:10
393:2 395:7,16
396:5 408:1
412:4,7,10,13
412:16,19
**pages** 134:4,4
135:10 184:3
193:11 202:7
212:21 215:19
223:11 228:15
252:15 261:21
286:22 288:9
361:18,23,24
403:4
**paid** 55:17
71:22 390:20
390:21
**pair** 386:8
**panel** 83:9
**paper** 279:22
**papers** 367:22
**paragraph**
360:9,13
363:16,20
372:12 374:5,7
375:18 376:10
384:5
**paragraphs**
374:5,11,11
**parcel** 297:8
**parent** 198:16
198:17
**parenthetical**
408:18

**parents** 25:24
199:19 277:1
**parish** 75:24
91:7,9,10
195:1 196:17
**parishes** 20:25
33:12 55:10,11
55:19,20 102:8
122:12 189:15
191:10 192:1
192:13
**part** 35:24
40:20 58:17
76:2 79:15,20
86:10 88:9,18
91:10,11,14
96:4 107:24
110:2 115:11
116:9,21,25
118:23 122:15
147:1,8 190:6
190:6 206:4,5
206:6 271:20
297:8 391:4,5
393:17,18,19
**participate**
321:9
**participated**
321:23
**particular**
29:11 56:9
63:22 78:23
79:17 88:5
113:25 134:14
199:23 200:8

250:12,16
278:4 283:16
288:24 299:15
**particularly**
52:21 55:6
78:24 111:24
272:5
**parties** 3:11,17
18:8 267:6,25
310:8 410:6,8
**partner** 15:11
**partners** 14:20
**parts** 55:12
72:11 91:7,8,8
102:15
**party** 19:11
58:7,12,17,19
59:7 273:7
313:11 410:3,4
**pass** 80:7 385:7
**passage** 17:11
164:22 272:18
272:20
**passed** 73:16
113:9 121:6
164:7 195:14
205:2 222:16
222:17,18
271:6 273:17
274:13
**passes** 44:9
**passing** 18:4
398:4
**passion** 189:17

**passionate**
234:6,7 257:14
**passports**
42:11
**password**
132:2 206:19
**past** 132:17
173:5 227:12
230:14 373:25
**paste** 173:22
174:10
**pasted** 190:10
**pastor** 15:15
86:20,21
**pastors** 14:7
**pattern** 354:14
**pauses** 408:10
**pay** 44:17 45:4
53:3 110:17
256:14,19
257:13 274:17
274:21
**pays** 12:18
**peer** 15:16
**peeve** 37:9
**penalty** 84:5
271:4 272:23
273:4,6
**pending** 99:1
164:16
**pennies** 392:24
**penwriting**
409:12
**people** 21:7
23:23 26:12

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[people - personal]**

| | | | |
|---|---|---|---|
| 28:19 30:19 | 187:5,12 | 318:25 319:6 | **perry**   294:22 |
| 31:15 32:12 | 188:13 189:15 | 321:21 324:14 | 295:7,16 |
| 33:4 34:16,18 | 189:17,20 | 337:18 339:14 | 296:24 297:3,9 |
| 34:20,22 36:23 | 190:17 191:11 | 340:18,19,20 | 297:15 307:16 |
| 37:1 51:17,24 | 191:13,18 | 340:20,21 | **person**   23:10 |
| 51:24 52:2 | 195:2 196:25 | 341:6 342:8,8 | 24:23 27:18 |
| 55:23 58:16 | 198:13 199:11 | 342:14,17 | 59:3 79:11 |
| 65:21 66:4 | 199:18,19 | 345:15 346:25 | 88:10 106:16 |
| 67:8,12,18 | 200:2,18,24 | 350:8 351:1 | 107:2 108:24 |
| 72:20 73:13 | 201:18,18 | 353:24 354:12 | 109:18,20 |
| 74:9 78:16,17 | 226:10,21,22 | 355:21 357:8 | 112:3 116:12 |
| 78:21 79:3,6 | 226:23 229:5 | 366:23 370:9 | 117:15 119:15 |
| 87:12,20 88:20 | 231:1 232:11 | 370:12 379:21 | 119:16 130:22 |
| 88:22 89:4,25 | 236:11,13 | 380:25 382:18 | 139:14 166:24 |
| 90:13,22 91:4 | 238:22 240:3 | 383:10 385:3,9 | 168:6 230:23 |
| 92:7 97:5,15 | 240:18 242:7 | 385:11 387:6,9 | 231:4 266:15 |
| 97:15,16 106:8 | 242:19 244:23 | 387:10 388:11 | 266:19 267:2 |
| 106:9 108:9 | 245:16,19 | 389:24 399:25 | 267:24 268:15 |
| 113:20 114:8 | 246:20 249:15 | 401:19 | 269:16,18 |
| 116:3 118:19 | 250:14,23 | **people's**   32:5 | 270:24 279:15 |
| 121:3 123:23 | 252:3 255:17 | **percent**   13:4 | 280:12,19 |
| 129:25 137:19 | 255:21 258:22 | 58:15 116:13 | 292:10,12 |
| 148:21,24 | 260:11,15,16 | 164:1 | 299:15 306:10 |
| 149:1,6,7,8,22 | 263:18 268:17 | **perfect**   403:19 | 307:20 308:12 |
| 150:3,5,11,15 | 268:20 271:6 | **perform**   63:21 | 311:12,24 |
| 150:25 151:8 | 273:21 275:5,5 | 64:1 | 328:3 342:22 |
| 151:19 152:16 | 277:15 278:21 | **period**   65:14 | 350:9 352:5 |
| 153:5 156:19 | 280:17 284:19 | 94:11 176:20 | 371:18 373:24 |
| 156:20 157:19 | 287:22 288:18 | 197:25 223:7 | 377:5 384:8,20 |
| 160:4,15 | 289:5,22,23 | 236:12 263:17 | 391:7 409:20 |
| 161:20 165:11 | 295:23 297:25 | **perkins**   1:20 | **person's**   32:16 |
| 165:16 177:12 | 298:21,23 | 2:12 | **personal**   8:16 |
| 178:21 179:16 | 306:7,11,22 | **perpetual** | 12:23 30:17 |
| 182:5 184:24 | 307:2 314:5 | 67:11 | 88:9,9 120:2 |
| 186:11,14,17 | 315:6 316:15 | | 121:21 128:18 |

**[personal - pieces]**

| | | | |
|---|---|---|---|
| 129:20 130:1,3 | **personalities** | **phone** 15:15 | 183:12,14,15 |
| 130:9,17,20,25 | 272:3 | 19:15 85:20 | 183:16,20,25 |
| 132:18,25 | **personally** 55:6 | 89:10 90:9 | 184:2,7,11,15 |
| 133:7,8,8,10,10 | 107:9 114:13 | 105:19 107:8 | 184:20 286:15 |
| 133:14 134:12 | 115:1 127:20 | 108:10 109:5 | 395:22 |
| 135:3,20,25 | 135:24 152:9 | 109:13 113:7 | **photos** 192:15 |
| 136:3,4 137:8 | 174:25 269:16 | 115:17 118:13 | **phrase** 261:4 |
| 149:22 150:4 | 269:18 311:3 | 118:18,25 | 408:19 |
| 152:5 155:4 | 383:24 | 129:8,15,16,19 | **phrases** 283:17 |
| 156:7,11,19 | **persons** 25:21 | 129:20 130:1,1 | 284:13 408:15 |
| 157:7,8 161:23 | 35:2 | 130:4,9,12,16 | **physical** 44:4 |
| 162:1,2,3 | **person's** | 130:20,23,25 | **physician** |
| 165:21 166:13 | 260:12 268:12 | 131:8 132:18 | 105:10 |
| 168:3 174:18 | 268:13 341:13 | 142:1,3,4,8,12 | **pick** 37:1 70:6 |
| 174:22 175:10 | **perused** 155:2 | 142:13 143:24 | 107:7,7 130:1 |
| 176:4 184:3 | **pet** 37:9 | 144:3,11,12 | **picked** 82:3 |
| 186:25 188:12 | **peterson** 225:1 | 145:2,13 | **picking** 378:3 |
| 202:8,10 | **petition** 307:15 | 160:17 166:2 | **picture** 162:21 |
| 208:13,17 | 337:13 356:14 | 166:23 170:12 | 170:17,18 |
| 210:8 220:14 | 356:18 | 172:1,7 180:4 | 182:3,9 183:9 |
| 221:17,17 | **pettigrew** 2:20 | 180:8 225:8,13 | 185:14,19,21 |
| 222:19 223:2 | 7:16,17 395:8 | 227:17 247:5 | 227:10,11,13 |
| 252:15,19 | **pharmaceutical** | 263:25 264:1 | 230:13 250:20 |
| 265:12 266:18 | 100:12 | 264:10 279:3,5 | 286:16 345:11 |
| 268:13,24 | **pharmacies** | 280:20 281:11 | 388:4 |
| 269:11 277:16 | 100:17 | 349:11 350:17 | **pictures** 192:18 |
| 277:17 281:12 | **pharmacist** | 350:18 351:23 | 223:5 266:18 |
| 299:6 306:3 | 100:14 101:11 | 352:1 378:1 | 268:14 331:9 |
| 312:12 340:4,7 | **pharmacists** | 387:9 388:23 | 340:4 |
| 360:15 361:18 | 195:4 | 400:5,7,12 | **piece** 78:23 |
| 361:23 371:2 | **pharmacy** | **phones** 178:19 | 79:5,17 89:20 |
| 371:21,23 | 100:5,18,23 | **phonetically** | 103:18 236:21 |
| 378:7,11,14 | 101:12 195:4 | 408:19 | 289:16 |
| 382:12,25 | **phil** 276:14 | **photo** 182:2,4,7 | **pieces** 273:11 |
| 403:4 409:14 | 277:6 278:13 | 182:8,12,23 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

[pill - positions]

**pill**   290:12,19
290:25
**pilot**   80:5
**pink**   397:23
**pinned**   89:7
**pinpoint**   76:4
106:3
**place**   26:4
46:18 58:20,20
196:15 247:2
403:19
**placed**   61:10
**places**   81:23
**plaintiff**   3:3
307:6 311:13
338:12 350:4,5
350:17 351:24
352:6,8 355:8
**plaintiff's**
181:19 182:19
188:16 207:19
215:18
**plaintiffs**   1:6
2:2 3:7 7:11,14
7:18,22,25
333:18 350:3
392:11
**plaintiff's**
229:18 231:16
234:22 239:9
249:19 285:5
316:17 358:20
359:21 367:6
380:15 383:15
390:5

**plan**   60:11
181:2,13,15
**plans**   180:13
180:17,19,20
180:22,24
181:14
**platform**   4:16
192:23 193:6
193:14,19
368:12
**platforms**
121:13 208:17
274:1
**play**   149:8
151:5,16
298:13 302:25
**played**   148:22
177:10 329:17
**player**   266:6,8
311:9 341:21
341:25 342:1
343:1,1 357:24
388:5
**players**   311:9
**playing**   153:4,4
177:1,13
**plays**   79:15,20
**pleadings**
387:20
**please**   7:6 9:2
10:4 11:17
88:23 89:7
114:11 120:25
121:9 157:1
165:24 166:12

166:17 207:2
245:18 258:2
263:25 264:11
282:4 299:24
302:20 304:15
323:5 332:8
346:11 351:18
360:13 363:15
366:8 367:10
369:24 376:23
379:6 388:8
404:25 405:6
**plenary**   24:19
25:2
**plentiful**   65:11
**plethora**   71:8
341:5 342:8
**plop**   56:17
**plus**   32:11,12
**point**   16:21
22:17 35:9
60:24 100:15
124:7 140:16
140:18 141:25
150:18 165:22
199:14 227:25
228:5 229:1
230:24 282:23
283:13,15
284:9 290:14
302:3,19 307:7
324:16 325:16
333:20 334:23
337:15,16
371:22

**pointed**   364:15
**police**   39:5 40:3
62:9 72:24
109:6,7 123:6
244:6,9,10
246:18 247:23
248:19,24
249:7 252:12
252:23 253:13
402:20
**policies**   69:17
72:5 244:8
249:6,6,8
**policy**   90:9
166:2,23
**political**   19:7
58:7,10,23
183:4 272:3
**politics**   29:23
179:24 183:6
233:23
**pop**   122:20
142:12
**popping**   142:17
142:23 143:19
**populated**
102:21
**portion**   360:7
**position**   22:23
46:13,16,23
47:1,2 76:17
105:9 134:3
382:11 383:4
**positions**   23:3
27:20 38:9,12

**[positions - preserve]**

46:11 47:8
123:13,16
382:22,24,25
**possession**
210:17 332:9
332:15,17,19
**possible** 86:15
88:21 115:5
154:10 199:18
239:20 252:15
**possibly** 110:12
**post** 4:13 27:5
27:9 89:6,22
104:20,22,23
120:22 122:2
126:24 134:24
137:4 140:16
145:18 158:13
160:10 161:9
161:10 162:10
169:24 170:1
173:15 174:1,1
174:15,24
175:9 176:23
178:15 182:22
183:2,3 184:20
184:24 185:3
185:10 195:6
207:2 208:16
243:7 244:2
245:15 253:6
256:15 263:4
264:18,24
271:17 275:9
275:12,15

308:3 316:8,13
317:23,25
318:18,19
360:8 389:15
394:7,18
**posted** 41:12
41:15 126:2,6
140:23 141:12
146:13 156:1
158:15 173:17
174:2,12 175:7
175:7 178:8
208:1,8,12
211:11 216:15
218:8,9 220:16
225:23,24
238:2 242:10
244:2,24 245:4
253:3 263:12
263:14 264:20
264:22,25
265:2 273:3
294:2 316:8,15
318:3 357:21
384:15 396:6,8
**posting** 105:20
142:23 161:15
249:25 252:13
316:12
**posts** 126:17
137:6,8 160:10
173:20,21
174:14,18
181:10 183:5,7
183:8 238:2

242:23 246:2,4
264:19 275:21
396:4
**potentially**
281:19
**pounded** 90:8
**poverty** 187:3
**power** 13:2
24:19 25:2
26:20
**practice** 2:3
12:22 13:2,5
28:23 29:6
81:24 109:9
171:24 173:2,4
175:14,16,17
197:21 228:23
228:24
**practicing**
12:20
**practitioner**
105:8,10 123:4
**pray** 285:7
**prayed** 14:19
**prayer** 14:2,20
15:8,11 183:1
184:16 323:19
323:20
**prayers** 254:10
**pre** 27:12,15
94:9 304:1,1
**preach** 86:21
**preface** 253:18
**prefaced** 381:6

**prefaces**
380:23 381:4
**prefacing**
237:3
**preference**
18:24
**pregnancy**
390:19,19
391:20 393:13
**pregnant** 357:7
380:25
**preliminary**
236:22
**premature**
54:17
**preparation**
12:9 216:10
308:1 345:12
**prepare** 69:12
158:17,19,20
158:21,22,23
158:25 159:9
159:11,12,14
**prepared**
409:13,16
**preparing**
310:6 335:10
383:7
**present** 2:16
7:6 24:11
**presentation**
77:24
**preserve**
301:25

Page 68
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[preserved - procedure]**

**preserved**
302:4
**preserving**
9:20
**president** 46:18
46:20 64:5,6
64:20 67:24
68:4,5 276:18
400:9,10
**press** 219:17
224:10,11,13
224:14,17
225:4,7,10,12
225:21 226:5
244:16,18
358:11 362:22
376:8,9
**pressed** 106:4,6
**pressing** 60:6
60:15 61:19,23
94:17 111:6
172:9,11
242:14
**pretty** 42:12
176:11,22
177:5 248:13
**prevent** 11:10
351:10
**previous** 80:1
304:7,8,25
365:3,4 395:4
**previously**
164:23 343:16
345:14 353:17
397:6 399:8

**primary**
225:14
**principal** 86:21
86:22
**principals**
186:24
**principles**
404:4
**print** 203:8
**printed** 383:13
**printout**
331:11
**prior** 54:8
103:10 105:2
216:10 272:19
300:8 301:2,2
304:7 310:15
326:6 328:7,8
328:17,24
334:1,2,6,7,9
334:21 335:17
336:10 345:15
345:17,22,25
346:22 349:20
350:14
**priorities**
193:17 398:17
**private** 134:6
135:5 136:13
136:16,19
137:11,12,16
137:20 138:11
138:11,14,19
138:21 139:24
140:5 141:20

