UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| MAYA DETIEGE and DAYNE SHERMAN, | CIVIL ACTION NO.: 3:23-cv-175 |
| *Plaintiffs* | |
| *v.* | JUDGE WALTER |
| KATRINA JACKSON, in her official and individual capacities, | MAGISTRATE JUDGE MCCLUSKY |
| *Defendant.* | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# I.     Table of Contents

I.      Table of Contents ...................................................................................................... 2

II.     Table of Authorities................................................................................................. 3

III.    Introduction ............................................................................................................. 5

IV.     Factual Background ................................................................................................. 5

V.      Summary of the Argument ..................................................................................... 13

VI.     Law and Argument.................................................................................................. 14

  A.    Summary judgment standard ................................................................................ 14

  B.    Defendant Jackson's Blocking of Plaintiffs on Twitter Violated Plaintiffs' First Amendment Rights ................................................................................................. 15
     1.   Plaintiffs' speech was protected by the First Amendment ............................. 15
     2.   Defendant Jackson's Twitter Page is a Designated Public Forum ................. 18
     3.   Defendant Jackson Engaged in Impermissible Viewpoint Discrimination in Blocking Plaintiffs. ....................................................................................... 23

  C.    Jackson was acting under color of law in blocking Plaintiffs............................. 29
     1.   Defendant Jackson possessed actual authority to speak on behalf of the state............ 31
        a.   Jackson's role as a state legislator is to make laws and set policy for the State of Louisiana ........................................................................................ 32
        b.   Communicating to and with the public on policy matters is within the scope of Defendant Jackson's job ............................................................... 35
     2.   Defendant Jackson purports to exercise her authority on social media ....................... 39
        a. The context of Defendant Jackson's Twitter page shows that she was using it in her official capacity ................................................................................ 40
        b.   The appearance and function of Defendant Jackson's Twitter page show that she uses it in her official capacity.......................................................... 43
        c.   Senator Jackson's use of government resources to Tweet show she uses the account in her official capacity. ............................................................... 45
        d.   The nature of Twitter cements state action in this case......................... 46

VII.    Conclusion .............................................................................................................. 48

## II.    Table of Authorities

**Cases**

303 Creative LLC v. Elenis, 600 U.S. 570 (2023) ........................................................................ 16

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) ..................................................................... 31

Attwood v. Clemons, 526 F. Supp. 3d 1152 (N.D. Fla. 2021) ...................................................... 25

Boos v. Barry, 485 U.S. 312 (1988) ............................................................................................. 17

Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330 (5th Cir. 2001) ................................................ 18, 20

Clark v. Kolkhorst, No. 1:19-CV-198-LY, 2021 WL 5783210 (W.D. Tex. Dec. 7, 2021) ........... 29

Connick v. Myers, 461 U.S. 138 (1983) ....................................................................................... 18

Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788 (1985) ................................... 15, 18

Cox v. Louisiana, 379 U.S. 536 (1965) ......................................................................................... 16

Czosnyka v. Gardiner, No. 21-cv-3240, 2022 WL 407651 (N.D. Ill. Feb. 10, 2022) .................. 19

Davison v. Randall, 912 F.3d 666 (4th Cir. 2019) ......................................................................... 22

Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) ........................................................ 9

Evans v. Herman, No. 4:22-CV-2508, 2023 WL 4188347 (S.D. Tex. Apr. 24, 2023), report and
    recommendation adopted, No. 4:22-CV-02508, 2023 WL 4188466 (S.D. Tex. June 26, 2023)
    ................................................................................................................................................. 29

Fairchild v. Liberty Indep. Sch. Dist., 597 F.3d 747 (5th Cir. 2010) ....................................... 18, 20

Felts v. Reed, 504 F. Supp. 3d 978 (E.D. Mo. 2020) ..................................................................... 19

Garnier v. O'Connor-Ratcliff, 41 F. 4th 1158 (9th Cir. 2022) ......................................... 19, 22, 29

Garrison v. Louisiana, 379 U.S. 64 (1964) ............................................................................. 16, 20

Knight First Amend. Inst. at Colum. Univ. v. Trump, 953 F.3d 216 (2nd Cir. 2020); vacated as
    moot, Biden v. Knight First Amend. Inst. at Colum. Univ., 141 S.Ct. 1220 (2021) ........... 22, 23

Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541 (S.D.N.Y. 2018)
    ................................................................................................................................................. 25

Lindke v. Freed, 601 U.S. 187 (2024).................................................................................... passim

Little v. Liquid Air Corp., 37 F.3d 1069 (5th Cir 1994)................................................................ 14

Freedom Def. Initiative v. King Cnty., 904 F.3d 1126 (9th Cir. 2018) ........................................ 22

Matal v. Tam, 137 U.S. 1744 (2017)....................................................................................... 17, 26

Meyer v. Grant, 486 U.S. 414 (1988) ........................................................................................... 18

Minnesota Voters All. v. Mansky, 585 U.S. 1 (2018)............................................................... 18, 22

Narayanan v. Midwestern State Univ., No. 22-11140, 2023 WL 6621676 (5th Cir. Oct. 11, 2023)
    ................................................................................................................................................. 14

Navarro v. Block, 72 F.3d 712 (9th Cir. 1995)............................................................................. 36

One Wis. Now v. Kremer, 354 F. Supp. 3d 940 (W.D. Wis. Jan. 18, 2019) ................................. 47

Packingham v. North Carolina, 582 U.S. 98 (2017) .............................................................. passim

Robinson v. Hunt Cnty., 921 F.3d 447 (5th Cir. 2019) ........................................................... passim

Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995)............................... 16, 23

Police Dep't of Chi. v. Mosley, 408 U.S. 92 (1972) ..................................................................... 13

Price v. City of New York, No. 15 CIV 5871 (KPF), 2018 WL 3117507 (S.D.N.Y. June 25, 2018)
    ................................................................................................................................................. 25

Sammons v. McCarthy, 606 F. Supp. 3d 165 (D. Md. 2022)........................................................ 19

Sgaggio v. De Young, No. 20-cv-01977-PAB-KMT,  2022 WL 970008 (D. Colo. Feb. 1, 2022) 17

Snyder v. Phelps, 562 U.S 443 (2011)..................................................................................... 16, 26

United States v. Macdaniel, 32 U.S. 1 (1833).............................................................................. 32

West v. Shea, 500 F. Supp. 3d 1079 (C.D. Cal. 2020) .................................................................. 19

Williams v. United States, 71 F.3d 502 (5th Cir. 1995) ............................................... 36

**Statutes**
42 U.S.C.A. § 1983 ..................................................................................................... 15

**Other Authorities**
About Being Blocked, X HELP CENTER, https://help.twitter.com/en/using-twitter/someone-
    blocked-me-on-twitter#:~:text=About%20being%20blocked,-
    Twitter%20gives%20people&text=If%20you%20have%20been%20blocked,alerting%20you
    %20of%20the%20block ............................................................................................. 47
Caroline Forsey, What is Twitter and How Does It Work?, HUBSPOT,
    https://blog.hubspot.com/marketing/what-is-twitter (July 26, 2021) ........................... 5
Fabio Duarte, X (Formerly Twitter) User Age, Gender, & Demographic Stats (2024), EXPLODING
    TOPICS (October 8, 2024),  https://explodingtopics.com/blog/x-user-stats ............................... 6
Jack Richards, @lalegis, You Can Tweet That, TOWN TALK (June 10, 2016, 2:16 PM),
    https://www.thetowntalk.com/story/news/2016/06/10/lalegis-you-can-tweet/85706164/ . 21, 38
Kat Devlin et al., For Global Legislators on Twitter, an Engaged Minority Creates Outsize Share
    of Content, PEW RESEARCH CENTER  (May 18, 2020)
    https://www.pewresearch.org/global/2020/05/18/for-global-legislators-on-twitter-an-engaged-
    minority-creates-outsize-share-of-content/ ........................................................... 37
Katrina R. Jackson-Andrews, LOUISIANA STATE SENATE https://senate.la.gov/smembers?ID=34
    [https://perma.cc/4ERN-BXBT] ............................................................................. 41
Louisiana State Senate, Legislative Communications Office, Member Services,
    https://lco.legis.la.gov/services ............................................................................. 45
Maya Detiege (@midaeros)'s Twitter Profile, X, https://twitter.com/midaeros ........................... 9
Members' Official X Handles – 118th Congress, U.S. HOUSE OF REPRESENTATIVES PRESS
    GALLERY, https://pressgallery.house.gov/member-data/members-official-twitter-handles (June
    27, 2024 ............................................................................................................. 38
SB342 by Senator Katrina Jackson-Andrews, LOUISIANA STATE LEGISLATURE,
    https://legis.la.gov/legis/BillInfo.aspx?i=242567 ..................................................... 39
State Senator Katrina R. Jackson Democrat District 34, LA. STATE. SENATE,
    https://senate.la.gov/smembers?ID=34 .................................................................... 6
The Editors of Encyclopaedia Britannica, X, BRITTANICA MONEY,
    https://www.britannica.com/money/Twitter (Jan 3, 2025)....................................... 5, 6
The Legislator as Lawmaker—The Interim, LA. H.R. 4,
    https://house.louisiana.gov/OG1620/OG1620docs/D%20-%20The%20Interim.pdf.............. 33

**Treatises**
Louisiana Civil Law Treatise, 20 LACIVL § 2:1 ........................................................ 32

**Constitutional Provisions**
La. Const. Art. I.......................................................................................................... 35
La. Const. Art. III, §1 .......................................................................................... 32, 38
La. Const. Art. VII ...................................................................................................... 32
La. Const. Arts. III §10 ............................................................................................... 36
La. Const. Preamble, Ann. Refs & Annos.................................................................... 35

### III.   Introduction

Plaintiffs Maya Detiege and Dayne Sherman respectfully submit this Memorandum in Support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Defendant Katrina Jackson, a Louisiana State Senator, engaged in impermissible viewpoint and content-based discrimination against Plaintiffs' protected speech on Jackson's public Twitter page.  Plaintiffs are both concerned citizens who, like Defendant Jackson, often engage in political discussions on Twitter.  Defendant Jackson blocked Plaintiffs after they expressed criticism of legislation that she sponsored and her political positions.  Plaintiffs' criticism of Defendant Jackson and her politics is core political speech clearly protected by the First Amendment.  Defendant Jackson blocked Plaintiffs because she disagreed with the viewpoint of their speech, a clear violation of their First Amendment rights.  There is no genuine dispute as to any material fact regarding this claim, and Plaintiffs are entitled to a judgment as a matter of law. For the reasons set forth herein, this Court should grant summary judgment in favor of Plaintiffs.

### IV.   Factual Background

The social media site "X," formerly known as Twitter, is a popular online social media platform on which users are able to quickly share their thoughts with large audiences, using short messages containing 280 characters or less.[1]  The purpose of the platform is to allow the rapid spread of information between users across the globe.[2]  The website is a valuable information hub, allowing users instant access to geopolitical developments and cultural happenings,

---

[1] The Editors of Encyclopaedia Britannica, X, BRITTANICA MONEY, https://www.britannica.com/money/Twitter (Jan 3, 2025); Caroline Forsey, What is Twitter and How Does It Work?, HUBSPOT, https://blog.hubspot.com/marketing/what-is-twitter (July 26, 2021).
[2] The Editors of Encyclopaedia Britannica, supra note 1; Forsey, supra note 1.

cementing the platform as a breaking news source.[3]  The United States alone sports nearly 100 million users.[4]  Because of its widespread usage and communicative utility, the Supreme Court has called social media and Twitter "the modern public square"[5] and noted that Twitter specifically can be used by citizens to "petition their elected representatives and otherwise engage with them in a direct manner" and thereby "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."[6]

    Defendant State Senator Katrina Jackson is an elected official from Monroe, Louisiana.[7] Jackson is a licensed attorney who currently serves as a Louisiana state senator for the Democratic Party.[8]  She has served as a Louisiana state senator since 2019 and is elected by Louisiana's Senate District 34.[9]  Prior to her time as a state senator, Senator Jackson was a member of the Louisiana House of Representatives.[10]

    Defendant Senator Katrina Jackson began using Twitter in March of 2012, shortly after she was elected a state representative.[11]  Her very first tweet on March 9, 2012 states, "On Monday at 12:00 Noon we will begin Legislative Session.  Our office will update you daily."[12] Her original Twitter username on the platform was @RepKJackson.[13]  Over the last twelve years

---

[3] The Editors of Encyclopaedia Britannica, <u>supra</u> note 1.
[4] Fabio Duarte, <u>X (Formerly Twitter) User Age, Gender, & Demographic Stats (2024)</u>, EXPLODING TOPICS (October 8, 2024), https://explodingtopics.com/blog/x-user-stats.
[5] <u>Packingham v. North Carolina</u>, 582 U.S. 98, 107 (2017).
[6] <u>Id.</u> at 104-05, 107.
[7] <u>State Senator Katrina R. Jackson Democrat District 34</u>, LA. STATE. SENATE, https://senate.la.gov/smembers?ID=34 (last visited January 4, 2025).
[8] <u>Senator Katrina R. Jackson: District 34</u>, LOUISIANA STATE SENATE, https://senate.la.gov/Senators/Bios/district34.pdf (last visited Jan 4, 2025).
[9] <u>Id.</u>
[10] <u>Id.</u>
[11] Ex. 1, at 3 (Bogen report).
[12] Ex. 2 (announcing start of session and upcoming public updates).
[13] Ex. 1, at 4 (Bogen report).

