UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

---

MAYA DETIEGE ET AL.             CIVIL ACTION NO.  23-175

VERSUS                           JUDGE DONALD E. WALTER

KATRINA R. JACKSON              MAG. JUDGE KAYLA D. MCCLUSKY

---

**MEMORANDUM RULING**

Before the Court are three motions. First, Defendant, Senator Katrina R. Jackson ("Jackson"), filed a motion for summary judgment. See Record Document 50. Plaintiffs, Maya Detiege ("Detiege") and Dayne Sherman ("Sherman") (collectively "Plaintiffs"), filed an opposition to Jackson's motion, Jackson filed a reply, and Plaintiffs filed a sur-reply. See Record Documents 70, 71, and 76. Second, Plaintiffs filed a motion for summary judgment. See Record Document 58. Jackson filed an opposition to Plaintiffs' motion to which Plaintiffs filed a reply. See Record Documents 69 and 72. Finally, Plaintiffs filed a motion to strike portions of Jackson's motion for summary judgment. See Record Document 67. Jackson filed an opposition to which Plaintiffs filed a reply. See Record Documents 77 and 78. For the reasons stated below, Jackson's motion for summary judgment (Record Document 50) is **GRANTED**. Plaintiffs' motion for summary judgment (Record Document 58) is **DENIED**. Plaintiffs' motion to strike (Record Document 67) is **DENIED**.[1]

---

[1] Plaintiffs move to strike several alleged mischaracterizations in Jackson's motion. See Record Document 67-1. The Court is "fully cognizant of the evidentiary standards" at this stage of the litigation and will properly "discount[] any improper statements and evidence." Graham v. Chesapeake Louisiana, L.P., No. 13-1571, 2013 WL 5673858, at *3 n.4 (W.D. La. Oct. 16, 2013) (citing Stults v. Conoco, Inc., 76 F.3d 651, 654-55 (5th Cir.1996)). The Court is further capable of "discerning [Jackson's] opinion from fact in these summary judgment proceedings." Hardy v. Caterpillar Glob. Mining Equip., LLC, No. 14-00492, 2016 WL 659150, at *5 (E.D. Tex. Feb. 18, 2016). Therefore, Plaintiffs' motion is denied.

## BACKGROUND

This is a First Amendment case regarding blocking on a social media platform by a person who holds a state office. See Record Document 19. Jackson, a Black woman, previously served in the Louisiana House of Representatives. See Record Documents 50-1 at 8, 50-2 at 5, and 58-1 at 6. Jackson currently represents the 34th District in the Louisiana Senate. See Record Documents 50-1 at 8 and 58-1 at 6. Jackson created a public account on the social media platform formerly known as "Twitter"[2] in 2012. See Record Documents 58-4 at 5 and 58-5 at 6. Because her account is public, other Twitter users can access and follow her account and interact with her posts, referred to as "tweets," by either replying to or liking the post or by sharing that post with their own followers.[3] See Record Documents 50-1 at 8 and 70-1 at 4.

---

Nevertheless, the Court admonishes Jackson regarding the impropriety of attributing a quote to a party without clearly notating alterations to the text. Neither party disputes that Detiege's tweet included the phrase "I do not support all black women. Some of you bitches are very dumb." Record Document 50-6. However, in Jackson's memorandum, she states that Detiege called her a "dumb Black bitch." See Record Document 50-1 at 13, 29. Jackson uses this phrase twice, once preceding a citation to Detiege's deposition and again paired with a phrase Detiege tweeted. See id. In neither source does Detiege call Jackson a "dumb Black bitch." Thus, although Jackson avers Detiege's tweets should "speak for themselves," Record Document 77 at 3, Jackson improperly resorts to modifying Detiege's language without noting modifications were made.