145:8 170:8,15
170:16,23,24
170:25 171:5
217:22,24
218:1 226:8
244:25 256:5
311:24 396:23
399:2,5,16
**privatization**
226:24
**privatize**
224:22 227:20
**pro** 57:24
82:16,18,25
83:7,11,23,24
84:10 128:19
128:19,20
129:5 272:21
**probably** 19:13
22:2 29:22
48:10 55:10
60:7 70:10
74:7 75:19,25
81:11 84:9
90:7 95:13
96:6 107:6
114:25 116:22
122:12 126:6
132:17 135:18
136:2 140:19
145:9,17
146:22 147:12
149:14 154:4,4
155:4 156:18
163:4 170:24

175:10 176:7
187:10 188:9
190:5 193:20
193:25 199:10
206:19 208:22
212:18 216:4
221:15 223:4
224:3 229:24
237:25 245:2,7
251:8,17
254:14,18,22
255:6 257:18
260:24 291:4
292:23 293:13
298:20 303:20
306:20 309:2,4
311:22 316:7
319:24 321:3
322:24 324:19
337:7 347:10
349:12,14
362:23,23
369:13 371:18
371:19 382:16
384:9,14,19
385:3,23 387:7
387:24 388:7
389:19 396:22
**problem** 171:2
200:22 216:8
264:12 286:24
333:9 367:15
392:3
**procedure** 3:10
3:17 107:24

**[procedure - public]**

110:24 111:13
112:22 270:18
301:10 408:5,6
409:24
**proceeding**
408:7,9,13
**process**   26:24
44:18 46:22
67:1 94:13,19
105:16 110:23
124:15 179:17
282:19 283:6,9
**produce**   57:4
348:12,24
350:1
**produced**
153:11,13
155:13 212:1,4
213:25 358:12
358:13
**production**
147:15 349:22
349:25
**profane**   283:24
**profanity**
283:18,23
284:1,12,15
353:19 354:2
360:25 362:16
362:17 366:21
381:12 388:9
**professor**   2:3
401:16
**proficient**
201:10

**profile**   148:20
179:6 182:3,6
183:8,20
185:14,19,21
227:10,11
228:20 230:13
233:10 258:24
259:3 262:23
266:12 279:20
286:15 305:14
345:11
**program**   77:22
80:5 398:21
399:1
**programs**
398:24
**prohibited**
410:1
**prohibition**
409:22
**projects**   56:18
56:21
**promise**   395:12
**promised**
273:16
**promulgation**
43:7
**prone**   96:1
**pronouncing**
276:15 346:16
**proof**   119:5
**proofing**   119:6
**proper**   324:21
**properly**
240:15

**property**   46:4
**proposal**
322:13
**proposals**
322:11
**proposed**
112:17 114:4
120:6,20 121:4
164:16,21
168:2
**propound**
211:5
**propounded**
333:19
**protected**
364:13,14
378:17,18,23
**protest**   402:8
402:18
**proud**   78:24
79:19
**prove**   211:9
**provide**   157:10
163:1,11,14
164:15 240:6
399:22
**provided**
128:15 156:15
158:1,2,8
391:1 392:13
**provides**
157:25
**providing**
158:6 163:6

**provision**
291:14,18,20
**provisions**   3:8
292:4 398:4
**public**   13:20
14:10 18:16,18
30:21,24 31:4
31:5 86:11
92:19 104:6,10
104:10,19
105:1,3 109:9
112:18 114:4
120:5,6,14,20
121:4,14
123:12,25
124:19 125:2
125:15 133:23
134:4,7 135:7
135:19 136:16
136:19 137:16
138:15,15
139:9,11 159:7
161:3 162:13
163:2,7 164:15
164:24 168:2
170:8,15,23
171:4 172:1,17
182:15 194:11
217:22 221:1
221:17,21,23
222:13 226:7
234:18,19
246:19 247:10
247:12,19,21
249:7 252:11

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

[public - racial]

| | | | |
|---|---|---|---|
| 252:14,22 | **pushed**  197:10 | **qualifying** | **quick**  99:24 |
| 256:4,5 263:10 | **put**   16:7 17:14 | 182:8,12,15 | 179:20 |
| 263:11,24 | 19:9,10 20:1 | 183:2 | **quickly**  200:1 |
| 272:3 273:8 | 25:12 34:25 | **quarter**  205:4,6 | 324:21 329:11 |
| 358:8 388:22 | 39:6,8 42:21 | **question**  10:4 | **quite**  16:22 |
| 388:23 396:19 | 46:14 53:13,20 | 22:15 37:5 | 227:13 268:11 |
| 396:20 413:19 | 54:4,14 57:9 | 69:4 76:3,22 | **quorum**  131:14 |
| **public's**  30:19 | 66:2 78:11 | 106:24 109:25 | **quotation** |
| 30:22 123:15 | 87:21 92:7 | 171:2 172:19 | 364:15 |
| **publication** | 98:12,17 121:5 | 198:20 213:9 | **quote**  289:5,7 |
| 300:2 | 121:5 149:22 | 213:10,15,19 | 364:1,7 365:4 |
| **publicly**  57:15 | 151:19 153:20 | 226:4 248:23 | 365:13,24 |
| 138:8 139:5,22 | 154:4,8 155:4 | 265:5 290:8 | 375:25 376:2 |
| 234:13 278:21 | 162:15,21 | 302:20 326:12 | 376:16 |
| **published** | 163:21 176:4 | 326:19,22 | **quoted**  298:20 |
| 367:21 | 187:13 190:8,9 | 328:18 329:15 | 368:8 369:2 |
| **puerto**  284:6 | 190:11 194:16 | 332:8,11,14 | 370:11,23,25 |
| **pull**  119:4 | 195:10 196:3 | 337:16 340:16 | 376:15 |
| **pulled**  208:6 | 197:1,8 201:9 | 342:11 346:11 | **quotes**  360:8 |
| 233:16 | 242:1,20,21 | 350:23 370:1 | **r** |
| **purely**  233:22 | 244:8 250:3 | 378:16,24 | **r**   150:18 151:3 |
| **purport**  322:25 | 255:5 256:4 | 383:8 | 151:7 152:6,17 |
| **purported** | 260:17 279:3,5 | **questionable** | 152:18 169:24 |
| 276:13 312:1 | 280:20 281:11 | 187:2 | 230:1 232:25 |
| 394:3 | 336:2 356:18 | **questioning** | 382:8,21 |
| **purportedly** | 362:5 382:16 | 219:10 | 384:22 395:20 |
| 296:12,23 | 387:8 393:16 | **questions**  3:15 | 411:5 412:2,3 |
| **purports**  278:6 | **putting**  162:15 | 8:24 10:22 | 412:3,24 413:2 |
| 278:9 | 194:17 364:15 | 11:11,14 65:2 | 413:4,12 |
| **purpose**  73:1 | 398:10 | 80:1 114:20,22 | **r.s.**  409:9 |
| **purposes**  3:8 | **q** | 139:2 166:9,11 | **race**  184:9 |
| **pursuant**  1:16 | **quadruple** | 183:11 201:18 | 277:2 379:20 |
| 3:8 | 396:9 | 226:13 249:13 | 380:10 387:12 |
| **push**  53:12 | **qualified**   184:8 | 291:9 303:22 | **racial**  284:4,8 |
| 189:21 | | 330:20 353:14 | 284:14,15 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                www.veritext.com

**[racial - recall]**

312:10,17
313:9 377:6
**racist**   298:21
**raise**   9:1 86:18
110:17
**raiser**   229:5
**raises**   256:14
256:19 257:13
274:18,22
**raising**   180:16
**ran**   57:21
185:4,6,8
387:12
**range**   281:4
**ranks**   244:9
**rape**   304:21
**rare**   18:5 23:2
**rarely**   81:12
172:15
**rates**   200:14
272:1 273:14
**rather**   348:11
**reach**   94:25
95:7 181:12
189:14 190:17
**reaches**   120:14
**reaction**   380:3
**read**   154:13
161:7 227:15
227:16 229:21
253:25 275:14
276:10,13
287:9,20 291:1
291:21,24
296:13 299:24

304:15 309:23
309:24 312:13
320:20 323:18
323:24 326:21
327:1 358:5
359:25 360:13
363:10,20
368:2 374:9,10
375:13 379:11
379:17 386:5,7
386:23 392:20
404:16,20
411:9 413:5
**reading**   3:13
125:7,8 172:24
287:2,5 289:16
390:14
**readings**   26:6
**reads**   190:1
**ready**   90:4
253:11 306:13
307:3,5,17
333:24
**real**   19:5 92:16
99:24 137:5
158:3 176:2
228:13 260:12
266:5,15
268:16 270:21
277:22 300:7
300:24,25
302:14 307:11
352:9
**reality**   217:11

**realize**   124:7
124:15 125:20
157:6
**realized**   150:11
150:15 157:21
166:7 321:18
324:20 402:23
**realizing**   91:4
**really**   15:16
20:21 42:13
53:18 65:11,19
113:3,8,10
122:19 125:25
131:8 139:25
142:5 144:24
148:9 160:5
161:17 172:13
249:16,25
250:1 251:18
254:22 280:18
281:13 312:6
385:4 387:6
392:23 403:6,6
**realms**   162:22
**reappointed**
47:13 62:11
90:12
**reason**   11:13
19:8 20:12
33:18 86:17
122:16 148:11
149:5 154:20
155:8 210:3
212:14,22
213:4,10,21,23

214:5,6,8
222:3 260:13
260:14 297:2,4
309:20 321:13
338:10 343:20
350:24 359:15
377:2 381:12
381:12 385:6
411:11 412:6,9
412:12,15,18
412:21
**reasonable**
362:18
**reasoning**
308:21
**reasons**   103:24
150:13 172:15
268:25 269:14
279:6,12
379:13 381:8
381:10
**rebate**   222:13
**reblocked**
344:9
**rebuild**   57:9
**recall**   11:23
12:5 19:19,20
27:21,22 28:2
28:3 83:10
123:3 124:24
125:25 126:1
136:18 140:4
143:15 145:7
164:4,19 165:9
170:8 173:11

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[recall - referred]**

| | | | |
|---|---|---|---|
| 175:13 190:13 | **recalled** 252:22 | **recollection** | **recreate** 136:7 |
| 194:1 204:3 | 266:12 | 22:4,10 41:3 | **recreation** |
| 207:4,5,12,15 | **recalling** | 165:14 170:22 | 55:20 |
| 209:3 232:5 | 372:24 | 175:6,12,24 | **recurring** |
| 241:12 256:10 | **receipt** 411:17 | 176:1,3 208:20 | 113:13 |
| 259:7,12,13,18 | **receive** 31:3 | 210:9 212:19 | **red** 184:23,25 |
| 259:19 262:9 | 93:6 112:20 | 220:13,14 | 185:2 |
| 262:13 266:2,8 | 120:4 121:10 | 227:4 293:23 | **redirect** 157:15 |
| 267:13,15,15 | 123:13 161:16 | 301:8 310:4 | 165:16 178:22 |
| 267:22,24 | 198:8 254:24 | 313:8 315:11 | **redirected** |
| 268:5,10 270:8 | 347:22 348:8 | 323:21 336:25 | 178:3 |
| 270:10,23 | **received** | 348:14 354:20 | **redirecting** |
| 272:7 273:1,9 | 115:21 148:10 | 354:23 374:14 | 156:20 |
| 274:9,13,21,23 | 154:25 213:6 | **recommend** | **redistricting** |
| 284:23,24 | 213:12,24 | 249:6 | 32:7 |
| 288:21 293:22 | 254:21 311:6 | **recommendat...** | **reduction** 3:14 |
| 296:25,25 | 331:11 336:1,8 | 63:15 69:16 | **reestablished** |
| 301:5,11 309:9 | 338:2 340:9 | **record** 10:5 | 159:6 |
| 309:9,15,17 | 347:3 348:22 | 15:23 17:1 | **refer** 17:15 |
| 312:6,25 315:8 | 368:17 | 32:15 33:25 | 35:3 89:4 |
| 315:12,14,17 | **receives** 112:16 | 37:18 41:4,5 | 172:23 |
| 324:10 327:23 | 116:13 176:7 | 41:18 98:18,19 | **reference** 34:7 |
| 340:19 342:7 | 191:4 | 98:21 168:8,9 | 238:3 328:1 |
| 344:21 347:6 | **receiving** | 172:22 209:17 | 356:17 408:17 |
| 354:19 355:5 | 112:15 142:5 | 209:18,21 | **referenced** |
| 355:11 357:13 | 347:25 | 216:8,18,18,20 | 188:20 347:16 |
| 370:22,25 | **recent** 42:23 | 217:1,19 258:4 | 411:6 |
| 371:8 372:20 | 184:13 339:18 | 258:6,11 290:5 | **references** |
| 372:22 374:15 | 340:9 341:4 | 314:1 353:7,9 | 307:14 340:6,7 |
| 381:19,20,21 | **recently** 183:9 | 353:11 408:7 | **referencing** |
| 383:16,18,19 | 272:12 339:1 | **records** 16:13 | 232:6 298:12 |
| 383:23 384:2 | 378:19 | 205:18 368:11 | **referral** 44:25 |
| 385:10 401:17 | **recess** 219:25 | 368:16,18,20 | 53:7 |
| 401:18 | **recognize** | 368:22,24 | **referred** 44:24 |
| | 219:13 253:24 | | 49:25 336:18 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company            www.veritext.com

**[referred - remember]**

referred 374:23 398:15
**referring** 34:24
138:6 240:9
281:17 356:21
**refers** 44:25
247:19 301:15
**reflect** 17:2
**reflected** 32:16
**reform** 110:21
214:16 271:7
273:17,18
274:7,11 317:8
**refresh** 170:21
208:19 260:20
285:2 310:18
313:3,6,13
315:10 348:11
354:22
**refreshed**
285:3
**refund** 111:6
**regarding** 33:5
43:4 79:16
130:5 163:2
164:24 166:23
171:3 272:9,18
272:23 331:9
350:4,5 352:13
354:17
**regardless** 56:1
60:23 149:5,21
150:4 165:20
289:13 371:4
**regards** 380:1

**region** 189:21
191:12
**regions** 39:22
**regular** 197:23
197:24 198:1
**regularly**
199:12
**reject** 53:24
66:11 94:19
96:5
**rejected** 232:12
233:24
**rejecting**
234:10
**related** 25:20
42:6,12 45:24
73:14 77:14,15
80:23 350:2
410:5
**relates** 103:19
**relating** 179:23
**relationship**
93:16 157:23
410:1,4
**relationships**
409:23
**relay** 217:11
**release** 224:10
224:11,13,14
224:17 225:4,7
225:10,12,21
226:5 244:16
244:18 358:11
376:8,9

**religious** 57:18
282:22,24
**reluctant**
377:15
**remain** 76:8
**remained** 187:9
**remains** 162:16
182:10
**remember**
13:18,24 15:23
16:3,12,15,22
17:1,2 19:14
19:22,23,24
20:5,18 21:5
21:10,22,25
22:25,25 23:12
25:21 26:1
32:6 33:21,23
34:8,11 45:10
45:18 50:7
66:7 76:20
81:22 82:1,13
83:3,21 84:23
85:11 88:25
97:7 100:10
101:14 105:7
105:11 109:24
111:4 122:23
123:1 124:22
125:4,16,17
127:9 136:2
140:6 141:10
141:19,19,21
142:2,19
144:13 145:15

152:3 156:3
162:11 163:19
167:24 173:17
173:21 176:6
176:18 177:9
177:13,14
178:9,15 179:7
190:9 205:4,17
207:8,23 208:8
208:11 209:25
210:23 217:18
218:15,21,25
221:14,20
223:1,5,6,8,11
223:12,13
224:12,13,14
225:6 227:21
229:21 231:25
237:15,15
238:19,20
239:19 240:16
240:17,22
241:23 242:17
243:24,24
246:5 248:11
248:20 249:25
250:1,1,5,9,11
250:12,16,21
250:22 251:1,2
251:4,17
252:11,25
253:1,1,25
254:1,9,9
256:21,23
260:2,6,7,10

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company        www.veritext.com