Defendant Jackson has tweeted over 2,300 times.[14]  As of October of this year, she had 6,600 "followers" on Twitter who automatically see her Tweets on their feeds.[15]

Jackson has consistently used her Twitter account as a tool of her legislative office. Most of Defendant Jackson's tweets involve her work as a legislator, first in the State House and then in the State Senate.  While some more recent tweets are personal in nature, such as photos of her family and wedding, her account has historically been primarily used for her legislative work, and she is very active on Twitter during legislative sessions.  For example, during her first legislative session as a state representative in 2012 she tweeted 55 times about the goings-on of the session, often tweeting multiple times a day.[16]  Her tweets informed the public about the progress of bills, encouraged members of the public to contact their representatives regarding legislation and asked the public for their thoughts on proposed legislation.[17]  During this first legislative session, out of her 55 tweets, only one was not related to her duties as a legislator.[18]  She has continued this tradition throughout her tenure as a legislator: in March of 2022 she tweeted to announce the kickoff of the legislative session,[19] to update and engage with the public about the goings-on of her committees,[20] and to inform the public of her legislative schedule and achievements.[21]  As will be cataloged below, Defendant Jackson has consistently used Twitter as a tool of her legislative office throughout her career.

---

[14] Ex. 1, at 4 (Bogen report).
[15] Id.
[16] Ex. 3 (all of Defendants' tweets during 2012 session).
[17] Id.
[18] Id.
[19] Ex. 4 (updating public on committee hearing schedule and providing link).
[20] Ex. 5 (tweeting from the floor with link to Ronald Green hearing); Ex. 6 (announcing upcoming hearing to Ronald Green hearing and providing link); Ex. 7 (informing of investigation into youth housing issue outside of district); Ex. 8 (announcing committee hearing schedule and providing link).
[21] Ex. 9 (providing legislative schedule, explaining bill to nolamom); Ex. 10 (providing legislative schedule, "more coming soon."); Ex. 11 (announcing death penalty event and committee hearings); Ex. 12 (announcing passage of bills from committee).

Defendant Jackson utilizes Twitter to communicate with the public, providing information and official press releases from her office.[22]  She often specifically directs the public to Twitter to engage with her and the legislative process.[23]  She tweets legislative announcements,[24] bills she filed or supported,[25] and the work of various task forces and committees on which she serves.[26]  Her tweets often include graphics identifying her as the state senator.[27]  She tweets to solicit ideas and feedback from her followers,[28] and has often engaged with other Twitter users regarding her specific legislative actions and beliefs.[29]  Senator Jackson's Twitter profile does not contain any "content policy" or limitations restricting discussions to certain content.[30]

*Plaintiff Maya Detiege*

Plaintiff Maya Detiege is a Twitter user and Louisiana resident who interacted with Defendant Jackson on Twitter regarding the Senator's legislation.[31]  Like Defendant Jackson,

---

[22] Ex. 9 (announcing Twitter weekly newsletter); Ex. 13 (press release on AG opinion); Ex. 14 (announcing her request for a meeting with other leaders);  Ex. 15 (press release announcing police oversight);  Ex.16, Jackson Dep. 224: 5-18.

[23] Ex. 17 ("Tune in!! I will provide the link in the comments at 9!!!!"); Ex. 18 ("Please stay in touch with me by Twitter!").

[24] See, e.g., Ex. 14 (announcing her request for a meeting with other leaders), Ex. 19 (announcing hearing from floor and providing link); Ex. 20 (Announcing "Today we convene a special session at 4pm!!..."); Ex. 21 (Announcing "We adjourned without passing revenue…., photo from floor.").

[25] See, e.g., Exs. 22 ("I work on many bills"); Ex. 23 (discussing prayer bill with voters); Ex. 24 (announcing passage of her bill and effective date); Ex. 25 (announcing cmtee passage of bill);  Ex. 26 (engaging in Twitter discussion re TOPS bill); Ex. 27 (announcing TOPS task force and bill withdrawal); Ex. 28 (encouraging people to call and meet with her about tax package).

[26] See, e.g., Ex. 29 (announcing hearing on bill in committee); Ex. 30 (announcing order of bill hearing and providing link); Ex. 31 (announcing cmtees to watch); Ex. 32 (announcing outcomes of special session.).

[27] See, e.g., Exs. 8, 9, 15, 31, 33, 34.

[28] See, e.g., Exs. 35 (announcing bills, what's your thoughts?), Ex. 36 (announcing bill filing time, asking for people to send bill ideas to her office); Ex. 37 ("listening to bill, let me know your thoughts").

[29] Ex. 16 Jackson Dep. 121:13-123:14; Ex. 9.

[30] Ex. 38 (Jackson Twitter homepage); Ex. 39 Sherman decl. ¶7; Ex. 40 Detiege decl. ¶11.

[31] Ex. 41 Detiege Dep. 8:8-9:15.

Ms. Detiege is also active on Twitter, where her username is @midaeros.[32]  She tweets

frequently about a variety of topics, including the National Hockey League (her favorite pastime)

and politics.[33]  Ms. Detiege, who graduated from Xavier University,[34] has lived in New Orleans

for many years[35] and her Twitter profile is public and geotagged to New Orleans,[36]  which means

her New Orleans location is visible to everyone on Twitter, whether they "follow" Ms. Detiege

on the platform or not.[37]

On June 24, 2022, the Supreme Court released its decision in Dobbs v. Jackson Women's

Health Organization, effectively overturning Roe v. Wade and eliminating the constitutional right

to abortion.[38]  Abortion generates fierce political debate on both sides of the issue.  On the same

day that the decision was published in Dobbs, Defendant Jackson, who is self-described as pro-

life "from the womb to the tomb,"[39] tweeted out a graphic stating that Roe was overturned,

followed by a list of her advocacy goals.  The right side of the graphic was signed, "Senator

Katrina R. Jackson."[40]

Two days later, on June 26, 2022, Senator Jackson tweeted another graphic explaining

how her bill, SB 342, amended Louisiana's 2006 "trigger law" outlawing abortion, with the only

exception being an abortion necessary to save the life of the mother.[41]  This bill, authored by

Senator Jackson and set to go into effect on August 1, 2022, expanded the statewide trigger law

---

[32] Ex. 41, Detiege Dep. 17:02-16; Maya Detiege (@midaeros)'s Twitter Profile, X,
https://twitter.com/midaeros (last visited Jan. 4, 2025); Ex. 40 Detiege decl. ¶ 3.
[33] Ex. 41, Detiege Dep. 23:12-17.
[34] Id. 9:18-25.
[35] Id. 9:13-15 .
[36] Id. 27:5—28:7; see also Maya Detiege (@midaeros)'s Twitter Profile, X, https://twitter.com/midaeros
(last visited Jan. 4, 2025).
[37] Ex. 33, Detiege Dep. 27:5-6.
[38] See generally Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) (holding that there is no
constitutionally-protected right to abortion).
[39] Ex. 16 Jackson Dep. 84:07-17.
[40] Ex. 33.
[41] Ex. 24.

to include an exception of medical futility, and defined the morning after pill as contraception.[42] The graphic also stated that there is no exception to the abortion criminality even in cases where the pregnancy is the result of rape or incest of the pregnant woman.[43]  The impact of the bill would be statewide.[44]  The lack of an exception for rape and incest generated heated debate on Twitter.

Ms. Detiege, who had recently experienced a complicated and dangerous pregnancy, was concerned and angry about how this new law would impact pregnant women's access to medical care.[45]  She replied to the Senator's tweet celebrating the overturning of <u>Roe</u>, "I say this with all disrespect: burn in hell. You don't care about women. You don't care about pregnant people. You don't care about children. You don't care about education. I do not respect all black women. Some of you bitches are very dumb."  Detiege continued, "I do not feel valued or supported by @KatrinaRJackson and I am actively rooting for her to be voted out in 2023. [praying emoji] can't come fast enough. Rooting for your downfall."[46]

Senator Jackson replied that her bill provided three million dollars for crisis pregnancy centers.[47] Ms. Detiege replied that the amount was a small percentage of the state budget, stating "thanks for the pennies, you (clown emoji)."[48]  Jackson then asked Detiege, "Did you advocate for more?"[49]  Detiege replied, "You're the one bragging about how much it is. You're the elected official. Did YOU advocate for more? Probably too busy not paying attention in committee

---

[42] <u>Id.</u>
[43] <u>Id.</u>
[44] Ex. 16, Jackson Dep. 385:24—386:01.
[45] Ex. 41, Detiege Dep. 53:13—54:18.
[46] Ex. 42 (Detiege engaging with Jackson re bill).
[47] Ex. 43 (Exchange with other user re women's health funding).
[48] Ex. 44 ("Thanks for the pennies, you (clown emoji).")
[49] <u>Id.</u>

meetings when your colleagues were asking questions…Poor response from an elected official. Hope your career ends quickly [praying emoji]."[50]

This exchange unfolded over several hours.  Defendant Jackson then permanently blocked Ms. Detiege from viewing Jackson's Twitter page.[51]  Detiege cannot see or reply to Jackson's tweets, retweet Jackson's tweets, view Senator Jackson's list of followers or followed accounts, or search for Senator Jackson's tweets.[52]

*Plaintiff Dayne Sherman*

Years before blocking Ms. Detiege on Twitter, Defendant Jackson blocked Twitter user Dayne Sherman after he expressed criticism of her and her legislation on the platform.  Mr. Sherman is active on social media and has a large following on Twitter, where is username is @TweettheSouth.[53]  He tweets to engage with current events, including Louisiana State politics and legislative happenings.[54]  Mr. Sherman uses Twitter because he believes it is the best way to communicate quickly with both the general public and legislators.[55]  Defendant Jackson and Mr. Sherman engaged in amiable and substantive political discussions many times on Twitter about pending and proposed legislation, including the issue of school vouchers.[56]  Prior to blocking Mr. Sherman, Defendant Jackson interacted with him so much on Twitter that he was her fourth most mentioned account.[57]

---

[50] Ex. 45.
[51] Ex. 41, Detiege Dep. 32:25—33:14; Ex. 40 Detiege decl. ¶ 17.
[52] Ex. 41, Detiege Dep. 32:25—33:14; Ex. 40 Detiege decl. ¶ 17.
[53] Ex. 46, Sherman Dep. 20:18—21:09.
[54] Id. 21:10-25.
[55] Id. 21:16-25.
[56] Exs. 47; 48 (acknowledging Plaintiff's work re education and thanking him for keeping the public informed); 49 (exchange re tax plans).
[57] Ex. 1, at 5.