Rather than acknowledging this misrepresentation, Jackson instead argues Plaintiffs cannot "dispute that Detiege said such words in the first place," and she points out that she "included the entire tweet in her statement of material facts." Id. But Jackson cannot seriously argue that misquoting Detiege is proper simply because Detiege used the individual words in her tweet. Quite plainly, the modified order of the words here changes both the meaning and connation of Detiege's tweet. Nor does inclusion of "the entire tweet" elsewhere in the memorandum excuse altering language attributed to Detiege. The Court reminds Jackson of her duty of candor toward the tribunal and cautions Jackson to indicate *any and all* alterations made to a quote in future filings. Zealous advocacy does not require misrepresentation, and further misrepresentations will not be tolerated by this Court.

[2] After the inception of this litigation, Twitter's name changed to "X." In the interest of clarity, the Court will refer to the social media platform as "Twitter" throughout this memorandum ruling.

[3] Users can share that post on their own account by either retweeting, which simply posts the original tweet on their account, or quote-tweeting, which allows users to post the original tweet with their own commentary attached to it.

Jackson's original Twitter username[4] was "@RepKJackson." See Record Document 58-4 at 6. She changed her username to "@SenatorKRJ" on December 12, 2019, to "@KatrinaJack_Sen" on March 4, 2020, and finally to "@KatrinaRJackson" on February 21, 2021. Id. Jackson's profile page is geotagged to Monroe, Louisiana. See Record Document 50-3 at 2. Her "bio," which is an optional short statement a person may include on his or her page, reads, "I'm interested in a better Louisiana!!!" Id. Her current profile picture is a wedding photograph, but at the time she blocked Plaintiffs, her profile picture was her official legislative headshot. See id.; Record Document 58-5 at 12, 15. Her profile page also links to the website "katrinarjackson.com." Record Document 50-3 at 2. The home page of that website references her position as the 34th District senator and allows visitors to donate to her campaign or to subscribe to her senator newsletter. See Record Document 58-7 at 11. Her home page also links to a page entitled "my platform," which provides summaries of Jackson's stances on various policy issues. See id.

Jackson posts on Twitter about both her personal life and her legislative office. For example, Jackson posted about her engagement, Founder's Day for Kappa Alpha Psi, religion, and family events. See e.g., Record Documents 50-11, 50-13, 50-20, and 50-25. But Jackson has also posted about and during legislative sessions, asked her followers to contact their senators about voting on certain bills, linked to various legislative hearings, posted press releases from her office, sought her followers' input on different legislative matters, solicited bill ideas from her followers, and provided information about bills she sponsored. See e.g., Record Document 58-4 at 16-19, 25-29, 34-35, 44, and 46. Some of Jackson's tweets include graphics. Jackson testified that, while she

---

[4] A person's "username" is a name associated with their account that begins with "@." When a person wants to engage directly with another person via tweets, they will "at" the person by using that person's username.

creates most of those graphics, legislative staff have occasionally prepared graphics for her profile. See Record Document 50-2 at 42. Additionally, some of these graphics include the signature "Senator Katrina R. Jackson." See e.g., Record Document 58-4 at 81. Jackson testified that graphics that include her senator signature generally indicate "legislative positions," but some of those legislative positions "intertwine with [her] personal positions." Record Document 50-2 at 98.

The instant case arises from Jackson's decision to block Sherman and Detiege from her Twitter profile, thereby preventing them from interacting with and seeing her account and tweets. See Record Document 19. Although Detiege and Sherman are not Jackson's constituents, they are both residents of Louisiana. See Record Document 58-5 at 12, 14. Jackson blocked Sherman in 2013 following a Twitter discussion on the legality of a pending bill. See id. at 13. The two engaged in discourse between April 4 to April 8, 2013, during which Sherman repeatedly opined that the proposed bill was unconstitutional. See Record Documents 58-4 at 73-76, 79-80. On April 8, 2013, Sherman tweeted, "Not what the courts say. It's unconstitutional #prayer. @RepKJackson . . . ." See id. at 80. Sherman alleges he was blocked after posting that tweet. See Record Document 58-5 at 13. In spring of 2023, sometime after Detiege filed her lawsuit but prior to Sherman joining the lawsuit, Jackson unblocked Sherman. See Record Documents 50-1 at 14, 70-2 at 1. Sherman joined the lawsuit after being unblocked. See Records Documents 50-1 at 14 and 50-27 at 14.