**[remember - reply]**

| | | | |
|---|---|---|---|
| 262:3 266:6,22 | 339:4,8,11,17 | 328:24 337:8 | 337:16 340:16 |
| 268:11 269:1,5 | 339:18,19,24 | 339:1 340:10 | 357:18 376:23 |
| 269:8 270:12 | 340:5,6,14,21 | 343:22,24 | 391:9 |
| 270:17 272:15 | 340:22 341:1,5 | 345:4 | **repkatrinajac...** |
| 272:18 273:22 | 342:6,9 345:1 | **remembering** | 318:15 |
| 273:24,25 | 345:2,2,18,19 | 348:3 | **repkjackson** |
| 274:4,17 | 345:20,24 | **remembers** | 148:3,8,12 |
| 284:23 285:8 | 346:1,6,15 | 217:15 | 149:4,11 |
| 285:13,18,21 | 347:25 348:9 | **remind**  31:17 | 233:19 276:16 |
| 285:24 286:2 | 349:4 350:13 | **reminding** | 276:22 293:3 |
| 286:11 288:25 | 351:23 352:6 | 212:19 | 314:6 320:14 |
| 289:2,3 290:6 | 352:18 354:9 | **reminds**  45:5 | **replied**  315:1 |
| 290:13,13,17 | 355:2,4,12,15 | **renovated** | 315:25,25 |
| 290:24 294:10 | 355:16,18,18 | 21:11 | 319:9,14,16 |
| 297:11,24,24 | 355:22,23 | **rep**  37:11 | 320:8 383:10 |
| 297:25 298:1,2 | 356:18,19 | 149:16 189:13 | 393:23 |
| 298:5,6,8 | 357:20 358:10 | 190:6,9,12 | **replies**  6:7 |
| 301:3 303:10 | 358:16,18 | 221:19 226:18 | 275:14 319:7 |
| 303:11 306:8 | 359:11,14 | 292:19,23 | 390:6 |
| 309:13 310:16 | 362:23 364:8 | **repeal**  320:10 | **reply**  5:12 |
| 311:4,10,18 | 364:10,25 | 320:12 | 113:6,8 114:11 |
| 312:22 313:10 | 365:3,9,9,16,16 | **repealing** | 177:16 200:6 |
| 313:15,15 | 365:18,20 | 317:14 320:16 | 229:19,20 |
| 314:9,18,21,25 | 366:6 370:15 | **repeat**  351:2 | 230:9,17 |
| 315:3 316:23 | 371:2 372:19 | **repeats**  291:10 | 275:10 276:5 |
| 317:3,15,18 | 373:8 374:19 | 323:10 | 278:1 287:20 |
| 320:4 321:2,8 | 374:20,21 | **rephrase**  18:21 | 289:4 291:1,2 |
| 323:16,17,18 | 375:2 376:5,12 | 22:15 46:21 | 291:4,5 293:15 |
| 323:24 324:1,3 | 384:12,13,18 | 72:13 85:13 | 293:16 314:24 |
| 324:7,8,9 | 390:18 391:11 | 125:14 134:8 | 316:2 318:9,10 |
| 325:13,14 | 391:11 397:19 | 139:21 198:20 | 318:19,21,22 |
| 327:24 328:2 | 397:24 398:25 | 202:16 212:8 | 319:6,9,11,18 |
| 329:7 330:3 | 400:8,10 | 227:10 230:8 | 320:8 391:10 |
| 335:4,8 337:11 | **remembered** | 257:10 265:2 | 391:18 392:6 |
| 337:23 338:25 | 75:15 244:10 | 269:17 278:3 | 392:18 394:7 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                          www.veritext.com

**[replying - respected]**

| | | | |
|---|---|---|---|
| **replying** | 7:24 8:4 55:12 | **request**   18:24 | 409:4,18 |
| 113:10 225:2 | 57:23 58:18,19 | 19:2,15,18 | 413:13 |
| 394:4,7,8,9 | 59:1 101:25 | 20:7 24:20,21 | **requirement** |
| **report**   35:16 | 192:13 | 29:20,22 46:21 | 90:25 |
| 64:3 69:12 | **representation** | 46:23 136:24 | **requiring** |
| 261:17,21,25 | 154:6 181:25 | 136:25 137:3 | 227:19 |
| 262:6 | 188:21 189:6 | 137:14 147:1,7 | **research**   66:14 |
| **reported**   60:21 | 191:4 193:13 | 147:10 196:9 | 154:23 173:6 |
| 262:1,10 274:4 | 208:3,9,21 | 201:23 211:23 | 210:18 310:3 |
| 409:12 | 209:23 210:3 | 236:20 269:3 | 348:3 377:12 |
| **reporter**   1:18 | 222:21 224:16 | 270:22 328:2 | **researched** |
| 3:7 7:1 8:1,8 | 230:2 231:23 | 329:6,12,22,24 | 335:18 378:19 |
| 8:21,25 9:5,12 | 237:13 241:20 | 329:25 334:13 | **reserve**   3:17 |
| 10:13 98:20 | 244:12 246:23 | 334:14,15,15 | 351:13 |
| 169:21 209:16 | 250:7 277:19 | 334:24 335:21 | **reserved**   17:21 |
| 209:19 214:19 | 285:25 359:12 | 349:22,25 | 17:23 25:11 |
| 216:19 257:24 | 382:4 384:10 | 394:14 | 32:9 112:13 |
| 258:3,10 | 392:14 | **requested** | 135:1 |
| 292:25 317:16 | **representative** | 19:13 20:4,13 | **resident**   292:8 |
| 326:21,25 | 13:14,16,19 | 51:5 70:13 | 342:23 387:18 |
| 353:6,10 | 15:25 21:3 | 148:17 208:23 | 387:21 388:1 |
| 358:21 364:9 | 31:21 71:20 | 213:5,12 328:9 | **resolved**   65:17 |
| 365:7,13 367:7 | 149:11 150:2 | 329:3,19 331:1 | 88:12 |
| 367:16 380:16 | 190:2,14 201:7 | 334:18,25 | **resource** |
| 401:4 404:21 | **representatives** | 337:4 368:16 | 117:19 189:19 |
| 405:1 408:2,23 | 31:18 186:4 | **requesting**   20:5 | **resources** |
| 409:5 | **representing** | 212:17 | 408:18 |
| **reporter's** | 8:11,12,14 | **requests**   25:5 | **respect**   30:8 |
| 408:1,13 | **reproductive** | 33:8 89:13 | 35:4 73:23 |
| **reporting** | 304:19 | 107:25 111:5 | 324:17 357:9 |
| 261:7,16 262:4 | **reps**   18:9 | 111:20 396:16 | **respectable** |
| 262:12 263:17 | **republican** | 396:18 | 324:18 |
| 409:13 410:2 | 73:7,9 254:11 | **require**   401:25 | **respected**   18:2 |
| **represent**   7:7 | **republicans** | **required**   37:14 | 27:14 |
| 7:11,14,18,21 | 228:12 276:17 | 51:1,2 328:25 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

[respectful - right]

respectful
277:12 278:14
280:10
respectfully
324:16
respond   36:13
88:25 92:14
115:6,8,15
139:14 165:22
165:23 166:18
179:19 226:16
226:20 231:2,6
240:14 264:9
276:19 277:11
293:7 314:16
314:19 321:20
368:9 385:9
responded
89:15 115:17
133:6 166:24
178:6 231:5
314:22 316:21
317:15 318:17
334:4 371:12
responding
88:14 127:11
179:1 259:22
259:22,23
307:1 316:11
391:7
responds
226:19 288:10
375:15
response   10:22
89:17 107:12

115:19 118:7
118:11 127:13
128:17 148:7
151:13,15,18
152:2 153:10
153:12 154:2
155:9 156:8,14
157:11 159:3
159:19,23
160:24 162:25
163:12 165:1,3
166:22 168:14
169:19 203:2
247:7 261:22
287:16 292:1,2
295:25 314:17
325:19 328:10
331:5 393:8,21
395:1
responses
113:21 178:16
258:22,23
259:1 260:15
316:22
responsibilities
32:24 34:13,14
35:19 39:14
47:16 48:21
206:1 249:10
responsibility
33:3,6 35:24
responsible
69:6
responsive
89:10

rest   29:8
103:23 279:16
337:4 344:24
restricted
360:14
restrictions
372:17
result   272:8
273:2 274:9
402:9
resulting
270:12
retaining
186:17
retired   51:25
59:25 106:17
return   114:1
193:21 411:13
411:16
retweet   5:21
359:1,13,16
retweeted
359:7 385:11
revenue   15:7
reversal   271:17
revert   244:23
reverting   252:3
review   12:8
43:11 141:10
147:11 212:7,8
266:19 286:21
311:22 317:13
320:14,15
323:7 331:18
331:20 332:9

333:13 335:1
337:12 340:6
389:21 411:7
reviewed   11:19
212:10 213:15
214:3,5 261:23
326:8 331:13
331:13,22
368:22,24
379:14,17
reviewing   50:3
50:8 214:1,7
291:13,18
368:11
revisit   397:1
revoked   111:7
reward   26:18
rhetoric   297:5
308:24
rican   284:6
richard   2:7
7:13 322:13
richard's
320:13
richland   91:9
right   9:1,18,25
10:7,8 11:9
12:14,18 14:8
17:8 18:1
19:24 20:19
24:18 25:4,11
26:5,14 28:7
30:10 36:21
41:7,24 42:17
43:17,21 44:13

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[right - room]**

| | | | |
|---|---|---|---|
| 45:5,18 47:4,7 | 143:1,23 | 274:19,19 | 396:1,2,21 |
| 47:12 49:10 | 144:10 146:4 | 276:15 278:24 | 397:8 399:19 |
| 50:20 51:18,23 | 149:25 152:9 | 279:9,11 280:2 | 400:15,25 |
| 53:10,15 54:22 | 153:14,15 | 281:7,12 | 401:2 404:13 |
| 55:24 56:4,12 | 154:8 155:25 | 286:12 287:2 | **rights** 84:2,3,3 |
| 56:15 60:7 | 156:2,3,11 | 287:18 289:6 | 271:24 304:19 |
| 61:3 62:10,21 | 157:5,14 158:7 | 289:24 293:6 | **ring** 347:1 |
| 62:24 65:20 | 158:21 159:1,5 | 295:2,12 | **roe** 271:17 |
| 66:8 70:9,15 | 159:11,17 | 300:20 301:17 | 272:7,10,19 |
| 72:1 73:22 | 165:21,25 | 301:25 302:4 | 381:22 |
| 74:4,6,20,23 | 169:17 170:9 | 302:11 305:2 | **role** 17:5 18:13 |
| 75:16 77:8,19 | 172:13 174:23 | 313:10 316:2 | 26:19 35:20 |
| 78:7,9,14 | 175:5 181:14 | 317:22 318:5 | 37:23,25 38:1 |
| 79:25 80:8 | 182:13 184:11 | 319:14 320:24 | 38:4,5,20 40:8 |
| 81:9 83:12 | 185:18 189:24 | 321:5 324:4 | 40:8 47:16 |
| 85:9,14,24 | 190:5,19 | 327:8 328:10 | 48:14,15,21 |
| 86:2,3,3,15 | 192:22 193:7 | 336:3,12 | 49:9 53:24 |
| 87:3 89:5,18 | 194:13 199:2 | 338:17,20 | 57:13,19 59:9 |
| 89:24 91:25 | 200:15 202:9 | 343:23 344:16 | 64:22 65:4 |
| 92:5,20 93:12 | 203:18,23 | 348:16,18,22 | 70:7 71:2 72:4 |
| 93:24 94:19 | 204:18 218:16 | 351:19 353:2 | 141:18 397:1 |
| 95:3 96:8,9 | 220:1 225:18 | 353:13 354:18 | 399:7 |
| 97:16 98:10,23 | 226:12 227:13 | 356:5 357:14 | **roles** 21:20 |
| 99:21 101:7,19 | 228:19 237:1 | 362:18,25 | 22:18 32:2 |
| 104:10 108:6,8 | 237:10 238:14 | 369:1 371:23 | 35:21 59:10 |
| 109:1,14,17 | 239:7 240:2,5 | 373:13,16,20 | 71:24 72:3 |
| 111:21 112:8 | 241:8 242:24 | 375:11,17 | **roll** 124:10 |
| 113:24 115:17 | 243:25 244:16 | 376:20,22 | 404:10 |
| 116:17 118:9 | 245:20 246:20 | 377:1 382:9 | **ronald** 40:4 |
| 118:14,24 | 247:2,12 | 383:3,6 384:9 | 187:11 244:1 |
| 119:16 120:10 | 248:22 255:3 | 384:23 385:19 | 248:9,13,21,25 |
| 127:8,17,25 | 255:13,16 | 386:6 387:6,9 | 249:2 |
| 128:16,19 | 265:9 268:10 | 387:16 388:10 | **room** 7:6 48:3 |
| 131:10 132:8 | 268:21 271:12 | 388:12,14 | 48:6,11 56:19 |
| 137:23 140:20 | 271:22 274:8 | 391:16 395:23 | 59:3,4,5 95:2 |

**[room - school]**

105:21 241:8
298:4
**rooting**   386:25
387:2
**rose**   298:3
361:13
**rouge**   33:10
91:12 104:12
117:2,3 191:7
198:6 239:18
248:12,15
**row**   61:6
**rude**   130:3
218:5
**rule**   21:13 24:3
24:3 28:1 35:5
43:7 54:13
105:24,25
113:1,5,11,14
264:4 408:4
**rules**   21:9
23:12,13 24:19
32:7 35:14
60:4 63:10
79:10 314:3
408:4 409:18
409:24
**run**   13:20 14:3
14:14 15:12
31:22,24,25
33:14 63:8
94:17 113:11
113:14,20
120:9 135:16
136:3,7 146:2

180:13,20
184:8,9 190:3
190:16 364:11
387:10
**running**   32:16
89:12 94:5
200:1 206:25
**rural**   20:25
22:14 102:15
102:16 128:9

**s**

**s**   3:1 41:14,14
114:5 266:11
281:25 284:7
284:11 312:11
357:10 375:24
379:22 380:6
381:3,14
386:17 403:5
412:3
**sabbatical**
140:21 141:15
145:22 146:1,5
146:6
**sad**   205:9
**sales**   317:14
320:12,16
**savvy**   159:9,10
**saw**   105:13
140:22
**saying**   10:17
15:6 26:10
32:4 79:18
93:21 99:11
120:11 156:23

173:9 176:15
186:6 208:6
219:11 255:2
256:22 278:19
278:20 281:5
282:13 288:3
289:17 290:21
290:23 291:3,4
303:20 307:19
309:16,16
315:16,16,23
320:3 331:6
333:17 339:6
341:11 346:2
348:10 356:20
365:12,16,16
368:9 370:11
370:15
**says**   15:24 31:5
88:19 89:7
120:25 130:14
137:14 148:2
170:24 171:18
176:13 189:1
189:13 198:13
201:13 220:24
221:20 243:14
255:14,20
257:3 266:3
276:15,19
277:7 278:12
283:15 291:16
292:17 298:12
305:12 308:3
315:1 319:21

328:16,24
334:8 372:15
372:19 375:6
376:10 380:23
384:5 386:23
388:22 389:13
392:22 394:9
395:18,19
**sb**   384:5 385:20
385:24
**scared**   146:12
**schedule**   16:24
23:15 24:16
26:3,13 36:15
37:4 49:3 60:8
60:14 180:6
**schedule's**
50:14
**scheduled**
24:21 42:7
60:13 91:3
**schedules**
60:23
**scheduling**
26:20 47:18,23
**scholarships**
399:22,23
400:16,18,18
**school**   2:4,8,18
2:22 39:12
64:11,13 90:25
92:2 100:5
142:7 178:17
178:18 186:12
196:19,22

Page 79
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                 www.veritext.com

**[school - see]**

205:20 229:4,6
323:19 375:10
398:24 401:7,8
**schools** 35:22
55:16 71:10
77:15,17,18,21
77:25 78:4,12
97:18 196:20
222:13 232:4
314:4 316:9
323:20
**school's** 401:11
**schwartzmann**
2:3 7:9,10
100:7 147:3
209:7,14
216:17,23
217:2,6,12
218:10,20
219:3,23 220:4
220:10 248:17
257:21 258:1
326:20 327:3
333:16 401:16
**science** 71:10
**scope** 50:21
275:2 333:23
**score** 196:21
**screen** 147:18
148:1,3 150:6
**screenshot** 5:15
294:6,7,12,17
294:18,21
295:6,11,12,15
300:18,21

305:4,6 306:9
307:25 308:2
396:11,12
**seal** 409:4
**search** 99:22
149:9 150:3,5
151:3,19
152:17,18
156:5 177:11
177:12 330:8
336:2 345:10
349:17 368:21
371:9
**searched** 151:5
368:21
**searches**
157:18
**searching**
150:12,15
**seat** 31:25
33:15,19 375:3
394:9
**second** 15:13
16:22 21:17
27:23 57:25
236:3 245:25
263:19 291:25
317:17 318:9
318:21 328:19
359:22 367:10
368:3 384:5
386:20
**secondary**
19:21 160:8
314:12