Defendant Jackson blocked Sherman after he criticized her position on the issue of school prayer during a lengthy Twitter exchange spanning from April 4 to April 8, 2013.[58]  Senator Jackson had recently sponsored a bill that would allow students to ask for a prayer club in school.[59]  Mr. Sherman, believing that prayer is a good thing but it does not belong in public schools,[60] reached out to Defendant Jackson on Twitter to discuss her bill, using the hashtag #stoptheprayerbill.[61]  In an ongoing tweet-thread that included Defendant Jackson, Mr. Sherman expressed his belief that Senator Jackson was pandering to the Louisiana Family Forum, which he found disappointing from a politician he admired.[62]  When Senator Jackson tweeted back that she, being a lawyer, would defend her bill against any potential lawsuits, therefore costing the state nothing, Mr. Sherman replied, "Well that will make it a cakewalk for the #ACLU."[63]  Mr. Sherman suggested the Senator scrap the bill, arguing that there was no way to make it constitutional.[64]

The Twitter discussion continued over the next couple of days, with Defendant Jackson debating the constitutionality of her proposed bill with Mr. Sherman, as well as other Twitter users.[65]  On the evening of April 7, Defendant Jackson tweeted at Mr. Sherman (@TweetheSouth) and the other Twitter users who had participated in the discussion "Amendment to bill will post tomorrow let's talk then whose in?"  On April 8, Mr. Sherman tweeted that teachers' rights would be violated by the school prayer bill; Senator Jackson disagreed.  Senator Jackson replied that private organizations are able to use public property,

---

[58] Ex. 46, Sherman Dep. 11:11-24; Ex. 39 Sherman decl. ¶ 15.
[59] Ex. 23; Ex. 16, Jackson Dep. 323:16-20.
[60] Ex. 39 at ¶ 11.
[61] Ex. 23 at 2.
[62] Ex. 23.
[63] Id. at 3.
[64] Id. at 4.
[65] Id. at 4 *et seq*.

such as reserving the capitol.[66]  Mr. Sherman responded that that was an equal access right.[67]

Jackson continued to defend the constitutionality of her bill. Mr. Sherman replied, "that's not

what the courts say. It's unconstitutional."[68]  That was the last reply that Mr. Sherman was able to

tweet to Senator Jackson's Twitter account.[69]  When he next searched the Defendant's username,

he was taken to a page indicating that he had been blocked by the Senator.[70]  After being blocked

by the Defendant, he was no longer able to view or interact with any of her tweets.[71]  He had

previously relied on her Twitter account to learn about legislation and follow the goings-on of the

Senate in legislative session.[72]

## V.    Summary of the Argument

The First Amendment principles governing this case are well established. The "government

may not grant the use of a forum to people whose views it finds acceptable but deny use to those

wishing to express less favored or more controversial views."[73]  That this censorship occurs on

social media rather than in-person does not change the First Amendment harm to citizens, who

are cut off from the modern "public square."[74]  Senator Jackson created a designated public

forum and then engaged in viewpoint discrimination by ejecting Plaintiffs from the forum based

upon disagreement with their viewpoints.  Plaintiffs are entitled to summary judgment.

---

[66] Id. at 8.
[67] Id.
[68] Id. at 9.
[69] Ex. 39 ¶ 13-14.
[70] Id. at ¶ 17.
[71] Id. at ¶ 18
[72] Id. at ¶ 9.
[73] Police Dep't of Chi. v. Mosley, 408 U.S. 92, 96 (1972).
[74] Packingham, 582 U.S. at 107.

# VI.     Law and Argument

## A.  Summary judgment standard

The Fifth Circuit instructs that "[s]ummary judgment is appropriate if there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[75]  The material facts of this case consist solely of Defendant Jackson's actions on Twitter.[76]  There is no genuine dispute as to those material facts.  Defendant Jackson admitted to the authenticity of her Twitter data, which she produced to Plaintiffs in her discovery responses.[77]  Plaintiffs have an expert that can use that data to authenticate every Tweet at issue in this case as having been made by the Senator, and the time at which it was made.[78]  The tweets also remain publicly available on Twitter, and can be verified by any fact witness.  Finally, Defendant Jackson has also now admitted to the authenticity of the tweets she claimed no recollection of in her deposition.[79]  Because Plaintiffs' case relies exclusively on the Senator's Twitter interactions, and those are established by the authenticated data, public information, and Defendant's own admissions, there is no disputed issue of material fact.

Because the only issues remaining are questions of law, summary judgment is appropriate.  This Court should find, as a matter of law, that (1) Senator Jackson engaged in impermissible viewpoint and content-based discrimination by blocking Plaintiffs Detiege and Sherman for engaging in protected First Amendment political speech in a designated public forum and (2) Senator Jackson's Twitter activity constitutes state action under Supreme Court precedent.  As such, this Court should grant Plaintiffs' motion for summary judgment.

---

[75] Narayanan v. Midwestern State Univ., No. 22-11140, 2023 WL 6621676, at *3 (5th Cir. Oct. 11, 2023); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir 1994).
[76] Narayanan, 2023 WL 6621676, at *3 (quoting Little, 37 F.3d at 1075).
[77] Ex. 50.
[78] Ex. 1, at 6-7.
[79] Ex. 51.

**B. Defendant Jackson's Blocking of Plaintiffs on Twitter Violated Plaintiffs' First Amendment Rights**

Plaintiffs have been deprived of their First Amendment rights under the U.S. Constitution.[80]  42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State deprives someone of a federal constitutional or statutory right."[81]  In evaluating a § 1983 claim, the Court must first analyze whether Plaintiffs' speech "is speech protected by the First Amendment, for, if it is not, we need go no further."[82]  If Plaintiffs' speech is protected speech, it is then necessary to "identify the nature of the forum, because the extent to which the government may limit access depends on whether the forum is public or nonpublic."[83]  Finally, it is necessary to "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard."[84]  Applying these steps to the instant facts, it is clear that (1) Plaintiffs' speech was protected by the First Amendment; (2) Jackson's Twitter profile constitutes a designated public forum; and (3) Defendant Jackson engaged in unconstitutional viewpoint discrimination when she blocked Plaintiffs from her Twitter account.  Proof of each element will be presented below.

**1. Plaintiffs' speech was protected by the First Amendment**

The First Amendment of the United States ensures that private citizens maintain the right to speak freely and without government intrusion.  This protects the right of private citizens to freely criticize the government and policies they do not agree with.[85]  Social media sites "provide

---

[80] <u>Robinson v. Hunt Cnty.</u>, 921 F.3d 447, 449-50 (5th Cir. 2019).
[81] 42 U.S.C.A. § 1983.
[82] <u>Cornelius v. NAACP Legal Def. & Educ. Fund</u>, 473 U.S. 788, 797 (1985).
[83] <u>Id.</u>
[84] <u>Id.</u>
[85] <u>Robinson</u>, 921 F.3d at 447.

perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."[86]  The nature of the online expression is accepted by courts to be "pure speech."[87]

In the United States we protect speech even where it is caustic and difficult to hear.[88] Free speech invites dispute and serves an important purpose when it creates dissatisfaction with the current conditions or stirs people to anger.[89]  This sacred national value applies to online speech—our modern "public square"[90]— where courts have protected controversial and challenging speech.  In Robinson v. Hunt Cty., in considering social media censorship, the Fifth Circuit reminded, "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."[91]

Plaintiff Sherman was blocked by Defendant Jackson for challenging her school prayer bill in the exchange, as cataloged *supra* at 10-12.  In reviewing the tweets that caused Defendant Jackson to block Plaintiff Sherman, Jackson could not point to a single word from Mr. Sherman that would merit a blocking by her own professed "case by case"[92] standard.  Mr. Sherman's statements directly commented on proposed legislation affecting all Louisianians. Here, based on her policy disagreement with Mr. Sherman on school prayer, Defendant Jackson impermissibly "regulat[ed] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."[93]

---

[86] Packingham, 582 U.S. at 107.
[87] 303 Creative LLC v. Elenis, 600 U.S. 570, 597 (2023).
[88] Garrison v. Louisiana, 379 U.S. 64, 75 (1964) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254,270 (1964)).
[89] Cox v. Louisiana, 379 U.S. 536, 551-52 (1965).
[90] Packingham, 582 U.S. at 107.
[91] Robinson, 921 F.3d at 447 (quoting Street v. New York, 394 U.S. 576, 592 (1969)); see also Snyder v. Phelps, 562 U.S 443, 454-56 (2011).
[92] Ex. 16, Jackson Dep. 353:23-25, 354:1-6.
[93] Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

Plaintiff Detiege was blocked by Defendant Jackson for the exchange chronicled *supra* at 7-10.  Defendant Jackson has said that Ms. Detiege's tweets were disrespectful, derogatory, and contained hate speech, making them subject to censorship.[94]  That is wrong as a matter of law. First, derogatory, offensive, and even vulgar speech is protected by the Constitution.[95]  "Speech is often provocative and challenging . . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."[96]

Second, the idea that the government has an interest in preventing speech expressing ideas that offend, including racist or sexist speech, "strikes at the heart of the First Amendment. Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'"[97] "As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate 'breathing space' to the freedoms protected by the First Amendment."[98]

Finally, Detiege's speech was not hate speech.  Detiege is also a Black woman.[99]  Her point in making her comment was that she does not blindly stand with all Black women, simply

---

[94] Ex. 16, Jackson Dep. 268:22—269:12, 278:5-8, 281:21-25; 379:20-22; Ex. 52 (spewing hate speech unprotected by First Amendment); Ex. 53 (hate speech);  Ex. 54 (hate speech, not unusual  to block offensive, harassment), Ex. 55 (hate speech, lewd comments inappropriate for teenagers.).
[95] Robinson, 921 F.3d at 447; see Matal v. Tam, 137 U.S. 1744, 1763  (2017); see also id. at 1766 (Kennedy, J., concurring).
[96] Sgaggio v. De Young, No. 20-cv-01977-PAB-KMT,  2022 WL 970008, at *16 (D. Colo. Feb. 1, 2022)(quoting City of Houston v. Hill, 482 U.S. 451, 461 (1987)).
[97] Matal, 137 U.S. at 1764.
[98] Boos v. Barry, 485 U.S. 312, 322 (1988) (quoting Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988)).
[99] Ex. 40, Detiege decl.¶ 14.

because of race.[100]  She was declining to stand with Katrina Jackson, *despite her being a Black woman to whom she would normally extend support and solidarity*, <u>because of</u> her legislation.[101] Detiege's words were not hate speech, they were to the contrary.  Detiege engaged in her tweets to express outrage over policies enacted by Defendant Jackson, which Ms. Detiege found deeply dangerous for women and also contrary to Defendant Jackson's professed faith.[102]  This is core political speech.[103] "The inquiry into the protected status of speech is one of law, not fact,"[104] and Plaintiffs' speech was unquestionably protected.

### 2. Defendant Jackson's Twitter Page is a Designated Public Forum

After determining that the plaintiff was engaged in protected speech, it is necessary next to identify the nature of the forum in which the plaintiff is attempting to exercise his or her rights.  There are three types of speech forums for First Amendment purposes: "the traditional public forum, the public forum created by governmental designation, and the nonpublic forum."[105]  First Amendment protections provided in designated public forums are the same as those given to traditional public forums—strict scrutiny.[106]  The government also may open a nonpublic forum for a limited purpose.[107]  Restrictions on speech in a limited public forum are subject to intermediate scrutiny by the courts.[108]

---

[100] <u>Id.</u>
[101] <u>Id.</u>
[102] Ex. 41, Detiege Dep. 53:13-54:18; Ex. 40 Detiege Decl. ¶ 13.
[103] <u>Meyer v. Grant</u>, 486 U.S. 414, 421-22 (1988) (Interactive communication concerning political change is appropriately described as "core political speech.")
[104] <u>Connick v. Myers</u>, 461 U.S. 138, 148 n. 7 (1983).
[105] <u>Cornelius</u>, 473 U.S. at 802.
[106] <u>Fairchild v. Liberty Indep. Sch. Dist.</u>, 597 F.3d 747, 757 (5th Cir. 2010) (holding that any limitation of public comment in these "forums must pass strict scrutiny with a compelling state interest and narrow tailoring."); <u>see also</u> <u>Minnesota Voters All. v. Mansky</u>, 585 U.S. 1, 11 (2018).
[107] <u>Chiu v. Plano Indep. Sch. Dist.</u>, 260 F.3d 330, 346 (5th Cir. 2001).
[108] <u>Minnesota Voters All.</u>, 585 U.S. at 2 (holding that a restriction must be "reasonable in light of the purpose served by the forum" and must be "guided by objective, workable standards.").