Jackson blocked Detiege in June of 2022. Jackson is a pro-life advocate. See Record Documents 50-1 at 11 and 58-1 at 39. In Roe v. Wade, the Supreme Court recognized a constitutional right to abortion. See 410 U.S. 113, 154, 93 S. Ct. 705, 727 (1973). Following that decision, the Louisiana legislature enacted a set of abortion laws that would go into effect if Roe v. Wade was overturned. See Record Documents 50-1 at 11 and 58-1 at 9. "Jackson authored an

4

amendment to that law [("SB 342")], which then-Governor Edwards signed into law." Record Documents 50-1 at 11 and 58-1 at 9-10. On June 24, 2022, the Supreme Court overruled Roe v. Wade. See Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 231, 142 S. Ct. 2228, 2242 (2022). That same day Jackson tweeted, "Let's Stand Together and Support Women and Children!!!" Record Document 58-4 at 81. She attached a graphic to this tweet, which read as follows:

> ROE is overturned
>
> Our advocacy must demand support for Women and children from the Womb to the Tomb
>
> We Must
>
> - Make Sure Women make fair wages to care for our children
> - We must stand with Louisiana while we fund anti-trafficking programs
> - We must create real resources for families
> - We must be about what we talk about; Support Women and Children from the Womb to Tomb
>
> Senator Katrina R. Jackson

Id. Detiege, who is also a Black woman, testified she had recently experienced an ectopic pregnancy and was "angry" about SB 342. See Record Documents 50-28 at 16 and 58-5 at 15. Detiege responded by "quote tweeting" Jackson's tweet:

> I say this with all disrespect: burn in hell.
>
> You don't care about women. You don't care about pregnant people. You don't care about children. You don't care about education.
>
> I do not support all black women. Some of you bitches are very dumb.

5

Record Document 50-6 at 2. In response to her own tweet, Detiege wrote, "I do not feel valued or supported by @KatrinaRJackson and I am actively rooting for her to be voted out in 2023. [praying emoji] can't come fast enough. Rooting for your downfall [blue heart emoji]." Id.

On that same day, Jackson responded to another user's tweet about her and her bill, and wrote, "I did but the [sic] no one states that fact the budget this year has $1.3 M to fight child sex trafficking and $ 3 M to support pregnancy centers – so much other funding but those who spew falsehood will not talk about that – oh and I have file [sic] equal pay bills." Id. at 3. Detiege quote tweeted that tweet and wrote, "Lol yea that 3mil (0.0008% of the budget) is really gamechanging [line break] Thanks for the pennies, you [clown emoji] . . . ." Id. at 4. Jackson replied, "Did you advocate for more?" Id. Detiege again quote tweeted Jackson, saying:

> You're the one bragging about how much it is. You're the elected official. Did YOU advocate for more?
>
> Probably too busy not paying attention in committee meetings when your colleagues were asking questions
>
> Poor response from an elected official. Hope your career ends quickly [praying emoji]

Record Document 58-5 at 31. Detiege alleges she was blocked around the time she sent this quote tweet. See Record Documents 50-28 at 17 and 58-5 at 15.

The parties also reference a second tweet posted by Jackson on June 26, 2024. On that date, Jackson tweeted, "SB 342 becomes effective on August 1, and amends the current trigger law that is in effect today." Record Document 58-4 at 82. She attached a graphic to this tweet, and the graphic explained how SB 342 amended previous Louisiana law. See id. This tweet appears to have been posted after Detiege was blocked. As of the filing of this memorandum ruling, Detiege remains blocked, and Jackson testified she would not unblock Detiege without a court order compelling her to do so. See Record Document 50-2 at 88.