**secret** 57:21
**secretary** 41:11
41:16 44:25
66:22
**section** 62:6
**secure** 391:18
**secured** 393:12
**see** 20:22 29:2
33:23 34:14
44:14,16 45:4
49:24 51:13
52:3 53:10,25
58:1 62:10
65:15 73:23
74:4,8,10
88:17,22 89:3
95:2 99:14,22
99:23 107:5
109:22 110:11
111:3 114:13
114:16,17
115:1,20 137:1
139:6,12
140:12 141:4,8
141:9 151:2
154:22 161:17
164:11 173:21
174:13,25
176:12,13
177:9 182:4,20
183:7,21
184:11,19,23
184:24 185:5
185:24 192:10
192:17,25

194:10 211:10
211:14,19
213:20 218:22
225:21 226:4
229:21 234:14
234:17 251:11
251:18 253:12
258:21,23
259:1,2 260:23
262:20,21,22
262:25 264:14
264:15 265:10
265:14 275:11
275:20 276:7
281:9 286:12
288:17,20
291:10 293:10
298:22 306:5
307:20 308:22
310:5 312:4,21
317:5 318:5
325:23,25
326:2,3 327:7
327:17,21
329:8,18 330:6
336:1,10,13,14
336:16,21,23
337:4,13 338:9
339:10,16
346:24 349:6
352:4 355:9,25
360:11 361:22
363:18 371:19
372:13 388:3
389:21 390:3

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[see - send]**

| | | | |
|---|---|---|---|
| 390:14 391:21 | **sees** 80:25 | 72:2 73:22 | **senator** 8:5,7 |
| 394:7,20 | **seldom** 130:21 | 75:20,21 78:24 | 10:3,8 12:19 |
| 395:18 396:24 | **select** 38:24 | 79:22 82:4 | 13:15,17 31:23 |
| 397:13 401:9 | 39:2,5 40:2 | 97:5 117:8,9 | 33:15,19 34:14 |
| 403:7 | 47:11,12 59:14 | 119:18,23 | 35:4,4,6,8,20 |
| **seed** 15:17 | 59:16 60:3,16 | 121:19 122:1,7 | 36:3,7 37:10 |
| **seeing** 27:6 | 61:22 62:8,17 | 126:19,22,23 | 37:14 48:22 |
| 67:1 73:18 | 62:18 63:6,13 | 127:19 130:5 | 49:17 69:1 |
| 80:21 210:24 | 64:2,4,5 68:5 | 131:17,22 | 71:21 73:9 |
| 231:6 301:18 | 123:6 235:5 | 133:1,8,9,15,19 | 98:23 115:22 |
| **seek** 92:3,11,21 | 244:6 246:18 | 133:19,22,22 | 121:22 149:16 |
| 97:10 99:1 | 247:22 249:11 | 133:25 134:1,8 | 149:20,23 |
| 105:1,5,17 | 249:12 263:15 | 134:10,22 | 150:1,22 |
| 254:10,12 | **selected** 18:25 | 135:12,16,17 | 151:17 168:11 |
| **seem** 306:23 | **selection** 39:24 | 136:1,1,7 | 213:4 217:14 |
| 339:22 393:6 | **semester** 205:5 | 148:18 152:11 | 225:1 258:8,16 |
| **seemingly** | **sen** 150:8 | 155:5 157:20 | 333:17 353:13 |
| 221:6 | 151:14,16 | 160:17 163:7 | 360:1 363:11 |
| **seems** 286:22 | 152:1 | 175:7 180:23 | 368:4 374:23 |
| 286:25 287:25 | **senate** 4:14 | 184:8 185:4,6 | 375:3,15 382:7 |
| 296:20 300:15 | 16:8,8 19:13 | 185:8 187:24 | 382:21 384:21 |
| 301:1 303:16 | 20:18 22:7 | 188:1,19 190:3 | 384:23,25 |
| 304:11 308:2 | 23:13 29:19 | 190:5,16 192:3 | 385:1 411:5 |
| 318:16 383:12 | 31:22 32:3,25 | 192:5 204:5,8 | 412:2,24 413:2 |
| 391:6 | 33:3,14,22 | 205:23 206:16 | 413:4,12 |
| **seen** 18:3 68:3 | 34:11 37:22,24 | 221:18,18 | **senatorkrj** |
| 78:15,15 81:2 | 38:9,14 39:11 | 224:4 228:7,9 | 148:4 149:4,12 |
| 167:2 170:25 | 39:11,16 40:20 | 228:15,16 | 150:7 233:3,19 |
| 171:19 177:21 | 41:4,5,11,16 | 239:3 244:25 | **senators** 32:8 |
| 193:14 255:20 | 42:2,5 46:11 | 245:13 246:17 | 32:13 89:24 |
| 288:13 302:19 | 46:18 49:2 | 249:16 256:19 | 119:17,23 |
| 302:23 303:23 | 52:19 57:3 | 264:23 304:18 | 191:6,7,9 |
| 303:24 307:12 | 59:11 64:12,19 | 375:3 388:25 | 223:22 |
| 354:24 355:14 | 64:20 66:25 | 390:2 403:8 | **send** 19:15 |
| | 71:9,15,16,23 | | 35:13 41:17 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[send - settings]**

95:22 96:1,17 96:18 97:13,14 106:20 107:12 113:5,6 114:10 114:11,18,19 115:18 118:7 120:11,24 137:14 158:13 175:1 181:10 196:8 197:14 197:22 207:10 209:6 318:6,7 319:16 330:24 334:22 335:12 335:14 348:4 370:12 404:22

**sending** 117:7 118:8 156:23 171:14 180:5 197:20 252:25

**sends** 114:10 345:5

**senior** 52:1 79:7 90:15,16 90:17 195:14 197:18 198:25 199:15,16

**seniors** 197:17 199:9,10,20,21

**senlandrieu** 224:19 276:16 276:20,25

**sense** 129:13 212:11 332:1

**sensitive** 36:24 59:23 76:8

**sent** 92:15 114:21 129:9 147:12 150:19 155:3 209:1,5 212:12 213:3,8 213:17 225:25 234:17 322:10 322:21 330:8 330:11,12 331:4,12,16,23 332:1,7,12,24 334:3,23 335:3 335:7,22 336:5 347:17,18 348:4 349:18 358:5 368:23 371:20 394:3 411:14

**sentence** 304:20 334:22

**sentences** 255:7

**separate** 345:22

**september** 1:22 4:20 7:2 224:7 409:10

**sergeant** 298:8

**series** 250:2,5 250:10,14,19 250:22 251:3

**serious** 12:6 28:21 79:2

**seriously** 90:10 163:15 352:10

**servant's** 189:14

**serve** 16:1,11 20:25 21:7 29:16,18 31:18 32:12 34:16,18 34:19,22 37:18 38:17,19,20,22 38:22,24 39:9 39:10,17,18 49:13 55:24 64:8,9,12 65:6 65:9 72:1,19 111:15 189:14 244:5 249:15

**served** 16:10 17:3 22:1,6,7,8 22:13 27:8,9 37:13 38:15,18 40:6,7,11 43:20 72:6

**serves** 23:1

**service** 79:13 116:15

**services** 71:7 409:21

**serving** 16:12 21:1 61:2

**session** 16:10 18:12 36:13 43:21 49:22 50:7 57:7 59:23 60:5

63:9 65:12 69:23 81:15 87:15 100:18 107:10 110:1,2 111:4,14 112:12 113:13 117:9,25 118:1 119:19 123:22 123:22 126:6 128:8 154:15 155:24 157:13 158:10 159:21 160:1,20 200:9 200:13 229:9 229:11,12 239:19 250:4 251:15 263:14 273:15 320:25

**sessions** 321:3 321:7

**set** 67:10,11 92:4 113:19 117:20 119:19 134:5 136:24 137:15,19,19 138:10,11,14 138:15,18,20 139:2,7 248:3 248:6,7,12,21 249:2,5 264:6 354:14 409:11

**setting** 141:20 145:7

**settings** 143:24 144:3,11,12

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[settings - sincerely]**

| | | | |
|---|---|---|---|
| 145:2 171:17 | 313:1,8,10,11 | **shortly** 343:19 | **shows** 137:2 |
| **seven** 55:9 91:6 | 313:14,16,18 | **shot** 175:1 | 148:14 192:15 |
| 192:6,6,8 | 314:19 315:19 | **show** 147:14 | 212:13 220:18 |
| 193:25 372:11 | 315:22 316:18 | 181:18 182:18 | 294:21 296:12 |
| **seventh** 90:2 | 317:10 320:8 | 182:22 183:7 | 296:19,23 |
| **several** 33:11 | 321:11 322:23 | 188:15 207:18 | 300:22 308:6,7 |
| 33:12 89:22 | 323:1 324:23 | 224:5 231:15 | 308:14,15 |
| 96:21 129:1 | 325:20 327:20 | 238:12 239:8 | 328:10 383:9 |
| 144:2 188:25 | 336:25 337:10 | 240:19 243:18 | **shut** 34:10 |
| 238:2 332:12 | 337:11 354:17 | 249:22 252:6 | 181:13,15 |
| 344:4 366:11 | 354:21,24 | 270:22 276:1 | **shutting** 144:3 |
| 379:8 | 355:3,8,9,12,23 | 294:5 296:22 | **sic** 153:8 |
| **sex** 390:18 | 356:1 411:4 | 299:20 300:21 | **sick** 181:10 |
| **sexual** 62:22 | 412:1 413:1 | 304:3 305:14 | 390:21 |
| 235:9 237:17 | **sherman's** | 313:19 316:16 | **side** 165:2 |
| 237:19 | 322:3,4 | 323:3 359:20 | 271:9,13,14 |
| **shake** 10:16 | **she's** 305:20,22 | 375:12 380:14 | 298:22 |
| **share** 58:5 99:5 | 306:23,24 | 381:17 383:14 | **sign** 138:17,21 |
| 119:17 161:25 | 307:7 356:21 | 388:1 390:4 | 194:11,25 |
| 162:1,3 264:1 | **shift** 57:12 | **showed** 155:10 | 201:21 211:10 |
| **sharon** 118:24 | 106:16 207:16 | 170:18 183:5 | 349:12 404:16 |
| **sheet** 411:11 | 239:23 257:20 | 212:23 232:21 | 404:20 411:12 |
| **sheriff** 29:22 | 275:8 299:19 | 355:17 383:6 | **signature** 409:3 |
| **sheriff's** 102:14 | 396:25 | **showing** 39:4 | **signed** 138:13 |
| **sheriffs** 26:8 | **shifted** 72:25 | 153:22 170:12 | 139:8 304:19 |
| 101:12 102:13 | 102:11 | 215:17 222:5 | 385:23 411:19 |
| 102:16 | **shifting** 78:22 | 227:1 229:17 | **signifies** 137:4 |
| **sherman** 1:5 | **shifts** 37:4 | 234:21 237:2 | **signify** 314:22 |
| 2:2 226:16,17 | 81:16 | 246:7 249:18 | **signing** 3:13 |
| 226:20 309:8 | **shirts** 101:17 | 253:22 255:23 | 330:1 |
| 309:10,11,12 | **shocked** 118:19 | 285:4 305:17 | **sills** 1:19 2:12 |
| 309:15,18 | **shop** 101:4 | 325:18 356:12 | **similar** 52:16 |
| 310:17 311:13 | **shopping** | 363:2,5 367:5 | 89:24 |
| 311:20 312:5 | 289:20 | 383:4 391:25 | **sincerely** |
| 312:16,17,20 | | | 282:21 |

**[single - sorry]**

single  262:9
  267:2,24 377:5
  377:8
singled  379:20
sinus  11:5
sister  184:25
sisters  183:24
sit  11:24 24:10
  30:24 99:19
  131:21 213:22
  214:2,3,8
  348:18
site  389:16
sits  71:15
sitting  21:1
  91:14 128:23
  141:18 142:9
  155:12,13
  238:10,11
  243:16 253:16
situation
  217:11 288:2
six  20:10 59:22
  185:4,7 192:1
  193:25 385:10
  396:13 401:5
sixteen  116:15
  143:17
sixth  34:1
  292:21
sixty  13:4
  116:13
sizes  21:14
skips  296:21

skyrocketing
  273:15
sleep  14:22
  87:17
slip  36:12
slow  17:22
  197:25
slowed  86:23
slumped  91:3
slur  284:8
  313:9
slurs  284:4,14
  284:15 312:10
  312:17
small  13:1
  91:11 100:16
  100:17 353:5
smaller  32:10
  33:7 74:14
  249:17 251:25
smart  266:10
  281:24 284:7
  356:15,20
  380:5
smartest  59:2,3
social  88:16,18
  88:22 89:1,4
  97:14,16
  105:20 120:17
  120:19 121:4
  121:13,23
  122:18,20,22
  126:8,23 127:4
  131:19 132:19
  132:24 133:2,5

135:13 140:13
140:18,24
141:11,12,16
142:25 143:4
145:18 151:1
154:5,9 157:15
158:1,4,15
160:3,15 161:2
162:23 163:21
165:6,10
169:25 170:2
181:4,5,8
182:7 208:17
215:13 221:16
242:10 262:4
273:5 274:16
281:20 285:15
293:18 356:3
358:15 368:11
sold  15:2
sole  53:24
  203:3,6 261:6
solemnly  9:6
solicit  100:2
  126:5 135:19
  164:24 173:7
solicited  122:22
  125:23
solutions
  230:19 411:23
solve  317:7
someblocked
  336:21
somebody  23:1
  100:19 162:7

171:18 175:1
176:13 177:21
180:3 181:10
197:6 198:6,12
201:7 205:19
266:4,14 269:6
299:10 305:13
316:12 328:23
336:21 338:5
342:18 345:5
388:5,9
somebodyblo...
  338:22 343:3
somebodyblo...
  340:24 341:9
  346:10,17
  347:2 352:8
  371:25
somebody's
  308:3,9
someone's
  107:18 111:24
someone's
  243:10 262:7
  342:2
something's
  197:18
somewhat
  16:23 78:15
  298:19
soon  66:19
  75:12
sorry  16:8 93:5
  118:4 147:22
  152:20 159:24

**[sorry - staff]**

184:12,22
187:20 214:22
235:15 236:24
249:20 253:6
277:8 287:8
303:9 309:13
329:24 330:19
341:18 344:7
361:25 365:9
367:11,14
394:24
**sought**  153:8
**sound**  121:16
**sounds**  26:19
**source**  160:16
163:6
**southern**  57:7
75:5,8
**spanning**  191:9
**sparked**  66:14
**speak**  80:12,14
83:24 84:4,22
85:18,20,23
86:4,17 100:16
228:16 287:21
299:15 361:19
400:2
**speaker**  19:1,5
19:9,10,23
24:22,24 64:21
**speakers**  21:12
**speaking**  35:21
78:5 81:5,13
81:16,19 82:5
83:13 85:12

278:12 279:25
280:13 284:21
289:19 384:7
**speaks**  126:22
228:14
**special**  92:4
93:4,5,7,15
**specific**  80:21
122:24 124:24
125:4 166:20
175:6,12 176:1
176:3,5 199:11
207:17 232:7
250:22 260:7,7
281:23 292:4
333:3,12 372:9
**specifically**
68:25 91:19
125:24 250:25
308:23 315:23
319:12 355:2
372:11 380:7,9
380:10
**specifics**
164:19 265:23
**speech**  282:10
283:1 359:5,17
364:13,14,21
364:23 366:23
375:20 376:14
376:17,21,25
377:3,11,17
378:5,6,9,12,17
379:18 380:2
380:11 386:13

402:16
**speeches**  85:3
**spelled**  408:19
**spelling**  408:16
**spend**  311:25
**spirit**  14:3
**spiritual**  14:5
**spoke**  11:19
82:10,13 83:3
83:22 85:11,12
85:15,16,20
172:23 347:4
400:10 402:2
**spoken**  83:9,11
85:4,22
**sponsor**  35:23
80:8 89:19,20
97:11 165:2
**sponsored**
79:22 167:22
196:16 301:19
301:24 302:10
303:1 385:18
385:24
**sponsoring**
196:16 323:19
**sponsorship**
372:16
**spontaneous**
408:8
**sports**  296:3
298:11,13
**spread**  39:16
191:5