As a threshold matter, the Defendant's Twitter page is a public forum.[109]  "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular."[110]  These platforms "allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'"[111]  On Twitter, "users can petition their elected representatives and otherwise engage with them in a direct manner."[112] When a government official selectively blocks criticism on Twitter, the blocked citizen is prevented from engaging in public debate, which prohibits access to "the modern public square"[113] and unfairly tilts public debate by reducing the visibility of dissent.  Such censorship is contrary to "our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-

---

[109] See generally Robinson, 921 F.3d at 448 (even where parties did not argue whether social media forum was limited or designated, court assumed it was a forum subject to First Amendment protections); Sammons v. McCarthy, 606 F. Supp. 3d 165, 213 (D. Md. 2022) (page is a public forum if it is open to public comment on matters of public import); Garnier v. O'Connor-Ratcliff, 41 F. 4th 1158 (9th Cir. 2022) (interactive sections of social media account are a public forum) vacated sub nom.;  O'Connor-Ratcliff v. Garnier, 601 U.S. 205 (2024); West v. Shea, 500 F. Supp. 3d 1079, 1084 (C.D. Cal. 2020); Lewis v. Jones, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020) (interactive component of page, which defendant left open for public discourse, was a public forum); Czosnyka v. Gardiner, No. 21-cv-3240, 2022 WL 407651, at *5 (N.D. Ill. Feb. 10, 2022) (when government official uses social media for official business, the interactive portions of the social media platforms are public fora for First Amendment purposes) (referencing Davison, 912 F.3d at 682; Knight First Amendment Inst., 928 F.3d at 237;  One Wisconsin Now v. Kremer, 354 F. Supp. 3d 940, 953 (W.D. Wis. 2019)); Felts v. Reed, 504 F. Supp. 3d 978, 985 (E.D. Mo. 2020) (public forum created where defendant referred to his title in the account handle and in his bio; showed pictures of himself in an official capacity; and used account to advertise legislative developments and community events, and to conduct other business related to the office, and opened the account in indiscriminate use by the public).
[110] Packingham, 582 U.S. at 104 (citations omitted).
[111] Id. at 107 (quoting Reno v Am. C.L. Union, 521 U.S. 844, 868 (1997)).
[112] Id. at 104-05.
[113] Id. at 107.

open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'"[114]

To determine whether a particular official created a designated or limited public forum, the Fifth Circuit looks to "(1) the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'"[115]  "The government creates a designated public forum 'by intentionally opening a nontraditional forum for public discourse.'"[116]  A limited public forum is open for public discourse by permitting speech of limited purpose or content.[117]

Defendant Jackson created a designated public forum.  Her account is open to all members of the public.[118]  She created her account in 2012, the same year she took office as a state representative.[119]  Throughout the 12 years of Senator Jackson's career as a public representative, she has consistently used Twitter to engage with the public.  She asks for public input on Twitter.[120]  She responds to Tweets from the public.[121]  She uses Twitter to announce information about her work and encourage public comment at meetings.[122]  She tweets about upcoming legislative meetings and encourages the public to participate.[123]  She tweets about

---

[114] Garrison v. Louisiana, 379 U.S. 64, 75 (1964) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

[115] Chiu, at 346 (quoting Estiverne v. La. State Bar Ass'n, 863 F.2d 371, 378 (5th Cir 1989)).

[116] Id. at 347 (quoting Cornelius, 473 U.S. at 805).

[117] Fairchild, 597 F.3d at 759.

[118] Ex. 16, Jackson Dep. 139:4-18; Ex. 56 at 3, RFA 11.

[119] Ex. 1; Ex. 16, Jackson Dep. 13:18-19; Ex. 2.

[120] See, e.g., Ex. 18 (asking for public contact on Twitter during legislative session); Ex. 35 (seeking input on marijuana legislation); Ex. 36 (asking for input on bills); Ex. 37 (seeking input on pharmacy bill); Ex. 57 ("We would love to hear from you…contact us."); Ex. 58 (seeking input on Jindal retirement package."); Ex. 59 (asking for input on questions to ask about budget).

[121] See, e.g., Ex. 14 (responding to NFIB,  using Twitter to set up meeting); Ex. 26 (replying to discussion re TOPS); Ex. 48 (discussing BESE with users); Ex. 60 (replying re road funding); Ex. 61 (engaging on healthcare) Ex. 62 (engaging with user on her policy votes);  Ex. 63 (responding to question about care for kids);  Ex. 16, Jackson Dep. 177:16-17.

[122] Ex. 16, Jackson Dep. 243:18—244:20, 246:17-21; See, e.g., Exs. 15, 34.

[123] See, e.g., Exs. 19, 29, 30, 31.

legislation that has passed and shares information on legislation.[124]  She uses Twitter to engage

with citizens and organizations throughout the state regarding bills she authored or sponsored

and seeks citizen input on public policy,[125] including to poll users on their thoughts on the

legalization of marijuana[126] and to solicit bill ideas from Twitter users.[127]

Defendant Jackson explicitly intended for her Twitter page to be a place to engage with

and receive comment from members of the public on any topic.[128]  Anyone, including users who

did not reside in her district, can comment on any topic and engage Defendant Jackson in a

discussion on her Twitter account.[129]  For example, prior to blocking Mr. Sherman, she often

engaged in political discussion with him on Twitter, despite the fact that he lived outside her

district;[130]  she has also had numerous exchanges about proposed legislation with a Twitter user

that goes by the handle "Nola Mom," who clearly does not live in her district.[131]  She has spoken

in the media about how Twitter is a direct line to her, whereas other forms of media may not

be.[132]

Participation on her account is not limited to certain discourse.[133]  Her account has no

warning that certain content is prohibited.[134]  Twitter is optimized for public debate and unlike

other "mixed use" pages, Jackson does not place any limitations on content or viewpoints that

---

[124] Ex. 25; Ex. 16, Jackson Depo 217:17-218:09, 222:05-20.
[125] Exs. 22, 17, 18, 27, 49, 63, 64 (asking for public discussion on amendment of bill), 65 (advising CASA who voted on bill).
[126] Ex. 35.
[127] Ex. 36.
[128] Ex. 16, Jackson Dep. 145:15-20.
[129] See, e.g., Ex 66, Green Decl.
[130] Exs. 39, 48, 49 Sherman Decl. ¶¶5-6.
[131] Exs. 9, 67.
[132] Jack Richards, @lalegis, You Can Tweet That, TOWN TALK (June 10, 2016, 2:16 PM), https://www.thetowntalk.com/story/news/2016/06/10/lalegis-you-can-tweet/85706164/.
[133] Ex. 16, Jackson Dep. 145:15-20.
[134] Ex. 38.

can be expressed.[135]  There are no policies or rules for tweeting on the page.[136]  Any such rules of decorum, limitations on acceptable speech, or boundaries on debate would have to be clearly stated, and "sufficiently definite and objective to prevent arbitrary or discriminatory enforcement."[137]  Defendant Jackson's failure to place any limits on the interactive activity on her Twitter page makes it a designated public forum as a matter of law.[138]  It was operated as such at all times relevant to this litigation.[139]

The facts of <u>Knight v. Trump</u> are largely analogous to the facts of this case.  There the United States Court of Appeals for the Second Circuit found that President Trump's Twitter account was a public forum because it opened an instrumentality of communication "for indiscriminate use by the general public."[140]  The court reasoned that "the President makes official statements on a platform that allows anyone—not just his supporters—to comment and engage with his statements and with each other."[141]  The court also noted that "[t]he only limitation Twitter places on creating an account is age-based: those under 13 years of age may not use its services."[142]  The same is true of Defendant Jackson, who opened an instrumentality of communication 'for indiscriminate use by the general public', and treats it as such.  Like Trump, Jackson makes official statements on Twitter and has no clear restrictions on her

---

[135] Ex. 38; Ex. 40, Detiege Decl. ¶ 11; Ex. 39, Sherman Decl. ¶ 7.

[136] <u>Id.</u>

[137] <u>Am. Freedom Def. Initiative v. King Cnty.</u>, 904 F.3d 1126, 1130 (9th Cir. 2018); <u>Minnesota Voters All.</u>, 585 U.S. at 2, (holding that any restriction must be "guided by objective, workable standards.").

[138] <u>See generally</u> <u>Davison v. Randall</u>, 912 F.3d 666, 682 (4th Cir. 2019) (discussing a designated forum where public is invited to participate in dialogue and express views, without restrictions and was open to public);  <u>Garnier v. O'Connor-Ratcliff</u>, 41 F.4th  1158 (9th Cir. 2022), *vacated sub nom*.;  <u>O'Connor-Ratcliff v. Garnier</u>, 601 U.S. 205 (2024) (holding that where the official placed no rules of decorum or etiquette on the page, it is a designated—rather than limited—public forum, having been opened for all discussions with the public.).

[139] Ex. 40, Detiege Decl. ¶ 11; Ex. 39, Sherman Decl. ¶ 7.

[140] <u>Knight First Amend. Inst. at Colum. Univ. v. Trump</u>, 953 F.3d 216, 223 (2nd Cir. 2020); <u>vacated as moot</u>, <u>Biden v. Knight First Amend. Inst. at Colum. Univ.</u>, 141 S.Ct. 1220 (2021).

[141] <u>Id.</u> at 221.

[142] <u>Id.</u> at 222.

comment or reply functions.  The former president, like Jackson, "repeatedly used the account as an official vehicle for governance and made its interactive features accessible to the public without limitation."[143]  She readily engages with her followers and anyone else who comments on her posts, without regard to whether they fall within her voting district.[144]  Like Trump, Jackson has no limitation on her account other than Twitter's restriction that "is age-based: those under 13 years of age may not use its services."  Jackson clearly created a designated public forum.

### 3.  Defendant Jackson Engaged in Impermissible Viewpoint Discrimination in Blocking Plaintiffs

"It is firmly settled that under our Constitution that the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."[145]  The Supreme Court explains, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."[146]  Where the plaintiff proves viewpoint discrimination, it is "immaterial whether the Facebook page is analyzed as a limited or designated public forum."[147]  The First Amendment "forbid[s] the State to exercise viewpoint discrimination" in either setting, "even when the limited public forum is one of its own creation."[148]  Here, Defendant Jackson blocked Plaintiffs Detiege and Sherman for their critical viewpoints on legislation she authored and sponsored.  But the Fifth Circuit does not require Plaintiffs to show the blocking was a result of criticism.

---

[143] Knight First Amend. Inst. at Colum. Univ., 953 F.3d at 223 (quoting Knight First Amend. Inst. at Colum. Univ. v. Trump, 928 F.3d 226, 237 (2nd Cir. 2019)).
[144] See supra n. 132-134; Ex. 16 Jackson Dep. 165:25-16713.
[145] Robinson v. Hunt Cnty., 921 F.3d 440, 447 (5th Cir. 2019) (quoting Street v. New York, 394 U.S. 576, 592 (1969)); see also Snyder v. Phelps, 562 U.S 443, 454-56 (2011).
[146] Rosenberger, 515 U.S. at 828.
[147] Robinson, 921 F.3d at 448.
[148] Id. at 448 (quoting Rosenberger., 515 U.S. at 829).