6

On February 9, 2023, Detiege filed suit against Jackson, alleging a cause of action under 42 U.S.C. § 1983 for a violation of her First Amendment right to free speech. See Record Document 1. The basis of this claim was her inability to access Jackson's Twitter page. See id. On August 28, 2023, Sherman joined this lawsuit, asserting an identical claim against Jackson. See Record Document 19. Both sides filed a motion for summary judgment, contending judgment in his or her favor is warranted because no genuine dispute of material fact exists, and he or she is entitled to judgment as a matter of law. See Record Documents 50 and 58.

## LAW & ANALYSIS

**I.  Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." Id. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific

7

facts showing the existence of a genuine issue for trial." Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (internal quotation marks and citation omitted); see also Fed. R. Civ. P. 56(c)(1). "The court has no obligation to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." Kim Kool Inc. v. Cobra Trucking LLC, 605 F. Supp. 3d 881, 884 (W.D. La. 2022) (quoting Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994)).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." Joplin v. Bias, 631 F.2d 1235, 1237 (5th Cir. 1980). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." Century Sur. Co. v. Colgate Operating, L.L.C., 116 F.4th 345, 349 (5th Cir. 2024) (quoting Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc., 73 F.4th 322, 327 (5th Cir. 2023)). "[W]hile cross-motions for summary judgment do not automatically indicate the absence of genuine issues of material fact, cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." Petro Harvester Operating Co., L.L.C. v. Keith, 954 F.3d 686, 700 (5th Cir. 2020) (quotation marks omitted).

## II.     42 U.S.C. § 1983.

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives someone "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 only "protects against acts attributable to a State, not those of a private person." Lindke v. Freed,

601 U.S. 187, 194, 144 S. Ct. 756, 764-65 (2024). In Lindke, the Supreme Court specifically considered the question of state action in the realm of social media. See id. at 197-98, 144 S. Ct. at 766-67. The city manager, James Freed ("Freed"), created a Facebook profile, and on this profile, he posted "prolifically (and primarily) about his personal life" and "information related to his job." Id. at 191-92, S. Ct. at 763. Kevin Lindke criticized the city's approach to the pandemic on some of Freed's posts, and Freed ultimately blocked him. See id. at 193, 144 S. Ct. at 763-64. The Supreme Court was thus confronted with "whether a state official engaged in state action or functioned as a private citizen" in these circumstances. Id. at 196, 144 S. Ct. at 765. Ultimately, the Supreme Court held that "a public official's social-media activity constitutes state action under Section 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." Id. at 198, 144 S. Ct. at 766.

For step one, "[a]n act is not attributable to a State unless it is traceable to the State's power or authority. Private action—no matter how 'official' it looks—lacks the necessary lineage." Id. at 198, 144 S. Ct. at 767. This is so because while "[t]he appearance and function of the social-media activity are relevant at the second step, [] they cannot make up for a lack of state authority at the first." Id. Thus, a plaintiff must show that the state official had "actual authority rooted in written law or longstanding custom to speak for the State. That authority must extend to speech of the sort that caused the alleged rights deprivation. If the plaintiff cannot make this threshold showing of authority, he cannot establish state action." Id. at 201, 144 S. Ct. at 768.

Where "an official has authority to speak for the State, [s]he may have the authority to do so on social media even if the law does not make that explicit." Id. at 200, 144 S. Ct. at 768. Further, in some situations, "a grant of authority over particular subject matter may reasonably

9

encompass authority to speak about it officially." Id. at 200, 144 S. Ct. at 768. But the Supreme Court cautioned against relying on "excessively broad job descriptions to conclude that a government employee is authorized to speak for the State." Id. at 201, 144 S. Ct. at 768 (quotation marks omitted). The district court must instead consider "whether making official announcements is *actually* part of the job that the State entrusted the official to do," not "whether making official announcements *could* fit within the job description." Id. at 201, 144 S. Ct. at 768 (emphasis in original).