**spring**  61:4
**springed**  61:7
**st**  397:23
**stack**  53:14,14
53:21 54:4,14
55:3 111:6
**staff**  27:4 36:14
66:25 89:2,11
92:15 93:25
94:4 95:13,16
95:23,24,25
96:16,21,25
99:24 101:3,3
101:4 106:6,16
107:6,15
108:14,16,21
109:18,19
110:9,14 111:2
111:19,25
112:9 114:10
115:8,14,15,18
115:21,25
116:3 117:2,2
117:3,24
119:11,11,13
119:23,24
140:22 142:10
143:7,20 158:9
158:9,11,17,24
168:5 172:4
195:8 196:8
197:4 200:1,25
201:11 202:2
203:17,22
204:1,13,15

Page 85
Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company          www.veritext.com

**[staff - stated]**

206:14 207:10
207:13 239:17
239:18,24
240:17 264:2,2
399:9
**staffed**  57:3
**staffer**  27:9
36:16 106:7
107:12 109:15
109:15,22
110:11 116:10
116:19 117:15
118:3,23
131:12 168:21
169:10,12
194:19 203:20
204:16 205:7
251:4,10
**staffers**  97:3
108:10 116:2
116:14 158:19
159:2,15
168:12,17
186:19 205:24
264:21
**staffing**  13:21
141:1
**staff's**  371:13
**stakeholders**
87:22 88:16
130:19
**stance**  82:18
**stand**  271:9
**standard**  28:23
29:6 171:10

251:9,18 264:4
283:25 352:19
353:24 354:5
362:2,6 373:7
**standards**
282:25
**standing**  39:2
39:24 40:18
45:10 69:23
403:1
**stands**  274:25
**start**  10:3
12:15,15 33:24
38:16 41:19
48:3,4 50:18
65:12 66:14,16
66:19 70:10
82:10 90:11
107:8 131:17
142:4 143:1
144:3 171:14
171:15 194:17
200:12 228:1,3
245:19 251:5
253:11 258:14
277:16 278:18
**started**  10:1
21:5 57:8 60:2
82:3,4 87:1
92:9 94:6
113:3,14
131:11 148:14
148:18 154:19
156:23 159:20
177:1 180:5

317:2 318:14
321:8 339:23
397:10 400:13
**starting**  77:22
87:2 126:7
281:8
**starts**  111:14
142:23 143:18
280:5,6 318:14
360:10 391:6
394:22
**state**  3:10 7:6
10:4 13:9,14
14:21 15:7,24
15:25 21:3
25:14 26:13
31:22 32:3
33:22 34:23
37:14,20 39:5
40:2,3 44:7,17
45:4 46:9 52:3
55:13 61:14
62:9 64:16,16
64:17,17,18
72:11,20,24
76:1,11,13
77:22 78:3,20
80:10,19 81:18
82:5 83:18
87:23 100:13
100:17 102:11
103:2,3,23
117:10 121:22
123:6 124:6,8
128:13,14,15

150:23 186:12
186:17 189:13
189:18,22
190:2,6,9,12,14
190:18,24
191:2,11,12,15
191:17 198:6
228:14,16,16
244:6,10
246:18 247:22
247:23 248:19
249:6 251:14
252:12,23
253:13 254:13
264:19 266:7,8
320:12 338:6
342:1,3,23
343:2,8 345:8
358:2 375:15
385:25 398:2
399:5,15,23,24
399:24 400:17
400:19,24
401:2 402:3,6
402:20,22,23
403:1,2 404:9
408:3,7 409:6
**stated**  1:1
72:19 123:4
203:2 240:16
256:16 275:15
278:22 331:13
331:17 332:16
335:11 350:10
350:10 370:2

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[stated - submitted]**

376:24 379:11
379:12 402:16
404:8
**statement**
94:21 186:8,9
187:17 189:12
208:16 242:19
307:19,24
358:10 359:10
364:8 365:3,4
365:10,14,21
365:21,24
370:21,24
371:1,3,4,10
376:5,7,11
**statements**
186:16 358:9
358:14 362:21
**states** 37:21
81:19 85:6
253:13 391:22
**statewide** 79:23
80:4,6,9,22
102:2,3,9,18
190:24 247:14
247:16
**stating** 224:20
**statute** 66:2
409:18
**statutes** 3:9
**stay** 100:13
**staying** 187:2
**stays** 182:7
200:15

**step** 51:8 60:23
105:21 110:2
172:3,8,14,15
209:9
**stepfather**
86:23
**stepped** 75:7
**steps** 311:16
329:14
**sterling** 248:18
248:19,20
**stick** 88:10
105:14 218:24
280:16 306:20
**stickler** 88:2
**stipulated** 3:2
**stipulations**
1:17
**stop** 101:4
245:14 260:18
286:23
**stopped** 92:6
262:12
**store** 37:2
289:20
**straight** 35:13
143:21 399:21
**straightforward**
66:9 87:14
**stray** 28:3
**stream** 136:5
**streamlined**
226:1
**street** 1:20 2:5
2:8,13,18,22

87:3
**strike** 346:10
373:2 392:4
400:5
**strive** 115:3
**strong** 26:25
27:1 63:17
**stuck** 56:19
108:14
**student** 51:14
51:15 56:15
117:11 119:21
119:22 165:25
166:5 167:3,5
**students** 57:6,7
100:9,10
205:18 323:20
**stuff** 12:25
47:24 62:25
85:20 87:9,11
120:18 126:3
130:12 131:2,5
134:12 136:1
142:15,23
143:18 144:3
146:13 147:6
156:23 161:8
162:8 165:12
176:14 195:22
200:18 203:8
220:7 239:20
240:13 254:24
262:12 282:21
335:15 344:3
359:14

**stupid** 277:7
278:19,20
281:5,25 284:7
**subcommittees**
17:3 39:1
**subject** 12:3
25:6 29:13
30:6 31:9 44:7
44:9,20 45:7
54:18 56:2
57:1 58:3 59:6
62:18 88:11
99:6,23 113:1
113:12,16,25
125:7 197:8
224:9 232:2
241:13 246:16
256:12,13,24
260:13 274:3
282:3 325:15
355:19 372:1,2
374:19
**subjected**
269:10 282:21
359:4,6 364:20
**subjective**
361:5,5,7
362:19,20
**subjects** 80:14
80:19 81:4
**submit** 19:20
192:20
**submitted**
18:19

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

**[subpoenaed - suspended]**

| | | | |
|---|---|---|---|
| **subpoenaed** 329:21 | **suite** 1:20 2:13 | **supposed** 106:14 114:8 229:6 | 230:4 231:2 238:15,17 241:22 242:14 |
| **subscribed** 413:14 | **sums** 116:16 | **supposing** 314:8 | 242:17 248:9 248:13 249:16 |
| **substance** 30:5 | **superintendent** 248:24 | **suppression** 72:22 73:19,20 | 249:17 253:5 |
| **substantive** 44:16 45:7 54:3,17 398:4 398:20 | **superintende...** 104:15 | **supreme** 312:9 364:22 366:24 377:21 378:20 | 254:4,7 259:15 261:19,20 264:12 273:3 276:3,7 279:1 |
| **successions** 13:1 | **supervision** 409:14 | **sure** 10:6 19:4 24:12 26:3 | 286:2,7 292:14 294:9,14,19 |
| **sudden** 14:12 142:23 345:11 | **supplement** 205:22 | 36:2 37:7 40:17 41:17 | 295:18,23 301:21,23 |
| **suddenly** 340:11,12,13 | **supplemental** 141:6 328:5,16 328:19 349:23 349:24 | 44:17 70:15 71:6 80:25 102:22 108:7 | 302:2 305:11 305:18 306:22 307:7,11 |
| **sue** 352:11 400:20 | **support** 67:16 144:16 221:1 221:21 222:2 231:22 232:3 277:3 301:21 375:9 381:2 382:1 387:10 390:19 391:10 391:19 | 122:4 133:12 138:4,22 139:23,25 143:19 148:9 148:24 153:2,5 153:18 154:14 154:18 156:6 156:19 164:1 164:10,12 | 308:15 311:18 311:19 317:1 317:24 318:1 318:16 324:25 334:17 336:7 353:15 358:4 364:1 369:7,13 372:24 378:2 |
| **sued** 310:21 360:1 363:11 | | | |
| **sues** 399:25 | | | |
| **suffering** 87:14 | | | |
| **suggest** 70:4 | | | |
| **suggested** 210:25 211:5 | **supported** 386:24 391:3 391:15 | 167:16,19,20 167:23 173:3 | 392:19 393:3,4 393:15 397:3 |
| **suggesting** 219:8 292:18 | **supporters** 387:11 | 173:10 175:25 177:9 179:5 | 398:18 399:14 400:19 402:3 |
| **suggestion** 317:10 322:18 | **supporting** 232:13 288:18 357:22 | 185:13 193:24 194:3 201:25 | **surgeon** 66:23 **surrounding** 299:16 303:25 |
| **suggestive** 69:19 96:17,18 | **supports** 276:20,22,25 | 210:23 211:18 212:16 220:9,9 | 309:3 324:5 **suspended** 60:4 |
| **suing** 401:11 | **suppose** 294:24 | 222:23 225:3 | |
| **suit** 309:18 336:21 358:7 402:1 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[swear - talking]**

| | | | |
|---|---|---|---|
| **swear**  7:8 9:6 | 383:1 | 117:5 146:1 | 134:10,12 |
| **swearing**  3:14 | **tagged**  126:17 | 168:3 172:1,16 | 153:16 176:8 |
| **switch**  39:24,25 | 126:25 127:2,3 | 209:8 211:2 | 181:17 190:21 |
| **switched**  70:16 | 127:5 165:10 | 257:22 264:11 | 194:23 195:2 |
| **sworn**  9:15 | 165:13,15 | 286:19 287:11 | 207:16 245:24 |
| 13:19 15:22 | 166:1,7 167:3 | 288:16 311:16 | 255:17 256:13 |
| 34:8 397:22 | 167:7 176:14 | 323:5 349:6 | 258:8,16 |
| 409:9 413:14 | 228:11 254:16 | 352:10 353:4 | 260:24 262:15 |
| **symbol**  146:15 | 305:8 308:3,12 | 356:2 367:10 | 265:23 273:12 |
| 146:16 | 308:20 314:5 | 401:8,20 | 275:24 279:19 |
| **synonymous** | 314:14 315:23 | **taken**  1:15 3:6 | 291:11,23 |
| 70:16 | 318:24 319:8 | 14:23 51:24 | 299:19 309:5,7 |
| **system**  61:10 | 319:12,13,14 | 63:4 81:13,17 | 313:6,17 |
| 67:10 80:18 | 319:15 322:5 | 105:9 124:15 | 371:18 376:13 |
| 113:22 116:6 | **tagging**  177:22 | 124:17 133:12 | 390:23 391:23 |
| 205:4 399:1,3 | 228:3 305:19 | 145:3,22 156:8 | **talked**  34:12 |
| | 305:22 | 201:1 264:7 | 37:23 79:25 |
| **t** | **tags**  156:9 | 285:7 297:7 | 108:8 112:15 |
| **t**  3:1,1 169:24 | 171:19 305:11 | 304:18 408:7 | 120:4 123:20 |
| 266:11 281:25 | 316:3 | 409:7 | 177:20 181:11 |
| 283:25 284:1,7 | **tailed**  157:3 | **takes**  52:12 | 185:14 203:13 |
| 284:11 312:11 | 321:20 | 91:13,15 | 235:1 248:1 |
| 352:12 356:19 | **tailor**  87:9,10 | **talk**  9:19 17:22 | 264:13 272:4,5 |
| 357:10 375:24 | **tails**  209:5 | 51:11,19 54:19 | 288:13,20 |
| 379:22 380:5 | **take**  10:13 | 57:15 59:13,19 | 290:6,7 293:10 |
| 381:3,14 | 11:16,17,18 | 76:18 79:24 | 338:3,5,8 |
| 386:17 403:5 | 16:2 17:13 | 86:13 89:2,18 | 346:23 350:15 |
| 412:3,3 | 18:15 25:20 | 92:24 94:15 | 352:2 354:9 |
| **tackle**  256:25 | 28:22 37:14 | 95:4 98:24 | 361:1,25 |
| **tactics**  109:1 | 43:9,9 47:25 | 102:11,13,13 | 369:21 370:10 |
| **tag**  127:6 229:3 | 48:7,15 51:6,7 | 102:17,18 | 370:20 376:16 |
| 229:5,7,7 | 63:21 66:13 | 103:1,6,21,23 | 379:10 386:12 |
| 254:6 305:21 | 67:13 78:18 | 110:3 117:12 | 390:18 |
| 305:24 306:25 | 81:16 107:15 | 120:8,12 127:8 | **talking**  54:21 |
| 308:5,7,10,17 | 110:18,21 | 130:15 131:3 | 66:16 69:4 |
| 316:1 319:6,10 | | | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[talking - testimony]**

93:2,19 95:11
97:17 103:2
106:8 110:7,12
122:19 217:9
253:1 258:14
267:12,14,16
281:6 299:6
320:18 333:5
337:6 340:13
390:15 402:24
**talkovers**
  408:11
**talks**   198:12
  392:11
**tapered**   86:17
**targeted**
  198:10 199:9
**targeting**
  295:22
**task**   39:6 64:2
  65:6,9,12,14,18
  65:19,21 66:9
  67:20 68:5,10
  68:16,22 69:4
  69:5,24 70:1,3
  70:4 79:25
**taught**   144:20
**tax**   15:4 111:6
  222:12 317:9
  317:11,14
  319:3,23
  320:14,17,17
  321:14
**taxes**   317:7
  320:12

**taxpayer**
  276:21
**teacher**   29:18
  57:2 150:19,20
  150:22 157:23
  178:12,14
  234:7 256:14
  256:18 257:13
  274:17,21
**teacher's**
  104:13,14
  110:17
**teachers**
  101:19 102:8
  290:7 314:2
**team**   224:25
**tech**   205:5,6
**teenagers**
  360:17 361:16
  361:19,20
  390:2
**teens**   362:3,5
**tell**   10:21,23
  11:8 16:14
  17:22 25:10
  41:5 42:18
  49:2 54:23
  65:18 79:6
  81:11 87:12
  88:22 92:16
  96:25 104:16
  106:12 107:15
  108:14 109:5
  109:21 111:10
  111:11 126:4

137:16 142:21
144:21 154:24
163:15,16
164:2 165:25
170:15 192:12
197:15 221:11
221:24 227:18
234:3 236:17
239:16 262:11
263:18 264:2,8
274:23 275:1
279:23 286:10
288:2,7,15
300:5 316:6
324:16 325:3,5
329:14 331:10
334:20 361:13
365:7,15
375:22 400:12
403:10,20
**telling**   93:22
  106:3 136:20
  250:14,23
  342:21 386:17
  390:16 396:17
**tells**   141:4
  144:11 180:25
  238:22 255:20
  283:13
**ten**   112:23
  116:22 216:5
  277:24
**tend**   188:13
  281:10,11

**tensas**   91:10
**tense**   142:21
**tenure**   230:25
**term**   16:22
  18:3 21:17,24
  27:3,5,9,12,15
  27:23 28:1
  31:23,23 33:15
  33:19 38:16,18
  38:21,22,23,25
  39:11 40:2,7
  41:15,21 42:22
  42:23 43:19
  45:12,22 49:19
  49:21 59:21
  70:17 280:3
  377:4 397:10
  397:10,12
**terms**   35:1
  42:19 267:11
  281:18
**territory**   32:18
  189:14
**testified**   99:11
  177:10 201:17
  268:17 277:14
  278:18 279:14
  293:17 404:1
**testify**   9:16
  23:24 30:13,16
  234:19 409:10
**testimony**   9:7
  18:15,17,17,18
  23:17 24:3,17
  26:21 30:8,19

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company              www.veritext.com