Defendant's actions "constitute viewpoint discrimination regardless of whether they were motivated by (plaintiff's) criticism of (defendant) or a determination that (plaintiff's) comment was otherwise 'inappropriate.'"[149]

Defendant Jackson's actions in response to her exchange with Mr. Sherman are unconstitutional viewpoint discrimination.  Mr. Sherman was blocked because he disagreed with Defendant Jackson regarding a bill she filed.  Mr. Sherman and Defendant Jackson only engaged in discussion related to Jackson's bills and work as a legislator.[150]  Mr. Sherman both praised and criticized Defendant Jackson based on her legislation, depending on whether he agreed or disagreed as to the effect and constitutionality of said legislation.[151]  Mr. Sherman was only blocked after a lengthy discussion with Defendant Jackson on Twitter regarding a school prayer bill that he believed violated the Constitution.[152]

Although Jackson did not admit in deposition to silencing Sherman based upon his content, she also cannot deny doing so because her testimony is that she cannot remember whether she ever blocked Mr. Sherman at all.[153]  Mr. Sherman was blocked shortly after disagreeing with Defendant Jackson about her proposed legislation.[154]  Although the Senator is unable to recall blocking Mr. Sherman, or any other Twitter users besides Ms. Detiege, the Court can deduce that she blocked him based upon viewpoint because of the timing of the block.  Courts have found that when a Plaintiff is blocked shortly after publicly expressing criticism, this strongly suggests

---

[149] <u>Robinson</u>, 921 F.3d at 447.
[150] Ex. 39, Sherman Decl. ¶ 5.
[151] Ex. 39, Sherman Decl. ¶ 6.
[152] Ex. 23; Ex. 39, Sherman Decl. ¶ 10-15.
[153] Ex. 16, Jackson Dep. 354:19-23; 355:2-7.
[154] Ex. 39, Sherman Decl. ¶ 14-15.

viewpoint discrimination.[155]  Here, the proximity in time and the absence of other intervening statements indicate Defendant Jackson blocked Mr. Sherman because of the viewpoint expressed in his tweets criticizing her proposed legislation on school prayer. She also has a known history of blocking[156] and applies a self-admitted subjective standard.[157]  Her actions constitute viewpoint discrimination and are a violation of Mr. Sherman's rights under the First Amendment.

Defendant Jackson's blocking of Ms. Detiege also constitutes viewpoint discrimination. Like Mr. Sherman, Ms. Detiege disagreed with a bill filed by Defendant Jackson.[158]  Defendant Jackson's abortion bill affected Ms. Detiege personally, and Ms. Detiege took to Twitter to express her opinion to Defendant Jackson, the legislator who sponsored and helped author the bill.[159]  Ms. Detiege believed that the bill was dangerous for women throughout Louisiana.[160]

It is uncontested that Defendant Jackson blocked Ms. Detiege based on the viewpoint expressed in her speech.  Her testimony is that she silenced Ms. Detiege because she was "derogatory," [161]  "disrespectful," [162] "us[ing] profanity," [163] "flaming,"[164] "filled with

---

[155] See Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 575 (S.D.N.Y. 2018), aff'd, 928 F.3d 226 (2d Cir. 2019) vacated as moot, Knight First Amend. Inst. at Colum. Univ. v. Biden, 141 S.Ct. 1220 (2021). (concluding plaintiffs being blocked shortly after posting critical tweets of the President supported the determination that they were "indisputably blocked as a result of viewpoint discrimination"); Price v. City of New York, No. 15 CIV 5871 (KPF), 2018 WL 3117507, at *16 (S.D.N.Y. June 25, 2018) (blocking plaintiff on social media very shortly after she posted critical comments "strongly suggest[s]" the motivation was to silence her public reproach); Attwood v. Clemons, 526 F. Supp. 3d 1152, 1172–73 (N.D. Fla. 2021) (explaining the short time frame between the plaintiff's comment and the defendant blocking the plaintiff contributed to a reasonable inference of viewpoint discrimination).
[156] Supra at p. 27, fn. 190-199.
[157] Supra at p. 25-26.
[158] Ex. 40, Detiege Decl. ¶ 9.
[159] Ex. 41, Detiege Dep. 53:21—54:18; Ex. 40, Detiege Decl. ¶¶ 7-10.
[160] Id.
[161] Ex. 16, Jackson Dep. 270:15.
[162] Id. 277:15-18.
[163] Id. 283:16-22.
[164] Id. 381: 8-15.

foolishness"[165] and using what she described as "hate speech."[166]  Although Defendant Jackson

and Ms. Detiege have differing viewpoints on the divisive issue, Defendant's disapproval of Ms.

Detiege's views does not give her the right to censor them.[167]  Ms. Detiege's speech may have

been offensive to Defendant Jackson, but that does not make it less protected.[168]

The Fifth Circuit has held that "[o]fficial censorship based on a state actor's subjective

judgment that the content of protected speech is offensive or inappropriate is viewpoint

discrimination."[169]  Defendant Jackson testified that this is <u>exactly</u> what she does.  Defendant

Jackson blocks users for speech that she perceives to be "disrespectful."[170]  She defines

disrespectful as a "wide range"[171] and "myriad of ways, depending on the subject matter"[172]

determined on a "case by case basis"[173] including name calling,[174] "getting off the issue and

starting to get insulting,"[175] and specifically referenced Plaintiff Detiege's tweets.[176]  She also

blocks users who engage in "derogatory" speech.[177]  She defines derogatory as "anything that

goes outside of the issues that we're discussing and starts name calling or starts being

disrespectful."[178]  When asked what she uses to determine whether speech is disrespectful,

---

[165] <u>Id.</u>
[166] <u>Id.</u> 284:4-10.
[167] <u>Id.</u> 284:4-10.
[168] <u>Snyder</u>, 562 U.S. at 460-61.
[169] <u>Robinson</u>, 921 F.3d at 447 (holding that  defendants' actions "constituted viewpoint discrimination regardless of whether they were motivated by her criticism of the defendant sheriff's office or a determination that her comment was otherwise 'inappropriate.'"); <u>see</u> <u>Matal</u>, 137 U.S. at 1763 (majority opinion); <u>see also</u> <u>id.</u> at 1766 (Kennedy, J., concurring).
[170] Ex. 16, Jackson Dep. 277—280.
[171] <u>Id.</u> 281:3-5.
[172] <u>Id.</u> 282:1-3.
[173] <u>Id.</u> 282:1-15.
[174] <u>Id.</u> 277:14-18.
[175] <u>Id.</u> 281:3-10.
[176] <u>Id.</u> 381:3-15.
[177] <u>Id.</u> 270:15, 277:15-18, 268:22—269:12, 279:24—280:02.
[178] Ex. 16, Jackson Dep. 280:4-6.

Defendant Jackson replied, "my intelligence," and religious faith.[179]  She noted that she evaluates "mentally" on a case-by-case basis whether something is disrespectful.[180]  She blocks users who engage in hate speech from her page.[181] She defines hate speech as "[w]hen you single out a person because they belong to a certain racial class and you do so in a manner that brings—and I can't fully explain it---but basically when you single out someone because they belong to a certain class and offer offensive comments to them."[182]  She blocks users who make lewd, inappropriate comments.[183]  She defines "lewd" as "a variety of things. Lewd can be—for me, lewd means comments that are inappropriate."[184]  And "inappropriate is case by case basis. Anything I believe is inappropriate.  Profanity…attacks on character that go well beyond anything appropriate."[185]  Jackson's testimony describing speech she censors includes only speech fully protected by the law and is determined only to her arbitrary assessment of what speech runs afoul of her subjective standards.

Blocking speech that is "disrespectful" or "derogatory" is a standardless policy and allows for her subjective determination of which speech should be blocked.  Jackson's own testimony confirms that she blocks based on her own subjectivity.[186]  This is borne out by the experience of many Louisianians who have been blocked by Senator Jackson for fully protected speech with which she disagrees.  Although she cannot recall any single specific instance,[187]

---

[179] Id. 282:16-23.
[180] Id. 283:11, 282:11, 362:12-14.
[181] Id. 359:15-17.
[182] Id. 377:4-10.
[183] Ex. 52.
[184] Ex. 16, Jackson Dep. 360:19-22.
[185] Id. 360:23-25, 361:1-2.
[186] Id. 361:5-11.
[187] Id. 266:11-25, 269:22-25;  270:1-25; 274:23-24, 275:1-7; 278:12-21, 284:20-25, 285:1-3; 296:24-25; 301:3-12; 372:21-23; 374:15-16.

Defendant Jackson has a history of blocking Twitter users who challenge her viewpoint.[188]  She has also blocked Twitter users Andrew McKevitt,[189] Andrew Perry,[190] Donald Hodge,[191] Eleanor Hugh-Jones,[192] Gabrielle Perry,[193] Katherine Hurst,[194] M. Christian Green,[195] Paige Bailey,[196] and Priscilla Gonzalez[197] for expressing criticism of her legislative positions.  These are all Louisiana citizens, all blocked by Defendant Jackson for expressing criticism of her or her legislation on Twitter.  These other blockings are relevant to this litigation because they show that Senator Jackson has a pattern of blocking contrary viewpoints, which belies her representation that she only blocks what she perceives as unprotected speech.  She blocks criticism, which she cannot do, regardless of whether she has created a limited or designated public forum.  It also shows that she blocks with essentially no standards.  Although Andrew Perry has been blocked by the Senator,[198] she testified at deposition that his tweet would not be derogatory language that would get him blocked.[199]  She also testified that she wouldn't normally block someone for the critical rhetoric in Gabrielle Perry's tweets, yet she too was blocked by the Senator.[200] When one user said, "what an embarrassingly stupid thing to say. I feel sorry for you."  The Senator replied, "your inability to advocate for your beliefs in a respectful manner just earned you a block."[201]

---

[188] Ex. 16, Jackson Dep. 342:5-10; 354:11-13.
[189] Ex. 68, McKevitt Decl.
[190] Ex. 69, Perry Decl.
[191] Ex. 70, Hodge Decl.
[192] Ex. 71, Hugh-Jones Decl.
[193] Ex. 72, Perry Decl.
[194] Ex. 73, Hurst Decl.
[195] Ex. 66, Green Decl.
[196] Ex. 74, Bailey Decl.
[197] Ex. 75, Gonzalez Decl.
[198] Ex. 69.
[199] Ex. 16, Jackson Dep. 308:21–309:04.
[200] Id. 308:23-25; 309:1-4; Ex. 72.
[201] Ex. 61.

The speech of other declarants was likewise fully protected political debate for which they were blocked.

In sum, Defendant Jackson clearly blocked Plaintiffs Detiege and Sherman based on the viewpoints expressed in their speech.  The blocking not only stopped them from leaving the offending comments, it also prevented them from "leaving any comments at all, no matter how short, relevant, or non-duplicative they might be."[202]  Sister courts in this Circuit have held that Robinson v. Hunt County gave defendants in this Circuit fair warning that viewpoint discrimination  within public comments on social media would violate the First Amendment, and that the law prohibiting viewpoint discrimination in public fora has been long established generally.[203]  Because Defendant Jackson blocked Plaintiffs based on the viewpoints expressed in their speech, her actions were plainly impermissible and in violation of Plaintiffs' First Amendment rights as long established by the Supreme Court and the Fifth Circuit.

## C.  Jackson was acting under color of law in blocking Plaintiffs

After establishing that there has been a deprivation of Plaintiffs' rights, this Court must determine whether that deprivation was committed by a person acting under color of state law.[204] Government officials can create social media accounts on Facebook with no comment section. In that case, they have not created a public forum for discussion; they are merely using social media to make announcements, akin to putting up a billboard.  But where a government official chooses to open an interactive social media account such as Twitter, they are choosing to create a

---

[202] Garnier v. O'Connor-Ratcliff, 41 F.4th 1158, 1182 (9th Cir. 2022) *vacated sub nom.*;  O'Connor-Ratcliff v. Garnier, 601 U.S. 205 (2024).

[203] Evans v. Herman, No. 4:22-CV-2508, 2023 WL 4188347, at *4 (S.D. Tex. Apr. 24, 2023), report and recommendation adopted, No. 4:22-CV-02508, 2023 WL 4188466 (S.D. Tex. June 26, 2023).

[204] Clark v. Kolkhorst, No. 1:19-CV-198-LY, 2021 WL 5783210, at *7 (W.D. Tex. Dec. 7, 2021) (citing Whitley v. Hanna, 726 F.3d 631, 638 (5th Cir. 2013)); see also Siegert v. Gilley, 500 U.S. 226, 232 (1991) (noting that whether the plaintiff has been deprived of a right secured by the Constitution is a threshold inquiry in a Section 1983 claim).

public forum for public engagement, triggering First Amendment protections for the public if the forum is operated "under color of law."