For step two, the plaintiff must show the state official purported to use the vested state authority. See id. at 201, 144 S. Ct. at 769. "If the public employee does not use h[er] speech in furtherance of h[er] official responsibilities, [s]he is speaking in h[er] own voice." Id. at 201, 144 S. Ct. at 769. When a profile is neither clearly personal or official and instead includes posts of both types, that page may be considered "mixed use." Id. at 202, 144 S. Ct. at 769. Mixed-use profiles require the district court to engage in "a fact-specific undertaking in which the post's content and function are the most important considerations" at step two. Id. at 203, 144 S. Ct. at 769. "[I]t is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts." Id. at 203, 144 S. Ct. at 770. When content and function alone are not enough to settle the issue, the district court may consider additional factors. See id. at 203, 144 S. Ct. at 770. "[F]or example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business." Id. at 203, 144 S. Ct. at 770.

Both parties agree Lindke controls this case. See Record Documents 50-1 at 23 and 58-1 at 30. Where the parties diverge is the application of the Lindke test to these facts.[5] Plaintiffs

---

[5] Additionally, the parties disagree about the interpretation of "state." Jackson asks the Court to consider whether she can speak on behalf of the State of Louisiana and/or the legislative body in which she sits. See Record Document 50 at 25-26. Conversely, Plaintiffs argue "state" refers to a

maintain both prongs of Lindke are satisfied. See Record Document 58-1 at 30-31. For step one, Plaintiffs direct the Court to several sources, discussed *infra*, which they argue establish that Jackson's "authority as a state legislator clearly encompasses communicating with members of the public about matters related to the duties of her office, and specifically her legislation." Id. at 39. Plaintiffs further argue "Jackson's portfolio of authority as a legislator [] includes drafting and voting on legislation." Id. at 38. Therefore, because "Plaintiffs were blocked after criticizing [] Jackson's legislation," her censorship of them fell "squarely within the Senator's bailiwick." Id. at 38. Finally, Plaintiffs assert the context, appearance, and function of Jackson's page and her use of government resources demonstrate that Jackson uses her account in her official capacity. See id. at 40-46.

Conversely, Jackson asserts "[s]tep [o]ne resolves the issue" because "Jackson has no actual authority to speak on behalf of the State on a particular matter in the relevant posts." Record Document 50-1 at 25 (quotation marks omitted). Jackson maintains no written law, custom, or usage grants her authority to speak on the State's behalf. See id. at 25-26. Jackson further asserts Plaintiffs cannot satisfy step two because she did not purport to exercise state authority. See id. at

---

"political system of a *body of people* who are politically organized," Record Document 72 at 6 n. 16 (citing Black's Law Dictionary (12th ed. 2024) (emphasis added)) and that the proper inquiry is thus whether "Jackson speaks as a state senator on behalf of her senatorial office." Id. at 6.
    The Court does not agree the definition of "state" is as narrow as Plaintiffs articulate. In Lindke, the Supreme Court considered whether the city manager had authority to speak on behalf of the city of Port Huron. See e.g., Lindke, 601 U.S. at 199, 144 S. Ct. at 767 ("Importantly, Lindke must show more than that Freed had some authority to communicate with residents on behalf of Port Huron.") (emphasis removed); id. at 200, 144 S. Ct. at 768 ("So a city manager like Freed would be authorized to speak for the city if written law like an ordinance empowered him to make official announcements."). Even Plaintiffs' cited definition of "state" does not support so narrow a reading. Jackson's senatorial office is not, on its own, a body of people who are politically organized; her senatorial office is *part of* a body of people who are politically organized.

26-28. She maintains that, regardless of the classification of her account as either personal or mixed use, "[t]he abortion-law posts . . . simply highlighted existing Louisiana law." Id. at 26-27.

As discussed *supra*, when considering cross-motions for summary judgment, the Court must "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." Century Sur. Co., 116 F.4th at 349. Therefore, the Court will discuss each motion in turn, beginning with Plaintiffs' motion for summary judgment.

### A. Plaintiff's Motion for Summary Judgment.

Plaintiffs bear the initial burden "of informing the district court of the basis for [their] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe[] demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c)). Ultimately, Plaintiff's motion must be denied because Plaintiffs fail to demonstrate that Jackson has "actual authority rooted in written law or longstanding custom to speak for the State" that "extend[s] to speech of the sort that caused the alleged rights deprivation." Lindke, 601 U.S. at 201, 144 S. Ct. at 768.