**[testimony - things]**

| | | | |
|---|---|---|---|
| 30:22 50:24 | **that's** 221:3,6 | 375:8,21 | 298:12 300:6,6 |
| 63:4,21 65:17 | 223:23 225:14 | 378:16 380:21 | 306:13 307:2 |
| 105:25 110:4 | 228:6 229:23 | 381:11 383:4 | 308:4 338:10 |
| 121:10 177:6 | 230:21 232:13 | 383:12 384:6,7 | 347:7 |
| 245:3 247:10 | 233:16 234:5 | 384:7 389:19 | **they've** 283:20 |
| 247:12,19,21 | 238:16 246:20 | 389:23 392:18 | **thing** 14:8 37:8 |
| 267:23 268:22 | 247:12,25 | 395:3,21,25 | 46:17 52:17 |
| 310:6,11,15,16 | 250:11,21 | 396:23 401:22 | 60:15 62:22 |
| 312:25 320:1 | 251:25 254:4,4 | 404:1,8,11,13 | 69:20 116:9 |
| 336:24 340:11 | 254:23 258:25 | **thayes4** 2:14 | 127:21 135:22 |
| 346:8,11 350:7 | 260:13 262:8 | 411:2 | 136:22 138:13 |
| 352:14 365:12 | 263:7,9,19 | **thegermange...** | 176:5,19,22 |
| 409:7,12 411:9 | 264:20 271:12 | 392:9 | 179:16 187:6 |
| 411:17 413:8 | 271:15 272:14 | **theirs** 159:14 | 228:12 229:4 |
| **text** 104:14 | 275:2,15,20 | **thereof** 3:13 | 235:13 237:25 |
| 110:5 129:25 | 278:8 282:14 | 410:9 | 245:11,22 |
| 131:6,11 170:1 | 284:11 287:25 | **theresa** 117:16 | 250:13 271:16 |
| 172:10 254:21 | 289:21 290:1 | 118:2 169:14 | 277:7 298:6 |
| 264:7 | 291:2,16,20,24 | 169:16 203:19 | 300:23 317:8 |
| **texting** 168:5 | 292:23 293:9 | 204:19,20 | 326:8 354:16 |
| 179:7 264:2 | 293:11 298:6 | 205:25 | 358:2 362:10 |
| **texts** 112:9 | 299:3 304:10 | **theresa's** | 371:8 389:13 |
| 131:9 142:10 | 305:22 310:10 | 204:22,25 | 396:22 |
| 143:11 264:8 | 313:12 318:10 | 206:4 | **things** 18:9,10 |
| **thank** 9:13 11:9 | 319:22 320:6 | **there's** 223:12 | 26:10 31:1 |
| 15:21 115:21 | 321:16,21 | 247:22 263:22 | 35:22,23,25 |
| 171:1 178:7 | 322:8 323:2 | 282:2 283:25 | 37:6 43:2,6 |
| 226:18,19 | 328:9,10 329:2 | 295:8,10 | 69:13 71:16 |
| 292:2 314:23 | 331:3,24 | 318:16 322:6 | 76:7 86:25 |
| 315:1,19,21,24 | 336:18 340:4 | 333:12 334:5 | 88:12 94:21 |
| 316:4,12 323:6 | 343:2,13 346:5 | 354:2 362:19 | 105:14 111:9 |
| 325:4,5 404:13 | 348:10 349:13 | 371:2 377:14 | 119:1,2 122:20 |
| **thanks** 114:19 | 355:22 359:11 | **they'll** 298:24 | 123:21,23 |
| 226:21 392:24 | 366:3,6,19,22 | **they're** 235:13 | 157:6 158:5,12 |
| | 366:25 374:6 | 263:14 264:25 | 187:17 195:2 |

**[things - thought]**

| | | | |
|---|---|---|---|
| 195:12 196:23 | 119:20 120:13 | 267:2,5 268:19 | 371:17 373:6 |
| 229:3,7 234:12 | 122:11 126:18 | 269:1 270:21 | 378:7 382:14 |
| 238:23 273:7 | 127:17,25 | 272:16 274:1 | 382:15 384:2 |
| 279:4 282:15 | 128:12 129:6 | 282:5 283:25 | 389:5,7 393:6 |
| 284:18 285:19 | 130:14 133:11 | 284:11 285:19 | 394:24 396:5 |
| 297:7 298:3 | 134:4,5 136:14 | 288:17 291:8 | 396:22 397:16 |
| 301:11 307:2 | 136:21 138:18 | 292:8 298:19 | 397:17,19 |
| 311:11,23 | 138:24,25 | 303:3 307:14 | 398:19 400:17 |
| 316:25 360:20 | 139:7,9,13 | 309:9 316:21 | 401:17,22,23 |
| 361:15 373:6 | 141:2 146:15 | 316:21 317:11 | 402:5 403:15 |
| 389:6,22 395:2 | 149:9 152:7,19 | 317:16 318:18 | **thinking** |
| **think**   12:6 13:4 | 155:18 156:21 | 321:16 322:5 | 292:10,12 |
| 17:2 19:9 | 156:21 157:3 | 326:13 328:20 | 377:11 |
| 21:23 22:12 | 164:21 165:9 | 329:7,21,23 | **thinks**  66:25 |
| 24:18 30:14,22 | 167:1,23 169:6 | 333:23 334:23 | **third**   15:14 |
| 34:1 35:5,15 | 173:5,6 174:5 | 335:6,19 336:2 | 127:23,24 |
| 36:7 37:5,20 | 177:22 178:6 | 337:25 338:1 | 134:17 276:9 |
| 39:9 41:2,2 | 178:13 183:10 | 339:13 340:20 | 276:21 |
| 47:10 52:23 | 184:5,14 190:7 | 340:21 341:12 | **thirds**   73:7 |
| 56:5,16 58:15 | 190:8 191:9 | 343:6,6 344:4 | **thirteen**   218:4 |
| 58:22,24 61:2 | 192:25 195:12 | 345:21,22 | 385:12 396:7 |
| 66:4,23 67:13 | 195:18 200:16 | 346:3,6,7,13,14 | **thirty**   91:15 |
| 68:17 70:9,11 | 201:3,12 202:1 | 346:20,21 | 97:4 111:15 |
| 70:13,25 71:7 | 202:12,14,14 | 347:18 348:7 | 116:16 372:11 |
| 71:22 73:9 | 202:22 204:23 | 348:19 349:18 | 396:14 |
| 75:11 78:17 | 205:5,9,10,15 | 350:12,14 | **thomas**   2:11 |
| 79:4,14 81:21 | 205:15,20 | 352:11 354:5 | 8:4 411:1 |
| 82:7,20 83:5,9 | 207:7 209:8 | 354:13 356:24 | **thompson** |
| 83:17 84:21,23 | 215:7,10,14 | 357:1 358:13 | 374:24 375:3 |
| 84:24 85:10,21 | 217:13 219:18 | 358:16 359:9,9 | **thoroughly** |
| 88:6 90:1 91:3 | 219:19 222:14 | 359:10 362:24 | 213:1,15 |
| 92:22,23 94:10 | 224:2,3 225:23 | 362:25 364:14 | **thought**   20:4 |
| 100:4 104:10 | 226:6 232:22 | 364:19,20,22 | 45:19 100:9 |
| 105:4 109:22 | 248:10,14,14 | 366:2,6 367:2 | 166:25 187:8 |
| 116:14 119:7 | 258:25 261:19 | 369:6 370:4,16 | 252:9 312:9 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[thought - times]**

| | | | |
|---|---|---|---|
| 316:7,11,14 | 179:13 191:6,6 | 110:1,3 111:3 | 251:20 253:12 |
| 320:6 321:20 | 194:18 204:24 | 112:4,5 115:7 | 253:12 258:4 |
| 339:12 348:2 | 209:4 212:10 | 115:11 116:11 | 261:25 262:4,5 |
| 358:11 377:20 | 213:17 229:24 | 116:19,21,25 | 262:6 265:3 |
| 399:19 402:22 | 251:14 273:20 | 117:8,13 | 266:21 267:9 |
| 408:11 | 321:7 330:10 | 118:23 120:24 | 268:7 271:15 |
| **thoughts** 100:3 | 331:14,23 | 121:25 122:9 | 271:16 272:6 |
| 121:24 122:23 | 332:11,23 | 122:13,16,17 | 273:4 274:19 |
| 265:15,18,20 | 335:2 336:5 | 125:5,6 127:4 | 275:1 280:8 |
| 371:23 | 342:16 343:18 | 128:9 131:1,10 | 290:5 292:8,22 |
| **thousand** 32:12 | 368:23 374:5 | 132:3,12 | 293:15 301:24 |
| 32:14 44:6,12 | 374:11 383:10 | 140:20 142:14 | 321:12,14,16 |
| 53:2,6,19 | 391:19 392:11 | 149:17 159:13 | 321:19,25 |
| 111:16 116:16 | 393:11,11 | 164:2 165:17 | 322:1,2,23 |
| 396:3,13 398:7 | 394:1 396:3,14 | 165:19 172:3 | 324:20 329:2 |
| 398:14 | **ticking** 219:20 | 172:23 174:4 | 336:3 339:2,3 |
| **thousands** | **tiered** 67:17 | 179:13 185:8 | 341:3 342:24 |
| 315:6 | **tighter** 50:14 | 197:4,5,11 | 345:4 346:14 |
| **thread** 178:1,2 | **till** 292:24 | 201:3,6 204:16 | 349:13 353:7 |
| 278:1 279:16 | **time** 7:3 14:1 | 205:11,14,19 | 357:23 363:8 |
| 279:17 318:17 | 15:10 16:6 | 206:4,5,5,6,10 | 367:15 370:9 |
| 394:19,21,22 | 19:4,8,12,21 | 209:15,17,20 | 383:12 396:11 |
| 394:23,23,24 | 20:25 26:13 | 210:24 212:16 | 396:12 398:23 |
| 395:3 | 28:1 37:4 39:6 | 216:5 219:18 | 402:7 411:18 |
| **threads** 161:10 | 39:6 40:15 | 221:18 222:18 | **timeframe** |
| **threat** 35:16 | 42:1,3 43:21 | 223:7 226:25 | 411:8 |
| 109:4,8 366:19 | 43:24 48:6 | 227:14,23,24 | **timer** 116:9 |
| **threats** 298:3 | 49:13,18 50:3 | 233:18,21 | **times** 14:7 |
| **three** 14:7 24:2 | 52:12 61:4 | 234:11,18 | 17:25 38:18 |
| 41:2 51:23 | 65:14 73:8 | 235:3,8 236:12 | 96:21 108:16 |
| 60:21 85:9,10 | 75:19,20 83:6 | 238:18 239:1 | 108:20 115:24 |
| 86:16,19 | 83:17 93:22 | 239:23 241:4 | 121:7 142:19 |
| 105:23 111:2 | 97:3,8 99:9 | 242:12,22 | 143:12,15 |
| 135:9 147:12 | 105:8 106:7,15 | 244:3 245:3,6 | 144:2 148:24 |
| 155:2 166:2 | 107:10 108:21 | 245:7 250:5 | 151:10 157:18 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                      www.veritext.com

**[times - transphobic]**

166:10 167:3
176:24 187:7
197:25 207:5
229:24 252:25
261:10 267:19
269:22 270:1
325:3 332:12
333:11 344:4
345:3 351:2
366:11,16
367:2 370:4,5
373:5 379:8
396:6
**timing**   271:20
**tired**   273:21
**title**   63:1,17
159:8 204:25
**titled**   147:18
**tobacco**   317:11
320:13
**today**   9:7 11:11
11:14 12:9
25:8 180:2
210:20 213:22
214:2,4,9
219:18 229:6
238:16 244:5
267:23 271:23
272:17 277:15
278:18 303:19
320:1 331:5
342:20 346:8
354:24 355:14
355:17 364:3
365:12 366:1,4

**today's**   7:2
**together**   73:25
74:4 106:19
127:7 180:25
182:17 186:16
329:7 347:12
**told**   11:7 15:12
20:6 40:11
47:10 57:20
59:4,12 100:11
147:9 155:7
162:19 175:15
178:13,13,17
179:6 215:4
222:1 223:21
247:8,10 253:7
257:15,16
270:18 322:7
330:7,7 342:21
357:6 362:8,11
362:25 363:1
372:5 375:20
376:10 402:5
402:13 404:2
**tolerance**
276:22 277:4
**tomb**   84:4,8
382:3
**tommy**   97:22
147:22 152:21
155:3,18 209:5
218:12 363:4
366:12 368:18
368:19

**tomorrow**
271:24
**tomorrow's**
251:13
**took**   11:7
140:20 141:15
146:5,5 261:12
266:18 329:14
**top**   19:21 46:14
182:4 220:18
223:16 227:6
232:15 240:24
241:2,17
252:17 254:5
255:2,7 292:21
392:20 395:18
395:21
**topal**   26:17
**topic**   270:13
274:5 297:24
394:12
**topics**   199:22
199:24 270:11
274:15
**total**   191:9
**totality**   333:14
**totally**   322:14
**touch**   49:20
118:25 335:9
**touched**   171:15
**tours**   123:22
**toward**   279:10
283:18 376:19
**towards**   88:10
279:8 363:16

**town**   231:12
**townships**
55:11
**track**   93:24
**traffic**   162:5
245:9,11
**trafficking**
390:19
**trained**   106:16
210:7
**training**   106:18
**tran**   117:16
169:24 204:19
**trans**   295:22
**transcribed**
409:13
**transcript**
405:3 408:15
409:3,16,17
411:6,19 413:5
413:8
**transcription**
408:13
**transient**
205:11
**transparent**
14:10 85:2
186:24
**transphobe**
296:15 297:16
**transphobic**
295:23 296:14
297:17 298:10
298:15,17

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                              www.veritext.com

**[transportation - tweet]**

| | | | |
|---|---|---|---|
| **transportation** 20:21 | 165:16 168:25 | 403:25 404:5 | 173:17 182:20 |
| **trash** 245:10,21 | 177:14 179:19 | **tulane.edu** 2:6 | 182:25 203:14 |
| **traveling** 83:17 | 191:10,17 | 2:19 | 207:10,18,20 |
| **tread** 178:1 | 199:11,15,17 | **tulane's** 402:25 | 207:21,24 |
| **trial** 3:18 9:20 | 204:9 229:21 | **turn** 78:10 | 208:1,4,10,21 |
| 143:18,18 | 239:20 264:9 | 141:24 143:3 | 209:24 210:4 |
| 272:2 273:17 | 348:25 358:12 | 144:12,23 | 210:11,15,22 |
| **tried** 58:9 | 363:4 371:7 | 145:1,5,10 | 210:24 211:7,9 |
| 151:18 166:9 | **trying** 10:13 | 389:11 | 211:16,20,21 |
| **trigger** 385:7 | 20:1 45:18 | **turned** 79:9 | 212:13,23 |
| **triggered** | 49:25 77:5 | 128:12 145:4 | 214:13,14 |
| 187:15,16 | 80:16 88:2 | 389:8 | 215:4,20,21,25 |
| **triggers** 171:14 | 95:17 100:24 | **turning** 79:10 | 216:4 217:17 |
| **trimester** | 104:1,2 105:22 | 133:21 144:8 | 220:13,14,24 |
| 276:21 | 111:14 141:8 | 381:23 | 221:5,15,21 |
| **true** 212:3,6,24 | 141:24 142:11 | **turns** 142:15 | 222:3,7,9,20,22 |
| 374:3 409:15 | 142:17 168:4 | 359:5 | 223:11,23,25 |
| 413:8 | 179:17 196:12 | **tweak** 95:23 | 224:8,12,17,25 |
| **truth** 9:8,8,9 | 205:15,16 | 289:13 | 225:3,5,6 |
| 10:21,23 11:8 | 217:10 219:24 | **tweet** 4:11,17 | 226:16 227:2,3 |
| 49:13 | 276:7 308:22 | 4:18,19,20,21 | 227:4,17,22 |
| **try** 35:8 36:13 | 311:4 317:7 | 4:22,23,24,25 | 229:12,14 |
| 37:7 53:15 | 333:7 339:25 | 5:3,5,6,7,8,9,10 | 230:3,5,9,16,21 |
| 55:17 76:7 | 356:16 372:3 | 5:11,16,17,20 | 230:22 231:3,4 |
| 78:10 86:6 | **tubes** 25:25 | 6:4,5,6,7,8 | 231:8,8,17,18 |
| 88:8,21 93:24 | **tugged** 56:4 | 153:19,25 | 231:19,24,25 |
| 104:6,18 | **tulane** 2:4,8,18 | 154:3,7,13,17 | 232:6,10,14,15 |
| 107:13 108:13 | 2:22 100:5 | 154:21 155:7 | 232:18 233:12 |
| 110:23 114:22 | 398:17,25 | 155:21,23 | 233:16,20 |
| 115:4 117:23 | 399:1,4,10,12 | 156:1 157:9 | 234:2,5,14,24 |
| 123:12,15,22 | 399:15,16,18 | 159:20,25 | 234:25 235:7 |
| 134:24 144:21 | 400:6,22 | 160:19,24 | 236:7,8,9,15,21 |
| 145:2 154:9 | 401:25 402:7 | 162:6,7,13 | 237:3,4,11,14 |
| 161:21 163:14 | 402:14,19 | 163:1,9,17 | 237:18 238:3,5 |
| | 403:3,9,10,20 | 164:9 173:1,14 | 238:14,20,21 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[tweet - twitter]**