The Supreme Court's decision in <u>Lindke v. Freed</u> affirmed that public officials are bound by the First Amendment when they use social media accounts in their official capacities, and articulated a two-prong test for evaluating when a government official's censorship of content on a social media page constitutes "state action" for the purposes of §1983.[205]  The Court held that a government official's social-media activity constitutes state action (and is therefore subject to First Amendment scrutiny) when "the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media."[206]

<u>Lindke</u> also makes clear that Senator Jackson's Twitter account, established as @RepKJackson and administered by her in her official capacity as a state legislator, is state action if she engaged in state action on any tweet on her page.  Because blocking a user on Twitter results in page-wide blackout, it is not simply the Plaintiffs' specific interactions with the Defendant that matter to the state-action analysis.  Defendant's block of Plaintiffs closed the entire forum to them, making the content of her entire page relevant to determining whether there is state action.[207]

Here, the facts show that Defendant Jackson acted under the color of law when she blocked Plaintiffs from viewing or interacting with her public Twitter page because she possesses

---

[205] <u>Lindke v. Freed</u>, 601 U.S. 187, 191 (2024).

[206] <u>Id.</u> at 198.

[207] <u>Lindke</u> 601 U.S. at 204. ("Because blocking operated on a page-wide basis, a court would have to consider whether Freed had engaged in state action with respect to any post on which Lindke wished to comment. The bluntness of Facebook's blocking tool highlights the cost of a 'mixed use' social-media account: If page-wide blocking is the only option, a public official might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts. A public official who fails to keep personal posts in a clearly designated personal account therefore exposes himself to greater potential liability.").

authority to speak on behalf of the state (specifically, her legislative offices as an elected state representative and senator), and she purports to exercise that authority when she engages with the public on Twitter. As such, this Court should find that Defendant Jackson, acting under color of law, deprived Plaintiffs of their First Amendment rights by censoring their comments and cutting off their access to a public forum she controls, because she disagreed with the viewpoint of their protected speech.

### 1. Defendant Jackson possessed actual authority to speak on behalf of the state

The first prong of the <u>Lindke</u> test highlights the foundational requirement in a §1983 action that the conduct that is alleged to have caused the deprivation of rights must be "fairly attributable" to the government.[208] Action by a public official is attributable as state action when it can be traced back to the government's power or authority.[209] This requires an examination of the specific job responsibilities of a public official to determine whether the speech being censored is a part of the public official's "bailiwick," or within the "portfolio" of responsibilities given to the public official.[210] To determine the scope of an official's responsibilities, the Court looks to statutes, ordinances, and regulations.[211] The Court also directed lower courts to look to custom and usage to determine whether a public official has been granted the power of the state[212] because one cannot "confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it."[213]

As a state legislator, it is Senator Jackson's job to set policy and law for the State of Louisiana. Her job responsibilities include listening to and engaging with the citizens of the

---

[208] <u>Id.</u> at 194 (quoting <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. 922, 937 (1982)).
[209] <u>Id.</u> at 198.
[210] <u>Id.</u> at 199.
[211] <u>Id.</u> at 200.
[212] <u>Id.</u>
[213] <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 168 (1970).

State to draft and vote on legislation that shapes the lives of her constituents and the public. Her responsibilities as a legislator and prevailing custom and usage clearly support the finding that she has the authority so speak on behalf of her office as a state legislator. She blocked Plaintiffs Detiege and Sherman for critical speech related to <u>legislation that she was sponsoring</u>—matters plainly within her bailiwick as a legislator.

### a. Jackson's role as a state legislator is to make laws and set policy for the State of Louisiana

An official's scope of power can be established through "statutes, ordinances, regulations, custom, or usage."[214] The written authorization of state legislators comes from the Louisiana Constitution, which vests the legislative power of the state in the legislature.[215] Legislative power encompasses the power to make laws, control finances of the state, review budgeting, and raise revenue through taxation.[216] This power is exercised primarily through the consideration and passage of legislative instruments in regular and special sessions.[217]

In addition to directly making legislation, Defendant Jackson's role requires her to sit on numerous committees and task forces.[218] Committee service requires legislators to review and debate possible bills.[219] If a bill does not make it through committee, it cannot be voted on by the entire legislature.[220] A significant duty of a committee is to take feedback and testimony from the public on legislation, whether through live testimony or written feedback.[221] The

---

[214] <u>Lindke</u>, 601 U.S. at 200; <u>see</u> <u>United States v. Macdaniel</u>, 32 U.S. 1, 14 (1833) ("[A government official] is limited in the exercise of his powers by the law; but it does not follow, that he must show [a] statutory provision for everything he does.").
[215] La. Const. Art. III, §1; Louisiana Civil Law Treatise, 20 LACIVL § 2:1.
[216] La. Const. Arts. III and VII; Louisiana Civil Law Treatise, 20 LACIVL § 2:1.
[217] Louisiana Civil Law Treatise, 20 LACIVL § 2:1.
[218] Ex. 76 (interrogatory responses).
[219] Ex. 16, Jackson Dep. 17:5-25.
[220] <u>Id.</u> 29:6-10.
[221] <u>Id.</u> 17:30-31.

legislative chair of a committee holds sole authority to put a bill on the committee's agenda for consideration and manage testimony from members of the public.[222]  Even outside of legislative session, "interim activities of standing committees are critical to the role of the legislature…[t]he authority of the legislature as policymaker is exercised during the interim through the standing committees, essentially through studies, oversight, and presession hearing of legislation."[223] Senator Jackson has served on numerous committees in her time as a legislator, holding powerful leadership positions.[224]  She has also held leadership positions in the Legislative Black Caucus, an influential caucus of Black legislators which operates to effectuate policy and advocate for underserved populations across our state.[225]

Separately, task forces are groups of legislators who are responsible for studying specific policy issues and making recommendations on policy matters.[226]  Similar to committees, task forces take testimony from the public[227] and listen to experts[228] to "get to the bottom of issues."[229]  They also bring forth legislative ideas and sometimes create reports, advising other legislators as to how to address discrete issues.[230]  Senator Jackson has served on many important

---

[222] Ex. 16, Jackson Dep. 23:08-24:05.
[223] The Legislator as Lawmaker—The Interim, LA. H.R. 4, https://house.louisiana.gov/OG1620/OG1620docs/D%20-%20The%20Interim.pdf (last visited Jan. 5, 2025).
[224] As senator, Defendant Jackson has served on the committees for Agriculture, Education (Vice-Chair), Insurance, Health and Welfare (Vice-Chair), Finance, and Joint Budget.  Her house assignments included committees for Appropriations, Joint Legislative Budget, House Executive, Health and Welfare, Commerce, Judiciary (Chair), and the Committee on Agriculture, Forestry, Aquaculture and Rural Development. Ex. 76; Ex. 16, Jackson Dep. 15:25—17:03.
[225] Ex. 16, Jackson Dep. 71:17-25, 72:1-11.
[226] Id. 69:5-23.
[227] Id. 65:17.
[228] Id. 71:4-5.
[229] Id. 249:10-14.
[230] Id. 69:04-70:06.

legislative task forces and select committees.[231]  Among her service, Jackson serves on the select committee on Woman & Children, which hears testimony in the interim of session on issues pertaining to women and children.[232]

Defendant Jackson's responsibility as a legislator includes enacting laws and advocating for policies for the State of Louisiana.  She does this through proposing legislation, voting on legislation, serving on task forces, serving on committees, receiving public input, public education, and myriad other acts.  Senator Jackson's job responsibilities require her to make policy decisions affecting the entire State, not simply her district.[233]

---

[231] Defendant Jackson's task force assignments have included Task Force on Affordable Automobile Insurance, Governor's Advisory and Review Commission on Assistant District Attorneys (Ex-officio member and Chairman); Advisory Council on Historically Black Colleges and Universities; Louisiana Law Enforcement Body Camera Implementation Task Force; Continuous Learning Task Force; Delta Economic Research and Sustainability District; Louisiana Emergency Response Network Board; Empowering Families to Live Well Louisiana Council; Industrial Hemp Promotion and Research Advisory Board; Joint Legislative Committee on Technology and Cybersecurity; Joint Legislative Committee on the Budget; Louisiana Commission on Justice System Funding (Chair); Louisiana Juvenile Jurisdiction Planning and Implementation Committee; Juvenile Justice Reform Act Implementation Commission (Chair); Lake Providence Watershed Council; Louisiana State Law Institute (Chair); Louisiana School for Math, Science, and the Arts; Governor's Advisory Council on Rural Revitalization (Chair); Senate Select Committee on State Police; Senate Select Committee on Women and Children; Task Force on Tenure in Public Postsecondary Education (designee of Chairman of Senate Committee on Education); Louisiana Women's Incarceration Task Force (designee of President of the Senate); and Work Force Training and Education Initiative Advisory Board (Chair). Ex. 76.

[232] Ex. 16, Jackson Dep. 38:23-25; 63:01-11.

[233]  The Defendant testified that she sponsors and votes on legislation that has statewide impact. Ex. 56 (RFA no. 4); Ex. 16, Jackson Dep. 79:21—80:09. The Senator also consults with a number of organizations outside of her district, working with citizens and interest groups across the state, such as the Pharmacy Association, the Teachers Association, Sheriffs Association, students from Xavier University of New Orleans, CASA (Court Appointed Special Advocates for Children) New Orleans, and VOTE, among others.  These interactions highlight the statewide nature of being a legislator, as Defendant Jackson testified that much of the legislation she has sponsored has a statewide effect. Ex. 16, Jackson Dep. 101:10-21,102, 100:2-25; Ex. 16, Jackson Dep. 79:21-24. She likewise takes speaking engagements outside of her district and her state. Ex. 16, Jackson Dep. 81:19—82:09, 84:18—85:10 and Ex. 76 at 7 *et seq*. She testified that she works in support of legislation outside of her district where it is something she believes in. Ex. 16, Jackson Dep. 86:04-09. She  may be tagged by other legislators on social media if they are working on a bill together. Ex. 16, Jackson Dep. 126:25—127:07.

**b.  Communicating to and with the public on policy matters is within the scope of Defendant Jackson's job**

Defendant Jackson is a high-ranking government official whose job implicitly contains the responsibility of speaking on legislative matters and for her elected office, and who also therefore has authority to censor for her office.[234]  As Lindke envisioned, in some cases the general grant of authority of authority to a high ranking official obviously encompasses a grant of authority to speak about those acts officially.[235]  This is such a case.  The grant of authority to Senator Jackson to represent the population and vote on legislative matters obviously encompasses a grant of authority to speak about those acts officially.  Making announcements about legislative matters and receiving public input is "actually part of the job"[236] that Defendant Jackson has been entrusted to do.  This is borne out by the textual authority creating the position, Jackson's own testimony, custom and usage, and Jackson's actions in censoring Plaintiffs.

First, Senator Jackson's job as a legislator explicitly requires her to serve and respond to the people of Louisiana.  The preamble to the State Constitution, which creates her position, provides that its intention, through the will of "the people," is "to maintain a representative and orderly government."[237]  In Louisiana, "all government, of right, originates with the people, is founded on their will alone, and is instituted to protect the rights of the individual and for the good of the whole. Its only legitimate ends are to secure justice for all, preserve peace, protect the rights, and promote the happiness and general welfare of the people."[238]  The Louisiana

---

[234] Lindke at 197 (explaining that in the context of social media use, speaking with official authority encompasses censoring other speech via deleting comments and blocking).

[235] Id. at 200 ("In some cases, a grant of authority over particular subject matter may reasonably encompass authority to speak about it officially.").

[236] Id. at 201.

[237] La. Const. Preamble, Ann. Refs & Annos.

[238] La. Const. Art. I § 1.

Constitution recognizes the public interest in how each legislator votes, requiring votes to be publicly recorded and published.[239]  The Fifth Circuit has recognized that legislative duties are "not confined to those directly mentioned by statute or the Constitution" but include duties related to the "primary obligation" to serve and respond to their constituents, as well as the public at large, of issues being considered by their legislative body.[240]  The duties of elected representatives extend beyond "participating in debates and voting."[241]

Defendant Jackson agrees.  She testified that her duties include informing and engaging with the public,[242] and receiving input from the public.[243]  Indeed, communicating with members of the public about policy is a large part of her job as a legislator.[244]  Defendant Jackson testified that she tries to keep the public informed about legislation because "the public has a right to know, especially my district, what I'm doing in Baton Rouge."[245]  She testified that her responsibility as a state senator is to "[s]erve the people of your district first. You serve other people next."[246]  Jackson's testimony cements that state legislators have the actual authority to speak on behalf of their offices to the public textually and through custom and usage.