Plaintiffs argue the "textual authority creating the position, Jackson's own testimony, custom, and usage, and Jackson's actions in censoring Plaintiffs" together demonstrate that "[m]aking announcements about legislative matters and receiving public input is 'actually part of the job' that [] Jackson has been entrusted to do." Record Document 58-1 at 35. While Plaintiffs cite a plethora of sources, the only persuasive sources for purposes of the Court's Lindke analysis are those dealing with Louisiana legislators. To the extent Plaintiffs rely on the customary use of

Twitter by national legislators,[6] those sources do not establish that *Louisiana* legislators customarily use Twitter to speak for the State. Moreover, Plaintiffs also improperly rely on Jackson's use of her Twitter. "[A]ppearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first." Lindke, 601 U.S. at 198, 144 S. Ct. at 766-67. Thus, even if Jackson's Twitter "looks and functions like an outlet" for official legislative announcements, that appearance and function would not establish Jackson had actual authority to use her Twitter in the first place. Id. at 199, 144 S. Ct. at 767. Indeed, Jackson may not "conjure the power of the State through [her] own efforts. [] [T]he presence of state authority must be real, not a mirage." Id. at 199, 144 S. Ct. at 767. Therefore, while the Court reviewed Jackson's deposition, statements she made about using social media, and tweets she posted, the Court has not considered and will not consider those sources for purposes of step one. To do so would directly contravene Lindke.[7]

---

[6] See Williams v. United States, 71 F.3d 502, 507 (5th Cir. 1995) (examining the legislative duties of members of the United States House of Representatives and finding that Members of Congress have a "primary obligation . . . to serve and respond to . . . constituents"); Kat Devlin et al., *For Global Legislators on Twitter, an Engaged Minority Creates Outsize Share of Content*, PEW RESEARCH CENTER (May 18, 2020), https://www.pewresearch.org/global/2020/05/18/for-global-legislators-on-twitter-an-engaged-minority-creates-outsize-share-of-content/ (examining how national legislators use Twitter); Packingham v. North Carolina, 582 U.S. 98, 104-05 (2017) ("[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose."); U.S. HOUSE OF REPRESENTATIVES PRESS GALLERY, *Members' Official X Handles - 118th Congress*, https://pressgallery.house.gov/member-data/members-official-x-handles-118th-congress (last visited Aug. 8, 2025).

[7] To the extent Plaintiffs are attempting to show Jackson's use creates a "custom," such argument is unpersuasive. Even if the Court assumes Plaintiffs' sources demonstrate that *Jackson* has customarily used her Twitter to make announcements and receive input, Jackson's use does not in any way suggest that "prior [senators] have purported to speak on [the State's] behalf and have been recognized to have that authority for so long that [the senator's] power to do so has become 'permanent and well settled.'" Lindke, 601 U.S. at 200, 144 S. Ct. at 768.

With those principles in mind, the Court turns now to Plaintiffs' sources of written law. These sources suggest the State vested Jackson (and other legislators) with authority to propose and vote on legislation. See La. Const. Ann. art. III, § 1; Louisiana Civil Law Treatise, 20 LACIVL § 2.1. The Louisiana Constitution further calls for "a representative and orderly government." See La Const. Ann. pmbl.; La. Const. Ann. art. I; La. Const. Ann. art. III, § 10. But while the Louisiana government is intended to be representative, that does not mean individual legislators have authority to solicit input or make announcements on the State's behalf. Further, legislators are tasked with proposing and voting on legislation, but Plaintiffs' sources do not in any way suggest, either implicitly or explicitly, that "making official announcements [about legislative matters] is *actually* part of the job that the State entrusted the official to do." Lindke, 601 U.S. at 201, 144 S. Ct. at 768 (emphasis in original). In sum, Plaintiffs' sources of written law do not demonstrate that Jackson has authority to speak on the State's behalf.