| | | | |
|---|---|---|---|
| 238:22 239:5 | 300:24,25 | 168:1 175:13 | 220:16 222:24 |
| 240:21,24,25 | 301:2 302:5,7 | 175:16 176:24 | 223:2,2,3 |
| 241:3,7,11,14 | 302:9,15,23 | 210:1 212:20 | 233:8,17 235:2 |
| 241:15,18,21 | 304:13,14,15 | 214:15 217:20 | 257:13 261:17 |
| 241:23,24 | 304:23,24 | 217:23,24 | 262:25 265:11 |
| 242:17 243:1 | 305:4,8,11,25 | 222:9 224:19 | 265:14 272:9 |
| 243:20,22,24 | 306:2,7 308:23 | 227:5,15 | 275:10,24 |
| 244:4,11,13 | 308:25 314:1 | 228:17 229:8 | 276:18 277:8 |
| 246:10,11,17 | 314:14,16,21 | 229:11 233:20 | 286:10 294:21 |
| 246:23,25 | 314:21,24,25 | 234:8,11 236:6 | 295:8 297:22 |
| 247:8,9 249:24 | 315:3,12,13,14 | 238:17 241:15 | 299:17 301:12 |
| 250:8 251:13 | 315:17 316:19 | 242:15 243:12 | 304:1 306:6,11 |
| 251:17,23 | 317:1,13,19 | 243:14 245:4 | 309:3 369:4,6 |
| 252:8,10,13,18 | 318:7 319:13 | 246:15 250:10 | 369:10 376:19 |
| 253:7,9,13,15 | 319:15 358:17 | 251:13 254:19 | 379:14 386:8,8 |
| 253:24 254:1,3 | 359:7 369:8,14 | 256:17,23 | 386:21 394:5 |
| 254:8,8,9 | 369:19 373:5 | 265:19 275:25 | **tweetthesouth** |
| 255:3 256:1,6 | 379:10,18,19 | 277:4,5 278:23 | 309:12 314:6 |
| 256:11,17,21 | 379:23 380:2,3 | 292:17 295:25 | 318:25 |
| 256:23 257:3,5 | 380:20 381:6 | 296:4,8 300:12 | **twelfth**  90:3 |
| 257:8,10,18 | 381:19,20,21 | 314:2 316:21 | **twelve**  67:15 |
| 262:1,10 | 382:5,13 | 322:18 382:14 | 215:24 218:4 |
| 265:18 272:18 | 383:10,17,19 | 385:5 391:2 | 315:17 396:7 |
| 276:6,7 277:23 | 384:11,12 | **tweeting** | **twenty**  32:15 |
| 278:3,4,12 | 385:2,14 386:5 | 224:13 228:1,3 | 35:6 111:15 |
| 287:20 291:16 | 386:21 387:4,7 | 236:16 237:16 | 263:12 267:14 |
| 293:4,7 295:13 | 387:13,14,15 | 256:2 295:16 | 321:3 383:9 |
| 295:15,16,20 | 387:23 390:6 | 369:20 384:6 | **twice**  85:15 |
| 295:25 296:3,4 | 391:4,12 392:4 | **tweets**  139:6,12 | 167:11 206:20 |
| 296:7,10,11,13 | 392:5,15,19,20 | 139:15 162:10 | **twistory**  153:8 |
| 297:1,10,13,15 | 393:9,15 | 177:16 203:9 | **twitter**  4:10,12 |
| 297:18 299:24 | **tweeted**  163:23 | 203:11 207:17 | 4:13 5:12,13 |
| 299:25 300:7 | 164:6,12,15,20 | 207:25 208:25 | 5:15,18,19 |
| 300:10,12,16 | 164:21,22 | 211:2,4 214:15 | 104:23,25 |
| 300:16,17,18 | 167:14,17,21 | 216:11 218:3 | 121:16,18 |

**[twitter - twitter]**

| | | | |
|---|---|---|---|
| 125:24 126:9 | 171:7,12,19,22 | 223:21 225:21 | 275:8,9,9,13,16 |
| 126:10,12,14 | 173:1,3,8,12,12 | 225:23 226:4,6 | 275:23 276:5 |
| 126:17,18,19 | 173:18,19,22 | 226:7 227:8 | 276:14 277:17 |
| 131:25 132:2,6 | 174:7,13 175:8 | 228:4,6,8,8,10 | 278:8,9,11 |
| 132:21,25 | 175:18,19,20 | 228:13,15 | 280:23 281:11 |
| 133:7,13 | 175:20 176:4,9 | 229:1,14,19 | 285:11 286:5,8 |
| 137:22 138:2,5 | 176:9,14,16,18 | 230:1,11 232:1 | 286:12,22 |
| 138:8,21,24 | 176:21,24 | 232:17,19,22 | 287:19 292:22 |
| 139:4,5,6,14,19 | 177:1,7,8,16,17 | 232:23,25 | 293:2,18 294:4 |
| 139:20,20,22 | 177:23 178:2,4 | 233:1,2,4,8,11 | 294:7,8,13,17 |
| 139:24 140:1,7 | 178:16 179:12 | 233:15 234:3 | 294:18,21 |
| 140:10 141:5 | 179:23 180:7,9 | 234:14 236:24 | 295:4,6 297:6 |
| 141:20 142:2 | 181:2,17,23 | 237:21 241:2,4 | 305:15,17,24 |
| 145:15 146:11 | 182:1,23 183:4 | 241:5,6,9,24 | 306:11 308:8,9 |
| 146:14,17,19 | 183:8 185:24 | 242:4,6,21,21 | 308:20 309:6 |
| 146:21 147:1,8 | 187:18,22 | 243:3,7,8,11 | 309:11,19 |
| 147:15 148:8 | 202:5,13,15 | 244:15 245:1 | 310:5 311:4,6 |
| 148:11,12,15 | 203:3 204:2 | 246:4,5 247:8 | 311:8 312:12 |
| 148:16,23,25 | 207:14 208:2,6 | 247:10 251:19 | 313:21,24 |
| 149:6,7 151:5 | 208:12,14,15 | 252:19,20 | 314:2 315:10 |
| 151:11 152:23 | 208:23,25 | 253:7 257:5,15 | 316:10,18 |
| 153:3,9,11,17 | 211:3,10,11,14 | 257:16 258:9 | 321:18 323:14 |
| 154:19,22,25 | 211:14,15,16 | 258:17 259:5,8 | 324:22,24 |
| 155:12,14,18 | 211:20,23 | 259:10,14,25 | 325:10,12,14 |
| 155:21 156:5 | 212:1,4,7,9,17 | 260:3,4 261:2 | 325:20,23,25 |
| 156:10,16,17 | 212:20,23 | 261:6,9,17 | 326:2,3 327:6 |
| 159:20 160:3 | 213:2,5,6,8,11 | 262:1,10,16,17 | 327:7,21 328:3 |
| 161:1,3,10,14 | 213:12,16,23 | 262:19 264:23 | 328:7,9,17 |
| 161:16,19,20 | 213:24 215:4,7 | 265:12,13,24 | 329:3,13,17,20 |
| 161:21,22,25 | 215:11 216:13 | 266:5,21 267:3 | 330:2,3 331:9 |
| 162:5,8,11 | 216:14 217:21 | 267:7,8 268:1 | 331:12 333:4 |
| 164:5,5,11 | 217:22,24 | 268:8 269:2,4 | 334:4,9,11,13 |
| 165:8,15 166:1 | 218:1 220:17 | 269:11,19,23 | 334:19,19,22 |
| 166:7,10,24 | 220:21 221:11 | 270:4,7,9,22 | 334:24,25 |
| 167:4,10,25 | 221:24 223:19 | 272:8 273:1,3 | 335:11,13,14 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[twitter - uh]**

| | | | |
|---|---|---|---|
| 335:16,19,21 | 166:8 168:4 | **ugly**   366:21 | 132:15,20 |
| 335:22 337:5 | 177:25 178:5 | **uh**   9:23 10:7,18 | 133:16,18 |
| 337:18 341:16 | 179:12 191:6 | 19:16,25 22:16 | 134:2,9 137:23 |
| 344:3 350:3 | 209:4,9 212:10 | 22:19 23:7,22 | 138:1,4 139:16 |
| 352:9,16,20,25 | 213:16 215:19 | 24:11,15 28:15 | 143:14 144:7 |
| 354:1,3,12 | 229:24 235:12 | 29:5,10 30:2 | 145:5,24 |
| 355:13,24 | 255:7 269:12 | 32:21,23 34:1 | 146:18 147:16 |
| 356:7 358:3 | 273:19 294:21 | 34:5,16 37:16 | 147:19,24 |
| 360:1,15 | 295:8 301:5 | 40:19,24 41:9 | 148:7 151:13 |
| 363:12,22 | 321:7 330:9 | 41:22 42:3,15 | 151:15,18 |
| 365:8 368:5,10 | 331:14,23 | 42:24 45:14,20 | 152:2 153:10 |
| 368:16,18,20 | 332:10,23 | 50:17 52:17,20 | 153:12,24 |
| 371:7 375:17 | 335:2 336:4 | 53:8 57:14 | 154:2 155:9,9 |
| 380:13 388:14 | 342:16 343:18 | 62:1,15 63:18 | 156:7,14 |
| 388:17,20 | 345:22 353:13 | 65:8 68:15 | 157:11 159:3 |
| 390:8,11 393:2 | 368:22 374:6 | 69:3 72:10,16 | 159:19,23 |
| 394:13,16 | 386:21 394:20 | 74:16 77:10 | 160:23 162:24 |
| 395:6,16,25 | 396:3 | 78:9 81:6 | 163:12 165:1,3 |
| 396:5,10,15,18 | **tx**   411:15 | 82:12 85:7 | 166:22 168:14 |
| 396:19 | **type**   12:22 76:4 | 88:15 91:18,21 | 169:19 170:5 |
| **twitter's** | 84:16 113:6 | 91:23 93:14 | 170:11,16,20 |
| 121:17 | 187:6 373:7 | 94:23 95:1 | 174:21 179:3 |
| **twitter's**   261:7 | 377:13 400:16 | 101:9 102:25 | 181:20,22 |
| **two**   22:2 24:2 | **typed**   208:14 | 104:24 107:22 | 182:2 185:15 |
| 34:3 38:10 | **types**   46:6 | 108:11,23 | 185:20 187:19 |
| 41:2 48:18 | 163:13 | 109:12 111:23 | 187:21 188:3 |
| 49:15 55:19 | **typewriting** | 112:2 115:2 | 189:25 191:24 |
| 61:6 66:7 | 3:15 | 116:1,20 | 192:4,9,22 |
| 67:14 73:7 | **typically** | 117:14 118:11 | 193:5,10,12,15 |
| 86:24 107:14 | 111:18 | 118:16 120:21 | 193:18 194:7 |
| 111:1 114:21 | **typo**   322:19,20 | 122:17 124:21 | 198:24 199:2,7 |
| 116:8 122:11 | **u** | 127:1,10,12 | 200:11 203:15 |
| 127:14 144:14 | **u**   3:1 283:24,25 | 128:5,7,20 | 206:2,16 |
| 144:20,25 | 300:13 | 129:14,23 | 225:12,20 |
| 159:6 166:1,1 | | 131:16 132:5 | 243:2 244:17 |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                www.veritext.com

**[uh - updates]**

244:20 246:1
247:13 254:18
259:9 268:10
281:2 287:13
296:7 299:22
302:8,11 307:4
318:12 324:4
336:12 342:13
343:23 349:23
355:7 358:25
359:2 360:12
363:7 372:14
386:22 388:18
396:21
**ulm** 75:6,7
100:10 176:19
176:20
**ultimate** 24:23
35:24
**ultimately**
18:25 46:17
**un** 89:23
**unable** 334:20
**unavailable**
48:16
**unblock** 337:18
337:22,24
340:15,24
341:4 342:18
343:2,12,14,15
343:17,21,25
345:1,2,3,15
346:18 350:12
370:7,9,19
372:4,6

**unblocked**
338:12 339:5,6
339:14 340:12
340:17,23
341:7 342:10
342:14,25
343:5 344:1,15
344:19 346:2,5
346:8,12 347:1
351:1 352:13
352:18 355:6
370:13 371:7
371:15,16
**unblocking**
350:24 355:2
**unborn** 84:2,3
**unclear** 289:17
**under** 10:21
11:2,4 62:2,3
65:24,25 72:6
73:5 105:23
161:9 228:19
249:5 291:10
350:6 409:14
**underage**
157:23
**underneath**
220:21 395:24
396:1
**underserved**
72:7,8,19,21
73:2 74:10
**understand**
10:20,25 11:1
70:20 103:20

109:21 116:6
123:10 219:24
220:3 303:21
308:21 315:7
333:22 340:16
351:16 372:3
377:3 387:20
390:23
**understanding**
30:20 102:23
308:4,17 331:2
334:17 378:5
409:16
**understands**
74:11
**understood**
15:2 58:12
143:25 156:19
218:19 220:3,9
**unethical**
402:21
**unfair** 53:23
**unfortunately**
188:8
**unfounded**
325:17
**unintended**
291:7,11,22
**unintentionally**
142:15
**unite** 189:20
**united** 1:1
37:21
**universally**
408:12

**universities**
62:25 235:3
**university**
399:16,18
402:8,19
403:25 404:5
**university's**
398:17
**unjustifiably**
339:15
**unopposed**
184:9,13,14,15
185:7
**unprotected**
378:6,12
**unscheduled**
61:15
**untruthful**
293:12
**unusual** 363:21
365:8,10,17
**update** 142:1,3
142:14,14
154:15 156:2
156:13,22
158:10 160:14
200:7,8
**updated** 110:20
197:7 198:7,15
200:2 201:19
201:22
**updates** 156:15
156:24 157:10
157:12,25
158:3,3,4,5,7,8

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                        www.veritext.com

**[updates - vaguely]**

| | | | |
|---|---|---|---|
| 158:18 160:5 | 283:3,24 308:9 | 269:23 270:6 | 366:4,5 367:3 |
| 171:13,16 | 313:8 354:1 | 278:25 284:2 | 369:3,6,9 |
| 201:8 275:18 | 363:22 364:3 | 285:11 286:5 | 389:2 |
| 275:19 | 366:23 388:9 | 293:20 294:1 | **user's** 307:18 |
| **updating** | 388:25 389:14 | 294:22 300:12 | **uses** 283:18 |
| 200:18 | 389:24 | 300:22 301:3,6 | **using** 25:9 |
| **uphold** 37:19 | **used** 28:16 47:2 | 301:14 305:17 | 159:20 303:14 |
| 312:10 | 113:22 115:10 | 308:24 311:5,6 | 365:10 |
| **upholding** | 115:11 122:6,8 | 311:8 356:7 | **usual** 180:6 |
| 402:14 | 126:4 127:20 | 360:1 369:20 | **usually** 21:9 |
| **upholds** 186:23 | 129:3 131:19 | 370:7 373:5 | 27:22 29:3 |
| **upper** 188:25 | 131:22,25 | 390:12 394:16 | 48:5,8 87:12 |
| **upset** 234:9 | 132:16 136:3 | **user's** 177:16 | 95:5 121:17 |
| 365:18 | 140:13 144:21 | **users** 121:23 | 182:7,9,15 |
| **urban** 74:3,6 | 162:22 163:4 | 122:22 176:10 | 197:9 225:25 |
| **use** 3:18 28:20 | 198:9,14 202:4 | 179:23 215:4,8 | 251:7,11 255:3 |
| 114:3 120:19 | 227:11,13 | 215:11,12 | 259:21 265:17 |
| 121:13 126:9 | 230:13 242:22 | 221:11,24 | 268:18 305:13 |
| 126:13,16 | 259:25 284:8 | 223:21 229:14 | 306:18 353:21 |
| 129:20,24 | 286:15 295:24 | 234:3 236:25 | 373:22 377:20 |
| 132:18 133:3 | 303:18 308:24 | 237:21 241:25 | 388:13 394:6,6 |
| 134:14,22 | 331:25 354:4 | 242:4,6,6 | 394:8,18 399:1 |
| 135:14 160:6,9 | 366:1 373:4 | 243:3 247:8,10 | 399:2 |
| 161:14,16,18 | 399:25 400:20 | 253:7 257:15 | **utopia** 26:14,16 |
| 161:25 162:3 | 402:4 408:10 | 257:16 259:17 | **utterance** |
| 162:20 166:11 | 411:19 | 260:7,9,21 | 298:25 |
| 173:1,3,12 | **useful** 161:3,11 | 262:16 264:15 | **v** |
| 174:14 175:19 | 161:13 | 265:13 266:20 | **v** 272:7,10,19 |
| 176:9,16 181:2 | **user** 139:11 | 267:11,12,14 | 411:4 412:1 |
| 181:4 194:3 | 234:14 243:8 | 267:16 270:7 | 413:1 |
| 204:3 246:5 | 259:2,2,14,19 | 272:8 273:1 | **vacation** 83:20 |
| 259:21 260:3 | 259:25 260:2,4 | 275:9 328:6,16 | **vaguely** 383:18 |
| 261:16,19 | 260:8 261:2 | 334:8 341:7 | 383:23 384:2 |
| 270:8 280:24 | 262:22 265:10 | 346:18 350:3 | 384:13,18 |
| 282:16,25 | 265:24 268:8 | 352:13,15 | |

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com

**[vail - want]**

vail  87:6
valid  409:2
valuable
  189:19
valued  386:24
values  57:23
varies  21:9
  95:18
variety  360:20
various  104:17
  106:2 172:14
  192:15 196:25
  215:16 252:11
vary  21:15
vast  102:21
  104:13 106:21
ver  222:23
verified  408:17
verify  211:15
  222:24 256:22
  276:12 278:7
  278:11 333:18
  411:9
veritext  411:14
  411:23
veritext.com.
  411:15
versa  48:9
versed  103:16
  136:21 137:4,5
version  357:19
versus  1:7
  271:17 381:22
vet  17:10 33:1
  44:7

vetoed  222:20
vets  17:6 28:5
  42:6 43:1 44:2
vetted  45:7
vetting  94:13
vhamrck  2:19
vice  21:23
  22:21,24 24:6
  24:8 27:24
  28:2 38:7,19
  38:20 40:12
  41:20 47:14,23
  48:9,20 49:3,9
  397:6 399:8
victims  271:5
  271:10 273:4
view  191:25
views  58:5 59:8
  99:5 140:17
vine  70:6
violated  375:16
violence  352:24
virginia  2:17
  7:21 82:6,8,11
  82:15,15
virus  389:19
viruses  122:20
  389:10,12,22
voice  90:16
voiced  123:25
  124:1 276:16
vote  17:16 24:2
  28:9,13,24
  29:7,9 31:16
  50:24 54:2

57:22 58:1,5
  63:10 64:14
  70:2 73:25
  74:4,6,9,10,12
  74:12 99:1
  101:13 103:6
  104:1 106:4,22
  106:23 164:25
  167:17,18
  214:17,25
  221:1,13,24
  222:1 223:22
  227:18 233:20
voted  44:22,22
  44:23 242:13
  387:1
voter  72:22
  73:19
votes  14:22
  73:11 163:24
voting  54:8
  64:22 70:11,23
  70:25 71:3,12
  71:13 73:4,18
  98:24 103:6,10
  105:2 111:17
  295:21
voucher  314:3
vouchers  316:9

**w**

wade  271:17
  272:7,10,19
  381:22
waded  274:16

wage  67:19
  73:18 390:22
wait  397:17
waited  55:2
waiting  62:10
  142:22 143:19
  172:6
waive  3:11
waivers  66:20
  67:4,7
walk  105:20
  144:22 180:25
  201:18 282:19
  283:4 298:2,8
walked  144:1,1
  181:1
walking  280:20
  326:8
walter  1:7
want  12:14,15
  14:4 23:25
  24:18 26:11
  36:22 37:21
  43:11 46:23
  50:5,18 51:11
  57:12,22 59:13
  61:8,17 66:5
  70:14 75:3,14
  80:20 89:18
  91:5 92:7 94:6
  94:20 96:9
  97:7 98:23
  101:20 102:15
  103:17 106:1
  107:4,5 108:7

**[want - wedding]**

| | | | |
|---|---|---|---|
| 109:2 117:12 | 388:24 396:25 | **wasting** 128:24 | 106:2 120:13 |
| 123:9 127:8 | 396:25 399:21 | **watch** 99:13 | 196:25 215:16 |
| 131:3,17 | 404:22 405:2 | 121:10 123:9 | 220:25 221:12 |
| 132:23 133:2 | **wanted** 9:18 | 236:11,13,20 | 252:12,14 |
| 135:11 147:20 | 40:14 56:16 | 236:25 237:21 | 282:2 289:21 |
| 148:1 152:4,7 | 149:14 156:6 | 238:16,22 | **we've** 18:2 |
| 152:15 166:4 | 170:6 178:20 | 239:25 241:16 | 40:21 62:2,3 |
| 167:5 176:8 | 194:23 387:3 | 241:25 242:2,4 | 90:1 108:25 |
| 181:16,16 | 400:19 401:9 | 242:19 243:4,6 | 113:10 115:21 |
| 182:18,22 | 402:3 | 243:8 251:15 | 120:4 123:20 |
| 194:5 197:2,7 | **wanting** 23:24 | 253:8 256:19 | 131:11 167:3 |
| 197:19 198:8 | 245:19 298:23 | 257:15 265:7 | 179:22 203:13 |
| 198:15 201:19 | **wants** 20:15,19 | **watching** | 216:1 313:5 |
| 205:3 207:1,16 | 51:13 108:24 | 236:19 238:7 | **wear** 185:1 |
| 207:16 211:5,7 | **warning** | 243:17 289:16 | **weather** 79:8 |
| 218:7,11 219:4 | 353:21 | **way** 15:6 34:11 | **website** 4:14,15 |
| 233:15 236:1 | **washington** | 67:9 69:14 | 4:16 41:12 |
| 237:6 242:19 | 81:25 83:8 | 87:21 91:12 | 163:22 188:4,7 |
| 247:25 248:4 | **wasn't** 220:15 | 96:9 97:13 | 188:10,12,18 |
| 257:20 258:8 | 228:24 234:10 | 102:10 114:1 | 188:19,22 |
| 258:16 262:15 | 238:9 269:6 | 114:15 136:24 | 191:22 192:11 |
| 265:23 275:8 | 274:3 279:21 | 137:15 144:14 | 192:12,18,19 |
| 275:24 277:25 | 290:16 315:16 | 144:15,17 | 193:14 194:17 |
| 279:19 291:4 | 321:18 330:13 | 150:5 154:10 | 197:10 201:24 |
| 292:15 295:1 | 330:21 335:8,9 | 161:6 167:11 | 201:25 202:4,5 |
| 295:13,14,22 | 335:16 338:7 | 197:9 211:18 | 202:7,8,9,16 |
| 299:19,19,20 | 339:3 340:19 | 216:13 219:22 | 262:5 263:8 |
| 301:13 309:5,7 | 341:5 342:7 | 247:6 251:20 | 264:17,19,21 |
| 313:18 317:17 | 344:2 345:7,7 | 270:25 281:10 | 287:17 318:8 |
| 330:20 333:12 | 352:24 388:4 | 329:9 331:16 | 319:4 |
| 333:25 342:6 | 401:13 402:23 | 334:5 399:23 | **websites** 202:6 |
| 343:21 350:13 | 403:2 404:9 | 400:15,17 | 202:21 |
| 356:5 380:12 | **waste** 219:17 | 402:20 410:9 | **wedding** 176:6 |
| 381:16,16 | 261:22,25 | **ways** 97:19 | 184:2 |
| 384:4 386:20 | 262:4,5 | 104:17,18 | |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                                    www.veritext.com

**[wednesday - women]**

| | | | |
|---|---|---|---|
| **wednesday** | 270:18 273:15 | 389:12 398:18 | **witness**   3:14 |
| 87:16 | 279:17 284:17 | **what's**   223:10 | 7:8 8:6,10,15 |
| **week**   56:19 | 290:4,4 294:2 | 239:21 249:22 | 8:19 9:3,10 |
| 112:19 195:12 | 311:8 322:23 | 265:19 271:23 | 75:1 76:25 |
| 263:4 326:9 | 324:19 325:7 | 291:6,21 | 77:4,9 97:21 |
| 371:11 | 328:21 329:17 | 325:18 360:5 | 98:1,5,9,14 |
| **weekly**   169:4 | 330:4 335:14 | 363:13 388:3 | 147:23 169:23 |
| 198:9 | 335:16,22 | 390:16 396:1 | 209:10 214:21 |
| **weeks**   166:1,2 | 336:14 337:3 | **white**   184:25 | 216:21,25 |
| 166:8 168:5 | 340:2 355:24 | 284:5 285:11 | 217:4,16 |
| 173:24 179:13 | 380:10 | 285:13,19 | 258:13 310:14 |
| 394:20 | **weren't**   288:10 | 286:18 287:10 | 326:15 328:14 |
| **weighed**   111:12 | 344:12 | 288:3 290:9,10 | 333:10 344:10 |
| **weighing**   111:8 | **western**   1:2 | 292:3,7,16 | 348:15,20 |
| **weight**   27:15 | **we'll**   236:5 | 308:14 392:2 | 351:12 366:10 |
| 111:10 275:6 | 242:23 350:25 | **wholesale** | 377:25 404:17 |
| **weighted** | 404:20 | 219:4 | 405:7 407:8 |
| 120:21 | **we're**   229:10 | **who's**   271:15 | 411:8,10,12,18 |
| **weird**   14:8 | 257:22 263:13 | **wide**   281:4 | **woman**   118:3 |
| 305:23 308:2 | 269:3 272:17 | **widow**   86:25 | 284:10 359:4 |
| 340:3 392:16 | 273:20 280:5 | **willing**   23:23 | 364:21 |
| **welcome** | 280:11 294:12 | **willingly** | **woman's** |
| 247:11 | 295:3 308:22 | 340:13 | 375:16 |
| **welfare**   16:3,5 | 333:5,22,24 | **wills**   13:1 | **womb**   84:3,8 |
| 16:20 38:21,22 | 337:6 343:13 | **windfall**   15:3 | 382:2 |
| 40:22 42:18,21 | 347:12,14 | **winter**   36:22 | **women**   38:25 |
| 47:6,15 48:2,9 | 353:16 355:20 | **wiped**   218:17 | 47:11 59:16,20 |
| 49:8 56:23 | 395:14 403:4 | **wise**   191:16 | 60:6,10,16,19 |
| 62:19 114:23 | **we've**   248:5 | **withdraw** | 60:25 61:1,3 |
| **went**   14:3 83:5 | 249:21 257:12 | 124:12,13,18 | 61:13 62:4,20 |
| 83:6 85:18 | 257:12 264:7 | **withdrawal** | 62:20,23 63:2 |
| 100:11 138:20 | 321:6 348:22 | 402:1 | 84:15 235:5,6 |
| 146:10 155:18 | 362:7,8 366:15 | **withdrawn** | 266:10 281:24 |
| 166:6 221:15 | 368:17 369:21 | 123:24 124:19 | 284:6 296:2,3 |
| 238:18 260:5 | 379:8 386:5 | | 298:11 304:21 |

**[women - yeah]**

356:15,20
357:7,10 359:6
375:23 379:21
380:4,6,8,10,24
381:2,13,24
382:2 386:16
390:16,24,25
403:8
**women's**   22:8
62:1,6
**women's**
298:13 403:7
**won't**   386:7
390:3
**word**   231:14
303:12 331:25
373:1,3,19
**words**   237:16
259:5,7 283:16
283:24 284:12
295:24 373:21
408:14,16
**wore**   397:23
**work**   36:6 42:9
51:25 56:9,20
58:10,22 59:1
59:19,25 76:6
80:10 82:6,21
87:18 90:25
100:2 101:22
114:2 115:10
116:22 117:19
117:24 119:24
129:20,21
130:5 134:10

140:13 157:24
168:13,21,24
169:5 187:25
192:15 271:2
272:22 273:11
274:6,11
287:21 289:21
289:23 387:10
397:25 398:16
399:9 401:1,3
404:6
**worked**   58:9
106:19 186:3,4
186:13 204:20
205:24 289:4
290:3 329:8
**worker**   117:11
119:21
**working**   21:3
59:7 77:25
90:24 96:24
97:3 108:4
127:7 140:15
140:22 141:13
141:14 145:19
145:25 172:11
292:18 335:5
335:23 336:4
**works**   36:14
93:16 95:4
119:23 128:7
136:15 168:18
169:16 174:24
**wouldn't**
221:20 234:9

239:18 256:2
266:22 269:25
270:8,10 274:4
274:13,23
275:4,5 284:23
284:23 286:23
298:5 299:18
302:18,21,22
302:22,24
303:22 306:12
311:21,21
321:8 324:7,10
324:10 325:2
326:18 337:7
371:19 375:2
380:8 389:17
403:18
**wow**   221:8
**write**   193:19
196:7 203:9
224:11
**writes**   203:11
285:20
**writing**   24:21
251:6,8 286:20
287:12 288:5
300:1
**written**   23:11
220:7
**wrong**   8:18
22:10 39:19
59:5 143:23
204:23 285:21
292:12 308:18
357:20 362:8

367:11 391:8
**wrongfully**
271:11
**wrote**   152:20
179:19 367:20
367:21
**www.legis**
41:13
**www.legis.la...**
264:20

---

**x**

---

**x**   121:17
137:21,25
138:6 368:21
**x.com.**   392:25
**xavier**   100:8,9
100:9
**xgabrielle**
300:13

---

**y**

---

**yeah**   35:25
39:22 43:11
46:8 48:13
55:21 58:11,17
63:19 78:25
82:20,21 83:15
85:22 92:8,17
92:17 94:18
104:1 115:4
122:21 125:12
125:22 126:8
130:7 131:9
132:17 139:13
143:6 146:15

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company                   www.veritext.com

**[yeah - zoom]**

147:9 149:14
152:2 155:2
160:25 163:10
163:25 164:14
173:13,16
174:11 176:11
181:13 182:6
183:20 196:4
200:24 217:3
223:9 226:21
243:21,23
251:17 252:3
253:6,15
285:13 292:22
293:10 294:24
303:8 322:2
323:2 328:21
337:7 342:16
343:18 367:24
369:6 372:11
379:10 381:10
381:14 384:2
392:22 393:1
397:16 400:4
**year**  16:3,7,12
21:23 34:1
40:1,6 60:21
62:13 66:15
71:22 77:24
78:9 80:8
86:18 94:7
113:12 159:6
160:25 169:6
180:16 196:16
200:4,10 205:2

206:20 207:3,8
207:8 228:2
231:21 232:8
232:10 256:8
256:13 272:13
272:15 302:2
320:25 321:7
329:16 334:6,7
334:10 337:10
337:11,13
391:23,23
397:15,16,18
397:23
**years**  12:5
14:18 16:4,17
16:20 22:2
23:14 31:19,20
31:21 41:2
56:24 57:11
71:11 81:1,12
86:16,20,24
94:1,8,11,12
95:10 116:15
132:1,17
143:17 144:14
144:20,25
156:24 183:25
185:4,7 193:25
194:18 215:23
215:24 218:4
222:15 257:2
273:20 277:24
301:5 315:5,17
317:2 320:23
321:6 324:1

371:20 382:3
396:7
**yellow**  101:17
**yesterday**
36:15 167:6,6
180:2 233:21
233:22
**yolanda**  338:3
338:4
**york**  81:21
82:24 83:3,4
85:16
**young**  66:6
78:16,17 178:7
179:1,16
321:19
**younger**  14:18
199:18
**youth**  89:25
90:6 91:21,22
186:14
**you'd**  327:7
351:6 357:4
**you'll**  291:14
**you're**  227:16
236:18 237:10
238:24 241:10
247:15 250:13
256:22 264:1
271:7 278:20
279:4 280:14
281:6 282:13
284:5 285:16
290:21 291:4
291:13 296:14

302:23 303:23
305:20 308:22
313:4 315:2
318:3 333:4
337:9 341:15
342:20 359:14
361:6 368:8
369:2 370:11
373:6,23
378:22 382:23
397:9
**you've**  227:11
230:13 233:17
255:20 259:7
259:19 260:8
260:22 262:10
267:2,6,11
268:7 269:22
270:7 275:25
284:24 285:7
285:23 286:15
290:3 300:2
327:16 331:8
342:21 343:5
353:17 361:25
362:4 367:2,15
371:20 376:24
388:20 394:2

**z**

**zero**  80:20
**zoom**  81:12
91:6 92:8
169:1 198:9
231:12

Veritext Louisiana – CRLA/goDEPO   cs-Louisiana@veritext.com
A Veritext Company          www.veritext.com

**['21 - '21]**

| , |
|---|
| **'21**   297:18 |

Veritext Louisiana – CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company                    www.veritext.com