In assessing whether an official has a state authority by virtue of custom or usage, courts consider all relevant facts, including information about an official's job duties, the way she executes those duties, and her predecessor's practices.[247]  Defendant Jackson's and other

---

[239] La. Const. Arts. III §10.
[240] Williams v. United States, 71 F.3d 502, 507 (5th Cir. 1995).
[241] Id.
[242] Ex. 16, Jackson Dep. 86:10-12.
[243] Id. 92:18-20.
[244] Id. 92:11-20, 104:6-12, 97:10-17, 101:5-21, 105:1-20; Ex. 77 (tweeting that must listen to public to determine public will).
[245] Ex. 16, Jackson Dep. 104:10-12.
[246] Id. 34:18-19.
[247] Navarro v. Block, 72 F.3d 712, 715 (9th Cir. 1995) (holding in municipal liability case that emergency dispatcher's testimony about current practices of Sheriff's Department in classifying 911 calls could establish custom).

legislative officials' usage of Twitter show that she possesses actual authority to act under color of state law in this domain.  Defendant Jackson herself has spoken publicly about the import of Twitter and social media in her work.  In 2016, she explained how the real-time feedback of social media makes her a more responsive representative.[248]  She testified at deposition that she checks Twitter during committee meetings[249] and there are many examples of her tweeting from the senate floor.[250]  Indeed, Twitter may be the only conduit to a legislator at such times; Jackson testified she did not accept phone calls from the public during those same meetings.[251]  For example, in March of 2014, during legislative session, Twitter user @ostrichVcamel tweeted at "@RepKJackson we're at LA Capitol and we want talk to you about HB 388. Please pull this bill. #roeingbackward #backdoorban #TRAPLA[.]"[252]  In less than ten minutes, Defendant Jackson tweeted back, giving them a time and a place to meet her on the floor to discuss the bill.[253]

Defendant Jackson's customary use of Twitter to do her job is consistent with its use by other elected officials who use Twitter as a communicative tool for their elected office.[254]  The Supreme Court noted in 2017 that "Governors in all 50 States and almost every Member of Congress have set up [Twitter] accounts" so that "users can petition their elected representatives and otherwise engage with them in a direct manner."[255]  Reporting documenting Twitter use in the Louisiana Legislature noted that "Democrat and Republican legislators also use the popular

---

[248] Richards, supra note 132.
[249] Ex. 16, Jackson Dep. 171:21-25.
[250] Exs. 5, 19, 78, 79, 80,  81, 82.
[251] Ex. 16, Jackson Dep. 172:1-3.
[252] Ex. 83.
[253] Id.
[254] Kat Devlin et al., For Global Legislators on Twitter, an Engaged Minority Creates Outsize Share of Content, PEW RESEARCH CENTER  (May 18, 2020) https://www.pewresearch.org/global/2020/05/18/for-global-legislators-on-twitter-an-engaged-minority-creates-outsize-share-of-content/; Ex. 18.
[255] Packingham, 582 U.S. at 105.

social media network to check the pulse of influential lobbyists, and visa-versa."[256]  The official website for the Louisiana legislature confirms that "technology and the media have opened the legislative process to a wider access by the public."[257]  The U.S. House of Representatives Press Gallery website shows that all 435 representatives have a Twitter account.[258]  Prevailing custom and usage demonstrates an understanding, from constituents to the Supreme Court, that legislators utilize Twitter to carry out their official duties, including informing members of the public and receiving information and feedback.

Finally, the Supreme Court in Lindke emphasized that there is likely actual authority to speak on behalf of the state where a public official censors an individual in connection with a matter within the official's "bailiwick," or portfolio of authority.[259]  Defendant Jackson's portfolio of authority as a legislator certainly includes drafting and voting on legislation.  Her own testimony confirms that engaging with the public on legislation is a significant part of her job as a legislator.[260] Both Plaintiffs were blocked after criticizing Defendant Jackson's legislation.[261]  Plaintiffs were using Twitter precisely as protected by the Supreme Court: to "engage… in a direct manner,"[262] on the Senator's own proposed legislation—the action most squarely within the Senator's bailiwick.[263]  Jackson frequently posts about bills on Twitter.[264]

---

[256] Richards, supra note 132.

[257] Id.

[258] Members' Official X Handles – 118th Congress, U.S. HOUSE OF REPRESENTATIVES PRESS GALLERY, https://pressgallery.house.gov/member-data/members-official-twitter-handles (June 27, 2024).

[259] Lindke, 601 U.S. at 199.

[260] Ex. 16, Jackson Dep. 86:10-12, 92:18-20, 92:11-20, 104:6-12, 97:10-17, 101:5-21, 105:1-20, 104:10-11, 34:18-19.

[261] Exs. 23, 44.

[262] Packingham, 582 U.S. at 104-05.

[263] La. Const. Art. III, §1.

[264] Ex. 16, Jackson Dep. 104, 105; 117:20-22; see, e.g., Ex. 9; Ex. 25; Ex. 35 (soliciting thoughts on legalizing marijuana) Ex. 57 ("We would love to hear from you…Contact us."); Ex. 54 ("Thoughts on Jindal retirement package."); Ex. 37 ("Listening to pharmacist bill. Let me know your thoughts.").

She advocates for pro-life legislation as a major component of her work.[265]  She blocked Plaintiff Detiege in a conversation about Jackson's own proposed anti-abortion legislation.[266]  She blocked Plaintiff Sherman after a conversation about Jackson's own proposed legislation also.[267]  The Plaintiffs' speech could not be more connected to the Senator's actual sphere of authority, which is further evidence that Jackson's blocking was under color of law.

In sum, when evaluating actual authority to speak for the state, the Court instructs us to examine the authority to speak on behalf of the official's government office generally.[268]  For example, in Lindke, if a city manager had authority to speak on behalf of the city for his office, he may have the authority to do so on social media, even if not explicitly authorized by law or statute.[269]  Defendant Jackson is a high-ranking legislative official, tasked with authoring, vetting, and voting on policy that affects the lives of all Louisiana citizens.  Her authority as a state legislator clearly encompasses communicating with members of the public about matters related to the duties of her office, and specifically her legislation.  The nature of the Defendant's position, the language of the Louisiana Constitution, the testimony of Defendant Jackson, the prevailing custom and usage, and the fact that Defendant Jackson censored Plaintiffs' speech on bills that she herself had authored all support finding that the Senator possessed actual authority to speak in her official capacity and within her bailiwick as a state legislator responsible for setting policy for the government.

**2.  Defendant Jackson purports to exercise her authority on social media**

---

[265] Ex. 16, Jackson Dep. 85-86; Ex. 33.
[266] Ex. 16, Jackson Dep.  382-383; Ex. 33; Ex. 24; Ex. 42; Ex. 44; Ex. 45; SB342 by Senator Katrina Jackson-Andrews, LOUISIANA STATE LEGISLATURE, https://legis.la.gov/legis/BillInfo.aspx?i=242567 (last visited Jan 4, 2025).
[267] Ex. 39, Sherman Decl.
[268] Lindke, 601 U.S. at 200.
[269] Id.

After establishing that Defendant Jackson possessed actual authority to engage in official speech, the Court instructs us to examine whether Defendant Jackson purported to act in her official capacity when using Twitter.[270]  "State officials have a choice about the capacity in which they choose to speak."[271]  That public employee "purports to exercise official authority when speaking 'in [her ]official capacity or' when [she] uses [her] speech to fulfill '[her] responsibilities pursuant to state law.'"[272]  Here the Senator did both.

The Lindke Court identified a number of factors that can be examined to determine whether a public official is purporting to exercise his government power.  These factors include the context of the speech, the content and function of the speech, and the use of government resources.  The Court also instructed the lower courts to consider the nature of the technology at issue in the case.[273] All of these factors confirm that Defendant Jackson's actions meet the second prong of the Lindke state action test.

### a. The context of Defendant Jackson's Twitter page shows that she was using it in her official capacity

First, the Court must look to the context of the social media account.  "Context can make clear that a social media account purports to speak for the government."[274]  Labels (such as "personal page") or disclaimers ("all opinions are my own") help to create a presumption that a page is official or personal.[275]  Defendant Jackson has no such label.[276]  Instead, her account bears the trappings of her official state work.  The photos and graphics she tweets to her many

---

[270] Id. at 191
[271] Id. at 201.
[272] Id. (quoting West v. Atkins, 487 U.S. 42, 50 (1988)).
[273] Id. at 203-04.
[274] Id. at 202.
[275] Id.
[276] Ex. 38.

followers, her history of Twitter usernames, and the fact that she links to her legislative website, all cloak her Twitter page in the authority of her legislative office.

Many of Defendant Jackson's tweets include graphics or photos that explicitly designate her as a legislative official.[277]  For example, she has used official photos of herself from the legislative gallery on her home page, and her Twitter cover photo is a "qualifying photo" from the day she qualified for public office.[278]  In fact, at the time she blocked both Plaintiffs, she used her official legislative headshot as her Twitter profile photo.[279]  Since her election to the state senate, Defendant Jackson has consistently posted graphics that identify her as senator for her district, include her official senate photos, and convey information about bills and happenings in the legislature to her followers.  She has repeatedly tweeted official press releases from her legislative office and includes her contact information and senate email address on social media.[280]  Many of her graphics proclaim they are "From the Office of Senator Jackson," even when she tweets about Mother's Day.[281]  She includes these graphics on tweets announcing bills, committee hearings, and other legislative information related to her committees and positions. Part of Defendant Jackson's job as a legislator is to engage with the public about her legislation and the legislation discussed by the committees she sits on.  When she does so via Twitter and

---

[277] Exs. 10, 11, 15, 25, 31, 84 (tweeting her legislative photo), 85 (calling to slow down special session to allow citizen participation).

[278] Ex. 38,  Ex. 16, Jackson Dep. 182:4-15.

[279] See Ex. 39, Sherman Decl.; Ex. 40, Detiege Decl.; see also Katrina R. Jackson-Andrews, LOUISIANA STATE SENATE https://senate.la.gov/smembers?ID=34 [https://perma.cc/4ERN-BXBT] (last visited Jan 4, 2025).

[280] Ex. 16, Jackson Dep. 224:05-225:20; Exs. 15, 60, 25, 36.

[281] Ex. 34 (from the desk of Senator Jackson, police oversight); Ex. 86 (Happy Mother's Day from Senator Jackson); Ex. 87 (from the desk of Senator Jackson, register to vote); Ex. 88 (from the desk of Senator Jackson, amber alerts); Ex. 89 (from the desk of Senator, BESE information); Ex. 90 (tweeting position on trans sports bill). .

attaches a graphic that says, "From the Office of Senator Jackson," she is clearly purporting to exercise her authority as a legislator.

At no time has Defendant Jackson's Twitter been set to "private"—meaning only viewable by an approved group of followers—or labelled a "personal page."[282]  In fact, when Jackson first posted on Twitter back in 2012, shortly after being elected as a state representative for the first time, her Twitter handle/username on the platform was @RepKJackson, a direct reference to her legislative office.[283]  That was the then-Representative Jackson's Twitter handle when she engaged with plaintiff Dayne Sherman regarding bills she had filed and supported, ultimately leading to his blocking from her page.[284]  After being elected to the state senate, Defendant Jackson changed her name to @SenatorKRJ, and later to @KatrinaJack_Sen,[285] which the Senator said was a play on her last name, Jackson, and the fact that she was a state senator.[286]  Defendant Jackson changed her handle to her current one, @KatrinaRJackson, in 2021, nine years into having her governmental office as her handle,[287] and with a long history of constant posts about legislative happenings and updates.  Despite dropping her title from her Twitter handle, Sen. Jackson's page does not state anywhere that it is her personal page.[288]

Defendant Jackson's Twitter page links to her official website katrinarjackson.com,[289] which is used for her senate work and includes a gallery of photos of her working on the floor.[290]  This website provides her legislative platform as well as a link to sign up for the official

[282] Ex. 56 at 3.
[283] Ex. 1 at 3-4 (Bogen report).
[284] Id. (expert report).
[285] Id. (expert report); Ex. 16 Jackson depo 151:11-19
[286] Ex. 16, Jackson Dep. 151:16-18.
[287] Ex. 1 at 3-4 (Bogen report)
[288] Ex. 38; Lindke, 601 U.S. at 202.
[289] Ex. 16, Jackson Dep. 187:22-24, 188:18-19.
[290] Ex. 16, Jackson Dep. 187: 22-25—189.

newsletter from her legislative office.[291]  Linking to her official website from a social media page also weighs in favor of finding that an official is purporting to use authority.  In sum, the context of Defendant Jackson's social media page shows that she is engaged in official speech and using Twitter as an instrumentality of her office.

### b. The appearance and function of Defendant Jackson's Twitter page show that she uses it in her official capacity.

The official nature of Defendant Jackson's activity on Twitter is also apparent in looking at the content and function of her tweets.  As examined above, as a legislator Defendant Jackson is responsible for formulating policies and enacting law.  Defendant Jackson utilizes Twitter to execute her duties.  She tweets about bills, both ones that she authored and others she is considering.[292]  She tweets about a wide variety of matters *as she is making law*, including school prayer,[293] abortion,[294] the Taylor Opportunity Program for Students (TOPS),[295] marijuana legalization,[296] and others.  She has directly instructed the public to use Twitter to "stay in contact" with her during session.[297] Many of Jackson's tweets include graphics explaining the bills or her positions on the legislation, which she also shares.[298]  In addition to tweeting about specific legislation, she also tweets about legislative activities, such as announcing committee meetings and opportunities for public comment.[299]  She testified that when she includes "Senator

---

[291] Ex. 91 (Senator's official website); Ex. 92 (Senator's platform on website).

[292] See, e.g., Ex. 3; Ex. 8; Ex. 13; Ex. 15, Ex. 57.

[293] Ex. 23.

[294] Ex. 33, 24, 43.

[295] Ex. 26, 27, 93.

[296] Ex. 19, 35.

[297] Ex. 17 (encouraging people to stay in touch via Twitter);  Ex. 18 ("Tune in!! I will provide the link in the comments at 9!!!!").

[298] Exs. 24, 33, 31, 35.

[299] Ex. 16, Jackson Dep. 121:02-16; 217:17—218:02; 221:24—222:04; Exs. 15, 25, 30, 31, 34, 57, 26.

Katrina R. Jackson" on a tweet, she is staking out a legislative position and showing it to the public.[300]

Defendant Jackson also utilizes Twitter to solicit feedback from the public to inform how she will vote on particular issues.[301] While she sometimes asks residents of her district to weigh in on an issue, she also often seeks feedback from the public generally.[302] She seeks public input to hear how citizens may be affected by legislation broadly, to determine her view of the best policy for the state and the residents thereof.[303] For example, in a tweet on February 23, 2022, she tweeted for the public to "Send your bill ideas" and listed her contact information.[304] The Senator has also withdrawn bills based upon feedback she received on Twitter. For example, in April 2024, after submitting a bill that would have required TOPS participants to pay back parts of the scholarship if they left the state within three years of graduation, the Senator received lots of feedback on her Twitter.[305] After engaging with Twitter users about the substance of the bill, Defendant Jackson tweeted that she had decided to withdraw the bill and stated that she intended to file a resolution to hear testimony from "everyone" regarding potential changes to the program.[306] Defendant Jackson tweets to inform others of her opinion on legislation, and to influence others to take action along with her. For example, Defendant Jackson has also frequently encouraged users to contact their legislators to vote with her position, including on a variety of healthcare and public-education related bills.[307] She also has referred users on social

---

[300] Ex. 16, Jackson Dep. 382:21-25, 383:1-7.
[301] Id. 105:1-5; Exs. 60, 35, 36, 57, 58, 37.
[302] Exs. 24, 52, 58, 59, 94 (pondering thoughts re vote with residents outside of her district).
[303] Ex. 16, Jackson Dep., 97:10-19.
[304] Ex. 31.
[305] Exs. 26, 27, 93.
[306] Ex. 27.
[307] Ex. 95 (asking public to "get on the phone and call their legislators" re hospital privatization); Ex. 96 (announcing MFP rejected, asking public to call legislators); Ex. 97 (encouraging people in other parts of

media to contact her Senate office, using Twitter as a conduit to her legislative staff.[308]  The function and content of her tweets demonstrate that the Defendant uses Twitter in her official capacity.

### c.  Senator Jackson's use of government resources to Tweet show she uses the account in her official capacity.

The Supreme Court held that "an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business."[309]  Defendant Jackson does just that—utilizing legislative staff to create content for her social media posts.[310]  As explained above, Defendant Jackson often tweets out graphics related to her legislation and committees.  She testified in her deposition that while "sometimes I prepare my own graphics," others sometimes create them for her, including her legislative staffers and members of a State Office at the Capitol, whose names she could not recall.[311]  The Louisiana Legislative Communications Office (LCO) is a dedicated office of staffers who provide members of the Louisiana Legislature with a number of communications-related services, including the creation of graphics, some of which were created for Defendant Jackson and then shared to her Twitter page.[312]  She also testified that her State-paid legislative aide, Terisa Tran, has aided her in making graphics that she then posts to Twitter.[313]  Additionally, she uses her government-issued,

---

the state to contact their senators re upcoming vote);  Ex. 98 (asking people across Louisiana to call their legislators to vote no on legislation);  Ex. 99 (calling for contact to legislators re pending legislation); Ex. 3 at  9 (calling for contact of state reps re budget cuts); Ex. 3 at 11 (calling for contact with representatives to vote no on bill).

[308] Ex. 16, Jackson Dep. 89:03-04, 165:08-166:19, 239:25-240:18; Exs. 9, 13, 15, 24, 31, 33, 34, 36, 57; 60.

[309] Lindke 601 U.S. at 203.

[310] Ex. 16, Jackson Dep. 158:19-25, 159:1-14. 168:11-15.

[311] Id, 158, 159:1-14; 168.

[312] Id.  203:13-25; Louisiana State Senate, Legislative Communications Office, Member Services, https://lco.legis.la.gov/services (last visited Jan. 6, 2025).

[313] Ex. 16, Jackson Dep. 169:13-15

legislative office desktop and laptop to use Twitter,[314] demonstrating a further usage of state resources on her Twitter.  Because she uses government staff and taxpayer resources to tweet, Defendant Jackson cannot now deny that she was conducting government business in the use of her Twitter account.

### d.  The nature of Twitter cements state action in this case

Finally, the Supreme Court noted that the "blunt" nature of Twitter blocking in this case militates toward a finding of state action if *any* post on the Defendant Jackson's Twitter feed is official.[315]  The <u>Lindke</u> Court contrasted two potential censorious actions on social media: (1) the deletion of the plaintiff's comments from a specific social media post versus (2) the blocking of the plaintiff from the entire social media page.[316]  The Court explained that in the former deletion example, the only post relevant to determining state action would be the post from which the plaintiff's comments were removed.[317]  The Court contrasted this with a page-wide blocking such as that at issue here, finding that where blocking prevents access to a page in its entirety, "a court would have to consider whether [the public official] had engaged in state action <u>with respect to any post</u>."[318]  This is because, where a government official uses a social media account to conduct <u>any</u> government business, a page-wide blocking deprives the blocked user of all

---

[314] Ex. 16, Jackson Dep. 131:15—132:17
[315] <u>Lindke</u> 601 U.S. at 204.
[316] <u>Id.</u>
[317] "One last point: The nature of the technology matters to the state-action analysis. Freed performed two actions to which Lindke objected: He deleted Lindke's comments and blocked him from commenting again. So far as deletion goes, the only relevant posts are those from which Lindke's comments were removed. Blocking, however, is a different story. Because blocking operated on a page-wide basis, a court would have to consider whether Freed had engaged in state action with respect to any post on which Lindke wished to comment. The bluntness of Facebook's blocking tool highlights the cost of a "mixed use" social-media account: If page-wide blocking is the only option, a public official might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts. A public official who fails to keep personal posts in a clearly designated personal account therefore exposes himself to greater potential liability." <u>Id</u>
[318] <u>Id.</u> (emphasis added)

access to any information or contact whatsoever.[319]  When a Twitter user "blocks" another user's access to their profile, the blocked user is prevented from engaging with the blocking user or viewing the blocking user's tweets.[320]  When a Twitter user is blocked, they are no longer able to see, or reply to the blocking user's tweets, retweet the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets.[321]

Defendant Jackson blocked both Plaintiffs from viewing her entire Twitter page—this means they could not view or interact with any of her thousands of tweets.[322]  While some posts on Defendant Jackson's public Twitter are personal in nature, the overwhelming majority of her tweets are in her capacity as a legislator.  If even one of those Tweets was official state action, the site-wide nature of the blocking creates state action regardless of the specific context of Plaintiffs' blockings.[323]  It is noteworthy that the Senator's Twitter feed is the only place that Louisianans can see some information; she does not "cross-post" every Tweet to other locations, including numerous original posts on a variety of legislative issues.[324] In fact, some of the Tweets made by Jackson in which she was most clearly engaged in state action and conducting senate

---

[319] Id.

[320] One Wis. Now v. Kremer, 354 F. Supp. 3d 940, 946 (W.D. Wis. Jan. 18, 2019)(internal citations omitted); About Being Blocked, X HELP CENTER, https://help.twitter.com/en/using-twitter/someone-blocked-me-on-twitter#:~:text=About%20being%20blocked,-Twitter%20gives%20people&text=If%20you%20have%20been%20blocked,alerting%20you%20of%20the%20block (last visited Jan. 5, 2025).

[321] Id.

[322] Ex. 39, Sherman Decl.; Ex. 40, Detiege Decl.

[323] Respectfully, this ruling is contrary to the Magistrate Judge's ruling in this case on Plaintiffs' second motion to compel. The Magistrate Judge indicated that she believed the only salient time periods in this case to be the dates on which Sherman and Detiege were blocked.  R. Doc. 45, p. 12. Lindke explains that this cabining of the facts is incorrect.

[324] See, e.g., Exs. 2, 18, 28, 30, 35, 36, 88, 89, 100, 101, 102, 103, 104, 105, 106 (explaining bill and providing link to bill to user), 107 (inviting users to weekly session talk). Because these posts containing legislative information are not available anywhere else, Plaintiffs and other individuals who have been blocked from the Senator's Twitter page lose access to the information.

business— soliciting public input on proposed legislation— were only posted on Twitter, not her Facebook account.[325] Given the page-wide nature of the blocking function on Twitter, users blocked by Defendant Jackson miss out on valuable information and opportunities to have their voices heard by legislators, which is in direct contradiction to the values of the First Amendment.

It also makes her blocking of any Twitter user unquestionably state action. In sum, as cataloged extensively above, Jackson purported to use her state authority by speaking in her official capacity and by using her speech to fulfill responsibilities pursuant to state law. She engaged in state action, making her censorious conduct subject to accountability under 42 U.S.C. § 1983.

## VII.    Conclusion

For the reasons above, there is no genuine dispute as to any material fact, and Plaintiffs are entitled to judgment as a matter of law. The undisputed evidence demonstrates that Plaintiffs were engaged in protected First Amendment speech when Defendant Jackson blocked them, effectively censoring their speech and cutting off access to a public forum. The facts show that Defendant Jackson was cloaked in the state's authority and purported to use it when she blocked Mr. Sherman, Ms. Detiege, and many others over disagreements on her public Twitter page, which she routinely used to conduct her duties as a state legislator. As such, Plaintiffs respectfully ask this Court to grant Plaintiffs' Motion for Summary Judgment on all claims.

---

[325] Exs. 35 (input on marijuana), 36 (call for bills).

Respectfully submitted,


*/s/ Katie Schwartzmann*
Katie M. Schwartzmann, La No. 30295
Annie Cleveland, La. No. 41473
Landon Pettigrew, Student Attorney
Richard Crow, Student Attorney
Tulane First Amendment Law Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
o: (504) 862-8813
kschwartzmann@tulane.edu
acleveland@tulane.edu