Plaintiffs likewise fail to demonstrate a longstanding custom or usage. Plaintiffs direct the Court to an online article[8] discussing research on how Louisiana legislators use Twitter. See Record Document 58-1 at 37-38. Even assuming a single news article is enough to establish a longstanding custom or usage, this article does not demonstrate that Louisiana legislators "have purported to speak on [the state's] behalf and have been recognized to have that authority for so long that the [legislators'] power to do so has become 'permanent and well settled.'" Lindke, 601 U.S. at 200, 144 S. Ct. at 768 (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 168, 90 S.Ct. 1598, 1614 (1970)). Notably, the article states that "Louisiana legislators who are on Twitter tend to be younger than less-connected counterparts," suggesting that social media use (and more specifically, Twitter

---

[8] Jack Richards, @lalegis, You Can Tweet That, TOWN TALK (June 10, 2016, 2:16 PM), https://www.thetowntalk.com/story/news/2016/06/10/lalegis-you-can-tweet/85706164/.

use) is a recent development. Richards, *supra* note 8. The article further notes that "[m]ore than 40 percent of House members and 36 percent of senators with Twitter accounts haven't tweeted this year." Id. More importantly, the article does not explain whether people recognize the legislators' profiles as official conduits for speaking on behalf of the State, and it certainly does not indicate any such power is permanent and well settled. See id. Without such evidence, Plaintiffs fail to demonstrate that longstanding custom or usage vests Louisiana legislators with authority to speak on the State's behalf.

For the reasons set forth *supra*, Plaintiffs have not made a threshold showing of authority. Because Plaintiffs "cannot make this threshold showing of authority, [they] cannot establish state action" as required for a Section 1983 action. Lindke, 601 U.S. at 201, 144 S. Ct. at 768. Therefore, Plaintiffs have not established they are entitled to judgment as a matter of law, and their motion must be denied.

## B. Defendant's Motion for Summary Judgment.

Plaintiffs bear the burden of proving their Section 1983 claims by a preponderance of the evidence. See Anderson v. Hall, No. 15-407, 2015 WL 9687837, at *4 (W.D. La. Dec. 4, 2015). "[W]hen the nonmovant has the burden of proof at trial, the moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to the nonmovant, with an allegation that the nonmovant has failed to establish an element essential to that party's case." Austin v. Kroger Texas, L.P., 864 F.3d 326, 335 (5th Cir. 2017). As discussed *supra*, Jackson, the movant, avers Plaintiffs, the non-movants, cannot establish an essential element of their claims. That is, Jackson maintains Plaintiffs cannot satisfy either step one or step two of the Lindke inquiry and thus fail to establish their 42 U.S.C. § 1983 claims. As such, Jackson has met the initial burden for her summary judgment motion, and the burden shifts to Plaintiffs "to produce evidence or

15

designate specific facts showing the existence of a genuine issue for trial." <u>Distribuidora Mari Jose, S.A. de C.V.</u>, 738 F.3d at 706.

For largely the same reasons set forth *supra*, the Court finds Jackson's motion for summary judgment must be granted. In their response, Plaintiffs argue "Jackson's position as a high-ranking legislative official, her own testimony, and the prevailing custom and usage of Twitter by legislators, all support finding that she possesses actual authority to speak on behalf of her office." Record Document 70 at 32. Plaintiffs do not advance any new sources of written law, custom, or usage to support the existence of actual authority, and, as previously discussed, Plaintiffs' cited sources do not establish Jackson had actual authority to speak on the State's behalf. As such, Plaintiffs cannot establish state action, and their Section 1983 action fails. Jackson has successfully demonstrated the lack of a genuine dispute and her entitlement to judgment as a matter of law. Therefore, Jackson's motion must be granted.

## **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Jackson's motion for summary judgment (Record Document 50) is **GRANTED**. All of Plaintiffs' claims filed against Jackson (Record Document 19) are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment (Record Document 58) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to strike (Record Document 67) is **DENIED**.

A judgment consistent with the instant Memorandum Ruling shall be issued herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 15th day of August, 2025.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE